**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

ALLIANCE OF HEALTH CARE
SHARING MINISTRIES,

                Plaintiff,

v.

COLORADO DIVISION OF INSURANCE;
and MICHAEL CONWAY, in his official
capacity as Commissioner of the Colorado
Division of Insurance,

                Defendants.

Case No. _____

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff Alliance of Health Care Sharing Ministries brings this action for declaratory and equitable relief against Defendants, the Colorado Division of Insurance and Michael Conway, in his official capacity as Commissioner of the Colorado Division of Insurance.  Plaintiff challenges a new Colorado law and implementing regulation that target religious organizations that help their members exercise the religious belief that they should contribute voluntarily to each other's financial, spiritual, and emotional medical needs.  In addition to singling out these religious organizations for special adverse treatment, the new law and regulation subject them to unwarranted long-term, continuing monitoring that would entangle the government excessively with religion and undermine the proper autonomy of all religious organizations.  Colorado's regime runs afoul of the First Amendment and sets Colorado apart as an outlier in the nation in its approach to these decades-old organizations.

1

## INTRODUCTION

1.      A new Colorado law and implementing regulation targets religious organizations that help their members exercise the religious belief that they should contribute to each other's medical needs.  Colorado subjects these long-established religious organizations, called health care sharing ministries, to extensive and intrusive reporting requirements regarding (1) those with whom they affiliate and associate, (2) their communications to current and prospective members of the ministry, and (3) their operational, statistical, and financial information, including which members they assist and how they staff their ministry.  These requirements are akin to subjecting a church to comprehensive inquiry and monitoring as to who its congregants are, how it evangelizes, and how it distributes from its collection basket for religious programs for its own members.

2.      Colorado is an outlier with respect to its new law and regulation.  Health care sharing ministries as organized today have existed for decades, and the Christian concept of sharing health care expenses dates to the earliest days of Christianity.  It draws upon Abrahamic traditions, and there also is a Jewish health care sharing ministry and there have been efforts to establish a health care sharing ministry for followers of Islam.  No other state has attempted to subject these indisputably religious organizations to anything remotely similar to the Colorado regime as a condition of merely existing within that particular state.  Nor does Colorado subject similar medical expense sharing organizations or activities to similar reporting and disclosure requirements.

3.      Colorado's unique, misguided approach violates the Constitution in several ways.  Significantly, it violates the Free Exercise rights of ministries to be free from laws that target

religious exercise, that do not treat comparable secular activities similarly to religious activities, and that provide state officials unbridled discretion to exempt their favored organizations. The Supreme Court recently explained that each of those types of laws violate the Constitution: a government acts unlawfully when it "restricts practices because of their religious nature," "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or provides a "mechanism for individualized exemptions" in an official's "sole discretion." *Fulton v. Philadelphia*, 593 U.S. 522, 533–35 (2021).

4. Just as significantly, Colorado's regime violates the autonomy of religious organizations to be free from unwarranted state entanglement in their affairs and from forced disclosure (and thereby potential chilling) of their affiliates and associates. As the Tenth Circuit recently explained, regulatory schemes that require "long-term, continuing monitoring" of religious organizations constitute excessive entanglement with religion in violation of the Establishment Clause's protection of religious autonomy. *Medina v. Catholic Health Initiatives*, 877 F.3d 1213, 1233 (10th Cir. 2017). And of course it is beyond dispute the First Amendment protects the rights of organizations, particularly religious organizations, not to disclose those with whom they associate. *Am. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021).

5. Colorado may enforce this new regime with crushing fines. Without immediate relief, health care sharing ministries are thus forced to choose between their constitutional rights and severe financial penalties. The Constitution protects them from that choice.

## PARTIES

6. Plaintiff Alliance of Health Care Sharing Ministries is a 501(c)(6) trade organization formed to represent the common interests of health care sharing ministry

organizations that are facilitating the sharing of health care needs (financial, emotional, and spiritual) by individuals and families.  The Alliance engages with federal and state regulators, as well as other stakeholders, regarding health care sharing ministries.  Its mission includes protecting the liberty of its member ministries to practice their religious convictions in health care, informing legislators and regulators regarding ministries, and helping ministries navigate legislative and regulatory environments.  The Alliance's members include the majority of the health care sharing ministries that have large, nationwide membership and that have been certified by the U.S. Department of Health and Human Services Centers for Medicare and Medicaid Services as meeting the federal definition of "health care sharing ministry" under the Affordable Care Act. The Alliance's members include Samaritan Ministries.

7.      Plaintiff has associational standing to bring this suit on behalf of its members who are adversely affected by the challenged statute and regulations. Those members would have standing to sue in their own right, the interests at issue are germane to the Alliance's mission, and the participation of an individual member is not required.

