**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

ALLIANCE OF HEALTH CARE
SHARING MINISTRIES,

               Plaintiffs,

v.

COLORADO DIVISION OF INSURANCE;
and MICHAEL CONWAY, in his official
capacity as Commissioner of the Colorado
Division of Insurance,

               Defendants.

Case No. 1:24-CV-01386

---

**<u>PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

Michael F. Murray
Paul Hastings LLP
2050 M Street, NW
Washington, D.C. 20036
(202) 551-1730
michaelmurray@paulhastings.com

William E. Mahoney
Paul Hastings LLP
600 Travis Street
Fifty-Eighth Floor
Houston, Texas 77002
(713) 860-7304
williammahoney@paulhastings.com

## TABLE OF CONTENTS

Table of Contents ................................................................................................................. i

Table of Authorities ............................................................................................................ ii

Introduction ........................................................................................................................ 1

Background .......................................................................................................................... 3

    I.    Plaintiff Alliance of Health Care Sharing Ministries ............................................. 3

    II.    Colorado Regime ................................................................................................... 5

Legal Standard .................................................................................................................. 15

Argument .......................................................................................................................... 16

    I.    Plaintiff is likely to succeed on the merits. ......................................................... 16

        A.    Colorado's regime violates the Free Exercise Clause. ................................. 16

        B.    Colorado's regime violates the Establishment Clause. ............................... 21

        C.    Colorado's regime violates the Freedom of Association ............................ 23

        D.    Colorado's regime violates the Free Speech Clause. .................................. 26

        E.    Colorado's regime does not survive strict scrutiny. ................................... 27

    II.    Plaintiff has established irreparable harm, and the balance of the equities and the public interest favor an injunction. ................................................................................... 29

        A.    Plaintiff has established irreparable harm because this case involves the loss of First Amendment freedoms and irrecoverable compliance costs. ................................. 29

        B.    Plaintiff has established that the balance of the equities and the public interest favor a preliminary injunction because of the constitutional rights at stake. ................................. 29

Conclusion ........................................................................................................................ 30

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) ........................................................................ 6

*Aguilar v. Felton*, 473 U.S. 402 (1985) ..................................................................................... 22

*Am. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ........................................... 3, 23, 24, 25

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) ............................................................ 27

*Bates v. City of Little Rock*, 361 U.S. 516 (1960) ....................................................................... 25

*Bethel Conserv. Mennonite Church v. Comm'r*, 746 F.2d 388 (7th Cir. 1984) .............................. 1

*Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011) .................................................................... 28

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980) ........................... 27

*Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742 (10th Cir. 2010) .................................... 30

*Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*,
    2 F.3d 1514 (11th Cir. 1993) ............................................................................................. 22, 23

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ...... 17, 19, 20, 28

*Citizens United v. Gessler*, 773 F.3d 200 (10th Cir. 2014) .......................................................... 29

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ........................................................................... 27

*Does 1-11 v. Board of Regents of Univ. of Colorado*,
    ___ F. 4th ____, 2024 WL 2012317 (10th Cir. 2024) ......................................................... 6, 20

*Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990) ..... 16, 17, 18

*Fulton v. Philadelphia*, 593 U.S. 522 (2021) .............................................................. 2, 17, 18, 19

*Healy v. James*, 408 U.S. 169 (1972) ........................................................................................ 25

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) ........................... 16, 29, 30

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012) .......... 21

*Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) ...................... 27

*Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378 (1990) .............................. 22

*John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) ............................................................................. 25

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
    344 U.S. 94 (1952) ................................................................................................................. 21

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ......................................................... 16, 20

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) ................................................................................... 22

*Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617 (2018) ....................................... 6, 19

*McCullen v. Coakley*, 573 U.S. 464 (2014) ................................................................................. 28

*Medina v. Catholic Health Initiatives*, 877 F.3d 1213 (10th Cir. 2017) .................................... 2, 23

*NAACP v. Alabama*, 357 U.S. 449 (1958) ................................................................................... 25

*NAACP v. Button*, 371 U.S. 415 (1963) ...................................................................................... 24

*Nken v. Holder*, 556 U.S. 418 (2009) .......................................................................................... 29

*Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256 (1979) ............................................ 20

*Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245 (10th Cir. 2016) ........................ 29

*Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205 (10th Cir. 2018) ................................ 15

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) .......................................................... 24, 25

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2021) ....................................... 20

*Shelton v. Tucker*, 364 U.S. 479 (1960) ....................................................................................... 25

*Tandon v. Newsom*, 593 U.S. 61 (2021) ...................................................................................... 18

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994) ............................................................. 26

*Wooley v. Maynard*, 430 U.S. 705 (1977) ................................................................................... 26

*Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014) ................................................................. 28

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) .............................................. 27

**Statutes**

Colo. Rev. Stat. § 10-14-70 ......................................................................................................... 19

Colo. Rev. Stat. § 10-16-107.4 ....................................................................... 6, 7, 10, 18

**Regulations**

Emergency Regulation 22-E-20 ............................................................................ 10

Regulation 4-10-01 ............................................................................................. 10

## INTRODUCTION

A new Colorado law and its implementing regulation threaten to fine or ban certain religious non-profit organizations in the state unless they report who they affiliate and associate with in the course of their ministry, how they collect and distribute contributions from members of their ministry, and what they communicate to current and prospective members of their ministry. These requirements run afoul of several First Amendment protections and render Colorado an outlier in its approach to these types of religious non-profit organizations.

