**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

ALLIANCE OF HEALTH CARE
SHARING MINISTRIES,

          Plaintiff,

v.

MICHAEL CONWAY, in his official
capacity as Commissioner of Insurance,

          Defendant.

Case No. 1:24-CV-01386-GPG-STV

**<u>Plaintiff Alliance of Health Care Sharing Ministries'
Motion for Summary Judgment</u>**

Michael F. Murray
T. Benton York
PAUL HASTINGS LLP
2050 M Street, NW
Washington, D.C. 20036
(202) 551-1700
michaelmuray@paulhastings.com
bentonyork@paulhastings.com

William E. Mahoney
PAUL HASTINGS LLP
609 Main Street
Suite 2500
Houston, TX 77002
(713) 860-7300
williammahoney@paulhastings.com

## Table of Contents

INTRODUCTION ...................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................... 3

    A. Plaintiff Alliance of Health Care Sharing Ministries ................................. 3

    B. Samaritan Ministries ................................................................................ 4

    C. Colorado Targeted Health Care Sharing Ministries ................................. 5

    D. John Oliver .............................................................................................. 8

    E. The Reporting Law ................................................................................. 10

    F. The Selective Application of the Reporting Law ..................................... 12

    G. Express Exemptions .............................................................................. 13

    H. Exemptions by Rule ............................................................................... 14

    I. Exemptions by Enforcement Discretion ................................................. 14

    J. The Reporting Law as Administered ...................................................... 15

    K. The Reporting Law's Harms ................................................................... 17

LEGAL STANDARD ............................................................................................ 18

ARGUMENT ........................................................................................................ 19

I    The Alliance is entitled to judgment on the merits .................................... 19

    A. Colorado's regime violates the Free Exercise Clause ........................... 19

        1.   Colorado's regime is not generally applicable ............................... 20

        2.   Colorado's regime is not neutral .................................................... 26

    B. Colorado's regime violates the Establishment Clause. .......................... 28

    C. Colorado's regime violates the Freedom of Association. ....................... 31

    D. Colorado's regime violates the Free Speech Clause. ............................ 34

    E. Colorado's regime does not survive strict scrutiny. ............................... 37

II    The Alliance prevails on the remaining injunctive-relief factors. ............. 37

CONCLUSION ..................................................................................................... 38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Axson-Flynn v. Johnson*,
   356 F.3d 1277 (10th Cir. 2004)....................................................................... 37

*Bates v. City of Little Rock*,
   361 U.S. 516 (1960) ....................................................................................... 33

*Blackhawk v. Pa.*,
   381 F.3d 202 (3d Cir. 2004)........................................................................... 26

*Bowen v. Kendrick*,
   487 U.S. 589 (1988) ...........................................................................31, 32, 33

*Brown v. Ent. Merchs. Ass'n*,
   564 U.S. 786 (2011) ....................................................................................... 38

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
   447 U.S. 557 (1980) ....................................................................................... 36

*Chamber of Com. of U.S. v. Edmondson*,
   594 F.3d 742 (10th Cir. 2010)........................................................................ 38

*Church of the Lukumi Babalu Aye v. City of Hialeah*,
   508 U.S. 520 (1993) ...........................................................................20, 27, 28

*Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*,
   2 F.3d 1514 (11th Cir. 1993)...........................................................29, 30, 31

*City of Boerne v. Flores*,
   521 U.S. 507 (1997) ....................................................................................... 37

*Does 1-11 v. Board of Regents of Univ. of Colorado*,
   100 F. 4th 1251 (10th Cir. 2024) ..............................................................27, 29

*Fulton v. Philadelphia*,
   593 U.S. 522 (2021) .................................................................................*passim*

*Healy v. James*,
   408 U.S. 169 (1972) ....................................................................................... 33

ii

*Hobby Lobby Stores v. Sebelius*,
   723 F.3d 1114 (10th Cir. 2013)........................................................................ 38

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
   565 U.S. 171 (2012) (Alito, J., concurring) ................................................... 29

*Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995) ........................................................................................ 35

*Jimmy Swaggart Ministries v. Board of Equalization*,
   493 U.S. 378 (1990) ................................................................................... 29, 31

*John Doe No. 1 v. Reed*,
   561 U.S. 186 (2010) ........................................................................................ 33

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022) ................................................................................... 20, 27

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
   584 U.S. 617 (2018) ................................................................................... 26, 27

*Medina v. Catholic Health Initiatives*,
   877 F.3d 1213 (10th Cir. 2017)................................................................. 2, 30, 31

*Murdoch v. Pennsylvania*,
   319 U.S. 105 (1943) ........................................................................................ 36

*NAACP v. Alabama*,
   357 U.S. 449 (1958) ................................................................................... 33, 34

*NAACP v. Button*,
   371 U.S. 415 (1963) ........................................................................................ 32

*Prairie Band Potawatomi Nation v. Wagnon*,
   476 F.3d 818 (10th Cir. 2007)......................................................................... 19

*Rentera v. New Mexico Office of the Superintendent of Insurance*,
   No. 23-2123, 2025 WL 635754 (Feb. 27, 2025) (unpublished)................................. 28

*Roberts v. United States Jaycees*,
   468 U.S. 609 (1984) ........................................................................................ 33

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2021) (per curiam)................................................................... 28

*SEC v. GenAudio Inc.*,
    32 F. 4th 902 (10th Cir. 2022) ..................................................................................... 19

*Tandon v. Newsom*,
    593 U.S. 61 (2021) (per curiam) ............................................................ 24, 25, 26, 29

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
    471 U.S. 290 (1985) ..................................................................................................... 31

*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994) ..................................................................................................... 35

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ..................................................................................................... 35

*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985) ..................................................................................................... 36

**Statutes**

C.R.S. § 6-23-102 ............................................................................................................. 13

C.R.S. § 10-14-705 ..................................................................................................... 13, 25

C.R.S. § 10-16-107.4 ..................................................................................................... 4, 16

C.R.S. § 10-16-107.4(1)(a)(I)–(III), (V)–(XII), (XVI), (XIX)–(XX) ..................................... 10

C.R.S. § 10-16-107.4(5) ............................................................................................... 14, 21

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................................... 19

**Regulations**

3 C.C.R. § 702-4 ............................................................................................................ 4, 16

**Constitutional Provisions**

First Amendment ........................................................................................................*passim*

## INTRODUCTION

This is a very different case from when this Court adjudicated Plaintiff Alliance of Health Care Sharing Ministries' preliminary injunction motion, because months of discovery have undermined the State's defense of its law and addressed many of this Court's concerns with the Alliance's claims. Most strikingly, Colorado defended its law and implementing regulation—which require the religious non-profit organizations known as health care sharing ministries to report how they collect and distribute contributions from members, their affiliations, and their communications—on the purported ground that the requirements protect consumers from the risks of health care sharing ministries. But Colorado's Commissioner of Insurance testified in his deposition: "I don't think that disclosure requirements are all that effective of a tool from a regulatory standpoint or from a consumer education standpoint." *Infra* ¶ 62. Colorado can no longer defend its law on the primary ground it asserted at the preliminary injunction stage.

