# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01386-GPG-STV
_____

RULE 30(b)(6) DEPOSITION OF:
KATY TALENTO - March 21, 2025
(via RemoteDepo)
Alliance of Health Care Sharing Ministries
_____

ALLIANCE OF HEALTH CARE SHARING MINISTRIES,

Plaintiff,

v.

MICHAEL CONWAY, in his official capacity as
Commissioner of the Colorado Division of Insurance,

Defendant.

_____


        PURSUANT TO NOTICE, the Rule 30(b)(6)
deposition of KATY TALENTO, Alliance of Health Care
Sharing Ministries, was taken on behalf of the
Defendant by remote means on March 21, 2025 at
8:03 a.m., before Ellie K. Liebenow, Registered
Professional Reporter and Notary Public within
Colorado, appearing remotely from Arapahoe County.

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
1                     REMOTE APPEARANCES

2     For the Plaintiff:

3              MICHAEL F. MURRAY, ESQ.
               Paul Hastings LLP
4              2050 M Street, NW
               Washington, D.C. 20036
5              michaelmurray@paulhastings.com

6

      For the Defendant:
7
               REED WILLIAM MORGAN, ESQ.
8              Senior Assistant Attorney General
               1300 Broadway
9              8th Floor
               Denver, Colorado 80203
10             reed.morgan@coag.gov

11

      Also Present:
12
               Brian Heller
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1    automated at this point, so maybe it's pressing a

2    button and sending an e-mail.

3         Q.    Yeah.  Are you familiar with -- I mean,

4    are you familiar that there are health insurance

5    companies that are able to effectively press a button

6    and send an e-mail, I mean, that they've made their

7    reporting obligations that automated?

8         A.    Are you asking if I've counted the hours

9    that Blue Cross, you know, spends in their compliance

10   department submitting your demands on them?

11        Q.    No, I'm not.

12        A.    Okay.  Then I didn't understand the

13   question.

14        Q.    I'm happy to re-ask.  I'm asking if you

15   have some understanding based on your experience --

16   and if the answer is no, that's fine -- but if you

17   have some understanding based on your experience of

18   the relative burden of complying with health insurance

19   requirement laws?

20        A.    No, I don't really know.  You would have

21   to ask them.

22        Q.    Okay.  So then paragraph 23, which I

23   think you were just referring to, discusses the burden

24   that the Alliance believes, you know, it has incurred

25   responding to Colorado's reporting law, and it

Katy Talento, Alliance  30(b)(6)
March 21, 2025

 1    estimates that the Alliance has spent over 1,000

 2    employee hours for a total cost of $100,000.  And my

 3    question is, can you tell us just how you came up with

 4    this 1,000 employee hours?

 5           A.   Yeah.  So that's -- that's responding to

 6    the law.  Obviously, we don't comply with the law.

 7    The Alliance doesn't.  And so responding would include

 8    all of our efforts, legislative efforts, during the

 9    early years there, so that number includes responding

10    to the bill and the law and the regulations pursuant

11    to the law, so that's a cumulative total, right, since

12    the beginning of the introduction of the bill, I

13    believe, and then there would be a smaller number that

14    would be sort of the annual compliance burden.  So

15    what that includes would be many hours of meetings and

16    phone calls, many hours of back-and-forth reviewing

17    documents, reviewing legislation, reviewing

18    regulations, going through each of the elaborate

19    columns in each of the reporting templates, which --

20    the wording of which changes from year to year in very

21    subtle ways, preparing testimony in some of the

22    stakeholder meetings and regulatory hearings that

23    occurred, reviewing that testimony and edits from our

24    ministry members, preparing, working with our lawyers,

25    our lobbyists, regulatory counsel.  I'm trying to

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
 1   think if there are any other activities that I can

 2   capture under there, but I believe that's how we did

 3   it.  We sort of went through our calendars.  We

 4   estimated some averages.  In different years, there

 5   were different averages.  It's been a moving target

 6   since enactment.

 7        Q.   You said since enactment.  Does that

 8   include time prior to enactment too?

 9        A.   Those thousand hours do include time

10   prior to enactment.

11        Q.   Okay.  And so just from your

12   description, I take it that that's -- I mean, a lot,

13   if not the vast majority, of that is kind of the

14   lobbying activities relating to either the law or the

15   regulations?

16        A.   Some of it, yes.  I kind of -- when I

17   did it in my head, I did it by year.

18        Q.   Okay.

19        A.   So, yeah, there was a lot by year.  But

20   since enactment, there's been plenty as well because

21   the temporary rules -- there were stakeholder

22   meetings.  There was testimony, you know, prior to the

23   initial emergency regulation, and then there were

24   changes to the emergency regulation, if I recall.  And

25   then there was a final proposed and then final final.
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1   You know, so we had to weigh in at every point.  And

2   then every year since that, you know, we've had

3   conversations as well, of course.

4          Q.   And since distribution of -- since

5   promulgation of the permanent regulation, how many

6   hours do you estimate that the Alliance has spent

7   responding to the statute and regulations?

8          A.   Well, the Alliance has been engaged in

9   litigation since the permanent regulation.

10         Q.   Okay.  But I guess taking litigation out

11  of the picture, since promulgation of the permanent

12  regulation, how many hours has the Alliance spent

13  responding to the statute and regulations?

14         A.   Well, I mean, I think we have meetings

15  to discuss what's going on with the regulation this

16  year or that year or what the new reporting changes

17  were made.  We don't get sent red lines of the changes

18  every year.  So when little changes are made, it's

19  hard to figure out what those are without going word

20  by word through every tab and every column and every

21  spreadsheet, so that's mostly what we -- what we do, I

22  mean, apart from the litigation with respect to the

23  Alliance.

24         Q.   Okay.

25         A.   The ministries have their own burden.

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
1           Q.   Sure.  And I understand the ministries

2    have their own burden, kind of the compliance tasks

3    that they're charged with.  I'm just trying to figure

4    out if the Alliance -- it seems to me that from your

5    description of the -- you know, how you responded to

6    the reporting law that most of that was either

7    lobbying, you know, pre-enactment or post enactment

8    relating to the regulations and that there's probably

9    fairly minimal burden to the Alliance moving forward

10   at this point post promulgation of the permanent

11   regulations?

