# EXHIBIT C

**COMMISSIONER MICHAEL CONWAY - April 02, 2025**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-CV-01386-GPG-STV

ALLIANCE OF HEALTH CARE SHARING MINISTRIES,

    Plaintiff,

vs.

MICHAEL CONWAY, in his official capacity as Commissioner of the Colorado Division of Insurance,

    Defendant.

_____

VIDEOCONFERENCE DEPOSITION OF

COMMISSIONER MICHAEL CONWAY

_____

PURSUANT TO NOTICE, the above-entitled videoconference (Zoom) deposition was taken on behalf of the Plaintiff on April 2, 2025, at 9:06 a.m., before Jana Mackelprang, Certified Realtime Reporter, Registered Professional Reporter, and Notary Public.

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

**COMMISSIONER MICHAEL CONWAY - April 02, 2025**

```
 1   APPEARANCES:

 2   For the Plaintiff:
             Benton York, Esq.
 3           Paul Hastings LLP
             600 Travis Street, 58th Floor
 4           Houston, Texas 77002
             (713) 860-7304
 5           bentonyork@paulhastings.com

 6   For the Defendant:
             Reed William Morgan
 7            Senior Assistant Attorney General
             Philip Khalife
 8            Assistant Attorney General
             1300 Broadway, 8th Floor
 9           Denver, Colorado 80203
             (720) 508-6335
10           reed.morgan@coag.gov
             phillip.khalife@coag.gov
11

12   Also Present:
             Walt Mathern, Videographer
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**COMMISSIONER MICHAEL CONWAY - April 02, 2025**

1  insurance sector.  The insurance sector, in general in
2  Colorado, it is about a $50 billion sector.  So we
3  regulate everything involved with it.
4              So everything from the insurance
5  companies that are operating in the state of Colorado,
6  making sure that they are complying with all the laws
7  and the regulations across all lines of insurance.
8  Right?  Health insurance, property and casualty, life
9  insurance, homeowner's, auto -- all those different
10 moving parts.
11             We regulate also the insurance agents,
12 who are selling the policies in the states.  We
13 regulate public adjustors.  We regulate bail bonds.
14 Some people don't realize that we actually regulate the
15 bail bond industry in Colorado.  That's generally true
16 across states.
17             So we have a lot of responsibility when
18 it comes to the insurance sector.
19      Q.    And if you were able to estimate, and
20 only if you're able, if you're able to estimate about
21 how much of your bandwidth is captured by the sharing
22 plan reporting law and enforcement operations?
23      A.    Today, Mr. York, it's a small percentage.
24 If it wasn't for this lawsuit, it would probably be
25 even smaller.

**COMMISSIONER MICHAEL CONWAY - April 02, 2025**

1  Q.    Sure.
2  A.    But probably to the tune of maybe 1 to
3  2 percent a year.
4  Q.    And I am going to show you another
5  exhibit.  I'm going to mark this one Plaintiffs'
6  Exhibit 3.
7        (Exhibit 3 was remotely introduced and
8  provided electronically to the reporter.)
9  Q.    (By Mr. York) I'll grant you the ability
10 to control the screen there.  So feel free to take a
11 look at the document, and let me know when you feel
