# EXHIBIT H

**LEILANI RUSSELL - March 31, 2025**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-CV-01386-GPG-STV

ALLIANCE OF HEALTH CARE SHARING MINISTRIES,

        Plaintiff,

vs.

MICHAEL CONWAY, in his official capacity as
Commissioner of the Colorado Division of Insurance,

        Defendant.

_____

VIDEOCONFERENCE DEPOSITION OF LEILANI RUSSELL

_____


PURSUANT TO NOTICE, the above-entitled videoconference (Zoom) deposition was taken on behalf of the Plaintiff on March 31, 2025, at 9:01 a.m. MST, before Jana Mackelprang, Certified Realtime Reporter, Registered Professional Reporter, and Notary Public.

**LEILANI RUSSELL - March 31, 2025**

```
 1   APPEARANCES:

 2   For the Plaintiff:
             William E. Mahoney, Esq.
 3           Paul Hastings LLP
             600 Travis Street, 58th Floor
 4           Houston, Texas 77002
             (713) 860-7304
 5           williammahoney@paulhastings.com

 6   For the Defendant:
             Reed William Morgan
 7            Senior Assistant Attorney General
             Philip Khalife
 8            Assistant Attorney General
             1300 Broadway, 8th Floor
 9           Denver, Colorado 80203
             (720) 508-6335
10           reed.morgan@coag.gov
             phillip.khalife@coag.gov

11

12   Also Present:
             Walt Mathern, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**LEILANI RUSSELL - March 31, 2025**

1  consumers decide to do with their purchasing power.

2       Q.    Let's look at page 4, please.  So at the

3  very top of this document, under "Summary of Findings,"

4  the first sentence says, "Of all" HSCAs "operating in

5  Colorado for some portion of 2021, 16 submitted data to

6  the Division ahead of the publication of this report

7  and all 16 submissions were deemed incomplete."

8             Do you think the reporting law is

9  difficult to comply with?

10      A.    I think that any time that there is a new

11 data submission process for any type of entity, there

12 are bumps and issues, and I think that that is what

13 happened in this situation.

14      Q.    So do you think the reporting law is

15 confusing?

16      A.    I do not.

17      Q.    Do you think it's fair to say that the

18 zero percent initial success rate could have had to do

19 with how the Division implemented the reporting law?

20      A.    No.

21      Q.    So you think the fact that no entity was

22 able to correctly comply with the law when it was first

23 implemented is the reporting entity's fault?

24      A.    No.

25      Q.    Could you elaborate on those two

**LEILANI RUSSELL - March 31, 2025**

1      A.      That also sounds about right.

2      Q.      And so almost four months later, you're

3  saying that some entities had still not cured their

4  deficiencies?

5      A.      It's been a couple years, but I believe

6  that's accurate.

7      Q.      Could the Division have fined any of

8  these entities for incorrect or incomplete submissions?

9      A.      The reporting law does allow that

10  opportunity, yes.

11      Q.      And the reporting law also permits the

12  Commissioner to eventually issue a cease-and-desist

13  order for an incomplete submission, right?

14      A.      Not for an incomplete submission.

15      Q.      Oh.  Would you please elaborate on that

16  for me?

17      A.      Sure.  If they have not responded after

18  we've identified their submission as incomplete -- and

19  they also have a set period of time -- the Division can

20  fine them, and that could end up in being a

21  cease-and-desist order.

22      Q.      So that I'm understanding correctly,

23  you're saying the Division can only do that if they

24  don't submit anything?

25      A.      No.  If they are -- that is one

**LEILANI RUSSELL - March 31, 2025**

1  policy, but I believe that there is a direction to be

2  more inclusive to include your pronouns, if you so

3  choose.

4        Q.    So, at the Division, it's not a

5  requirement to have your pronouns?

6        A.    I am not aware of any requirement.

7        Q.    Can we go on to page 7, please?  So at

8  the second paragraph, under the heading "Marketing

9  Efforts and Use of Producers," it talks about social

10  media's use by HSCAs.  And this paragraph notes that

11  only two HCSAs reported using social media in their

12  marketing efforts, but the Division found that all 16

13  of the reporting entities did use social media, right?

