# EXHIBIT Q

**KATHERINE HARRIS - CORPORATE REPRESENTATIVE - April 01, 2025**

```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 1:24-CV-01386-GPG-STV
_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
THE COLORADO DIVISION OF INSURANCE by KATHERINE
HARRIS, a corporate representative

April 1, 2025
_____

ALLIANCE OF HEALTH CARE SHARING MINISTRIES,

Plaintiff,

vs.

MICHAEL CONWAY, in his official capacity as
Commissioner of the Colorado Division of Insurance,

Defendant.
_____

APPEARANCES:

    PAUL HASTINGS LLP
        By Benton York, Esq.
           William E. Mahoney, Esq.
           2050 M Street, NW
           Washington, DC 20036
           (202) 551-1700
            Appearing on behalf of Plaintiff.

    COLORADO DEPARTMENT OF LAW
        By Reed William Morgan, Esq.
           Phillip Khalife, Esq.
           Gabe Young, Esq.
           Ralph L. Carr Colorado Judicial
           Center
           1300 Broadway, 8th Floor
           Denver, Colorado 80203
           (720) 508-6335
            Appearing on behalf of Defendant.

    Also Present: Walt Mathern, Videographer
```

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

**KATHERINE HARRIS - CORPORATE REPRESENTATIVE - April 01, 2025**

1    Pursuant to Notice and the Federal Rules
2  of Civil Procedure, the videotaped videoconference
3  deposition of THE COLORADO DIVISION OF INSURANCE, by
4  KATHERINE HARRIS, a corporate representative, called
5  by the Plaintiff, was taken on Tuesday, April 1,
6  2025 , commencing at 1:18 p.m., via remote video
7  conferencing, before Robert Leifer, Court Reporter
8  and Notary Public within and for the State of
9  Colorado.

KATHERINE HARRIS - CORPORATE REPRESENTATIVE - April 01, 2025

| | | |
|---|---|---|
| 1 | Q    And so what you've just described is the | 16:00:41 |
| 2 | division getting information about these entities, | 16:00:45 |
| 3 | but how does just having that information do | 16:00:52 |
| 4 | anything to address consumer confusion?  How does | 16:00:57 |
| 5 | that result in less consumer confusion? | 16:01:01 |
| 6 | A    Sure.  I think a couple of different | 16:01:06 |
| 7 | ways.  I think the companies know that they're | 16:01:08 |
| 8 | reporting marketing materials to us.  I believe that | 16:01:08 |
| 9 | it generally impacts their behavior in terms of the | 16:01:12 |
| 10 | marketing terms that they use.  I believe they're | 16:01:16 |
| 11 | more careful than they have been in the past around | 16:01:21 |
| 12 | using terms like ACA compliant, for example. | 16:01:25 |
| 13 | The division can and has sent follow-up | 16:01:28 |
| 14 | inquiry letters to companies, particularly when we | 16:01:33 |
| 15 | find terms that they are using in their marketing | 16:01:37 |
| 16 | that are defined in the Affordable Care Act, and | 16:01:41 |
| 17 | then notifying the company of those problematic | 16:01:45 |
| 18 | terms that are leading to that confusion. | 16:01:49 |
| 19 | Q    And so aside from influencing the | 16:01:52 |
| 20 | entity's marketing outreach, do you find -- well, | 16:01:57 |
| 21 | let me -- I'm sorry, let me set that aside. | 16:02:04 |
| 22 | Is it an intended result that the | 16:02:10 |
| 23 | entities will change their marketing materials | 16:02:15 |
| 24 | because they have to report under this law? | 16:02:25 |
| 25 | A    If they were using terms defined in the | 16:02:30 |