IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01386-GPG-STV

ALLIANCE OF HEALTH CARE SHARING MINISTRIES,

      Plaintiff,

v.

MICHAEL CONWAY, in his official capacity as
Commissioner of the Colorado Division of
Insurance,

      Defendant.

---

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF 70]**

---

Defendant Michael Conway, in his official capacity as Colorado Commissioner of Insurance (the "Commissioner"), by and through undersigned counsel, the Office of the Attorney General, hereby submits this Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, pursuant to D.C.COLO.LCivR 56.1.

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

DEFENDANT'S STATEMENT OF UNDISPUTED FACTS ................................................ 1

I.   Sharing Plans pose a unique risk to Colorado consumers............................................ 1

II.  Colorado enacted the Law to combat the risks posed by Sharing Plans and
     protect consumers. ................................................................................................ 6

III. The Law's reporting requirements address risks posed by Sharing Plans................. 8

IV. The Commissioner properly implemented the Law. ................................................. 11

RESPONSE TO THE ALLIANCE'S STATEMENT OF UNDISPUTED FACTS.................. 12

LEGAL STANDARD ...................................................................................................... 21

ARGUMENT ................................................................................................................. 22

I.   The Alliance cannot succeed on its claims. .......................................................... 22

     A.  The Law does not violate the Free Exercise Clause............................................ 22

          1.  The Law is neutral. ........................................................................................ 23

          2.  The Law is generally applicable. ................................................................... 28

               i.    The Law does not treat comparable secular activity more favorably
                     than religious exercise. ............................................................................. 28

               ii.   The Law does not provide a mechanism for individualized exemptions....... 31

               iii.  Because the Law is neutral and generally applicable, it is subject to
                     rational basis review, which it easily satisfies................................................ 34

     B.  The Law does not violate the Establishment Clause. ........................................... 35

     C.  The Law does not violate the Alliance's freedom of association.......................... 38

1.  The Law's requirement that Sharing Plans report certain, limited
    information regarding their commercial relationships does not
    significantly burden their ability to communicate their views............................. 39

2.  Even if the Law significantly burdens Sharing Plans' associational rights,
    the Law satisfies exacting scrutiny. .................................................................. 43

D.  The Law does not violate the Free Speech Clause. ............................................. 44

1.  The Law's reporting requirement regarding Sharing Plans' marketing
    materials call for commercial information that triggers—and satisfies—
    *Zauderer* review. ............................................................................................... 44

2.  Nor do the Law's other reporting requirements violate the Free Speech
    Clause. .................................................................................................................. 47

II.  The Alliance will not suffer irreparable harm. ........................................................... 49

III. The balance of the equities and public interest weigh against an injunction. ............ 50

CONCLUSION................................................................................................................... 50

## TABLE OF AUTHORITIES

**CASES**

*Agostini v. Felton*, 521 U.S. 203 (1997)................................................................... 36, 37, 38

*Aguilar v. Felton*, 473 U.S. 402 (1985) ............................................................................. 38

*Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ................................. passim

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) .................................................. 21

*Axson-Flynn v. Johnson,* 356 F.3d 1277, 1297 (10th Cir. 2004) ………………….….… 31, 33

*Bd. of Trs. v. Fox*, 492 U.S. 469 (1989) ............................................................................. 46

*Bowen v. Kendrick*, 487 U.S. 589 (1988) ............................................................................ 37

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ................................................................ 39

*Buckley v. Valeo*, 424 U.S. 1 (1976) .................................................................................. 39

*Chiles v. Salazar*, 116 F.4th 1178 (10th Cir. 2024) cert. granted on other grounds,
   No. 24-539, 2025 WL 746313, March 10, 2025 ........................................................... 25

*Church of Lukumi Babalu Aye*, Inc. v. City of Hialeah, 508 U.S. 520 (1993) .............. passim

*Church of Scientology v. City of Clearwater*, 2 F.3d 1514 (11th Cir. 1993) ....................... 38

*Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251 (10th Cir. 2024) ............... 28

*Emp. Div. v. Smith*, 494 U.S. 872 (1990) ....................................................................... 22, 31

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) ...................................................... 28, 31

*Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539 (1963) ....................................... 39

*Harmon v. City of Norman*, Okla., 61 F.4th 779 (10th Cir. 2023) ....................................... 23

*Harris v. Quinn*, 573 U.S. 616 (2014)  ............................................................................... 44

*Horrell v. Dep't of Admin.*, 861 P.2d 1194 (Colo. 1993) .................................................... 33

*In re First Nat. Bank*, 701 F.2d 115 (10th Cir. 1983) ............................................................ 41

*In re Motor Fuel Temperature Sales Prac. Litig.*, 641 F.3d 470 (10th Cir. 2011) .......... 39, 42

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ................................................. 22, 36

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) .......................................................................... 35

*Lichenstein v. Hargett*, 83 F.4th 575 (6th Cir. 2023) .......................................................... 39

*Maryland v. King*, 567 U.S. 1301 (2012) ............................................................................ 50

*Medina v. Catholic Health Initiatives*, 877 F.3d 1213 (10th Cir. 2017) ............................... 38

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ................................................ 40

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................................. 22

*Powers v. Harris*, 379 F.3d 1208 (10th Cir. 2004) .............................................................. 35

*Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818 (10th Cir. 2007) ..................... 22

*Renteria v. N.M. Off. of Superintendent of Ins.*, No. 23-2123, 2025 WL 635754 (10th Cir.
Feb. 27, 2025) ……………………………………………………………..…………… 26, 30

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ................................................................... 39

*SEC v. AT&T*, Inc., 626 F.Supp.3d 703 (S.D.N.Y. 2022) ..................................................... 48

*Seegmiller v. LaVerkin City*, 528 F.3d 762 (10th Cir. 2008) ................................................ 35

*Shelton v. Tucker*, 364 U.S. 479 (1960). ............................................................................ 42

*Sherbert v. Verner*, 374 U.S. 398 (1963) ........................................................................... 31

*Tandon v. Newsom*, 593 U.S. 61 (2021) ................................................................. 22, 28, 30

*Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290 (1985) ............................ 37

*United States v. Sup. Ct. of N.M.*, 839 F.3d 888 (10th Cir. 2016) ....................................... 21

*Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980) ............................. 45

*Wyoming Gun Owners v. Gray*, 83 F.4th 1224 (10th Cir. 2023) ......................................... 43

*Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626 (1985)......................................... 44

**STATUTES**

§ 6-23-102, C.R.S. ................................................................................................. 17

§ 10-16-107.4(1)(a)(I)-(III), (XII)-(XIV), C.R.S. .................................................... 9

§ 10-16-107.4(1)(a)(IV), (XV), and (XVI), C.R.S. ........................................... 10, 43

§ 10-16-107.4(1)(a)(V)-(XI), C.R.S. ..................................................................... 9

§ 10-16-107.4(1)(a)(XV), (XVI), C.R.S. ............................................................... 40

§ 10-16-107.4(1)(a)(XVII), C.R.S. ............................................................ 9, 44, 45

§ 10-16-107.4(1)(a)(XVIII)-(XX), C.R.S. ............................................................. 9

§ 10-16-107.4(1)(a), C.R.S. ................................................................................. 48

§ 10-16-107.4(1), C.R.S. ........................................................................... 16, 32, 42

§ 10-16-107.4(2), C.R.S. ...................................................................................... 20

§ 10-16-107.4(2)(b), C.R.S. ................................................................................. 16

§ 10-16-107.4(3), C.R.S. ...................................................................................... 11

§ 10-16-107.4(5) C.R.S. ....................................................................................... 32

§ 10-16-107.4, C.R.S. .................................................................................... 10, 11

§§ 10-3-903, -903.5, C.R.S. ................................................................................. 43

**RULES AND REGULATIONS**

Fed. R. Civ. P. 56(a) ........................................................................................... 21

Regulation 4-10-01 ............................................................................................... 9

Regulation 4-10-01(4)(G)..................................................................................... 17

Regulation 4-10-01(4)(M) .................................................................................. 16

Regulation 4-10-01(5)(A)(1)(c). .................................................................. 10, 20

Regulation 4-10-01(5)(A)(1)(d) ............................................................................ 9

**OTHER AUTHORITIES**

Am. Humanist Ass'n, What You NEED To Know About Health Care Sharing
Programs RIGHT NOW!, YOUTUBE, at 26:15-30 (May 5, 2025) ................................ 15

Black's Law Dictionary (12th ed. 2024)................................................................. 46

Colo. Gen. Assembly, HB20-1008 ......................................................................... 6

Colo. Gen. Assembly, HB21-1135 ......................................................................... 6

CROWD HEALTH, Member Guide ......................................................................... 24

HB 22-1269, 73rd Gen. Assemb., 2d Reg. Sess. (Colo. 2022)........................................... 14

Health Care Sharing Plan Reporting Template For Regulation 4-10-01 ............. 9, 10, 16, 40

## INTRODUCTION

The Law, House Bill 22-1269 together with its implementing regulations, imposes modest commercial reporting requirements on all Sharing Plans—secular and religious. Even the Alliance's expert agrees that the Law helps protect consumers in light of documented instances in which "criminals," "fraudulent entities," and "wolves in sheep's clothing" have operated Sharing Plans as "scams." *See infra* Defendant's Statement of Undisputed Facts ("Fact(s)") 16, 18, 19, and 46. The Alliance admits that "most of the information requested in HB 1269 our ministries already disclose to any state that asks[.]" Fact 47. And the Alliance's members confirm that the reporting requirements have not affected their relationships with third-party affiliates or their religious communications. *See* Facts 58 and 59.

This Court previously rejected the Alliance's request for a preliminary injunction, finding it had "not made a showing—strong or otherwise—that it is likely to succeed on the merits of any of its claims." ECF 54 at 19. In search of some hint of religious animus, the Alliance combed through more than 20,000 pages of documents produced by the Commissioner. But nine months of discovery have only bolstered the Court's conclusion that the Law protects consumers without infringing any First Amendment rights. The Court should grant summary judgment to the Commissioner and deny the Alliance's requested permanent injunction.

## DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

### I.    Sharing Plans pose a unique risk to Colorado consumers.

1.    Sharing Plans saw substantial growth after the passage of the Affordable Care Act

("ACA") in 2010. ECF 46-1 at 2-21; Decl. of Kate Harris ("Harris Decl.") ¶ 7[1]; Ex. 1, Expert Report of Justin Giovannelli ¶ 6.

2.      There are both religious and secular Sharing Plans that operate across the country, including in Colorado. Ex. 2**,** Waldo Dep. 20:15-19 (discussing "spectrum" of secular to religious Sharing Plans); Ex. 1 ¶¶ 22-24; ECF 46-1 at 624-631; Decl. of Leilani Russell ("Russell Decl.") ¶¶ 23-33.