8.      Plaintiff has member ministries, including Samaritan Ministries, who have members in Colorado that participate in the ministries' health care sharing programs and incur medical expenses in Colorado that are shared among ministries' members.  These ministries are required to comply with the Colorado statute and regulation in order to operate in Colorado.  These ministries not only will face intrusive and extensive burdens on their religious beliefs from the operation of the Colorado statute and regulation, but also significant compliance costs for compiling and producing the required information.  These harms are directly traceable to the

statute and regulations, which are unique among U.S. jurisdictions, and would be remedied by an order enjoining the statute and regulation from taking effect.

9.    Defendant Colorado Division of Insurance ("Division") is a state agency responsible for administering the Colorado statute targeting health care sharing ministries.  The Division also promulgated regulations implementing that statute.

10.    Defendant Michael Conway, sued in in his official capacity, is the Commissioner of the Colorado Division of Insurance.

## JURISDICTION AND VENUE

11.    This action arises under the Constitution and the laws of the United States. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

12.    The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

13.    Venue lies in this district under 28 U.S.C. § 1391(b)(1) and (2).

## FACTUAL ALLEGATIONS

I.    **Health Care Sharing Ministries**

A.    **Origin and Overview**

14.    Although the term "health care sharing ministry" ("HCSM") developed in the 20th century, the concept of health care sharing ministries is hundreds of years old among Christians, drawing on Abrahamic traditions.  Health care sharing ministries are the latest nomenclature for the mutual aid plans established by various Christian denominations, particularly Mennonites, Amish, and Anabaptists, to implement their understanding of the biblical admonition to "[b]ear ye

one another's burdens."  *Bethel Conserv. Mennonite Church v. Comm'r*, 746 F.2d 388, 392 (7th Cir. 1984) (quoting Galatians 6:2).

15.     This type of ministry is common among Christian traditions.  There are more than 100 health care sharing ministries in the United States, with total membership of about one million members.  There also is a Jewish health care sharing ministry, and there have been efforts to establish a health care sharing ministry for followers of Islam.

16.     Although these ministries vary in details, they share the common feature that their members exercise their religious beliefs to share in each other's health burdens spiritually through prayer, emotionally through fellowship and communications, and financially through monetary support.

**B.      Health Care Sharing Ministries in Practice**

17.     Samaritan Ministries exemplifies this reality.  Samaritan was formed in 1991 in Illinois and began a nationwide ministry in 1994.  Samaritan declares that its "purpose is to glorify God by growing and equipping disciples of Jesus Christ to love God with all their heart, soul, mind and strength, and to love and care for their neighbor as themselves."  Bylaws (citing Matthew 28:18–20, among others).  Its "mission is to redeem health care by helping the Body of Christ love one another through sharing each other's health care burdens while experiencing authentic Biblical community."  *Id.* (citing Galatians 6:2, among others).

18.     To that end, "every month, members of Samaritan Ministries give to other members who have medical needs.  Members pray and send their monthly share, along with notes of encouragement, directly to the member in need.  This allows members to minister to all aspects of the need: spiritual, emotional, physical, and financial."  But Samaritan does not guarantee

reimbursement of any medical expense; rather, it receives information about medical needs and then asks fellow members to send funds, notes, and prayers those members in need, as long as those medical needs are consistent with Samaritan's ethical norms.  It adjusts what it asks of members, depending on member needs.  It also accounts for the struggles of particular members at times of their lives by reducing what it asks of them, which was a common phenomenon during the pandemic.  These decisions are made in accordance with the principle that members must "carry their own load."  *Id.* (citing Galatians 6:5).

19.     To become a member of Samaritan, one must "be a Christian living by biblical principles" as certified by a local church leader.  Members also must affirm Samaritan's statement of faith, which contains numerous doctrinal positions, and attend church services at least three weeks per month.  And they must agree to resolve disputes amongst members, consistent with biblical principles.  *See* Application (citing 1 Corinthians 6:1-8).

20.     Samaritan is governed along the lines of a congregational church.  Its members vote to control the governing Board.  Indeed, members control by that vote a supermajority of the Board, that is, six of nine seats.  The Board votes on all significant matters, including, importantly, changes in requested sharing amounts.

21.     Samaritan's internal operations also closely resemble that of a church.  Staff must be members and must affirm a statement of faith.  Staff open meetings with prayer, are invited to prayer sessions with staff chaplains, and engage in communal fasting, prayer, and worship.

22.     Samaritan also serves as a community for association and expression.  Through newsletters, websites, a virtual forum, and local events, as well as member-to-member communications, Samaritan's members exhort each other on a host of religious topics, ranging

7

from the theological to the practical.  For example, newsletters contain discussions of "missional medicine," spotlights on member couples "spreading the Gospel," and international and prison ministry issues.