The religious non-profit organizations in this case are called health care sharing ministries, several of which are members of Plaintiff Alliance of Health Care Sharing Ministries. Health care sharing ministries are the latest nomenclature for the mutual aid plans established by various Christian denominations, particularly Mennonites, Amish, and Anabaptists, to implement their understanding of the biblical admonition to "[b]ear ye one another's burdens." *Bethel Conserv. Mennonite Church v. Comm'r*, 746 F.2d 388, 392 (7th Cir. 1984) (quoting Galatians 6:2). This type of ministry is common among Christian traditions, and extends to other Abrahamic traditions as well. There are more than 100 health care sharing ministries in the United States and they can be formed by different religions; there is a Jewish ministry, and there have been efforts to establish one for followers of Islam. Although these ministries vary in details, they share the common feature that their members through the ministries exercise their religious beliefs to share in each other's health burdens spiritually through prayer, emotionally through notes and letters, and financially through monetary support.

Colorado recently enacted a new law and implementing regulation that subjects health care sharing ministries to extensive, continuous, and intrusive regulation as a condition of existence in

the state.  Colorado singled out "ministries" alone among medical expense sharing practices for these regulations because of their religious features and also authorized the Colorado insurance commissioner to exempt other organizations caught up in the new regime, in his sole discretion. The commissioner already has exercised that discretion, because Colorado's regime is burdensome:  Colorado's new regime requires (1) a list of "third-parties" with whom ministries affiliate and associate, (2) submission to the government of communications to prospective and current members, and (3) the reporting of extensive financial and statistical information regarding members' sharing.  These requirements are akin to subjecting a church to comprehensive inquiry and monitoring as to who it associates with, how it evangelizes, and how it distributes from its collection basket for religious programs for its own members.

This new regime runs afoul of the First Amendment in several ways.  First, it violates the Free Exercise rights of ministries to be free from a regime that "restricts practices because of their religious nature," "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or provides a "mechanism for individualized exemptions" in an official's "sole discretion."  *Fulton v. Philadelphia*, 593 U.S. 522, 533–35 (2021).  Second, Colorado's regime violates the autonomy of religious organizations to be free from unwarranted state entanglement in their affairs and from forced disclosure (and thereby potential chilling) of those their affiliates and associates.  As the Tenth Circuit recently explained, regulatory schemes that require "long-term, continuing  monitoring" of religious organizations constitute excessive entanglement with religion in violation of the Establishment Clause's protection of religious autonomy.  *Medina v. Catholic Health Initiatives*, 877 F.3d 1213, 1233 (10th Cir. 2017).  Third, it is beyond dispute the First Amendment protects the rights of

organizations, particularly religious organizations, not to disclose those with whom they associate. *Am. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021).

Colorado's new regime is enforceable by fine or ban, putting ministries to the choice of their religious belief or legal liability. This new regime should be enjoined preliminarily to prevent these First Amendment violations.

## BACKGROUND

### I. Plaintiff Alliance of Health Care Sharing Ministries

Plaintiff Alliance of Health Care Sharing Ministries is a 501(c)(6) trade organization formed to represent the common interests of health care sharing ministry organizations that are facilitating the sharing of health care needs (financial, emotional, and spiritual) by individuals and families. Exhibit A (Declaration of Rob Waldo) at ¶ 6; Exhibit B (Declaration of Katy Talento) at ¶ 8. The Alliance's members include several of the health care sharing ministries, including Samaritan Ministries, that have large, nationwide membership and that have been certified by the U.S. Department of Health and Human Services Centers for Medicare and Medicaid Services as meeting the federal definition of Health Care Sharing Ministries in the Affordable Care Act. Exhibit B at ¶ 8.

A health care sharing ministry is a modern-day mutual aid plan entered into by individuals and families to share each other's health care needs. Exhibit A at ¶¶ 4–7; Exhibit B at ¶¶ 4–7. There are more than 100 health care sharing ministries in the United States, with total membership of about one million Americans. Exhibit B at ¶ 6. These ministries may be formed by different religions: there currently is a Jewish ministry, and there have been efforts to form a ministry for members of Islam. Dkt. 1, at ¶ 15.

3

Although these ministries vary in details, they share the common feature that their members exercise their religious beliefs to share in each other's health burdens spiritually through prayer, emotionally through fellowship and communications, and financially through monetary support. Exhibit A at ¶ 6; Exhibit B at ¶ 6.  For example, Samaritan Ministries proclaims its "mission is to redeem health care by helping the Body of Christ love one another through sharing each other's health care burdens while experiencing authentic Biblical community."  Exhibit A at ¶ 5.  To that end, every month, members of Samaritan Ministries give to other members who have medical needs.  *Id*. at ¶ 6.  Members pray and send their monthly share, along with notes of encouragement, directly to the member in need.  *Id.*  This benefits the receiver by helping to alleviate the significant spiritual, emotional, and financial burdens that health care expenses bring.  *Id.*  It benefits the giver by allowing them to tangibly live out their personally held beliefs through participation in the biblical call to bear one another's burdens and thus fulfill the law of Christ.  *Id.*  Samaritan also establishes criteria, including religious criteria, for membership and is organized along the lines of a congregational church.  *Id.* at ¶¶ 15–17.

Unlike health insurance, ministries like Samaritan do not guarantee reimbursement of any medical expense.  Rather, they receive information about medical needs and then ask members to send funds, notes, and prayers to those members in need, as long as those medical needs are consistent with their religious or ethical norms.  *Id.* at ¶¶ 6–7; Exhibit B at ¶¶ 4–5.