Discovery also has reinforced the Alliance's constitutional claims. The Alliance argued previously that the Colorado regime's empowerment of the government to issue exemptions and the exemptions already issued to comparable conduct violate the Free Exercise Clause's requirement of general applicability, for they "undermine[] [Colorado's] contention that its [law] can brook no departures." *Fulton v. Philadelphia*, 593 U.S. 522, 542 (2021). This Court was concerned that Colorado's regime provides only the authority for the Commissioner to create "categorical exclusions." But discovery has established that Colorado pushed for its authority to create "categorical exclusions" in order to benefit what it calls "the good guys." In addition, the regime allows for discretionary enforcement

that Colorado has exercised at its own fiat without explanation. For example, Colorado informed a secular organization (CrowdHealth) that it was subject to the law in January 2023, but did not follow up with that organization for over eighteen months, until mere days after filings its opposition to the Alliance's preliminary injunction motion, all the while sending the Alliance's members with ever more intrusive deficiency letters.

The Alliance also argued that Colorado's regime "restricts practices because of their religious nature." *Id.* at 533. This Court was concerned that there was no "religious gerrymander." But discovery has now confirmed that Colorado officials internally communicate that the law is all about health care sharing ministries, notwithstanding the sanitized bill language about "health care sharing arrangements." Moreover, the Commissioner himself assisted the anti-religious entertainer John Oliver in producing his attack on health care sharing ministries and the Deputy Commissioner—straying from what elsewhere she called her "allowable" talking points—posted online that she "never loved a piece of television more."

Finally, the Alliance argued that Colorado's law intrudes on the religious autonomy of organizations protected by the Establishment Clause. This Court was concerned that the reporting requirements regime "requires only an annual email." But discovery has established that ministries submit significant numbers of pages per year, that Colorado has tracked whether submitters are religious, and that Colorado has compiled lists of the ministries' affiliates, including individuals and religious entities. This is the exact type of "long-term, continuing monitoring" that the Tenth Circuit has condemned. *Medina v. Catholic Health Initiatives*, 877 F.3d 1213, 1233 (10th Cir. 2017).

Because the undisputed facts show that Plaintiffs are entitled to summary judgment, this Court should grant this motion, declare Colorado's regime unconstitutional, and enjoin it.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Plaintiff Alliance of Health Care Sharing Ministries

1.    Plaintiff is a 501(c)(6) trade organization formed to represent the common interests of health care sharing ministries. Dkt. 8-5 at ¶ 8.

2.    Health care sharing ministries are not insurance. They are non-profit, 501(c)(3) values-based organizations composed of individuals with strong religious ties who faithfully come together to share eligible health care costs, as described in each ministry's sharing guidelines. *Id.* at ¶ 5; **Ex. A**, Talento Dep. at 95:8–101:23.

3.    Health care sharing ministries enable faith-based communities to support one another and decide which health care costs they will share. Health care sharing ministries have a statement of beliefs that everyone in the ministry agrees to uphold. That statement of beliefs ensures that the ministry maintains an identity rooted in shared faith. New members must expressly acknowledge that they (1) adhere to the ministry's statement of faith, (2) will abide by its requirements of members, and (3) understand what types of expenses are shared and what types of expenses will not be shared. Dkt. 8-5 at ¶ 7.

4.    The Alliance's members are Altrua HealthShare, Christian Care Ministry (also known as Medi-Share), Liberty HealthShare, OneShare Health, and Samaritan Ministries International. Talento Dep. at 29:5–32:11.

5.      The Alliance's members have been certified by the U.S. Department of Health and Human Services Centers for Medicare and Medicaid Services as meeting the federal definition of "health care sharing ministry" under the Affordable Care Act. Dkt. 8-5 at ¶ 8.

6.      Each of the Alliance's member ministries have individual members in Colorado who participate in the ministries' health care sharing programs and incur medical expenses in Colorado that are shared among the ministries' members. The Alliance's member ministries are required to comply with the reporting law[1] to operate in Colorado. Dkt. 39 at ¶ 8.

**B.    Samaritan Ministries**

7.      Samaritan is a Christian 501(c)(3) nonprofit ministry that serves a distinct religious body whose members share directly in one another's spiritual, emotional, and financial burdens (arising from illness and injury). Dkt. 8-1 at ¶ 4.

8.      Samaritan was formed in 1991 in Illinois and began a nationwide ministry in 1994. *Id.* at ¶ 5. Samaritan's purpose is "to glorify God by growing and equipping disciples of Jesus Christ to love God with all their heart, soul, mind and strength, and to love and care for their neighbor as themselves." *Id.* Samaritan's "mission is to redeem health care by helping the Body of Christ love one another through sharing each other's health care burdens while experiencing authentic Biblical community." *Id.*

9.      To that end, every month, members of Samaritan give to other members who have medical needs. *Id.* at ¶ 6. Prayer is a central component of Samaritan's ministry: members

---

[1] House Bill 22-1269, codified at C.R.S. § 10-16-107.4, and its implementing regulation, Regulation 4-10-01, 3 C.C.R. § 702-4 (collectively the "reporting law" or "regime").

pray for other members in need and often send them notes of encouragement, staff pray for members, and members often pray for the staff. *Id*. at ¶ 6.

10.     To join Samaritan, one must be a Christian living by biblical principles, as certified by a local church leader. *See* Dkt. 8-4 at 3–4.

11.     Samaritan is governed along the lines of a congregational church. Dkt. 8-1 at ¶ 17. The entire Samaritan membership (over 80,000 households), votes on whether to increase monthly sharing amounts. *Id*. at ¶ 15.

12.     The Alliance's member ministries' operations also closely resemble that of a church. All member ministries have a chaplain who provides spiritual direction, counseling, prayer, and support. All member ministries hold worship services and prayer services on site. Most member ministries host Bible studies. Talento Dep. at 150:6–151:7.

13.     The Alliance's member ministries serve as communities for association and expression. All Alliance member ministries have newsletters that detail their evangelical efforts, inspirational stories, and sermons. All Alliance members encourage member-to-member interaction, including through internal platforms, physical notes, or phone calls. Members can always call their ministry and request prayers. *Id*. at 150:6–151:7.

**C.     Colorado Targeted Health Care Sharing Ministries**

14.     The Colorado Division of Insurance first evidenced its singular focus on the religious aspects of health care sharing ministries in a "consumer advisory" on December 11, 2020. Dkt. 46-1 at 421–22. In the "consumer advisory," the Division stated that members of the public should be wary of a "health care sharing program or ministry,"

because, among other reasons "members may also be subject to religious or moral restrictions from the sharing ministry." *Id.* at 421.

15.     For several years both before and after the Division's "consumer advisory" warning about the "religious or moral" elements of a "ministry," a state legislator introduced a bill targeting for regulation all entities constituting a "health care sharing ministry." *See, e.g.*, HB20-1008; HB21-1135.

16.     At a legislative hearing on HB20-1008, Rep Mullica testified:

> One question that I have . . . is the potential to deny a claim for immoral behavior or something along those lines . . . and I would just, I know we have two representatives from organizations up here. I would just like to hear from you specifically if that is something that your organization participates in or if it's something that you've heard of happens in the industry. It's something that's concerning to me to think that if somebody pays in that they could potentially be denied a claim because of "immoral behavior."

Health & Ins. Comm., Hearing 3:54:37pm–3:55:24pm (2/4/2020), tinyurl.com/yc69d5na.