12           A.   If you're talking about the Alliance

13   specifically or as the trade group representing

14   burdened entities, then, you know, in terms of my

15   time, the time of direct reports to me, we've been

16   litigating since then.  So, I mean, I'm not sure what

17   the answer is here.

18           Q.   Yeah.  Well, I'm not talking about

19   litigation.  Remember, I put that to the side.  So I'm

20   trying to figure out if -- for the purpose of my

21   question, I will ask you to put that to the side.  And

22   what I'm asking about is, what is the ongoing burden

23   to the Alliance specifically post promulgation of the

24   permanent regulation?

25           A.   Well, okay.  So, I mean, for every
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
 1   amount of time that we have to spend coordinating with

 2   the ministries to help them process, you know, how

 3   best to handle this situation, that's an hour that we

 4   can't spend preaching the gospel of how we think Jesus

 5   should do healthcare.  That's an hour we can't spend

 6   or a dollar we can't spend, you know, going to

 7   conferences and educating stakeholders.  So resources

 8   are finite, so I think there are intangible burdens

 9   here that are hard to quantify for you.  I also -- I

10   also would suggest, you know, that -- let's say you

11   put a camera outside the door of a church.  You know,

12   would that -- and was constantly monitoring, would

13   it -- would it change any behavior in intangible ways?

14   So, I mean, I think continuous monitoring certainly

15   changes behavior and certainly makes everyone, I

16   think, cautious and -- you know, in ways that we can't

17   even -- we may not even be conscious of, but we

18   certainly can't quantify it.

19          Q.   Yeah.  I mean, I appreciate that.  I'm

20   trying to respond to the specific quantification you

21   put in paragraph 23 and trying to understand moving

22   forward what the burdens are relating to those

23   specific quantities you put into that paragraph.  And

24   I haven't heard from you any, I guess, direct

25   explanation of why the Alliance in particular moving
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1   forward would be required to devote significant

2   employee hours to the reporting law post promulgation

3   of the permanent regulations?

4        A.   Well, if our ministries are complying

5   with the reporting requirement, then we do sit and

6   help interpret the changes to the regulation, and we

7   have meetings about that.  We have phone calls about

8   that.  We have to review.  You know, each year, the

9   templates are a little different.  The adaptations are

10  a little different.  So we have to analyze that and

11  help them analyze it.  We analyze it together.  It's

12  often not very clear, so we kind of kick things

13  around.  We spend time talking about, you know, how

14  best to interpret these words coming out of this

15  division.

16        Q.   To the extent that the templates and the

17  regulations are subject to less revision moving

18  forward, I take it that your burden would be subject

19  to, you know, less time spent moving forward then?

20        A.   That sounds to me like a hypothetical.

21  I don't -- I don't know.

22        Q.   Okay.  The only -- I guess the only time

23  that I've heard you articulate, though, that the

24  Alliance spends at this point on the reporting law is

25  adjusting potentially to changes in the regulations.

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1    Is there anything else that I'm missing that you --

2    that you feel like the Alliance is involved with?

3           A.    Well, that's -- a great deal of what we

4    do is help our member ministries interpret and analyze

5    government rules and regulations, so that's a lot of

6    what we do.  And, obviously, when we're litigating,

7    we're not doing that as much, and that's all we've

8    been doing.  So if you're asking me some hypothetical

9    burden in the future in a state that I don't know will

10   be, I cannot answer that.

11          Q.    No.  I think I'm not asking a

12   hypothetical here.  I think I'm just confirming

13   whether there's anything else currently that you're

14   doing other than -- and we're putting the litigation

15   to the side -- but other than advising on, it sounds

16   like, compliance issues with the regulations.  And I

17   take it that there is nothing else, or feel free to

18   describe --

19          A.    Not that I can think of right now.  I

20   mean, these are open-ended, vague questions.  I don't

21   know the answer.

22          Q.    Well, I'm just asking about what else

23   you're doing right now.  I don't -- I want to

24   understand more concrete.

25          A.    There isn't compliance right now, you

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
 1   know, as there would be without litigation, so this

 2   is -- it's very difficult to separate those

 3   activities.

 4          Q.   All right.  Are you familiar with Aliera

 5   Healthcare?

 6          A.   Aliera?

 7          Q.   Yeah.

 8          A.   I am familiar with them, yes, what's

 9   been made public, yes.

10          Q.   And are you familiar with Trinity

11   Healthshare?

12          A.   Yes.

13          Q.   And how are you familiar with them, just

14   generally?

15          A.   I'm aware that they were organizations

16   that there were -- I'm aware that Aliera was a

17   for-profit brokerage firm started by a certain man and

18   his family and -- and that they spun off a separate

19   organization called Trinity Healthshare that they

20   claimed was a healthcare sharing organization and that

21   they were the subject of a number of enforcement

22   matters across many states, and they eventually

23   declared bankruptcy, I want to say, in 20- -- you

24   know, a few years ago, 2021.  2018 or so is when they

25   were at kind of the peak of their activities, 2018,
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
 1    '19, '20 maybe.
 2         Q.   Okay.  Do you know if Aliera or Trinity
 3    were ever qualified or certified as healthcare sharing
 4    ministries under the Affordable Care Act?
 5         A.   They were not.
 6         Q.   Neither one of them?
 7         A.   No, not to my knowledge with the list
 8    that I have from CMS.
 9         Q.   Okay.  And you mentioned that they were
10    the subject of multiple state enforcement actions, I
11    believe?
12         A.   Yes.
13         Q.   Do you have an understanding of what
14    those actions generally alleged?
15         A.   Yes.
16         Q.   And what was that as best as you
17    understand?
18         A.   That they were either in violation of
19    deceptive trade practices or they were unlicensed
20    insurance entities, that those were usually what was
21    going on, that they were engaged in deceptive,
22    fraudulent practices.
23         Q.   And those deceptive, fraudulent
24    practices, were they alleging that they effectively
25    misrepresented their products to the consumers?
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1        A.   I mean, I don't have a photographic

2   memory of each of these filings.  Yeah, I don't

3   remember exactly how often or how many times something

4   like that was -- or even if something like that was

5   alleged.  I know that they were often accused of

6   deceptive practices and being unlicensed insurance.

7        Q.   Okay.  And did you ever form a

8   conclusion as to whether they were engaged in

9   deceptive trade practices?

10        A.   I don't know how I could have formed

11   such a conclusion.