12 like you've had a good chance to review it.
13 A.    Okay, I think I'm good.
14 Q.    With regard to Exhibit 3, the subject
15 line there indicates it's a forwarded email, with the
16 subject line being "Redrafted bill on pooling
17 arrangements," dated March 26th, 2019.  Did I read that
18 correctly?
19 A.    You did.
20 Q.    And it is sent from the email address
21 michael.conway@state.co.us.  Did I read that correctly?
22 A.    You did.
23 Q.    Is that your email address?
24 A.    That is my email address.
25 Q.    And so did you send this email up here at

**COMMISSIONER MICHAEL CONWAY - April 02, 2025**

1    A.    You did.
2    Q.    When you say, "I've signed off on this
3 going to bill paper," is that shorthand for a specific
4 process?
5    A.    That's shorthand for getting to the point
6 where it's going to be introduced.
7    Q.    Essentially, are you -- I guess the bill
8 was ultimately introduced by a member of the
9 legislature, but this is giving them confirmation that
10 the Commissioner finds the language acceptable?
11    A.    From a general perspective, yes, I think
12 that's right.
13    Q.    And then when you say you need help
14 building the case for the disclosure requirements, in
15 what context would you be building the case?
16    A.    So I think -- so this was six years ago
17 at this point, but I think what I was likely
18 referencing there, Mr. York:  In general, I don't think
19 that disclosure requirements are all that effective of
20 a tool from a regulatory standpoint or from a consumer
21 education standpoint.
22          Really what we were worried about with
23 the sharing plans was that people were getting confused
24 about what they were purchasing, and they ended up
25 purchasing things that they thought were major medical

**COMMISSIONER MICHAEL CONWAY - April 02, 2025**

1  insurance.  And what I was worried about, and what I
2  continue to be worried about when it comes to
3  disclosure requirements, is quite often legislators use
4  a disclosure requirement as almost a safety belt.  It's
5  an easy thing to get through, and it makes them, to
6  some degree, feel like they've done something, but it
7  really doesn't, from really kind of a regulatory tool,
8  I don't think it's very effective to actually make sure
9  that you're protecting consumers.
10             And when you compare really all of the
11 authority that we have for the other lines of
12 insurance, when it comes to people being misled, when
13 it comes to consumers being misled, I was worried --
14 and like I said, I continue to be worried -- that just
15 a basic disclosure requirement would make legislators
16 feel good, like they've done something, but it wouldn't
17 necessarily solve the underlying issue of trying to
18 make sure that we were getting good information to
19 consumers and they weren't being misled.
20      Q.     And so are you -- would you be making
21 that case to members of the legislature or to the
22 public in Colorado?
23      A.     Which case, Mr. York?
24      Q.     In your email where you say, "I'm going
25 to need help building the case for the disclosure

**COMMISSIONER MICHAEL CONWAY - April 02, 2025**