14        A.    That is what the report says.

15        Q.    So does the Division monitor the social

16  media accounts of the reporting entities?

17        A.    No.

18        Q.    So how did you or the people who worked

19  on this report make that determination, if you don't

20  monitor their social media accounts?

21        A.    We did an initial Internet search, and if

22  there was a social media site for that health care

23  sharing plan or arrangement for the specific reporting

24  year, we noted that.

25        Q.    And would that be a one-time search?

**LEILANI RUSSELL - March 31, 2025**

1    A.    For the most part, that tends to be one

2   time each year.

3    Q.    You said "for the most part."  So when

4   would be the exception to that?

5    A.    If they've submitted their marketing

6   material to us and we are going back and forth after

7   we've determined their submission to be incomplete, and

8   they, you know, hypothetically have submitted

9   additional marketing material, we might check that

10  social media site again to see if there was any missed,

11  not reported to us within that specific reporting year.

12    Q.    Commissioner Conway contributed to this

13  report, correct?

14    A.    Commissioner Conway reviews, I believe,

15  every report that is published.  So he reviewed this

16  report at one point.

17    Q.    And he would have made some changes to

18  the copy of the report, right?

19    A.    I don't believe that's the case.  He does

20  potentially provide comments and suggestions.

21    Q.    Did Ms. Harris contribute to this report?

22    A.    Similarly, Ms. Harris might provide

23  comments and suggestions, but the drafting of the

24  report was by myself.

25    Q.    Did Ms. Judy contribute to this report?

**LEILANI RUSSELL - March 31, 2025**

1  eligible for sharing, $34,291,846 in healthcare costs

2  or services were paid by the HCSAs by December 31,

3  2023.

4        Q.      Thank you.  And I apologize because I

5  realize that I was unclear.

6              So I'll call that the sticker price or

7  submission versus sharing price distinction that we've

8  been discussing, and I agree that that's in the report.

9              What I meant is that, as we talked about

10 with the prior two reports, the body mentioned how

11 there were certain expenses like contraception,

12 abortion, expenses like that that aren't shared by

13 health care sharing ministries.

14             And my question to you is:  That's not in

15 the body of this report, right?

16       A.      Give me a minute, please.

17             I believe it is in the appendix, in one

18 of the appendixes of this report, so not in the body.

19       Q.      Okay.  So let's go on to the appendix.

20 It's Appendix D and it's on page 12.

21             So here in the middle of page 12, similar

22 to the prior reports but in the appendix, we have a

23 list of treatments and expenses that health care

24 sharing arrangements might decline to share, correct?

25       A.      That is correct.

**LEILANI RUSSELL - March 31, 2025**

1    Q.    And unlike the prior two years, this list

2  does not call out that health care sharing arrangements

3  might decline to share expenses related to abortion,

4  right?

5    A.    It seems to be missing that.

6    Q.    And I'll just note -- if you would like,

7  you should be able to control F and search the

8  document, if you would like, just to be sure.

9         The word "abortion" is not in this

10 document, right?

11   A.    That is correct, I am not seeing the term

12 "abortion."

13   Q.    And returning to page 12, if you look at

14 one of the middle bullets, it says, "maternity care,"

15 and now it says, quote, "unless the mother has been a

16 member for 12 months without changing to a lower cost

17 program."

18        Can you explain why this report now

19 refers to "mothers" in the context of "maternity care"

20 instead of "pregnant people" or "pregnant persons"?

21   A.    I think that was probably a typo, just

22 like leaving off abortion coverage was probably a typo.

23 My guess is that this was copied and pasted directly

24 from member guidelines, but I can't recollect if there

25 would have been another reason.

**LEILANI RUSSELL - March 31, 2025**

1  Q.    So your testimony today is that abortion

2  should have been included on this list?

3  A.    My recollection is that, yes, some of the

4  health care sharing plans and arrangements that

5  reported to the Division reference that abortion

6  coverage may not be covered in certain situations.  So

7  it should have been added on this list.