3.      Membership in a Sharing Plan often comes at a lower monthly cost than traditional health insurance. Harris Decl. ¶ 7; Ex. 1 ¶ 17(b).

4.      Sharing Plans do not guarantee reimbursement of health expenses—they rely on voluntary contributions from other members. Harris Decl. ¶ 8; Ex. 1 ¶ 39.

5.      Sharing Plans are not subject to the ACA requirement that insurance plans spend at least 80% of premiums paying claims. Harris Decl. ¶ 8; Ex. 1 ¶¶ 45-46.

6.      Sharing Plans also commonly exclude coverage for many items that ACA-compliant insurance plans are required to cover, including pre-existing conditions, pregnancy, substance use disorder treatment, family planning services, mental health treatment, and cancer treatments. Harris Decl. ¶ 8; Ex. 1 ¶ 33.

7.      Unlike ACA-compliant insurance plans, Sharing Plans may deny repayment based on ethical, moral, or religious principles. Harris Decl. ¶ 8; *see* § 10-16-113, C.R.S. (claim denial procedures for insurance plans).

8.      In 2018, the Colorado Division of Insurance ("Division") began receiving more

---

[1] Because of the length of the declarations and exhibits included in ECF 46-1,the Commissioner incorporates ECF 46-1 herein by reference rather than re-attaching those declarations and exhibits to this brief.

complaints from consumers and providers about Sharing Plans. Harris Decl. ¶¶ 9-13.

9.      The Division collected information demonstrating that Sharing Plans (1) offered incentives to insurance producers and agents, who would aggressively market the plans to consumers; (2) distributed misleading marketing materials, which made consumers believe that Sharing Plans offered standard insurance benefits at less cost, without indicating that Sharing Plans lacked many of the required protections of traditional insurance; and (3) refused or delayed payment on claims in contravention of consumers' expectations. *Id.* ¶¶ 9-10.

10.     In August 2019, the Division issued cease and desist orders to two Sharing Plan entities, Trinity Healthshare ("Trinity") and Aliera Healthcare ("Aliera"), because Trinity was operating as an unlicensed insurance company and Aliera was marketing and administering Trinity's products in Colorado. *Id.* ¶ 14.

11.     Around this same time, other state and federal regulators issued warnings and took enforcement actions against Aliera, Trinity, and other Sharing Plans arising from some of the same issues referenced in Facts 8 and 9. *Id.* ¶¶ 17-23, 29-30, 33-42.

12.     Despite promising to pay claims, Aliera and Trinity only paid out a small portion of fees collected from members—8% to 35%—depending on the plan. *Id.* ¶ 19.

13.     Instead of paying claims, Aliera and Trinity siphoned members' contributions and made improper payments to their corporate officers. *Id.* ¶ 21.

14.     Aliera and Trinity later reported that they could pay only between 0-10% of nearly a billion dollars' worth of their members' claims. *Id.* ¶¶ 24-25.

15.     This misconduct affected not only Colorado consumers enrolled in Trinity plans,

but also Colorado consumers enrolled in Sharing Plans offered by OneShare Health ("OneShare") (an Alliance member) that were administered by Aliera. *Id.* ¶¶ 26-28. *See also* Ex. 3a,[2] OneShare Dep. at 14:16-22.

16.     Alliance's proffered expert, Rob Waldo ("Waldo"), *see* Ex. 11, at 3, Alliance Expert Designation, called Sharing Plans offered by Aliera/Trinity "scams." Ex. 2, at 36:6-12.

17.     Another Alliance member that operates in Colorado, Liberty Healthshare ("Liberty"), engaged in similar conduct, diverting millions of dollars in funds contributed by its members to its corporate affiliates and senior officers. Harris Decl. ¶¶ 35-36.

18.     Alliance expert Waldo testified that individuals who controlled Liberty from 2014 through 2022 were "wolves in sheep's clothing." Ex. 2, at 34:6-35:7, 72:8-24.

19.     Alliance expert Waldo testified that "criminals" and "fraudulent entities" operated Sharing Plans between 2015 to 2022. Ex. 2, at 72:25-73:12.

20.     Colorado Children's Hospital reported that, between 2017-2019, "it had accounts receivable of $1.75 million from 1,300 total claims and 680 patients enrolled in Sharing Plans." Ex. 4, Second Declaration of Leilani Russell ¶ 8(a).

21.     In late 2019, another provider complained that Alliance member Liberty "act[s] in such a way that blurs the lines between a [Sharing Plan] and an insurance plan," and it had "visits dating back to July 2018 that have yet to be paid by Liberty, even though they are visits that are eligible for benefits." Ex. 4, ¶ 8(b).

22.     Liberty admits that from 2020-2022, a "backlog" of consumer claims began

---

[2] OneShare designated multiple individuals for its Rule 30(b)(6) deposition. The other designee's transcript is marked as Exhibit 3b.

4

accruing, which was believed to exceed $10 million. Ex. 5, Liberty Dep. 24:18-25:1-4.

23.    The "backlog" still exists (as of April 17, 2025). Ex. 5, at 35:11-15.

24.    Samaritan Ministries ("Samaritan") and the Alliance's expert admitted Sharing

Plans' advertisements that use insurance terms (e.g., "deductible," "premium," and

"coverage") are "egregious" and confuse consumers. Ex. 6, Samaritan Dep. 15:9-16:2.

25.    The Alliance admits that "the good guys try to stay away from insurance terms" like

"deductible" and "premium." Ex. 7, Alliance Dep. 79:4-80:21.

26.    Liberty agrees that it is inappropriate and can cause confusion for Sharing Plans

to use the terms "deductible," "premium," and "coverage." Ex. 5, at 47:10-49:2.

27.    Between 2018 and 2022, Sharing Plans, including various Alliance members,

repeatedly advertised their Sharing Plans using insurance terms. Ex. 4 ¶ 7 (attaching

advertisements); Ex. 1 ¶¶ 39-43; Russell Decl. ¶¶ 17-20; Harris Decl. ¶ 31.

28.    The Alliance's expert agrees that to avoid consumer confusion, Sharing Plans

"should not use health insurance brokers, producers, [or] agents." Ex. 2, at 27:1-8.

29.    Many Sharing Plans in Colorado—including Alliance member, OneShare—use

licensed insurance producers to market their plans to consumers. ECF 46-1 at Resp.

Appx. pp. 740, 755. OneShare pays a higher commission to producers (as a percentage

of product value) than traditional ACA health insurance plans pay. Ex. 3a, at 24:8-28:23.

30.    In December 2020, the Division issued an advisory to Colorado consumers

warning Sharing Plans: may offer low monthly payments, use insurance terms, and

appear similar to ACA-compliant insurance, but "often do not have the same

comprehensive benefits as ACA plans, and do not meet the ACA consumer protection

standards"; often exclude pre-existing conditions, mental health care, and substance use disorders; may deny reimbursement for religious or moral reasons; and can leave members responsible for medical bills. Harris Decl. ¶ 31.

31.    Many states issued similar warnings. *Id.* ¶ 30.

**II.    Colorado enacted the Law to combat the risks posed by Sharing Plans and protect consumers.**

32.    Traditional insurance companies are subject to significant oversight and reporting requirements in Colorado. Harris Decl. ¶¶ 62-76; Ex. 1 ¶¶ 44-47.

33.    In contrast, before 2022, Sharing Plans were not subject to any oversight or reporting requirements in Colorado. Harris Decl. ¶¶ 44-45; Ex. 1 ¶¶ 44-48.

34.    In 2020 and 2021, Colorado legislators proposed legislation that would impose requirements on Sharing Plans. Harris Decl. ¶ 46. These bills failed to become law. *Id*.

35.    These prior, unenacted drafts of legislation distinguished between "reporting" requirements that would be provided to the Commissioner and "disclosure" requirements for Sharing Plans to post on their websites and distribute directly to potential members. *See* Colo. Gen. Assembly, HB20-1008, https://leg.colorado.gov/bills/hb20-1008 (last visited June 20, 2025) (including "Bill Summary" that Sharing Plans would be required to (1) "*[r]eport* specified information to the commissioner" and (2) "[p]rovide certain *disclosures* on its website, in marketing materials, and to potential members") (emphasis added); Colo. Gen. Assembly, HB21-1135, https://leg.colorado.gov/bills/hb21-1135 (last visited June 20, 2025) (same).

36.    In February 2022, legislators introduced a new iteration of this legislation, HB22-1269, which passed. Harris Decl. ¶¶ 44-49. This version of the legislation included various

reporting requirements (analogous to those present in the 2020 and 2021 versions of the legislation), but no longer had the disclosure requirements present in 2020 and 2021 versions of the legislation.[3]

37.    These bills were not motivated by religious animus, but by the pressing consumer protection concerns articulated above. *Id.* ¶¶ 44-61.

38.    In support of HB22-1269, its legislative sponsor, Representative Lontine, stated that Sharing Plans have "minimal oversight," so the Law "requires [Sharing Plans] to submit some basic, routine information to the Division of Insurance about how they operate"; the reporting requirements were intended to "promote a necessary level of transparency" and "discourage misconduct," including by making "sure the programs can provide coverage to their members, and help the programs keep their advertising honest and clear"; but the Law would not otherwise "impact the way these arrangements operate," because "[t]hese programs may work for some people, particularly those for whom health sharing aligns with their deeply held religious beliefs." Harris Decl. ¶ 51.

39.    The Division and religious Sharing Plans supported the bill. *Id.* ¶¶ 52-55.

40.    Even the Alliance and one of its members recognized that oversight of Sharing Plans was necessary. They testified in support of an alternate bill, HB22-1198, that would have required reporting to the Attorney General, rather than the Division. *Id.* ¶¶ 47-48.

41.    The alternate bill would have regulated Sharing Plans' communications with members, required Sharing Plans to disclose financial and transactional information to

---

[3] Because prior legislation included distinct reporting requirements and disclosure requirements, while the Law includes only the reporting requirements, this brief refers to the requirements under the Law as reporting requirements to avoid any confusion.

members, submit to financial audits, and publicly post information on their website regarding their plan, membership requirements, program materials, and the annual financial audit. *Id.* The alternate oversight bill, however, failed. *Id.* ¶ 49.

42.    After passage of HB22-1269, the Division implemented emergency and permanent regulations implementing its provisions. Russell Decl. ¶¶ 6-11.

43.    Religious Sharing Plan Christian Healthcare Ministries ("CHM") submitted a written comment commending the Division on its rulemaking process, stating it "respects and appreciates the level of attention that the Department [sic] is giving to developing a rule that is balanced and provides a reasonable path for compliance." CHM "feels like there is a bit of obfuscation . . . being entered into the record that appears to make compliance with the rule more difficult than it is."  Ex. 4 ¶ 10.