23.     Numerous other ministries function as religious organizations in a similar way as Samaritan.  For example, Medi-Share members agree to "live by biblical standards," that "believers are to bear one another's burdens," and "attend and actively support a fellowship of believers regularly."  Medi-Share Guidelines (citing, among others, Matthew 2:19).  OneShare Health, similarly, declares that its "Mission as a Health Care Sharing Ministry is to help Christians share each other's medical expenses by providing affordable sharing programs which align with their beliefs. With origins in the Anabaptist faith and a chaplain on staff, we welcome and unite those who agree with our core biblical principles and Statement of Beliefs relating to life, health, and caring for others."  OneShare Health, Who We Are (May 8, 2024).  Liberty HealthShare's Sharing Guidelines require that its members "acknowledge that Jesus Christ is [their] Salvation," "Demonstrate the Fruits of the Spirit," "Honor the biblical teaching to 'share one another's burdens,'" and "Participate regularly in worship and prayer."  Liberty HealthShare 2023 Sharing Guidelines.

### C.     Historical Interaction with Governments

24.     Ministries like Samaritan, Medi-Share, OneShare Health, and Liberty HealthShare enjoy recognition by the federal government.  The Affordable Care Act exempts members of health care sharing ministries from various of its requirements.  The U.S. Department of Health and Human Services has certified that at least 107 of these ministries satisfy that definition.  The IRS

also treats ministries as tax-exempt 501(c)(3) organizations and several file paperwork regarding that status.

25.      A supermajority of states do not intrude upon the operations of health care sharing ministries.  Thirty-three states have enacted safe harbor laws clarifying that health care sharing ministries are exempt from the state insurance code and may operate subject only to the general legal requirements applicable to charities.  An additional four states allow health care sharing ministries to operate exempt from the state insurance code by providing an exemption for their respective residents from those states' insurance mandates.  A few states, such as New Mexico, have challenged some ministries (wrongly, and subject to litigation) as constituting insurance subject to the insurance code.

26.      That widespread state treatment of health care sharing ministries is consistent with state regulatory treatment of similar medical expense sharing organizations and practices.  States rarely if ever subject similar expense sharing arrangements to regulation, such as but not limited to, direct primary care arrangements, medical discount cards, crowdfunding, student health clinics at universities (where students pay a fee for unlimited access), charities that pay medical bills, or fully-insured out-of-state employer health plans with in-state enrollees.

## II.      Colorado's Outlier Approach

27.      Colorado, however, has taken a different approach, motivated by bias against health care sharing ministries, which renders it unique in the entire nation.  That is, Colorado has set out to regulate health care sharing ministries, in contrast to similar health financing arrangements, because they are health care sharing ministries and maintain certain religious beliefs.

A.      **Colorado's Singular Focus on Health Care Sharing Ministries**

28.     Colorado first evidenced its singular focus on the religious aspects of health care sharing ministries in a "consumer advisory" on December 11, 2020.  *See* Consumer Advisory: Division of Insurance Cautions Coloradans on the Limitations of Health Care Sharing Programs (Dec. 11, 2020), https://perma.cc/FRJ9-A3CS.

29.      In the "consumer advisory," the Division stated that members of the public should be wary of a "health care sharing program or ministry," because, among other reasons "members may also be subject to religious or moral restrictions from the sharing ministry."  *Id.*

30.     Colorado also evidenced its singular focus on health care sharing ministries in the legislative process.  For several years both before and after the Division's "consumer advisory" warning about the "religious or moral" elements of a "ministry," a state legislator introduced a bill targeting for regulation all entities constituting a "health care sharing ministry."  *See, e.g.*, House Bill 20-1008; House Bill 21-1135.

31.     Several years later, and notwithstanding separate public comments regarding the focus of the bill sponsor on health care sharing ministries, the legislature attempted to sanitize those efforts by removing all references to a "ministry," but retaining the same essential regulatory scheme.  House Bill 22-1269; *see* Hannah Metzger, Colorado Bill Aims to Create Reporting Requirements for Health Care Sharing Ministries, Colorado Politics (Mar. 11, 2022), https://perma.cc/A4K4-4Q8F (recognizing the similarities between House Bill 22-1269 and prior bills).

32.     That bill, after some revisions, became law on June 8, 2022.  Laws 2022, Ch. 444 (H.B. 22-1269) (June 8, 2022) (codified at Colo. Rev. Stat. § 10-16-107.4).

**B.     Colorado's Health Care Sharing Ministries Law:  Intrusive and Extensive Regulation with Unbridled Discretion**

33.     The Colorado statute imposes extensive and intrusive reporting requirements on health care sharing ministries in order to exist in Colorado.  The statute requires reporting of several types of information:  statistical and financial, affiliations, and communications.

34.     First, the statute requires reporting of mounds of statistical and financial information.  Across over a dozen different statutory requirements, the statute requires reporting of comprehensive information regarding the number of members in the ministry, the amounts contributed to each other, the amounts requested to be shared, and actually shared, the amounts members of the ministry pay to health care providers, and the internal structure of the ministry. Colo. Rev. Stat. § 10-16-107.4(1)(a)(I)–(III), (V)–(XII), (XVI), (XIX)–(XX).  The reporting requirements provide a detailed picture of the ministry's finances.  To put it another way, the reporting requirements ask the ministries how much their members are contributing to each other. This is akin to asking a church in a painstakingly detailed fashion about its collection basket and how it spends that money.