Health care sharing ministries like Samaritan enjoy recognition by the federal government. The Affordable Care Act exempts members of health care sharing ministries from various of its requirements.  Exhibit B at ¶¶ 8.  The U.S. Department of Health and Human Services has certified

that at least 107 of these ministries satisfy that definition.  Dkt. 1 at ¶ 24.  The IRS also treats

ministries as tax-exempt 501(c)(3) organizations.  *Id.*

A supermajority of states do not intrude upon the operations of health care sharing

ministries.  *Id.* at ¶ 25.  Thirty-three states have enacted safe harbor laws clarifying that health care

sharing ministries are exempt from the state insurance code and may operate subject only to the

general legal requirements applicable to charities.  *Id.*  An additional four states allow health care

sharing ministries to operate exempt from the state insurance code by providing an exemption for

their respective residents from those states' insurance mandates.  *Id.*  A few states, such as New

Mexico, have challenged some ministries (wrongly, and subject to litigation) as constituting

insurance subject to the insurance code.  *Id.*

That widespread state treatment of health care sharing ministries is consistent with state

regulatory treatment of similar medical expense sharing organizations and practices.  States rarely

if ever subject similar expense sharing arrangements to regulation, such as but not limited to, direct

primary care arrangements, medical discount cards, crowdfunding, student health clinics at

universities (where students pay a fee for unlimited access), charities that pay medical bills, or

fully-insured out-of-state employer health plans with in-state enrollees.  *Id.* at ¶ 26.

## II.     Colorado Regime

Colorado has made itself an outlier from these other states.  The legislature and the Division

of Insurance ("Division") have set out to regulate Plaintiff's members due to their religiosity.  From

2020 through the present day, Colorado officials have repeatedly stated that they want to burden health care sharing ministries because of their religious nature.[1]

In 2020, the Division issued a "consumer advisory" about a "ministry" due to its "religious" beliefs. *Id.* at ¶ 28. Specifically, the Division stated that members of the public should be wary of a "health care sharing program or ministry," because, among other reasons "members may also be subject to religious or moral restrictions from the sharing ministry." *Id.* at ¶ 29. For several years subsequently, a state legislator introduced a bill targeting for regulation those organizations that are a "health care sharing ministry." *Id.* at ¶ 30. That bill became law, after the legislature sanitized references to "ministry" with "program." *Id.* at ¶¶ 31–32. That law requires reporting of extensive and intrusive information. Exhibit A at ¶¶ 8–12; Exhibit B at ¶¶ 12–17. In particular, the statute requires reporting statistical and financial information, affiliations, and communications.

First, across over a dozen different statutory requirements, the statute requires reporting of comprehensive information regarding the number of members, the amounts contributed, requested to be shared, and shared, the amounts paid to health care providers, and the internal structure of the ministry. Colo. Rev. Stat. § 10-16-107.4(1)(a)(I)-(III), (V)-(XII), (XVI), (XIX)-(XX). Second, the statute requires reporting of detailed information regarding the ministry's affiliations, including "[a]ny contracts" and "third parties," *id.* § 10-16-107.4(1)(a)(IV), (XV), and that is exactly the type of disclosure that chills the ministry's operations and affiliations. Exhibit A at ¶¶ 9–10, 12,

---

[1] This would not be the first time in recent years that Colorado officials would have exhibited animus to religious exercise. *See, e.g.*, *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617 (2018); *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023); *Does 1-11 v. Board of Regents of Univ. of Colorado*, ___ F. 4th ____, 2024 WL 2012317 (10th Cir. 2024).

20; Exhibit B at ¶ 16, 18.  Last, the statute requires submission of the ministry's speech: all member and potential member communications "promoting" the ministry, including all "descriptions and other materials" that explain the ministry's sharing programs.  *Id.* § 10-16-107.4(1)(a)(XVII).  And the raw disclosures from the ministries are available to anyone who asks for them under a Colorado Open Records Act request.

The statute also, significantly, empowers the Division to enforce its restrictions and to fine or prohibit the operation of ministries for violations, *id.* § 10-16-107.4(2), and to adopt implementing rules, *id.* § 10-16-107.4(4).  Notably, the statute states that its provisions do not apply to "[d]irect primary care agreements," or "other consumer payment arrangements identified by the commissioner by rule."  *Id.* § 10-16-107.4(5).  It does not cabin the commissioner's discretion in any way.

This summary is a concise distillation and categorization of the statute's extensive requirements.  Here is precisely everything that the statute requires the ministries to disclose:

> (I) The total number of individuals and households that participated in the plan or arrangement in this state in the immediately preceding calendar year;
>
> (II) The total number of employer groups that participated in the plan or arrangement in this state in the immediately preceding calendar year, specifying the total number of participating individuals in each participating employer group;
>
> (III) If the person offers a plan or arrangement in other states, the total number of participants in the plan or arrangement nationally;
>
> (IV) Any contracts the person has entered into with providers in this state that provide health-care services to plan or arrangement participants;

(V) The total amount of fees, dues, or other payments collected by the person in the immediately preceding calendar year from individuals, employer groups, or others who participated in the plan or arrangement in this state, specifying the percentage of fees, dues, or other payments retained by the person for administrative expenses;

(VI) The total dollar amount of requests for reimbursement of health-care costs or services submitted in this state in the immediately preceding calendar year by participants in the plan or arrangement or providers that provided health-care services to plan or arrangement participants;

(VII) The total dollar amount of requests for reimbursement of health-care costs or services that were submitted in this state and were determined to qualify for reimbursement under the plan or arrangement in the immediately preceding calendar year;

(VIII) The total amount of payments made to providers in this state in the immediately preceding calendar year for health-care services provided to or received by a plan or arrangement participant;

(IX) The total amount of reimbursements made to plan or arrangement participants in this state in the immediately preceding calendar year for health-care services provided to or received by a plan or arrangement participant;

(X) The total number of requests for reimbursement of health-care costs or services submitted in this state in the immediately preceding calendar year that were denied, expressed as a percentage of total reimbursement requests submitted in that calendar year, and the total number of reimbursement request denials that were appealed;

(XI) The total amount of health-care expenses submitted in this state by plan or arrangement participants or providers in the immediately preceding calendar year that qualify for reimbursement pursuant to the plan or arrangement criteria but that, as of the end of that calendar year, have not been reimbursed, excluding any amounts that the plan or arrangement participants incurring the health-care costs must pay before receiving reimbursement under the plan or arrangement;