17.     In the same hearing, Deputy Commissioner Harris testified:

> I just want to share a personal example that happened to me a couple months ago. So my mom lives in a rural area. She's pre-Medicare age. She was between jobs, and she was looking for coverage, health coverage, of some sort. Her financial planner recommended one of these health care cost sharing arrangements to her. She called me because she wasn't—you know, she knows I work in insurance—and she wasn't familiar with the company, and I had to explain to her that she would not likely be covered for any of her claims because she's gay, and due to the morality clause they would likely not cover anything for her, and that was a very hard conversation to have.

*Id.* at 4:36:50pm–4:37:30pm.

18.     When asked by a DOI employee if she would agree to an interview with a reporter "about health care sharing ministries," Deputy Commissioner Harris replied "Sure, that's fine. I've got my 'allowable' talking points fairly baked in at this point :)" **Ex. B** at 2.

19.     Commissioner Conway does not think there is a difference between the terms "health care sharing arrangement" and "health care sharing ministry." **Ex. C**, Conway Dep. at 54:7–14.

20.     Legislative testimony about HB22-1269 was also hostile to health care sharing ministries. During the principal House hearing, sponsor Rep. Lontine testified, "I have to ask, if you have a business that stands on religious, moral high ground, what do you have to fear about reporting about your business?" and she disparaged opposition to HB22-1269 as "disinformation." Health & Ins. Comm., Hearing 3:43:34pm–3:43:55pm (4/1/2022), tinyurl.com/5nnxb86x.

21.     Representative Titone asked a question about "these health care ministries" and asked how they are different than GoFundMe. *Id.* at 1:04:11pm–1:05:03pm.

22.     Even with HB22-1269 sanitized by removing the term ministry, the bill sponsor made public comments regarding the focus of the bill as on health care sharing ministries. *See* Hannah Metzger, Colorado Bill Aims to Create Reporting Requirements for Health Care Sharing Ministries, Colorado Politics (Mar. 11, 2022), perma.cc/ZL85-Z7SX ("Lontine said she doesn't think all health care sharing ministries are bad, but she wants to protect Coloradans from the ones that are.").

23.     Deputy Commissioner Judy referred to the sanitized bill as really being about ministries in pre-enactment emails to Commissioner Conway, Deputy Commissioner

Harris, and Justin Giovanelli (a professor who Colorado later retained as an expert in this litigation). **Ex. D** at 1 ("health care sharing ministries bill"); **Ex. E** at 1 ("health care sharing ministry reporting bill").

24.     Now– former Rep. Lontine and former Sen. Hansen (the Senate sponsor) spoke on a panel about HB22-1269 at the "2025 Health Care Sharing Ministries Symposium," sponsored by the Association of Secular Elected Officials, the Center for Freethought Equality, and the American Humanist Association. *See* American Humanist Association, What You NEED To Know About Health Care Sharing Programs RIGHT NOW! (May 5, 2025), tinyurl.com/4h3vh752.

25.     Rep. Lontine acknowledged that the majority of the entities affected by the regime are religious. *Id.* at 25:42–26:30.

26.     Rep. Lontine also stated:

> We are seeing religious freedom being used as a reason to discriminate. That's basically what we can't let happen. . . . Discrimination here looks like not having access to health care. And that is something that is vital to everybody. And so I think that pushing back on that looks like we can't discriminate because you don't think an unmarried woman should be having a baby. Or because you're gay you shouldn't be having children or have access to any reproductive health services.

*Id.* at 54:09–55:29.

**D.     John Oliver**

27.     John Oliver is a television figure who is well known for his anti-Christian bias. Dkt. 58 at 8–9 & 9 n.1.

28.     Commissioner Conway and Deputy Commissioner Harris assisted with John Oliver's critique of health care sharing ministries. Dkt. 58-1 at 35–45. Commissioner

Conway spoke with a producer for John Oliver's show about health care sharing ministries and a staff member shared HB20-1008 and the consumer advisory with the producer. *Id.* at 38. Deputy Commissioner Harris directed DOI staff to "pull recent complaints" about HCSMs for the Oliver show "ASAP." *Id.* at 35–36. Conway Dep. at 33:1–36:15.

29.     John Oliver incorporated an entity called "Our Lady of Perpetual Health, Inc." to mock health care sharing ministries. *See* https://perma.cc/3SUK-W7WT.



30.     John Oliver also incorporated a fake church called "Our Lady of Perpetual Exemption" to mock churches. *See* https://perma.cc/D3VP-HBBF.

31.    Deputy Commissioner Harris publicly promoted Oliver's show on health care sharing ministries, stating she's "never loved a piece of television more":



https://perma.cc/C6EZ-L339.

### E.    The Reporting Law

32.    The statute requires reporting of significant statistical and financial information. Across over a dozen different requirements, the statute requires reporting of comprehensive information regarding the number of members in a ministry, the amounts contributed to each other, the amounts requested to be shared, and actually shared, the amounts members of the ministry pay to health care providers, and the internal structure of the ministry. C.R.S. § 10-16-107.4(1)(a)(I)–(III), (V)–(XII), (XVI), (XIX)–(XX).

33.    The statute requires reporting of detailed information regarding the ministry's affiliations. It requires reporting of "any contracts the [ministry] has entered into with providers," that is, all medical practitioners with which it may do business. *Id.* § 10-16-107.4(1)(a)(IV). It also requires reporting of "any third parties that are associated with or assist" the ministry "in offering or enrolling participants" in the ministry" and a "detailed

accounting" of amounts "paid to a third party" for "operating, managing, or administering a plan or arrangement." *Id.* § 10-16-107.4(1)(a)(XV).

34.     The statute requires submission of the ministry's speech. It asks for "any" member and potential member communications "promoting" the ministry, including all "descriptions and other materials" that explain the ministry's sharing programs. *Id.* § 10-16-107.4(1)(a)(XVII).

35.     The Commissioner is required by statute to prepare a written report summarizing the reported information and publish on its website underlying information, subject to the requirement that it be "accurate and evidence-based." *Id.* § 10-16-107.4(3).

36.     The statute empowers the Commissioner to enforce its restrictions and to fine or prohibit the operation of ministries for violations. *Id.* § 10-16-107.4(2).

37.     The statute gives the Commissioner rulemaking authority. *Id.* § 10-16-107.4(4).

38.     The regulation defines several key terms. For example, it clarifies that "third party" means "contractors that are associated with or assist the plan or arrangement in offering or enrolling Colorado residents as participants" in the ministry. *Id.* Section 4(M). That is, ministries must report any entity that helps the ministry share medical expenses.

39.     The regulation also clarifies that the term "administrative expenses" includes "staff salaries," "marketing, outreach, and enrollment efforts." *Id.* Section 4(A). That is, ministries must report how much they spend on ministers and religious communications and outreach to new members.

40.    The final regulation requires the ministries to compile, verify, and then submit a spreadsheet with comprehensive information, even beyond that in the statute. Updated Health Care Sharing Plan Reporting template for regulation 4-10-01, Sheet 2–3.

**F.    The Selective Application of the Reporting Law**

41.    The reporting law is selective in its application to similar activities. (It, of course, does not enumerate comprehensively the many activities that are like the activities of health care sharing ministries but that it does not cover.) There are numerous comparable activities that Colorado does not regulate, including direct primary care arrangements, medical discount cards, crowdfunding, student health clinics at universities (where students pay a fee for unlimited access), charities that pay medical bills, church plans, or fully-insured out-of-state employer health plans with Colorado enrollees. Talento Dep. at 132:10–135:16, 143:3–148:13, 148:14–149:20.