12        Q.   Okay.  You don't -- you didn't follow it

13   closely enough to really form a personal conclusion?

14        A.   I followed it closely, but I had no

15   fact-finding authority.

16        Q.   I'm not asking about your fact-finding

17   authority.  I'm just asking as a person who's in the

18   industry who is designated as an expert here.  Like

19   did you ever personally form a conclusion as to

20   whether they were good actors or bad actors?

21        A.   They were certainly alleged repeatedly

22   to be bad actors.  There were many accounts of them as

23   such alleging that.  The way most of these cases were

24   resolved is that there were settlements where no such

25   facts were conceded, so it's, you know -- I can't

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
1   know -- I didn't look under their books.  I didn't see
2   under their hood, but there was a lot of smoke.  They
3   were definitely viewed in the public sphere as bad
4   actors for sure.
5           Q.    Some of the actions that I've seen
6   regarding Aliera referenced a product that it offered
7   called AlieraCare.  Are you familiar with that product
8   at all?
9           A.    Not very.  Is that the -- was that a
10  ministry program?
11          Q.    Well, I think --
12          A.    Sharing program?
13          Q.    I think it was a sharing program, yeah,
14  and it came in -- the reason I mentioned this is it
15  came in these metallic tiers that were bronze, silver,
16  and gold plans.  And are you familiar with that
17  traditional insurance and the Affordable Care Act uses
18  those same metallic designations?
19          A.    Yes.
20          Q.    Do you believe that use of those
21  metallic terms for a sharing plan could cause consumer
22  confusion where consumers associate it with
23  traditional insurance?
24          A.    Well, that would depend.  I know of a
25  sharing organization, not the one you mentioned, that
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1    uses those -- that uses that vocabulary, and they were

2    using it long before the Affordable Care Act was

3    enacted.  So it's questionable whether the Affordable

4    Care Act plans have some sort of market -- proprietary

5    dominance over these terms.  I would also say, you

6    know, it kind of depends on the context too.  You ask

7    if it's confusing.  I mean, the Affordable Care Act

8    only touches a sliver of the American population,

9    which is largely insured by employer plans and

10   government plans.  So how many people out there in the

11   world actually know what gold, silver, bronze means is

12   a small sliver of the American population.  So whether

13   it's confusing or reminds people of the ACA

14   Marketplace is very fact dependent and may or may not.

15        Q.   Okay.  I know that Trinity in these

16   cases, one of the facts that some of these enforcement

17   actions noted was that it used insurance terms such as

18   "deductible," "premium," and "comprehensive coverage"

19   when describing its products to consumers.  Do you

20   think that use of those terms -- and I'll just do it

21   one by one, I guess.  Do you think that a sharing

22   plan's use of the term "deductible" is accurate?

23        A.   I don't -- I don't know.  It would

24   depend on the specific situation.  I mean, I don't

25   know.  It's speculative.

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
 1            Q.   Okay.  So when would it be, you know, an

 2    appropriate term and when would it not be an

 3    appropriate term in your mind?

 4            A.   Well, I mean, if you're talking about

 5    sharing programs that are not actually insurance, you

 6    know, the good guys try to stay away from insurance

 7    terms that people associate with insurance, and, I

 8    mean, you know, it's important to think about

 9    everyone.  You know, insurance is so dominant, the

10    dominant way to finance healthcare bills.  And so

11    everyone comes at this from an insurance lens.  So if

12    you see a word out there like the word "premium," I

13    mean, "premium" has many meanings; right?  But

14    everyone sees the world through an insurance lens.

15    That doesn't mean that every use of the word "premium"

16    should be seen through that lens.  So it can be

17    confusing.  It can be confusing depending on people's

18    experiences and exposures and the context they're

19    seeing words in and what those words are referring to.

20    So, I mean, I can't speak specifically.  I know that

21    there are good charities and there are bad -- you

22    know, bad charities.  There are good churches.  There

23    are bad churches.  We try to be the good guys, and we

24    try to be as, you know, absolutely crystal clear about

25    what we are and what we're not.  And so we try to use
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1    words that don't remind people of the insurance

2    context as much as we can.  So I can't speak to what

3    Aliera did.  All I can speak to is sort of, you know,

4    what we try to do.

5            Q.    Well, then, I mean, what do you think --

6    you know, if you are one of the good guys, right, if

7    you're a sharing plan who views yourself as one of the

8    good guys, what are the terms that are, you know, so

9    closely associated with insurance that you think you

10   should steer clear as much as you can of those terms?

11   Which terms would you put into that bucket?

12           A.    So, I mean, one of the -- there are a

13   number of standards at the independent third-party

14   accreditation body that we recommend that ministries

15   partner with, and they take a look at some of the

16   terms that a sharing ministry is using to try to get

17   at some of the -- I think the concern that you're

18   expressing.  And so, you know, I think it's fact

19   specific, but we do try to stay away from terms like

20   that, from terms like "deductibles" and "premiums," as

21   best we can.  And sometimes we do use those words to

22   contrast, actually, what we do.  So like, you know,

23   we'll use the word like this isn't a deductible as

24   you're used to hearing in the insurance context.  So

25   is a ministry never allowed to contrast with insurance

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1   and can't even speak the word?  You know, it's always

2   context specific.

3          Q.   Yeah.  Do you think it's more

4   problematic -- would you agree it's more problematic

5   when a ministry uses that term to describe its own

6   product than when it contrasts with those terms?  Is

7   that fair?

8          A.   We probably would not.  I mean, we don't

9   recommend that ministries use terms very commonly

10  associated with insurance products to describe their

11  programs.  And often those terms are not accurate, so

12  it wouldn't even make sense to use those terms to

13  describe their programs because that's not how their

14  programs work often.

15         Q.   Okay.  So I know we've talked about

16  "deductible" and "premium."  I take it that you agree

17  that those are some of these terms that it makes sense

18  to avoid using; is that right?

19         A.   I mean, if you're talking about the

20  sense that they're used in an insurance product.  So

21  like I mentioned, the word "premium" has many

22  meanings.