```
 1  subject line there.  It's an email with the subject
 2  line "Re:  Health care sharing ministries/Last Week
 3  Tonight."
 4           Did I read that correctly?
 5       A.     You did.
 6       Q.     And the from line is from
 7  michael.conway@state.co.us.  Did you send this email?
 8       A.     It appears I did.
 9       Q.     In your email, you say, "Copying Deb in
10  for awareness."  Did I read that correctly?
11       A.     You did.
12       Q.     And is "Deb" Debra Judy?
13       A.     That is correct.
14       Q.     And do you recall why you would have
15  wanted her to be aware of this email thread?
16       A.     I don't, Mr. York.  My assumption would
17  be that it was because there was discussion about the
18  legislation.
19       Q.     And who is Vincent Plymell?
20       A.     Vince is effectively our public
21  information officer.
22       Q.     And what is your understanding of his job
23  requirements/duties as public information officer?
24       A.     Yeah, he handles stuff like most public
25  information officers.  He handles media requests that
```

**COMMISSIONER MICHAEL CONWAY - April 02, 2025**

1  come in, like this one from the folks at the John
2  Oliver Show.  He handles drafting, press releases,
3  responding to media, just the general types of things
4  that public information officers do.
5         Q.    And we can look specifically, just for
6  reference -- so on page 6 of Exhibit 5, there's an
7  email dated January 9th, 2020, from Jason Levitis.  And
8  it says, "Hi Mike.  Hope all is well.  The John Oliver
9  show ('Last Week Tonight') is considering doing a story
10 on health care sharing ministries, focusing on the
11 risks to consumers.  I just spoke to the producer,
12 Charles Wilson, on background.  He's interested in
13 speaking with smart folks who've worked on them.  Are
14 you interested in speaking with him on background?  If
15 so I can connect you."
16            Did I read that correctly?
17       A.    You did.
18       Q.    And is the Mike that he's referring to,
19 is that you?
20       A.    There are far too many Mikes in the
21 world, but I'm sure that's me.
22       Q.    And I guess the response to that appears
23 to be from you saying, "Sure, I copied Vince, my PIO,
24 in"; is that correct?
25       A.    That is correct.

**COMMISSIONER MICHAEL CONWAY - April 02, 2025**

1      Q.    Do you know who Jason Levitis is?

2      A.    Yeah, Jason is in the health policy

3  world.  I don't remember who he was working for at that

4  point, Mr. York, but he's in the -- he does work in the

5  health policy issues.

6      Q.    But, just to be clear, he's not somebody

7  within the Division?

8      A.    That's correct.  He does not work for the

9  Division, and he was not working for the Division at

10 that point.

11     Q.    So do you recall, did there come a time

12 that you spoke with a producer or anyone from the Last

13 Week Tonight show?

14     A.    So based on this email thread, obviously

15 we did speak with a producer.  I don't remember the

16 conversation, Mr. York.

17     Q.    Well, my follow-up question would be:  Do

18 you recall anything that was discussed during a meeting

19 with anyone from the Last Week Tonight show?

20     A.    I don't.  We get media requests all the

21 time.  I'm talking to reporters both on the record and

22 off the record.  And this one was obviously off the

23 record based on the email chatter.  I don't remember

24 the conversations, especially when they're six years in

25 the past.  Five years, I guess.

**COMMISSIONER MICHAEL CONWAY - April 02, 2025**

1  Q. And do you recall if you ever watched the
2  episode of Last Week Tonight focusing on health care
3  sharing ministries?
4  A. It came out -- again, just based off of
5  this email thread, it came out right after the Marshall
6  fire here, which was taking up all of our time.  I
7  probably watched it, Mr. York, but I don't remember it.
8  Q. When was the Marshall fire?
9  A. It was December 30th of 2020.
10 Q. This may already be captured in your
11 answer before, but do you recall who would have been on
12 the call, anyone else from the Division speaking with
13 the producers from Last Week Tonight?
14 A. Based on the email thread, it was just
15 Vincent and myself.
16 Q. If I haven't said it already, if there's
17 ever a time that you would like to refer back to an
18 exhibit that I've already put up, please let me know,
19 and I'll make sure that you're able to do that.
20 A. Thank you.
21 Q. I am going to show you a different
22 exhibit now, switching gears.  Are you able to see my
23 screen right now?
24 A. I am, yes.
25         MR. YORK:  We'll mark this one Exhibit 6.

**COMMISSIONER MICHAEL CONWAY - April 02, 2025**

1  the companies when they sign up for HCSAs.  This
2  reporting will help to shed light on HCSAs, and it
3  becomes another tool in our consumer protection
4  toolbox."
5              Did I read that correctly?
6       A.    You did.
7       Q.    And so in this quote, you used the term
8  "HCSA."  And in the earlier consumer alert that we
9  looked at, you used the term "health care sharing
10 ministries."  Do you view those two terms as being
11 interchangeable, or is there a difference between those
12 two terms?
13      A.    No, I don't think there's a difference
14 between those two terms.
15      Q.    And then down here on page 2 of
16 Exhibit 8, it states -- it states, "This report is a