8  Q.    And your testimony today is that it is a

9  typo, that in the context of "maternity care" it refers

10  to "mothers" instead of "pregnant people"?

11  A.    That is correct, that is a typo.

12  Q.    And just for housekeeping on this,

13  Commissioner Conway would have reviewed this report

14  before it went out?

15  A.    In a general process, yes, I believe he

16  would have.

17  Q.    And Ms. Harris would have reviewed this

18  report before it went out?

19  A.    Yes, as a general practice, that would

20  have happened as well.

21  Q.    And Ms. Judy?

22  A.    Probably as well.

23  Q.    And I promise this is the end of this

24  line of questioning, but just for clarity, would you

25  say the names of anyone else who you think would have

**LEILANI RUSSELL - March 31, 2025**

1  reviewed or contributed to this report?

2       A.     I think that's it.  Given the litigation,

3  we might have run parts of it by our attorney team,

4  such as Mr. Khalife and Mr. Young.  And I believe that

5  some of these reports do get run through the governor's

6  office for review.  I wouldn't know who at the

7  governor's office.

8       Q.     So would the governor's office then have

9  reviewed the prior two reports?

10      A.     I believe that the policy came into

11 effect before the second report, but not the first

12 report.  So I don't recall if the governor's office

13 team in any way reviewed the first report.

14      Q.     This is interesting to me because I

15 haven't seen many documents that implicate the

16 governor's office.  When did the governor's office

17 start getting involved in the reporting law?

18      A.     I mean, the Governor signs the bill into

19 law.  I did not have any interaction with them on

20 implementation of this bill.

21            And, in general, the policy that I'm

22 talking about is across all state departments in terms

23 of public reports, not specific to this reporting --

24 this report or this implementation.

25            When exactly they implemented that

**LEILANI RUSSELL - March 31, 2025**

1  change, I vaguely remember it being before we published

2  the second report.

3         Q.    Do the Governor and the Commissioner

4  communicate on policies about health care sharing

5  arrangements?

6         A.    I can't speak to what the Commissioner

7  and the Governor discuss.  I don't know.

8         Q.    Do you know if the Governor has taken out

9  a position on health care sharing arrangements?

10        A.    I do not know.

11        Q.    I've got no more questions about this

12  document.

13        A.    Okay.

14              MR. KHALIFE:  What do you think about

15  taking a little break, Will?

16              MR. MAHONEY:  One moment, let me just

17  look at where I am.

18              Let's see.  We took our last break at

19  about an hour ago, didn't we?  Okay, let's take a

20  five-minute break.  Is that enough time for you,

21  Ms. Russell?

22              THE DEPONENT:  That is.  Thank you.

23              MR. MAHONEY:  Let's go off the record,

24  please.

25              THE VIDEOGRAPHER:  The time now is 11:05.

LEILANI RUSSELL - March 31, 2025

1      A.      That appears to be this email thread,
2  correct.
3      Q.      Can you tell me where the Division gets
4  its authority to grant extensions for plan or
5  arrangement submissions?
6      A.      So the reporting law allows the Division
7  to collect data from health care sharing plans or
8  arrangements and to implement House Bill 12 -- 22-1269
9  as necessary.
10         So as a part of any data submission
11 process at the Division, we include options for
12 extensions, where requested.  And if not, you know,
13 work to get those submissions in on time.
14     Q.      Is there any rule that governs the
15 extension process?
16     A.      Specifically for health care sharing
17 plans or arrangements, I am not aware of a rule, no.
18     Q.      Does it sound like there are other rules
19 that govern how you interact with entities that --
20 let's just strike that.  It's too complicated.
21         Is there any sort of policy or procedure
22 that's written that governs the extension process?
23     A.      For health care sharing plans or
24 arrangements, there is not.
25     Q.      Who decides to give an extension at the

**LEILANI RUSSELL - March 31, 2025**

1  Division?

2       A.    For the most part, that is myself.  I

3  think almost all of them probably have been granted by

4  myself.  If there was a situation where I was out of

5  office for some reason, it might have been a more

6  junior staff person working on implementation, or it

7  might have been discussed with Chief Deputy

8  Commissioner Harris.

9       Q.    So do you ever consult with anyone other

10  than a junior staff person or Ms. Harris on the

11  extension process?