44.    The Division issued a letter to the Alliance identifying various changes it made to the rule based on comments from the Alliance. The Division "welcomed the opportunity to sit down" and "discuss these issues" further, reiterating the Division's consumer protection concerns that led it to support the Law, but also indicating that the Division "take[s] no position on whether or not HCSA plans are the right decision for a Colorado consumer, rather our intent in implementing HB 22-1269 is to make the data we receive under the statute available to Coloradans to make the best decision for themselves and their families." Ex. 4 ¶ 11.

III.    **The Law's reporting requirements address risks posed by Sharing Plans.**

45.    The Law addresses the unique risks posed by Sharing Plans. Harris Decl. ¶¶ 7-42, 79; Ex. 1 ¶¶ 6(b)-(c), 31-52.

46.     The Alliance's expert agrees that the Law can help protect consumers from bad actors such as Aliera/Trinity by "surfac[ing] . . . problem[s] earlier." Ex. 2, at 76:20-27:5.

47.     The Alliance admits "most of the information requested in HB 1269 our ministries already disclose to any state that asks and to their members." Ex. 4  ¶ 9; *see, e.g., id.* ¶¶ 12-15.

48.     **Membership.** The Law requires a Sharing Plan to report on the number of its members in Colorado and nationally. § 10-16-107.4(1)(a)(I)-(III), (XII)-(XIV), C.R.S.; 3 Colo. Code Regs. § 702-4:4-10-01(5)(A)(1)(a) (Insurance Reg. § 702-4:4-10-01 herein after referred to as "Regulation 4-10-01") (requiring Sharing Plans to submit a completed Reporting Template); *Updated Health Care Sharing Plan Reporting Template For Regulation 4-10-01* ("Reporting Template") at 2, cells 17A-F, https://tinyurl.com/4kd4bwkn (last visited June 20, 2025). This allows the Commissioner to understand the number of Coloradans without health insurance coverage, as well as which Sharing Plans are operating in Colorado and the extent of their operations. Harris Decl. ¶ 59.

49.     **Financial Health and Corporate Information**. The Law requires reporting on financial issues, including total contributions received by a Sharing Plan from Colorado consumers and the total value of claims submitted, approved, denied, paid, and approved but not paid in Colorado. § 10-16-107.4(1)(a)(V)-(XI), C.R.S.; Reporting Template at 2-3. It also requires basic corporate information, including a contact person, affiliated companies, and an organizational chart. § 10-16-107.4(1)(a)(XVIII)-(XX), C.R.S.; Regulation 4-10-01(5)(A)(1)(d); Reporting Template at 2. This information allows

Colorado to monitor the financial health of the Sharing Plans, understand their corporate structure, and evaluate whether a Sharing Plan is following through on its commitments to its members. Harris Decl. ¶ 59.

50.    **Marketing.** The Law also seeks information to confirm that a Sharing Plan is marketed in a way that is not misleading. § 10-16-107.4(1)(a)(XVII), C.R.S.; Regulation 4-10-01(5)(A)(1)(c). This information addresses consumer protection concerns relating to consumers' confusion about whether a Sharing Plan is insurance and what rights the consumers may have to receive coverage. Harris Decl. ¶ 59.

51.    **Commercial Third-Party Affiliates.** The Law seeks to identify third parties that a Sharing Plan contracts with to form provider networks, as well as the number (not names) of insurance brokers that a Sharing Plan engages with to market its products. § 10-16-107.4(1)(a)(IV), (XV), and (XVI), C.R.S.; Reporting Template at 3. These commercial relationships—provider networks and contracted insurance brokers—are indicative of traditional insurance arrangements. This information helps the Division put consumers on notice, through the annual report, that licensed insurance producers may attempt to market non-ACA compliant Sharing Plans to Colorado consumers. And again, this information helps Colorado monitor the operations of the Sharing Plans to ensure they are not engaged in the business of insurance, while simultaneously ensuring consumers are not confused and are on notice about the limits of these arrangements compared to traditional insurance. Harris Decl. ¶ 59.

52.    The Law is designed to provide commercial information about Sharing Plans and is appropriately tailored to achieve that informational interest and does not regulate in

ways that do not advance that interest. Harris Decl. ¶ 59.

53.    The Law does not ban Sharing Plans, nor does the Law impose any restrictions or requirements on Sharing Plans' messaging. *See generally* § 10-16-107.4, C.R.S.

54.    The Law does not broadly subject Sharing Plans to all Colorado insurance laws. Health insurers are subject to extensive, ongoing examinations of their finances, claims handling, plan designs, and other business activities. *See generally* Harris Decl. ¶¶ 61-76. To protect consumers, health insurers are subject to minimal capitalization requirements and must contribute to a statewide guaranty fund. *Id.* ¶¶ 70, 74-78.

### IV.    The Commissioner properly implemented the Law.

55.    The Law has been successfully implemented for over three years. Since passage of HB22-1269, the Division has promulgated emergency and permanent rules implementing its provisions. Russell Decl. ¶¶ 6-9.

56.    The Law applies equally to religious and secular Sharing Plans. *See generally* § 10-16-107.4, C.R.S.; Ex. 2, at 80:8-82:7; Russell Decl. ¶¶ 23-33.

57.    Sharing Plans, including the Alliance's members, have reported information under the Law on four occasions: December 2022, March 2023, May 2024, and March 2025. Russell Decl. ¶ 34 (2022-2024); Ex. 4 ¶¶ 21-23 (2025).

58.    The Law does not interfere with how Sharing Plans engage in religious messaging—communications that are not required to be reported under the Law—or achieve their religious objectives. Ex. 6, at 113:6-123:8; Ex. 3a, at 7:12-13:18.

59.    Samaritan, OneShare, and Liberty admit that no third-party vendor has raised concerns about, or threatened to terminate or actually terminated their business

relationship with those Sharing Plans as a result of, the Law. Ex. 6, at 162:5-163:15; Ex. 3a, at 33:4-16; Ex. 5, at 65:16-25.

60.    After Sharing Plans report information to the Division, the Law requires the Commissioner to publish an annual report summarizing the information. § 10-16-107.4(3), C.R.S. To date, the Division has published three annual reports. These reports aggregate and summarize information gathered by the Law and identify trends or critical features of Sharing Plans. Russell Decl. ¶¶ 42-44; Ex. 4 ¶ 20.

61.    Although Sharing Plans' incomplete data submissions hampered some data analyses, these reports conveyed key facts regarding Sharing Plans' operations in Colorado, including: confirming for the first time which entities operate in Colorado; that around 60,000 Coloradans are current members of Sharing Plans; that Coloradans contributed between $78 and $97 million annually in 2021 and 2022 to Sharing Plans; and Sharing Plans' use of insurance producers to recruit and enroll new members. Russell Decl. ¶ 46.

### RESPONSE TO THE ALLIANCE'S STATEMENT OF UNDISPUTED FACTS

1. Admitted.

2. Admitted in part. Sharing Plans[4] are generally not insurance; however, their eligibility requirements and operational structures vary widely. Ex. 1 ¶¶ 19-26. Some Sharing Plans have operated as unauthorized insurers. Harris Decl. ¶¶ 14-17.

---

[4] The Law applies to all Sharing Plans, not just health care sharing ministries. The Alliance's allegations, which repeatedly reference health care sharing ministries, do not accurately reflect all reporting entities under the Law. The Commissioner generally uses the broader term "Sharing Plan" to respond to the Alliance's allegations so as to include all entities subject to the Law.

3. Admitted in part. Sharing Plans' faith-based requirements and practices vary widely. Ex. 1 ¶¶ 19-26. Sharing Plans typically have a document, alternately referred to as "membership guidelines," "membership agreement," "statement of beliefs", or "statement of standards," that includes terms governing sharing principles.  *Id.* ¶ 20.

4. Admitted.

5. Admitted.

6. Admitted.

7. Admitted in part. Individual members' practices are not established by the record and will vary. *See* Ex. 1 ¶¶ 19-26.

8. Admitted.

9. Admitted in part. Individual members' practices are not established by the record and will vary. *See* Ex. 1 ¶¶ 19-26.

10. Admitted.

11. Denied. The record provides no framework for comparison to the functions of a congregational church.

12. Denied. The cited record does not claim that Sharing Plans resemble a church. Ex. 7, at 150:1-151:25. Additionally, Sharing Plans' eligibility requirements and operational structures vary widely. Ex. 1 ¶¶ 19-26.

13. Denied. The cited record does not claim that Sharing Plans serve as communities for association and expression. Ex. 7,at 150:1-151:25. Additionally, Sharing Plans' eligibility requirements and operational structures vary widely. Ex. 1 ¶¶ 19-26.

14. Denied. *See supra* Facts 30-31. The Advisory focused on the harms potentially posed

to consumers by all Sharing Plans and did not "focus" on the "religious aspect" of plans. ECF 46-1 at 417-418.

15. Denied. The bills addressed secular and religious "health care cost-sharing arrangements" and did not "target" religious Sharing Plans. Harris Decl. ¶ 46.

16. Admitted.

17. Admitted.

18. Admitted.

19. Denied. Commissioner Conway indicated that these terms are often used interchangeably, explaining "most folks out there really are thinking . . . all of those terms are inclusive of all of the different types of health care sharing plans that are in the market" and that when using the terms "ministry," "plan," "arrangement," or otherwise to refer to Sharing Plans, "folks really typically are referring to the same types of entities that are out there, both what people refer to as the original ACA health care sharing ministries that were connected to religion and then the secular entities as well." Ex. 8, Conway Dep. 54:7-14, 81:11-23.

20. Denied. The legislative testimony about HB22-1269 was focused on consumer protection and was not hostile to Sharing Plans—religious or secular—and Rep. Lontine did not "disparage" opposition to HB22-1269. *See* Harris Decl. ¶¶ 44-55.

21. Admitted.

22. Denied. The bill's "focus" was any "person . . . that offers or intends to offer a plan or arrangement to facilitate payment or reimbursement of health-care costs or services for [Colorado] residents," regardless of religious affiliation. HB 22-1269, 73rd Gen. Assemb.,

2d Reg. Sess. (Colo. 2022). The term "health care sharing ministries" was an early catch-all term, which was borrowed from the ACA, and included both religious and secular organizations. *See* Ex. 8, at 81:11-23.

23. Denied. The full record of these communications demonstrates that Deputy Commissioner Judy referenced "health care sharing ministries" in a broader context that is inclusive of religious and nonreligious Sharing Plans. *See* Dkts. 70-5 and 70-6.