35.     Compounding that burden, many of the terms in these reporting requirements are imprecise or nonsensical.  For example, the statute requires reporting of the percentage of revenues retained for "administrative expenses," but there is no standard definition of that term in the statute. Similarly, the statute requires reporting of dollar amounts of "requests for reimbursement of health care costs or services," but does not specify whether those amounts should be the "sticker price" providers put on an invoice or the reduced amount they eventually accept.  The statute also requires reporting of "reimbursement request denials," but provides no definition as to whether requests that are outside of ministry guidelines constitute a "denial."

36.     Second, the statute requires reporting of detailed information regarding the ministry's affiliations.  It requires reporting of "any contracts the [ministry] has entered into with providers," that is, all medical practitioners with which it may do business.   *Id.* § 10-16-107.4(1)(a)(IV).  It also requires reporting of "any third parties that are associated with or assist" the ministry "in offering or enrolling participants" in the ministry" and a "detailed accounting" of amounts "paid to a third party" for "operating, managing, or administering a plan or arrangement." *Id.* § 10-16-107.4(1)(a)(XV). This is akin to asking a church about how it performs its charitable endeavors, how it evangelizes, and who it associates with in doing so.

37.     Finally, the statute requires submission of the ministry's speech.  It asks for "any member and potential member communications "promoting" the ministry, including all "descriptions and other materials" that explain the ministry's sharing programs.  *Id.* § 10-16-107.4(1)(a)(XVII).  This is akin to asking a church about the speech it uses to evangelize and recruit new adherents or explain its doctrines.

38.     This summary is a concise distillation and categorization of the statute's extensive requirements.  Here is precisely everything that the statute requires the ministries to disclose:

> (I) The total number of individuals and households that participated in the plan or arrangement in this state in the immediately preceding calendar year;
>
> (II) The total number of employer groups that participated in the plan or arrangement in this state in the immediately preceding calendar year, specifying the total number of participating individuals in each participating employer group;
>
> (III) If the person offers a plan or arrangement in other states, the total number of participants in the plan or arrangement nationally;

(IV) Any contracts the person has entered into with providers in this state that provide health-care services to plan or arrangement participants;

(V) The total amount of fees, dues, or other payments collected by the person in the immediately preceding calendar year from individuals, employer groups, or others who participated in the plan or arrangement in this state, specifying the percentage of fees, dues, or other payments retained by the person for administrative expenses;

(VI) The total dollar amount of requests for reimbursement of health-care costs or services submitted in this state in the immediately preceding calendar year by participants in the plan or arrangement or providers that provided health-care services to plan or arrangement participants;

(VII) The total dollar amount of requests for reimbursement of health-care costs or services that were submitted in this state and were determined to qualify for reimbursement under the plan or arrangement in the immediately preceding calendar year;

(VIII) The total amount of payments made to providers in this state in the immediately preceding calendar year for health-care services provided to or received by a plan or arrangement participant;

(IX) The total amount of reimbursements made to plan or arrangement participants in this state in the immediately preceding calendar year for health-care services provided to or received by a plan or arrangement participant;

(X) The total number of requests for reimbursement of health-care costs or services submitted in this state in the immediately preceding calendar year that were denied, expressed as a percentage of total reimbursement requests submitted in that calendar year, and the total number of reimbursement request denials that were appealed;

(XI) The total amount of health-care expenses submitted in this state by plan or arrangement participants or providers in the immediately preceding calendar year that qualify for reimbursement pursuant to the plan or arrangement criteria but that, as of the end of that calendar year, have not been reimbursed, excluding any amounts that the plan or arrangement participants incurring the health-care

costs must pay before receiving reimbursement under the plan or arrangement;

(XII) The estimated number of plan or arrangement participants the person is anticipating in this state in the next calendar year, specifying the estimated number of individuals, households, employer groups, and employees;

(XIII) The specific counties in this state in which the person:

(A) Offered a plan or arrangement in the immediately preceding calendar year; and

(B) Intends to offer a plan or arrangement in the next calendar year;

(XIV) Other states in which the person offers a plan or arrangement;

(XV) A list of any third parties, other than a producer, that are associated with or assist the person in offering or enrolling participants in this state in the plan or arrangement, copies of any training materials provided to a third party, and a detailed accounting of any commissions or other fees or remuneration paid to a third party in the immediately preceding calendar year for:

(A) Marketing, promoting, or enrolling participants in a plan or arrangement offered by the person in this state; or

(B) Operating, managing, or administering a plan or arrangement offered by the person in this state;