8

(XII) The estimated number of plan or arrangement participants the person is anticipating in this state in the next calendar year, specifying the estimated number of individuals, households, employer groups, and employees;

(XIII) The specific counties in this state in which the person:

(A) Offered a plan or arrangement in the immediately preceding calendar year; and

(B) Intends to offer a plan or arrangement in the next calendar year;

(XIV) Other states in which the person offers a plan or arrangement;

(XV) A list of any third parties, other than a producer, that are associated with or assist the person in offering or enrolling participants in this state in the plan or arrangement, copies of any training materials provided to a third party, and a detailed accounting of any commissions or other fees or remuneration paid to a third party in the immediately preceding calendar year for:

(A) Marketing, promoting, or enrolling participants in a plan or arrangement offered by the person in this state; or

(B) Operating, managing, or administering a plan or arrangement offered by the person in this state;

(XVI) The total number of producers that are associated with or assist the person in offering or enrolling participants in this state in the plan or arrangement, the total number of participants enrolled in the plan or arrangement through a producer, copies of any training materials provided to a producer, and a detailed accounting of any commissions or other fees or remuneration paid to a producer in the immediately preceding calendar year for marketing, promoting, or enrolling participants in a plan or arrangement offered by the person in this state;

(XVII) Copies of any consumer-facing and marketing materials used in this state in promoting the person's plan or arrangement, including plan or arrangement and benefit descriptions and other materials that explain the plan or arrangement;

> (XVIII) The name, mailing address, e-mail address, and telephone number of an individual serving as a contact person for the person in this state;
>
> (XIX) A list of any parent companies, subsidiaries, and other names that the person has operated under at any time within the immediately preceding five calendar years; and
>
> (XX) An organizational chart for the person and a list of the officers and directors of the person[.]

*Id.* § 10-16-107.4(1)(a)(I)–(XX).

Shortly after the enactment of the statute, the Division promulgated emergency interim regulations. *See* Emergency Regulation 22-E-20. After accepting public comments on those regulations, including that the interim regulations imposed significant costs in excess of their benefits, the Division promulgated final regulations effective April 30, 2024. *See* Regulation 4-10-01, available at https://doi.colorado.gov/health-care-sharing-plans-or-arrangements.

The final regulations impose extensive and intrusive reporting obligations that flow from the statutory requirements but are even broader. Indeed, the final regulations break out and expand the statutory requirements across 27 columns (A through AA) of one spreadsheet and another six columns on a second spreadsheet. Here is what the spreadsheet requires:[2]

| A. Product name |
| --- |
| (list out all products your organization offers in Colorado) |
| B. Number of Colorado residents that participated in this product in the reporting year<br>(Individuals) |

---

[2] All emphasis is in original. These required disclosures have been transposed vertically and are listed in a table for convenience, but they can be accessed in their native format at: docs.google.com/spreadsheets/d/1B0yM0Oyhj0gNaQk9YDsTTM4udHCVfyfcZDNKnApJWVs/

10

| |
|---|
| C. Number of Coloradan HOUSEHOLDS that participated in the product in this reporting year |
| D. The total number of employer groups in Colorado that facilitate all or some of their employee participants' monthly share contributions |
| E. For each employer group included in element D, list out how many individual Colorado participants were included<br><br>(separate answers by commas) |
| F. Total number of participants in the product NATIONALLY? |
| G. Number of contracts entered into with health care service providers providing services for Colorado participants for this product. This includes contractors that provide telehealth services for participants |
| H. Total amount of fees, dues, shares, contributions, or other payments **collected** from individuals, Colorado employer groups, or others who participated in the product ($) |
| I. The percentage of fees, dues, shares, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for <u>administrative expenses</u> (%) |
| J. The percentage of fees, dues, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for <u>program expenses</u> (%) |
| K.  Total dollar amount of health-care costs or services that were incurred by the participant and <u>submitted</u> by or on behalf of the participant for sharing ($) |
| L. Total dollar amount of requests for sharing of Colorado participants' health-care costs or services that qualified for sharing excluding any amounts that the participants incurring |

11

| |
|---|
| the health-care costs or services must pay before receiving sharing amounts under the member guidelines ($) |
| M.  Total dollar amount of payments made to <u>providers</u> for Colorado participants' health care costs or services ($) |
| N. Total dollar amount of sharing requests facilitated or provided to Colorado <u>participants</u> for health care costs or services ($) |
| O. Total number of requests by or on behalf of the Colorado participants' for sharing of healthcare costs or services incurred by the participant (Number) |
| P. Total number of share requests, for Colorado participants, that were denied (not shared) because they were not eligible for sharing according to the organization's guidelines (Number) |
| Q. Total number of **<u>appeals</u>** of denied sharing requests for Colorado participants' incurred health-care costs or services (Number) |
| R. Total number of  appeals requests that were later approved for sharing for Colorado participants' incurred health-care costs or services (Number) |
| S. Percentage of total number of requests denied compared to the total number of Colorado participants share requests submitted |
| T. Percentage of total number of requests denied compared to the total number of appeals for sharing that were "denied" (not shared) for Colorado participants |
| U. Total amount of **Colorado** participants' health-care costs or services submitted in the reporting period that qualify for sharing pursuant to the plan/arrangement's criteria but that |

| |
|---|
| were not shared or paid by the last day of the reporting year, excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines<br>($) |
| V. Estimated number of individual plan/arrangement participants anticipated in Colorado in  the current calendar year |
| W. Estimated number of households plan/arrangement participants anticipated in the current calendar year |
| X. Estimated number of employer groups in Colorado that facilitate all or some of their employee participants' monthly share contributions in the current calendar year |
| Y. Estimated total number of individual Colorado participants associated with the employers in element X in the current calendar year |
| Z.  The total number of producers that are associated with or assist in offering or enrolling participants in Colorado in the product<br>(number of **producers**) |
| AA. Of the number of Colorado participants in the product how many were enrolled through a producer<br>(number of **participants**) |

Updated Health Care Sharing Plan Reporting template for regulation 4-10-01, Sheet 2.