42.    The regime overwhelmingly regulates religious organizations. As of Colorado's 2023 Report, at least 86.8% of Coloradans who were members of a reporting entity were members of ministries.[2] *See* Dkt. 58-1 at 7–8; Dkt. 46-1 at 766 (85.2%[3] for 2022), 751 (92.7% for 2021).

43.    Professor JoAnn Volk also made the point that the regime overwhelmingly regulates religious organizations on an email chain discussing the 2021 Report with Professor Justin Giovannelli, Leilani Russell (the primary Division employee administering the law), and Deputy Commissioner Judy:

---

[2] This is underinclusive because it does not include the membership total for Unite Health Share Ministries, a religious ministry.
[3] This is also underinclusive because it excludes Unite Health Share Ministries.

> It looks like the list of reporting entities [in the 2021 Report] is largely HCSMs, as a share of the number of entities reporting and by enrollment. If it creates problems for you to have us refer only to HCSMs [in a blog post], we can try to include some very concise explanation of the term, and point out that for the most part, it's HCSMs reporting.

**Ex. F** at 2.

## G.    Express Exemptions

44.    The reporting law explicitly states that its provisions do not apply to "direct primary care agreements." During the drafting of the bill, an advocate for direct primary care worked with Deputy Commissioner Judy and Rep. Lontine to add this language to HB22-1269 because direct primary care otherwise falls within the scope of the law. **Ex. G** at 1. The advocate noted "We've flagged this for Rep Lontine and she is open to including amendment language since the intent of [HB22-1269] is to establish safe guards on the ministries not DPC[.]" *Id.*

45.    Separate and apart, Colorado exempts direct primary care from regulation under the Insurance Code. C.R.S. § 6-23-102.

46.    Colorado law also exempts "Grand or subordinate lodges of masons, odd fellows, or knights of Pythias," among other fraternal organizations from regulation under the Insurance Code. C.R.S. § 10-14-705.

47.    The Division does not have staff who work on direct primary care agreements, crowdfunding, consumer payment plans, or student health clinics. **Ex. H**, Russell Dep. at 29:10–31:4.

**H.     Exemptions by Rule**

48.     The statute explicitly states that its provisions do not apply to "other consumer payment arrangements identified by the commissioner by rule." C.R.S. § 10-16-107.4(5).

49.     Deputy Commissioners Judy and Harris, Rep. Lontine, legislative staff, lobbyists, and members of special interests discussed how to ensure that a favored dental payment arrangement—described as the "good guys"—that fell within HB22-1269's terms could be excluded through amended language and how the Commissioner had the power to exempt organizations under the statute. Dkt. 58-1 at 27–33.

50.     Deputy Commissioner Judy proposed that granting the Commissioner exemptive authority by rulemaking was the simplest solution. *Id*. at 29.

51.     Regulation 4-10-01 expressly exempts not only the statutorily exempted "direct primary care agreements," but also "consumer payment plans offered directly between a provider and patient" and "crowdfunded sources" (which it does not define).

**I.     Exemptions by Enforcement Discretion**

52.     The Division agreed to not enforce the statute against Alliance members during the pendency of the motion for a preliminary injunction in this action. Dkt. 46 at 3–4.

53.     The Commissioner decided to suspend enforcement. Conway Dep. at 74:3–5.

54.     The Division also decided not to enforce the regime against *any* entity during that period. *Id*. at 73:10–74:9. The Division never made any kind of public or formal notice that it was suspending enforcement of the regime (or, later, that it was enforcing the regime again). *Id*. at 74:10–17.

55.    Commissioner Conway stated that there is no temporal limitation on the Commissioner's discretion to suspend enforcement. *Id.* at 75:24–76:4.

56.    The Division sent a letter to a secular sharing organization, CrowdHealth, demanding compliance with its regime on January 11, 2023. **Ex. I** at 2.

57.    CrowdHealth disputed the applicability of the regime. **Ex. J.**

58.    The Division did not pursue enforcement against CrowdHealth at that time.

59.    On November 23, 2023, a third-party recommended that the Division investigate CrowdHealth. **Ex. K** at 1.

60.    The Division sent another letter to CrowdHealth for failing to comply with its regime only on September 9, 2024 (*after* filing its opposition to the preliminary injunction motion in this case, where the Division denied selective enforcement of the regime). **Ex. L** at 1.

61.    The Division grants extensions of time at the discretion of Ms. Russell and without reasoning. Russell Dep. at 108:25–109:13

**J.    The Reporting Law as Administered**

62.    Commissioner Conway believes that disclosure requirements are ineffective regulatory tools: "I don't think that disclosure requirements are all that effective of a tool from a regulatory standpoint or from a consumer education standpoint." Conway Dep. at 18:13–21; *see also id.* at 18:22–19:9. Ms. Russell testified that the Division does not use the collected materials for those purposes. Russell Dep. at 150:4–12.

63.    The Division has tracked whether each entity that makes submissions under the regime is religious. **Ex. M** [2021 Aggregate Submissions] at 24 ("Faith Based?" column).

64.     The Division maintains lists of third parties, including individuals and other religious entities, who affiliate with health care sharing ministries. *Id.* at 13–15; **Ex. N** [2022 Aggregate Submissions] at 13–15; **Ex. O** [2023 Aggregate Submissions] at 21–22; Russell Dep. at 141:8–156:25.

65.     The Division checks health care sharing ministries' social media accounts to see if material the Division deems "marketing material" was not submitted to the Division. Russell Dep. at 60:7–61:11.

66.     The Division requires health care sharing ministries to submit links to all "specific websites, or pages on a website" that have marketing materials. **Ex. P** at 1.

67.     There is no definition of "marketing material" in the reporting law or related rules. C.R.S. § 10-16-107.4; 3 C.C.R. § 702-4. Russell Dep. at 128:23–129:5.

68.     The collection of marketing material is intended to "impact[] their [the ministries'] behavior." **Ex. Q**, Division Dep. at 74:1–12.

69.     The administration of the reporting law captures one to two percent of the Commissioner's time annually. Conway Dep. at 15:19–16:3.

70.     The Commissioner's reports, like its initial consumer advisory, also focus on the ministries' policy not to facilitate payment of medical expenses inconsistent with their religious beliefs. Dkt. 46-1 at 738–52 [2021 Report], 753–76 [2022 Report]; Dkt. 58-1 at 4–25 [2023 Report].

71.     The 2021 and 2022 reports (pre-litigation) call out ministries for not sharing in expenses related to abortion, but the 2023 report (post-litigation) does not mention

abortion at all. *Compare* 2021 Report at 6 and 2022 Report at 6 *with* 2023 report at 12; Russell Dep. at 73:9–74:12.

72.     The Commissioner reviews and approves every report. Russell Dep. at 61:12–16.

73.     The Governor's office signed off on the 2022 and 2023 reports. *Id.* at 75:23–77:2.

74.     The Division concluded that no reporting entity (0 out of 16) correctly initially complied with the reporting law in 2021. *Id*. at 44:2–20.