23         Q.   Yeah.  What about "coverage"?

24         A.   Maybe.  I mean, it would depend.  Again,

25  the word "coverage" has many meanings.  Insurance is

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
 1    not the only solution out there, so it depends on the

 2    context.  Yeah, I mean, I just -- it would have to

 3    depend on the context.  We try -- we try not to be

 4    confusing to anybody.  We don't want to confuse

 5    anybody.  So, you know, like I said with the word

 6    "premium" or "coverage," like in the insurance space,

 7    those do have specific meanings, but that's not what

 8    we do.  We don't provide coverage.  We don't have

 9    premiums even as they are meant in the insurance space

10    or similar even.  So it wouldn't even be accurate to

11    use those terms.  I mean, in most cases -- in the case

12    you might be thinking about, I don't think it would

13    even be accurate to describe it in our program.  So,

14    obviously, we recommend accuracy.  We recommend

15    clarity.  So if those words would not serve those

16    goals, then don't use them.

17           Q.    Okay.  Would you put "claim" in the same

18    bucket?

19           A.    Do you mean "claim" as in a bill that a

20    healthcare provider submits to someone who pays for

21    healthcare?

22           Q.    Yeah.

23           A.    The word "claim" is, obviously, a broad

24    term.

25           Q.    Sure.  But when you're looking at a
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1  healthcare, you know, coverage product and you see the

2  word "claim" and "deductible" and "premium," it seems

3  like all of those evoke notions of insurance to some

4  extent.  I'm just trying to figure out if "claim" is,

5  in your mind, in that same category as "deductible"

6  and "premium" and "coverage."

7        A.   It would depend on the context.  It

8  would depend on the context.  It might be.  It just

9  depends on the context.

10        Q.   Do you -- when you think of a, you know,

11  typical sharing plan structure, does "claim" -- you

12  know, "submission of a claim," does that feel like an

13  accurate way of describing, you know, a request for

14  reimbursement, or do you think that's not the most

15  accurate way to describe that?

16        A.   I think it probably in terms of our

17  ministries in the Alliance, it's probably not

18  accurate.  Does that mean that nobody has ever used

19  that word?  Maybe in passing or by accident or

20  imprecisely.  I mean, no, I don't know if that's the

21  case.  But it's probably not the most accurate way to

22  describe what's happening in our programs.

23        Q.   I know you said that Mr. Waldo was on

24  the board of the Alliance; is that right?

25        A.   Yes.

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
 1          Q.   Are you -- I take it that that means you

 2    work with him with some regularity?

 3          A.   Sure.

 4          Q.   You know, we spoke previously with

 5    Mr. Waldo, and he -- the word he used was "egregious,"

 6    that it would be egregious for sharing plans to use

 7    certain insurance terms, including "claims,"

 8    "coverage," "deductible," "premium."  And, actually,

 9    another one he mentioned was "policy."  I mean, do you

10    agree that it would be egregious to use those terms?

11          A.   I think it would depend on the context.

12          Q.   Do you agree that use of those terms

13    could cause consumer confusion?

14          A.   Depending on the context, it could.

15          Q.   We've been talking a lot about insurance

16    terms, but I know that oftentimes sharing clients

17    use slightly -- they might use kind of different

18    terms, so I just want to confirm some of those.  You

19    know, is it accurate to say that sharing plans

20    generally require their members to make contributions

21    on a monthly basis to remain eligible for sharing?

22          A.   Yes.  They typically require

23    contributions either directly to the ministry for

24    administrative expenses and to other members for their

25    medical needs.
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1        Q.   Okay.  And if I refer to that as a

2    "monthly share," do you understand what I mean by

3    that, or is there --

4        A.   If that's how you want it to mean, sure.

5        Q.   Is there a term that you prefer to refer

6    to that general structure?

7        A.   No.  That's fine.

8        Q.   Okay.  And sharing plans generally

9    define the package of medical expenses that are

10   eligible for reimbursement and identify other types of

11   medical expenses for which reimbursement, you know,

12   might be limited or unavailable.  If I refer to

13   that -- again, I welcome pushback, but the only word

14   that I could come up with was a "defined benefit

15   package."  But if you have a preferred -- a different

16   term to refer to that -- I mean, first of all, do you

17   agree with that concept that they generally have this

18   package of expenses that are eligible for

19   reimbursement and others that are not?  Is that

20   structurally accurate?

21       A.   Every ministry has sharing guidelines.

22   And in those guidelines is a list of healthcare

23   services that are eligible for sharing and healthcare

24   services that are not.

25       Q.   Okay.  And is there some word that I

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1    could use that would kind of capture that that you

2    would find -- I don't know -- that makes sense?

3         A.   Eligible expenses.

4         Q.   Eligible expenses, okay.  And I'm also

5    aware that sharing plans require -- at least many

6    require members to pay like a predetermined dollar

7    amount of their own medical bills before the plan

8    begins to facilitate payment or reimbursement of

9    expenses.  I've seen some sharing plans refer to that

10   as an "initial unshareable amount" or, also, an

11   "annual household portion."  Do those terms make sense

12   to you, or is there a different one that you prefer?

13        A.   I think each ministry defines that

14   burden that they ask members to bear of their own,

15   pursuant to the biblical references to bearing our own

16   burdens, bearing our own loads, each of them kind of

17   defines it differently.  They use different words.

18        Q.   Okay.  So "initial unshareable amount,"

19   though, you understand what I mean by that?

20        A.   Yes.

21        Q.   I'm going to share another document, and

22   this will be Exhibit 7.  Ms. Talento, again, please

23   feel free to just review it and let me know when

24   you've had a chance.

25        A.   Yes.

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
 1   think, the first sentence.  Well, quite a bit about
 2   that first sentence, actually.  And now I'd like to
 3   turn to the second sentence regarding how healthcare
 4   ministries -- your opinion that they are like other
 5   organizations that pay for medical expenses, but are
 6   excluded from Colorado's regime, including
 7   crowdfunding, direct primary care, and fraternal
 8   benefit societies.  Do you see that part?
 9         A.   Yep.
10         Q.   Okay.  So you say that sharing
11   ministries are like other organizations.  Are there
12   any other organizations that you didn't reference in
13   this opinion that you believe are also similar to
14   sharing ministries?
15         A.    In that they facilitate payment for
16   medical expenses, yeah.  So, I mean, certainly
17   self-funded church plans, non-ERISA church plans, of
18   course.  I think the Farm Bureau Plan.  HSAs, HRAs,
19   FSAs, those are all kind of third parties that
20   facilitate or enhance access in some way to healthcare
21   financing solutions.  Did I say crowdfunding?  Oh, I
22   did.  Certainly crowdfunding in many aspects, hospital
23   financial assistance programs perhaps, depending.
24   There's a charity called Dollar For that is sort of a
25   third party that helps facilitate access for
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1    members -- not members, but facilitate access for

2    people to charity programs that can help them with

3    their healthcare bills.