17 first step to find out more about HCSAs and how they
18 work, added Commissioner Conway.  That means we can
19 help Colorado consumers know what they are, and more
20 importantly, what they aren't getting when they look at
21 HCSAs."
22             Did I read that correctly?
23      A.    You did.
24      Q.    And so when you said, "This report is a
25 first step," was there a second step that you would

**COMMISSIONER MICHAEL CONWAY - April 02, 2025**

1 privileged communication with counsel, but something in
2 the form of a formal legal memorandum, advising on
3 perhaps an issue of law that you have questions about.
4       A.    Not as a general rule, no, Mr. York.
5       Q.    Is that something that you ever do?
6       A.    Specific to regulations?
7       Q.    Yes.  Yes.  In the approval, when you're
8 reviewing the proposed rule for final approval.
9       A.    I don't recall ever doing that, so, no.
10      Q.    Are you aware that, at some point during
11 the litigation, it was represented that the Division
12 had suspended or was pausing enforcement of the
13 reporting law?
14      A.    I am aware of that, yes.
15      Q.    And were you involved in making a
16 determination to suspend or -- whatever word you would
17 choose -- to pause enforcement of the reporting law?
18      A.    So if I'm remembering correctly,
19 Mr. York, there was a request from your client to not
20 enforce the reporting requirement during the pendency
21 of the litigation for your client specifically.  And I
22 was willing to agree to that, but we weren't going
23 to -- while we were not enforcing against your client,
24 and I should say your client's members, we wouldn't be
25 enforcing it against others at the same time.  So we

**COMMISSIONER MICHAEL CONWAY - April 02, 2025**

1  have an even playing field out there in the health care
2  sharing plan space.
3       Q.    So that was specifically a decision by
4  the Commissioner?
5       A.    It was.
6       Q.    And then when was that pause lifted?
7       A.    So I think the pause was lifted
8  effectively when your client lost the preliminary
9  injunction case.
10      Q.    So was there ever any kind of formal
11 announcement or paper that stated enforcement was being
12 suspended when that period began?
13      A.    No.
14      Q.    And was there ever any kind of formal
15 announcement or paper indicating that the rule was now
16 being enforced again?
17      A.    No.
18      Q.    And would that be an exercise of
19 discretion to be able to suspend enforcement?
20      A.    I think, generally speaking, yes,
21 Mr. York, and it's not all that different than the way
22 that we have approached things at the Division.  If we
23 have litigation ongoing or if there's a new law, then
24 we very well may take enforcement discretion not to
25 enforce things or to work with companies in order to

**COMMISSIONER MICHAEL CONWAY - April 02, 2025**

1   make sure that they understand the new law -- a variety
2   of different ways.
3           Q.      And how do you understand that discretion
4   surrounding enforcement to be defined or limited in any
5   way?
6           A.      I think it depends on the underlying law,
7   Mr. York, that we're engaging in or that we're
8   enforcing, I should say.  There are certainly laws out
9   that specifically use words like "may" when it comes to
10  enforcement.  There are other laws that use words like
11  "shall" when it comes to enforcement.
12                  So I think it depends on the underlying
13  law.
14          Q.      And do you recall in this particular
15  instance whether you were relying on language in the
16  law itself to be able to exercise discretion?
17          A.      You mean on the reporting law itself,
18  Mr. York?
19          Q.      Yes, I'm sorry, on the reporting law.
20          A.      So I think the reporting law does have
21  "may" language in it.  So that's certainly a component
22  of my analysis and my, kind of, thought process when it
23  comes to these types of issues, in general.
24          Q.      So what would be the temporal limitation
25  for how long the Commissioner has discretion to suspend

**COMMISSIONER MICHAEL CONWAY - April 02, 2025**

1  enforcement for this particular law, the reporting law?
2       A.    I don't know that there is a temporal
3  aspect to enforcement discretion, Mr. York, generally
4  speaking.
5       Q.    And then when enforcing the reporting law
6  here, is that enforcement process something that you
7  are involved with, or does that fall under the category
8  of something that you may end up being a decision-maker
9  over, if there's an appeal, that you're separated from
10 the enforcement process?
11      A.    I would be separated from the,
12 quote/unquote, enforcement process; but I think it's
13 important to note, too, that the enforcement --
14 enforcement can be a very broad term.  The team, for
15 example, has engaged, over the years, with folks that
16 either hadn't reported or were reporting -- their
17 reporting was incomplete, to inform different entities
18 that they need to report and/or get complete reporting
19 in place.
20      Q.    And how -- well, do you have any role in
21 directing the team's discretion about whether they
22 should issue a letter or not to an entity they know not
23 to be in compliance with regard to the reporting law?
24      A.    I wouldn't be directly involved in that.
25      Q.    Do you have any authority to set policy