12       A.    For the most part, the extension

13  determination is mine.

14       Q.    So when deciding whether to give an

15  extension, how do you, Ms. Russell, determine whether

16  to give one?

17       A.    I believe we have granted every one for

18  any of the reasons provided to us, but I look at the

19  information provided to us, and I try to give about two

20  weeks.

21       There have been situations where health

22  care sharing plans have asked for additional time.

23  We've said yes or no or modified that based off the

24  time we believe it will take to review each of the

25  submissions ahead of our annual report deadline.

**LEILANI RUSSELL - March 31, 2025**

1    page 1, please.  Ms. Sorensen writes to you and she

2    asks a question about the section of the template that

3    asks for additional websites that the organization uses

4    to communicate marketing materials, correct?

5         A.    Yes.

6         Q.    And then she asks if she needs to submit

7    links to YouTube, right?

8         A.    She does.

9         Q.    So is it the Division's view that a

10   reporting entity needs to submit each and every single

11   link to online marketing material?

12        A.    The reporting law is clear, that all

13   materials used to communicate marketing -- and I'm

14   paraphrasing -- marketing and consumer-facing materials

15   need to be submitted.

16        Q.    So if it's a YouTube account that has 100

17   videos, do all 100 videos necessarily need to be

18   submitted?

19        A.    In that situation, they could provide

20   links to the videos or they could provide clips to the

21   videos themselves, as long as we're able to access all

22   100 of them.

23        Q.    Is there any rule that defines what a

24   marketing material is under the statute?

25        A.    I do not believe that there is.

**LEILANI RUSSELL - March 31, 2025**

1    Q.    Is there any written policy and procedure
2  anywhere that defines what a marketing material is?
3    A.    For the reporting law?
4    Q.    Yes.
5    A.    Not to my knowledge.
6    Q.    How do you, as the person who primarily
7  implements the law, determine whether particularly
8  something online is a marketing material?
9    A.    If it is of a commercial nature,
10  encouraging somebody to enroll or consider enrolling in
11  a health care sharing plan or arrangement, I would
12  consider that a marketing material.
13    Q.    Is every post on a social media account,
14  like a Facebook account, by a reporting entity, is that
15  a marketing material?
16    A.    I don't believe so.
17    Q.    How should a reporting entity determine
18  whether a social media post is a marketing material?
19    A.    If it is used to communicate, encourage
20  somebody to enroll in the health care sharing plan or
21  arrangement or to consider enrolling in the health care
22  sharing plan or arrangement, I would consider it a
23  marketing material; and therefore reporting entity
24  material as well.
25    Q.    Is a tweet from a reporting entity that

**LEILANI RUSSELL - March 31, 2025**

1   outside of Excel, it's customary that we send the

2   actual sheet.  So I'm going to send one to you.

3           And on this one -- I'll give you a second

4   to look it over, but then I'm going to have to do a

5   screen-share on this one.  It's just too complicated to

6   describe otherwise.

7           A.      Okay.

8           Q.      So I just sent over the native file that

9   was labeled DOI_21949.  And if you could take a moment

10  to peruse it and let me know when you're ready, we can

11  talk about it.

12          A.      Okay, I believe that I'm ready.

13          Q.      Okay, thank you.  Are you able to see my

14  screen?

15          A.      I am.  Is it possible at all to make it

16  slightly larger?  Sorry, I'm on a laptop.

17          Q.      No, it's completely understandable.

18  Yeah, I have a big monitor.

19          Is that better?

20          A.      That's good.  Thank you.

21          Q.      Are you able to see my cursor?

22          A.      I am.

23          Q.      Okay.  So I just clicked -- I'm on

24  sheet 1, which is named "Aggregate Product Level

25  Information."  And I'm at row 2, Column C.  It says

**LEILANI RUSSELL - March 31, 2025**

1  2021.  Do you see that?