24. Admitted in part. This panel discussion was conducted years after the Law's enactment and after Rep. Lontine left elected office and is not material to claims that the Law "targeted" religious Sharing Plans (the heading for this section).

25. Denied. *See supra* Response to the Alliance's Statement of Undisputed Facts ("Response") 24. Rep. Lontine's statement related to Sharing Plans in general, not those "affected by the regime." Am. Humanist Ass'n, *What You NEED To Know About Health Care Sharing Programs RIGHT NOW!,* YOUTUBE,  at 26:15-30 (May 5, 2025), https://tinyurl.com/4h3vh752.

26. Admitted in part. *See* Response 24.

27. Denied. The cited record does not claim John Oliver is "well known for his anti-Christian bias." The Division is not aware of and denies any such bias.

28. Denied. The John Oliver show approached the Division regarding consumer risks associated with Sharing Plans and the Division gathered information and was interviewed regarding the same. Ex. 8, at 34:5-11

29. Denied. The cited record does not demonstrate a purpose to "mock" Sharing Plans.

30. Denied. The cited record does not demonstrate a purpose to "mock churches."

31. Admitted in part. The tweet was on Kate Harris's personal Twitter account.

32. Admitted in part. The reporting requirements are not "significant" or "comprehensive." *See generally* Harris Decl. ¶¶ 61-76; *See supra* Facts 47-54.

33. Admitted in part. The required reporting information is not "detailed." *See supra* Fact 51.

34. Admitted in part. The cited portion of the statute imposes reporting requirements for Sharing Plans' commercial speech. *See supra* Fact 50.

35. Admitted.

36. Admitted in part. The statute empowers the Commissioner to enforce "compliance with the requirements" of the section, not "restrictions." § 10-16-107.4(2)(b), C.R.S.

37. Admitted.

38. Denied. The regulation defines "third party" with regard to "contractors" that are associated with or assist a "plan or arrangement in offering or enrolling" members, and does not use the phrases "any entity" or "ministry." Regulation 4-10-01(4)(M).

39. Denied. The Law requires Sharing Plans to report the percentage, in aggregate, spent on administrative expenses. The specific expenses are not itemized. *See* Reporting Template at 2, cell 17I.

40. Denied.  Regulation 4-10-01 does not require "comprehensive information" "beyond that in the statute."  *Compare* Reporting Template *with* § 10-16-107.4(1), C.R.S.

41. Denied. The named activities are fundamentally different than Sharing Plans, including with regard to the consumer risks addressed by the Law. *See supra* Fact 45.

42. Denied. The cited records do not distinguish between religious and secular

organizations. *See* ECF 58-1 at 7–8; ECF 46-1 at 762.

43. Admitted in part. The cited record does not claim that the Law "overwhelmingly" regulates religious organizations. ECF 70-6 at 2.

44. Admitted in part. The cited record states that direct primary care arrangements are not subject to Colorado's Insurance Code (Title 10), and language was added to "clarify[]" this. ECF 70-7 at 2.

45. Denied. Direct primary care is not insurance and is not regulated by the Insurance Code. § 6-23-102, C.R.S.; Ex. 9, Russell Dep. 29:10-13.

46. Denied. The exemptions in section 10-14-705, C.R.S., apply only to Article 14, not the Insurance Code as a whole.

47. Admitted.

48. Admitted.

49. Denied. The cited material does not claim the subject dental plan is "favored" or "fell within HB22-1269's terms." The dental group representative referred to certain entities as "good guys," a term not adopted by any member of the State. ECF 58-1 at 27-33.

50. Denied. Deputy Commissioner Judy proposed statutory language regarding "other consumer payment arrangements identified by the Commissioner by rule" that are not Sharing Plans and therefore not subject to the reporting requirements. ECF 58-1 at 29.

51. Denied. The regulation confirms the listed activities are not subject to the Law and provides additional definitional guidance for "crowdfunded sources"—those "that do not require ongoing membership fees, share requirements, or dues for the purposes of payment for and/or reimbursement of health care services." Regulation 4-10-01(4)(G).

52. Denied. During the pendency of the motion for preliminary injunction, the Division agreed to not enforce the statute against *any* Sharing Plans, not only Alliance members. Ex. 8, at 73:18-74:2

53. Denied. The Division has not used its enforcement authority under the Law against any entities since its enactment in 2022. Rather, consistent with the Division's general practice, the Division has focused its initial efforts on improving compliance. Ex. 8, at 74:20-75:23; Ex. 10, Div. of Ins. Dep. 92:17-25.

54. Admitted in part.  The Division did not "suspend[]" enforcement of the Law. *See* Response to 53.

55. Denied. The cited record reflects the Commissioner discussing a "temporal aspect to enforcement discretion," not a temporal limitation on his discretion to "suspend enforcement." Ex. 8, at 75:24–76:4.

56. Admitted in part. The letter did not "demand" compliance, but rather requested information. *See* Ex. 4 ¶ 17.

57. Admitted.

58. Admitted.

59. Denied. The referenced third-party inquired whether the Division had "looked into the compliance of CrowdHealth," without making any "recommend[ation]." ECF 70-11.

60. Admitted in part. The letter alleged a failure to provide required reporting and requested a response or the information required by the Law. ECF 70-12.

61. Denied. Extensions are granted or denied based off the Division's timing requirements for its annual report deadline. Ex. 9, at 109:21-25.

62. Denied. This alleged fact is included under a header titled "The Reporting Law as Administered." The quotation from Commissioner Conway does not relate to the Law, but rather to prior, unenacted legislation, which included not only reporting requirements analogous to those in the Law, but also additional disclosure requirements for Sharing Plans to post on their websites and distribute directly to potential members. *See supra* Facts 34-36; Ex. 8, at 17:4-21:5 (discussing March 26, 2019 email that referenced draft legislation approximately two years before the Law was enacted, and noting that Commissioner did not believe disclosure requirements in prior unenacted legislation were all that effective of a regulatory tool, but there were other "sections of the proposed legislation . . . that I think are good pieces of legislation."). The Division, including Commissioner Conway, believes the reporting requirements implemented by the Law are effective regulatory tools to prevent consumer confusion and harm. *See supra* Facts 45-54. The excerpted portion of Ms. Russell's testimony specifically regards reporting regarding third-party affiliates, and Ms. Russell testified to some ways that information is used to prevent consumer harm. Ex. 9, at 148:5-152:9.

63. Admitted in part. The Division initially attempted to determine Sharing Plans' religious affiliations, but due to challenges doing so, ceased the effort. Ex. 9, at 157:20-25.

64. Admitted.

65. Admitted in part. The Division checks Sharing Plans' public social media accounts only if they arise in a general internet search for Sharing Plans' marketing materials or if a Sharing Plan's submission has been determined incomplete. Ex. 9, 60:7-61:11.

66. Admitted.

67. Admitted in part. The Law provides examples of marketing materials. *See* Regulation 4-10-01(5)(A)(1)(c).

68. Admitted in part. Collecting marketing material can prevent consumer harm in several ways, including by discouraging Sharing Plans from using misleading insurance terms. Ex. 10, at 73:7-74:18.

69. Admitted.

70. Denied. *See supra* Facts 60-61. The reports do not "focus" on exclusions related to religious beliefs. The cited reports span forty pages, which contain only five total mentions of religious exclusions. *See generally* ECF 46-1 at 734-772; ECF 58-1 at 4-25.

71. Admitted in part. The 2021 and 2022 reports do not "call out ministries for not sharing in expenses related to abortion," but rather include "abortion with no exceptions for rape or safety of the pregnant person" in a list of six other common Sharing Plan eligibility exclusions. ECF 46-1 at 739. The 2023 report omits this list. Dkt 58-1 at 1-11.

72. Admitted.

73. Denied. The governor's team reviewed the second (2023) report, but Ms. Russell was unsure about review of the first (2022) report. Ex. 9, at 75:23–77:2.

74. Admitted.

75. Admitted in part. Before issuing any fine, the Commissioner must provide 30 days' notice and opportunity to cure any deficiency. *See* § 10-16-107.4(2).

76. Denied. *See supra* Facts 43, 47. Alliance member OneShare claimed it required only 60 hours to comply with the Law. Ex. 3b**,** at 24:20-26:2. But neither Samaritan nor OneShare were able to provide documentation supporting these purported burdens.

77. Admitted in part. The record reflects this amount was incurred prior to enactment of the Law, including lobbying activities. Ex. 7, at 66:22-68:17.

78. Denied. *See supra* Facts 47-54.

79. Denied. *See supra* Facts 47, 51, 59.

80. Denied. *See supra* Facts 47, 51, 59. Also, the cited record makes claims about affiliates' preferences—not the Alliance members' preferences.

81. Denied. *See supra* Facts 47, 51, 59.

82. Admitted in part. This reporting requirement does not harm Samaritan. *See supra* Facts 47, 50, 58.

83. Denied. The Law helps to protect consumers and does not harm the Alliance and its member ministries' religious missions. *See supra* Facts 45-54, 58-59.

## LEGAL STANDARD

This Court may grant summary judgment where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When presented with cross-motions for summary judgment, [the court] "'must view each motion separately,' in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 906–07 (10th Cir. 2016) (citations omitted). And if the parties dispute factual matters, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

To obtain a permanent injunction, the Alliance must prove (1) actual success on

the merits, (2) irreparable harm unless the injunction is issued, (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Prairie Band Potawatomi Nation v. Wagnon,* 476 F.3d 818, 822 (10th Cir. 2007). This is "remarkably similar" to the standard for preliminary injunctions, with the key distinction being that the permanent injunction requires a showing of actual success on the merits. *Id.* Here, the third and fourth factors merge because a governmental entity is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    The Alliance cannot succeed on its claims.

### A.  The Law does not violate the Free Exercise Clause.

"[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability[.]'" *Or. Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990) (citation omitted). The Alliance bears the burden of proving a free exercise violation, which it may do by showing the government "has burdened [its] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.,* 597 U.S. 507, 525 (2022) (quoting *Smith*, 494 U.S. at 879–81).[5] The Alliance fails to make either showing.

---

[5] This Court correctly held previously that the Alliance bears this burden. ECF 54 at 20 n.11 (citing, among other cases, *Kennedy,* 597 U.S. at 525). The Alliance claims *Tandon v. Newsom,* 593 U.S. 61, 62 (2021) (per curiam), holds to the contrary. *See* ECF 70 at 25. But the Alliance cites to the portion of *Tandon* discussing the government's "burden to establish that the challenged law satisfies strict scrutiny"—a separate issue. 593 U.S. at 62-63.