(XVI) The total number of producers that are associated with or assist the person in offering or enrolling participants in this state in the plan or arrangement, the total number of participants enrolled in the plan or arrangement through a producer, copies of any training materials provided to a producer, and a detailed accounting of any commissions or other fees or remuneration paid to a producer in the immediately preceding calendar year for marketing, promoting, or enrolling participants in a plan or arrangement offered by the person in this state;

(XVII) Copies of any consumer-facing and marketing materials used in this state in promoting the person's plan or arrangement, including plan or arrangement and benefit descriptions and other materials that explain the plan or arrangement;

> (XVIII) The name, mailing address, e-mail address, and telephone number of an individual serving as a contact person for the person in this state;
>
> (XIX) A list of any parent companies, subsidiaries, and other names that the person has operated under at any time within the immediately preceding five calendar years; and
>
> (XX) An organizational chart for the person and a list of the officers and directors of the person[.]

Colo. Rev. Stat. § 10-16-107.4(1)(a)(I)–(XX).

39.    All of the reported information is subject to public review.  Indeed, the Division is required by statute to prepare a written report summarizing the reported information and publish on its website underlying information, subject to the requirement that it be "accurate and evidence-based." *Id.* § 10-16-107.4(3).  And the raw disclosures from the ministries are available to anyone who asks for them under a Colorado Open Records Act request.

40.    The statute also, significantly, empowers the Division to enforce its restrictions and to fine or prohibit the operation of ministries for violations.  *Id.* § 10-16-107.4(2).  Those fines can amount to five thousand dollars a day even for merely incomplete submissions, leading to the potential for fines over technical, non-substantive violations.

41.    The statute, finally, empowers the Division to adopt implementing rules.  *Id.* § 10-16-107.4(4).

42.    The statute is selective in its application to similar activities.  It explicitly states that its provisions do not apply to "direct primary care agreements."  (It, of course, does not enumerate comprehensively the numerous other activities that are similar to the activities of health care sharing ministries but that it does not cover.)  The statute also explicitly states that its provisions

15

do not apply to "other consumer payment arrangements identified by the commissioner by rule." *Id.* § 10-16-107.4(5). That provision provides unbridled discretion to the Division to exempt organizations along the lines of the ministries.

### C.    Colorado's Implementing Regulations

43.    Shortly after the enactment of the statute, the Division promulgated emergency interim regulations. *See* Emergency Regulation 22-E-20. After accepting public comments on those regulations, including that the interim regulations imposed significant costs in excess of their benefits, the Division promulgated final regulations effective April 30, 2024. *See* Regulation 4-10-01, available at https://doi.colorado.gov/health-care-sharing-plans-or-arrangements.

44.    The final regulations impose extensive and intrusive reporting obligations that flow from the statutory requirements. The regulation defines several key terms. For example, it clarifies that "third party" means "contractors that are associated with or assist the plan or arrangement in offering or enrolling Colorado residents as participants" in the ministry. *Id.* Section 4(M). That is, ministries must report any entity that helps share medical expenses. The regulation also clarifies that "administrative expenses" includes "staff salaries," "marketing, outreach, and enrollment efforts." *Id.* Section 4(A). That is, ministries must report how much they spend on ministers and religious communications and outreach to new members.

45.    Significantly, the regulation also confirms that it applies selectively. It defines "health care sharing plan" to mean "any organization that offers or markets products to facilitate payment or reimbursement of health care costs or services." *Id.* Section 4(G). But it immediately exempts not only the statutorily exempted "direct primary care agreements," but also "consumer

payment plans offered directly between a provider and patient" and "crowdfunded sources." *Id.* Section 4(G).

46.     The regulatory burden imposed by the statute and regulations is not only extensive and intrusive, but also costly.  Health care sharing ministries must spend significant resources compiling state-specific information, which they do not generally collect or assemble, particularly at this level of detail.  Member ministries must divert staff time and funds away from the core purpose of the ministries—sharing in members' health care expenses—and towards compliance with the statute and regulations.  This includes employee time to train employees on the regime, gather the required data, prepare reports, verify their accuracy, ensure legal compliance, and submit the reports and other materials to Colorado.

47.     The final regulation requires the ministries to compile, diligence, and then submit to the Division a spreadsheet with the following information:[1]

| |
|---|
| A. Product name<br><br>(list out all products your organization offers in Colorado) |
| B. Number of Colorado residents that participated in this product in the reporting year<br>(Individuals) |
| C. Number of Coloradan HOUSEHOLDS that participated in the product in this reporting year |
| D. The total number of employer groups in Colorado that facilitate all or some of their employee participants' monthly share contributions |