But the required disclosures do not even stop there.  The Division also requires the ministries to complete the following fields:

- Parent companies, subsidiaries, and other names that your organization has operated under at any time with the immediately preceding 5 calendar years:
- Provide your Organization's website

13

- Provide any additional website(s) your organization uses to communicate marketing materials including social media sites

- Additional context you'd like to provide the Division about this product or any of the data submitted on this tab? Possibly [sic] data to include could be the total dollar amount of discounts negotiated for Colorado participants.  If any Colorado data were provided on a pro rata basis please note that here and which data elements (e.g. B, G-J, M) are based off of national numbers

- Name of third party - provide the "doing business as" name of each applicable third-party (list out separately)

- Total commission, fees, or remuneration paid in the previous calendar year for: **marketing, promoting, or enrolling participants in a HCSPA product to Colorado participants**

- Total commission, fees, or remuneration paid in the previous calendar year for: **operating, managing, or administering a product offered by the HCSPA**

- **Total number of producers** that are associated with or assist in offering or enrolling participants in Colorado (Aggregate value)

- **Total commission, fees, or remuneration paid** in the previous calendar year **to producers** for: marketing, promoting, or enrolling Colorado participants in a plan or arrangement (Aggregate value)

- List out the Colorado counties where a plan/arrangement was offered in **2023**

- List out the Colorado counties where a plan/arrangement is **intended** to be offered in **2024**

- List out the other states (i.e., states other than Colorado) in which your organization offered a plan or arrangement was in **2023** One row per state

- Please describe any appeals processes that your organization's uses when a participant contests a reimbursement, requested share, or payment denial

14

*Id.* Sheet 2–3 (all emphasis in original).  Although not all of these requirements are constitutionally problematic, there can be no doubt of their burden.  Exhibit A at ¶¶ 8–24; Exhibit B at ¶¶ 11–24.

Significantly, the regulation also confirms that it applies selectively.  It defines "health care sharing plan" to mean "any organization that offers or markets products to facilitate payment or reimbursement of health care costs or services."  Regulation 4-10-01, Section 4(G).  But it immediately exempts not only the statutorily exempted "direct primary care agreements," but also "consumer payment plans offered directly between a provider and patient" and "crowdfunded sources." *Id.*

The Division's first public report continued to focus on the religiosity of the ministries.  Dkt. 1 at ¶ 52.  It also provided misleading information, confounding the "sticker price" charged by medical providers with the amounts ultimately paid by the ministries' members.  *Id.* at ¶ 50.  This report confirms the harms of the Colorado regulatory regime.

## LEGAL STANDARD

A preliminary injunction is merited when an applicant shows (1) a likelihood of success on the merits, (2) irreparable harm absent relief, (3) the balance of equities weighs in its favor, and (4) the injunction is in the public interest.  *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018).  "[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor."  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145

(10th Cir. 2013) (en banc), *aff'd sub nom., Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682 (2014).

## ARGUMENT

### I.      Plaintiff is likely to succeed on the merits.

Plaintiff is likely to succeed on the merits because Colorado's regime violates the Free Exercise Clause, the Establishment Clause, the Freedom of Association, and the Free Speech Clause, and Colorado does not even meaningfully attempt to satisfy the heavy burden of strict scrutiny.

### A.      Colorado's regime violates the Free Exercise Clause.

The First Amendment prohibits the government from burdening "the free exercise" of religion.   "The [Free Exercise] Clause protects not only the right to harbor religious beliefs inwardly and secretly."  *Kennedy v. Bremerton Sch. Dist*., 597 U.S. 507, 524 (2022).  Rather "[i]t does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'"  *Id*. (quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 877 (1990)).

There can be no question that Colorado's regime burdens the free exercise of religion. Consistent with their commitment to bear each others' burdens, Plaintiff's members exercise their religious beliefs by contributing spiritually, emotionally, and financially to each others' medical expenses.  *See supra* Background Part I.

An individual or organization "may carry the burden of proving a free exercise violation in various ways."  *Kennedy*, 597 U.S. at 525.  In particular, government action is subject to strict

scrutiny under the Free Exercise Clause when it "is not 'neutral' or 'generally applicable.'" *Id.* (citing *Smith*, 494 U.S. at 879–881).

Colorado's regime fails both of these requirements.

### 1.      Colorado's regime is not generally applicable.

"[L]aws burdening religious practice must be of general applicability." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993).  A law may fail general applicability in at least two ways.  *Fulton*, 593 U.S. at 533–34.

a. First, a law "is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions."  *Id.* at 533 (alteration in original) (internal quotation marks omitted).  Consequently, the "creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given."  *Id.* at 537.

The Supreme Court's decision in *Fulton* exemplifies this rule.  There, the city of Philadelphia "stopped referring children to [Catholic Social Services] upon discovering that the agency would not certify same-sex couples to be foster parents due to its religious beliefs about marriage."  *Id.* at 527–28.  The city argued that its decision was an application of a generally applicable policy that foster agencies such as Catholic Social Services must provide services regardless of sexual orientation.  But the Court concluded that was not a generally applicable policy because it empowered the city to grant exceptions at its "sole discretion."  *Id.* at 537.  As the Court put it, the "creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it 'invite[s]' the

government to decide which reasons for not complying with the policy are worthy of solicitude." *Id.* (alteration in original) (quoting *Smith*, 494 U.S. at 884).