75.     The Division could have fined any entity for an incorrect or incomplete submission. *Id.* at 47:7–10.

**K.     The Reporting Law's Harms**

76.     The reporting law harms Samaritan. Samaritan's staff spend at least 285 hours annually gathering the required data, preparing reports, verifying their accuracy, and submitting them to Colorado. Dkt. 8-1 at ¶ 22. Samaritan further incurs ongoing legal fees in connection with complying with HB22-1269. *Id.* at ¶ 23.

77.     The Alliance has spent over $100,000 in employee time in responding to the reporting law. Dkt. 8-5 at ¶ 20–22, 23; Talento Dep. at 66:22–86:10.

78.     The reporting law requires that Samaritan provide extensive and intrusive financial data and operational statistics that go far beyond what other regulations require. This information can be easily misunderstood or mischaracterized, causing further harm to Samaritan. Dkt. 8-1 at ¶¶ 11–13.

79.     The reporting law further harms Samaritan by requiring it to report to Colorado "third parties" that are involved in "operating, managing, or administering" the Samaritan sharing program; Samaritan also enters into non-disclosure agreements and contracts

with third party vendors with the expectation of protecting the confidential nature of their business relationship. Many Samaritan affiliates wish to maintain their privacy and do not want their information shared with others, including the government. Dkt. 8-1 at ¶ 10.

80. Many Alliance members wish to maintain the privacy of their business or religious affiliations and do not want those affiliations shared with the government. Dkt. 8-5 at ¶ 16.

81. Some affiliates of Alliance member ministries are reluctant to work with the ministries because of Colorado's regime. *Id.* at ¶ 16; Talento Dep. at 207:19–212:17.

82. The reporting law harms Samaritan by requiring it to submit copies of all member and potential member communications "promoting" the ministry, including all "descriptions and other materials" that explain Samaritan's programs. Dkt. 8-1 at ¶ 19.

83. The reporting law harms the ability of the Alliance and its member ministries to carry out their religious mission to redeem and reform healthcare in the name of Jesus. Talento Dep. at 214:15–215:25, 216:11–218:12.

### LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To defeat a motion for summary judgment, [the nonmovant's] evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *SEC v. GenAudio Inc.*, 32 F. 4th 902, 920 (10th Cir. 2022). A party is entitled to a permanent injunction at the summary judgment stage when it proves, as a matter of law, "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction

may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007). Aside from requiring a showing of actual success on the merits, the standard for a permanent injunction is identical to the standard for a preliminary injunction. *Id.*

## ARGUMENT

**I    The Alliance is entitled to judgment on the merits.**

**A.    Colorado's regime violates the Free Exercise Clause.**

The First Amendment prohibits the government from burdening "the free exercise" of religion. "The [Free Exercise] Clause protects not only the right to harbor religious beliefs inwardly and secretly." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). Rather, "[i]t does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Id.* (quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 877 (1990)).

There can be no question—and Colorado has not disputed—that Colorado's regime burdens the ministries' free exercise of religion. *Supra* ¶¶ 1–13, 76–83. Consistent with their commitment to bear one another's burdens, members of ministries exercise their religious beliefs by contributing spiritually, emotionally, and financially to each other's medical expenses.

An individual or organization "may carry the burden of proving a free exercise violation in various ways." *Kennedy*, 597 U.S. at 525. In particular, government action is subject to strict scrutiny under the Free Exercise Clause when it "is not 'neutral' or

'generally applicable.'" *Id.* (citing *Smith*, 494 U.S. at 879–881). Colorado's regime fails both requirements.

### 1.    Colorado's regime is not generally applicable.

"[L]aws burdening religious practice must be of general applicability." *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (1993). A law may fail general applicability in at least two ways. *Fulton*, 593 U.S. at 533–534.

**a.** First, a law "is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Id.* at 533 (alteration in original) (internal quotation marks omitted). Thus, the "creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given." *Id.* at 537. That "undermines the [State's] contention that its [law] can brook no departures." *Id.*

The Supreme Court's decision in *Fulton* exemplifies this rule. There, the city of Philadelphia "stopped referring children to [Catholic Social Services] upon discovering that the agency would not certify same-sex couples to be foster parents due to its religious beliefs about marriage." 593 U.S. at 527–528. The city argued that its decision was an application of a generally applicable policy that foster agencies such as Catholic Social Services must provide services regardless of sexual orientation. But the Court concluded that was not a generally applicable policy because it empowered the city to grant exceptions at its "sole discretion." *Id.* at 537. As the Court put it, this regime 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id.* (alteration in original) (quoting *Smith*, 494 U.S. at 884).

Here, the statute contains at least two types of exemption mechanisms: rulemaking and enforcement. First and foremost, with respect to rulemaking, the statute empowers the Division to exempt "other consumer payment arrangements identified by the commissioner by rule." C.R.S. § 10-16-107.4(5). The statute does not cabin the Division's discretion in any way. The Division has exercised that exemptive authority in its final regulation. That is a clear violation of the principle most recently enunciated in *Fulton*. Consequently, the Colorado regime is not generally applicable and is subject to strict scrutiny, which Colorado cannot satisfy.

This Court held that *Fulton* is not applicable to exemption authority that is provided "by rule," because such authority provides for "categorical exclusions." But respectfully, *Fulton* made no such distinction, with good reason: the concern is whether the government can "decide which reasons for not complying with the policy are worthy of solicitude" and whether the presence of discretion "undermines the [State's] contention that its [law] can brook no departures." 593 U.S. at 537, 542. That concern is applicable regardless of whether the government exercises discretion by rule or not.

That is why another decision in this district did not read *Fulton* this way. In *Bella Health & Wellness v. Weiser*, the court held *Fulton* applied when "the uniformity of [the state law]'s application was dependent on the outcome of three boards' rulemaking." 699 F. Supp. 3d 1189, 1214 (D. Colo. 2023). In that case, Colorado enacted a law empowering its medical, pharmacy, and nursing boards to promulgate regulations on whether medication abortion reversal constituted accepted practice. The boards promulgated regulations to the effect that medication abortion reversal is not a generally accepted

21

practice but—but not per se unaccepted—and would be evaluated on a case-by-case basis. The court held that this statute and implementing rules "contain multiple mechanisms for exceptions." *Id*. First, "at the initial stage, the uniformity of [the statute's] application was dependent on the outcome of three boards' rulemaking. The fact that the law itself included this discretionary measure 'undermines the [State's] contention that its [regulations] can brook no departures.'" *Id*. (quoting *Fulton*). The court went on to address two other mechanisms: a case-by-case process in the implementation rules and the discretion of instituting the disciplinary process. *Id*. at 1214–15. *Bella Health* confirms the applicability of Fulton's concern about selectivity to rulemaking.

Indeed, in this very case, Colorado discussed using its exemptive rulemaking authority to selectively protect secular "good guys" (while ensuring the ministries receive harsh treatment). *Supra* ¶¶ 49–50. In an email during the legislative process, Colorado officials encouraged legislative solutions that would empower the Commissioner to exempt from the statute's plain coverage a particular practice regarding the payment of dental expenses. Any revisionism that these "good guys" are different than the ministries only underscores that Colorado is picking and choosing whom to exempt.