4                    Student health clinics like at college,

5    a number of them even require some sort of flat fee,

6    and you get unlimited access to care.  And it's the

7    flat fee to the third party, not actually the clinic

8    itself, but the university.  Let's see.  DPC in the

9    sense that it's not only just, you know, you're paying

10   the provider itself, but you're also -- that provider

11   is facilitating access to additional discounts only

12   available to the DPC members outside of that provider,

13   other providers.

14                    So, of course, anything that's like not

15   swept up in the -- I'm sorry -- that's not -- I

16   haven't mentioned but could be swept up by the law

17   that also facilitates access would be any even fully

18   insured product outside of Colorado, is not licensed

19   in Colorado.  If they enroll Coloradoans, then -- you

20   know, like let's say an employer insurance policy in

21   Wyoming that has an enrollee who is a Colorado

22   resident, like that insurance policy is not licensed

23   in Colorado, but yet it's facilitating and arranging

24   payment for healthcare.  College plans outside of

25   Colorado as well, similarly.

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
 1              Q.   I'm sorry.  What --
 2              A.   This would be any like college plan
 3     outside of Colorado would also kind of, I would argue,
 4     meet the definition.
 5              Q.   And can you just -- how do those
 6     function?
 7              A.   Yeah.  So colleges can be planned
 8     sponsors, either self-funded plan sponsors, or they
 9     can be -- have a fully insured product for their
10     students.
11              Q.   I'm tracking now.
12              A.   I mean, even like -- you know,
13     healthcare sharing ministries kind of grew out of a
14     glorified pass the hat operation, right, so any kind
15     of pass the hat operation.  We even had a state
16     government in New Mexico acknowledge in court that
17     three or five elders in a church that stood up and
18     collected money for Pastor So-and-So's knee
19     replacement would meet that state's definition of
20     insurance and would, therefore, be insurance.  So, I
21     mean --
22              Q.   And by "pass the hat," you mean -- is
23     there a -- is there like a more formal term?
24              A.   Well --
25              Q.   I understand what you're describing a
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1    little bit, but --

2         A.   You could have formal, you know, special

3    collections at a church for a specific purpose or a

4    specific benevolence fund that take place every week

5    that facilitate payment.  I'm trying to think if

6    there's anything else?  I mean, conceivably, if family

7    members got together and offered a loan for someone's

8    healthcare, you know, that's like a -- and you had to

9    pay back the loan or you had to prepay -- you know,

10   let's say you had an operation in two months and you

11   started the loan process and you were paying on that,

12   paying your family members back on that loan or gift

13   or whatever, you know, that might meet the definition

14   too.  What meets the definition and what's exactly

15   like a healthcare sharing ministry are different, but

16   that's kind of the point.

17        Q.   Okay.  All right.  So that seems -- is

18   that a fairly comprehensive list of the organizations

19   that you think pay for medical expenses but are

20   excluded from Colorado's regime?

21        A.   Yeah, I think so.  There may be others

22   that I could think of in an hour, but that's what I've

23   got now.

24        Q.   Okay.  Now, obviously, your opinion

25   focuses on crowdfunding, direct primary care, and

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1  entities?

2          A.   I don't.  I'm sorry.

3          Q.   Okay.  Can you explain the basis for

4  your opinion that healthcare sharing ministries are

5  like crowdfunding?

6          A.   Sure.  So in crowdfunding, you typically

7  have people who are choosing to voluntarily come

8  together for altruistic purposes, and so that is

9  similar.  Often there's a religious component as well,

10 not always.  There doesn't have to be.  It's not an

11 anonymous situation.  It's not like all HIPAA PHI

12 anonymity-type situation, right, similar to healthcare

13 sharing ministries where we know each other and we

14 often will engage with each other directly, so that's

15 similar.

16          Crowd sharing sites.  And it's sort

17 of -- I think "crowd sharing" is a term of art that's

18 developing.  I'm not sure there's a technical legal

19 definition.  In fact, I think when we were exempted in

20 the Colorado statute or reg statute or by reg, it was

21 just crowd sharing.  I can't remember exactly how they

22 defined it.  But I'm not sure there's a clear legal

23 definition because I know that there are organizations

24 that might fall into specifically a sharing program

25 that look like a sharing program, that call themselves

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1   a crowdfunding operation.

2              So in some cases, they may even be the

3   same.  They're not necessarily ministries.  Like

4   CrowdHealth, for instance, calls itself crowdfunding

5   for healthcare, and, yet, you know, they -- they kind

6   of look like they're running a sharing operation, so

7   much so that I think they -- they may have had some

8   engagement with the statute.

9              So, yeah, they're collecting money

10  sometimes, and very often that money is collected

11  monthly, so you can commit to a monthly contribution.

12  I know if you go to like GiveSendGo or GoFundMe or

13  things like that, you can say, Hey, I want to

14  contribute every month.  And so you're contributing to

15  someone else's needs, and that's -- so that's similar.

16  They're not identical, of course, but they're similar.

17       Q.   The monthly donation that you just

18  referenced, is that -- I actually haven't seen that

19  before.  Is that structured so that you're committing

20  to like a particular person's needs, or how is that

21  structured?

22       A.   Yeah.  So I think the way I've seen it

23  is you -- when you get on the website and you click

24  "do you want to donate," it will ask you, Do you want

25  to donate one time or recurring?  So you can choose.

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
 1          Q.   And which was that?  You said GoFundMe

 2    or another one?

 3          A.   I can't remember which ones, but I think

 4    they were the main ones, yeah.  And even as a donor,

 5    I've done that.  So, yeah, GiveSendGo or GoFundMe or

 6    both.  I'm not sure which, but I've definitely seen

 7    it.

 8          Q.   Are you aware of crowdfunding

 9    organizations that have terms defining eligible

10    expenses?

11          A.   I don't think so, although, I mean,

12    certainly during all this COVID craziness with the

13    Canadian truckers, these -- there were certain

14    crowdfunding sites that determined that some types of

15    giving was ineligible.