2        A.    I do.

3        Q.    So I understand this document to be the

4  spreadsheet, or at least a spreadsheet that the

5  Division used to aggregate all the data it got for the

6  2021 reporting year.  Is that right?

7        A.    This is a spreadsheet that we used to be

8  able to pull data into Tableau, which we may use for

9  visualizations in the annual report.

10       Q.    So this has all the 2021 data in it,

11  right?

12       A.    No, it has the 2021 data that were

13  provided in time for the report.

14       Q.    Okay.  Fair enough.  And just another way

15  we can confirm that, other than the 2021 we have up

16  here, is at the bottom here in Column F, row 102, for

17  the total number of participants for 2021, it's 67,876,

18  and that's the total that's in the 2021 report.

19             Does that sound right?

20       A.    That sounds roughly correct.

21       Q.    Okay.  So I'd like to look at sheet C,

22  which is labeled "Across All Orgs, Page 3 Aggregate."

23  And if we look at the heading here, the template calls

24  for a list of third parties, excluding producers, that

25  are associated with or assist the organization -- and

**LEILANI RUSSELL - March 31, 2025**

1    I'll make this bigger --

2         A.    Thank you.

3         Q.    -- in offering or enrolling participants

4    in Colorado in the plan or arrangement, right?

5         A.    Yes.

6         Q.    So this is where, on the template, the

7    reporting entities are supposed to list the third

8    parties that they do business with, right?

9         A.    It looks like it's where the third

10   parties that they're used for enrolling participants in

11   the plans or arrangements, and then further broken down

12   by marketing and promoting -- and I apologize, I can't

13   see the rest of the header on cell D8.

14             And then E8 looks for operating,

15   managing, and again I can't read the rest of that

16   header as well.

17             Oh, thank you.

18        Q.    Can you explain to me if there's a rule

19   that provides the scope of what's required here under

20   row 7, columns B through E, about the list of third

21   parties?

22        A.    I believe within the emergency

23   regulation, which would have been effective at the time

24   of this report, there is a definition of third parties

25   included.  And then cells D8 and E8 refer to data

LEILANI RUSSELL - March 31, 2025

1  points required under Colorado law.

2      Q.     Under the list of third parties, do the

3  IT people at the entities need to report -- do they

4  need to be listed on here?

5                  MR. KHALIFE:  Object to form.

6                  THE DEPONENT:  I mean, I think that this

7  one is that they could, if they chose to provide

8  information, under the operating, managing, or

9  administering; but what we're trying to understand is

10  the marketing and promotion and enrolling participants.

11      Q.     (By Mr. Mahoney) So was there any rule or

12  policy and procedure that defines the scope of

13  "associated with" in this template?

14                  MR. KHALIFE:  Object to form.

15                  THE DEPONENT:  When you're saying

16  "associated with" -- oh, I see where you're

17  highlighting that.  So, again, third parties are

18  defined in the emergency regulation and in the

19  permanent regulation.

20      Q.     (By Mr. Mahoney) Okay.  And there are 101

21  names on this list.  And you can confirm that on your

22  own, if you want, but I can also confirm that by -- I

23  highlighted all of them, and then we can see down here

24  in the count feature that it says 101 names.  Does that

25  sound right?

**LEILANI RUSSELL - March 31, 2025**

1  A.  Without doing deduplication, I can't

2  confirm that it's a firm 101, but I do recognize that

3  the highlighted -- there are 101 rows highlighted.

4  Q.  Would deduplication have been done before

5  this was compiled for Tableau?

6  A.  We would have done, yes, we would have

7  done deduplication, but really what we would be pulling

8  up is the number of third-party entities and the total

9  dollar amount in aggregate paid to those.

10  Q.  Okay.  I don't believe there to be any

11  duplicates on here, but we don't need to get into that

12  because it's either something that's right or wrong,

13  but just to guide you, I don't believe there to be

14  duplicates on here.

15  You agree that there's a lot of small

16  businesses on this list, right?

17  A.  I have no way of knowing the size of the

18  businesses on this list.

19  Q.  You agree that there's many, very many,

20  religious entities on this list, right?