### 1. The Law is neutral.

A law is neutral "so long as its object is something other than the infringement or restriction of religious practices." *Harmon v. City of Norman*, 61 F.4th 779, 794 (10th Cir. 2023) (citation omitted). Evidence of a law's impermissible religious hostility may be found in its text or legislative history, or in the background circumstances giving rise to the law. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533-34, 540 (1993) (plurality part of opinion). "Facial neutrality" is not determinative, as a court must ensure also the law does not "mask[]" religious hostility through "religious gerrymanders." *Id.* at 534 (citation omitted).

In *Lukumi,* the Supreme Court addressed a challenge to city ordinances prohibiting certain types of animal slaughter. *Id.* at 526-28. The Court relied on the ordinances' text (using words with "strong religious connotations," like "sacrifice" and "ritual"), legislative history (expressing concern with "certain religions" and responding to community complaints about the Santeria church), and actual operation ("almost the only conduct" subject to the ordinances "is the religious exercise of Santeria church members") to conclude that "suppression of the central element of the Santeria worship service was the object of the ordinances." *Id.* at 533-36. Importantly, the Court noted, a law's "adverse impact" alone does not demonstrate the government's religious hostility because "a social harm may have been a legitimate concern of government for reasons quite apart from discrimination." *Id*. at 535.

The Law's text, legislative history, and context make clear its purpose is to protect consumers, not suppress religious practice. Facts 8-54; ECF 54 at 26-27. The

legislature enacted Section 10-16-107.4 after evidence emerged of documented

consumer harms associated with Sharing Plan practices. *See* Facts 8-31. These harms

included consumers being misled regarding the scope of Sharing Plan benefits (causing

consumers to incorrectly believe Sharing Plans were equivalent to ACA-compliant

insurance) and Sharing Plans denying and delaying payment on claims while siphoning

member contributions to enrich their corporate affiliates. *Id*. Providers also complained

about Sharing Plan practices. Facts 8, 20-21. And Sharing Plans faced enforcement

actions in Colorado and other states, not for their religious activities, but for violating

state laws and otherwise mistreating consumers. Facts 10-31.

  The Law's legislative sponsor testified the Law was intended to protect

consumers. Fact 38. At the same time, that sponsor stated the Law would not otherwise

"impact the way these arrangements operate" because they "work for some people,

particularly those for whom health sharing aligns with their deeply held religious beliefs."

Fact 38. The Division and multiple religious entities testified in support of the Law and

its consumer protection objectives. Fact 39. And the Law's actual reporting

requirements align with the consumer protection interests that motivated it. Facts 45-54.

  Nor does the Law demonstrate religious hostility through an impermissible

"religious gerrymander." *Lukumi*, 508 U.S. at 535. It regulates Sharing Plans regardless

of their religious or secular nature. At the time of the Law's enactment, it was unclear

which Sharing Plans—regardless of their religious or secular character—were operating

in Colorado and subject to the Law's requirements. Several cycles of reporting

demonstrated that multiple Sharing Plans subject to the Law are in fact secular. Russell

Decl. ¶¶ 23-33. Knew Health "accept[s] everyone, regardless of . . . religious affiliations." *Id.* ¶¶ 24-28. Similarly, CrowdHealth—which, despite its name, operates as a Sharing Plan and has reported under the Law—has no religious affiliation. CROWD HEALTH, *Member Guide*, https://www.joincrowdhealth.com/resources/member-guide (May 1, 2025). *See* Ex. 4 ¶¶ 16-19, 24. And nothing prevents additional secular Sharing Plans from establishing operations in Colorado. *See* Russell Decl. ¶¶ 30-33.

Any "adverse impact" of the Law on religious Sharing Plans reflects not "impermissible targeting," but instead the government's "legitimate concern" in addressing "a social harm." *See Chiles v. Salazar,* 116 F.4th 1178, 1224 (10th Cir. 2024) (citing *Lukumi,* 508 U.S. at 535) (even if law disproportionately affected practitioners with religious practices, it was neutral because its focus was "not on restricting religious practice, but on preventing the harmful impact" of regulated conduct), *cert. granted on other grounds*, 145 S. Ct. 1328 (2025).

The Alliance mischaracterizes various events and documents in its attempt to construct a story of religious animus. None demonstrate any animus.

First, prior iterations of the legislation similarly arose from legitimate consumer protection interests. The Alliance suggests these prior versions of the legislation targeted religion, providing no explanation other than that they used the term "health care sharing ministries." ECF 70 ¶ 15. This Court correctly rejected this argument previously, noting "health care sharing ministries" was a term used in the ACA. 26 U.S.C. § 5000A(d)(2)(B); ECF 54 at 23. The use of the term "ministry" only shows the bills borrowed from language in federal law.

The Alliance also suggests the 2022 version of the bill "sanitized" references to "ministry" with "program." ECF 70 at 7 (¶ 22). But because not all Sharing Plans are religious in nature, the use of the term "program" ensures the Law applies to all Sharing Plans, including those that are not "ministries."

The Alliance repeats its argument—already rejected by this Court, *see* ECF 54 at 23-24—that the Division's December 2020 Consumer Advisory demonstrated religious animus. ECF 70 at 5-6. The full text of the Advisory referred to both "Health Care Sharing Programs" and "Ministries" and merely alerted consumers to certain limitations in these programs. Facts 30-31; *accord Renteria v. N.M. Off. of Superintendent of Ins.,* No. 23-2123, 2025 WL 635754, at *7-8 (10th Cir. Feb. 27, 2025) (finding no expression of hostility in press release from New Mexico insurance official cautioning that Sharing Plans would not provide traditional, ACA-compliant coverage guarantees, may include religious and moral restrictions on reimbursement, and have on occasion been found to be fraudulent, the latter of which the court said was "grounded in fact" and not "an official expression of hostility").

The Alliance misconstrues an email to claim that Colorado discussed using its "exemptive rulemaking authority to selectively protect secular 'good guys.'" ECF 70 at 1, 22, 28. But it was a lobbyist who referred to certain charitable organizations as "good guys," not a representative of Colorado. And the Court correctly interpreted this "correspondence as reflecting a more general intent not to subject charitable organizations to the Reporting Law, because they do not pose the same consumer risks as the health sharing plans Colorado intended to regulate." ECF 60 at 5-6.

The Alliance claims that the Commissioner's "misleading" annual reports required by the Law reiterate the view that secular entities are "good guys" and religious HCSAs are "bad guys." ECF 70 at 28. The Alliance appears to object to the fact that the reports have noted ministries' Sharing Plans do not cover "medical expenses inconsistent with their religious beliefs," including for some, "expenses related to abortion." ECF 70 at 16-17. But far from being misleading, these facts are undisputed, and are not in any event the focus of the annual reports, which instead summarize all facets of Sharing Plans in Colorado. Facts 60-61; Response to 70.

Finally, the Alliance claims the Commissioner "conspired with the John Oliver show," an "anti-religious entertainer," to "denigrate[] the ministries." ECF 70 at 27-28. Far from the Alliance's imagined nefarious conspiracy, the evidence confirms the show reached out to the Commissioner to discuss "risks to consumers" presented by Sharing Plans, and the Commissioner sought to gather consumer complaints the Division received to explain the consumer concerns. *See* ECF 58-1 at 35-45. This Court previously noted the "obvious innocent explanation" for the Division's participation was that Oliver, with his large audience, "could use his platform to advise consumers of health sharing plans' documented risks, not so they could express their disapproval of the religious beliefs and religious practices of sharing ministries." ECF 60 at 6. The fact that the Deputy Commissioner subsequently praised the show (*see* ECF 70 at 27-28) that advised consumers of these risks is hardly surprising and does not evidence religious animus.

In short, the text, legislative history, and context for the Law make clear its

purpose is to protect consumers. It was not motivated by religious hostility, nor did it seek to suppress religious practice.

### 2. The Law is generally applicable.

General applicability analysis screens for government actions that devalue religious conduct by judging it to be of lesser import than secular conduct. *See Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1277 (10th Cir. 2024). To show the Law is not generally applicable, the Alliance must demonstrate it either "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," *Fulton v. City of Phila.*, 593 U.S. 522, 534 (2021), or "provid[es] a mechanism for individualized exemptions," thus enabling the government to exercise such discretion to selectively burden religion. *Id.* at 533 (citation omitted). The Alliance can do neither.

### i. The Law does not treat comparable secular activity more favorably than religious exercise.

A law is not generally applicable if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton,* 593 U.S. at 534. Stated another way, a law is not generally applicable if it treats "comparable secular activities more favorably than . . . religious exercise." *Tandon v. Newsom,* 593 U.S. 61, 63 (2021) (per curiam). "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue," specifically, "the risks various activities pose." *Id.* at 62.

The Alliance argues the Law is not generally applicable because "Colorado fails

to subject and explicitly exempts numerous comparable secular activities from the burdens imposed on health care sharing ministries," including direct primary care arrangements, consumer payment plans, crowdfunded arrangements, masonic fraternal organizations, medical discount cards, student health clinics at universities, charities that pay medical bills, and fully-insured out-of-state employer health plans with Colorado enrollees. ECF 70 at 24. However, the Alliance's argument fails because it cannot show those entities inflict the harm to consumers addressed by the Law, and thus cannot show that they undermine the consumer protection interests underlying the Law.

The complaints the Division received before Colorado enacted the Law show that consumers were confused and harmed by Sharing Plans' insurance-like features and mistook these plans for traditional, comprehensive insurance plans. Facts 8-9. "There is no evidence that any of the excepted arrangements pose similar consumer confusion risks." ECF 54 at 30. The Alliance points to no evidence that would alter this Court's conclusion.

The unique risks of consumer confusion and harm presented by Sharing Plans come from their unique structure, which differentiates them from each of the allegedly comparable secular arrangements identified by the Alliance. Sharing Plans are the only one of these arrangements[6] in which third parties solicit monthly payments (akin to insurance premiums) while holding themselves out as offering comprehensive benefits

---

[6] Of the arrangements cited by the Alliance, this Court found that only foreign (that is, out-of-state, fully insured) employer health plans resemble insurance, because they are. ECF 54 at 31. But they "do not pose similar risks to consumers as sharing plans" because they "are regulated by insurance officials in the states [where] they are [domiciled]". *Id.*

packages (akin to insurance plans) and promising to facilitate payments for members' healthcare costs (akin to insurance claims). Harris Decl. ¶ 79; Ex. 1 ¶¶ 6(c), 52-53; Dkt 54 at 29-31.

Sharing Plans also differ from these other entities in that they are often marketed using insurance terminology and sold by insurance brokers, which causes consumer confusion that Sharing Plans are insurance. Facts 24-29; Ex. 1 ¶¶ 17(c), 38; ECF 54 at 30-31.