---

[1] All emphasis is in original.  These required disclosures have been transposed vertically and are listed in a table for convenience, but they can be accessed in their native format at: docs.google.com/spreadsheets/d/1B0yM0Oyhj0gNaQk9YDsTTM4udHCVfyfcZDNKnApJWVs/

| |
|---|
| E. For each employer group included in element D, list out how many individual Colorado participants were included<br><br>(separate answers by commas) |
| F. Total number of participants in the product NATIONALLY? |
| G. Number of contracts entered into with health care service providers providing services for Colorado participants for this product. This includes contractors that provide telehealth services for participants |
| H. Total amount of fees, dues, shares, contributions, or other payments **<u>collected</u>** from individuals, Colorado employer groups, or others who participated in the product<br>($) |
| I. The percentage of fees, dues, shares, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for <u>administrative expenses</u><br>(%) |
| J. The percentage of fees, dues, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for <u>program expenses</u><br>(%) |
| K.  Total dollar amount of health-care costs or services that were incurred by the participant and <u>submitted</u> by or on behalf of the participant for sharing<br>($) |
| L. Total dollar amount of requests for sharing of Colorado participants' health-care costs or services that qualified for sharing excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines<br>($) |
| M.  Total dollar amount of payments made to <u>providers </u>for Colorado participants' health care costs or services<br>($) |

| |
|---|
| N. Total dollar amount of sharing requests facilitated or provided to Colorado <u>participants</u> for health care costs or services<br>($) |
| O. Total number of requests by or on behalf of the Colorado participants' for sharing of healthcare costs or services incurred by the participant<br>(Number) |
| P. Total number of share requests, for Colorado participants, that were denied (not shared) because they were not eligible for sharing according to the organization's guidelines<br>(Number) |
| Q. Total number of **<u>appeals</u>** of denied sharing requests for Colorado participants' incurred health-care costs or services<br>(Number) |
| R. Total number of  appeals requests that were later approved for sharing for Colorado participants' incurred health-care costs or services<br>(Number) |
| S. Percentage of total number of requests denied compared to the total number of Colorado participants share requests submitted |
| T. Percentage of total number of requests denied compared to the total number of appeals for sharing that were "denied" (not shared) for Colorado participants |
| U. Total amount of **Colorado** participants' health-care costs or services submitted in the reporting period that qualify for sharing pursuant to the plan/arrangement's criteria but that were not shared or paid by the last day of the reporting year, excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines<br>($) |

| |
|---|
| V. Estimated number of individual plan/arrangement participants anticipated in Colorado in the current calendar year |
| W. Estimated number of households plan/arrangement participants anticipated in the current calendar year |
| X. Estimated number of employer groups in Colorado that facilitate all or some of their employee participants' monthly share contributions in the current calendar year |
| Y. Estimated total number of individual Colorado participants associated with the employers in element X in the current calendar year |
| Z. The total number of producers that are associated with or assist in offering or enrolling participants in Colorado in the product<br>(number of **producers**) |
| AA. Of the number of Colorado participants in the product how many were enrolled through a producer<br>(number of **participants**) |

Updated Health Care Sharing Plan Reporting template for regulation 4-10-01, Sheet 2 (emphasis in original).

48.     But the required disclosures do not stop there.  The Division also requires the ministries to complete the following fields:

- Parent companies, subsidiaries, and other names that your organization has operated under at any time with the immediately preceding 5 calendar years:

- Provide your Organization's website

- Provide any additional website(s) your organization uses to communicate marketing materials including social media sites

- Additional context you'd like to provide the Division about this product or any of the data submitted on this tab? Possibly [sic] data to include could be the total dollar amount of discounts

20

negotiated for Colorado participants.  If any Colorado data were provided on a pro rata basis please note that here and which data elements (e.g. B, G-J, M) are based off of national numbers

- Name of third party - provide the "doing business as" name of each applicable third-party (list out separately)

- Total commission, fees, or remuneration paid in the previous calendar year for: **marketing, promoting, or enrolling participants in a HCSPA product to Colorado participants**

- Total commission, fees, or remuneration paid in the previous calendar year for: **operating, managing, or administering a product offered by the HCSPA**

- **Total number of producers** that are associated with or assist in offering or enrolling participants in Colorado (Aggregate value)

- **Total commission, fees, or remuneration paid** in the previous calendar year **to producers** for: marketing, promoting, or enrolling Colorado participants in a plan or arrangement (Aggregate value)

- List out the Colorado counties where a plan/arrangement was offered in **2023**

- List out the Colorado counties where a plan/arrangement is **intended** to be offered in **2024**

- List out the other states (i.e., states other than Colorado) in which your organization offered a plan or arrangement was in **2023** One row per state

- Please describe any appeals processes that your organization's uses when a participant contests a reimbursement, requested share, or payment denial

*Id.* Sheet 2–3 (all emphasis in original).  Although not all of these requirements are constitutionally problematic, there can be no doubt of their burden.

### D.    Colorado's Report

49.    The harms of this regulatory regime are confirmed and exacerbated by the Division's first public report.  Contrary to the statutory requirement that it produce an accurate

report, the Division reported *wildly misleading* information.  *See* Colorado Division of Insurance, Health Care Sharing Plans and Arrangements in Colorado (Apr. 1, 2023).