Here, the statute empowers the Division to exempt "other consumer payment arrangements identified by the commissioner by rule." Colo. Rev. Stat. § 10-16-107.4(5). The statute does not cabin the Division's discretion in any way. The Division has exercised that exemptive authority in its final regulation. That is a clear violation of the principle most recently enunciated in *Fulton*. Consequently, the Colorado regime is not generally applicable and is subject to strict scrutiny, which it fails. *See infra* I.E.

b. Second, a law fails general applicability if it "treat[s] *any* comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam), or "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," *Fulton*, 593 U.S. at 534. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62. The comparability analysis "is concerned with the risks various activities pose," not the "reasons why" people engage in those activities. *Id*. A single exemption for comparable secular activity condemns government action to strict scrutiny review. *Id.*

Here, Colorado fails to subject and indeed explicitly exempts numerous comparable secular activities from the burdens imposed on health care sharing ministries. For example, Colorado law explicitly exempts direct primary care arrangements, while Colorado regulation explicitly exempts consumer payment plans and crowdfunded arrangements. In addition, Colorado does not regulate other organizations that help individuals share medical expenses, such as but not limited to medical

18

discount cards, student health clinics at universities (where students pay a fee for unlimited access), charities that pay medical bills, fully-insured out-of-state employer health plans with Colorado enrollees, or some fraternal organizations. *See, e.g.*, Colo. Rev. Stat. § 10-14-70 (exempting "Grand or subordinate lodges of masons, odd fellows, or knights of Pythias," among other fraternal organizations from regulation under the Insurance Code).

Colorado has not asserted a specific interest in regulating health care sharing ministries. To the extent that interest consists of the Division's general concern in consumer protection with respect to the sharing and payment of medical expenses, *see* https://doi.colorado.gov/, these other activities raise similar interests. Consequently, the Colorado regime is not generally applicable and is subject to strict scrutiny. *See infra* I.E.

### 2.      Colorado's regime is not neutral.

The government is "obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of [] religious beliefs." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018). "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533. Laws are not neutral when they accomplish a "religious gerrymander." *Lukumi*, 508 U.S. at 535. A religious gerrymander occurs when "the burden of the [law], in practical terms, falls on [religious] adherents but almost no others." *Id.* at 536. A law is also not neutral when "the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body" demonstrate animus toward religion. *Masterpiece*, 584 U.S. at 639. When "'official expressions of hostility' to religion accompany laws or policies

19

burdening religious exercise," courts must "'set aside' such policies without further inquiry." *Kennedy*, 597 U.S. 507, 525 n.1 (2022) (quoting *Masterpiece*, 584 U.S. at 639).

Even "slight suspicion" of religious intolerance or "subtle departures from neutrality" violate the Free Exercise Clause. *Masterpiece*, 584 U.S. at 639. As the Tenth Circuit recently explained, there does not need to be "egregious language" from officials: for "if that is the bar for an inference of hostility, it will almost never be cleared." *Does 1-11 v. Board of Regents of Univ. of Colorado*, ___ F. 4th ____, 2024 WL 2012317 (10th Cir. 2024).

Rather, in assessing neutrality, courts must "survey meticulously" for "masked, as well as overt" hostility. *Lukumi*, 508 U.S. at 534. "Factors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece*, 584 U.S. at 639 (quoting *Lukumi*, 508 U.S. at 540). All evidence of a law's purpose is relevant to determining whether a law was "enacted 'because of,' not merely 'in spite of,' [its] suppression of [] religious practice." *Lukumi*, 506 U.S. at 540 (quoting *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 279 (1979)); *see e.g.*, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2021) (per curiam) (rejecting pandemic restrictions because "statements made in connection with the challenged rules can be viewed as targeting the ultra-Orthodox [Jewish] community") (internal quotation marks omitted) (alteration in original); *Lukumi*, 508 U.S. at 541 (rejecting regulation regarding treatment of animals because of, among other reasons, hostility of members of the city council towards the religion of Santeria).

Here, Colorado's regulatory regime is not neutral with respect to religion.  The Division's statements target "ministries" for their religious beliefs, the legislative history exhibits the same focus, the Division's misleading report reiterates that view, and the statutory and regulatory exemptions privilege similar secular conduct.  *See supra* Background Part II.  Together, these facts indicate more than a "slight suspicion" that Defendants have proceeded in a manner intolerant of religious beliefs.

To put it differently, from the beginning Colorado has targeted health care sharing "ministries" and has listed as a rationale for doing so the religious beliefs of those ministries.  The regulatory regime thus "violate[s] the State's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint."  *Masterpiece*, 584 U.S. at 638.

### B.    Colorado's regime violates the Establishment Clause.

"Throughout our Nation's history, religious bodies have been the preeminent example of private associations that have act[ed] as critical buffers between the individual and the power of the State."  *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 199 (2012) (Alito, J., concurring) (internal quotation marks omitted).   "To safeguard this crucial autonomy," the courts have long acted to "protect a private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs."  *Id.*  To put it another way, the Constitution guarantees religious bodies "independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."  *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

The Establishment Clause furthers that end.  Under it, government action may not "foster an excessive government entanglement with religion."  *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971) (internal quotation marks omitted).  It may not "closely" monitor the proportion of activities a religious organization spends on religious activity or the manner to which it puts its resources.  *See Aguilar v. Felton*, 473 U.S. 402 (1985).  Although government may impose "narrowly drawn" requirements regarding "recordkeeping and disclosure," it may not force a religious organization to subject itself to the state as the ultimate arbiter of its activities.  *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1535 (11th Cir. 1993).  For example, the Court has distinguished recordkeeping requirements to enable the collection of sales taxes, *see Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378, 394 (1990), with recordkeeping that requires "close administrative contact" on an ongoing basis, *see Aguilar*, 473 U.S. at 414.