There also is an additional level of exemption discretion here: enforcement discretion. *Fulton* is triggered when a regime "invites the government to consider the particular reason for a person's conduct." 593 U.S. at 537. An administrative enforcement system like the one in this case is just that. *Bella Health* is again instructive. There, the court observed that the state officials "have discretion throughout the disciplinary process to decide whether and how to punish a provider who engages in" medication abortion

reversal and that such discretion triggered *Fulton*. 699 F. Supp.3d at 1214–15.

Here, similarly, Colorado is empowered to decide *which* organizations it enforces its regime against and *when*. That discretion has come into play in at least two ways so far. First, in this case, Colorado decided not to enforce its regime against those ministries in active litigation over the regime (and others) during the pendency of preliminary injunction proceedings in this Court. *Supra* ¶¶ 52–55, 61.

Second, Colorado has selectively chosen when and how to enforce its regime with respect to crowdfunding, conducting enforcement against secular entities only after denying its regime targets the ministries. *Supra* ¶¶ 56–60. Colorado sent a letter to a crowdfunder demanding compliance with its regime in January 2023. Ex. I at 2. Eighteen months later, it apparently had received nothing from that organization, despite being recommended to investigate it. Ex. K.[4] In that interim, it had sent numerous deficiency letters to ministries over purported omissions in or problems with their submissions, reminding the ministries of fines and compliance requirements and publishing critical reports. Yet Colorado sent its follow up letter to that secular crowdfunder for failing to comply with its regime only in September 2024, after filing its opposition to the preliminary injunction motion in this case, denying selective enforcement of the regime. Ex. L. There is only one way to read this history that Colorado has revealed: if the organization is a ministry, then Colorado will enforce its regime vigorously; if the organization is secular, then Colorado may not do so.

---

[4] In this email chain, a Division employee repeatedly asks about "ministries" reporting under the regime and evidences that she did not even know that the regime applies to organizations other than ministries.

**b.** Second, a law fails general applicability if it "treat[s] *any* comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (emphasis in original), or "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," *Fulton*, 593 U.S. at 534. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62. A single exemption for comparable secular activity condemns government action to strict scrutiny review. *Id*.

Here, Colorado fails to subject and explicitly exempts numerous comparable secular activities from the burdens imposed on health care sharing ministries. *Supra* ¶¶ 21, 41–47. For example, Colorado law explicitly exempts direct primary care arrangements, while Colorado regulation explicitly exempts consumer payment plans and crowdfunded arrangements. *Id*. ¶¶ 44–45. Indeed, the exemption for direct primary care was added through the efforts of a lobbyist "since the intent of [HB22-1269] is to establish safe guards on the ministries not DPC." *Id*. That these practices are explicitly exempted necessarily means that they would be covered by the statutory language but for the explicit exemption and thus trigger "the government's asserted interests in a similar way."

In addition, Colorado does not regulate other organizations that help individuals share medical expenses, such as but not limited to masonic fraternal organizations, medical discount cards, student health clinics at universities (where students pay a fee for unlimited access), charities that pay medical bills, or fully-insured out-of-state employer health plans with Colorado enrollees. *Supra* ¶¶ 21, 41–47. All these

organizations involve the same purported interest in regulatory medical expense sharing.

This Court previously rejected this claim by crediting Colorado's argument that none of these practices "resembles insurance" such that it creates confusion and flipping the burden onto the Alliance to prove otherwise. Yet the Supreme Court has criticized placing the burden on the plaintiff in these cases. In *Tandon*, the Court criticized the Ninth Circuit for not placing the burden on the government: "instead of requiring the State to explain why it could not safely permit at-home worshipers to gather in larger numbers while using precautions used in secular activities, the Ninth Circuit erroneously declared that such measures might not 'translate readily' to the home." 593 U.S. at 64; *see Blackhawk v. Pa*., 381 F.3d 202, 211 (3d Cir. 2004) (placing burden on government). Regardless of that burden flipping, however, Colorado's purported evidence of customer confusion disintegrates at the slightest touch:  it primarily consists of state insurance commissioner or attorney general enforcement activity against organizations operating an unlicensed insurance company or in violation of other charitable laws, not consumer confusion as to the ministries' operations. *See* Dkt 46-1 at 79–233. Colorado's remaining evidence consists of complaints about producers or networks, which are not exclusive to ministries and do not justify a focus on them, or complaints regarding religious organizations not facilitating sharing of payment of medical procedures against their religious beliefs, which are fundamentally theological and not a subject for regulation.

In any event, Colorado's argument is fatally undermined by the Commissioner's testimony. Under *Tandon*, comparability is assessed based on "the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62. But Colorado can

no longer assert a governmental interest in preventing consumer confusion—that is educating consumers and protecting them—now that its own Commissioner states the law does not advance that interest. *Supra* ¶ 62.[5] Consequently, discovery undermined Colorado's primary argument under *Tandon*.

## 2.    Colorado's regime is not neutral.

The government is "obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of [] religious beliefs." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018). "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533. Laws also are not neutral when they accomplish a "religious gerrymander" where "the burden of the [law], in practical terms, falls on [religious] adherents but almost no others." *Lukumi*, 508 U.S. at 535-36.

A law is also not neutral when "the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body" demonstrate animus toward religion. *Masterpiece*, 584 U.S. at 639. When "'official expressions of hostility' to religion accompany laws or policies burdening religious exercise," courts must "'set aside' such policies without further inquiry." *Kennedy*, 597 U.S. 507, 525 n.1 (2022) (quoting *Masterpiece*, 584 U.S. at 639).

Even "slight suspicion" of religious intolerance or "subtle departures from neutrality" violate the Free Exercise Clause. *Masterpiece*, 584 U.S. at 639. As the Tenth

---

[5] Colorado may try to reinterpret the Commissioner's statement about "disclosure requirements" to be about "specific" disclosure requirements, *see* Appellee's Brief in Case No. 25-1035, 10th Cir. (May 7, 2025) at 26, but the testimony speaks for itself.

Circuit recently explained, there does not need to be "egregious language" from officials: for "if that is the bar for an inference of hostility, it will almost never be cleared." *Does 1-11 v. Board of Regents of Univ. of Colorado*, 100 F. 4th 1251 (10th Cir. 2024).

Rather, in assessing neutrality, courts must "survey meticulously" for "masked, as well as overt" hostility. *Lukumi*, 508 U.S. at 534. "Factors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece*, 584 U.S. at 639 (quoting *Lukumi*, 508 U.S. at 540). All evidence of a law's purpose is relevant to determining whether a law was "enacted 'because of,' not merely 'in spite of,' [its] suppression of [] religious practice." *Lukumi*, 506 U.S. at 540 (quoting *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 279 (1979)); *see e.g.*, *Roman Catholic Diocese of Brookyn v. Cuomo*, 141 S. Ct. 63, 66 (2021) (per curiam) (rejecting pandemic restrictions because "statements made in connection with the challenged rules can be viewed as targeting the ultra-Orthodox [Jewish] community") (internal quotation marks omitted) (alteration in original); *Lukumi*, 508 U.S. at 541 (rejecting regulation regarding treatment of animals because of, among other reasons, hostility of members of the city council towards the religion of Santeria).