16          Q.   And I'm not familiar with the Canadian

17    truckers.  What was that about?

18          A.    So there were Canadian truckers that

19    were protesting vaccine mandates from Moscow from

20    Canada, and they staged a giant caravan, and they

21    blocked off like all of Ottawa or something and, you

22    know, shut down the country.  And many of their

23    leaders and supporters were trying to raise money

24    because they needed help.  They were taking time off

25    their work and whatever.
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
1              And so there were kind of -- it was a
2    politically divisive time, of course, and there were,
3    I think, politically idealogically motivated
4    crowdfunding organizations that thought that it was
5    wrong what these protesters were doing, and they
6    targeted the GiveSendGo requests and sites on their
7    platforms that were trying to support these.  They
8    shut them down and they said, We're not -- this type
9    of fundraising is -- for these causes, for these type
10   of benefits, for these type of expenses are not
11   eligible to participate on our platform.
12        Q.    Okay.  So that feels to me like a little
13   bit of a one-off.  There's not --
14        A.    There are others.  I mean, there are
15   some -- in fact, it was so common, the political
16   divisiveness of GoFundMe, that GiveSendGo, which is a
17   more right-leaning operation, was founded, because
18   GoFundMe was, you know, cancelling everybody.
19        Q.    I gotcha.  But GoFundMe, it doesn't have
20   like a defined set of eligible expenses for which you
21   may contribute as a general operating matter?
22        A.    I don't recall.  I think they -- I think
23   they do have some sort of terms of service that, you
24   know, exclude some things and may even list some
25   things.  I would have to review the terms of service.
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
 1          Q.   Okay.  You just -- I guess sitting here

 2   today, though, you couldn't tell me which types of

 3   medical expenses, for example, GoFundMe would allow

 4   you to donate to versus which types of medical

 5   expenses it would not allow you to fund?

 6          A.   No.  But I wouldn't be the least bit

 7   surprised to see services like the abortion reversal

 8   pill excluded from GoFundMe.

 9          Q.   Okay.  Are you aware of any requirement

10   on GoFundMe or -- I'm sorry.  The other one you

11   referred to GiftsandGo?

12          A.   GiveSendGo.

13          Q.   Oh, GiveSendGo.  Are you aware of a

14   requirement on -- from crowdfunding organizations that

15   requires the recipients to pay a certain threshold of

16   their expenses before they can receive the

17   crowdfunding benefits?

18          A.   Well, the platform itself does take its

19   cut, if that's what you mean.

20          Q.   No.  I'm thinking more like the initial

21   unshareable amount or like a deductible, something

22   analogous to that.

23          A.   I'm not aware of that, no.

24          Q.   Are you aware of crowdfunding

25   organizations that offer member I.D. cards to present
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1   to providers?

2          A.   I'm not aware of that, no.

3          Q.   Are you aware of crowdfunding

4   organizations that utilize provider networks?

5          A.   No, of course not.

6          Q.   Are you aware of crowdfunding

7   organizations that require a submission of medical

8   bills that are reviewed for eligibility for

9   reimbursement?

10         A.   I can't say for sure.  Again, to the

11  extent that certain types of expenses are disfavored

12  or favored on a certain site, they may require some

13  sort of documentation.

14         Q.   Okay.  Your opinion also references

15  direct primary care.  Are you aware of direct primary

16  care arrangements that involve a third party that

17  facilitates reimbursements?

18         A.   Yes.

19         Q.   And what are those?  Can you just

20  describe that for me?

21         A.   Sure.  So when I build a health plan for

22  employers and I put primary DPC on the plan, it's the

23  plan sponsor acting through the third-party

24  administrator, who is collecting the money -- well,

25  I'm sorry.  The third-party administrator on the plan

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1    is collecting the money from the plan sponsor to pay

2    the DPC doctor on behalf of the doctor's enrollees,

3    the people who signed up.

4        Q.   Okay.  And do those direct primary care

5    arrangements only -- I mean, is their focus

6    specifically on providing primary care services?

7        A.   So they -- they vary quite a bit, in

8    fact.  So some of them have a variety of other

9    ancillary-related services.  Some of them also do

10   holistic care or energy work or imaging.  A number of

11   them do imaging.  Most of them dispense prescription

12   drugs, and so they -- they do -- each of them is

13   different.  One of the challenges of working with

14   them, they each like want to sell you all the things

15   that they do and not just standardize, so it's

16   complicated.

17       Q.   Is dispensing -- you said some of them

18   do what, dispense --

19       A.   They dispense prescription drugs.  They

20   run basically a pharmacy as well.

21       Q.   I see.  Why don't we turn to the third

22   topic of your opinion, which is that the

23   organizational structure and operations of healthcare

24   sharing ministries reflect their religious character.

25   These include requirements of a common statement of

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1   faith, regular church attendance, affirmation that

2   members will live in accordance with biblical values

3   in agreement to Christian dispute resolution.  Do you

4   see that one?

5          A.   Um-hum.  Yes.  Sorry.

6          Q.   Are you able to detail -- I think it's

7   related to this discussion of the organizational

8   structure and operations, but, you know, correct me if

9   you think I'm wrong.  But are you able to detail for

10  us the religious functions that your member ministries

11  engage in with members?

12         A.   Yeah.  Each of them is different, but --

13  they do this differently, but all of them have a

14  chaplain on staff that provide spiritual direction,

15  spiritual guidance, counseling, prayer, support.  All

16  of them conduct worship services and prayer services

17  on site and often will sponsor such events off site.

18  All of them provide some sort of newsletter that, you

19  know, describes evangelism efforts by members or

20  affiliated ministries or themselves or will tell an

21  encouraging story, an inspirational -- little sermons,

22  little sermonettes.  All of them encourage members to

23  communicate with one another.  Often it's through kind

24  of a platform.  Sometimes, like with one ministry in

25  particular, they actually exchange physical notes and

Katy Talento, Alliance  30(b)(6)
March 21, 2025

```
 1   sometimes a phone call.  So there's always kind of

 2   like a prayer phone tree, and you can always as a

 3   member call the ministry and get prayer right on the

 4   spot.  Most of them host Bible studies.  Often they

 5   will host virtual Bible studies among their members,

 6   certainly for their staff.  That's probably all I can

 7   think of right now.

 8        Q.   Okay.  Are you aware whether your member

 9   ministries are required to report to the State of

10   Colorado when they host a Bible study or how they host

11   those?

12        A.   I am not aware that they are required to

13   do that.

14        Q.   Are they required in your understanding

15   to report if people, you know, call the ministry and

16   seek to obtain a prayer right on the spot?

17        A.   No, not exactly.  I think maybe what

18   you're describing is, you know, they're required to

19   give their org chart, so to the extent that they have

20   chaplains.  To the extent that they partner with a

21   vendor that provides counseling services for their

22   staff, for their members, the terms of those contracts

23   would be clear.  To the extent that their materials,

24   of course, their evangelization materials, their

25   recruiting materials, all of those, you know,
```

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1    It had fewer constitutional flaws than the bill that

2    became law.