21  A.  I have no way of confirming the religious

22  nature of any of these entities on this list.

23  Q.  Is White Dove LLC a religious entity?

24  A.  I have no idea.  We don't ask for that

25  information, and I don't look into it.

**LEILANI RUSSELL - March 31, 2025**

1      Q.     Is St. Francis Health Assurance LLC a

2  religious entity?

3      A.     I have no idea.  Again, we don't request

4  that information, and I don't look into it.

5      Q.     And so the same would go for Our

6  Shepherd, LLC; Our Ministry Plans, LLC; Millennium

7  Calvary, LLC; Liberty Calvary, LLC; Good Samaritan

8  Solutions, LLC, you don't know if any single one of

9  those entities is religious or not?

10      A.     I don't make a determination on how

11  individuals choose and identify their faith, and that

12  includes corporations.

13      Q.     And are you aware that the names of

14  individual people are on this list?

15      A.     I am looking at potentially some of those

16  as well.  That is provided by the health care sharing

17  plans themselves.

18      Q.     So right there on line 72, it says

19  Allison G.  That's a person, right?

20      A.     I have no idea.  I don't have any way to

21  go into the name of a corporation or an actual

22  individual person.

23      Q.     What about here on line 82, Kevin B?  Is

24  that a person?

25      A.     Again, I have no way of going in and

**LEILANI RUSSELL - March 31, 2025**

1  verifying, nor do I go in to verify that that is a

2  person or a name used by a business.

3        Q.    Line 89, is Sammi B a person?

4        A.    I have no way of verifying if Sammi B is

5  a person or a business or a corporation.

6        Q.    And then how about Tammy S on line 74?

7        A.    On line 94, I have no way of verifying if

8  the name provided here is of an individual or of a

9  business or corporation.

10        Q.    And I've got two more, I promise.  Line

11  97, Denny W, you don't know if that's a person?

12        A.    Again, we've provided the definition of

13  third party, and we do not further dig into those.  I

14  have no way of knowing if it's a person or a business.

15        Q.    And the last one, line 100, you can't

16  tell me if the name Wendy S, if that refers to a

17  person?

18        A.    I can't tell you that.

19        Q.    Okay.  Can you tell me what specific

20  consumer protection interests are furthered by having

21  this list of entities and people that are affiliated

22  with reporting entities?

23        A.    Can you please rephrase that question?

24        Q.    Sure.  So the State's stated purpose for

25  the law is consumer protection, right?

LEILANI RUSSELL - March 31, 2025

 1          A.      (Nods.)

 2          Q.      Is that a yes?

 3          A.      I'm sorry, I didn't realize that was a

 4   question.  Yes.

 5          Q.      And the law requires the submitting

 6   entities to submit a list of businesses and people that

 7   they affiliate with, correct?

 8          A.      The law requires health care sharing

 9   plans to submit information on third-party --

10   third-party entities that help enroll participants in

11   the plan or arrangement or market.

12          Q.      So how is submitting this list, how does

13   it protect consumers in Colorado?

14          A.      So if we find out that there is a

15   marketing company or more that is providing misleading

16   information -- say that we look at Health Care Sharing

17   Plan A, and we see by talking with them and sending

18   them an inquiry letter that their information to market

19   their sharing plan is misleading and talks about things

20   like "guaranteed coverage" or uses terms like

21   "deductible" or "bronze plan" -- in the past, I believe

22   that we've heard:  Oh, the marketing company did that;

23   they did that without our knowledge or permission.

24                  So we can then search through this list

25   for that marketing company, see if there are any

**LEILANI RUSSELL - March 31, 2025**

1  materials submitted by Health Care Sharing Plan B, D,

2  and reach out to them to see if they're aware of the

3  situation, and also to look at the marketing materials

4  to see if maybe we missed something that also looks

5  like improper marketing of insurance.

6        Q.    So it sounds like the Division

7  investigates every single name on this list, right?

8             MR. KHALIFE:  Object to form and

9  misstating the testimony.