The Alliance argues that these other entities are comparable to Sharing Plans, but the Alliance's argument ignores the unique risks posed by Sharing Plans. *Contrast Tandon,* 593 U.S. at 62 (discussing similar risks posed by various activities in contributing to the spread of COVID-19 regardless of their religious or secular character); *Lukumi,* 508 U.S. at 544-45 (discussing similar health risks posed by improper disposal of animal carcasses regardless of the religious or secular character). *Cf. Renteria,* 2025 WL 635754, at **8-9, n.9 (finding New Mexico Insurance Code, which provided exceptions for fraternal benefit organizations and labor organizations, was generally applicable and enforceable against a Sharing Plan where there was no evidence that fraternal benefit organizations or labor organizations posed risks similar to those posed by Sharing Plans).

The Law is generally applicable because "[t]here is no evidence that any of the excepted arrangements pose similar consumer confusion risks." ECF 54 at 30. In other words, the Law does not prohibit religious conduct while permitting secular conduct that undermines the government's consumer protection interests in similar ways.

ii.   **The Law does not provide a mechanism for individualized exemptions.**

"A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 593 U.S. at 533 (quoting *Smith*, 494 U.S. at 884). In *Fulton*, the Court held that the city's nondiscrimination requirement in its foster care contract was not generally applicable because the contract expressly permitted "exception[s] . . . granted by the Commissioner or the Commissioner's designee, in his/her sole discretion." 593 U.S. at 535 (quoting the contract). The Court explained that creating this mechanism for granting exceptions "'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude," thus enabling the government to exercise such discretion to selectively burden religion. *Id.* at 537 (quoting *Smith*, 494 U.S. at 884).

Similarly, a state unemployment compensation statute that generally disqualified applicants from receiving benefits if they refused suitable work but permitted exceptions for applicants deemed to have "good cause," "created a mechanism for individualized exemptions" that permitted the state to credit secular but not religious reasons for refusing suitable work. *Smith*, 494 U.S. at 884 (distinguishing *Sherbert v. Verner*, 374 U.S. 398 (1963)); *see also Axson-Flynn v. Johnson,* 356 F.3d 1277, 1297 (10th Cir. 2004) (identifying *Sherbert* as "[p]erhaps the best example of such a system" of individualized exemptions).

The Alliance argues that the Law contains "two types of exemption mechanisms"—rulemaking and enforcement—that make the Law not generally

applicable under *Fulton*. ECF 70 at 21. The Alliance is wrong on both counts.

　　*Rulemaking*: The Alliance argues that the Law is not generally applicable because the statute grants the Commissioner authority—which he has exercised via regulations—to prospectively identify consumer payment arrangements *other* than Sharing Plans that are not subject to the Law's reporting requirements. ECF 70 at 21-22.

　　The Law applies to Sharing Plans, defined as "[a] person not authorized . . . to offer insurance in this state that offers . . . a plan or arrangement to facilitate payment or reimbursement of health-care costs or services[.]" § 10-16-107.4 (1), C.R.S. The Law provides that it does not apply to "[d]irect primary care arrangements" or "[o]ther consumer payment arrangements identified by the commissioner by rule, including consumer payment plans[.]" § 10-16-107.4(5) C.R.S. Sharing Plans have a unique collection of features that distinguish them from the direct primary care arrangements, consumer payment plans, and crowdfunded sources cited by the Alliance—unique features that include monthly payments, a comprehensive benefits-like package to members, and a formal arrangement involving third parties who help facilitate payment of health care costs or services on an individual's behalf. *See generally* Harris Decl. ¶ 79; Ex. 1 ¶¶ 6(c), 52-53; Dkt 54 at 29-31.

　　The Law does not grant an "individualized exemption" for any person or group or invite the Commissioner to "consider whether individual persons' beliefs are worthy (or unworthy) of solicitude," so as to trigger *Fulton's* general applicability concerns. ECF 54 at 29. In other words, the Commissioner does not have the discretion to exempt

particular Sharing Plans from the Law's requirements on an individualized basis—

discretion that would create the danger of selectively burdening religion. Instead, the

Law "simply delegates rulemaking authority to a public official—that is, it permits a

public official to create *categorical* exclusions for *types* of arrangements that do not

implicate [the Law]'s underlying policy objectives and concerns." *Id.; see also Axson-*

*Flynn,* 356 F.3d at 1298 ("*Smith*'s 'individualized exemption' exception is limited, then, to

systems that are designed to make case-by-case determinations. The exception does

not apply to statutes that, although otherwise generally applicable, contain express

exceptions for objectively defined categories of persons.").[7]

      Enforcement: The Alliance claims that Colorado selectively enforces the Law, but

the record is clear that during the roughly three years the Law has been in effect

(including throughout the pendency of the preliminary injunction motion), the

Commissioner has not enforced the Law—whether via fines or cease and desist

orders—against any Sharing Plans, secular or religious. Russell Decl. ¶ 39. The

Alliance's claim of selective enforcement is accordingly unfounded.[8]

---

[7] The Alliance cites a document where it claims Colorado "discussed using its
exemptive rulemaking authority to selectively protect secular 'good guys'." ECF 70 at
22. This was not a statement from a representative of Colorado. And this Court correctly
found the document does not "discuss[] how . . . to exempt a particular favored entity,"
rather it "reflect[s] a more general intent not to subject charitable organizations to the . .
. Law, because they do not pose the same consumer risks" as Sharing Plans. ECF 60
at 5-6.

[8] Regardless, the Alliance cites no authority applying a selective enforcement analysis
to *Fulton*'s "individualized exemption" test. Rather, to the extent the Alliance claims the
Commissioner could target religious entities for enforcement based on religious
motivations, the Sharing Plans could assert an as-applied constitutional challenge in an
enforcement proceeding. *See Horrell v. Dep't of Admin.*, 861 P.2d 1194, 1198 n.4 (Colo.
1993) (permitting as-applied constitutional challenges in administrative proceedings).

Nevertheless, the Alliance complains that the Division sent only two letters to a secular Sharing Plan demanding compliance with the Law in January 2023 and September 2024, while in the interim the Division sent an unspecified additional number of letters to an unspecified number of "ministries." ECF 70 at 23. The Alliance somehow concludes that the "only . . . way to read this history"—vague as it is—is that the Division will "enforce its regime vigorously" against ministries but "may not do so" against secular entities. *Id*. The Alliance fails to identify the number of "ministries" and letters sent to them necessary to support its claim of differential enforcement. Regardless, the secular entity at issue claimed initially (and wrongly) that it was a crowdfunding entity, not a Sharing Plan. Ex. 4 ¶¶ 16-19. So it was not postured similarly to various Sharing Plans—secular and religious—who were admittedly subject to the Law but submitted incomplete reporting under it. Differences in the Sharing Plans reflected those different postures, not different treatment of secular and religious entities.

In sum, the Law does not include any mechanism for granting individualized exemptions that would create the danger that the government would exercise this discretion to devalue religious as opposed to secular conduct.

### iii.    Because the Law is neutral and generally applicable, it is subject to rational basis review, which it easily satisfies.

A law that is neutral and generally applicable is constitutionally permissible if it is rationally related to a legitimate government interest. *See Lukumi*, 508 U.S. at 531. Rational basis review "is highly deferential toward the government's actions. The burden is on the plaintiff to show the governmental act complained of does not further a

legitimate state purpose by rational means." *Seegmiller v. LaVerkin City*, 528 F.3d 762,

772 (10th Cir. 2008). The government's decision "must be upheld if 'any state of facts

either known or which could reasonably be assumed affords support for it.' Second-

guessing by a court is not allowed." *Powers v. Harris*, 379 F.3d 1208, 1216-17 (10th Cir.

2004) (citations omitted).

The Law easily satisfies rational basis review. As discussed above, the Law

seeks to achieve a legitimate government interest: shedding light on Sharing Plans'

operations given the unique risks they pose to Colorado consumers. *See* Facts 4-44.

The Law is rationally related to that interest because it provides the Division with key

information to determine whether Sharing Plans are putting consumers at risk and to

take appropriate action if a Sharing Plan is misrepresenting its products as insurance,

indicating that its products operate like insurance, or operating as an unauthorized

insurer.[9] *See* Facts 45-54.

### B. The Law does not violate the Establishment Clause.

In *Lemon v. Kurtzman, 403 U.S. 602 (1971),* the Supreme Court adopted several

tests for determining when the government violates the Establishment Clause. The

Alliance invokes one particular strand of *Lemon*: that the government may not cause

"excessive government entanglement with religion." *Id.* at 613. But in *Kennedy,* 597 U.S.

at 534, the Supreme Court "abandoned" *Lemon* and at least some of its Establishment

---

[9] Even if the Court finds that strict scrutiny applies, the Law survives for the reasons that
the Law satisfies exacting scrutiny. *Infra* at Argument I(C)(2). Colorado's informational
interest is not only legitimate, but compelling. *See* Facts 45-51. And the Law is narrowly
tailored to meet that interest. *See* Facts 46-47, 52-54.

Clause tests. Instead, the Court directed that the Establishment Clause "be interpreted by 'reference to historical practices and understandings.'" *Kennedy,* 597 U.S. at 535.

This Court previously held that laws that foster excessive entanglement are inconsistent with historical practices and understandings, and that the Law does not constitute entanglement in violation of those practices and understandings. ECF 54 at 34-40. The Alliance now ignores the question whether *Kennedy* supplanted *Lemon*'s "excessive entanglement" test with a "historical practices" test and argues only that the Law is unconstitutional under an "excessive entanglement" analysis. ECF 70 at 29.[10] This Court should again reject this argument as discovery has only buttressed its prior conclusion.

"Interaction between church and state is inevitable . . . , and [courts] have always tolerated some level of involvement between the two." *Agostini v. Felton,* 521 U.S. 203, 233 (1997). While government regulations that require "pervasive monitoring by public authorities" can create excessive entanglement, *id.* "generally applicable administrative and recordkeeping regulations may be imposed on religious organization without running afoul of the Establishment Clause," *Jimmy Swaggart Ministries v. Cal. Bd. of Equalization,* 493 U.S. 378, 395 (1990) (citations omitted). Such regulations do not constitute "sponsorship, financial support, [or] active involvement of the sovereign in religious activity." *Id.* at 393.

The Supreme Court has repeatedly found administrative and recordkeeping

---

[10] The Law is constitutional under the "historical practices" test for the reasons previously articulated by the Commissioner. *See* ECF 46 at 23.

regulations to be permissible under the Establishment Clause, including:

- A sales tax applied to sales of religious materials, even though it presumably imposed "substantial administrative burdens" on religious entities. *Id.* at 394-95.

- Government monitoring of public funds used in parochial schools, including monthly surprise site visits and close contact between administrative personnel for the public and parochial school systems. *Agostini*, 521 U.S. at 233-35.