50.     The report purports to state the aggregate dollar amount of health care costs submitted and to compare that number to the amount paid, thereby suggesting that the ministries fail to facilitate their members sharing medical expenses with one-another.  But the aggregate dollar amount of health care costs submitted consists primarily of the "sticker price" that providers charge (and which other health care entities involved in financing medical bills, such as insurance companies or even cash-pay patients, almost never pay).

51.     This error was replicated in news coverage of Colorado's report, without any correction by Colorado.  *See* Allison Bell, Think Adviser https://www.thinkadvisor.com/2023/05/16/what-colorado-data-tells-us-about-the-wild-west-of-health-care-cost-sharing-ministries/.

52.     The Division's report, like its initial consumer advisory, also focused on the ministries' policy not to facilitate payment of medical expenses inconsistent with their religious beliefs.

53.     The Division spoke publicly about this report to CBS News, expressing "concern[]" that "1 in 4 Coloradans purchasing health care coverage on their own" choose health care sharing ministries, as opposed to an ACA-based plan.  *See* Markian Hawryluk, At Least 1.7 Million Americans Use Health Care Sharing Plans, Despite Lack of Protections, CBS News (June 13, 2023), https://perma.cc/L2GA-PJR7.  (That statistic also is likely incorrect, because Colorado asks for the number of members in particular HCSMs but does not ask for, and has not undertaken, any effort to de-duplicate members who participate in multiple programs for a particular HCSM.)

54.     A few months later, Commissioner Conway reiterated his "very vocal" concerns with health care sharing ministries and in particular his concern that health care sharing ministries do not facilitate the sharing of all the medical expenses that are required to be covered by an Affordable Care Act insurance plan.  Of course, the reason the ministries decline to facilitate the sharing of certain expenses is because those expenses are incurred for reasons that violate their religious beliefs.

## CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I: Free Exercise Clause
### Not Generally Applicable

55.     This count incorporates all preceding paragraphs by reference.

56.     "[L]aws burdening religious practice must be of general applicability." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993).  A law may fail general applicability in at least two ways.  *Fulton*, 593 U.S. at 533–34.

57.     First, a law fails general applicability if it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.*  The comparability analysis "is concerned with the risks various activities pose," not the "reasons why" people engage in those activities.  *Id*.

58.     Plaintiff's members exercise their religious beliefs through sharing medical expenses.  Health care sharing ministries exist because their members believe that their religion commands them to bear each other's burdens.

59.     Colorado has not asserted in its legislation a specific interest in regulating health care sharing ministries.  To the extent that interest consists of the Division's general concern in consumer protection with respect to the sharing and payment of medical expenses, *see* https://doi.colorado.gov/, there are numerous comparable activities that Colorado does not regulate, including but not limited to direct primary care arrangements, medical discount cards, crowdfunding, student health clinics at universities (where students pay a fee for unlimited access), charities that pay medical bills, or fully-insured out-of-state employer health plans with Colorado enrollees.

60.     Second, a law "is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions."  *Fulton*, 593 U.S. at 533 (alteration in original) (internal quotation marks omitted).  As the Supreme Court explained, "[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude."  *Id.* (alteration in original).

61.     Here, the statute empowers the Division to exempt "other consumer payment arrangements identified by the commissioner by rule."  Colo. Rev. Stat. § 10-16-107.4(4).  The Division has exercised that exemptive authority in its final regulation.

62.     Colorado's regulatory regime thus triggers strict scrutiny.  Colorado has no compelling interest in its regulatory regime, nor has it selected the least restrictive means to further any government interest.  Health care sharing ministries are already regulated in Colorado by the Attorney General, who has jurisdiction over all charities and other non-insurance entities and

whose office is tasked with balancing constitutional religious liberty, free speech, and free association interests with consumer protection interests.

63.     Plaintiff's members have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

## COUNT II
### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I: Free Exercise Clause
### Not Neutral

64.     This count incorporates all preceding paragraphs by reference.

65.     The government is "obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of [] religious beliefs." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018).

66.      "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533. Laws are not neutral when they accomplish a "religious gerrymander." *Lukumi*, 508 U.S. at 535. A religious gerrymander occurs when "the burden of the [law], in practical terms, falls on [religious] adherents but almost no others." *Id.* at 536. A law is also not neutral when "the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body" demonstrate animus toward religion. *Masterpiece*, 584 U.S. at 639. When "'official expressions of hostility' to religion accompany laws or policies burdening religious exercise," courts must "'set aside' such policies without further inquiry." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022) (quoting *Masterpiece*, 584 U.S. at 639).

67.     Colorado's regulatory regime is not neutral with respect to religion. The Division's statements, the legislative history, the exemptions for similar secular conduct, and the manner of

implementing the statute indicate that defendants have proceeded in a manner intolerant of religious beliefs. The regulatory regime thus "violate[s] the State's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint." *Masterpiece*, 584 U.S. at 638.