This distinction is well illustrated in *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*.  There, the city of Clearwater, Florida, promulgated an ordinance requiring that any organization that solicits funds report the name of the organization, its tax-exempt status, its purpose, the names and addresses of its officers, its other locations, any past criminal prosecutions, and, most relevant here, "[a]n estimated schedule of salaries, wages, fees, commissions, expenses and costs to be expended and paid in connection with the solicitation of funds and in connection with their disbursement, and an estimated percentage of the total projected collections which the costs of the solicitation will comprise," together with annual figures for the same.  *Church of Scientology*, 2 F.3d at 1521–22.  The court concluded that this ordinance excessively entangled the government with a religious organization because it essentially required a religious

organization "to divulge its entire budget and all its operations on a continuing basis," and it mandated "detailed monitoring and close administrative interaction." *Id.* at 1535.

Similarly and more recently, in *Medina v. Catholic Health Initiatives*, the Tenth Circuit held that regulatory schemes that require "long-term, continuing monitoring" constitute excessive entanglement with religious organizations in violation of the Establishment Clause. 877 F.3d at 1233. There, an employee argued that a church's benefit plan should be subject to ERISA and that exempting churches from ERISA coverage constituted excessive entanglement with religion. The Tenth Circuit concluded that the employee's argument turned the Establishment Clause on its head: "far from entangling the government in the affairs of religious institutions, the church-plan exemption avoids the entanglement that would likely occur in its absence." *Id.* at 1234.

Here, Colorado's regime imposes the "long-term, continuing monitoring" and "detailed monitoring and close administrative interaction" condemned by *Medina* and *Church of Scientology*. The Colorado regime subjects health care sharing ministries to extensive and intrusive monitoring of finances and operations. The statutory requirements number in the dozens; the regulatory requirements fill multiple spreadsheets. *See supra* Background Part II. Colorado requests detailed financial and operational metrics that are akin to asking a church how it spends its collection baskets on charitable giving. Even worse, Colorado exposes those internal workings of a religious organization for all the world to see. Consequently, Colorado's regime triggers strict scrutiny, which it cannot survive. *See infra* I.E.

### C.    Colorado's regime violates the Freedom of Association.

The Supreme Court has "'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others.'" *Bonta*, 594

U.S. at 606 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). "Protected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'" *Id.* (quoting *Roberts*, 468 U.S. at 622).

It is "hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Id.* (alteration in original). In such situations, courts subject government restrictions on the freedom of association to "exacting scrutiny." *Id.* at 607. This is a high bar. Under this standard, there must be "a substantial relation" between the restriction and a "sufficiently important governmental interest." *Bonta*, 594 U.S. at 607. Not just any governmental interest is "sufficiently important." For example, "administrative convenience" is not enough. *Id.* at 615. Similarly, for a "substantial relation" to exist between the restriction and the governmental interest, that restriction must be "narrowly tailored." *Id.* at 608. That is because "First Amendment freedoms need breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 433 (1963). To be "narrowly tailored," the restriction must satisfy a "means-end fit." *Id.* at 613. Required disclosure, for example, is not acceptable when enforcement mechanisms such as *ex post* investigation would suffice. *See id.* at 614.

The right to freedom of association applies in two ways of particular relevance here. First, the government can violate the freedom of association by compelling an organization to disclose the names of individuals who associate with the organization. In *Americans for Prosperity Foundation v. Bonta*, the Court held that California's requirement that nonprofit organizations

24

disclose the identities of their donors violated the First Amendment. *Id.* at 618. There, the California Attorney General promulgated a regulation requiring nonprofit organizations to file paperwork listing their major donors, in the interest of easing the investigatory burden of the government agency. The Supreme Court declared the regulation unconstitutional. It held that California's generalized interest in preventing wrongdoing did not justify the significant burden, including the risk of public disclosure, of collecting this information from nonprofit organizations. *See id.* *Bonta* is the latest in a long line of cases preventing the government from inquiring into the "internal structure or affairs of an association." *See, e.g.*, *Roberts*, 468 U.S. at 623; *NAACP v. Alabama*, 357 U.S. 449, 462 (1958); *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960); *Healy v. James*, 408 U.S. 169, 181–182 (1972).

Second, the government can violate the freedom of association by compelling an individual to disclose the names of organizations with which he associates. "[A] vital relationship [exists] between freedom to associate and privacy in one's associations." *NAACP v. Alabama*, 357 U.S. at 462. That is because compelled disclosure of individuals' associations can "subject them to threats, harassment, or reprisals from either Government officials or private parties," *John Doe No. 1 v. Reed*, 561 U.S. 186, 200 (2010)—a risk that is increasingly true in today's digital age.

In *Shelton v. Tucker*, for example, the Court declared unconstitutional an Arkansas statute requiring teachers to list the organizations to which they belonged or contributed. 364 U.S. 479 (1960). The Court held that, although the government of course enjoys the right to investigate the fitness of those who teach in its schools, that governmental interest "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.* at 488.

The Colorado regime runs afoul of both of these principles.  It requires the disclosure of numerous entities that associate with health care sharing ministries.  That disclosure has the potential to chill entities from affiliating with the ministries.  Indeed, the Alliance is already aware of exactly that.  *See supra* Background Part II.

Colorado cannot satisfy exacting scrutiny because there is no substantial relation between the disclosure requirement and a sufficiently important governmental interest.  Colorado has not advanced such an interest; to the extent it relies on a general interest in consumer protection, that does not match the burdensome disclosure regime it has enacted.  There is no substantial relation between a putative consumer protection rationale and the requirements, and in any event, the requirements are not narrowly tailored.