Here, Colorado's regulatory regime is not neutral with respect to religion. *Supra* ¶¶ 14–31. Indeed, the Commissioner himself conspired with the John Oliver show—a well-known anti-religious entertainer—who then viciously mocked and denigrated the

ministries and then was praised by the Deputy Commissioner for that segment. *Id.* ¶¶ 27–31. In addition, the Division's statements target "ministries" for their religious beliefs, casting them as discriminatory; the legislative history exhibits the same focus (protecting secular "good guys"—implicitly classifying ministries as "bad guys"); the Division's misleading reports reiterate that view; and the statutory and regulatory exemptions privilege similar secular conduct while covering conduct that is overwhelmingly (as of the 2023 Report, over 86%) religious. *Id.* ¶¶ 14–31, 42, 43, 49, 50, 69–75. Together, these indicate much more than a "slight suspicion" that Defendant has proceeded in a manner intolerant of religious beliefs.[6]

Colorado previously argued its regime is not a gerrymander because it in theory applies to secular health care sharing plans. Yet "[i]t is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue." *Tandon*, 593 U.S. at 62. And this Court also recognized that upwards of 85% of regulated organizations are religious. Dkt. 54 at 17.

### B.    Colorado's regime violates the Establishment Clause.

Throughout our Nation's history, religious bodies have been the preeminent example of private associations that have act[ed] as critical buffers between the individual and the power of the State." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 199 (2012) (Alito, J., concurring) (internal quotation marks

---

[6] The combination of these private and public communications reveals more intolerance than the case of *Rentera v. New Mexico Office of the Superintendent of Insurance*, No. 23-2123, 2025 WL 635754 (Feb. 27, 2025) (unpublished), which involved primarily public statements, *id.* at *7–*8.

omitted). "To safeguard this crucial autonomy," the courts have long acted to "protect a private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs." *Id.* As this court accepted (rejecting Colorado's contrary argument), the Establishment Clause furthers that end, prohibiting "excessive entanglement between religion and government." *Does* 1-11, at 1270. Under it, although government may impose "narrowly drawn" requirements regarding "recordkeeping and disclosure," it may not force a religious organization to subject itself to the state as ultimate arbiter of its activities. *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1535 (11th Cir. 1993); *see Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378, 394 (1990).

This distinction is well illustrated in *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*. There, the city of Clearwater promulgated an ordinance requiring that any organization that solicits funds report the name of the organization, its tax-exempt status, its purpose, the names and addresses of its officers, its other locations, any past criminal prosecutions, and, most relevant here, "[a]n estimated schedule of salaries, wages, fees, commissions, expenses and costs to be expended and paid in connection with the solicitation of funds and in connection with their disbursement, and an estimated percentage of the total projected collections which the costs of the solicitation will comprise," together with annual figures for the same. *Church of Scientology*, 2 F.3d at 1521–22. The court concluded that this ordinance excessively entangled the government with a religious organization because it essentially required a religious organization "to divulge its entire budget and all its operations on a continuing basis," and it mandated

"detailed monitoring and close administrative interaction." *Id*. at 1535.

Similarly and much more recently, in *Medina v. Catholic Health Initiatives*, the Tenth Circuit held that regulatory schemes that require "long-term, continuing monitoring" constitute excessive entanglement with religious organizations in violation of the Establishment Clause. 877 F.3d at 1233. There, an employee argued that a church's benefit plan should be subject to ERISA and that exempting churches from ERISA coverage constituted excessive entanglement with religion. The Tenth Circuit concluded that the employee's argument turned the Establishment Clause on its head: "far from entangling the government in the affairs of religious institutions, the church-plan exemption avoids the entanglement that would likely occur in its absence." *Id*. at 1234.

Here, Colorado's regime imposes the "long-term, continuing monitoring" and "detailed monitoring and close administrative interaction" condemned by *Medina* and *Church of Scientology*. The Colorado regime subjects health care sharing ministries to extensive and intrusive monitoring of finances and operations. The statutory requirements number in the dozens; the regulatory requirements fill multiple spreadsheets. *Supra* ¶¶ 32–40. Colorado requests detailed financial and operational metrics that are akin to asking a church how it spends its collection baskets on charitable giving, keeping lists of affiliates, including individuals and religious entities. *Id*. ¶¶ 63, 64, 78. Even worse, Colorado exposes those internal workings of a religious organization for all the world to see in its reports, and in raw submissions online or in CORA requests. Consequently, Colorado's regime triggers strict scrutiny, which it cannot survive.

This Court's primary response to these arguments was to describe Colorado's

regime as a reporting requirement and "only requiring an annual email." But discovery has confirmed that this regime cannot be characterized as just an "annual email," in light of the volume (thousands of pages across the Alliance members alone) and nature of the submissions. Indeed, the cases that Colorado cites prove as much because they are worlds away: *Bowen v. Kendrick*, 487 U.S. 589 (1988), involved religious organizations voluntarily participating in government programs, not being required to do so to operate at all, and in *Jimmy Swaggart Ministries*, 493 U.S. at 378, and *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290 (1985), the law required the religious organizations to create records for themselves, not create records and then turn them over to the government. And *Church of Scientology* itself involved a reporting regime.

At the end of the day, Colorado simply has no response to the undisputed fact that its regime subjects health care sharing ministries to dozens of invasive requirements and public scrutiny of their internal operations.

## C.    Colorado's regime violates the Freedom of Association.

The Supreme Court has "'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others.'" *Bonta*, 594 U.S. at 606 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). It is "hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Id.* (alteration in original). In such situations, courts subject government restrictions on the freedom of association to "exacting scrutiny." *Id.* at 607.

Under "exacting scrutiny," there must be "a substantial relation" between the restriction and a "sufficiently important governmental interest." *Bonta*, 594 U.S. at 607. Not just any governmental interest is "sufficiently important." For example, "administrative convenience" is not enough. *Id.* at 615. Similarly, for a "substantial relation" to exist between the restriction and the governmental interest, that restriction must be "narrowly tailored." *Id.* at 608. That is because "First Amendment freedoms need breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 433 (1963). To be "narrowly tailored," the restriction must satisfy a "means-end fit." *Id.* at 613. Required disclosure, for example, is not acceptable when enforcement mechanisms such as *ex post* investigation would suffice. *See id.* at 614.

The right to freedom of association applies in two ways of particular relevance here. First, the government can violate the freedom of association by compelling an organization to disclose the names of individuals who associate with the organization. In *Americans for Prosperity Foundation v. Bonta*, the Supreme Court held that California's requirement that nonprofit organizations disclose the identities of their donors violated the First Amendment. *Id.* at 618. There, the California Attorney General promulgated a regulation requiring nonprofit organizations to file paperwork listing their major donors, in the interest of easing the investigatory burden of the government agency. The Supreme Court declared the regulation unconstitutional. It held that California's generalized interest in preventing wrongdoing did not justify the significant burden, including the risk of public disclosure, of collecting this information from nonprofit organizations. *See id*. *Bonta* is the latest in a long line of cases preventing the government from inquiring into the "internal

structure or affairs of an association." *See, e.g.*, *Roberts*, 468 U.S. at 623; *NAACP v. Alabama*, 357 U.S. 449, 462 (1958); *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960); *Healy v. James*, 408 U.S. 169, 181–182 (1972).