3              MR. MORGAN:  All right.  Can we take a

4    little break?  I think we've been going for almost two

5    hours here.  And, also, can we figure out where we are

6    on time?

7              (Recess taken, 2:01 p.m. to 2:14 p.m.)

8         Q.   (BY MR. MORGAN)  Ms. Talento --

9    Mrs. Talento -- sorry.  I'm actually saying Mrs., but

10   it comes out short.  Are you aware of any reluctance

11   by third parties, affiliates, or providers to work

12   with the Alliance as a result of Colorado's reporting

13   law?

14        A.   With the Alliance or with ministries?

15        Q.   Well, I'm going to ask about the

16   ministries.  But right now, I'm just asking about the

17   Alliance.

18        A.   No, not the Alliance.

19        Q.   Okay.  And then same question.  Are you

20   aware of any reluctance by third parties, affiliates,

21   or providers to work with the Alliance's member

22   organizations as a result of the reporting law?

23        A.   Yes.

24        Q.   Okay.  Can you please describe that for

25   me?

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1          A.   So there's -- I have sort of two

2    thoughts on that.  One is a direct example, and the

3    next is how to sort of prove a negative, right, the

4    dog that doesn't bark.  So I'll talk about that in a

5    second.

6               But, first, ultimately the -- you know,

7    when this law was being considered, I was talking with

8    the DPC community and the -- you know, a

9    representative of that community told me flat out that

10   they would very much hesitate to work with a ministry

11   if their contracts, rates, terms and conditions were

12   going to be disclosed to the government.  So that's

13   sort of the direct example.  I can -- I don't know if

14   you want to follow up on that, but then I can give the

15   indirect example.

16          Q.   Okay.  So appreciate that.  Why don't we

17   follow up on the direct example first.  Is that the

18   only time that somebody has communicated to you, I

19   guess, that they would flat out hesitate to work with

20   the ministry if those contracts, rates, and terms were

21   going to be disclosed?

22          A.   I'm not generally asking, and most

23   people aren't following that law and that requirement,

24   and most vendors that our ministries work with are not

25   in Colorado and would have never even heard about

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1    these requirements.  So it really requires us to do

2    outreach, and you can imagine the ministries are quite

3    loathe to raise that to their vendors' attention.

4    It's already hard enough to get vendors to work with

5    us because we're religious and weird and different

6    than what they're used to or what they may be used to.

7              And so, you know, we have to kind of

8    tell them in order to elicit their opinion, and so the

9    direct example that I know was a case of me telling

10   them and asking outright, you know, like what do you

11   think?  And they were more interested in it since it

12   was a Colorado organization.  And, of course, you may

13   know that direct primary care is kind of hubbed in

14   Colorado.  Colorado is a hotbed of direct primary care

15   innovation, and a bunch of those larger vendors are

16   there as well as indie practices are in Colorado, so

17   they were paying attention more.

18        Q.   Okay.  And just to be clear then, it

19   sounds like maybe that was the only direct example of

20   somebody communicating that to you; is that right?

21        A.   Correct.

22        Q.   Okay.  Was there concern -- did they

23   express why they were concerned about that?

24        A.   Yes.  I mean, they -- so this leads to

25   my indirect example, which is true of the direct

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1   example as well too.  But, you know, when I negotiate

2   contracts in my other business with all kinds of

3   vendors that help run a health plan, including DPC

4   vendors and others, third-party administrators,

5   pharmacy benefit managers, patient navigators,

6   stop-loss insurance, whatever, there's always a very

7   firm provision in the contracts around confidential

8   information.  Their rates are always included in that,

9   terms of the contract that this provision is part of

10  is always included in that, names, you know, all of

11  it.

12          In many cases, vendors don't even want

13  us, you know, making it public that they are a vendor

14  just because they don't -- they don't want that to be

15  used as kind of indirect advertising or whatever.  And

16  so -- and, indeed, you know, when -- when the insurer

17  and the hospitals and the pharmacy benefit managers

18  were required by us in the first Trump administration

19  to disclose their rates publicly, they sued.  This is

20  information they do not want disclosed.  And every

21  vendor does not want their rates disclosed, and it is

22  included in their confidential information provisions

23  in their contracts.

24          So there's a -- you know, a strong, I

25  guess, business reason for that to be the case, but,

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1    also, just vendors that will work with healthcare

2    sharing ministries are clearly not hostile to

3    religion.  In many cases they are friendly to

4    religious groups and faith community, and they don't

5    want to get on the radar of the Colorado state

6    government for many, many, I would think, obvious

7    reasons.

8         Q.   And is there a reason why those

9    contracts couldn't be protected by the confidentiality

10   provisions in the reporting law to, you know, assuage

11   those concerns?

12        A.   So we asked for much more protective

13   confidentiality provisions in that law and were

14   denied, during the reg similarly and were denied.  So,

15   you know, there's no real protection there.  It's

16   basically up to the commissioner.  So, no, I don't

17   think that protects anyone at all.

18        Q.   If their pricing is a trade secret, you

19   don't believe that you could request that those be

20   held confidential?

21        A.   We can certainly request it, but then

22   what if we don't want -- what if the commissioner

23   doesn't want it to be.  You know, if you go through

24   all -- first of all, it's unclear whether non-Colorado

25   entities would have those protections.  I'm not a -- I

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1   forget what it's called, DORA or FOIA or whatever,

2   like the open records law in Colorado is.  We examined

3   it at length at the time of the legislation, but I

4   don't recall it very well right now.  But my

5   recollection is that it was not nearly protective

6   enough.  It did not -- you know, you'd have to

7   litigate if there was a dispute about this, and so,

8   you know, that's money and resources.  That's crazy.