10            THE DEPONENT:  No.  And, in fact, I

11  stated earlier that we don't dig in further for the

12  information that is provided here to know if this

13  business is religious or if it's an individual or some

14  sort of corporation.

15       Q.    (By Mr. Mahoney) But can you clarify for

16  me?  Because what I understood was that for this data

17  to be useful, you need to look into how each of these

18  entities and people relate to the submitting entities.

19  Right?

20       A.    I don't know that it's the only way for

21  it to be useful, but we can, again, if there was a

22  situation where a marketing company -- and we've had

23  this come up -- where a marketing company, health care

24  sharing plan tells us that their marketing company was

25  improperly marketing, and they're no longer working

**LEILANI RUSSELL - March 31, 2025**

1  with them, we could go and see if there are any others

2  working, and review the sharing materials provided to

3  us by the reporting entities.

4        Q.    So is it fair to say that a lot of the

5  time, you don't do anything more with this information;

6  is that right?

7        A.    We report out on it, as I said, in

8  aggregate, as required by law, to speak to the spending

9  for Colorado members' enrollment, and that is -- off

10  the top of my head, those are the main points that we

11  use these data for.

12        Q.    And so, as you suggest, you know, seeing

13  if the reporting entity actually, you know --

14  preventing them from playing dumb, but they were

15  affiliated with this entity, can you recall any single

16  instance in which that actually happened?

17        A.    I wouldn't call them playing dumb.

18        Q.    Sure, and I didn't mean anything

19  pejorative by that.

20        A.    We have looked in -- we've received some

21  marketing materials that use terms like "open

22  enrollment," which does not apply to a health care

23  sharing plan or arrangement because you can enroll at

24  any time, but it does trigger Google searches -- I'm

25  sorry, Internet searches during a period of time where

**LEILANI RUSSELL - March 31, 2025**

1  you can't buy an ACA health insurance plan.

2           We've reached out to the health care

3  share sharing plan to find out more, do the inquiry

4  process.  They have come back to say that that was

5  because of the marketing team that they were using at

6  that point, and they are no longer using them.

7       Q.    So are any of the entities that you just

8  described, are they on this list?

9       A.    I don't recall the name of the marketing

10  company off the top of my head.  And because I have

11  TINs here, I can't also recall how that relates to the

12  sharing plans themselves.

13           I will say having this data structure

14  allows us to go back and search later on, but I just

15  don't recall off the top of my head at the moment.

16       Q.    Okay.  I understand.  And looking at the

17  amounts, can you tell me why it's helpful to the

18  Division to have some of these low-dollar amount

19  associations?

20           For example, just because it's not clear

21  for the transcript, on line 75, we see CP Benefits LLC,

22  and it says that the entity paid them $22.  Why is that

23  helpful to the Division to have that information?

24       A.    I mean, I will say that we can't know

25  until we get the information.  We don't specifically

**LEILANI RUSSELL - March 31, 2025**

1  look or include or exclude a certain dollar amount.

2  You know, it would be unfortunate if we created a

3  minimum dollar amount spent on marketing, and then it

4  ended up being the improper marketing to look like

5  insurance by somebody who was a low dollar amount.

6              There's no way to tell dollar amount

7  compared to impact.  So I would be a little hesitant to

8  say that not having this information couldn't be

9  helpful.

10      Q.    So you actually anticipated where I was

11  going to go, which was whether the Division considered

12  having a dollar amount cutoff to be reported.

13      A.    To my knowledge, I have never considered

14  that.  I don't know that that had been proposed.  If it

15  has, I don't recall that.  And if that had been

16  something that was previous to my time, I am unaware of

17  it.

18      Q.    And do you agree that if there was some

19  sort of dollar amount cutoff, like say $1,000, then

20  this list would be smaller, right?

21      A.    Conceivably, it could be smaller.  It

22  doesn't mean that we wouldn't be missing those with

23  potentially big impact on improper marketing.

24      Q.    And I'm going to double back just because

25  it was a very specific question.  Right?  If there was

**LEILANI RUSSELL - March 31, 2025**

1  a $1,000 cutoff, this $22 association would not be on

2  here, right?