- Recordkeeping requirements of the Fair Labor Standards Act, despite being "burdensome in terms of paperwork." *Tony and Susan Alamo Found. v. Sec'y of Labor,* 471 U.S. 290, 305-06 (1985).

- Government review of adolescent counseling programs established by religious institutions that are grant recipients, involving review of materials and periodic site visits. *Bowen v. Kendrick*, 487 U.S. 589, 615-17 (1988).

That the Law imposes some "paperwork" burdens—even if those amounted to "substantial administrative burdens," of which there is no evidence here—does not render a generally applicable statute an "excessive entanglement" under *Jimmy Swaggart* and *Tony and Susan Alamo Foundation.* This Court correctly found that the Law merely requires submission of an annual email to the Division attaching the required materials. ECF 54 at 37. This is far less continuous and less intrusive than the monthly unannounced onsite visits approved by *Agostini* and on par with the government review of materials approved by *Bowen*. Indeed, the Alliance has admitted that "most of the information requested in HB 1269 our ministries already disclose to any state that asks . . . ." Fact 48; *see* Tenth Circuit Case No. 25-1035, ECF 11-1 at 10 (admitting that much of the information is "largely already share[d] publicly."); *see, e.g.,* Ex. 4 ¶¶ 12-15 (attaching Massachusetts reporting form and detailing Sharing Plans that have reported under Massachusetts law, including Alliance members Christian Care

Ministry, Liberty, OneShare, and Samaritan). Other reporting entities have said the Law provides "a reasonable path for compliance." Fact 44.

Neither *Medina v. Catholic Health Initiatives*, 877 F.3d 1213 (10th Cir. 2017), nor *Church of Scientology v. City of Clearwater*, 2 F.3d 1514 (11th Cir. 1993), holds otherwise. *See* ECF 70 at 29-30. Recognizing that "long-term, continuing monitoring" could constitute excessive entanglement, *Medina* simply held that an exemption from ERISA for church benefit plans avoided such entanglement. 877 F.3d at 1233-34. And the Eleventh Circuit in *Church of Scientology* relied on *Aguilar v. Felton,* 473 U.S. 402 (1985), for its analysis of "close" and "detailed" monitoring to support its finding of excessive entanglement. *Scientology*, 2 F.3d at 1536. But the Supreme Court in *Agostini* later overruled *Aguilar,* finding what it had earlier deemed "close" and "detailed" monitoring was permissible under the Establishment Clause. *Agostini*, 521 U.S. at 235.

This Court correctly concluded that the Law, which requires only an annual submission of "high-level and basic business information," does not entail detailed monitoring or close administrative contact between Colorado and the Sharing Plans, and thus does not involve excessive entanglement in violation of the Establishment Clause. *See* ECF 54 at 37-40.

### C. The Law does not violate the Alliance's freedom of association.

The Alliance failed to demonstrate that the Law significantly burdens its ability to communicate its views by requiring reporting of Sharing Plans' commercial, third-party affiliates, and rational-basis review thus applies. Even if the Law did burden the Sharing Plans' expressive association, it satisfies heightened scrutiny.

1. **The Law's requirement that Sharing Plans report certain, limited information regarding their commercial relationships does not significantly burden their ability to communicate their views**.

The freedom of association protects "the right of people to make their voices heard on public issues" and is "premised in part on the notion that some ideas will only be expressed through collective efforts." *In re Motor Fuel Temperature Sales Pracs. Litig.,* 641 F.3d 470, 479 (10th Cir. 2011) (citation omitted). Specifically, it serves to protect "the advancement of beliefs and ideas," not to obfuscate business dealings inarguably of interest to the state in protecting the welfare of its citizens. *See Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 544 (1963).

More specifically, a freedom of association claim triggers exacting scrutiny only where a law "significantly burden[s]" a group's ability to express its message. *See Boy Scouts of Am. v. Dale,* 530 U.S. 640, 653 (2000); *Roberts v. U.S. Jaycees,* 468 U.S. 609, 626 (1984) (referencing "serious burdens" on freedom of expressive association); *Lichenstein v. Hargett,* 83 F.4th 575, 602 (6th Cir. 2023); *see* ECF 54 at 45. In *Americans for Prosperity Found. v. Bonta,* the Court clarified it is "[t]he risk of a chilling effect on association" that "trigger[s]" First Amendment protection. 594 U.S. 595, 618-19 (2021);. s*ee* ECF 54 at 46 (citation omitted); *see also Buckley v. Valeo,* 424 U.S. 1, 3 (1976) (risk of chilling requires a "reasonable probability"). Based on these authorities, this Court correctly placed the burden of demonstrating this threshold requirement on the Alliance. ECF 54 at 44-47. Specifically, the Alliance must detail how the Law "creates a real risk of chilling . . . expressive activities, and the objective facts on which that belief is grounded." *Id.* at 47.

The Law's requirement that Sharing Plans identify commercial affiliates does not involve—let alone, significantly burden—expressive association. The Law requires reporting of contractual relationships with for-profit insurance brokers and other third parties who market the Sharing Plans. *See* § 10-16-107.4(1)(a)(XV), (XVI), C.R.S. And the Law requires Sharing Plans to report *the number of* providers with whom they contract to provide health care services to members. *See* Reporting Template at 2, cell 17G. These reporting requirements are limited to commercial transactions that may cause consumer confusion because they resemble traditional insurance. Fact 51; Ex. 1 ¶¶ 37-38. And Sharing Plans—including the Alliance's member organizations—already report this information elsewhere. Fact 47. Specifically, four of the Alliance members report under Massachusetts law, which requires Sharing Plans to "list and describe the role of any third-party vendors or administrative partners that acted on behalf of your health arrangement to assist with the marketing, sales, and administration of the health arrangement." Ex. 4 ¶¶ 14-15.

The Law does not implicate Sharing Plans' expressive association rights. It does not require reporting of their individual members' and donors' identities; of Sharing Plans' associations with ministries, churches, or other non-profits; nor of their associations with advocacy organizations, trade groups, lobbyists, or groups engaged in political activity. *Contrast NAACP v. Alabama ex rel. Patterson*, where the Supreme Court held that Alabama's efforts to compel reporting of the NAACP's Alabama members' names and addresses would impermissibly interfere with the organization's and its members' collective advocacy for civil rights in light of the "uncontroverted

showing" that revelations of its members' identities previously exposed those individuals to physical and economic reprisals. 357 U.S. 449, 462-63, 466 (1958); *see also Bonta,* 594 U.S. at 606, 617 (expressive association rights implicated by reporting of charitable organizations' donors).

A Sharing Plan may well seek to communicate certain views. But reporting requirements regarding its commercial relationships does not burden—let alone significantly burden—its ability to communicate those views.

The Alliance presents no evidence that these reporting requirements would significantly burden any expressive activity. After roughly three years of the Law's operation, Alliance member Samaritan claims merely that the Law has the "potential" of chilling. ECF 8-1 at ¶10. But multiple different Alliance members, including Samaritan, OneShare, and Liberty, have confirmed that no third party has stopped contracting with them because of the Law (nor threatened to). Fact 59.

Ultimately, the Alliance fails to adequately connect any claimed risk of chilling to the Law and falls far short of demonstrating the significant expressive burdens the freedom of association is designed to protect against. *Compare Patterson,* 357 U.S. at 462 (citing "uncontroverted showing" required reporting of NAACP's members' names would interfere with organization's collective advocacy given physical and economic reprisal against those members), *Bonta,* 594 U.S. at 606, 617 (striking down California law requiring reporting of donors to charitable organizations where evidence demonstrated they and their supporters had been subjected to threats, protests, stalking, and physical violence), and *In re First Nat'l Bank,* 701 F.2d 115, 116-18 (10th

Cir. 1983) (holding petitioners met their evidentiary burden of establishing a potential

infringement of associational rights where they submitted affidavits describing

harassment and intimidation of known members and fear of reprisals), *with In re Motor*

*Fuel Temperature Sales Pracs. Litig.*, 641 F.3d at 489-90 (allegations that compelled

reporting of membership and internal strategic communications would give the opposing

side "an unfair advantage in the policy debate" and increased compliance costs were

insufficient to demonstrate a burden on associational rights).

The Alliance invokes *Shelton v. Tucker* to argue that associational freedoms can

be violated by compelling an individual to report the names of organizations with which

they associate. ECF 70 at 33. In *Shelton*, the Supreme Court struck down an Arkansas

law requiring public school teachers to report all associational ties—including social,

political, avocational, or religious—prior to employment as broadly stifling fundamental

personal liberties. *Shelton v. Tucker,* 364 U.S. 479, 487-90 (1960). But, unlike in

*Shelton*, the Law's reporting requirements apply only to persons *offering a plan or*

*arrangement*—i.e., Sharing Plans—not individuals. § 10-16-107.4(1), C.R.S.(emphasis

added). Moreover, the Law's required reporting of Sharing Plans' commercial

relationships is wholly unlike the requirement that individuals report personal,

expressive, and religious—in other words, noncommercial—relationships which was

invalided in *Shelton*.

Because the Alliance failed to show the Law significantly burdens Sharing Plans'

associational rights, the Court need not review the Law under exacting scrutiny.

      **2. Even if the Law significantly burdens Sharing Plans' associational
         rights, the Law satisfies exacting scrutiny.**

If a law significantly burdens the freedom of association, the government must
"demonstrate a substantial relation between a disclosure scheme's burden and an
important governmental interest" and "also show that the regime is 'narrowly tailored to
the government's asserted interest.'" *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1244
(10th Cir. 2023); *Bonta*, 594 U.S. at 597 ("narrowly tailored" does not require the Law to
be the least restrictive means).

The Law requires Sharing Plans to report the commercial, third-party affiliates it
contracts with that are typically associated with insurance arrangements and wholly
unrelated to Sharing Plans' expressive activity. § 10-16-107.4(1)(a)(IV), (XV), and (XVI),
C.R.S. This requirement is substantially related to Colorado's interests in ensuring
Sharing Plans do not market themselves in ways that could mislead Colorado
consumers, and that Sharing Plans are not transacting the business of insurance
without the requisite authority. *See* §§ 10-3-903, -903.5, C.R.S. By asking Sharing
Plans to report their contractual relationships with commercial, third-party affiliates that
are typically associated with insurance arrangements—like provider networks and third-
party affiliates who market and enroll individuals in plans—the Law seeks information
about commercial (not expressive) affiliations involving plan features that may elicit
consumer confusion.