68.     Although strict scrutiny is not applicable to a non-neutral law, Defendants could not satisfy strict scrutiny in any event because they lack a compelling interest and the law is not narrowly tailored.

69.     Plaintiff's members have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

**COUNT III**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Establishment Clause**
**Religious Autonomy**

70.     This count incorporates all preceding paragraphs by reference.

71.     The government may not subject religious organizations to "long-term, continuing monitoring" without satisfying strict scrutiny. *Medina*, 877 F.3d at 1233. That is because the First Amendment protects against the government excessively entangling itself with religious organizations. *Id.* In order to function, religious organizations must have breathing space consistent with their autonomy. *See id.* That means that the government may not subject their finances and operations to "pervasive monitoring." *Id.*

72.     The Colorado regime subjects health care sharing ministries to extensive and intrusive monitoring of finances and operations. It requests detailed financial and operational metrics that are akin to asking a church how it spends funds from its collection baskets on charitable giving.

73.     Colorado's regulatory regime thus triggers strict scrutiny.   Colorado has no compelling interest in its regulatory regime, nor has it selected the least restrictive means to further any government interest.

74.     Plaintiff's members have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

**COUNT IV**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Free Association**
**Compelled Disclosure of Affiliation**

75.     This count incorporates all preceding paragraphs by reference.

76.     The Supreme Court has "'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others.'" *Bonta*, 594 U.S. at 606) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). "Protected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'" *Id.* (quoting *Roberts*, 468 U.S. at 622). It is "hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Id.* (alteration in original). Such disclosures are subject to "exacting scrutiny." *Id.* at 607.

77.     The Colorado regime requires the disclosure of numerous entities that associate with health care sharing ministries. That disclosure has the potential to chill entities from affiliating with the ministries.

78.     Colorado cannot satisfy exacting scrutiny, because there is no substantial relation between the disclosure requirement and a sufficiently important governmental interest.  Colorado has not advanced such an interest; to the extent it relies on a general interest in consumer protection, that does not match the burdensome disclosure regime it has enacted.  There is no substantial relation between that interest and the requirements.  In any event, the requirements are not narrowly tailored.

79.     Plaintiff's members have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

### COUNT V
### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I: Free Speech Clause
### Compelled Speech

80.     This count incorporates all preceding paragraphs by reference.

81.     "The right to speak and the right to refrain from speaking are complementary components of the broader concept of individual freedom of mind" protected by the First Amendment.  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (internal quotation marks omitted). Any attempt by the government either to restrict speech or compel individuals to express certain views is subject to strict scrutiny.  The general rule "that the speaker has the right to tailor the speech[ ] applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid."  *Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

82.     The Colorado regime, by requiring reporting of information that Colorado posts publicly, compels the ministries to speak about their internal operations. In addition, by requiring submission of ministry communications, it chills protected speech.

28

83.    Defendants cannot satisfy strict or exacting scrutiny for these speech restrictions or this compelled speech because they lack a compelling interest and the law is not narrowly tailored.

84.    Plaintiff's members have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

a.    Declare that Colorado's health care sharing ministry law and regulation violate the Free Exercise Clause of the First Amendment to the United States Constitution because they are not neutral or generally applicable;

b.    Declare that Colorado's health care sharing ministry law and regulation violate the Establishment Clause of the First Amendment to the United States Constitution by intruding on the autonomy of religious organizations;

c.    Declare that Colorado's health care sharing ministry law and regulation violate the Freedom of Association of the First Amendment to the United States Constitution by compelling identification of affiliates and associates;

d.    Declare that Colorado's health care sharing ministry law and regulation violate the Free Speech Clause of the First Amendment to the United States Constitution by restricting, chilling, and compelling speech;

e.    Declare that Colorado's health care sharing ministry law and regulation are unconstitutional on their face and as applied to Plaintiff and its current and future members;

f.      Issue a preliminary injunction and permanent injunction prohibiting Defendants, their agents and employees, and all those acting in concert with them, from enforcing Colorado's health care sharing ministry law and regulation against Plaintiff, its current and future members, and all those acting in concert with them;

g.      Award nominal damages in the amount of $1.00 against Defendants;

h.      Award Plaintiff reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

i.      Award such other relief as the Court may deem equitable, just, and proper.

**Jury Demand**

Plaintiff demands a trial by jury of all issues so triable.


Dated: May 16, 2024                          Respectfully submitted,

                                             /s/ *Michael F. Murray*
                                             Michael F. Murray
                                             Paul Hastings LLP
                                             2050 M Street, NW
                                             Washington, D.C. 20036
                                             (202) 551-1730

                                             William E. Mahoney
                                             Paul Hastings LLP
                                             600 Travis Street
                                             Fifty-Eighth Floor
                                             Houston, Texas 77002
                                             (713) 860-7304