### D.  Colorado's regime violates the Free Speech Clause.

The right to speak and the right to refrain from speaking are "complementary components of the broader concept of individual freedom of mind" protected by the First Amendment. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (internal quotation marks omitted). "Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as those that forbid speech. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). Any attempt by the government either to restrict, chill, or compel individuals to express certain views is subject to strict scrutiny. The general rule "that the speaker has the right to tailor the speech[ ] applies not only to expressions of value, opinion, or endorsement, but equally to

statements of fact the speaker would rather avoid." *Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

The Colorado regime, by requiring submission of the communications of the ministries with prospective and current members, chills ministry speech and, by requiring reporting of information that Colorado posts publicly, compels the ministries to speak about their internal operations.  That is inconsistent with the First Amendment's prohibition on restricting or compelling speech.  Defendants cannot satisfy strict scrutiny for these infringements because they lack a compelling interest, and the law is not narrowly tailored.

For compelled speech, the only narrow exception to that strict scrutiny relates to "purely factual and uncontroversial disclosures" that are "related to the State's interest in preventing deception of consumers" by commercial speech and that are not "unduly burdensome." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985); *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).  Defendants cannot satisfy this standard because they post excerpts of Plaintiff's members' speech that are misleading by omission and thereby controversial.

### E.    Colorado's regime does not survive strict scrutiny.

When government action infringes free exercise and religious autonomy rights, it must survive strict scrutiny:  "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).  The government bears the burden, and therefore "face[s] the daunting task of establishing that the requirement was narrowly tailored to advance a compelling governmental interest." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004).  The government cannot do so here.

Colorado has no realistic possibility of demonstrating a compelling government interest. Indeed, it has not yet even tried to provide one—in legislative findings, a gubernatorial signing statement, a regulatory preamble, or otherwise.  No other state imposes the regulatory regime that Colorado does.  Colorado has not taken enforcement action against ministries for any of the presumably consumer protection-like concerns motivating this law.  Colorado simply has not shown an "actual problem in need of solving." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (internal quotation marks omitted).  And to the extent there is a problem with consumer protection, this regime is underinclusive with respect to medical expense sharing.  *See supra* Background Part II.  A government fails to show a compelling interest "when [a law] leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547; *see also Yellowbear v. Lampert*, 741 F.3d 48, 60 (10th Cir. 2014) (Gorsuch, J.) ("A law's underinclusiveness . . . can raise with it the inference that the government's claimed interest isn't actually so compelling after all.").

Colorado's regime also is not narrowly tailored.  Its underinclusivity to other similar behaviors condemns it, for a law that is "underinclusive in substantial respects" demonstrates an "absence of narrow tailoring" that "suffices to establish [its] invalidity." *Lukumi*, 508 U.S. at 546. Moreover, Defendants would need to demonstrate—with evidence—that their myriad other sources of consumer protection, including the Attorney General's authority over charities and false advertising, have somehow been ineffective. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 490–495 (2014) (holding that a law failed even intermediate scrutiny where the state did not show "that it seriously undertook to address the problem with less intrusive tools readily available to it"). Defendants have not shown this and they could not do so.

**II.    Plaintiff has established irreparable harm, and the balance of the equities and the public interest favor an injunction.**

Because, as Plaintiff has established, Colorado's regime violates the First Amendment, the remaining preliminary injunction factors "present little difficulty." *Citizens United v. Gessler*, 773 F.3d 200, 218 (10th Cir. 2014).

**A.    Plaintiff has established irreparable harm because this case involves the loss of First Amendment freedoms and irrecoverable compliance costs.**

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Hobby Lobby*, 723 F.3d at 1145.  Indeed, "the likelihood that [plaintiff] will suffer a violation of its First Amendment rights[,] . . . standing alone, gives rise to an irreparable injury." *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1263 (10th Cir. 2016).  Here, Plaintiff has established a likelihood of success on the merits of its First Amendment claims.  Accordingly, Plaintiff has shown that it and its members will suffer irreparable harm.

In addition, Plaintiff's members also are suffering irreparable harm because of the costs they must incur to comply with Colorado's regime.  *See* Exhibit A at ¶ 22–23; Exhibit B at ¶¶ 19–23.  Those costs cannot be recovered from the government should that regime be invalidated later.

**B.    Plaintiff has established that the balance of the equities and the public interest favor a preliminary injunction because of the constitutional rights at stake.**

In a suit against the government, the two factors regarding the balance of the equities and the public interest "merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Both are satisfied in this case.  "When a law is likely unconstitutional, the interests of those the government represents, such as [consumers,] do not outweigh a plaintiff's interest in having its constitutional rights protected."

29

*Hobby Lobby*, 723 F.3d at 1145 (cleaned up).  Indeed, "it is always in the public interest to prevent the violation of a party's constitutional rights."  *Id.*   To put it another way, Colorado "does not have an interest in enforcing a law that is likely constitutionally infirm." *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010).   Accordingly, the final two preliminary injunction factors favor Plaintiff.

## CONCLUSION

This Court should grant Plaintiff's motion for a preliminary injunction.

Dated: May 17, 2024                                    Respectfully submitted,

                                                       /s/ *Michael F. Murray*
                                                       Michael F. Murray
                                                       Paul Hastings LLP
                                                       2050 M Street, NW
                                                       Washington, D.C. 20036
                                                       (202) 551-1730
                                                       michaelmurray@paulhastings.com

                                                       William E. Mahoney
                                                       Paul Hastings LLP
                                                       600 Travis Street
                                                       Fifty-Eighth Floor
                                                       Houston, Texas 77002
                                                       (713) 860-7304
                                                       williammahoney@paulhastings.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of May, 2024 I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for all parties of record.

/s/ *Michael F. Murray*
Michael F. Murray