Second, the government can violate the freedom of association by compelling an individual to disclose the names of organizations with which he associates. "[A] vital relationship [exists] between freedom to associate and privacy in one's associations." *NAACP v. Alabama*, 357 U.S. at 462. That is because compelled disclosure of individuals' associations can "subject them to threats, harassment, or reprisals from either Government officials or private parties," *John Doe No. 1 v. Reed*, 561 U.S. 186, 200 (2010)—a risk that is increasingly true in today's digital age. In *Shelton v. Tucker*, for example, the Supreme Court declared unconstitutional an Arkansas statute requiring teachers to list the organizations to which they belonged or contributed. 364 U.S. 479 (1960). The Court held that, although the government of course enjoys the right to investigate the fitness of those who teach in its schools, that governmental interest "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id*. at 488.

The Colorado regime runs afoul of both principles. It requires the disclosure of numerous entities that associate with health care sharing ministries, including those who, in Colorado's words, "assist in marketing and enrollment" (that is, proselytization). *Supra* ¶¶ 33, 64. That disclosure has the potential to chill entities from affiliating with the ministries. Indeed, the Alliance is already aware of exactly that and submitted two sworn declarations supporting that effect, as well as testifying to the same in deposition. Supra

¶¶ 79–81. One deponent, a ministry official, further testified in deposition that organizations are reluctant to work with his ministry because of its beliefs, that disclosure of that affiliation will exacerbate that problem, and that organizations often do not give reasons for their refusal to deal. Dkt. 52-1 at 7–10, 14–15. In light of this evidence, the Alliance has satisfied the required showing under governing precedents.

Once the Alliance makes that showing, Colorado cannot satisfy the required exacting scrutiny for its regime because there is no substantial relation between the disclosure requirement and a sufficiently important governmental interest. *Supra* ¶ 62. Colorado has not advanced such an interest; to the extent it relies on a general interest in consumer protection, that does not match the burdensome disclosure regime it has enacted. There is no substantial relation between a putative consumer protection rationale and the requirements, and the requirements are not narrowly tailored.

### D.    Colorado's regime violates the Free Speech Clause.

The right to speak and the right to refrain from speaking are "complementary components of the broader concept of individual freedom of mind" protected by the First Amendment. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (internal quotation marks omitted). "Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as those that forbid speech. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). Any attempt by the government either to restrict, chill, or compel individuals to express certain views is subject to strict scrutiny. The general rule "that the speaker has the right to tailor the speech[ ] applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact

the speaker would rather avoid." *Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

The Colorado regime, by requiring submission of the communications of the ministries with prospective and current members, chills ministry speech and, by requiring reporting of information that Colorado posts publicly, compels the ministries to speak about their internal operations. *Supra* ¶¶ 65–68, 82, 83; Russell Dep. at 150:1–12. That is inconsistent with the First Amendment's prohibition on restricting or compelling speech. Consequently, it is subject to strict scrutiny. Defendant cannot satisfy strict scrutiny because he lacks a compelling interest, and the law is not narrowly tailored.

For compelled speech, the only narrow exception to the application of strict scrutiny relates to "purely factual and uncontroversial disclosures" that are "related to the State's interest in preventing deception of consumers" by commercial speech and that are not "unduly burdensome." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985); *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). Defendant cannot satisfy this standard because they post excerpts of Plaintiff's members' speech that are misleading by omission and designed to make them look unscrupulous, which is thereby controversial.

This Court rejected that claim with two erroneous conclusions. First, it concluded that the ministries' speech, although admittedly religious and soliciting funds for an IRS-recognized charities, *see* Dkt. 54 at 56, is nonetheless "commercial speech" (and thus its required submission is not subject to strict scrutiny) because it "inform[s] private economic decisions relating to health care coverage and do[es] provide information about goods

and services." *Id.* at 56–57. This is inconsistent with the Supreme Court's holding in *Village of Schaumburg v. Citizens for a Better Env't*, that "charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics of goods and services." 444 U.S. 620, 632 (1980).

This Court navigated around *Schaumberg*'s holding on charitable solicitation by pointing to "Colorado's concern" that the ministries are simply "[p]roposing commercial transactions" and it is those transactions that "concern" Colorado. Dkt. 54 at 58. But Colorado does not get to decide whether religious speech is instead commercial any more than Pennsylvania could decide that "the sale of religious literature by itinerant evangelists" was a "commercial enterprise beyond the protection of the First Amendment." *Schaumburg*, 444 U.S. at 630 (describing *Murdoch v. Pennsylvania*, 319 U.S. 105 (1943), protection of the sale of religious literature). Religious speech does not lose its protection because the state believes it is solely or primarily commercial, or because aspects of it relating to commerce raise "concerns." That would undermine the strict scrutiny protection for religious speech.

Second, this Court also rejected the Alliance's claim that requiring the submission of ministry data on internal operations and posting it publicly (in a misleading fashion, to boot) triggers strict scrutiny. This Court held that although not technically "commercial speech," Colorado's regime "does not implicate core First Amendment concerns" because the requirements are "commercial-speech adjacent" and akin to the "securities context." Dkt. 54 at 61–63. But Colorado's regime compels disclosure and then publishes (misleadingly) the internal operations *of a religious organization*, not the details of a

securities trade. It is only by again wrongly accepting "Colorado's desire" to focus on aspects of ministries relating to commerce, *id.* at 63, that the application of strict scrutiny can be avoided, this time by creating a First-Amendment-free zone for "commercial-speech adjacent" restrictions.

### E.    Colorado's regime does not survive strict scrutiny.

When government action infringes free exercise and religious autonomy rights, it must survive strict scrutiny: "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The government bears the burden, and therefore "face[s] the daunting task of establishing that the requirement was narrowly tailored to advance a compelling governmental interest." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004). Colorado cannot satisfy that standard in light of the lack of Colorado enforcement actions addressed by this law: Colorado simply has not shown an "actual problem in need of solving." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (internal quotation marks omitted). Indeed, the Commissioner himself stated the regime is not even effective. *Supra* ¶ 62. And the regime is not narrowly tailored in light of its underinclusion of similar conduct and the existence of other legal tools for consumer protection, which have been deployed by Colorado and every other state to-date.

## II    The Alliance prevails on the remaining injunctive-relief factors.

It is blackletter law that a First Amendment violation or the imposition of compliance costs is irreparable harm. *See Hobby Lobby Stores v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013). Plaintiff and its members will suffer both injuries absent a permanent injunction. Further, the "balance of equities" and the "public interest" factors "merge when

the Government is the opposing party," and the government does not have an interest in enforcing a law that is invalid, especially when Colorado did not enforce it for most of this litigation. *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010).

## CONCLUSION

For the foregoing reasons, this Court should enter summary judgment for Plaintiff on all claims and order declaratory and injunctive relief.

Dated: May 16, 2025

Respectfully submitted,

*/s/ Michael F. Murray*

Michael F. Murray
T. Benton York
PAUL HASTINGS LLP
2050 M Street, NW
Washington, D.C. 20036
(202) 551-1700
michaelmurray@paulhastings.com
bentonyork@paulhastings.com

William E. Mahoney
PAUL HASTINGS LLP
609 Main Street
Suite 2500
Houston, Texas 77002
(713) 860-7300
williammahoney@paulhastings.com

*COUNSEL FOR PLAINTIFF ALLIANCE OF HEALTH CARE SHARING MINISTRIES*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 16, 2025, I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system, which will send notification of such

filing to counsel for all parties of record.

/s/  ***William E. Mahoney***
William E. Mahoney