9   No one wants to be involved in that.  It's much easier

10  just to not do business with us, of course.

11          And that's just the business issue.

12  That's the like rates.  But then like -- you know, I

13  presume you are aware of Colorado's reputation among

14  the religious community, and I don't think that most

15  entities want to be associated with religious and

16  faith organizations and get on the radar of a

17  sometimes hostile state government.

18          Q.   And then, you know, my other follow-up

19  question is, do you have any documentation relating to

20  that conversation with that DPC representative?

21          A.   No.  It was a verbal conversation.  I

22  don't have like notes about it.

23          Q.   Okay.  Now, you mentioned that that was

24  kind of the first example, and the second example, I

25  think, was proving the negative.  Could you elaborate

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1    administration.  The hospital sued twice.  They --

2    fair enough, they were laughed out of court both in

3    district and circuit court, so they lost eventually.

4    The insurers -- so the insurers have a separate case

5    as well.  They threatened to sue.  They sent us all

6    kinds of mean letters and -- anyway, so they --

7    there's all kinds of documentation of their

8    assertions.

9         Q.    Okay.  But you don't have any documents

10   from third-parties affiliates, the providers,

11   regarding Colorado's reporting law?

12        A.    No.  Like I said, most vendors are not

13   even familiar with the law and what it would do to

14   them.

15        Q.    Okay.  Do you contend that the reporting

16   law has impacted the Alliance's ability to minister to

17   others?

18        A.    The Alliance as our -- as a religious

19   organization ourselves?

20        Q.    Yeah.

21        A.    Well, sure.  I mean, every hour that I

22   spend here with you, every hour that I spend, you

23   know, when we were lobbying, every hour I have to

24   convene the ministries and figure out how to interpret

25   the latest changes to the reg or reporting rule is an

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1    hour that I've not spent on the radio.  It's an hour

2    that I've not spent talking to legislators and

3    policymakers and writing op-ed and, you know, telling

4    people how to redeem and reform healthcare and how to

5    do it the way Jesus would do it.  Yeah, and every

6    dollar -- every dollar we spend here with you on Mike

7    and his incredibly reasonable fees.

8          Q.    And are there any other ways in which

9    you contend that the reporting law has impacted the

10   Alliance's ability to minister to others other than

11   what you just stated?

12         A.    So, I mean, I think we get -- we speak

13   to the intangibles again, right.  So here we are in a

14   deposition that's taking all day where, you know,

15   we've had extensive discovery.  Of course, when you

16   know that you might be involved in litigation, it

17   changes your behavior and conduct in a variety of

18   ways, tangible and intangible, in terms of the notes

19   that I kind of need to take but I won't take or the --

20   you know, the e-mails I wish I could send but I don't

21   send because you never know how it's going to be

22   interpreted or used in discovery or made public.

23   There's so many things that you change when you think

24   you might be under the threat of litigation all the

25   time.

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1          Q.    Okay.   Under threat.   The litigation

2     that you filed, right?

3          A.    Yes, that we were forced to file in

4     order to preserve our constitutional rights, yes.

5          Q.    Okay.   Are there any other ways in which

6     the reporting laws impacted the Alliance's ability to

7     minister to others?

8          A.    I mean, that seems like a lot.  I don't

9     know.  I can't think of any right now.  I'll let you

10    know if I remember something later.

11         Q.    Okay.  And then do you contend that the

12    reporting laws also impacted the Alliance member

13    organization's ability to minister to others?

14         A.    Yes, certainly.

15         Q.    And can you, you know, summarize those

16    impacts for us?

17         A.    Sure.  Well, all the same arguments that

18    I just gave apply to them all the more, much more,

19    because they are involved directly in ministry to

20    their members and to others and to the healthcare

21    system.  So they had to spend, you know, a ton of time

22    and effort trying to fight this law, fight this bill,

23    fight the legislation, rather, and try to improve the

24    regulatory implementation of it and then compliance or

25    figure out how they're going to comply, what they can

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1   comply with, what they can't, you know.

2              It's a lot of internal meetings.  All

3   these meetings take everyone's time that should be

4   spent on ministering the gospel and serving their

5   members and dollars as well, obviously, for all the

6   same reasons.  Resources of time and money are a

7   zero-sum game.  It's a scarce resource.

8              So I certainly think, also, that

9   Colorado, probably by design, serves as a model to

10  other states as, oh, let's do this bill if Colorado

11  did it.  And so, you know, now we have three

12  Colorado-style bills in other states.  But now we're

13  all spending money on lobbyists and lawyers, resources

14  and time.  You know, I'm spending all day driving to

15  one of these states next week and back.  So, yeah,

16  that's -- that's a problem.  It starts to proliferate

17  and metastasize.

18              And we have to think about, certainly

19  when we go into the budgeting cycle and when our

20  ministries go into their budgeting cycles, they have

21  to think about, well, what states are popping that we

22  may have to sue them?  You know, two of our ministries

23  are suing in New Mexico.  It's not over Colorado

24  legislation, but we are having to think very

25  seriously, oh, if Bill X passes in State Y, okay, that

Katy Talento, Alliance  30(b)(6)
March 21, 2025

1    would be probably next year.  We'd have to plan, and

2    we may have to spend all our budget on another, you

3    know, lawsuit.

4                We've had to cut -- just back to the

5    Alliance, we've had to cut our activities

6    significantly in terms of what we're doing at the

7    federal level and our ability to hire consultants and

8    vendors that would help us achieve our mission at the

9    federal level and at the state level.  We have, you

10   know, transformed our budget to accommodate

11   litigation, and it may only get worse if these

12   Colorado-style bills pass in other states.

13        Q.    And what are the states -- you mentioned

14   three that are considering what you call a

15   Colorado-style bill.  Which states are those?

16        A.    Oregon, New York, and Vermont.

17        Q.    Are you aware of any federal legislation

18   regarding sharing plans that is under consideration?

19        A.    I think there is a legislative proposal

20   by the atheist caucus.  I do not say that facetiously.

21   I think that's what they call themselves.  I believe

22   the legislator is Jared Huffman.  So that's a House

23   proposal.  And then there are a number of positive tax

24   proposals that would not harm healthcare sharing

25   ministries.  They would help.