3      A.     For this year, they may not be on there.

4  And then in future years, they could be.

5      Q.     Can you tell me what safeguards are in

6  place to ensure that this list doesn't get outside the

7  Division?

8      A.     Sure.  We have standard data protection

9  policies across the state.  In addition, we have

10  limited access to all files related to implementation

11  of House Bill 22-1269 to key folks that are working on

12  the program.

13          For example, when Ms. Bencic stopped

14  working on the program, we removed her access to those

15  files.

16          With Tableau, it is a secure data server.

17  And, again, we only have limited access to folks -- we

18  only have limited access to that, to the folks that are

19  working on the report or implementation of the program.

20          And then you do have to access

21  information through a State of Colorado employee email

22  account.  And then, generally speaking, like I said,

23  there are broad State of Colorado protections that are

24  built into our systems, which I would not be the best

25  to speak of those at this time.

**LEILANI RUSSELL - March 31, 2025**

1    Q.    Do you know if there would be a log or

2  any sort of record of everyone at the Division who has

3  actually accessed this list in the past?

4    A.    I mean, that's a very technical question

5  that I don't feel qualified to be able to answer.  It

6  could be possible; I don't know.

7    Q.    Do you agree that businesses and people

8  are right to fear that they might be doxxed by being on

9  this list?

10    A.    When you say "doxxed," can you please

11  define how you mean that?

12    Q.    Sure.  It's a somewhat new term, but I

13  understand that to mean, have their information posted

14  on the Internet for kind of all the world to see and

15  potentially threatened or harm them.

16    A.    So built in intentionally into the law

17  and into the regulations, both the emergency regulation

18  and the permanent regulation, we have the ability to

19  request any information submitted to the Division be

20  kept confidential.

21        It is clear, we can't make the whole

22  submission confidential.  To date, we have never

23  challenged a health care sharing plan submission

24  request saying that it shouldn't be confidential.

25        So if the health care sharing plan

LEILANI RUSSELL - March 31, 2025

1  requests that that information be kept confidential, it
2  won't be shared.
3        Q.    You agree that the facts that these
4  organizations and people have to be submitted to the
5  State of Colorado, that that might make them less
6  willing to associate with the health care sharing
7  plans?
8        A.    I can't assume what these individuals or
9  others would be interested in.
10       Q.    Can you tell me if the Division has any
11 empirical data or analysis to support that the law has
12 actually addressed consumer confusion concerns or
13 consumer protection concerns?
14       A.    Could you please -- when you say
15 "empirical data," do you mean -- what exactly?
16       Q.    Sure.  For example, we're now into the
17 third reporting year.  Does the Division have any
18 statistical tests that show that consumer complaints
19 against health care sharing arrangements have gone down
20 since this law was passed?
21       A.    I don't know that that is a data point
22 that we necessarily collect.  We do have our consumer
23 complaints.  Conceivably, that could be something that
24 we look at.  I am not aware off the top of my head of
25 any such data point.

**LEILANI RUSSELL - March 31, 2025**

1    Q.    Subjectively, are you aware of consumer

2  complaints going down after the passage of this law, of

3  the reporting law?

4    A.    I am not aware.  I actually don't know

5  that -- not necessarily complaints, but we have gotten

6  more inquiries, which is a different line.  And so

7  we've gotten people reaching out, wanting to understand

8  more.

9    Q.    Do you know if a consumer reaches out to

10  the Division, does the Division ever advise them that a

11  sharing plan might be a good fit for them?

12    A.    I don't work on that team, the consumer

13  services team, so I can't speak to their policies and

14  how they handle things.  In general, I don't believe we

15  take any line of promoting one sort of business over

16  the other.

17    Q.    Except I do think I need to push back on

18  that a little bit because of the stated consumer

19  protection concerns that you've raised, right?  Like

20  the Division has stated that they're concerned about

21  health care sharing arrangements, right?

22    A.    I believe the Division has sent out a

23  consumer alert to raise consumer awareness about

24  potential for issues with health care sharing plans and

25  arrangements.  That's what I'm aware of.