The Law is narrowly tailored to address Colorado's acute consumer protection
concerns in ensuring Sharing Plans neither operate as unregulated insurance
companies nor confuse consumers. This distinguishes the Law from the law at issue in

*Bonta*. 594 U.S. 595. There, the Court struck down a California law requiring reporting of major donors to charitable organizations soliciting funds because the reporting requirements were not narrowly tailored to the government's stated interest in preventing charitable fraud due to the over-breadth of sensitive information collected. But here, the Law's reporting requirements are targeted to features that may create consumer confusion and only require information regarding the commercial—not expressive—affiliations. *See* Facts 52-55, 60.

Thus, though it need not, the Law satisfies exacting scrutiny.

### D.  The Law does not violate the Free Speech Clause.

The Alliance claims two components of the Law violate the Free Speech Clause. *See* ECF 70 at 35. First, the Alliance challenges the Law's reporting requirement regarding Sharing Plans' marketing materials. § 10-16-107.4(1)(a)(XVII), C.R.S. This requirement pertains to commercial speech that is factual and non-controversial, and thus triggers—and satisfies—*Zauderer* review. Second, the Alliance claims that by requiring reporting of commercial information Colorado posts publicly, the Law compels Sharing Plans to speak about their "internal operations." These reporting requirements—which are analogous to commercial speech and speech compelled by securities regulations—do not run afoul of the First Amendment.

#### 1.  The Law's reporting requirement regarding Sharing Plans' marketing materials call for commercial information that triggers—and satisfies—*Zauderer* review.

Commercial speech "does no more than propose a commercial transaction." *Harris v. Quinn*, 573 U.S. 616, 648 (2014) (citations omitted). Advertising a commercial

transaction is commercial speech. *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio,* 471 U.S. 626, 637 (1985). The First Amendment permits the government's compelled reporting of commercial information that is factual and uncontroversial so long as the reporting requirements are reasonably related to consumers' informational interests and do not unduly burden the actor's expression. *Id.* at 651.

The Law's reporting requirement regarding marketing materials pertains to commercial information. The Law requires reporting of "any consumer-facing and marketing materials used in this state in promoting the person's plan or arrangement, including plan or arrangement and benefit descriptions[.]" § 10-16-107.4(1)(a)(XVII), C.R.S. Sharing Plans' marketing materials plainly contain commercial speech, as they convey information about the Plans' benefits or conditions and propose a commercial transaction: paid membership in exchange for the opportunity to have some medical expenses reimbursed by the Sharing Plan. *See* ECF 54 at 56.

The Alliance argues that Sharing Plans' marketing materials are not commercial in nature and instead comprise charitable solicitations. ECF 70 at 35-36. But charitable solicitations involve the "communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes" that are "not primarily concerned with providing information about the characteristics and costs of goods and services." *Vill. of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 632 (1980). But Sharing Plans' marketing materials have a "clear commercial bent." ECF 54 at 57. They provide "information about goods and services." *Id. See* Fact 50; *see, e.g.,* Ex. 4 ¶ 7 (attaching marketing); Ex. 1 ¶¶ 21-37 (same). And Sharing Plans form commercial

45

relationships with insurance brokers to market their plans. *See* Facts 28-29; Ex. 1 ¶ 38.

On the other hand, charitable solicitations call for donations—i.e., free contributions that support the charity's activities. And donations or gifts assume that someone is not getting something in return. *Gift*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The voluntary transfer of property to another without compensation"); *Charitable Contribution*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A gratuitous transfer of property to a charitable social-welfare, religious, scientific, educational, or other qualified organization"). In contrast, Sharing Plans "involve a quid pro quo: members pay regular fees in consideration for . . . getting their medical needs covered." ECF 54 at 56.

Speech about the terms and conditions of a commercial transaction—the exchange of money for goods and services—remains commercial in focus regardless of whether the commercial speaker is a religious actor. *See, e.g.*, *Bd. of Trs. v. Fox,* 492 U.S. 469, 474-75 (1989) (rejecting argument that commercial and non-commercial speech were "inextricably intertwined" for purposes of evaluating Free Speech claim, where challenged regulation applied to specific commercial components and speaker could still convey noncommercial messages).

The Law's reporting requirement regarding marketing materials pertains to factual and uncontroversial information, as it requires reporting of marketing materials that Sharing Plans author and disseminate into the stream of commerce. The reporting requirements are reasonably related to Colorado's consumer protection interests. They shed light on Sharing Plans' marketing operations to ensure they are not making misrepresentations to consumers. *See* Fact 50.

The Law does not burden these activities or communications at all. The Alliance claims that having to report these marketing materials to Colorado "chills ministry speech." ECF 70 at 35. But the Alliance does not identify any expressive burden imposed by the marketing material reporting requirement. *See* ECF 54 at 57. Rather, the evidence confirms there have been no changes to marketing materials since passage of the Law. *See* Fact 58. This reporting requirement therefore easily passes *Zauderer*'s rational basis standard. ECF 54 at 59.

### 2. Nor do the Law's other reporting requirements violate the Free Speech Clause.

The Alliance also argues the Law compels Sharing Plans to speak about their internal operations by requiring reporting of commercial information that Colorado posts publicly.[11] ECF 70 at 36-37. The Law, however, does not require reporting of religious materials. It is not interested in how Sharing Plans might engage in religious activity with their members. It does not inquire as to whether or how Sharing Plans use their funds or organization for charitable or religious purposes. It does not ask after prayer requests, efforts to share their faith with others, or meetings among members.

Instead, the Law is focused on Sharing Plans' activities that relate most to their insurance-like conduct. For example, the Law requires Sharing Plans to report objective and verifiable commercial information such as how much money Sharing Plans collected from members; how much money Sharing Plans paid for administrative

---

[11] The Alliance has not defined these "internal operations," but this Court reasonably presumed the Alliance was referring to reporting requirements regarding the total dollar values (a) Sharing Plans collect, (b) for which they receive reimbursement requests, (c) that qualify for reimbursement, (d) "and like data." ECF 54 at 59-60.

expenses, paid to reimburse medical costs; the organizational structure and documents

of Sharing Plans; the number of plan members; and third-party contractors and fees

paid to such contractors, such as insurance brokers engaged to solicit participation in

the plan. *See generally* § 10-16-107.4(1)(a), C.R.S. These reporting requirements are

factual and uncontroversial and are directly related to Sharing Plans' commercial

activity—facilitating the payment of medical services in exchange for members'

payment. Fact 50.

This Court properly analogized the Law's requirements in this regard to reporting

requirements of both general commercial information and securities-related content in

determining that rational basis review applies. ECF 54 at 61-65. First, "*Zauderer* . . .

underscores that laws compelling disclosures of factual information in connection with

commercial transactions may implicate only minimal First Amendment interests . . .

[and] are judged under a rational basis standard. . . ." *Id.* at 61 (citing *SEC v. AT&T,*

*Inc.,* 626 F.Supp.3d 703, 749 (S.D.N.Y. 2022)). Second, "in the securities context,

courts generally uphold compelled disclosure requirements under deferential rubrics."

ECF 54 at 61-62 (citing cases). This Court found the rationales supporting those

deferential rubrics applied equally to the Law's requirements—namely, it pertains to

"high-level data about their business," is "calculated to prevent consumer and

marketplace confusion," "do not operate to suppress any ideas, do not involve political

speech, do not restrict speech," but rather merely "require factual disclosures about . . .

business operations" in an emerging market that operates in close proximity to an

already "extensively regulated" insurance market. ECF 54 at 62-64.

The Alliance argues *Zauderer* does not apply, alleging that the Commissioner's annual report discloses the required reporting information in a misleading, and thus controversial, way. ECF 70 at 35. But the record does not support the claim that the annual reports—which are required to and do "summariz[e] the [reported] information," C.R.S. 10-16-107.4(3)(a)—are misleading. *See generally* ECF 46-1 at 734-772.

Moreover, *Zauderer* applies when the subject matter of the required reporting is factual and uncontroversial—as is the case here. That the Commissioner goes on to speak in his own annual report, summarizing and aggregating the reported information, does not change the factual and uncontroversial nature of the reporting requirements applicable to Sharing Plans. Indeed, the annual report's summary portions do not even identify specific Sharing Plans when quoting from the factual materials the Division collects. *See generally* ECF 46-1 at 734-772.

The Commissioner's report also does not restrain any Sharing Plan from communicating any (legal) message to any audience. Nor does it, or the Law's reporting requirements, force Sharing Plans to utter, endorse, or subsidize any views expressed by the Division or the Commissioner.

This Court correctly concluded the Law's required reporting of this commercial information satisfies rational basis review. ECF 54 at 64-65. The reporting requirements are directly related to Colorado's consumer protection interests: shedding light on Sharing Plans' operations to ensure they are not operating as unauthorized insurers or making misrepresentations to consumers. *See* Facts 45-54.

## II.    The Alliance will not suffer irreparable harm.

The Alliance member organizations "already disclose to any state that asks" "most of the information requested" by the Law. Ex. 4 ¶ 9. Sharing Plans, including the Alliance's member organizations, have reported information under the Law on four occasions. *See* Fact 58. Sharing Plans concede the Law provides "a reasonable path for compliance." Fact 44. The Alliance has failed to demonstrate that any First Amendment rights have been burdened. The Alliance suffers no irreparable harm as a result of the Law.

**III.    The balance of the equities and public interest weigh against an injunction.**

The Law safeguards consumers against harm, and the Alliance has failed to substantiate any purported harms its members would suffer from its continued operation. Since its passage, the Law has promoted these public interests by requiring Sharing Plans to report discrete information regarding their commercial operations. A permanent injunction would deprive Colorado of this information, leaving Colorado consumers at increased risk to what the Alliance's own expert called Sharing Plan "scams" operated by "criminals," "fraudulent entities," and "wolves in sheep's clothing." Facts 16, 18, 19 and 46. Therefore, this factor also weighs against a permanent injunction. *Maryland v. King,* 567 U.S. 1301, 1303 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (citation omitted).

## CONCLUSION

The Commissioner respectfully requests that the Court grant his motion for summary judgment and deny the Alliance's motion for summary judgment.

DATED at Denver, Colorado this 27th day of June, 2025.

PHILIP J. WEISER
Attorney General

*s/ Reed Morgan*
REED WILLIAM MORGAN, 40972*
Senior Assistant Attorney General

*s/ Phillip Khalife*
PHILLIP KHALIFE, 46333*
Senior Assistant Attorney General

*s/ Gabriel Young*
GABRIEL D. YOUNG, 56806*
Assistant Attorney General

Ralph L. Carr Colorado Judicial Center
1300 Broadway, 8th Floor
Denver, CO  80203
720-508-6335 (Morgan)
720-508-6388 (Khalife)
720-508-6402 (Young)
Reed.Morgan@coag.gov
Phillip.Khalife@coag.gov
Gabe.Young@coag.gov
*\* Counsel of Record*