IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01386-GPG-STV

ALLIANCE OF HEALTH CARE SHARING MINISTRIES,

      Plaintiff,

v.

MICHAEL CONWAY, in his official capacity as
Commissioner of the Colorado Division of
Insurance,

      Defendant.

---

**REBUTTAL EXPERT REPORT OF JUSTIN GIOVANNELLI, J.D., M.P.P.**

---

# I.   Introduction

## A.   Qualifications

1. My name is Justin Giovannelli. I am an associate research professor and a project director at the Center on Health Insurance Reforms, at Georgetown University's McCourt School of Public Policy. I hold a J.D. from New York University School of Law, a Master of Public Policy from Georgetown, and a B.A. from Penn State University.

2. I study the regulation of private health insurance under state and federal law, including under the federal Affordable Care Act (ACA), and the implications of these rules for insurance markets and consumers. My work focuses on understanding how state and federal regulation and related health coverage policies are likely to affect the availability and affordability of, and the benefits offered by, private health insurance sold to individuals and small employers. I author publications and provide policy analysis and advice in these areas. My published works have addressed topics including implementation of Title I of the ACA (including the law's insurance market reforms, health insurance marketplaces, coverage affordability programs, and individual mandate) and the



1

regulation and oversight of coverage arrangements that are not subject to the ACA's individual and small-group market rules. These publications include works specifically regarding the operation and regulation of health care sharing ministries.

3. I have provided my resume and a list of all publications I have authored in the previous 10 years in Appendix A. I have not testified as an expert at trial or by deposition during the previous four years.

## B.    Assignment

4. On January 3, 2025, plaintiff Alliance of Health Care Sharing Ministries (the Alliance) designated Katy Talento and Rob Waldo as experts in this matter. The designation states that Ms. Talento and Mr. Waldo may present opinions, as further described in their declarations, regarding the purpose, practices, and operations of health care sharing ministries and the similarities and differences between these organizations and others. Counsel for the State of Colorado asked me to review and consider Ms. Talento's and Mr. Waldo's opinions, as described in the designation and their declarations. I am being compensated for my work in this matter at a rate of $300 per hour.

5. This report presents my analysis and response to the opinions of Ms. Talento and Mr. Waldo. In performing this work, I have relied on the materials identified in Appendix B.

## C.    Summary of Opinions

6. In performing this assignment, I have reached the following conclusions:

    a. Ms. Talento's and Mr. Waldo's suggestion that Sharing Plans are all religious in character, with a shared history, purpose and structure that uniformly reflects this character, is inaccurate.[1] Today, Sharing Plans are a diverse group that hold themselves out as serving different purposes, with different structures and different expectations for members. They have

---

[1] Ms. Talento and Mr. Waldo refer to "health care sharing ministries" and the statute and implementing regulations at issue in this matter apply to "health care sharing plans and arrangements." For clarity, I use the statutory term, abbreviated as "Sharing Plans," in this report.

Resp. Ex. 1

adapted and thrived in response to relatively recent policy changes affecting the broader market for health coverage — many Sharing Plans launched only after these changes — and explicitly compete with traditional health insurance on the basis of commercial features and considerations.

    i. The market for Sharing Plans is much larger than it was prior to enactment of the federal Affordable Care Act (ACA) in 2010, both in terms of the number of such plans that broadly advertise to consumers across the country and the number of people nationwide who enroll in them.

    ii. Sharing Plans include both religious and secular entities and vary widely with respect to membership eligibility requirements and operational structures.

b. Ms. Talento's and Mr. Waldo's assertion that Sharing Plans are fundamentally different from traditional health insurance is belied by how Sharing Plans operate and advertise and is at odds with how consumers often talk about them.

    i. Sharing Plans share — with each other and with traditional health insurance — a common commercial element: they will not facilitate payment of a consumer's medical expenses unless the consumer makes monthly payments of a predetermined amount in accordance with the membership agreement or guidelines.

    ii. Sharing Plans have many additional features that are similar or identical to traditional health insurance, including defined benefit packages, cost-sharing elements (deductibles, copayments), member ID cards to show providers, and provider networks, and they are increasingly sold by insurance producers.

    iii. There is one structural difference between how traditional health insurance works and how Sharing Plans are supposed to work that is key to understanding why Sharing Plans are not treated as insurance.

3

1. In contrast to health insurance, Sharing Plans disclaim that they guarantee payment for members' qualifying medical expenses.

2. In practice, however, Sharing Plans make representations that downplay or obscure the significance of this limitation and suggest that members can trust that their medical costs will be paid.

iv. Because Sharing Plans are not, by default, considered to be insurance, they are not required to — and in practice do not — adhere to any of the federal and state consumer protections that apply to insurance.

v. Even though Sharing Plans and health insurance are subject to very different rules, the numerous similarities between them, and the ways in which Sharing Plans represent what it is they do, create a significant risk of consumer confusion and harm.

1. Consumers can and do misunderstand or discount the limitations of Sharing Plans and conclude that, for all intents and purposes, Sharing Plans and insurance are the same.

2. Consumers who enroll in a Sharing Plan based on the assumption that they are a reliable replacement for insurance can be — and have been — exposed to dramatically higher costs than they anticipated.

c. Sharing Plans are materially different from other non-insurance arrangements and methods for paying for health care identified by Ms. Talento. Sharing Plans are not health care providers but rather third parties that facilitate or administer bill payments, often by serving as intermediaries between their members and providers. They are not platforms for ad hoc fundraising, nor do they hold themselves out as a solution for merely minor medical expenses or a discrete category of services. In exchange for regular predetermined payments, they offer

4

much more: a suite of features — including defined benefit packages, familiar cost-sharing structures, member ID cards, provider networks — that mirrors comprehensive health insurance and that is advertised as suitable for large health care costs.

## II.    The Market for Sharing Plans Is Much Larger and More Diverse Than It Was Prior to Enactment of the ACA

### A.    The Affordable Care Act and Sharing Plans

7.    The ACA was enacted in 2010. The law established numerous federal requirements for group health plans and health insurance issuers that were generally designed to make health coverage more accessible, affordable, and comprehensive for Americans, regardless of their health status. These changes created a regulatory landscape for health insurance that was much different from what it had been previously, particularly for health insurance sold to individuals. I discuss some of the ACA's rules in Section III.D., below.

8.    Sharing Plans are not specifically exempted from the ACA's consumer protections. However, because Sharing Plans are not, by default, considered to be insurance, they are not subject to any of the ACA's rules. I discuss this issue in Sections III.C. and III.D., below.

9.    The ACA also includes a provision, commonly known as the "individual mandate," which imposed a tax on people who could afford to maintain enrollment in health coverage that met minimum standards ("minimum essential coverage") but chose not to do so.

10.   The ACA specified several exceptions to the individual mandate. For example:

   a.   Members of a recognized religious group who are conscientiously opposed to private or public insurance are exempt from the individual mandate.

   b.   Members of a "health care sharing ministry," as the term is defined in the individual mandate provision, are also exempt from the tax penalty. An organization satisfies the individual mandate's definition of a health care sharing ministry if:

5

    i. It is a nonprofit;

    ii. Its members share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs;

    iii. Its members retain membership even after they develop a medical condition;

    iv. It, or a predecessor organization, has been in existence at all times since December 31, 1999 and medical expenses of its members have been shared continuously without interruption since that date;

    v. It conducts an annual independent audit.

11. Pursuant to a change in federal law, the tax associated with the individual mandate was reduced to zero beginning in 2019. This change had the effect of making the ACA's individual mandate a dead letter.

12. The term "health care sharing ministry" is not used in the ACA other than in connection with the law's individual mandate.

**B.** **The Number of Sharing Plans That Broadly Advertise and Enroll Consumers Across the Country has Grown Dramatically Since 2010, And Membership in These Organizations Has Increased More Than Tenfold**

13. Although there is a long history in the United States of local communities, including communities of faith, coming together to help members who face hardship, the large membership Sharing Plans that today operate in Colorado and across the country are modern organizations. Christian Healthcare Ministries — a former Alliance member that may be the largest Sharing Plan by enrollment in the United States — represents that it is the "nation's first and longest-serving health cost sharing ministry." (Exhibits 2 and 3.) It was established in 1981.

14. Many of the Sharing Plans that operate in Colorado are far newer. At least six of these organizations — CrowdHealth, Impact Health Sharing, Jericho Share, Knew Health, Sedera, and Zion HealthShare — did not exist prior to 2010.

15. At least three other large membership Sharing Plans, Alliance member OneShare Health, Solidarity HealthShare, and United Refuah HealthShare, represent that

Resp. Ex. 1

they are affiliated with, or are a successor to, smaller Sharing Plans founded before December 31, 1999 (the cutoff date to qualify as a health care sharing ministry for purposes of the ACA's individual mandate). However, these organizations only began selling memberships under their current names and in their current forms within approximately the past 10 years.

16. The number of people enrolled in Sharing Plans — both the new organizations as well as those that came about in the 1980s and 1990s — has increased enormously in recent years. In March 2010 (the month the ACA was enacted), the Alliance represented that Sharing Plans were serving more than 100,000 members. (Exhibit 4.) By 2023, national enrollment in the Sharing Plans that have a presence in Colorado was approximately 1.5 million. (Exhibit 3.)

17. This growth in the market for Sharing Plans is attributable to several factors.

   a. Many people oppose the ACA generally and certain of its coverage requirements specifically; many people also disagreed with the law's requirement to maintain minimum essential coverage or else pay a tax. There are many bases for this opposition and disagreement, some related to individuals' religious beliefs, some not. Because membership in a Sharing Plan that meets the definition of health care sharing ministry for purposes of the ACA's individual mandate conferred an exemption from the mandate, many people who objected to the law gravitated to Sharing Plans as a means of shielding themselves from it. Indeed, even following the practical elimination of the individual mandate, some Sharing Plans that meet the applicable definition continued to advertise that fact on their websites.

   b. For individuals who qualify, Sharing Plans typically have a low upfront cost, relative to what these organizations often refer to as "traditional" insurance. In part because insurance and insurance-like products are complicated and have numerous interrelated features, the "sticker" price of coverage — a single number that is easy to compare and that signifies, in concrete terms, what the consumer has to give up in order to get the plan — is often the critical factor in a consumer's decision to enroll. Because

Sharing Plans often have appeared to have a cheaper monthly payment than fully regulated health insurance, many consumers gravitated to these plans as a means of saving money. Indeed, as I discuss in Section III.C., below, many Sharing Plans explicitly compete with health insurance on the grounds that they are more affordable, and just as reliable.

    c.   While it is my understanding that, prior to 2010, the Sharing Plans that existed typically did not use insurance producers (e.g., insurance brokers) to generate enrollment, this business practice has become much more common. In 2023, at least five of the Sharing Plans that operate in Colorado reported enrollment in the state via producers; at least six paid third parties for "marketing, promoting, or enroll[ment]." (Exhibit 3.) My review of Sharing Plan websites indicates that, whatever is happening in Colorado, there are more Sharing Plans than this that use producers or otherwise pay third parties to enroll new members. Notably, the commission rate for selling Sharing Plans may be many times higher than for traditional insurance, which creates a financial incentive for insurance producers to promote the former more than the latter. (Exhibit 5.)

18. There are additional explanations for why this market has become increasingly attractive. Sedera, a Sharing Plan founded in 2014 that describes itself as a health care sharing ministry (it does not purport to be one that meets the individual mandate definition), identifies three reasons why health sharing has grown "exponentially:"

    a.   "The need for a better way to pay for medical care has grown;

    b.   It's a viable way to pay for healthcare costs; [and]

    c.   It's part of the free-market solution to a broken healthcare system."
       (Exhibit 6.)

## C.   Sharing Plans Include Both Religious and Secular Entities and Vary Widely With Respect to Membership Eligibility Requirements and Operational Structures

19. Ms. Talento and Mr. Waldo suggest that Sharing Plans are religious in character, with a shared history, purpose and structure that uniformly reflects this character:

Resp. Ex. 1

that they have a common statement of faith and require regular church attendance, for example, and instruct members to live in accordance with biblical values. But this describes only a subset of such plans and is inaccurate with respect to the universe of Sharing Plans that sell to consumers in Colorado and across the nation.

20. Sharing Plans facilitate payment of their members' medical expenses pursuant to the terms of a document that describes 1) member eligibility for the Sharing Plan and 2) how the plan is supposed to work. Sharing Plans have different names for this document, such as "membership guidelines" or the "membership agreement." This document typically includes or is accompanied by a statement to which prospective enrollees must agree. For some Sharing Plans, this is a "statement of faith;" for others, it is a "statement of standards" or a "statement of principles."

21. These guidelines, agreements, and statements, as well as the other materials Sharing Plans present on their websites, reveal a diverse "industry" — this is Alliance member OneShare Health's term — with materially different membership criteria and organizational structures. (Exhibit 7.)

22. Many Sharing Plans expressly evoke a particular faith and some require prospective members to profess agreement with specific biblical tenets. Of these plans, it appears that in practice, at least one encourages enrollment by individuals who are not religious. Alliance member OneShare provides marketing material on its website, authored by the Sharing Plan's former CEO, which offers the "Truth Behind Health Care Sharing Ministries" and seeks to dispel "common misconceptions regarding health care cost sharing." (The material uses the terms "health care sharing ministry," or "HCSM," and "health care cost sharing" interchangeably.) One such "misconception" that OneShare's former CEO dispels is that "Only People of Faith Can Join an HCSM." (Exhibit 8.)

23. Other Sharing Plans evoke religion more broadly. For example, one Sharing Plan requires members to agree that "every member has a fundamental and religious right to worship God in their own way" and that it is a member's "religious and ethical obligation to share in the burden of others when they need assistance according to my current resources and opportunities." (Exhibit 9.) Another states

9

that members must acknowledge that the Sharing Plan considers itself accountable to a higher power, but emphasizes that there is "no religious requirement to join." (Exhibits 10 and 11.)

24. Still other Sharing Plans are secular. These plans do not require members to agree that they hold any particular religious beliefs. Rather, members must attest to, for example, statements affirming their faith in other members, or in the power of an ethical and health-conscious community. (Exhibits 12 and 13.) One such Sharing Plan, CrowdHealth, markets itself in its guidelines as "building a Crowd of people like you —savvy, generous, and responsible," and states simply that "CrowdHealth Members have like minds in seeking something trustworthy, simplified, and freeing — a new solution that is changing the game and is bigger than fighting for healthcare freedom on your own." (Exhibit 14.)

25. While a few Sharing Plans require members to attend church regularly, most do not. Indeed, most of the Alliance's members do not require this. Alliance member Altrua HealthShare makes a point of noting that church attendance is not required, in a manner that suggests the absence of this requirement is a selling point for consumers. (Exhibit 15.)

26. Sharing Plans are also structured in different ways. Some instruct members to pay their health care providers and submit eligible bills to the Sharing Plan for reimbursement. Others instruct members to show their providers their Sharing Plan ID card and have the providers submit medical bills to the Sharing Plan for payment. Sharing Plans that use this structure send payments directly to the provider, obviating the need for the member to front the cost of their medical services. Some Sharing Plans facilitate reimbursement of member expenses by assigning a specific member or members to send their monthly payment to another member. However, this approach is less common. More often, Sharing Plans instruct members to send monthly payments to the plan or to deposit them in a designated account administered by the plan. In general, these Sharing Plans represent that they keep members' payments separate and that the plan administers or facilitates payments between these accounts.

10

III.   Sharing Plans Share Numerous Material Features With Traditional Health Insurance, Advertise in Ways That Downplay or Obscure the Significance of Their Limitations Compared to Insurance, and Accordingly, Are Often Misunderstood by Consumers to Be Functionally Equivalent to Health Insurance

A.   Sharing Plans Have a Common Commercial Element: The Services They Offer to Their Members Are Conditional on the Member Making Set Monthly Payments in Accordance With the Membership Agreement or Guidelines

27. Sharing Plans require consumers to pay a set dollar amount each month to be eligible (and remain eligible) to have their medical expenses paid. In common with traditional insurance, many Sharing Plans may offer a form of "grace period" in which a member who falls behind on their monthly payments has the opportunity to catch up on what they owe (although they may or may not be eligible to have their expenses paid during this period). But, also in common with traditional insurance, a Sharing Plan member who does not make these regular payments cannot avail themselves of the services these plans provide.

28. Sharing Plans often characterize these set monthly payments as "voluntary," and Mr. Waldo uses this word too. This description is deeply misleading. A member who does not pay their "voluntary" monthly fee will not be eligible to have their medical expenses paid. The monthly payment is voluntary only in the most literal sense that no one is forcing the member to make it. Yet there are crucial consequences to the member if they do not: they will not have their medical expenses paid.

29. And this is exactly how it works with traditional insurance. A consumer with health insurance has the same decision to make each month: make the predetermined payment or don't. This choice is no more or less "voluntary" than the one facing a consumer with a Sharing Plan. If the consumer with health insurance chooses not to pay, they will (after a grace period), lose membership in their health plan, and with it the opportunity to have their health expenses paid.

30. This fundamentally commercial, transactional element undergirds, explicitly and implicitly, many of the representations Sharing Plans make about themselves. For

11

example, the Alliance states on its website that health care sharing ministries are a "practical option" for many people because "[t]hey offer principled, high-quality care at a price often more affordable than what is offered by Big Insurance or the hyper-regulated federal exchange." (Exhibit 16.)

B.    Sharing Plans Have Many Additional Features That Are Similar or Identical to Traditional Health Insurance

31.    Sharing Plans are not fundamentally different from health insurance. To the contrary, many of their features mirror those found in traditional health insurance, and Sharing Plans regularly explain these features using terms and concepts that are functionally or literally identical to those used by health insurers. In addition, many Sharing Plans explicitly market themselves as a viable alternative to traditional health insurance: an alternative that offers insurance-like features — including the capacity to shield members from large medical expenses — at a more affordable price.

32.    Premiums. As I have discussed above, Sharing Plans require members to pay a set dollar amount each month to be eligible (and remain eligible) to have their medical expenses paid. Although Sharing Plans usually call these payments a "monthly contribution" or "monthly share," they are not one-off charitable contributions, nor are they in any meaningful sense optional or voluntary. Rather, they function just like a monthly premium does for insurance. A member's monthly contribution is typically set at a level that reflects factors including where the member lives, their age, how many people in their household are covered by the Sharing Plan, and the generosity of the benefit plan that the member has selected. (I discuss Sharing Plan benefits below.)  These are the same factors that insurance companies account for when setting premiums for the coverage they sell.

33.    Defined benefit packages. Just like traditional health insurance, Sharing Plans define a package of benefits that are eligible for payment and identify types of medical expenses — members' "preexisting conditions," for example — for which payments are limited or unavailable. Just like health insurance, most offer multiple versions of these packages, with different included benefits, maximum

Resp. Ex. 1

limits on payment, and/or different cost-sharing structures.[2] Packages that are relatively more generous — with more included benefits, higher payment limits, and/or lower cost-sharing obligations for the member — require a higher monthly payment. Sharing Plans typically give these different benefit packages different names, often in a manner that appears to signal the relative generosity of the offerings. For example, Alliance member Altrua offers four types of plans named after precious stones, ranging from Ruby (the plan with the lowest monthly payment but the fewest benefits, the lowest annual limit on payments, and the highest cost-sharing), to Sapphire, Emerald, and Diamond (the plan with the highest monthly payment but the most benefits, the highest payment limits, and the lowest cost-sharing). (Exhibit 17.) Christian Healthcare Ministries names its plans after precious metals, ascending in generosity from Bronze, to Silver, to Gold. (Exhibit 18.) This is, in fact, the ACA's approach too: health plans sold to individuals must be classified by their relative generosity on a scale that includes Bronze, Silver, and Gold.

34. <u>Deductibles</u>. Sharing Plans require members to pay a predetermined dollar amount of their own medical bills before the plan will begin to facilitate the payment of any expenses. Sharing Plans have different names for this concept — it is sometimes called an "initial unshareable amount," for example, or an "annual household portion" — but it is functionally identical to an insurance deductible. To help answer the question, "What is an Annual Household Portion (AHP)," Alliance member Medi-Share directs consumers to a video it created with the same name. Medi-Share's video begins by defining the term as I have done in the first sentence of this paragraph. It continues with an illustrative example: if you have an AHP of $2,500 and "then have a $7,500 hospital stay, you'll be responsible for $2,500 to meet your Annual Household Portion, but the remaining $5,000 will be shared by your fellow members." (Note the certainty with which this representation is made.) The video concludes with the suggestion to "think of

---

[2] As noted below, coverage subject to the ACA cannot impose maximum dollar limits on covered benefits (though this was common practice prior to the law's enactment). However, insurers can and still routinely do offer a range of plans with different benefit and cost-sharing designs.

Resp. Ex. 1

it like this for purposes of understanding: your AHP is similar to a deductible."
(Exhibit 19.)

35. <u>Other cost-sharing parameters</u>. Sharing Plans incorporate other cost-sharing
parameters into their benefit packages, as well. For example, members may be
expected to pay a specified amount of their medical bill to their provider at the
point of service before the plan will facilitate payment of the remainder. This
payment to the provider may be deemed a "visit fee" or "consultation fee" but is
equivalent to an insurance copayment.

36. <u>Member ID cards</u>. Just like health insurance, many Sharing Plans issue their
members an ID card and instruct them to present the card to their provider when
they access care. Alliance member Medi-Share's ID card closely resembles the
cards that health insurers provide and identifies the copays associated with
various health services. (Exhibit 20.) Alliance member Altrua's member ID card
lists the address to which health care providers should "send medical claims."
(Exhibit 21.) Sharing Plans often eschew the word "claims" in favor of the word
"needs," but not always.

37. <u>Provider networks</u>. Some Sharing Plans, including most Alliance members,
advertise that they use or are in some way affiliated with a provider network.

    a. Provider networks are a ubiquitous feature of health insurance. In general,
health insurers use networks as a tool to try to manage costs. A provider
who contracts with an insurer to participate in its network agrees to
provide care to the insurer's enrollees at a negotiated rate, with the
expectation that being "in network" will drive higher patient volume.
Enrollees are not required to obtain care in-network. However, they have a
strong financial incentive to do so because the plan will cover a greater
percentage of the cost and because they are insulated from any additional
bills for the service: the combination of the enrollee's share (for example,
their copayment and/or payment against their deductible) and the plan's
share (the contracted rate) constitutes payment in full and the provider
cannot charge the enrollee for any additional cost. Again, enrollees are not

14

barred from seeing an out-of-network provider, but it is likely to be much more expensive if they do so.

    b.  In the context of Sharing Plans, the consequences to an enrollee of obtaining care within the plan's network, or not, are murkier. Sharing Plan advertisements that tout the use of a provider network certainly suggest that this feature is a benefit to members, one that may facilitate broad access to care and result in cost savings if they use an in-network provider. And, as with traditional insurance, it does appear there are concrete financial implications to going out-of-network in at least some Sharing Plans. For example, Alliance member Medi-Share instructs its members to use the plan's Preferred Provider Organization (PPO) network and indicates that members who do not do so will be responsible for a larger share of the cost. (Exhibit 22.) Alliance member OneShare Health represents that members "are not restricted to an In-Network/Out-of-Network requirement" and are free to see any provider but also cautions that members who obtain care out-of-network may face higher costs as a result. (Exhibit 23.)

38. <u>Sales by insurance producers</u>. As I noted above, Sharing Plans increasingly rely on insurance producers (e.g., insurance brokers) to generate enrollment. Most of the Alliance's members use insurance producers or otherwise pay commissions to third parties to enroll new members. For example, Alliance member OneShare Health encourages insurance producers to "join our team" by highlighting "industry-competitive commissions paid weekly" and suggesting its plans are "perfect to bundle with ancillary [insurance] products such as Accident, Critical Illness, Hospital Indemnity, & Limited Med[,] Dental, Vision, & Life Insurance." (Exhibit 24.)

Resp. Ex. 1

C.     While Sharing Plans Do Not Guarantee Payment of Members'
       Qualifying Medical Expenses, They Make Representations That
       Downplay or Obscure the Significance of This Limitation and Suggest
       Members Can Trust That Their Medical Costs Will Be Paid

39.   There is one structural difference between how traditional health insurance works
      and how Sharing Plans are supposed to work that is key to understanding why
      Sharing Plans are not treated as insurance. As Mr. Waldo notes, health insurers
      guarantee payment of their enrollees' qualifying medical expenses, while Sharing
      Plans do not. Sharing Plans tell consumers this, and the membership agreements
      and guidelines that consumers sign or consent to when they enroll contain
      multiple disclaimers to this effect.

40.   At the same time, Sharing Plans also make representations that muddy the waters
      — that suggest Sharing Plans are a viable replacement for health insurance and
      that consumers can rely on them accordingly.

41.   Most Sharing Plans position themselves as a more affordable alternative to
      traditional health insurance. For example:

      a.   Alliance member Samaritan Ministries offers group plans that can be
           purchased by small employers. Samaritan's advertising cites health
           insurance research from KFF that describes health insurance costs for
           small employers and, using this data as a baseline, asserts that in most
           cases, "Samaritan Groups . . . will save you 50% or more." (Exhibit 25.)

      b.   The homepage for Alliance member Altrua poses a series of questions —
           "What if I could save $600 on health care? What if I could afford another
           car? What If I could afford a larger apartment?"— and urges consumers to
           call now to discover savings. (Exhibit 26.)

      c.   Impact Health Sharing claims to "deliver[] a modern and affordable
           alternative to health insurance, where most save 30-50% when they join"
           and deploys a banner that declares "Families Are Saving Thousands!"
           (Exhibit 27.) Similarly, United Refuah HealthShare's website tells visitors
           that families typically save $10,000 to $20,000 every year. (Exhibit 28.)
           WeShare, which administers Unite Health Share Ministries' Sharing Plan,

16

tells consumers to "Slash your medical premiums by up to 50%" by joining its "cost-effective alternative to traditional insurance." (Exhibit 29.)

42. Implicit in all of these advertisements is a representation about Sharing Plans' reliability: that they can be trusted — just as much as insurance, or more — to facilitate a consumer's medical payments so that the consumer will pay less than they would if they had insurance.

43. Sometimes, these representations of reliability are explicit. For example:

   a. Alliance member Medi-Share describes itself as "An Affordable, Reliable Health Care Alternative" and calls its "Complete" plan a "comprehensive alternative to health insurance" that gives "peace of mind." (Exhibits 30 and 31.)

   b. Solidarity Healthshare describes itself as a "refreshingly affordable alternative" that allows consumers to "[s]ay goodbye to sky-high premiums and hello to budget-friendly options that don't compromise on quality." It continues: "From preventive care to major medical events, we have your back every step of the way." (Exhibit 32.)

   c. CrowdHealth's founder tells website visitors the Sharing Plan isn't health insurance and explains "Why That's a Good Thing!" He asserts that members are "better off" with CrowdHealth and cites KFF data showing that health insurers deny a large share of in-network claims: "insurers get away with guaranteeing coverage, but they aren't living up to their word. They make it sound like you can trust them, but in reality, they're leaving millions of Americans with huge, unexpected bills. . . . That's the opposite of what we stand for at CrowdHealth." (Exhibit 33.)

   d. In the section of its 2023 member guidelines that summarizes how "health cost sharing works," Christian Healthcare Ministries asks: "**How can we be sure** our members will honor their commitments to carry each other's burdens?" (emphasis added). The Sharing Plan's answer: "**We point to our history**" (emphasis in original). It represents that members have shared 100 percent of eligible medical bills since 1981. (Exhibit 34.)

Resp. Ex. 1

e.   The Alliance provides similar assurances. On its website, it asks the question: "Can I trust health care sharing ministries with my medical bills?" The Alliance's answer contains no mention of the fact that Sharing Plans do not guarantee payment of a member's medical bills. What it does say is that Sharing Plans have a long and unblemished track record of payment: "Since the 1980s Health Care Sharing Ministries have shared 100% of eligible medical expenses for their members." (Exhibit 35.)

D.   **Because Sharing Plans Are Not, by Default, Considered to Be Insurance, They Are Not Required to Follow Any of the Consumer Protections That Apply to Insurance**

44. Traditional health insurance is subject to numerous federal and state rules designed to safeguard consumers. These rules set forth minimum standards (for coverage and for the entities that sell it), establish oversight and enforcement regimes, and create protections for consumers in the event an insurer becomes insolvent.

45. For example, the ACA established a variety of standards for health insurance sold directly to individuals, including but not limited to:

a.   A prohibition on the use of preexisting condition exclusions;

b.   A prohibition on annual or lifetime limits on the dollar value of covered benefits;

c.   A requirement to cover certain high-value preventive services without cost-sharing;

d.   A requirement that plans provide a minimum level of actuarial value and correspond to one of four actuarial value tiers: Bronze (a plan with 60 percent actuarial value); Silver (70 percent); Gold (80 percent); and Platinum (90 percent);

e.   A requirement that plans cover 10 specified categories of essential benefits, and a cap on annual out-of-pocket spending for such benefits; and

Resp. Ex. 1

      f.   A requirement to spend 80 percent of revenue on health care claims and activities to improve care quality.[3]

46. Sharing Plans are not required to — and in practice do not — adhere to any of these protections.

      a.   As described in Section III.C., above, however, they do borrow these concepts. For example, they exclude coverage of "preexisting conditions" and utilize benefit package tiers (e.g., Christian Healthcare Ministries' Bronze, Silver, and Gold plans).

47. States' laws also provide a regulatory framework for health insurance. Under Colorado law, this framework includes, but is not limited to:

      a.   Requirements for doing insurance business in Colorado, which include numerous standards governing an insurer's finances (such as capital requirements) and corporate structure;

      b.   Form and rate review processes in which health plans must file extensive information and data with the Division of Insurance to demonstrate that the plans comply with applicable federal and state standards and that their proposed rates are not excessive, inadequate, or unfairly discriminatory;

      c.   Authority for the Division of Insurance to examine the operations of a health insurer's business and impose penalties for noncompliance with applicable laws; and

      d.   A requirement for insurers to join (and pay into) the state's guarantee association, an organization charged with providing financial protection to Colorado consumers (e.g., by continuing to pay claims) in the event their insurer becomes insolvent.

48. Sharing Plans are not governed by any of these state requirements. Their financial health is not subject to any minimum standards or government oversight and there is no protection for consumers in the event member expenses exceed the capacity of the Sharing Plan.

---

[3] All of these rules also apply in some manner to employer coverage.

Resp. Ex. 1

E.    Even Though Sharing Plans and Health Insurance Are Subject to Very
Different Rules, the Numerous Similarities Between Them, and the
Ways in Which Sharing Plans Represent What It Is They Do, Create a
Significant Risk of Consumer Confusion and Harm

49. Because of the ways Sharing Plans operate and advertise, consumers (including
Sharing Plan members) can and do misunderstand or discount the limitations of
these plans and conclude that, for all intents and purposes, Sharing Plans and
insurance are the same.

50. In the preparation of this report, I used Google to search the term "Medi-share."[4]
The first webpage to appear in the search results that did not belong to Medi-
Share itself was titled "Our Honest Medi-Share Review after 14 years," from the
website "SeedTime Money." (Exhibit 36.) SeedTime describes itself as a financial
education website that "help[s] Christians live financially free and impact
eternity;" it has been featured in numerous religious and secular publications,
including Forbes, Time, and USA Today. (Exhibit 37.) Seedtime appears to be
affiliated in some fashion with Medi-Share: its review contains links to a website
cobranded by Medi-Share and Seedtime, where a visitor can begin the Medi-
Share enrollment process. Seedtime's review is lengthy and nuanced and reflects
the apparent understanding of a longtime Sharing Plan member who recommends
it. It includes the following statements:

a. "People are always asking me if it is Christian Medical Insurance. Simply
put, no Medi-Share isn't insurance, but most people wouldn't really be
able to tell a difference. While it essentially serves the same purpose as
health insurance, they are very clear that it is NOT insurance. They call it,
'Christian Healthcare Sharing.' It offers essentially all of the benefits of
health insurance but with lower premiums."

b. "Each plan essentially tallies medical claims each month, then divides by
the number of members, officials say. After subtracting for overhead and
administrative expenses, the rest goes to pay claims."

---

[4] I used the Firefox browser and was not signed in to the browser or to Google.

Resp. Ex. 1

c. "Why we opt for the high-deductible plan[:] . . . A lot of people are doing that now with traditional health insurance as well. We work around the high deductible by budgeting a certain amount each month. . . . But it's comforting to know that Medi-Share will pay 100% of medical costs above that annual deductible."

d. "When we were shopping around for a health-sharing service, there were a few keys that we were looking for:

  i. They had to have been around a long time and had a long history of paying bills. . . .

  ii. I didn't want to be mailing checks to other members. . . . I was much more interested in something that functioned like the health insurance that I was used to. With Medi-[S]hare we just give our 'insurance card' to the doctor or occasionally send a bill to Medi-[S]hare and they take care of the rest.

  iii. It had to be simple. . . . In the health insurance world (and sharing ministries) there are often so many complexities with plans, deductibles, copays, etc. and [Medi-Share has] made the whole process relatively simple." (Exhibit 36.)

51. Other Sharing Plan members appear to have had very different experiences.

a. I have reviewed the Declaration of Kate Harris, which references numerous complaints from consumers who enrolled in Sharing Plans but who misunderstood that the plans were not insurance, or that they had significant limitations, compared to insurance. Many of these complaints report that Sharing Plans had not facilitated payment of the complainant's medical expenses in accordance with their understanding of how the plan was supposed to work.

b. The Harris Declaration also references materials that document the activities of Sharing Plans Aliera Healthcare and Trinity Healthshare (and Trinity's successor, Sharity Ministries). Aliera and Trinity/Sharity were the subjects of enforcement actions in multiple states, including Colorado, and eventually filed for bankruptcy. It appears that the former members of

21

these Sharing Plans are owed hundreds of millions of dollars in unpaid
medical expenses.

c.   Christian Healthcare Ministries, the Sharing Plan that "point[ed] to [its]
history" of sharing 100 percent of eligible medical bills since 1981, is
actually the successor entity of a Sharing Plan called the Christian
Brotherhood Newsletter (CBN). In 2000, following complaints of
financial mismanagement and more than $30 million in unpaid claims, the
Ohio Attorney General sued CBN, and it was placed in receivership in
2001. In 2004, CBN's founder and other former officials were found liable
of misappropriating funds and ordered to repay nearly $15 million.
(Exhibit 38.)

## IV.   Sharing Plans Are Materially Different From Other Non-Insurance Arrangements and Methods for Paying for Health Care

52. While Sharing Plan features closely resemble those of traditional health
insurance, they have much less in common with the other methods of paying for
health care that Ms. Talento identifies. Sharing Plans are not health care providers
but rather third parties that facilitate or administer bill payments; indeed, they
often serve as intermediaries between their members and providers. They offer
this service not just for minor medical expenses but also for very large ones; they
describe themselves as providing benefits that are comprehensive or complete, or
that provide catastrophic protection against large costs. They do not advertise
themselves as providing a simple discount on a discrete category of health care
services; as discussed above, Sharing Plans offer a suite of features — defined
benefit packages, familiar cost-sharing structures, member ID cards, provider
networks — that mirrors what health insurers offer. By contrast:

a.   Crowdfunding entities are fundraising platforms. Unlike Sharing Plans,
they do not offer defined packages of benefits, do not establish cost-
sharing parameters (such as deductibles and copays), do not require
submission of medical bills, do not review those bills, and do not interact
with providers on a consumer's behalf. Consumers do not enroll and

22

access to whatever funds an individual may raise is not contingent on the consumer making set payments every month to the platform.

b. Direct primary care arrangements are contracts between consumers and health care providers without a third-party payer or payment facilitator (such as a Sharing Plan). Because these agreements are with primary care providers, included benefits are typically much more limited than health insurance or the packages of benefits offered by Sharing Plans.

53. Unlike Sharing Plans, fraternal benefit societies are specifically regulated by the Division of Insurance pursuant to Title 10 (Insurance), Article 14 (Fraternal Benefit Societies) of the state code. These laws include various organizational and financial requirements designed to safeguard consumers, none of which apply to Sharing Plans. It is my understanding that fraternal benefit societies, at present, primarily offer regulated life insurance and annuity products (which are represented to the public as insurance). I am unaware of consumer complaints regarding any health insurance products that these organizations may offer.

I declare under penalty of perjury that the foregoing is a true and correct statement of my opinions.

*Justin Giovannelli*

Justin Giovannelli

February 14, 2025

23

# Appendix A

1. Resume

2. List of Publications Authored in the Previous 10 Years

Resp. Ex. 1

Appendix A                                                    Giovannelli Report

# JUSTIN GIOVANNELLI

## PROFESSIONAL EXPERIENCE

**GEORGETOWN UNIVERSITY, MCCOURT SCHOOL OF PUBLIC POLICY,**
**CENTER ON HEALTH INSURANCE REFORMS**, Washington, DC
*Associate Research Professor,* July 2013 – Present

- Serve as principal investigator for ongoing grant-funded work that examines federal and state regulation of the individual and small-group health insurance markets and the Affordable Care Act's (ACA) health insurance marketplaces.
- Analyze applicable federal and state laws, regulations, and other administrative actions, including federal and state policies affecting implementation of the ACA.
- Author research publications that analyze federal and state policies likely to affect coverage access, affordability, and adequacy. Published works address topics including: provider network regulation and oversight; implementation and enforcement of the ACA's insurance market rules; the development and operation of the ACA marketplaces; coverage arrangements that are not required to comply with the ACA's individual and small-group market rules; and ACA Section 1332 waivers.
- Respond to inquiries from federal and state officials, local and national media, and peer research organizations regarding regulation and oversight of private health insurance, trends in the individual health insurance markets, and emerging policy proposals likely to affect the accessibility, affordability, or comprehensiveness of private coverage.
- Serve as principal investigator for a grant that provides technical assistance regarding the ACA and health coverage access to senior policy staff and a team of consumer assistance personnel at a national nonprofit patient advocacy organization.
- Provide policy analysis and advice to senior policy staff at national patient advocacy organizations regarding private health insurance regulation and the implications of federal and state legislative and regulatory developments for the populations they represent.
- Served as an appointed consumer representative to the National Association of Insurance Commissioners (NAIC), the standard-setting and regulatory support organization for state insurance regulators.
- Provided technical assistance regarding ACA complex enrollment and eligibility issues to the Assister Help Resource Center, a federally funded call center that offered elevated support for marketplace enrollment assisters.
- Supervise faculty and staff in the performance of research, writing, and technical assistance projects.
- Served as an adjunct professor at the Georgetown University Law Center to teach a law school course about the ACA and state and federal regulation of private health insurance.

**NATIONAL PARTNERSHIP FOR WOMEN & FAMILIES**, Washington, DC
*Health Policy Intern*, May 2012 – May 2013

- Analyzed federal regulations and guidance implementing the ACA and distilled this analysis for staff in memoranda and orally.
- Assisted in drafting comments to proposed regulations implementing the ACA and wrote public-facing materials describing provisions of the law.

**CAHILL GORDON & REINDEL LLP**, New York, NY
*Litigation Associate*, October 2004 – September 2008; June 2010 – July 2011
*Summer Associate*, May – August 2003

- Represented clients in federal and state litigation and in investigatory matters brought by federal and state authorities.
- Researched and analyzed a range of complex legal issues, including: constitutional questions concerning the First Amendment and the division of power between the federal government and the states; the scope and effect of statutes and regulations; and the impact of proposed federal legislation and rulemaking.

Resp. Ex. 1

- Applied this research and analysis to write court briefs and internal and client memoranda, and to advise firm partners and clients.
- Advised witnesses in connection with congressional and deposition testimony.
- Supervised teams of junior and mid-level lawyers on research, writing, and document review projects.
- Wrote an appellate brief and argued the appeal as *pro bono* counsel for a defendant's criminal appeal.
- Interviewed a client's employees to develop and memorialize complicated factual issues related to ongoing litigation.
- Analyzed legal and factual issues to draft portions of a client's written responses to regulatory inquiries.

THE HONORABLE ERIC VITALIANO, U.S. DISTRICT JUDGE,
EASTERN DISTRICT OF NEW YORK, Brooklyn, NY
*Law Clerk*, October 2008 – May 2010
- Assisted in drafting judicial opinions and wrote internal memoranda for civil and criminal matters brought in federal district court and, when the Judge sat by designation, in the U.S. Court of Appeals for the Second Circuit.

NEW YORK CIVIL LIBERTIES UNION, New York, NY
*NYU Civil Rights Clinic, Intern*, August 2003 – May 2004
- As part of the clinic team, successfully represented a plaintiff in a lawsuit challenging certain police practices used by the NYPD at large-scale public demonstrations in New York City.
- Conducted the deposition of an NYPD officer, defended the client's deposition, and assisted with the depositions of several other NYPD personnel, including the Chief of the Department.
- Drafted portions of the federal court complaint and the client's written responses to the City's requests for documents and information.

U.S. ATTORNEY'S OFFICE, EASTERN DISTRICT OF NEW YORK, Brooklyn, NY
*Violent Criminal Enterprises Section, Intern*, June – August 2002
- Researched and drafted court briefs and internal memoranda, including the Government's opposition to a suppression motion in a murder case.
- Represented the Government at a sentencing hearing.
- Reviewed investigatory documents in order to draft a request to the federal court for permission to conduct electronic surveillance.
- Helped Assistant U.S. Attorney prepare for interviews with cooperating witnesses.

## EDUCATION

GEORGETOWN UNIVERSITY, GEORGETOWN PUBLIC POLICY INSTITUTE, Washington, DC
Master of Public Policy, May 2013
Honors:          *Graduate School Merit Scholarship*

NEW YORK UNIVERSITY SCHOOL OF LAW, New York, NY
Juris Doctor, *cum laude*, May 2004
Honors:          *Moot Court Board, National Team Member, 2003-04*
                 *Mock Trial Team, Chairperson, 2003-04*

PENNSYLVANIA STATE UNIVERSITY, University Park, PA
Bachelor of Arts (with Honors) in Political Science, *magna cum laude*, May 2001
Honors:          *Academic Excellence Scholarship* – for selection into the Schreyer Honors College
                 *Dean's List* – all semesters

Appendix A                                                                          Giovannelli Report

## List of Publications Authored in the Previous 10 Years

"Enhancing Essential Health Benefits: How States Are Updating Benchmark Plans to Improve Coverage," with Stacey Pogue, Vrudhi Raimugia, and Kevin Lucia, *The Commonwealth Fund*, November 2024.

"Substantial Marketplace Coverage Gains for Communities of Color Threatened Again," with Rachel Swindle, Jalisa Clark, and Christine Monahan, *Georgetown University Center on Health Insurance Reforms*, October 2024.

"If Expanded Federal Premium Tax Credits Expire, State Affordability Programs Won't Be Enough to Stem Widespread Coverage Losses," with Rachel Swindle, *The Commonwealth Fund*, September 2024.

"Clearing the Path: Streamlining Enrollment in Covered California for Californians Transitioning from Medi-Cal," with JoAnn Volk, Sabrina Corlette, Kevin Lucia, and Edwin Park, *California Health Care Foundation*, August 2024

"How States Can Use Tax and Unemployment Filings to Sign People Up for Health Insurance," with Rachel Swindle and Rachel Schwab, *The Commonwealth Fund*, June 2024.

"States Expand Access to Affordable Private Coverage for Immigrant Populations," with Rachel Schwab, *The Commonwealth Fund*, February 2024.

"Ensuring Access to Behavioral Health Providers," with JoAnn Volk and Christina Goe, *The Commonwealth Fund*, January 2024.

"Policy Innovations in the Affordable Care Act Marketplaces," with Rachel Schwab, Rachel Swindle, and Jalisa Clark, *The Commonwealth Fund*, November 2023.

"Health Care Sharing Ministries Leave Consumers with Unpaid Medical Claims," with JoAnn Volk and Christina Goe, *The Commonwealth Fund*, November 2023.

"State Public Option Plans Are Making Progress on Reducing Consumer Costs," with Christine Monahan and Nadia Stovicek, *The Commonwealth Fund*, November 2023.

"Biden Administration Sets Limits on Use of Short-Term Health Insurance Plans, But States Can Do More to Protect Consumers," with Kevin Lucia and Christina Goe, *The Commonwealth Fund*, August 2023.

"Coverage of Preventive Services Without Cost Sharing in Jeopardy as Texas Court Strikes Down ACA Protection," with Rachel Schwab, *The Commonwealth Fund*, April 2023.

"Implementing the Family Glitch Fix on the Affordable Care Act's Marketplaces," with Rachel Schwab and Rachel Swindle, *The Commonwealth Fund*, December 2022.

"The ACA's Preventive Services Benefit Is in Jeopardy: What Can States Do to Preserve Access?," with Sabrina Corlette and Madeline O'Brien, *The Commonwealth Fund*, November 2022.

"State-Based Marketplace Outreach Strategies for Boosting Health Plan Enrollment of the Uninsured," with Rachel Schwab and Rachel Swindle, *The Commonwealth Fund*, October 2022.

Resp. Ex. 1

Appendix A                                                              Giovannelli Report

"HHS Approves Nation's First Section 1332 Waiver for a Public Option–Style Health Care Plan in Colorado," with Christine Monahan and Kevin Lucia, *The Commonwealth Fund*, July 2022.

"Broker Commissions for Mid-Year Enrollment in the Marketplaces: Options for State Marketplaces and Insurance Regulators to Prevent Discrimination," *Robert Wood Johnson Foundation*, May 2022.

"California's Marketplace Tries New Tactics to Reduce the Number of Uninsured and Underinsured," with Rachel Schwab and Kevin Lucia, *The Commonwealth Fund*, March 2022.

"Update on State Public Option-Style Laws: Getting to More Affordable Coverage," with Christine Monahan and Kevin Lucia, *The Commonwealth Fund*, March 2022.

"Massachusetts Data on Health Care Sharing Ministries Reveal Finances That Put Consumers at Risk," with JoAnn Volk and Christina Goe, *The Commonwealth Fund*, March 2022.

"Ensuring the Adequacy of ACA Marketplace Plan Networks," *The Commonwealth Fund*, February 2022.

"State 'Easy Enrollment' Programs Gain Momentum, Lay Groundwork for Additional Efforts to Expand Coverage," with Rachel Schwab, Kevin Lucia, and Sabrina Corlette, *The Commonwealth Fund*, August 2021.

"State Public Option–Style Laws: What Policymakers Need to Know," with Christine Monahan and Kevin Lucia, *The Commonwealth Fund*, July 2021.

"State Efforts to Standardize Marketplace Health Plans Show How the Biden Administration Could Improve Value and Reduce Disparities," with Rachel Schwab and Kevin Lucia, *The Commonwealth Fund*, July 2021.

"State Public Option–Style Laws: What Policymakers Need to Know," with Christine Monahan and Kevin Lucia, *The Commonwealth Fund*, July 2021.

"A Permanent Boost to Federal Premium Assistance Could Change State Approaches to ACA 1332 Waivers," *The Commonwealth Fund*, May 2021.

"Federal Policy Priorities for Preserving and Improving Access to Coverage: Perspectives from State-Based Marketplaces," with Rachel Schwab, Julia Buschmann, and Kevin Lucia, *The Commonwealth Fund*, February 2021.

"Georgia's ACA Waiver Flouts Federal Law, Drawing a Legal Challenge," with JoAnn Volk and Kevin Lucia, *The Commonwealth Fund*, January 2021.

"The Benefits and Limitations of State-Run Individual Market Reinsurance," with JoAnn Volk, Rachel Schwab, and Emily Curran, *The Commonwealth Fund*, November 2020.

"During the COVID-19 Crisis, State Health Insurance Marketplaces Are Working to Enroll the Uninsured," with Rachel Schwab and Kevin Lucia, *The Commonwealth Fund*, May 2020.

"Georgia's ACA Waiver Proposal Would Jeopardize Access to Affordable, Comprehensive Coverage When Georgians Need It Most," with Kevin Lucia, *The Commonwealth Fund*, April 2020.

"State-Based Marketplaces Find Value, Potential Opportunity for Growth in Small-Business Offering," with Rachel Schwab and Kevin Lucia, *The Commonwealth Fund*, March 2020.

Resp. Ex. 1

Appendix A                                              Giovannelli Report

"States Take Action on Health Care Sharing Ministries, But More Could Be Done to Protect Consumers," with JoAnn Volk and Christina Goe, *The Commonwealth Fund*, February 2020.

"States Work to Make Individual Market Health Coverage More Affordable, But Long-Term Solutions Call for Federal Leadership," with JoAnn Volk and Kevin Lucia, *The Commonwealth Fund*, January 2020.

"Court Strikes Down a Trump Administration Rule Designed to Circumvent the Affordable Care Act," with Kevin Lucia, *The Commonwealth Fund*, April 2019.

"The Administration Tried to Make It Easier for States to Waive ACA Rules: Will Any Take the Plunge?," with JoAnn Volk, *The Commonwealth Fund*, January 2019.

"In the Wake of New Association Health Plan Standards, States Are Exercising Authority to Protect Consumers, Providers, and Markets," with Kevin Lucia, Sabrina Corlette and Christina Goe, *The Commonwealth Fund*, November 2018.

"Trump Administration Hands States Another Tool for Dismantling Preexisting Condition Protections," *Georgetown University Center on Health Insurance Reforms*, November 2018.

"Lawsuit Threatens Affordable Care Act Preexisting Condition Protections But Impact Will Depend on Where You Live," with Sabrina Corlette and Maanasa Kona, *The Commonwealth Fund*, August 2018.

"Impact of Association Health Plans on Consumers and Markets Will Depend on State Approaches," with Kevin Lucia, Sabrina Corlette, Christina Goe, and Maanasa Kona, *The Commonwealth Fund*, August 2018.

"Health Care Sharing Ministries: What Are the Risks to Consumers and Insurance Markets?," with JoAnn Volk and Emily Curran, *The Commonwealth Fund*, August 2018.

"To Understand How Consumers Are Faring in the Individual Health Insurance Markets, Watch the States," with Kevin Lucia and Sabrina Corlette, *The Commonwealth Fund*, July 2018.

"State Efforts to Pass Individual Mandate Requirements Aim to Stabilize Markets and Protect Consumers," with Dania Palanker and Rachel Schwab, *The Commonwealth Fund*, June 2018.

"State Regulation of Coverage Options Outside of the Affordable Care Act: Limiting the Risk to the Individual Market," with Kevin Lucia, Sabrina Corlette, JoAnn Volk, Dania Palanker, Maanasa Kona, and Emily Curran, *The Commonwealth Fund*, March 2018.

"How Did State-Run Health Insurance Marketplaces Fare in 2017?," with Emily Curran, *The Commonwealth Fund*, March 2018.

"Short-Term, Limited Duration Insurance Proposed Rule: Summary and Options for States," with Sabrina Corlette and JoAnn Volk, *The Robert Wood Johnson Foundation*, March 2018.

"State Flexibility in a New Era: What are the research priorities for Section 1332 waivers?," *AcademyHealth*, January 2018.

"Insurer Participation in ACA Marketplaces: Federal Uncertainty Triggers Diverging Business Strategies," with Emily Curran and Kevin Lucia, *The Commonwealth Fund*, January 2018.

"States Face Key Decisions if Alexander-Murray Proposal Is Included in Year-End Budget Bill," with Sabrina Corlette, *Georgetown University Center on Health Insurance Reforms*, December 2017.

3

Appendix A                                                                                   Giovannelli Report

"State-Based Marketplaces Push Ahead, Despite Federal Resistance," with Emily Curran, *The Commonwealth Fund*, November 2017.

"Graham-Cassidy's Waiver Program Allows States to Erase Protections for People with Pre-existing Conditions," with Sabrina Corlette, Kevin Lucia, and JoAnn Volk, *Georgetown University Center on Health Insurance Reforms*, September 2017.

"States See Opportunities for Flexibility in the ACA's Innovation Waiver Program," with Kevin Lucia, *The Commonwealth Fund*, September 2017.

"ACA 'Bare Counties': Policy Options to Ensure Access Must Address Longer-Term Stability and Competition," with JoAnn Volk and Kevin Lucia, *The Commonwealth Fund*, September 2017.

"As Health Plans Become Less Standardized, Consumer Decision-Support Tools Will Be Critical," with Emily Curran and Kevin Lucia, *The Commonwealth Fund*, August 2017.

"Amid Market Uncertainty, Trump Administration Retreats from Health Plan Oversight," with Kevin Lucia, *The Commonwealth Fund*, June 2017.

"2017 Federal and State Marketplace Trends Show Value of Outreach," with Emily Curran, Sabrina Corlette, and Kevin Lucia, *The Commonwealth Fund*, May 2017.

"Who Would Gain Under the Proposal to Expand Health Savings Accounts?," with JoAnn Volk, *The Commonwealth Fund*, April 2017.

"Loss of Cost-Sharing Reductions in the ACA Marketplace: Impact on Consumers and Insurer Participation," with JoAnn Volk, Dania Palanker, and Kevin Lucia, *The Commonwealth Fund*, March 2017.

"Eliminating Essential Health Benefits Will Shift Financial Risk Back to Consumers," with Dania Palanker and JoAnn Volk, *The Commonwealth Fund*, March 2017.

"Efforts to Support Consumer Enrollment Decisions Using Total Cost Estimators: Lessons from the Affordable Care Act's Marketplaces," with Emily Curran, *The Commonwealth Fund*, February 2017.

"Regulation of Narrow Networks: With Federal Protections in Jeopardy, State Approaches Take on Added Significance," with Ashley Williams, *The Commonwealth Fund*, February 2017.

"ACS CAN Examination of Cancer Drug Coverage and Transparency in the Health Insurance Marketplaces," *American Cancer Society Cancer Action Network*, February 2017.

"State Experiences Show Why Repealing the ACA's Premium Subsidies and Individual Mandate Would Cripple Individual Health Insurance Markets," with Kevin Lucia, *The Commonwealth Fund*, January 2017.

"Uncertain Future for Affordable Care Act Leads Insurers to Rethink Participation, Prices," with Sabrina Corlette, Kevin Lucia, and Dania Palanker, *The Robert Wood Johnson Foundation*, January 2017.

"States That Leaned In on the Affordable Care Act Have Much to Lose," with Sabrina Corlette and Emily Curran, *The Commonwealth Fund*, January 2017.

"Regulation of Health Plan Provider Networks," with Kevin Lucia and Sabrina Corlette, *Health Affairs*, July 2016.

Appendix A                                                              Giovannelli Report

"Factors Affecting Health Insurance Enrollment Through the State Marketplaces: Observations on the ACA's Third Open Enrollment Period," with Emily Curran, *The Commonwealth Fund*, July 2016.

"Beyond UnitedHealthcare: How Are Other Publicly Traded Insurers Faring on the Marketplaces?" with Kevin Lucia, Emily Curran, and Sabrina Corlette, *The Commonwealth Fund*, June 2016.

"The Next Stage in Health Reform," with Henry Aaron and Kevin Lucia, *Georgetown University Center on Health Insurance Reforms*, May 2016.

"Innovation Waivers and the ACA: As Federal Officials Flesh Out Key Requirements for Modifying the Health Law, States Tread Slowly," with Kevin Lucia, Sean Miskell, and Ashley Williams, *The Commonwealth Fund*, February 2016.

"Insurer Participation in State-Based Marketplaces in 2016: A Closer Look," with Emily Curran and Kevin Lucia, *The Commonwealth Fund*, January 2016.

"Why Are Many CO-OPs Failing? How New Nonprofit Health Plans Have Responded to Market Competition," with Sabrina Corlette, Sean Miskell, and Julia Lerche, *The Commonwealth Fund*, December 2015.

State Efforts to Reduce Consumers' Cost-Sharing for Prescription Drugs," with Sabrina Corlette and Ashley Williams, *The Commonwealth Fund*, November 2015.

"States Revisit Insurer Benefit Requirements, But Have Little Data on Consumers' Experiences," with JoAnn Volk, Kevin Lucia, Ashley Williams, and Kayla Connor, *The Commonwealth Fund*, October 2015.

"Why ACA Marketplaces Should Report Comprehensive Enrollment Data," with Sean Miskell and Kevin Lucia, *The Commonwealth Fund*, September 2015.

"The Experiences of State-Run Marketplaces That Use HealthCare.gov," with Kevin Lucia, *The Commonwealth Fund*, September 2015.

"State-Based Marketplaces Look for Financing Stability in Shifting Landscape," with Sean Miskell, Kevin Lucia, and Sabrina Corlette, *The Commonwealth Fund*, May 2015.

"Implementing the Affordable Care Act State Regulation of Marketplace Plan Provider Networks," with Kevin Lucia and Sabrina Corlette, *The Commonwealth Fund*, May 2015.

"The Affordable Care Act CO-OP Program: Facing Both Barriers and Opportunities for More Competitive Health Insurance Markets," with Sabrina Corlette, Kevin Lucia, and Sean Miskell, *The Commonwealth Fund*, March 2015.

"After a Slow Start, Federal Small Business Health Insurance Marketplace Offers New and Improved Functions," with Kevin Lucia and Sean Miskell, *The Commonwealth Fund*, February 2015.

Resp. Ex. 1

# Appendix B: Materials Relied Upon

## Court Documents

1. Defendant's Response in Opposition to Plaintiff's May 17, 2024 Motion for a Preliminary Injunction, September 3, 2024

2. Declaration of Kate Harris and accompanying exhibits, August 30, 2024

3. Plaintiff Alliance of Health Care Sharing Ministries' Designation of Experts, January 3, 2025

4. Declaration of Katy Talento, May 17, 2024

5. Declaration of Rob Waldo and accompanying exhibits, May 17, 2024

## Publicly-Available Sources

| Exhibit No. | Name |
|---|---|
| 1 | Colorado House Bill 22-1269, as enacted |
| 2 | Christian Healthcare Ministries, About CHM, accessed February 13, 2025 |
| 3 | Colorado Division of Insurance, Health Care Sharing Plans and Arrangements in Colorado, Colorado House Bill 22-1269 2023 report, October 2024 |
| 4 | Alliance of Health Care Sharing Ministries, What is a health care sharing ministry? (Mar. 2010), accessed February 13, 2025 |
| 5 | Covered California, March 14, 2019 Board Meeting Presentation Slides, accessed February 13, 2025 |
| 6 | Sedera, The History of Medical Cost Sharing, accessed February 13, 2025 |
| 7 | OneShare Health, Homepage, accessed February 13, 2025 |
| 8 | OneShare Health, The Truth Behind Health Care Sharing Ministries, accessed February 13, 2025 |
| 9 | Jericho Share, About Us, accessed February 13, 2025 |
| 10 | Zion HealthShare, Principles of Membership, accessed February 13, 2025 |
| 11 | Zion HealthShare, Homepage, accessed February 13, 2025 |
| 12 | Knew Health, Member Guidelines updated November 2024 |
| 13 | Sedera, ACCESS+ Membership Guidelines updated October 1, 2023 |
| 14 | CrowdHealth, Member Guide, accessed February 13, 2025 |
| 15 | Altrua HealthShare, About Altrua HealthShare, accessed February 13, 2025 |
| 16 | Alliance of Health Care Sharing Ministries, FAQ: Why Do So Many Americans Choose a Health Care Sharing Ministry?, accessed February 13, 2025 |



EXHIBIT
**B**

| 17 | Altrua HealthShare, How It Works, accessed February 13, 2025 |
|---|---|
| 18 | Christian Healthcare Ministries, CHM Programs, accessed February 13, 2025 |
| 19 | Medi-Share, What Is an Annual Household Portion (AHP)?, accessed February 13, 2025 |
| 20 | Medi-Share, Where Can I Find My Member ID Card?, accessed February 13, 2025 |
| 21 | Altrua HealthShare, Membership ID Card, accessed February 13, 2025 |
| 22 | Medi-Share, Medi-Share Complete Guidelines as of April 1, 2024 |
| 23 | OneShare Health, How to Choose Your Doctor With the First Network, accessed February 13, 2025 |
| 24 | OneShare Health, Become a Producer, accessed February 13, 2025 |
| 25 | Samaritan Ministries, Samaritan Groups, accessed February 13, 2025 |
| 26 | Altrua HealthShare, Homepage, accessed February 13, 2025 |
| 27 | Impact Health Sharing, Homepage, accessed February 13, 2025 |
| 28 | United Refuah HealthShare, Homepage, accessed February 13, 2025 |
| 29 | WeShare, Homepage, accessed February 13, 2025 |
| 30 | Medi-Share, Homepage, accessed February 13, 2025 |
| 31 | Medi-Share, Medi-Share Complete, An Affordable, Reliable Health Care Alternative, accessed February 13, 2025 |
| 32 | Solidarity HealthShare, Homepage, accessed February 13, 2025 |
| 33 | CrowdHealth, CrowdHealth Isn't Health Insurance… and Why That's a Good Thing!, accessed February 13, 2025 |
| 34 | Christian Healthcare Ministries, Guidelines effective January 1, 2023 |
| 35 | Alliance of Health Care Sharing Ministries, FAQ: Can I Trust Health Care Sharing Ministries With My Medical Bills?, accessed February 13, 2025 |
| 36 | Seedtime, Our Honest Medi-Share Review after 14 years," accessed February 13, 2025 |
| 37 | Seedtime, Homepage, accessed February 13, 2025 |
| 38 | The Beacon Journal, Minister, Family Liable in Suit (May 26, 2004), accessed February 13, 2025 |

Resp. Ex. 1

# EX 1.1



HOUSE BILL 22-1269


BY REPRESENTATIVE(S) Lontine, Amabile, Bernett, Boesenecker, Caraveo, Hooton, Jodeh, Kipp, Lindsay, McCormick, Michaelson Jenet, Sirota, Titone, Woodrow;
also SENATOR(S) Hansen, Ginal, Jaquez Lewis, Moreno, Fenberg.


CONCERNING REQUIREMENTS IMPOSED ON PERSONS NOT AUTHORIZED TO
    TRANSACT INSURANCE BUSINESS IN THIS STATE WHO ARE OFFERING
    COVERAGE OF HEALTH-CARE COSTS FOR COLORADO RESIDENTS, AND,
    IN CONNECTION THEREWITH, MAKING AN APPROPRIATION.


*Be it enacted by the General Assembly of the State of Colorado:*

**SECTION 1.** In Colorado Revised Statutes, **add** 10-16-107.4 as follows:

**10-16-107.4. Health-care sharing plan or arrangement - required reporting and certification - noncompliance - information posted on division website - rules.** (1) A PERSON NOT AUTHORIZED BY THE COMMISSIONER PURSUANT TO ARTICLE 3 OF THIS TITLE 10 TO OFFER INSURANCE IN THIS STATE THAT OFFERS OR INTENDS TO OFFER A PLAN OR ARRANGEMENT TO FACILITATE PAYMENT OR REIMBURSEMENT OF HEALTH-CARE COSTS OR SERVICES FOR RESIDENTS OF THIS STATE,

---

*Capital letters or bold & italic numbers indicate new material added to existing law; dashes through words or numbers indicate deletions from existing law and such material is not part of the act.*

Resp. Ex. 1

REGARDLESS OF WHETHER THE PERSON IS DOMICILED IN THIS STATE OR ANOTHER STATE, SHALL SUBMIT TO THE COMMISSIONER BY OCTOBER 1, 2022, AND BY MARCH 1 EACH YEAR THEREAFTER:

(a) THE FOLLOWING INFORMATION:

(I) THE TOTAL NUMBER OF INDIVIDUALS AND HOUSEHOLDS THAT PARTICIPATED IN THE PLAN OR ARRANGEMENT IN THIS STATE IN THE IMMEDIATELY PRECEDING CALENDAR YEAR;

(II) THE TOTAL NUMBER OF EMPLOYER GROUPS THAT PARTICIPATED IN THE PLAN OR ARRANGEMENT IN THIS STATE IN THE IMMEDIATELY PRECEDING CALENDAR YEAR, SPECIFYING THE TOTAL NUMBER OF PARTICIPATING INDIVIDUALS IN EACH PARTICIPATING EMPLOYER GROUP;

(III) IF THE PERSON OFFERS A PLAN OR ARRANGEMENT IN OTHER STATES, THE TOTAL NUMBER OF PARTICIPANTS IN THE PLAN OR ARRANGEMENT NATIONALLY;

(IV) ANY CONTRACTS THE PERSON HAS ENTERED INTO WITH PROVIDERS IN THIS STATE THAT PROVIDE HEALTH-CARE SERVICES TO PLAN OR ARRANGEMENT PARTICIPANTS;

(V) THE TOTAL AMOUNT OF FEES, DUES, OR OTHER PAYMENTS COLLECTED BY THE PERSON IN THE IMMEDIATELY PRECEDING CALENDAR YEAR FROM INDIVIDUALS, EMPLOYER GROUPS, OR OTHERS WHO PARTICIPATED IN THE PLAN OR ARRANGEMENT IN THIS STATE, SPECIFYING THE PERCENTAGE OF FEES, DUES, OR OTHER PAYMENTS RETAINED BY THE PERSON FOR ADMINISTRATIVE EXPENSES;

(VI) THE TOTAL DOLLAR AMOUNT OF REQUESTS FOR REIMBURSEMENT OF HEALTH-CARE COSTS OR SERVICES SUBMITTED IN THIS STATE IN THE IMMEDIATELY PRECEDING CALENDAR YEAR BY PARTICIPANTS IN THE PLAN OR ARRANGEMENT OR PROVIDERS THAT PROVIDED HEALTH-CARE SERVICES TO PLAN OR ARRANGEMENT PARTICIPANTS;

(VII) THE TOTAL DOLLAR AMOUNT OF REQUESTS FOR REIMBURSEMENT OF HEALTH-CARE COSTS OR SERVICES THAT WERE SUBMITTED IN THIS STATE AND WERE DETERMINED TO QUALIFY FOR REIMBURSEMENT UNDER THE PLAN OR ARRANGEMENT IN THE IMMEDIATELY

PAGE 2-HOUSE BILL 22-1269

Resp. Ex. 1

PRECEDING CALENDAR YEAR;

(VIII)  THE TOTAL AMOUNT OF PAYMENTS MADE TO PROVIDERS IN THIS STATE IN THE IMMEDIATELY PRECEDING CALENDAR YEAR FOR HEALTH-CARE SERVICES PROVIDED TO OR RECEIVED BY A PLAN OR ARRANGEMENT PARTICIPANT;

(IX)  THE TOTAL AMOUNT OF REIMBURSEMENTS MADE TO PLAN OR ARRANGEMENT PARTICIPANTS IN THIS STATE IN THE IMMEDIATELY PRECEDING CALENDAR YEAR FOR HEALTH-CARE SERVICES PROVIDED TO OR RECEIVED BY A PLAN OR ARRANGEMENT PARTICIPANT;

(X)  THE TOTAL NUMBER OF REQUESTS FOR REIMBURSEMENT OF HEALTH-CARE COSTS OR SERVICES SUBMITTED IN THIS STATE IN THE IMMEDIATELY PRECEDING CALENDAR YEAR THAT WERE DENIED, EXPRESSED AS A PERCENTAGE OF TOTAL REIMBURSEMENT REQUESTS SUBMITTED IN THAT CALENDAR YEAR, AND THE TOTAL NUMBER OF REIMBURSEMENT REQUEST DENIALS THAT WERE APPEALED;

(XI)  THE TOTAL AMOUNT OF HEALTH-CARE EXPENSES SUBMITTED IN THIS STATE BY PLAN OR ARRANGEMENT PARTICIPANTS OR PROVIDERS IN THE IMMEDIATELY PRECEDING CALENDAR YEAR THAT QUALIFY FOR REIMBURSEMENT PURSUANT TO THE PLAN OR ARRANGEMENT CRITERIA BUT THAT, AS OF THE END OF THAT CALENDAR YEAR, HAVE NOT BEEN REIMBURSED, EXCLUDING ANY AMOUNTS THAT THE PLAN OR ARRANGEMENT PARTICIPANTS INCURRING THE HEALTH-CARE COSTS MUST PAY BEFORE RECEIVING REIMBURSEMENT UNDER THE PLAN OR ARRANGEMENT;

(XII)  THE ESTIMATED NUMBER OF PLAN OR ARRANGEMENT PARTICIPANTS THE PERSON IS ANTICIPATING IN THIS STATE IN THE NEXT CALENDAR YEAR, SPECIFYING THE ESTIMATED NUMBER OF INDIVIDUALS, HOUSEHOLDS, EMPLOYER GROUPS, AND EMPLOYEES;

(XIII)  THE SPECIFIC COUNTIES IN THIS STATE IN WHICH THE PERSON:

(A)  OFFERED A PLAN OR ARRANGEMENT IN THE IMMEDIATELY PRECEDING CALENDAR YEAR; AND

(B)  INTENDS TO OFFER A PLAN OR ARRANGEMENT IN THE NEXT CALENDAR YEAR;

PAGE 3-HOUSE BILL 22-1269

Resp. Ex. 1

(XIV)  OTHER STATES IN WHICH THE PERSON OFFERS A PLAN OR ARRANGEMENT;

(XV)  A LIST OF ANY THIRD PARTIES, OTHER THAN A PRODUCER, THAT ARE ASSOCIATED WITH OR ASSIST THE PERSON IN OFFERING OR ENROLLING PARTICIPANTS IN THIS STATE IN THE PLAN OR ARRANGEMENT, COPIES OF ANY TRAINING MATERIALS PROVIDED TO A THIRD PARTY, AND A DETAILED ACCOUNTING OF ANY COMMISSIONS OR OTHER FEES OR REMUNERATION PAID TO A THIRD PARTY IN THE IMMEDIATELY PRECEDING CALENDAR YEAR FOR:

(A)  MARKETING, PROMOTING, OR ENROLLING PARTICIPANTS IN A PLAN OR ARRANGEMENT OFFERED BY THE PERSON IN THIS STATE; OR

(B)  OPERATING, MANAGING, OR ADMINISTERING A PLAN OR ARRANGEMENT OFFERED BY THE PERSON IN THIS STATE;

(XVI)  THE TOTAL NUMBER OF PRODUCERS THAT ARE ASSOCIATED WITH OR ASSIST THE PERSON IN OFFERING OR ENROLLING PARTICIPANTS IN THIS STATE IN THE PLAN OR ARRANGEMENT, THE TOTAL NUMBER OF PARTICIPANTS ENROLLED IN THE PLAN OR ARRANGEMENT THROUGH A PRODUCER, COPIES OF ANY TRAINING MATERIALS PROVIDED TO A PRODUCER, AND A DETAILED ACCOUNTING OF ANY COMMISSIONS OR OTHER FEES OR REMUNERATION PAID TO A PRODUCER IN THE IMMEDIATELY PRECEDING CALENDAR YEAR FOR MARKETING, PROMOTING, OR ENROLLING PARTICIPANTS IN A PLAN OR ARRANGEMENT OFFERED BY THE PERSON IN THIS STATE;

(XVII)  COPIES OF ANY CONSUMER-FACING AND MARKETING MATERIALS USED IN THIS STATE IN PROMOTING THE PERSON'S PLAN OR ARRANGEMENT, INCLUDING PLAN OR ARRANGEMENT AND BENEFIT DESCRIPTIONS AND OTHER MATERIALS THAT EXPLAIN THE PLAN OR ARRANGEMENT;

(XVIII)  THE NAME, MAILING ADDRESS, E-MAIL ADDRESS, AND TELEPHONE NUMBER OF AN INDIVIDUAL SERVING AS A CONTACT PERSON FOR THE PERSON IN THIS STATE;

(XIX)  A LIST OF ANY PARENT COMPANIES, SUBSIDIARIES, AND OTHER NAMES THAT THE PERSON HAS OPERATED UNDER AT ANY TIME WITHIN THE IMMEDIATELY PRECEDING FIVE CALENDAR YEARS; AND

PAGE 4-HOUSE BILL 22-1269

(XX) AN ORGANIZATIONAL CHART FOR THE PERSON AND A LIST OF THE OFFICERS AND DIRECTORS OF THE PERSON;

(b) A CERTIFICATION BY AN OFFICER OF THE PERSON THAT, TO THE BEST OF THE PERSON'S GOOD-FAITH KNOWLEDGE AND BELIEF, THE INFORMATION SUBMITTED IS ACCURATE AND SATISFIES THE REQUIREMENTS OF THIS SUBSECTION (1).

(2) (a) IF THE PERSON SUBJECT TO THE REQUIREMENTS OF SUBSECTION (1) OF THIS SECTION FAILS TO SUBMIT THE INFORMATION OR CERTIFICATION REQUIRED BY SAID SUBSECTION, THE SUBMISSION IS INCOMPLETE. THE COMMISSIONER SHALL MAKE A DETERMINATION OF COMPLETENESS NO LATER THAN FORTY-FIVE DAYS AFTER THE SUBMISSION. IF THE COMMISSIONER HAS NOT INFORMED THE PERSON OF ANY DEFICIENCIES IN THE SUBMISSION WITHIN FORTY-FIVE DAYS AFTER RECEIVING THE SUBMISSION, THE SUBMISSION IS CONSIDERED COMPLETE.

(b) (I) IF THE COMMISSIONER DETERMINES THAT A PERSON FAILS TO COMPLY WITH THE REQUIREMENTS OF SUBSECTION (1) OF THIS SECTION, THE COMMISSIONER SHALL:

(A) NOTIFY THE PERSON THAT THE SUBMISSION IS INCOMPLETE AND ENUMERATE IN THE NOTIFICATION EACH DEFICIENCY FOUND IN THE PERSON'S SUBMISSION; AND

(B) ALLOW THE PERSON THIRTY DAYS AFTER NOTICE OF THE INCOMPLETE SUBMISSION TO REMEDY THE DEFICIENCY FOUND IN THE SUBMISSION.

(II) IF THE PERSON DOES NOT REMEDY THE DEFICIENCY WITHIN THE THIRTY-DAY PERIOD, THE COMMISSIONER MAY LEVY A FINE NOT TO EXCEED FIVE THOUSAND DOLLARS PER DAY.

(III) IF THE PERSON DOES NOT REMEDY THE DEFICIENCY OR DEFICIENCIES WITHIN THIRTY DAYS AFTER THE INITIAL FINE IS LEVIED, THE COMMISSIONER MAY ISSUE A CEASE-AND-DESIST ORDER IN ACCORDANCE WITH SECTION 10-3-904.5.

(3) ON OR BEFORE APRIL 1, 2023, AND ON OR BEFORE EACH

PAGE 5-HOUSE BILL 22-1269

OCTOBER 1 THEREAFTER, THE COMMISSIONER SHALL:

(a) PREPARE A WRITTEN REPORT SUMMARIZING THE INFORMATION SUBMITTED BY PERSONS PURSUANT TO SUBSECTION (1) OF THIS SECTION; AND

(b) POST ON THE DIVISION'S WEBSITE THE REPORT AND ACCURATE AND EVIDENCE-BASED INFORMATION ABOUT THE PERSONS WHO SUBMITTED INFORMATION PURSUANT TO SUBSECTION (1) OF THIS SECTION, INCLUDING HOW CONSUMERS MAY FILE COMPLAINTS.

(4) THE COMMISSIONER MAY ADOPT RULES AS NECESSARY TO IMPLEMENT THIS SECTION.

(5) THIS SECTION DOES NOT APPLY TO:

(a) DIRECT PRIMARY CARE AGREEMENTS AS DEFINED IN ARTICLE 23 OF TITLE 6; OR

(b) OTHER CONSUMER PAYMENT ARRANGEMENTS IDENTIFIED BY THE COMMISSIONER BY RULE, INCLUDING CONSUMER PAYMENT PLANS OFFERED DIRECTLY BY A PROVIDER TO A PATIENT OR THE PARTY RESPONSIBLE FOR PAYMENT ON BEHALF OF THE PATIENT.

**SECTION 2.**  In Colorado Revised Statutes, 10-3-904.5, **amend** (1)(a) as follows:

**10-3-904.5.   Emergency cease-and-desist orders - issuance.** (1)  The commissioner may issue an emergency cease-and-desist order ex parte if:

(a)  The commissioner believes that:

(I)  An unauthorized person is engaging in the business of insurance in violation ~~of the provisions~~ of section 10-3-105 or 10-3-903 or is in violation of a rule promulgated by the commissioner; ~~and~~ OR

(II)  A PERSON IS FAILING TO REMEDY OR HAS NOT REMEDIED A DEFICIENCY OR DEFICIENCIES IN THE SUBMISSION REQUIRED PURSUANT TO SECTION 10-16-107.4 (1) WITHIN THE THIRTY DAYS AFTER THE

PAGE 6-HOUSE BILL 22-1269

COMMISSIONER LEVIES AN INITIAL FINE PURSUANT TO SECTION 10-16-107.4
(2)(b)(II); AND

**SECTION 3. Appropriation.** (1) For the 2022-23 state fiscal year,
$84,568 is appropriated to the department of regulatory agencies. This
appropriation is from the division of insurance cash fund created in section
10-1-103 (3), C.R.S. To implement this act, the department may use this
appropriation as follows:

(a)  $39,097 for use by the division of insurance for personal
services, which amount is based on an assumption that the division will
require an additional 0.5 FTE;

(b)  $6,875 for use by the division of insurance for operating
expenses;

(c) $19,714 for the purchase of legal services; and

(d) $18,882 for the purchase of information technology services.

(2)  For the 2022-23 state fiscal year, $19,714 is appropriated to the
department of law. This appropriation is from reappropriated funds received
from the department of regulatory agencies under subsection (1)(c) of this
section and is based on an assumption that the department of law will
require an additional 0.1 FTE. To implement this act, the department of law
may use this appropriation to provide legal services for the department of
regulatory agencies.

(3)  For the 2022-23 state fiscal year, $18,882 is appropriated to the
office of the governor for use by the office of information technology. This
appropriation is from reappropriated funds received from the department of
regulatory agencies under subsection (1)(d) of this section. To implement
this act, the office may use this appropriation to provide information
technology services for the department of regulatory agencies.

**SECTION 4.  Applicability.** This act applies to conduct occurring
on or after the effective date of this act.

PAGE 7-HOUSE BILL 22-1269

SECTION 5.  **Safety clause.** The general assembly hereby finds, determines, and declares that this act is necessary for the immediate preservation of the public peace, health, or safety.


Alec Garnett
SPEAKER OF THE HOUSE
OF REPRESENTATIVES

Steve Fenberg
PRESIDENT OF
THE SENATE


Robin Jones
CHIEF CLERK OF THE HOUSE
OF REPRESENTATIVES

Cindi L. Markwell
SECRETARY OF
THE SENATE


APPROVED June 8, 2022 at 12:06 pm
(Date and Time)


Jared S. Polis
GOVERNOR OF THE STATE OF COLORADO


PAGE 8-HOUSE BILL 22-1269

# EX 1.2

1 (833) JOIN-CHM                                    Member Access                    🔍


**CHM** *Christian Healthcare Ministries*



# About CHM

# The original **cost sharing ministry**.

Christian Healthcare Ministries (CHM) was established in 1981. As the nation's first and longest-serving health cost sharing ministry, CHM provides a cost-effective, accountable, and faith-based framework— health cost sharing—to help fellow believers facing a health crisis. The ministry shares 100 percent of eligible medical bills and overall has satisfied over $11 billion in members' healthcare costs.

Our biblical community of members in all 50 states and around the world works together to share the burden of medical expenses. Participation is a voluntary expression of Christian faith and does not require a contract. As part of a biblical covenant, CHM members step in and help fellow brothers and sisters in Christ when eligible medical bills arise.

Case No. 1:24-cv-01386-GPG-STV     Document 76-1     filed 06/27/25     USDC Colorado
pg 45 of 547

CHM's concept originated 2,000 years ago with the early church who "held all things in common" and followed the Apostles as they prioritized meeting the needs of the poor, the oppressed, and their Christian family. Members are an extension of that testimony as CHM is first and foremost a ministry, reflecting the spiritual values outlined in Galatians 6:2 and Acts 2 and 4.

Every year, thousands of individuals face financial ruin because of a major illness or accident. That's where CHM steps in.

The ministry, under the leadership of President and CEO J. Craig Brown II, is headquartered in Barberton, Ohio. We're a nonprofit (501(c)(3)), accredited organization, and a Better Business Bureau Accredited Charity.

## EAGER TO SERVE

Our mission is to glorify God, show Christian love, and experience God's presence as Christians share each other's medical bills.

## OUR VALUES

# Respect

God created every person uniquely and for a unique purpose beyond what we can see. *[Romans 12:10, 1 Peter 2:17]*

# Service

Resp. Ex. 1

Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 46 of 547

We glorify God by serving others with humility, excellence, and care. *[Matthew 20:28]*

# Accountability

The fruit of accountability is the willingness to take responsibility for one's time, resource, and conduct. *[Titus 2:7-8]*

# Excellence

Our goals, expectations, boundaries, and potential are flexible to God's refining plan. Regardless of our achievements today, we want to be better tomorrow. *[Philippians 4:8]*

# Gratitude

We celebrate that the source of goodness is not ourselves but God. Everything good comes from Him. *[James 1:17]*

Resp. Ex. 1

# Integrity and Accountability

As America's first and longest-serving health cost sharing ministry, we make choices that prioritize integrity. CHM is a Better Business Accredited Charity with a first-in-the-nation independent accreditation from Demotech, a financial analysis firm that serves insurance companies by providing Financial Stability Ratings®.

Additionally, CHM's operational model enables it to be audited annually by an independent auditing firm, making audit results available upon request.



Our actions don't stop there. We've taken care of 100 percent of members' eligible medical bills since 1981 and have internal controls to make sure the ministry operates with integrity and accountability. In accordance with good business practices and the laws governing not-for-profit, tax-exempt organizations, CHM has an independent Board of Directors that controls its functions.

Information about CHM's board of directors and additional measures we take to maintain the highest level of integrity and accountability are outlined in the CHM Guidelines. Please click here to sign up to download the Guidelines. Or, if you're a current member, please visit your Member Portal to access your copy.



**1-800-791-6225**

127 Hazelwood Avenue
Barberton, OH 44203

**DONATE** →

| ABOUT | HOW IT WORKS | PROGRAMS | HEALTH AND WELLNESS | CONTACT US |
|---|---|---|---|---|
| By the numbers | | CHM Gold | Blog | Stay Connected |
| | | CHM Silver | Newsroom | |
| | | CHM Bronze | | |
| | | CHM SeniorShare™ Groups | | |

FAQS

FOR PROVIDERS

GLOSSARY

ACCREDITATIONS







© 2025 Christian Healthcare Ministries. All rights reserved.

Careers    Legal Notices    Terms and Conditions of Use    Privacy Policy

Resp. Ex. 1

# EX 1.3



# Health Care Sharing Plans and Arrangements in Colorado

## Colorado House Bill 22-1269 2023 report

October 2024

Resp. Ex. 1

# Table of Contents

**Table of Contents**                                                                    **2**
**Background**                                                                           **3**
**Overview of Data Collection Efforts**                                                  **3**
**Summary of Findings**                                                                  **4**
    Membership                                                        4
    Table 1. 2023 Enrollment Data per HCSA                            4
    Financial Information                                             6
    Marketing Efforts and Use of Producers                            7
**Data Limitations**                                                                     **8**
**Questions or Concerns**                                                                **8**
**Next Steps**                                                                           **8**
**Appendices**                                                                           **9**
    Appendix A: Associated Legislation, Regulation, and Division Information    9
    Appendix B: Regulatory Definitions of Terms Related to HCSA Reporting        9
    Appendix C: List of Health Care Sharing Arrangements Operating in Colorado   11
    Appendix D: Services and Pre-existing Conditions Excluded from Sharing by Some
HCSAs                                                                                    11
    Appendix E: 2023 Financial Information Table 1                     13
    Appendix F: 2023 Financial Information Table 2                     15
    Appendix G: 2023 Data on share request denials and appeals        17
    Appendix H: Additional 2023 Data from the Health Care Sharing Plan Reporting
Template                                                                                 20
    Appendix I: Number of HCSAs Operating in each State               22

Resp. Ex. 1

# Background

The 73rd Colorado General Assembly passed House Bill 22-1269 ("HB22-1269") requiring Health Care Sharing Ministries, Plans, or Arrangements ("HCSAs") to report data annually to the Division of Insurance ("Division") and "for the Commissioner [of Insurance] to prepare a written report summarizing the information submitted" about the HCSAs operating in Colorado. HCSAs report data to the Division about annual enrollment and financial data, use of licensed producers, HCSA member guidelines, and marketing materials.[1] These data reporting efforts are intended to increase transparency about HCSAs for Colorado consumers.

Regulation 4-10-01 defines a "Health care sharing plan" or "health care sharing arrangement" or "plan" or "arrangement" or "HCSPA" as, "any organization that offers or markets products to facilitate payment or reimbursement of health-care costs or services for one (1) or more residents of Colorado. This does not include direct primary care agreements as defined in § 6-23-101, C.R.S.; consumer payment plans offered directly between a provider and patient (or patient's responsible party); businesses used to facilitate the plan's operations such as reimbursement handling, cost containment vendors, data processing; and crowdfunded sources that do not require ongoing membership fees, share requirements, or dues for the purposes of payment for and/or reimbursement of health care services."[2] Colorado law requires all HCSAs to report data to the Division annually.

# Overview of Data Collection Efforts

To collect data from HCSAs offering plans or arrangements in Colorado in 2023, the Division used the infrastructure implemented for previous years' data collection efforts and released regulation 4-10-01. This included two years of data collection under Emergency Regulation 22-E-20, two public meetings ahead of the adoption of Emergency Regulation 22-E-20, discussions with representatives from different Sharing Plans, two public comment periods to respond to draft forms of regulation 4-10-01, updates to the data reporting template, and a dedicated HCSA data collection webpage to meet the requirements of Colorado statute.[3] The two previous years of data collection efforts and feedback provided by consumer advocates, HCSAs, and members of the public helped refine updates to the regulation and data reporting template. Additionally, the Division offered HCSAs one-on-one office hours to answer questions and help clarify the reporting requirements. One HCSA reached out to the Division with questions ahead of the submission deadline.

By May 31, 2024, seventeen HCSAs submitted data for the 2023 calendar year. Division staff reviewed all submissions for completeness; followed up with each HCSA if materials were missing or data elements did not appear to follow Section 10-16-107.4 CRS and regulation 4-10-01.

---

[1] For a full list of all information required to be reported to the Division annually by HCSAs see § 10-16-107.4(1), Colorado Revised Statutes ("C.R.S").

[2] Regulation 4-10-01 establishes the data reporting requirements applicable to all HCSAs offering or that intend to offer plans or arrangements to facilitate payment or reimbursement of health-care costs or services for residents of Colorado.

[3] Links to these items can be found in the Appendices below.

Resp. Ex. 1

Five HCSAs reported a subset of required values for 2023[4]. Given the potential statistical impact these missing data could have on comparing financial data from one year to the next, the Division cautions against comparing the summary financial data provided in this report to previous years' reports. All seventeen HCSAs reported enrollment data for 2023.

## Summary of Findings

Seventeen HCSAs submitted data to the Division ahead of the publication of this report. For the purposes of this report, where inconsistencies in the data are present, the Division has presented a subset of data in the summary sections to include only those from HCSAs that reported in accordance with Regulation 4-10-01 and noted this in the footnotes.

HCSAs do not have uniform sharing or business practices and where some data points required by law are not applicable to a specific HCSA and the HCSA has communicated that distinction in their reporting template "N/A" is used in this report to note that distinction. Where data were missing from a submission "-" is used.

### Membership

Presented in Table 1 is a summary of enrollment related data for each HCSA in 2023.

### Table 1. 2023 Enrollment Data per HCSA

| Organization | Number of Colorado members enrolled | Number of members enrolled nationally | Number of Coloradan households participating | Number of Colorado members participating through an employer | Number of Colorado members enrolled through a producer |
|---|---|---|---|---|---|
| Altrua Ministries | 264 | 11,564 | 145 | 0 | 0 |
| Christian Care Ministry, dba Medi-Share | 17,127 | 408,793 | 6,518 | 216 | 0 |
| Christian Healthcare Ministries | 13,593 | 476,828 | 5,824 | 294 | 0 |
| Impact Health Sharing | 360 | 14,588 | 210 | N/A | 360 |
| Jericho Share | 2,587 | 12,864 | 1,681 | - | 2,587 |
| Knew Health | 162 | 2,902 | 86 | 2 | 0 |
| Liberty HealthShare | 2,911 | 60,858 | 1,362 | 6 | - |

---

[4]Due to ongoing litigation relating to HCSA entities and regarding the reporting requirements, the Division will not comment on individual HCSA submissions for the 2024 reporting cycle.

4

| Organization | Number of Colorado members enrolled | Number of members enrolled nationally | Number of Coloradan households participating | Number of Colorado members participating through an employer | Number of Colorado members enrolled through a producer |
|---|---|---|---|---|---|
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | 174 | 17,821 | N/A | 0 | 0 |
| OneShare | 2,116 | 28,423 | 1,098 | 0 | 0 |
| Samaritan Ministries International | 12,828 | 349,408 | 3,510 | 187 | - |
| Sedera Medical Cost Sharing Community | 2,562 | 35,447 | 1,171 | 344 | 1564 |
| Sedera, Inc. | 716 | 3,807 | 361 | 66 | 706 |
| Share HealthCare | 53 | 618 | 26 | 0 | 0 |
| Solidarity | 551 | 19,429 | 210 | N/A | 0 |
| Unite Health Share Ministries[5] | Redacted | Redacted | Redacted | Redacted | Redacted |
| Universal Health Fellowship | 758 | 10,079 | 542 | N/A | 758 |
| Zion HealthShare | 4,700 | 51,185 | 2,488 | 0 | 0 |

In 2023, seventeen HCSAs reported a total membership of 62,461 Coloradans and 1,521,668 members nationally. Colorado HCSA membership numbers represent slightly over 4% of national HCSA enrollment of these HCSAs. In comparison, Colorado's 2020 census population is 1.7% of the national population.[6] Actual enrollment in HCSAs in Colorado is likely different than reported here as other HCSAs could be operating in Colorado but have not reported data to the Division.

Seven of the seventeen HCSAs reported Colorado employer groups participating in sharing arrangements in 2023. Of the seven HCSAs that reported data on employer participation, the range of members participating in a HCSA per employer is 1 to 65 members, with an aggregate total of 1,115 members across all seven HCSAs.

---

[5] Unite Health Share Ministries (UHSM) requested that data supplied on tabs 2 and 3 of the reporting template, and therefore what would be displayed on this table, be confidential. Where "Redacted" is displayed the data were submitted to the Division but redacted from the report.
[6] United States Census Bureau. [Profile United States 2020 census data]. Retrieved from https://data.census.gov/profile?g=0100000US

5

## Financial Information

Twelve HCSAs reported the required financial information to the Division. However, one of the HCSAs requested that their financial information be kept confidential, and they are excluded from the summary analysis presented in this section.

HCSAs are required to report the "Total amount of fees, dues, shares, contributions, or other payments collected from individuals, Colorado employer groups, or others who participated in the [HCSA's] product." The eleven HCSAs collected $39,474,869 in total fees, dues, shares, contributions, and other payments from members in 2023.

HCSAs are also required to report on the dollar amount of healthcare costs submitted for their members' sharing requests, the dollar amount of those healthcare costs that are determined eligible for sharing based on their specific member guidelines, and the dollar amount paid or shared to cover healthcare expenses the HCSA determines are eligible for sharing. A total of $96,207,407 in healthcare costs were submitted for sharing by members of the eleven HCSAs. Many of the HCSAs note that the dollar amount of healthcare costs or services submitted for sharing includes duplicate charges, ineligible charges based on the HCSA's sharing guidelines (for example a member may receive a single itemized bill from a provider with both eligible and ineligible charges but the full bill is submitted as part of the sharing request), discounts that the HCSAs negotiated on their members' behalf, and the members' agreed-upon portions of medical bills. Once those amounts ineligible for sharing were deducted, the eleven HCSAs reported that $58,590,086 of members' total 2023 health care costs were determined eligible for sharing. Of the $58,590,086 determined by the HCSAs to be eligible for sharing $34,291,846 in healthcare costs or services were paid by the HCSAs by December 31, 2023.

Actual health care costs of Colorado members were likely different than the HCSAs reported as some bills/share requests do not include costs for benefits excluded from sharing and were not submitted by the member. Nor do the amounts submitted to the Division include the amounts members need to pay before being eligible for sharing. This is sometimes referred to as an "Annual Unshared Amount" and the amount varies within a HCSAs offered products and across HCSAs.

The guidelines of twelve[7] HCSAs explicitly state that members must use or are obligated to pursue[8] other payment options available to the member before submitting a share request otherwise the member's healthcare costs are not eligible for sharing. This includes using insurance, Medicare, Medicaid, Veterans Administration, Tricare, private/public grants, crowdfunding, and any liable third party (in the event of an accident) before submitting a share

---

[7] Five HCSAs did not submit their member guidelines as required

[8] An example of "obligation to pursue" other payment options is copied from one HSCA's member guidelines with the name of the HCSA removed from the quote, "it is your [the member's] obligation to pursue payment from any other responsible payer before submitting such medical expenses to [HCSA] for assistance. If a governmental, insurance, or religious program; liable third party; fraternal organization; or any other financial assistance source will pay any portion of the qualifying medical bill, that amount will offset any unshared and/or shared amounts applied to the member's needs up to the total amount of the need. If the Sharing Member refuses to accept such assistance, then that portion of the medical need also becomes ineligible for sharing."

Resp. Ex. 1

request. From one HCSA's member guidelines, "Failure to disclose coverage with an insurance, third-party administrator, or government assistance plan may result in ineligibility for sharing. This includes, but is not limited to, any form of coverage through a non-member spouse, family member, employer, or government entity." One HCSA requires or suggests that members first request providers and hospitals to reduce or write off eligible health care bills (sometimes referred to as a "self-pay" discount).

Five HCSAs also state or suggest that members must first request charity care and financial support from local governments and consumer support organizations in paying the member's health care bills by including language such as, "Needs do not qualify for sharing to the extent that they are discountable by the health care provider or payable by any other source, whether private, governmental, or institutional." This means that medical costs submitted for sharing by a member (and what is later submitted to the Division through the data reporting template) are likely different from the total health care cost to provide those services.

## Marketing Efforts and Use of Producers

Five HCSAs reported that 262 producers enrolled 6,442 members in these five HCSAs. The range of Colorado membership enrolled via producers varies from 1 member enrolled through a producer for one HCSA to 1,151 members enrolled through a producer for another HCSA. HCSAs are not required to report the names, business, or license numbers of individual producers so the count of 262 producers across this subset of HCSAs is not a unique count of producers and likely includes double counting.

Four of the five HCSAs that reported an association with producers also reported on the "total commission, fees, or remuneration paid in [2023] to producers for: marketing, promoting, or enrolling Colorado participants". The fifth HCSA included their producer payment information with one of the other HCSAs that reported on this value. Producers were paid a total of $100,580 in 2023 by the four HCSAs. The Division noted inconsistencies in how some HCSAs reported on the use of producers to enroll members in HCSAs and on the commissions, fees, or remunerations paid to producers. Some of the HCSAs commented that they cannot know if their subcontractors or third-party administrators follow the definition of a producer or not, so they are unable to report on these required data elements. Additionally, five HCSAs did not submit data on marketing or use of producers. It is possible that more than the five HCSAs noted above work with producers to enroll members and that more than the four HCSAs noted above paid producers for marketing, promoting, and enrolling members.

Six HCSAs paid third parties $892,039 for "marketing, promoting, or enrolling participants in a plan or arrangement to Colorado participants" and four HCSAs paid third parties $4,896,482 for "operating, managing, or administering a plan or arrangement offered by the [HCSA]."

Sixteen HCSAs used social media to communicate to members and to market their products. Non-confidential marketing materials submitted by each HCSA, which include examples of social media posts, will be posted in the coming months to the Division's website.

7

## Data Limitations

Information provided by each HCSA includes an attestation that the annual submission is the "best of your good-faith knowledge and belief, is accurate and satisfies the requirements of § 10-16-107.4, C.R.S." and must be signed by an officer of the HCSA. The Division has checked each submission for completeness but is limited in its ability to independently verify all or some parts of each submission. The Division intentionally does not, and will not, collect information on individual HCSA members, employers, or producers.

Five HCSAs reported a subset of required values for 2023[9].

The Division does not collect demographic information about HCSA members; the types of employers who help cover an HCSA membership for their employees; or the names of producers used to enroll members into HCSAs.

HCSA members can switch HCSAs mid-year and would be double counted in this situation without a way to be deduplicated from the data submitted to the Division and used in this report. Therefore, the values for these data points in this report may not be a unique count.

## Questions or Concerns

If you have a question about your health care sharing arrangement or health insurance coverage you can contact the Division's Consumer Services team. The Consumer Services team is available to answer questions or respond via phone and/or our consumer portal. Information about filing a complaint can be found on the Division's website, emailing DORA_Insurance@state.co.us, or calling 303-894-7490 (within the Denver Metro area) or 800-930-3745 (outside the Denver Metro area).

## Next Steps

Review of 2023 data submissions is expected in the coming months. If evidence is later discovered proving an HCSA was operating in Colorado during the reporting period, and did not submit data to the Division, the Division may initiate enforcement actions against non-reporting HCSAs. The Division is not anticipating updates to this 2023 report. Finalized submission materials, excluding confidential information, will be posted to the Division's website for interested parties to download. Annually, HCSA data submissions are due to the Division on March 1st of each year with the associated report published by October 1st of the same year.

If there is evidence that a HCSA is operating in Colorado but is not included in this report, please contact Leilani Russell (Leilani.Russell@state.co.us).

---

[9]Due to ongoing litigation relating to HCSA entities and regarding the reporting requirements, the Division will not comment on individual HCSA submissions for the 2024 reporting cycle.

8

# Appendices

## Appendix A: Associated Legislation, Regulation, and Division Information

- [Colorado House Bill 22-1269](#)
- Division of Insurance [Emergency Regulation 22-E-20](#)
- Division of Insurance [Regulation 4-10-01,](#) including an attestation
- The Division's [consumer complaint portal](#) and [information on how to ask a question or file a complaint](#)
- [The Division's web page](#) dedicated to House Bill 22-1269

**2023 Reporting Template:** The annual reporting template all HCSAs submit to the Division can be downloaded from the Division's website:
https://docs.google.com/spreadsheets/d/1B0yM0Oyhj0gNaQk9YDsTTM4udHCVfyfcZDNKnApJWVs

**About the Division of Insurance:** The Colorado Division of Insurance, part of the Department of Regulatory Agencies (DORA), regulates the insurance industry and assists consumers and other stakeholders with insurance issues. Visit doi.colorado.gov for more information or call 303-894-7499 / toll free 800-930-3745.

**About DORA:** DORA is dedicated to preserving the integrity of the marketplace and is committed to promoting a fair and competitive business environment in Colorado. Consumer protection is our mission. Visit dora.colorado.gov for more information or call 303-894-7855 / toll free 800-886-7675.

## Appendix B: Regulatory Definitions of Terms Related to HCSA Reporting

The following definitions related to Health Care Sharing Plans and Arrangements can be found on [Regulation 4-10-01](#) and are used by the HCSAs to report to the Division.

**"Administrative expenses"** shall mean costs incurred to operate and support the functioning of the health care sharing plan or arrangement. This includes but is not limited to bank fees, staff salaries, data processing, sales, management of health care expense submissions, marketing, outreach, and enrollment efforts. This includes fees, commissions, and remuneration paid to contractors or third parties that acted on behalf of the HCSPA to facilitate administrative operations.

**"CORA"** shall mean the Colorado Open Records Act (§ 24-72-201, et seq, C.R.S.).

**"Coloradans"** shall mean residents of Colorado during the reporting period.

**"Filing date"** shall mean for the purposes of this regulation, the day after the HCSPR filing is received at the Division.

9

**"Health care costs" or "health care expenses"** shall mean any amount billed by a health care provider for health care services or related products or by a pharmacy.

**"Health care provider"** shall have the same meaning as found at § 10-16-102(56), C.R.S. "Health care provider" includes telehealth and direct primary care providers for the purposes of this regulation.

**"Health care services"** means any services included in or incidental to the furnishing of medical, behavioral, mental health, or substance use disorder; dental, or optometric care; hospitalization; or nursing home care to an individual, as well as the furnishing to any person of any other services for the purpose of preventing, alleviating, curing, or healing human physical illness or injury, or behavioral, mental health, or substance use disorder. "Health-care services" includes the rendering of the services through the use of telehealth, as defined in § 10-16-123 (4)(e), C.R.S.

**"Health care sharing plan" or "health care sharing arrangement" or "plan" or "arrangement" or "HCSPA"** shall mean any organization that offers or markets products to facilitate payment or reimbursement of health-care costs or services for one (1) or more residents of Colorado. This does not include direct primary care agreements as defined in § 6-23-101, C.R.S.; consumer payment plans offered directly between a provider and patient (or patient's responsible party); businesses used to facilitate the plan's operations such as reimbursement handling, cost containment vendors, data processing; and crowdfunded sources that do not require ongoing membership fees, share requirements, or dues for the purposes of payment for and/or reimbursement of health care services.

**"Health Care Sharing Report" or "HCSR"** shall mean the report required to be filed with the Commissioner pursuant to § 10-16-107.4(1), C.R.S.

**"Health Care Sharing Plan or Arrangement Reporting template" or "template"** shall mean the data reporting template created and distributed by the Division for the purposes of collecting data per § 10-16-107.4, C.R.S.

**"Insurance producer" or "producer"** shall have the same meaning as found at § 10-2-103(6), C.R.S., with the exception that for the purposes of this regulation it does not include § 10-2-103(6)(b), C.R.S."

**"Product(s)"** means, for the purposes of this regulation, the services covered as a package under a membership plan, tier, or level.

**"Program expenses"** shall mean any service by the HCSPA or its contractors that, while not direct medical care, contributes to the care and overall experiences of HCSPA's participants. This includes but is not limited to coaching and wellness programs, care navigation, care coordination, medical review, quality improvement efforts, cost containment, reimbursement handling, and bill negotiations. This includes fees, commissions, and remuneration paid to contractors that acted on behalf of the HCPA to facilitate program expenses.

10

**"Third party"** shall mean contractors that are associated with or assist the plan or arrangement in offering or enrolling Colorado residents as participants in the plan or arrangement.

## Appendix C: List of Health Care Sharing Arrangements Operating in Colorado

**List of HCSAs that offered plans or arrangements in Colorado in 2023
and reported data to the Division**

Altrua Ministries
Christian Care Ministry, dba Medi-Share
Christian Healthcare Ministries
Impact Health Sharing
Jericho Share
Knew Health
Liberty HealthShare
Logos Missions, Inc, dba Christian Mutual Medical Assistance
OneShare
Samaritan Ministries International
Sedera Medical Cost Sharing Community
Sedera, Inc.
Share HealthCare
Solidarity
Unite Health Share Ministries, dba UHSM
Universal Health Fellowship
Zion HealthShare

11

## Appendix D: Services and Pre-existing Conditions Excluded from Sharing by Some HCSAs

For more information about exclusion or coverage of services for any particular HCSA review the specific membership guidelines from the HCSA.

**The following are health care services that are excluded from sharing across some of the organizations that reported data to the Division. This is not an exhaustive list.**

- Acupuncture
- ADHD treatments
- Contraception coverage
- Cosmetic surgery
- Dental coverage
- Diabetic medication and supplies
- Eye care
- Fertility/Infertility care
- Gender affirming care
- Maternity care - unless the mother has been a member for 12 months without changing to a lower cost program
- Medications used to support chronic or pre-existing health conditions
- Mental health treatment
- Routine and preventive care – including, but not limited to, all well-patient care and screening tests and procedures
- Substance use disorder treatment
- Vaccinations and/or Immunizations
- Weight Management treatment or procedures

**The following are a list of conditions that some of the HCSAs reported as pre-existing and therefore ineligible for sharing, or had limitations on sharing based on the HCSA's specific guidelines. This is not an exhaustive list.**

- ALS
- Alzheimer's Disease
- Aneurysm
- Asthma
- Autism Spectrum Disorder
- Cancer
- Cerebral Palsy
- Congenital Conditions
- Congestive Heart Failure
- COPD
- Cystic Fibrosis
- Dementia
- Diabetes Type I and II
- Down's Syndrome
- Endometriosis
- Experimental treatments
- Heart Palpitations
- Hepatitis
- Hypertension
- HIV/AIDS
- Lupus
- Lyme's Disease
- Multiple Sclerosis
- Muscular Dystrophy
- Rheumatoid Arthritis
- Sickle-Cell Disease
- Sleep Apnea

12

## Appendix E: 2023 Financial Information Table 1

For HCSAs with different percentages reported across their multiple products/programs the high and low range of the reported values are displayed in this table.

Please review the data limitations section included in this report for additional context about the financial data reported to the Division.

| Organization | Total amount of fees, dues, shares, contributions, or other payments collected from individuals, Colorado employer groups, or others who participated in the product | The percentage of fees, dues, shares, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for **administrative expenses** | The percentage of fees, dues, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for **program expenses** | Total dollar amount of health-care costs or services that were incurred by the participant and submitted by or on behalf of the participant for sharing | Total dollar amount of requests for sharing of Colorado participants' health-care costs or services **that qualified for sharing** excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines |
|---|---|---|---|---|---|
| Altrua Ministries[10] | $835,931.28 | - | - | - | - |
| Christian Care Ministry, dba Medi-Share[11] | $27,706,631.00 | - | - | - | - |
| Christian Healthcare Ministries | $22,276,198.01 | 4.80% | 5.60% | $55,763,555.94 | $46,056,456.71 |
| Impact Health Sharing | $511,485.00 | 34.70% | 14.60% | $1,116,220.00 | $177,337.53 |
| Jericho Share | $1,219,599.95 | 0%-82% | 0%-82% | $1,079,940.20 | $80,843.46 |
| Knew Health | $306,938.94 | 33% | 20% | $200,827.89 | $98,530.56 |

---

[10]Data from these HCSAs were excluded from the financial analysis presented in this report due to inconsistencies or missing data. Where data were missing from a submission " - " is used.
[11] Ibid

Resp. Ex. 1

| Organization | Total amount of fees, dues, shares, contributions, or other payments collected from individuals, Colorado employer groups, or others who participated in the product | The percentage of fees, dues, shares, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for **administrative expenses** | The percentage of fees, dues, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for **program expenses** | Total dollar amount of health-care costs or services that were incurred by the participant and submitted by or on behalf of the participant for sharing | Total dollar amount of requests for sharing of Colorado participants' health-care costs or services **that qualified for sharing** excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines |
|---|---|---|---|---|---|
| Liberty HealthShare[12] | $9,563,957.00 | - | - | - | - |
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | $199,300.00 | 10.00% | 22.00% | $128,393.20 | $64,905.36 |
| OneShare[13] | $4,275,772.68 | - | - | - | - |
| Samaritan Ministries International[14] | $16,012,373.00 | - | - | - | - |
| Sedera Medical Cost Sharing Community | $5,916,748.45 | First three months: 62%; after that: 12% | 23% | $6,904,090.50 | $5,455,787.61 |
| Sedera, Inc. | $1,523,542.20 | First three months: 62%; after that: 12% | 23% | $1,053,231.50 | $803,148.60 |
| Share HealthCare | $54,297.00 | 33.6% - 38.4% | 62.2% - 66.4% | $778.85 | $266.00 |
| Solidarity | $825,220.00 | 8% | 32% | $3,033,948.59 | $547,717.95 |

---

[12] Data from these HCSAs were excluded from the financial analysis presented in this report due to inconsistencies or missing data. Where data were missing from a submission " - " is used.
[13] Ibid
[14] Ibid

Resp. Ex. 1

| Organization | Total amount of fees, dues, shares, contributions, or other payments collected from individuals, Colorado employer groups, or others who participated in the product | The percentage of fees, dues, shares, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for **administrative expenses** | The percentage of fees, dues, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for **program expenses** | Total dollar amount of health-care costs or services that were incurred by the participant and submitted by or on behalf of the participant for sharing | Total dollar amount of requests for sharing of Colorado participants' health-care costs or services **that qualified for sharing** excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines |
|---|---|---|---|---|---|
| Unite Health Share Ministries[15] | Redacted | Redacted | Redacted | Redacted | Redacted |
| Universal Health Fellowship | $1,652,026.00 | 36% - 50% | 34% - 60% | $2,012,926.35 | $167,719.53 |
| Zion HealthShare | $4,989,513.17 | 13.40% | 3.20% | $24,913,494.41 | $5,137,373.18 |

---

[15] Unite Health Share Ministries (UHSM) requested that data supplied on tabs 2 and 3 of the reporting template, and therefore what would be displayed on this table, be confidential.

Resp. Ex. 1

## Appendix F: 2023 Financial Information Table 2

| Organization | Total dollar amount of payments made **to providers** for Colorado participants' health care costs and services | Total dollar amount of health-care costs or services that were incurred **by the participant** and submitted by or on behalf of the participant for sharing | Total amount of Colorado participants' health-care costs and services submitted in 2023 that qualify for sharing pursuant to the plan/arrangement's criteria but that were not shared or paid by 12/31/2023, excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines[16] | Total number of requests by or on behalf of the Colorado participants' for sharing of healthcare costs or services incurred by the participant |
|---|---|---|---|---|
| Altrua Ministries[17] | - | - | - | - |
| Christian Care Ministry, dba Medi-Share[18] | - | - | - | - |
| Christian Healthcare Ministries | $5,013,145.76 | $16,752,703.49 | $11,573.42 | 17,188 |
| Impact Health Sharing | $148,457.56 | $28,879.97 | $0.00 | 863 |
| Jericho Share | $80,843.46 | $0.00 | $57,226.13 | 1,724 |
| Knew Health | $0.00 | $98,530.56 | $1,570.56 | 71 |
| Liberty HealthShare[19] | - | - | - | - |
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | $8,983.92 | $48,288.89 | $7,632.55 | 262 |

[16] The values reported in this column exclude any amounts that the participants incurring the health-care costs or services must pay before share requests are approved under the plan or arrangement
[17] Data from these HCSAs were excluded from the financial analysis presented in this report due to inconsistencies or missing data. Where data were missing from a submission " - " is used.
[18] Ibid
[19] Ibid

Resp. Ex. 1

| Organization | Total dollar amount of payments made **to providers** for Colorado participants' health care costs and services | Total dollar amount of health-care costs or services that were incurred **by the participant** and submitted by or on behalf of the participant for sharing | Total amount of Colorado participants' health-care costs and services submitted in 2023 that qualify for sharing pursuant to the plan/arrangement's criteria but that were not shared or paid by 12/31/2023, excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines[16] | Total number of requests by or on behalf of the Colorado participants' for sharing of healthcare costs or services incurred by the participant |
|---|---|---|---|---|
| OneShare[20] | - | - | - | - |
| Samaritan Ministries International[21] | - | - | - | - |
| Sedera Medical Cost Sharing Community | $4,613,502.51 | $842,285.10 | $714,919.60 | 3,374 |
| Sedera, Inc. | $678,527.10 | $124,621.50 | $0.00 | 324 |
| Share HealthCare | $0.00 | $266.00 | $0.00 | 2 |
| Solidarity | $440,173.93 | $107,544.02 | - | 2,806 |
| Unite Health Share Ministries[22] | Redacted | Redacted | Redacted | Redacted |
| Universal Health Fellowship | $150,947.58 | $16,771.95 | $6,850.75 | 1,837 |
| Zion HealthShare | $4,167,983.89 | $969,389.29 | $31.00 | 2,501 |

---

[20] Ibid
[21] Ibid
[22] Unite Health Share Ministries (UHSM) requested that data supplied on tabs 2 and 3 of the reporting template, and therefore what would be displayed on this table, be confidential. Their data is excluded from the financial analysis presented in this report.

Resp. Ex. 1

## Appendix G: 2023 Data on share request denials and appeals

For HCSAs with different percentages reported across their multiple products/programs the high and low range of the reported values are displayed in this table.

Where a HCSA has not supplied data to the Division, " - " is used.

Where a HCSA has indicated that a required data element is not applicable, "N/A" is used.

| Organization | Total number of share requests, for Colorado participants, that were denied (not shared) because they were not eligible for sharing according to the organization's guidelines | Total number of appeals of denied sharing requests for Colorado participants' incurred health-care costs or services | Total number of appeals requests that were later approved for sharing for Colorado participants' incurred health-care costs or services | Percentage of total number of requests denied compared to the total number of Colorado participants share requests submitted | Percentage of total number of requests denied compared to the total number of appeals for sharing that were "denied" (not shared) for Colorado participants |
|---|---|---|---|---|---|
| Altrua Ministries[23] | - | - | - | - | - |
| Christian Care Ministry, dba Medi-Share[24] | - | - | - | - | - |
| Christian Healthcare Ministries | 4,585 | 5 | 1 | 0.27% | 0% |
| Impact Health Sharing | 88 | 0 | 0 | 10.20% | 0% |
| Jericho Share | 47 | 4 | - | 0% - 17.00% | 0% - 33.00% |
| Knew Health | 0 | 0 | 0 | N/A | N/A |
| Liberty HealthShare[25] | - | - | - | - | - |

[23] Data from these HCSAs were excluded from the financial analysis presented in this report due to inconsistencies or missing data. Where data were missing from a submission " - " is used.
[24] Ibid.
[25] Ibid.

Resp. Ex. 1

| Organization | Total number of share requests, for Colorado participants, that were denied (not shared) because they were not eligible for sharing according to the organization's guidelines | Total number of appeals of denied sharing requests for Colorado participants' incurred health-care costs or services | Total number of appeals requests that were later approved for sharing for Colorado participants' incurred health-care costs or services | Percentage of total number of requests denied compared to the total number of Colorado participants share requests submitted | Percentage of total number of requests denied compared to the total number of appeals for sharing that were "denied" (not shared) for Colorado participants |
|---|---|---|---|---|---|
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | 19 | 0 | 0 | 0% - 8.00% | 0% |
| OneShare[26] | - | - | - | - | - |
| Samaritan Ministries International[27] | - | - | - | - | - |
| Sedera Medical Cost Sharing Community | 271 | 2 | 2 | 7.60% - 8.20% | 0% |
| Sedera, Inc. | 22 | 0 | 0 | 0% - 6.80% | 0% |
| Share HealthCare | 1 | 0 | 0 | 50.00% | 0% |
| Solidarity | 695 | - | - | 24.00% | - |
| Unite Health Share Ministries[28] | Redacted | Redacted | Redacted | Redacted | Redacted |
| Universal Health Fellowship | 307 | 16 | 4 | 16.20% | 5.20% |
| Zion HealthShare | 196 | 23 | 10 | 5.80% - 9.00% | 7.00% - 14.00% |

[26] Data from these HCSAs were excluded from the financial analysis presented in this report due to inconsistencies or missing data. Where data were missing from a submission " - " is used.
[27] Ibid.
[28] UHSM requested that data supplied on tabs 2 and 3 of the reporting template be confidential.

## Appendix H: Additional 2023 Data from the Health Care Sharing Plan Reporting Template

Where a HCSA has not supplied data to the Division, " - " is used.

Where a HCSA has indicated that a required data element is not applicable, "N/A" is used.

| Organization | The total number of employer groups in Colorado that participated in this product | Number of contracts entered into with health care service providers providing services for Colorado participants for this product | Estimated number of individual plan/arrangement participants anticipated in Colorado in 2024 | Estimated number of households plan/arrangement participants anticipated in Colorado in 2024 | Estimated number of employer groups plan/arrangement participants anticipated in Colorado in 2024 | Estimated number of individual Colorado participants associated with the employers in in 2024 |
|---|---|---|---|---|---|---|
| Altrua Ministries | 0 | - | 264 | 141 | 0 | 0 |
| Christian Care Ministry, dba Medi-Share | 34 | - | 12,951 | 4,934 | - | - |
| Christian Healthcare Ministries | 24 | 13 | 10,382 | 4,806 | 24 | 289 |
| Impact Health Sharing | 0 | 0 | 410 | 18,000 | 0 | 0 |
| Jericho Share | 0 | 1 | 2,750 | 1,801 | - | - |
| Knew Health | 1 | 0 | 375 | 200 | 1 | 2 |
| Liberty HealthShare | 2 | 11 | 1,350 | 2,807 | 3 | 6 |
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | 0 | 0 | 230 | N/A | 0 | 0 |
| OneShare | - | - | 2,116 | 1,098 | 0 | 0 |

| Organization | The total number of employer groups in Colorado that participated in this product | Number of contracts entered into with health care service providers providing services for Colorado participants for this product | Estimated number of individual plan/arrangement participants anticipated in Colorado in 2024 | Estimated number of households plan/arrangement participants anticipated in Colorado in 2024 | Estimated number of employer groups plan/arrangement participants anticipated in Colorado in 2024 | Estimated number of individual Colorado participants associated with the employers in in 2024 |
|---|---|---|---|---|---|---|
| Samaritan Ministries International | 17 | 0 | 11,320 | 3,033 | 15 | 183 |
| Sedera Medical Cost Sharing Community | 345 | 1 | 2,114 | 966 | 66 | 285 |
| Sedera, Inc. | 1 | 1 | 595 | 547 | 1 | 72 |
| Share HealthCare | 0 | 0 | 70 | 35 | 5 | 2 |
| Solidarity | N/A | N/A | 675 | 300 | 0 | 0 |
| Unite Health Share Ministries[29] | Redacted | Redacted | Redacted | Redacted | Redacted | Redacted |
| Universal Health Fellowship | N/A | 0 | 834 | 596 | N/A | N/A |
| Zion HealthShare | 0 | 1 | 5,267 | 2,802 | 0 | 0 |

---

[29] UHSM requested that data supplied on tabs 2 and 3 of the reporting template be confidential.
Resp. Ex. 1

## Appendix I: Number of HCSAs Operating in each State[30]

| State | Number of HCSAs Operating in 2023 | State | Number of HCSAs Operating in 2023 | State | Number of HCSAs Operating in 2023 |
|---|---|---|---|---|---|
| Alabama | 11 | Louisiana | 11 | Ohio | 10 |
| Alaska | 8 | Maine | 10 | Oklahoma | 10 |
| Arizona | 11 | Maryland | 8 | Oregon | 10 |
| Arkansas | 11 | Massachusetts | 9 | Pennsylvania | 8 |
| California | 11 | Michigan | 11 | Rhode Island | 10 |
| Colorado | 11 | Minnesota | 10 | South Carolina | 11 |
| Connecticut | 9 | Mississippi | 11 | South Dakota | 11 |
| Delaware | 11 | Missouri | 10 | Tennessee | 11 |
| Florida | 11 | Montana | 9 | Texas | 11 |
| Georgia | 11 | Nebraska | 11 | Utah | 11 |
| Hawaii | 8 | Nevada | 10 | Vermont | 7 |
| Idaho | 11 | New Hampshire | 10 | Virginia | 11 |
| Illinois | 9 | New Jersey | 10 | Washington | 7 |
| Indiana | 11 | New Mexico | 10 | West Virginia | 10 |
| Iowa | 9 | New York | 9 | Wisconsin | 11 |
| Kansas | 11 | North Carolina | 11 | Wyoming | 11 |
| Kentucky | 10 | North Dakota | 10 | | |

[30] Information from six HCSAs are not included in this table. One HCSA asked for their data submitted on the template to remain confidential and five did not submit these data following regulation 4-10-01. Due to ongoing litigation relating to HCSA entities and regarding the reporting requirements, the Division will not comment on individual HCSA submissions for the 2024 reporting cycle.

# EX 1.4

2/13/25, 10:53 AM                                   Alliance Of Health Care Sharing Ministries

The Wayback Machine - https://web.archive.org/web/20100315162003/http://www.healthcaresharing.org:80/hcsm/



- [Home](#)
- [About Us](#)
- [What is a health care sharing ministry?](#)
- [Blog](#)
- [Links](#)
- [Current Issues](#)

"...because Faith, Liberty, and Charity are essential to effective health care."

# What is a health care sharing ministry?

A health care sharing ministry (HCSM) provides a health care cost sharing arrangement among persons of similar and sincerely held beliefs. HCSMs are not-for-profit religious organization acting as a clearinghouse for those who have medical expenses and those who desire to share the burden of those medical expenses. These organizations are known as health care sharing ministries (HCSM).

- HCSMs receive no funding or grants from government sources.
- HCSMs are not insurance companies. HCSM do not assume any risk or guarantee the payment of any medical bill. Ten states have explicitly recognized this and specifically exempt HCSMs from their insurance codes.[1]
- HCSMs serve more than 100,000 members, with members in all fifty states.
- HCSMs' members share more than $60 million per year for one another's health care costs.
- HCSMs strive to be accessible to members regardless of their income, because traditionally shares are a fraction of the cost of insurance rates.

# History

In our nation's past, our forefathers were quite familiar with bearing one another's burdens. Mutual aid was a foundation of social welfare in the United States. Today, our mentality has moved far from that of our ancestors. We still have the mandate to bear one another's burdens, but we hardly know what that means anymore. If an emergency medical problem arises, the government or the insurance company takes care of it, and our friends, relatives and neighbors have little participation in restoring us to our former state. We don't think we need each other in the way we used to. HCSMs provide an opportunity where Christians can minister to the body of Christ while being thrifty with their money, and without ignoring their own medical needs. Medical need sharing ministries have grown in popularity and success ever since the Old Order Amish Church Fund began the modern-era of burden-bearing during the 1960's. Today, members from a broad spectrum of Christian denominations support each other's medical needs across all fifty states and around the world.

# Biblical basis

Resp. Ex. 1

A need sharing ministry is founded on the biblical mandate of believers to share each other's needs. Our goal is to apply Galatians 6:2, "Bear one another's burdens, and thus fulfill the law of Christ" to the ever-rising medical costs which can be quite burdensome for anyone, single or married, young or old. It is a principle that has been around since the birth and growth of the early Church. The book of Acts reports, "All the believers were together and had everything in common. Selling their possessions and goods, they gave to anyone as he had need," (Acts 2:44-45). These Christians are making a decision to be there for their neighbor in need and bring glory to God in the process of sharing.

# How it works

The member ministries of the Alliance publish and distribute a monthly publication to a group of committed Christian members who have offered to give a certain amount each month. This money is shared among the members to assist those with medical bills. The publication lists the current needs of its members and shows who the payment is to help that particular month. This brings Christians together to share medical bills with one another. The key is that medical needs are shared among members. The personal approach of need sharing ministries facilitates Christians to bear one another's burdens in a very tangible way. Biblical principles are foundational to health care sharing ministries and the members treat each other with respect, prayer, and genuine care.

# Testimony from a member

We are amazed at the care and generosity of God's people! We received over 200 cards and gifts from those who felt led by the Holy Spirit to help bear our financial burden! I now share with others as much as possible about this incredible ministry. We often found ourselves in tears as we read the meaningful notes of agape love and encouragement.

Michael and Mary Suitter
Hayden, ID

1Iowa Section 505.22, Kansas Section 40-202, Kentucky Revised Statute 304.1-120 (7), Maryland Article 48 Insurance Code Section 1-202(4), Missouri Section 376.1750, Oklahoma Statutes Citationized Title 36 Section110-11, Pennsylvania 40 Penn. Statute Section 23(b), Utah Section 31 A-1-103(3)(c), Virginia 38.2-6300 and 38.2-6301, Wisconsin Statute 600.01 (1) (b) 9.

home | about us | what is a hcsm? | blog | links | current issues | contact us | ©2010 Alliance of Health Care Sharing Ministries

# EX 1.5

Resp. Ex. 1



# COVERED CALIFORNIA POLICY AND ACTION ITEMS

## March 14, 2019 Board Meeting

Resp. Ex. 1

# QUALIFIED HEALTH PLAN CERTIFICATION STANDARDS AND ISSUER CONTRACTING FOR 2020

James DeBenedetti, Director, Plan Management



# 2020 QHP/QDP Certification Applications

☐ Certification Applications went live on March 1, 2019.

☐ Application Update - Covered CA has amended the marketing expectation in the Individual Marketplace Applications to :

*"Upon contingent certification, the expectation for all Applicants is to invest at least 0.6% of their individual market gross premium revenue collected (on and off exchange) on marketing and spend at least 65% of their acquisition marketing funds on DR tactics. Applicants that do not meet this expectation must provide an alternate proposal, including supporting evidence and documentation, on the Applicant's equivalent market strategies, and explain how it will better meet Covered California's expectations for enrollee acquisition and retention."*



Resp. Ex. 1

2

# 2020 Certification Update – Proposed Milestones

| | |
|---|---|
| Release draft 2020 QHP & QDP Certification Applications | December 2018 |
| Draft application comment period | December 14 – 28, 2018 |
| Plan Management Advisory: Benefit Design & Certification Policy recommendation | January 2019 |
| January Board Meeting: Discussion of Benefit Design & Certification Policy recommendation | January 17, 2019 |
| Letters of Intent Accepted | February 1 –15, 2019 |
| February Board Meeting | February 21, 2019 |
| Final AV Calculator Released* | February 2019 |
| Applicant Trainings (electronic submission software, SERFF submission and templates*) | March 1, 2019 |
| QHP & QDP Applications Open | March 1, 2019 |
| March Board Meeting: Approval of 2020 Patient-Centered Benefit Plan Designs & Certification Policy | March 14, 2019 |
| QHP Application Responses (Individual and CCSB) Due | May 1, 2019 |
| Evaluation of QHP Responses & Negotiation Prep | May - June 2019 |
| QHP Negotiations | June 2019 |
| QHP Preliminary Rates Announcement | July 2019 |
| Regulatory Rate Review Begins (QHP Individual Marketplace**) | July 2019/TBD |
| QDP Application Responses (Individual and CCSB) Due | June 1, 2019 |
| Evaluation of QDP Responses & Negotiation Prep | June – July 2019 |
| QDP Negotiations | July 2019 |
| CCSB QHP Rates Due | July 24, 2019 |
| QDP Rates Announcement (no regulatory rate review) | August 2019 |
| Public posting of proposed rates | July 2019 |
| Public posting of final rates (per CCIIO's proposed rate filing timeline) | September – October 2019 |

\* Final SERFF template dependent on CMS release

\*\* TBD = dependent on CCIIO rate filing timeline requirements

COVERED
CALIFORNIA

# 2020 STANDARD BENEFIT PLAN DESIGNS (HEALTH AND DENTAL)

James DeBenedetti, Director, Plan Management

Resp. Ex. 1



**4**

# 2019 PLANS IN THE DRAFT 2020 AV CALCULATOR

Due to AV requirements, the benefit workgroup considered a number of potential changes to cost shares for the 2020 benefit plan designs.

| | Bronze | | Silver | | | | CCSB Silver | | |
|---|---|---|---|---|---|---|---|---|---|
| | HDHP | Standard | Silver | Silver 73 | Silver 87 | Silver 94 | Copay | Coins | HDHP |
| AV Target | 60 | 60 | 70 | 73 | 87 | 94 | 70 | 70 | 70 |
| Deviation Allowance | +/-2.0% | +/-2.0% | +/-2.0% | +/-1.0% | +/-1.0% | +/-1.0% | +/-2.0% | +/-2.0% | +/-2.0% |
| 2019 AV | 61.62 | 60.94 | 71.84* | 73.90* | 87.85* | 94.21 | 71.57* | 71.90* | 70.47 |
| 2020 AV - Baseline | 62.93 | 62.39 | 73.33* | 75.40* | 88.55* | 94.54 | 73.08* | 73.39* | 71.49 |

| | Gold | | Platinum | |
|---|---|---|---|---|
| | Copay | Coins | Copay | Coins |
| AV Target | 80 | 80 | 90 | 90 |
| Deviation Allowance | +/-2.0% | +/-2.0% | +/-2.0% | +/-2.0% |
| 2019 AV | 78.06 | 81.80 | 88.90 | 91.73 |
| 2020 AV - Baseline | 79.28 | 82.75 | 89.63 | 92.18 |

*Final AV includes additive adjustment for drug copay accumulation

**Red text:** AV is outside de minimis range

**Blue text:** AV is within de minimis range

COVERED CALIFORNIA

5

# PROPOSED COST SHARE CHANGES: PLATINUM, GOLD, SILVER

**Platinum Coinsurance and Copay Plans:** Increase MOOP from $3,350 to $4,500

**Individual-only Gold Coinsurance and Copay Plans:**
- ☐ Increase MOOP from $7,200 to $7,850
- ☐ Increase cost shares for specialist visit, labs, x-rays, Tier 3 drugs, ED visit

**Individual-only Silver Plan:**
- ☐ Increase MOOP from $7,550 to $7,850
- ☐ Increase medical deductible from $2,500 to $4,000
- ☐ Increase pharmacy deductible from $200 to $300
- ☐ Increase cost shares for labs, x-rays, imaging, drugs*, ED visits

**\*Note:** One-dollar increases to Tier 1 drugs have a significant AV impact.  New Tier 1 cost shares that are not multiples of 5 reflect a cost share increase made to prevent other AV increases to commonly-used services.

Resp. Ex. 1

**COVERED CALIFORNIA**

6

# PROPOSED COST SHARE CHANGES: SILVER CSR

## Silver 73 Plan:
□ Increase MOOP from $6,300 to $6,550
□ Increase medical deductible from $2,200 to $3,700
□ Increase pharmacy deductible from $175 to $275
□ Increase cost shares for labs, x-rays, imaging, drugs*, ED visits

## Silver 87 Plan:
□ Increase MOOP from $2,600 to $2,700
□ Increase medical deductible from $650 to $1,400
□ Increase pharmacy deductible from $50 to $100
□ Increase cost shares for labs, x-rays, drugs*, ED visits

## Silver 94 Plan: No changes

**\*Note:** One-dollar increases to Tier 1 drugs have a significant AV impact.  New Tier 1 cost shares that are not multiples of 5 reflect a cost share increase made to prevent other AV increases to commonly-used services.

Resp. Ex. 1

**COVERED CALIFORNIA**

# PROPOSED COST SHARE CHANGES: BRONZE

**Bronze:**

☐ Increase MOOP from $7,550 to $7,850

☐ Decrease member coinsurance from 100% to 40%

☐ Decrease office visit copays by $10

☐ Decrease Tier 1 drug cost share from 100% member coinsurance (up to $500) after the pharmacy deductible to $18* after pharmacy deductible

**\*Note:** One-dollar increases to Tier 1 drugs have a significant AV impact.  New Tier 1 cost shares that are not multiples of 5 reflect a cost share increase made to prevent other AV increases to commonly-used services.

Resp. Ex. 1

COVERED
CALIFORNIA

8

# PROPOSED COST SHARE CHANGES: CCSB-ONLY PLANS

**NEW CCSB-only Gold Plans:**

☐ $7,850 MOOP

☐ $250 medical deductible (no pharmacy deductible)

☐ $25 primary care visits / $50 specialist visits

☐ Medical deductible applies to ED visits, inpatient admissions, skilled nursing facilities, and medical transportation

**CCSB-only Silver Plans:**

☐ Increase MOOP from $7,550 to $7,850

☐ Increase medical deductible from $2,000 to $2,250

☐ Increase pharmacy deductible from $200 to $300

☐ Increase cost shares for office visits, x-rays, imaging, drugs*, ED visits

☐ Applied the medical deductible to ED visits

**\*Note:** One-dollar increases to Tier 1 drugs have a significant AV impact.  New Tier 1 cost shares that are not multiples of 5 reflect a cost share increase made to prevent other AV increases to commonly-used services.

Resp. Ex. 1

COVERED
CALIFORNIA

# CHANGE: MEDICAL TRANSPORTATION

Covered California proposes removing the deductible from Medical Transportation (Emergency and Non-Emergency) in the following plan designs*:

☐ Individual-only Silver plan

☐ CSR Silver plans

This change will not impact the plan design AV.

*The plan design documents presented for Board discussion on 2/21 indicated removal of the deductible from medical transportation on the CCSB-only plan designs as well.  We are proposing to retain the deductible to align with the deductible applying to ED services.  The plan design documents presented today reflect this change.



# BRONZE HDHP

Plan Management convened the 2020 Benefit Design Workgroup to discuss options for resolving the Bronze HDHP actuarial value (AV) issue and developed the following path forward:

☐ The Bronze HDHP presented in the plan design documents has a MOOP/deductible of $6,950 and meets the AV requirements at 61.97%. The IRS will release the annual limit for the MOOP in May.

☐ Continuing to work internally and with stakeholders to find a solution for offering a Bronze HDHP that meets all requirements

Resp. Ex. 1



# 2021 VALUE-BASED INSURANCE DESIGN (VBID) PILOT

Covered California is exploring a pilot VBID program for select regions for the 2021 plan year for the most prevalent chronic conditions, including diabetes, chronic obstructive pulmonary disease (COPD), and hypertension.  Specifics of the program will be developed over the next few months and will be informed by:

☐  VBID-X – National Workgroup on VBID for the Exchanges

☐  Issuer VBID programs (i.e. already in place or in the development stage)

☐  Input from researchers, stakeholders, etc.

Resp. Ex. 1

# CERTIFIED AGENT POLICIES REGARDING AFFORDABLE CARE ACT NON-COMPLIANT PRODUCTS

Doug McKeever, Chief Deputy Executive Director, Program

Resp. Ex. 1



# CONSUMER PROTECTION POLICY RESEARCH REGARDING AFFORDABLE CARE ACT NON-COMPLIANT PRODUCTS

☐ There are many health care products being marketed today to consumers that may not be compliant with the Affordable Care Act and its consumer protection provisions

☐ Unlike the rest of the nation, California has taken measures to protect consumers from many of these products including short-term medical plans, but there are some non-insurance products being sold in California that pose significant financial risk to consumers

☐ Californian consumers have been targeted by extensive marketing and media campaigns in the last year

Resp. Ex. 1



# AGENT COMMENTS

**Covered California received comments from various stakeholders about establishing standards regarding Certified Agents selling ACA non-compliant plans (particularly Sharing Ministries)**

**Agent Comments**

☐ Comments received from 88 agents as of March 8, 2019 (complete list of comments available [HERE](#))

☐ Comments reflected a wide diversity of opinion, with many respondents supporting Covered California taking action — ranging from banning the sale of Sharing Ministries to requiring disclosure — and many opposing Covered California taking any action.  Among the "buckets" or responses from agents submitting comments were:

- Prohibit certified agents from selling Sharing Ministry plans: 16 support; 14 oppose

- Covered California should establish disclosure policies: 7 support; 5 oppose

- Sharing Ministry plans should be an alternative when no other coverage option fits (e.g., SEP when no QLE exists, subsidy ineligible): 27 support; 18 oppose



Resp. Ex. 1

# STAKEHOLDER COMMENTS

**California Association of Health Underwriters Comments**

- The Association that represents agents on legislative matters recommended:
  - No action taken against Sharing Ministry plans
  - Working with Covered California to create a disclosure form for agents to better inform consumers, the use of which would be a voluntary best practice (full comment viewable on page 20 HERE)

**Sharing Ministry Comments**

- Covered California received comment from one Sharing Ministry plan, Christian Care Ministry, which provided clarification on the scope and nature of their benefits, noted broad agreement with concept of requiring disclosure, and provided an example of disclosure they provide

**Qualified Health Plan Comments**

- During regular meetings with QHP carriers, all 11 supported Covered California taking some action, with most supporting disclosure requirements

Resp. Ex. 1

# COVERED CALIFORNIA: STAFF RECOMMENDATION & NEXT STEPS

- As a result of research to date, more non-Qualified Health Plan products have been identified in addition to Sharing Ministries

- Covered California will be conducting additional research to discover the array of non-QHP products and their implications for consumers and the market

- Some of these products may not be compliant with the Affordable Care Act (ACA)

- Covered California staff expects to bring to the Board a recommendation requiring a disclosure statement with all ACA non-compliant products listed, based on research to be conducted

- This disclosure will be created with input from the Department of Managed Health Care, the California Department of Insurance, the Certified Agent community, consumer advocates and Covered California's Qualified Health Plans in order to address all ACA non-compliant products

Resp. Ex. 1



# BACKGROUND MATERIALS

## CERTIFIED AGENT POLICIES REGARDING AFFORDABLE CARE ACT NON-COMPLIANT PRODUCTS

Resp. Ex. 1



# TAKING A CLOSER LOOK AT HOW HEALTH CARE SHARING MINISTRY PLANS WORK

| | Covered California Health Net HMO *Standard Silver Plan* | Aliera *AlieraCare Plus Plan* | Liberty *Liberty Complete Plan* | Christian Care Ministry *Medi-Share Plan* |
|---|---|---|---|---|
| Deny Coverage for Health Status | No | Yes | Yes | N/A*1 |
| Coverage for Pre-Existing Conditions | Yes | No | No | Limited, only after 36 months' payments*1 |
| Minimum Essential Benefit Coverage | Yes | No | No | No |
| Enrollment Fee | No | $125 | $135 | $50 |
| Agent Commission | 2.6% | 15-20% | 15-20% | 15-20% |
| Monthly Premium | $351 without subsidy $220 with subsidy | $193 | $299 | $281 |

**\*Per 03/08/2019 communication from Christian Care Ministry, some data has been updated for this 03/14/2019 presentation**
**\*1 All cost sharing benefits are subject to qualification, variable member contributions, and continuation of shared beliefs**

Resp. 15-A II

COVERED CALIFORNIA

**DISCLAIMER: The information presented here is for illustrative comparison only and shows possible coverage for a single 30-year-old in California. Data presented is taken from each Ministry's public-facing website or plan summaries and may be incomplete.**

10

# BENEFIT COMPARISONS: SILVER PLAN & HCSMS

| | Covered California Health Net HMO *Standard Silver Plan* | Aliera *AlieraCare Plus Plan* | Liberty *Liberty Complete Plan* | Christian Care Ministry *Medi-Share Plan* |
|---|---|---|---|---|
| Lifetime Maximum | Unlimited | $250,000 per incident $1,000,000 lifetime | $1,000,000 per incident | Unlimited*[1] |
| Annual Out-of-Pocket Maximum | $7,550 | $7,500 | None | N/A*[1] |
| Annual Deductible | $2,500 | $5,000 | $1,000 | $1,750 |
| Primary Care Office Visit | Unlimited | 3 annual visits | 1 annual visit | N/A*[1] |
| Emergency Room | $350 copay | $500 copay | Variable | Variable[1] |
| Prescription Drugs | Copays after $200 Rx deductible | Not Covered / Discount Card | Not Covered / Discount Card | Variable [1] |
| Maternity | 20% coinsurance after deductible | Not Covered | Variable | Variable[1] |

*Per 03/08/2019 communication from Christian Care Ministry, some data has been updated for this 03/14/2019 presentation
1: All cost sharing benefits are subject to qualification, variable member contributions, and continuation of shared beliefs

Resp. Ex. 1

COVERED CALIFORNIA

**DISCLAIMER: The information presented here is for illustrative comparison only and shows possible coverage for a single 30-year-old in California. Data presented is taken from each Ministry's public-facing website or plan summaries and may be incomplete.**

20

# CHRISTIAN CARE MINISTRY SAMPLE DISCLOSURE

☐ In an email sent to <u>OutreachandSales@covered.ca.gov</u> on March 8, 2019, Christian Care Ministry shared the following sample disclosure:

▪ Medi-Share is administered on behalf of its members by Christian Care Ministry, Inc (CCM). It is important to understand that Medi-Share is distinctly different than insurance.  Medi-Share does not pool money and does not pay members' bills.  There are no guarantees, contracts, or transfer of risks or responsibilities of the members' medical bills.  Medi-Share facilitates member-to-member (peer-to-peer) sharing of medical expenses through individually owned Sharing Accounts as governed by our Member-Voted Guidelines.  Providers are paid by the members and not by Medi-Share.



Resp. Ex. 1

21

# CHRISTIAN CARE MINISTRY FULL RECOMMENDATION

☐ In an email sent to [OutreachandSales@covered.ca.gov](mailto:OutreachandSales@covered.ca.gov) on March 8, 2019, Christian Care Ministry provided the following recommendation:

■ We agree that consumers need to be protected and equipped to make informed decisions about their healthcare solutions. That is why we support the recommendation to require Covered California Certified Agents to provide clear information about the risks and benefits of Sharing Ministry programs before enrolling the consumer (including that the program is not a Covered CA plan and full agent commission disclosure). In fact, any prospective agent who wishes to represent Medi-Share to potential members must first undergo a thorough training and certification program ensuring full disclosure that Medi-Share is not insurance.

Resp. Ex. 1



# POTENTIAL AGENT PAYMENT STANDARDS AS PART OF
# QUALIFIED HEALTH PLAN CONTRACTS

Doug McKeever, Chief Deputy Executive Director, Program

Resp. Ex. 1



# COVERED CALIFORNIA EVALUATION OF AGENT COMMISSIONS

One out of two Covered California consumers relies on certified insurance agents for assistance.  Because agents serve an important role in helping Californians enroll in and use their health plan benefits, Covered California conducted an evaluation of agent compensation programs.  We identified four key takeaways for further exploration:

1.  Looking at agent compensation as one component of total acquisition costs and impact to consumers
2.  Evaluating adequacy of compensation programs
3.  Recognizing the value to the independent agent channel to have predictable revenue streams to plan and invest in their operations
4.  Ensuring agent incentives align with consumer protections



Resp. Ex. 1

# AGENT AND STAKEHOLDER OUTREACH

- Outreach and Sales conducts continued outreach to all 14,000 Certified Agents, Qualified Health Plans, regulators, and advocates

- Outreach and Sales held an agent webinar on March 1, 2019, after the February Board meeting, which 388 agents attended

  - Outreach and Sales discussed the information available about agent commissions and presented Covered California's observations and concerns



Resp. Ex. 1

25

# AGENT COMMENTS

**Covered California received comments from various stakeholders about establishing standards regarding Plans' commission payments to agents**

## Agent Comments

☐ Comments received from 111 agents as of March 8, 2019 (complete list of comments available <u>HERE</u>)

☐ Nearly all agents want Covered California to "take action" (only 4 of 111 that commented said "market forces" should be allowed to determine commissions); however, there was a mix of action requested. Major "buckets" of comments were:

- Act to increase commissions paid to agents (about 30% of comments)

- Act to prevent commissions from declining further (about 14% of comments)

- Act (or encourage the Department of Health Care Services to act) to pay agents for work related to enrolling consumers in Medi-Cal (about 17% of comments)

Resp. Ex. 1

COVERED CALIFORNIA

# AGENT COMMENTS

**Covered California received comments from various stakeholders about establishing standards regarding Plans' commission payments to agents**

**Major Themes from Agent Comments**

- Enrolling consumers into the Individual Market is becoming a losing proposition
- Current Commission payments often do not amount to a "living wage"
- Agents assist Medi-Cal enrollees, yet are not compensated…and should be
- Covered CA should take over commission payments
- Every Year premiums go up and commissions go down
- The Medical Loss Ratio rules should be revised so agents get paid more
- Enrollment is complicated and very time consuming


Resp. Ex. 1

# STAKEHOLDER COMMENTS

**California Association of Health Underwriters Comments**

- The Association that represents agents on legislative matters commented:

  - Appreciated Covered California's recognition that agents are the bedrock of enrollment

  - Recommended Covered California conduct a study on minimum fair and consistent agent compensation before pursuing any Board action and offered support to produce this data-driven study (full comment viewable on page 25 HERE)

**Qualified Health Plan Comments**

- During regular meetings with Qualified Health Plan (QHP) carriers, all 11 opposed Covered California taking action

- However, if Covered California were to take action:

  - 1 QHP noted the "least bad" action would be to establish policies related to lowering commissions

  - 1 QHP noted the "least bad" action would be to establish a minimum commission

Resp. Ex. 1

COVERED CALIFORNIA

https://hbex.coveredca.com/toolkit/webinars-briefings/downloads/BSC_Comments_on_CC_Policy_Regarding_Agent_Payment_Standards.pdf

**28**

# RECOMMENDATION: NO ACTION AT THIS TIME

☐ After discussions with Covered California's QHPs, we have received a voluntary commitment from the 3 Qualified Health Plans (Anthem, Blue Shield of California, and Kaiser) whose current commissions without bonuses are below the 1.7% weighted average of all plans to not lower agent commissions below today's commission levels for the next 2 years (plan years 2020 and 2021)

   ☐ With this commitment, we believe that rather than take any action, Covered California should conduct further research before making a recommendation to the board on actions it might take regarding agent compensation

☐ In order to develop recommendations, Covered California will review the range of inputs needed to promote broad enrollment and a healthy risk mix, including total acquisition costs (including commissions, bonuses, and marketing expenses made by Covered California and its QHPs), market and regulatory conditions, and agent engagement

☐ This action is based, in part, on the anticipation that California may enact an individual coverage penalty that would increase enrollment in 2020 and that there will not be other major federal or market activities that disrupt the individual market. In the event there are major disruptions, Covered California may revisit the need to establish a binding policy of some sort



Resp. Ex. 1

# BACKGROUND MATERIALS

## POTENTIAL AGENT PAYMENT STANDARDS
## AS PART OF QUALIFIED HEALTH PLAN CONTRACTS



Resp. Ex. 1

# AGENT COMMISSION TRENDS IN CALIFORNIA, 2013-2019

□ Consumer demand for decision-support from agents has remained steady while agent compensation has declined

□ Agents earned 7% of premium in 2013 and 2.4% of premium in 2018



Pre-ACA to 2018
**Total California Individual Market**
**Premium, Enrollment, and Agent Commissions**
(on and off-exchange enrollment)



# 2019 SURVEY OF HEALTH PLAN COMMISSION PROGRAMS

| Health Plan | 2013 Agent Commission | | 2019 Agent Commission | |
|---|---|---|---|---|
| | Commission per member per month dollar amount | Commission percentage of premium | Commission per member per month dollar amount | Commission percentage of premium |
| Highest Plan | | | $25 | 4.2% |
| Lowest Plan | | | $5 | 0.9% |
| **All Plans Weighted AVG** | **$20** | **7%** | **$11** | **1.7%** |



Resp. Ex. 1

# PROPOSED NEW NAVIGATOR FUNDING MODEL 2019 TO 2022

Robert Kingston, Sales Operations Chief, Outreach and Sales Division



Resp. Ex. 1

# THE IMPORTANCE OF NAVIGATOR OUTREACH

☐ Navigators are unique from Certified Agents in their regulatory responsibility to conduct outreach and education

☐ Covered California has heard stakeholders' concerns about social media:

- There are many ways to fulfill the outreach commitment, including earned and paid media, and local community events

- We are committed to helping Grantees with the newly-incorporated social media expectations

- There is some compelling data supporting the value of social media channels for Navigator-targeted consumers

Resp. Ex. 1

COVERED
CALIFORNIA

# WHY SOCIAL MEDIA MATTERS: SMARTPHONES INCREASE ACCESS TO CONSUMERS



% of U.S. adults who own the following devices

□  77% of all Americans own a smartphone

Resp. Ex. 1

Pew Research Center, February 2018

# A MAJORITY OF NAVIGATOR-TARGETED POPULATIONS OWN SMARTPHONES IN 2018

% of U.S. adults who own the following devices

|  | Any cellphone | Smartphone | Cellphone, but not smartphone |
|---|---|---|---|
| White | 94% | 77% | 17% |
| Black | 98% | 75% | 23% |
| Hispanic | 97% | 77% | 20% |
| Less than high school graduate | 90% | 57% | 33% |
| High school graduate | 92% | 69% | 24% |
| Less than $30,000 | 92% | 67% | 25% |
| $30,000-$49,999 | 98% | 82% | 15% |

**As of 2018, the following targeted populations own smartphones:**

☐ 75% of African Americans

☐ 77% of Latinos

Resp. Ex. 1

COVERED CALIFORNIA

Pew Research Center, February 2018

36

# SOCIAL MEDIA REACHES NAVIGATOR-TARGETED POPULATIONS BY FPL



% of U.S. adults who use at least one social media site, by income

☐ 63% of Americans under 250% of FPL use at least 1 social media platform

☐ 74% of Americans 250-400% of FPL use at least 1 social media platform

Resp. Ex. 1
Pew Research Center, March 2018, "Social Media Use in 2018"

37

# SOCIAL MEDIA REACHES NAVIGATOR-TARGETED POPULATIONS BY RACE



% of U.S. adults who use at least one social media site, by race

- □ 72% of Latinos use at least 1 social media platform

- □ 69% of African Americans use at least 1 social media platform



Resp. Ex. 1

Pew Research Center, March 2018, "Social Media Use in 2018"

# SOCIAL MEDIA CREATES THE POTENTIAL FOR DAILY NAVIGATOR CONTACT WITH CONSUMERS



*Among the users of each social media site, the % who use that site with the following frequencies*

**As of 2018, social media users are *frequent* users:**

☐ 74% of Facebook users access daily

☐ 60% of Instagram users access daily

☐ 46% of Twitter users access daily

Resp. Ex. 1
Pew Research Center, March 2018, "Social Media Use in 2018"

# PLATFORM PREFERENCE VARIES BY TARGETED POPULATION

## Use of different online platforms by demographic groups

*% of U.S. adults who say they use ...*

| | Facebook | YouTube | Pinterest | Instagram | Snapchat | LinkedIn | Twitter |
|---|---|---|---|---|---|---|---|
| Total | 68% | 73% | 29% | 35% | 27% | 25% | 24% |
| Men | 62 | 75 | 16 | 30 | 23 | 25 | 23 |
| Women | 74 | 72 | 41 | 39 | 31 | 25 | 24 |
| White | 67 | 71 | 32 | 32 | 24 | 26 | 24 |
| Black | 70 | 76 | 23 | 43 | 36 | 28 | 26 |
| Hispanic | 73 | 78 | 23 | 38 | 31 | 13 | 20 |
| Ages 18-29 | 81 | 91 | 34 | 64 | 68 | 29 | 40 |
| 18-24 | 80 | 94 | 31 | 71 | 78 | 25 | 45 |
| 25-29 | 82 | 88 | 39 | 54 | 54 | 34 | 33 |
| 30-49 | 78 | 85 | 34 | 40 | 26 | 33 | 27 |
| 50-64 | 65 | 68 | 26 | 21 | 10 | 24 | 19 |
| 65+ | 41 | 40 | 16 | 10 | 3 | 9 | 8 |

☐ Instagram is more popular with Black consumers

☐ Facebook is more popular with Hispanic consumers

☐ Twitter is more popular with young consumers



Resp. Ex. 1

1: Pew Research Center, March 2018, "Social Media Use in 2018"

40

# PLATFORM PREFERENCE VARIES BY FPL, EDUCATION, AND GEOGRAPHIC LOCATION

## Use of different online platforms by demographic groups

*% of U.S. adults who say they use ...*

|  | Facebook | YouTube | Pinterest | Instagram | Snapchat | LinkedIn | Twitter |
|---|---|---|---|---|---|---|---|
| <$30,000 | 66 | 68 | 20 | 30 | 23 | 13 | 20 |
| $30,000-$49,999 | 74 | 78 | 32 | 42 | 33 | 20 | 21 |
| $50,000-$74,999 | 70 | 77 | 34 | 32 | 26 | 24 | 26 |
| $75,000+ | 75 | 84 | 39 | 42 | 30 | 45 | 32 |
| High school or less | 60 | 65 | 18 | 29 | 24 | 9 | 18 |
| Some college | 71 | 74 | 32 | 36 | 31 | 22 | 25 |
| College+ | 77 | 85 | 40 | 42 | 26 | 50 | 32 |
| Urban | 75 | 80 | 29 | 42 | 32 | 30 | 29 |
| Suburban | 67 | 74 | 31 | 34 | 26 | 27 | 23 |
| Rural | 58 | 59 | 28 | 25 | 18 | 13 | 17 |

☐ LinkedIn is popular with college-educated consumers

☐ Twitter is popular in urban areas

☐ Facebook and Instagram are popular with consumers in the 250-400% FPL range



Resp. Ex. 1

1: Pew Research Center, March 2018, "Social Media Use in 2018"

41

# PROPOSED NAVIGATOR OUTREACH ACTIVITY GOALS

| Category | Point(s) Earned | Qualifying Activity |
|---|---|---|
| Events | 3 | Each event reported (note: office hours do not constitute events) |
| Paid Media | 1 | Every $100 spent on advertising promoting Covered California enrollment |
| Earned Media | 10 | Each documented instance of earned media |
| Twitter | 1 | 1 point earned per month (max) for 4 tweets from account with min. 1,000 followers |
| Facebook | 1 | 1 point earned per month (max) for 2 posts |
| Instagram | 1 | 1 point earned per month (max) for 2 posts |
| LinkedIn | 1 | 1 point earned per month (max) for 2 posts |

- We heard you and agree: Outreach is more than social media
- Additional changes have been based on stakeholder feedback
- Many paths to success – any combination will meet the requirement
- Expectations scale with grant size (50 points for $50,000 award, 300 points for $500,000 award)
- Performance may impact year over year award adjustments
- This will be a work in progress, and goals may be adjusted year over year



Resp. Ex. 1

# SAMPLE OF POTENTIAL NAVIGATOR FUNDING AND GOALS

| Grant Funding | Goal Amount | CPE* | | Grant Funding | Goal Amount | CPE* |
|---|---|---|---|---|---|---|
| $50,000 | 286 | $175 | | $300,000 | 1,714 | $175 |
| $75,000 | 429 | $175 | | $325,000 | 1,857 | $175 |
| $100,000 | 571 | $175 | | $350,000 | 2,000 | $175 |
| $125,000 | 714 | $175 | | $375,000 | 2,143 | $175 |
| $150,000 | 857 | $175 | | $400,000 | 2,286 | $175 |
| $175,000 | 1,000 | $175 | | $425,000 | 2,429 | $175 |
| $200,000 | 1,143 | $175 | | $450,000 | 2,571 | $175 |
| $225,000 | 1,286 | $175 | | $475,000 | 2,714 | $175 |
| $250,000 | 1,429 | $175 | | $500,000 | 2,857 | $175 |
| $275,000 | 1,571 | $175 | | | | |

## $6.5 MM total program budget

☐ Most current Navigators likely to receive same funding as today

☐ If individual mandate penalty returns and affordability measures increase enrollments, both the goals would go up and the CPE would likely be adjusted down to reflect the new trend

☐ **Note: both "Goal" and CPE to be adjusted in RFA to reflect actual enrollments**



Resp. Ex. 1

* Cost Per Effectuation

43

# RECOMMENDATION TO THE BOARD

- Covered California is recommending that the solicitation for the 2019-22 Navigator Request For Application be approved by the board with the following major direction:

  - Target funding of $6,500,000 for 2019-20

  - Specific enrollment goals and cost per effectuation ("CPE") be adjusted annually

  - Enrollment targets reflect new enrollments and renewals

  - Performance-based contracts with: (1) adjustments within a year based on performance compared to target and (2) upward or downward targets from year-to-year

  - Assessment of Response to RFA and annual performance reviews based on outreach activities, including potential of in-person, as well as earned, paid and social media outreach

- The Request for Application will include pertinent details regarding the program updates including effectuations based goals, productivity based payments, outreach expectations, and targeted areas pilot

Resp. Ex. 1

# BACKGROUND MATERIALS

## PROPOSED NEW NAVIGATOR FUNDING MODEL 2019 TO 2022



Resp. Ex. 1

# NAVIGATOR PROGRAM STAKEHOLDER OUTREACH

Staff discussed proposed program updates with Navigators and made changes based on the feedback received

□ Round Table Discussions – August 2018

□ Monthly Productivity Reports – September 2018 through March 2019

□ Informal Site Visits – October/November 2018

□ Program Webinar – December 2018

□ Funding and Scope of Work Webinar/Work Group – February 2019

□ Round Table Discussions – March 2019

□ Public Comments Available between February 21 and March 8, 2019 – No formal comments submitted

Resp. Ex. 1

# NEXT STEPS AND TIMELINE

| Activity | Approximate Date |
|---|---|
| Release Navigator RFA Solicitation | March 19, 2019 |
| Response to Questions Posted on Exchange Website | March 25, 2019 |
| Letter of Intent to Respond Due (Optional) | March 25, 2019 |
| Application Due | April 5, 2019 |
| Grant Application, Evaluation, and Selection Process | April 8, 2019 – April 30, 2019 |
| Notification of Intent to Award Posted on the Exchange's Website | May 16, 2019 |
| Last Day to Submit Protest | May 22, 2019 |
| Navigator Grant Award Period | July 1, 2019 – June 30, 2022 |



Resp. Ex. 1

# COVERED CALIFORNIA'S NAVIGATOR PROGRAM TODAY

- □ $6.475 million annual program funding
- □ Over 100 awardees (42 lead Navigator grantees and 60 subcontractors)
- □ Navigators enroll, educate and provide assistance to consumers and they conduct outreach activities including targeted population strategies, public enrollment, media, and publicity events
- □ Navigator grants are based on performance goals that count consumer plan selections and some but not all renewals

| Grant Year | Total Grant Funding | # of Entities | Grant Funding Range | Number of Effectuations | Average Grant |
|------------|--------------------|--------------|--------------------|------------------------|--------------|
| **2018-19** | **$6,475,000** | **42** | **$50,000-$500,000** | **Ongoing** | **$154,167** |
| 2017-18 | $6,425,000 | 43 | $50,000 - $500,000 | 40,355 | $149,419 |
| 2016-17 | $7,100,000 | 46 | $50,000 - $500,000 | 35,858 | $154,348 |
| 2015-16 | $10,550,000 | 69 | $50,000 - $500,000 | 40,096 | $152,899 |
| 2014-15 | $10,886,569 | 65 | $25,000 - $500,000 | 77,457 | $167,486 |

Resp. Ex. 1



48

# COVERED CALIFORNIA'S NAVIGATOR PROGRAM REFRESH

Potential Request for Application (RFA) for 2019 – 2022 to be released March 2019

- ☐ Navigators chosen on RFA selection criteria (competitive process)
  - Geographic reach
  - Ability to reach targeted populations (Latinos, African Americans, etc.)
  - Ability to meet or exceed effectuated enrollment targets
  - Outreach activities to include community events, paid, earned, and social media

- ☐ Current grantees must reapply; funding awards will be made in accordance with the RFA scoring methodology
  - Past performance will be considered for future selection

- ☐ Navigator grants will be awarded in increments of $25,000 with a minimum award at $50,000

Resp. Ex. 1



# COVERED CALIFORNIA'S NAVIGATOR PROGRAM PROPOSED PERFORMANCE EXPECTATIONS

☐ Navigators receive enrollment goals

☐ Navigator grant funds distributed in five equal payments with final payment to increase or decrease based on count of effectuated enrollment.  Can go up/down by $30 per effectuated enrollment if above/below goal

☐ Navigators receive outreach activities goals

☐ RFA includes option to apply for additional funds to target one or more of four areas with low navigator presence

Resp. Ex. 1



# PROPOSED CHANGES TO FUNDING MODEL FOR COVERED CALIFORNIA NAVIGATORS

|  | Plan Selections counted toward enrollment goal | New Effectuated Enrollments counted toward enrollment goal | Active Renewals counted toward enrollment goal | Passive Renewals counted toward enrollment goal | Events, Earned, Paid, & Social Media included in Scope of Work |
|---|---|---|---|---|---|
| **OLD MODEL** | ✓ | NO | ✓ | NO | NO |
| **NEW MODEL** | NO | ✓ | ✓ | ✓ | ✓ |

Resp. Ex. 1



51

# NEW FUNDING TO REACH TARGETED AREAS

☐ Navigators may apply to receive $25,000 funding above core funding to target one of four rural regions

| Meta-Regions | # of target zip codes | Total Population 2017 |
|---|---|---|
| Greater Yosemite | 10 | 46,091 |
| San Bernardino County | 8 | 34,885 |
| North of Redding | 8 | 26,270 |
| Sierra Foothills | 11 | 47,630 |
| Grand Total | 37 | 154,876 |

Resp. Ex. 1



52

# BENCHMARK COMPARISON FOR ESTABLISHING FUNDING FOR NAVIGATORS

- Covered California cost per acquisition benchmark (CCA CPA) of $82 is based on marketing expense as a share of lifetime value of account annualized

- $25/hr basis for hour's salary benchmark

- Weighted average agent commission is $132 per member per year

- 2017-18 average funding vs. new model productivity equals $155 for today's Navigator funding benchmark



Cost Per Effectuation

| | CCA CPA | 4 hours' salary | 5 hours' salary | Current Agent commission | 6 hours' salary | 2017-18 Navigator Average CPE | 7 hours' salary |
|---|---|---|---|---|---|---|---|
| | $82 | $100 | $125 | $132 | $150 | $155 | $175 |

| | CCA CPA | 4 hours' salary | 5 hours' salary | Current Agent commission | 6 hours' salary | 2017-18 Navigator Average CPE | 7 hours' salary |
|---|---|---|---|---|---|---|---|
| **Total Navigator Grant assuming 41,000 effectuation basis -** | **$3.8MM** | **$4.4MM** | **$5.3MM** | **$5.5MM** | **$6.1MM** | **$6.3MM** | **$6.8MM** |
| **Grant as a % of Covered California 2018-19 $340MM budget -** | **1.1%** | **1.3%** | **1.6%** | **1.6%** | **1.8%** | **1.8%** | **2.0%** |



Resp. Ex. 1

53

# COVERED CALIFORNIA NAVIGATOR PROPOSED SCOPE OF WORK 2019-2022

The following is a broad scope of the major expectations of Navigator organizations.

☐ Agree to a performance goal, assist consumers enroll with Covered California, and maintain expertise in eligibility and enrollment

☐ Submit strategic work plan and campaign strategy, submit bi-monthly reports, collaborate with Covered California staff on outreach efforts, and serve underserved or vulnerable populations

☐ Ensure consumer assistance is culturally and linguistically appropriate for population served, accessibility to consumers with disabilities, and that no consumer is left behind

☐ Ensure that counselors comply with program requirements such as annual training and certification, following policy, and maintaining active contact information

☐ **NEW FOR 2019 – Promote Covered California eligibility and enrollment through earned media and social media platforms and report key metrics on a bi-monthly basis**



Resp. Ex. 1

# NEW FUNDING TO REACH TARGETED AREAS

☐ Navigators currently reach 72% of population within 15-minute drive time

☐ Navigators + uncompensated Certified Application Entities reach 91% of population within 15-minute drive time

☐ Densely-populated urban areas have an adequate certified counselor presence

☐ Identified 37 zip codes that are not within 15-minute drive time of certified counselor locations where total resident population in zip code exceeds 1,000 people

☐ Grouped zip codes by meta-region to establish "sales territories" for pilot project

Resp. Ex. 1



# CERTIFIED APPLICATION COUNSELOR PROGRAM PERMANENT REGULATIONS FOR ADOPTION

Brian Kearns, Attorney, Office of Legal Affairs

Resp. Ex. 1



# CERTIFIED APPLICATION COUNSELOR PROGRAM

☐  The Office of Legal Affairs requires Board approval to complete the permanent rulemaking process for the Certified Application Counselor (CAC) regulations.

☐  The CAC regulations are currently emergency regulations. This rulemaking package seeks to make all emergency regulations permanent. The Board previously approved the emergency regulations on April 6, 2015.

☐  The Office of Legal Affairs commenced the permanent rulemaking process on December 28, 2018, by providing notice to all interested parties.

☐  The 45-day public comment period ran from December 28, 2018, to February 11, 2019. A 15-day public comment period commenced on February 20, 2019, and concluded on March 8, 2019.

COVERED CALIFORNIA

# CERTIFIED APPLICATION COUNSELOR PROGRAM

☐ The Office of Legal Affairs received some comments seeking clarification regarding the proposed regulations. There were no major comments requiring changes to the regulation package.

☐ The final regulation package will look very similar to the current emergency regulations.

☐ As discussed in the previous Board meeting, there are two noteworthy changes to Section 6854(a) and Section 6860(d). Section 6854(a) has been amended to clarify that any person with legal authority can execute the Certified Application Entity agreement on behalf of the entity. Section 6860(d) has been updated to include a deadline to complete annual recertification training.

Resp. Ex. 1

COVERED
CALIFORNIA

# CERTIFIED APPLICATION COUNSELOR PROGRAM

☐ Government Code section 100500(a)(6) requires the Board to discuss proposed regulations at a properly noticed meeting before adopting them.

☐ The Board discussed the regulation package during the Board meeting on February 21, 2019.

☐ The Office of Legal Affairs now requests the Board to formally adopt the regulation package so it can be filed with the Office of Administrative Law.

Resp. Ex. 1

# EX 1.6

Resp. Ex. 1



Menu ⌄

Our website is undergoing maintenance. Some information may be outdated.

For the most up to date information, please contact Member Services at 855-973-3372.



# The History of Medical Cost Sharing

*Date Published: 2023-09-12*

*Author: Team Sedera*

America's healthcare system is ever-

# EX 1.7



(https://www.onesharehealth.com)

# EASY ENROLLMENT

## A Health Care Sharing Ministry That Puts Its Members First.

"Carry each other's burdens, and in this way you will fulfill the law of Christ." Galatians 6:2 (NIV)

**View Programs (Https://Www.Onesharehealth.Com/En/Memberships)**



### Who is OneShare Health?

Our Mission as a Health Care Sharing Ministry is to help Christians share each other's medical expenses by providing afforda⁺ ⁺haring programs which align with their beliefs. With origins in the Anabaptist faith and a chaplain on staff, we welcome and unite th⁺ ⁺o agree with our core biblical principles and Statement of Beliefs relating to life, health, and caring for others.

Hello, welcome to OneShare Health! My name's Josh and I'm an automated OneShare Bot.

Resp. Ex. 1

As an **ACA-exempt** path to health care, OneShare Health offers affordable and flexible medical sharing Programs. With industry leading Membership Programs and unparalleled Member experience, OneShare Health continues to grow our health care sharing Family in many markets across the country.

## Sharing Programs

With three different OneShare Health Programs to choose from, you don't have to worry about a complicated health care choice! Find your perfect fit and enjoy the quality care you've come to expect from our health care sharing ministry.



Contributions as low as



per month ⑦

**Included in Program**

✔ Our Most Affordable Program

✔ Ideal for Temporary Gaps

✔ No 4-Month Limit

✔ Flexible – Cancel Anytime

✔ Includes Telemedicine & Discounts

✔ Next-Day Active Dates

✔ Option to Re-Enroll

Resp. Ex. 1

**GET QUOTE**

## OneShare℠
# Catastrophic

Contributions as low as



per month ⓘ

**Included in Program**

✔ Membership Discounts Including Vison & Dental

✔ Emergency Care for Life's Unexpected Events

✔ 24/7 Telemedicine at No Additional Cost

✔ Mental Health Support at No Cost

✔ Freedom to Choose Any Doctor

✔ Next-Day Active Dates

**GET QUOTE**



## OneShare℠
# Classic

Contributions as low as

# $92.99

per month ⓘ

**Included in Program**

✔ All Catastrophic services including these additional features

✔ Comprehensive Preventive Services

✔ Maternity Sharing Eligible

✔ Unlimited Specialist Visits

✔ Primary Care Doctor

✔ Urgent Care Visits

# Designed With You In Mind



## Affordable

Meet increasing health care costs with affordable, ACA-exempt medical cost-sharing Programs.



## Easy Enrollment

We offer health sharing Programs with next-day Active Dates and year-round enrollment.

Resp. Ex. 1



## Provider Access

OneShare Health Members have access to nearly one million providers and facilities, in-person or online!



## Mental Health

Easy access to a Mental Health Chat available 24/7/365.

## What Our Members are Saying

---

...the service was amazing when I talk to them on the phone--very quick answers, very satisfy
everyone was very informative and nice. So absolutely, I would recommend anyone sign up
use this health share program.

---



**Paul**
Los Angeles, CA

Resp. Ex. 1

# $2.544803771E8

Total Medical Expenses Shared

# $1798482

Charitable Donations



Learn More (Https://Www.Onesharehealth.Com/En/Mission-Motion)

## OneShare Health Blog

One Share, One Voice: we're writing about the news and health topics that matter most. Catch up on the latest from the OneShare Health Blog.

(https://blog.onesharehealth.com/the-signs-of-seasonal-depression)

**2 MIN READ**

### The Signs of Seasonal Depression
(https://blog.onesharehealth.com/the-signs-of-seasonal-depression)

Feb 12, 2025

As the seasons change, so can our moods. For many, shorter days and colder weather bring more than just a shift in...

(https://blog.onesharehealth.com/10-meal-prep-ideas-to-start-the-new-year)

**4 MIN READ**

### 10 Meal Prep Ideas to Start the New Year off Right
(https://blog.onesharehealth.com/10-meal-prep-ideas-to-start-the-new-year)

Feb 10, 2025

The start of a new year is the perfect time to establish healthy habits, and meal prepping is one of the best ways to...

(https://blog.onesharehealth.com/what-to-plant-in-february)

**2 MIN READ**

### Starting a Garden? What to Plant in February.
(https://blog.onesharehealth.com/what-to-plant-in-february)

Feb 7, 2025

If you're eager to get your garden started but aren't sure what to plant in February, the first step is knowing your...

 (Https://Www.Bbb.Org/Us/Tx/Irving/Profile/Health-Sharing-Ministries/Oneshare-Health-0875-91021818/#Sealclick)

 (Http://Ahcsm.Org/)



Contact Us (Https://Www.Onesharehealth.Com/En/Contact)

Leadership Team (Https://Www.Onesharehealth.Com/Oneshare-Health-Leadership-Board)

Sharing By The Numbers (Https://Www.Onesharehealth.Com/Sharing-By-The-Numbers)

Careers (Https://Www.Onesharehealth.Com/En/Careers)

Appeals & Disputes (Https://Www.Onesharehealth.Com/Member-Disputes)

Resp. Ex. 1

Become A Producer (Https://My.Onesharehealth.Com/Producer-Signup)

Provider Sign Up (Https://Www.Onesharehealth.Com/En/Providers)

Member Portal (Https://Www.Onesharehealth.Com/Member-Portal)

Member Resources (Https://Www.Onesharehealth.Com/Members)

Referral Program (Https://Referral.Onesharehealth.Com/V2/7/Register)

*'Therefore Encourage One Another And Build One Another Up, Just As You Are Doing.'* **1 Thessalonians 5:11 (ESV)**

1125 Executive Circle, Suite #130
Irving, Texas, 75038

---



(https://www.onesharehealth.com)

𝐟 (https://www.facebook.com/OneShareHealthMinistry) 𝕏
(https://twitter.com/OneShareHealth) ⓘ
(https://www.instagram.com/onesharehealth) in
(https://www.linkedin.com/company/onesharehealth) ▶
(https://www.youtube.com/channel/UClRsU3XL9sGPaETD-
67wc1g)

Disclaimers (https://www.onesharehealth.com/legal-notices)

Privacy Policy (https://www.onesharehealth.com/privacy-policy)

ACA Exempt (https://www.onesharehealth.com/en/aca-exempt)

© 2025 OneShare Health, LLC

OneShare Health, LLC is not an insurance company but a religious health care sharing ministry. For our full disclosures, see www.onesharehealth.com/legal-notices (https://www.onesharehealth.com/legal-notices) for the most
up to date state availability listing.

Resp. Ex. 1

# EX 1.8

Contact Us (https://www.onesharehealth.com/en/contact)    |

Referral Program (https://referral.onesharehealth.com/v2/7/register)



(https://www.onesharehealth.com/en/)

Become a Member
(https://blog.onesharehealth.com/cs/c/?cta_guid=e33f6cf3-c109-4e17-80a8-8
9b6859e4d00e&click=5540dc82-4996-4fb0-8aeb-40f6f51b5249&redirect_ur
pLh_YlFJIAS4z9XxYnPf0jnOlVozTlmwKQzDjNA7RvZ7oO1HExASLZrv2gOUblbT
QfzkGlTTVno9INn5vTXR3hL1OKliq84rdyT7PkglGoSzVKR9yoJbBAYiHArTgqZZZ
behind-health-care-sharing-ministries&ts=1739498987133&__hstc=1874214

# Browse By Topic

ALL (https://blog.onesharehealth.com/)

Healthcare Sharing & FAQ
(https://blog.onesharehealth.com/tag/healthcare-
sharing-faq)

Healthy Lifestyle
(https://blog.onesharehealth.com/tag/healthy-
lifestyle)

News & Releases
(https://blog.onesharehealth.com/tag/news-
releases)

OurStories
(https://blog.onesharehealth.com/tag/ourstories)

Features
(https://blog.onesharehealth.com/tag/features)

**6 min read**

## THE TRUTH BEHIND HEALTH CARE SHARING MINISTRIES (HTTPS://BLOG.ONESHAREHEALTH.COM/TRUTH-BEHIND-HEALTH-CARE-SHARING-MINISTRIES)

By OneShare Health Guest (https://blog.onesharehealth.com/author/oneshare-
health-guest) on 12:00 PM on September 13, 2021

Topics:   OurStories(https://blog.onesharehealth.com/topic/ourstories)

Resp. Ex. 1



As traditional health care costs continue to rise and become unattainable for many American households, finding a health care program that is affordable and meets the needs of each family member is of utmost importance. Many individuals are unaware that it is possible to access quality health care from trusted professionals without going the traditional route.

---

Save up to 50% or more on your family's health care! Input your ZIP Code below for a free OneShare Health quote!

Enter Zip Code*

Get Quote Now!

---

Since 2020, more than 1.5 million Americans have reported that they are active members of a Health Care Sharing Ministry (/what-is-a-christian-health-share-ministry) (HCSM). A health care sharing program is not insurance, but rather a membership program in which members share the cost of each other's medical bills. Members of some HCSMs contribute as little as a quarter of the national average for individual health care coverage under a traditional health care insurer.

But, like traditional health care plans, there are many HCSM program options that offer unique features to suit the needs of their members. Not all are created equal. When choosing an HCSM, it is important to know the facts and understand what you are and are not entitled to as a member.

As a Christian health care sharing (/faq-health-sharing-programs-oneshare-health) organization, one of the most important aspects of what we do is to be transparent and inform the public of health care alternatives that may be more affordable (https://my.onesharehealth.com/save-money-on-health-care-options) and member-centered than traditional health care plans. You should expect this from any health care organization.

With the rise of popularity in HCSMs, consumers are looking for the truth about what these alternative programs have to offer and why they should consider joining a healthcare sharing program rather than enrolling in traditional coverage. In order to better understand health care sharing, we need to address a few common misconceptions regarding health care cost sharing.

Resp. Ex. 1

**All HCSMs Are Alike.** While Christian health sharing programs (/faq-history-of-health-care-sharing-ministries) operate on the same premise of medical cost sharing, program options, member requirements, member accessibility and member assistance, each program varies widely. It is important to find what sets each apart from others in the field, such as pastoral support, behavioral health assistance and membership discount services.

**Only People Of Faith Can Join an HCSM.** Some health care sharing programs (https://www.onesharehealth.com/en/memberships) require their members to undergo an extensive application process in order to be considered for membership. This route can make individuals wary of the exclusivity of these viewpoints. One of the common requirements of these applications includes being an active member of a church, but this is not true of every HCSM. While OneShare Health is founded on Christian principles, we welcome anyone who agrees with our inclusive shared Statement of Beliefs. Seek out an option that aligns with your beliefs.

**HCSMs are Too Strict.** A primary concern of individuals considering joining a medical cost sharing program is the strictness of sharing requirements. In many cases, not all medical costs will be eligible for sharing. It's true, like traditional health care coverage, HCSMs have guidelines (https://www.onesharehealth.com/en/about) on what types of treatments and procedures are eligible. Take time to dive into the details of a plan to find one that meets your level of needs. You will find that many options address the same medical services as traditional health care coverage and offer increased customer support through a health care experience tailored to the needs of each member.

When choosing any medical care plan or program, it is important to make a health care sharing comparison. The best health care sharing programs (/faq-is-oneshare-health-insurance) offer additional member support and services to provide the best overall member experience. Find what makes the HCSM stand out from others such as the provider networks. For example, our network has nearly 800,000 professional providers at more than 1.5 million health care service locations, which ensures our members have access to the right health care providers for their needs.

Not all HCSM offerings are created equal. HCSMs vary in their options and member support such as Bella, the Intuitive Mental Health Chatbot, that connects 24/7 via the Clever Health™ App to provide self-help and coping techniques for anxiety and depression at no additional cost. Additionally, some HCSMs offer members support such as a prayer line, telemedicine offerings that allow you to talk to a doctor at any time, and discounts on dental, vision, and more.

Unlike traditional health care coverage, HCSMs link members together to help one another in their health journey. Members join a community of people who are contributing their resources monthly to help meet the needs of your family and countless others who benefit from cost sharing.

Don't be afraid to explore ACA-exempt Health Care Sharing Ministries (https://my.onesharehealth.com/how-long-have-health-sharing-ministies-been-around) that provide flexible and affordable health care options that fit your needs, both medically and financially. Health care does not come in a one-size-fits-all option, that's why it is important to select an option that works best for you, even if it's an alternative to traditional health care plans.

## Save up to 50% or more on health care!

If you don't want to go the Obamacare route, and also want to save money on your care, check out our Health Care Sharing Ministry that's exempt from the ACA. OneShare Health is an alternative to traditional insurance coverage, we are a Health

Care Sharing Ministry that could start saving you thousands per year on your healthcare!

Click below to learn more or get your free OneShare Health quote today.

BECOME A MEMBER

(https://blog.onesharehealth.com/cs/c/?cta_guid=fde693c5-9e9c-4de6-b00e-
6d60cfff745a&signature=AAH58kFcaZnF61xY7ZIapSpce5vqSDSNlg&portal_id=67299
59&pageId=55146595232&placement_guid=b54dffed-25c1-4e00-a123-
4c8400777149&click=533236a6-29b6-47a4-a148-
68c8522df00d&redirect_url=APefjpEGREQZX7g06hIMI5vDRWklkGFmtH0-
StdyZlZ0jUJ678nY3XQj79qfZiAVpKV_CQcnIc0HGL_56Kclici11W6NWsuW5eY2nWUq
mayW-
vOs8hfYmVs5xOU0umeVZIcvKqTwvPgYIwvZHDaTfNuG8nEptNSTu4x8Nr3Y0iCYEOK
7s8WCoRRZl1j7AI0AXzLfXWbMrnMH4cvtLxeNRWGzYguDBmR-
WfHUW8BdktB3nb6htcmlcrbaEbSyCkHqjSuRLRDX8LtlBNNL5Vut3DJ7G1KtU-
HUhqcVG7YEna9G9Ec68lkcoy4&hsutk=3e520fbf90146f2b9da8fac7f6c6771c&canon=
https%3A%2F%2Fblog.onesharehealth.com%2Ftruth-behind-health-care-sharing-
ministries&ts=1739498987189&__hstc=187421431.3e520fbf90146f2b9da8fac7f6c6771
c.1739498714599.1739498714599.1739498714599.1&__hssc=187421431.2.1739498
714599&__hsfp=1931306372&contentType=blog-post)

---

About the Author

Jeff Gary (/oneshare-health-jeff-gary-ceo) serves as the CEO of OneShare Health (https://onesharehealth.com/en/?utm_source=pr&utm_medium=earned&utm_campaign=truthbehind&utm_id=july). With more than 25 years of experience in the health care industry, he has served in a variety of health care capacities such as CEO and founder of The JMG Group and growth officer for OneShare Health (https://onesharehealth.com/en/?utm_source=pr&utm_medium=earned&utm_campaign=truthbehind&utm_id=july). Jeff earned his B.A. in Economics from Vanderbilt University and his impressive career highlights to date include generating more than $130 million in new business revenue, increasing profitability by more than $440 million for his clients. Jeff has been instrumental in working with the C-level suite at various healthcare entities to develop and execute go-to-market strategies, executive mentorship, sales leadership, innovative product development guidance, and creative pricing models. Throughout his career, Jeff has represented companies such as WellPoint (Anthem), United Health Group, Teladoc Health (Pre IPO), and numerous start-up organizations. As the newly appointed CEO of OneShare Health (https://onesharehealth.com/en/?utm_source=pr&utm_medium=earned&utm_campaign=5mistakes&utm_id=july), his goal is to build an organization that puts members first.

---

*"Do not neglect to do good and to share what you have, for such sacrifices are pleasing to God."*

Hebrews 13:16 (ESV)

---

Post    in Share    Share 0



Written by OneShare Health Guest
(https://blog.onesharehealth.com/author/oneshare-
health-guest)

---

**← PREVIOUS POST (/OURSTORIES-JEREMY-FARMER-ON-CHANGE)**



**OurStories: Jeremy Farmer on 'Change' (/ourstories-jeremy-farmer-on-change)**

**NEXT POST → (/HEALTHY-SMOOTHIE-RECIPES)**



**Healthy Smoothie Recipes to Improve Your Health (/healthy-smoothie-recipes)**

**FIRST NAME***

**LAST NAME**

**EMAIL***

**WEBSITE**

**COMMENT***

protected by reCAPTCHA
Privacy · Terms

**Submit Comment**



**Contact Us (https://www.onesharehealth.com/en/contact)**

**Leadership Team (https://www.onesharehealth.com/en/one-share-health-leadership-board)**

**Sharing by the Numbers (https://www.onesharehealth.com/sharing-by-the-numbers)**

**Careers (https://www.onesharehealth.com/en/careers)**

**Appeals & Disputes (https://www.onesharehealth.com/member-disputes)**

(https://www.onesharehealth.com/en/OneShareHealthMinistry)

(https://www.onesharehealth.com)

(http://ahcsm.org/)

(https://twitter.com/OneShareHealth)

(https://www.linkedin.com/company/onesharehealth)

(https://www.youtube.com/channel/UClRsU3XL9sGPaETD-67wc1g)

Proud Member of

*'Therefore encourage one another and build one another up, just as you are doing.'*

*1 Thessalonians 5:11 (ESV)*

1125 Executive Circle, Suite #130 Irving, Texas, 75038

OneShare Health, LLC is not an insurance company but a religious health care sharing ministry. For our full disclosures, see www.onesharehealth.com/legal-notices (https://www.onesharehealth.com/legal-notices) for the most up to date state availability listing.

Copyright © 2023 OneShare Health, LLC, All rights reserved.

Sitemap (https://www.onesharehealth.com/sitemap.xml) | Privacy Policy (https://www.onesharehealth.com/privacy-policy) | Disclaimers (https://www.onesharehealth.com/legal-notices) | ACA Exempt (https://www.onesharehealth.com/en/aca-exempt)

# EX 1.9

Resp. Ex. 1

# Jericho Share

### A Health Care Sharing Ministry

Home        Options        About Us        Resources        Providers        Contact Us



Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado    pg 156 of 547

# About Us

Jericho Share is a nonprofit 501(c)(3) Health Care Sharing Ministry (HCSM). Jericho Share consists of a community of individuals and families that agree to a common set of religious and ethical beliefs and who believe in inspiring grace and compassion. Our members contribute and share in the financial burden of other member's eligible medical needs according to these beliefs, and our Member Information Guide (MIG).

Jericho Share provides flexible, cost effective, sharing options that offers everyday care like office visits, preventative and wellness services, inpatient hospitalization and much more. Our focus is to ensure that you have an exceptional member experience.

**We invite all who believe in our Statement of Religious and Ethical Beliefs to enroll and become part of the Jericho Share community today!**

## Let's Connect

✉ outreach@jerichoshare.com

📞 866-545-2955

📍 Address
11152 Westheimer RD #639
Houston, Texas 77042-3218

## Quick Links

Home
Options
About Us
FAQ
Lifestyle Features
MDLIVE ®
Paramount Rx

## Legal

Privacy Policy
Legal Notices

DISCLAIMER

Resp. Ex. 1

Jericho Share is a non-profit Health Care Sharing Ministry. The members of Jericho Share voluntarily share in each other's eligible medical needs based on the acceptance of Member Information Guide. All members accept responsibility for their own medical needs as Jericho Share is not an insurance company and is not regulated as insurance. Any program or offering from Jericho Share should not be considered a substitute for an insurance policy. Jericho Share nor any member of Jericho Share assume any legal obligation to share in the eligible medical needs incurred by any other Jericho Share member.



# I BELIEVE

I believe every member has a fundamental and religious right to worship God in their own way.

I believe it is my religious and ethical obligation to share in the burden of others when they need assistance according to my current resources and opportunities.

I believe in sharing in a common community of like-minded individuals with the need to come to together in a caring community, regardless of race, age, gender, or political affiliation.

I believe it is my obligation to care for my family, and that emotional, mental, and physical abuse of any kind to a family member, or to anyone else, is morally wrong.

# EX 1.10

(/)

‹ MEMBER GUIDELINES (/EN_US/MEMBER-GUIDELINES)

🔍 Search the Toolbox

# Principles of Membership

## Table of Contents

Member Guideline Notice

---

*\*Official Member Guideline*

Adherence to the Zion HealthShare Principles of Membership minimizes medical risks, encourages good health practices, and ensures member integrity and accountability. Our members must comply with certain requirements to maintain membership and remain eligible to participate in our medical cost sharing community.

Zion HealthShare members are expected to act with honor and integrity. Members should not falsify a sharing request, medical records, or use other deceptive practices. If a member abuses the trust of our community, their membership may be revoked or withdrawn.

**All Zion HealthShare members must attest to the following statements:**

1. I believe that a community of ethical, health-conscious people can most effectively care for one another by directly sharing the costs associated with each other's healthcare needs. I acknowledge that Zion HealthShare affiliates itself with, and considers itself accountable to, a higher power. I recognize that Zion HealthShare welcomes members of all faiths.
2. I understand that Zion HealthShare is a benevolent organization, not an insurance entity, and that Zion HealthShare cannot guarantee payment of medical expenses.
3. I will practice good health measures and strive for a balanced lifestyle. I agree to abstain from the use of any illicit or illegal drugs and refrain from excessive alcohol consumption, acts which are harmful to the body. I understand that members who use tobacco will have an increased monthly contribution (per household membership) of $50.
4. I am obligated to care for my family. I believe that mental, physical, emotional, or other abuse of a family member, or any other person, is morally wrong. I am committed to always treating my family and others with care and respect.
5. I agree to submit to mediation followed by subsequent binding arbitration, if needed, for any instance of a dispute with Zion HealthShare or its affiliates.

---

*Notice*

Resp. Ex. 1

*Please note all article sections formatted like this are official member guidelines and will be marked "\*Official Member Guideline" when applicable. Anything else is simply helpful information to assist you in understanding the member guidelines and how to use your Zion HealthShare Membership.*

*Members who call the Zion HealthShare office asking about eligibility of medical expenses will be given an opinion, not a decision. Sharing Requests and medical expenses cannot be authorized over phone. For more information on submitting bills to Zion HealthShare, review the Member Guidelines (https://toolbox.zionhealthshare.org/en_US/member-guidelines) or login to your Member Portal (https://members.zionhealthshare.org/auth/login).*

*These guidelines are effective as of January 1, 2025.*

*Note*

*The Member Guidelines that go into effect January 1, 2025 will only be applicable to sharing requests that are submitted on or after that date. If a sharing request was submitted prior to January 1, 2025 the sharing request will be reviewed for sharing eligibility according to the Member Guidelines in effect at that time.*

MEMBERSHIP PRINCIPLES (/CONTACT-US##SEARCH_QUERY=MEMBERSHIP PRINCIPLES)    HEALTH PRACTICES (/CONTACT-US##SEARCH_QUERY=HEALTH PRACTICES)

BELIEF (/CONTACT-US##SEARCH_QUERY=BELIEF)    RELIGIOUS (/CONTACT-US##SEARCH_QUERY=RELIGIOUS)    LIFESTYLE (/CONTACT-US##SEARCH_QUERY=LIFESTYLE)

REQUIREMENTS (/CONTACT-US##SEARCH_QUERY=REQUIREMENTS)    PARTICIPATION (/CONTACT-US##SEARCH_QUERY=PARTICIPATION)

PRINCIPLES OF MEMBERSHIP (/CONTACT-US##SEARCH_QUERY=PRINCIPLES OF MEMBERSHIP)    MEMBERSHIP (/CONTACT-US##SEARCH_QUERY=MEMBERSHIP)

**Related Articles**



## HealthShare Beginnings (/en_US/member-guidelines/healthshare-beginnings)

What is Zion HealthShare     *Official Member Guideline Medical cost sharing orga…



## The Initial Unshareable Amount (IUA) (/en_US/member-guidelines/the-initial-unshareable-amount-iua)

What Is an IUA?     *Official Member Guideline The initial unshareable amount, or…



## Individual Membership Eligibility (/en_US/member-guidelines/membership-eligibility)

*Official Member Guideline Individual membership eligibility is primarily based o…



## Pre-Membership Medical Conditions (/en_US/member-guidelines/pre-membership-medical-conditions)

Understanding Pre-Membership Medical Conditions     *Official Member Guideline To…

**Welcome to the Zion HealthShare Toolbox!**

Use the Zion HealthShare Member Toolbox to review the Member Guidelines and gain a better understanding of how to use your membership!

Can't find what you're looking for? Contact us (https://zionhealthshare.org/contact-us/)

Home (https://zionhealthshare.org/)                                         About (https://zionhealthshare.org/about-zion-healthshare/)

Learn More (https://zionhealthshare.org/)                                  State Notices (https://zionhealthshare.org/state-notices/)

Member Portal (https://members.zionhealthshare.org/auth/login)

 (https://twitter.com/ZionHealthShare)      (https://www.facebook.com/zionhealthshare)      (https://www.linkedin.com/company/zion-healthshare) (h healthshare)

Privacy Policy (https://zionhealthshare.org/privacy-policy/)  |  Terms of Service (https://zionhealthshare.org/terms-conditions/)

©2025 Zion HealthShare. All Rights reserved.

Knowledge Base Software powered by Helpjuice (https://helpjuice.com/?utm_campaign=customer_kb)

# EX 1.11

2/13/25, 9:17 PM                          Zion Healthshare | Affordable Health Insurance Alternative

                                                                    

# An Affordable & Innovative Alternative to Traditional Health Insurance

| SEE HOW IT WORKS | FAQ |
|---|---|

## INCLUSIVE
No religious requirement to join

## FREEDOM
No provider network restrictions

## ACCESSIBLE
No enrollment period – join any time



# What is Zion HealthShare?

We empower our members to take ownership of their health by providing an affordable alternative to traditional health insurance for individuals, families, companies, and organizations. Zion HealthShare is a non-profit organization that allows members to contribute to each other's medical expenses, also called medical cost sharing.

**CONTACT US**

Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 165 of 547

# *Explore Membership Options*

Whether you are looking to join the Zion HealthShare community for yourself
or you own a business and want to provide a health benefit to your employees,
we have a membership option for you.

2/13/25, 9:17 PM                    Zion HealthShare | Affordable Health Insurance Alternative



## *Direct Membership*

### FOR INDIVIDUALS & FAMILIES

Medical cost sharing support when unexpected medical events occur,
preventive healthcare, pharmacy discounts, 24/7 telemedicine, and mental
health support.

## *Starting at $111/month*

SEE PRICING



## *Essential Membership*

### FOR COMPANIES & ORGANIZATIONS

Offer Zion HealthShare to your employees with the ability to customize your
membership and the flexibility to integrate with your organization's other
healthcare options.

## *Starting at $82/month*

SEE PRICING

Resp. Ex. 1

Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 167 of 547

# Membership Services & Features



## MEDICAL COST SHARING

Our medical cost sharing community helps with unexpected medical needs.



## PREVENTIVE SHARING

Annual provider visits and other preventive services available without the need to meet your IUA.



## ZION RxSHARE

Access to discounted prescriptions from any pharmacy delivered to your home, powered by Rx Valet.



## VIRTUAL CARE

Unlimited access to virtual primary care, mental health resources, and care coordination, powered by Primestin Care.

Resp. Ex. 1

**LEARN MORE ABOUT OUR SERVICES**

**VIEW OUR MEMBER GUIDELINES**

# *Zion HealthShare Resources*

2/13/25, 9:17 PM                    Zion Healthshare | Affordable Health Insurance Alternative

## *Our Blog*

Find helpful articles all about healthy living, as well as news and other
announcements.

**LEARN MORE**

## *Medical Advocacy*

Let us help you find a fair-cost provider in advance and arrange payment for your upcoming procedure.

**LEARN MORE**

Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 171 of 547

### *Additional Giving Fund*

Contribute to help members whose costs are ineligible for community sharing.

**LEARN MORE**

# *Contact Zion HealthShare*

If you have any questions and would like to contact us, please call us at (888) 920-9466, or use this form to get in touch and we will respond to your inquiry as quickly as possible.

First Name*

Last Name*

Email Address*

Phone*

Message*

9 + 12 =

**SUBMIT**

Resp. Ex. 1

2/13/25, 9:17 PM                    Zion HealthShare | Affordable Health Insurance Alternative

**Contact Zion HealthShare**

1141 W Silicon Circle Suite A

St. George, UT 84770

888-920-9466

**About Zion HealthShare**

How It Works

Memberships

Resources

Careers

Contact Us

**Disclosures**

State Notices

Washington Statement

Accreditations

Financials

Privacy Policy

Terms & Conditions

   

Copyright © by Zion HealthShare. All rights reserved.

# EX 1.12

# knewhealth

# **Member Guidelines**

## knewhealth

Knew Health is not an insurance company nor is the membership offered through an insurance company. Knew Health Membership does not satisfy state or federal requirements for healthcare coverage or minimum essential coverage. This is not a legally binding agreement to reimburse or indemnify you for medical expenses you incur. There is no guarantee of payment of medical expenses you incur.

KNEWHEALTH.COM |  (855) 542-0050

Resp. Ex. 1

# Knew Health's Mission

At Knew Health, we believe everyone should have easy access to preventive health and wellness resources. And everyone should have a safety net for when unexpected medical costs occur.

Knew Health makes healthcare simple and affordable by pairing general health and wellness with medical cost sharing.

We put your health first by providing access to personalized health coaching, routine health visits and screenings, allowances for wellness care that goes beyond the routine, access to the highest quality supplements, complimentary lab work, telehealth, and monthly seminars on health and wellness education.

And when you have a health Need, we provide you with the freedom to choose the right providers for you. We give you a team dedicated to helping you easily navigate the healthcare system and choose the highest quality care for the most fair and reasonable rates. We make it possible to invest back into your health and wellness, and we'll have your back when unexpected medical costs happen. We're also here for joyous times of pregnancy and birth, whether it's a home birth or hospital delivery.

The concept of medical cost sharing has evolved over decades of communities coming together in times of need and sharing burdens with one another. Knew Health has created a one-of-a-kind community of passionate individuals that pull together to efficiently manage one another's medical costs.

Knew Health will make your life better. We will change the way you think about healthcare by making it easier to live healthier, to feel your best, to save money on the highest quality healthcare, and we'll help one another every step of the way. Through our intentionally different, wellness-focused healthcare solution, you can achieve your optimal wellness and have the stability of our community at your back.

# Principles of Membership

Each member of Knew Health must comply with the following requirements to maintain membership and remain eligible to participate in the medical cost sharing program and participate in all other Knew Health services. Adherence to the Knew Health Principles of Membership minimizes medical risks, encourages good health practices, and ensures member integrity and accountability.

All Knew Health Members must attest to the following statements:

- I believe that a community of ethical, health-conscious people can most effectively care for one another by directly sharing the costs associated with each other's health care Needs. I recognize that Knew Health welcomes members of all faiths.

- I understand Knew Health is a membership, not an insurance entity, and that Knew Health cannot guarantee payment of medical expenses.

- I have a shared faith in myself and members of Knew Health, as well as the strength of our Community.

- I believe I have a fundamental right guaranteed by the U.S. Constitution to freely associate in the lawful exercise of common beliefs to voluntarily share health expenses with one another.



Resp. Ex. 1

- I believe in the importance of charity and benevolence as well as the social duties of voluntariness, integrity, honesty, and personal responsibility.

- I believe that practicing good health measures and striving for a balanced lifestyle is a commitment that all Knew Health Community members should make.

- I agree to abstain from the use of ALL illegal drugs in my state of residence, as well as abstaining from using prescription medications without a prescription.

- I agree to refrain from excessive alcohol consumption, and acts which are harmful to the body.

- I agree that members who use tobacco products, including, but not limited to, cigarettes, e-cigarettes, cigars, chewing tobacco, snuff, vape products, pipe tobacco, and smoked cannabis will have an increased monthly contribution of $112.50 per individual.

- I agree to care for my family. I believe that mental, physical, emotional, or other abuse of a family member, or any other person, is morally wrong. I commit to treating my family and others with care and respect at all times.

- I agree to submit to mediation followed by subsequent binding arbitration, if needed, for any instance of a dispute with Knew Health or its affiliates.

## Membership Eligibility

Membership eligibility in Knew Health is primarily based on two factors.

1. Adherence to the Knew Health Principles of Membership.

2. Participation in the community by submitting monthly contributions.

After committing to these primary obligations, prospective members are eligible to enroll in the Knew Health Community. Membership may begin on a date elected by the prospective member or specified by Knew Health. The first monthly contribution must be received before membership is considered active.



Resp. Ex. 1

## 1. Commitment

Members of Knew Health commit to abide by a set of personal standards as outlined in the Knew Health Principles of Membership. If a violation of the Principles of Membership is discovered, all cost sharing for the Needs of that member will be put on hold. This hold will begin on the date in which the violation was discovered or recorded in the member's medical records. A notification of the hold and an explanation of the discovery will be issued to the member.

The member will be granted 30 days to submit documentation supporting compliance with the Principles of Membership. If the submitted documentation does not satisfactorily demonstrate compliance with the Principles of Membership, the member will automatically be withdrawn from the sharing program and membership will be revoked. In the event that membership is revoked due to a violation of the Principles of Membership, Knew Health will not return the offending member's contributions received prior to the date of withdrawal.

## 2. Participation through Contributions

To participate in the member-to-member medical cost sharing Community and access Knew Health services, members must submit the monthly contribution amount associated with their level of membership.

Members have multiple options for submitting their monthly contributions. Individual members can make contributions directly to Knew Health. For members who enroll in Knew Health through their workplace, payments can be made through their employer.

Membership in the Knew Health Community is voluntary, but the monthly contribution is required to be active and eligible for sharing. Monthly contributions must be received no later than 30 days after the billing date. If a monthly contribution is not received by the last day of the billing month, the membership will become inactive and the member will be withdrawn from the Knew Health Community.

Any member that has been withdrawn may reapply, provided they meet all enrollment and eligibility requirements. Once the member reapplies and membership is reinstated by Knew Health, the member will become eligible to participate in the Knew Health Community. All member Needs and medical costs occurring after the membership is inactivated and before reinstatement will be ineligible for sharing, and any medical conditions existing before the date of reinstatement will be considered pre-existing. Any member whose membership has been inactivated three times will not be eligible to reapply.

## 3. Qualification

To be qualified for membership, an applicant must meet all criteria set forth in the membership guidelines and the membership enrollment form. If at any time it is discovered that a member did not submit a complete and accurate membership enrollment form, the incomplete or inaccurate form could result in either a retroactive membership limitation or a retroactive denial of membership.

While member health status has no effect on eligibility for membership, there are limitations on medical cost sharing for some conditions that existed prior to a member's effective date.



Resp. Ex. 1

# Membership Requirements

Knew Health offers different enrollment types for individuals and families. Monthly contributions are based on the enrollment type, Initial Unshareable Amount (IUA), and the age of the oldest participating member. This section outlines the different household memberships and who is eligible for enrollment therein.

### 1. Determination of Household Membership

There are four tiers of membership, and member contributions are calculated depending on the participating members of a household.

- Individual Membership: an individual member of Knew Health

- Spouse/Domestic Partner Membership: A combined membership made up of two individuals that are married or are domestic partners

- Adult & Children: A combined membership made up of an individual adult member and any eligible dependent children (see below), without membership of a spouse or domestic partner

- Family Membership: A combined membership made up of two individuals who are married or who are domestic partners, and any dependent children

### 2. Dependants

An unmarried dependent child may participate under a combined membership with the head of household through the age of 25. Children born into a membership from an eligible maternity Need may participate under a combined membership as long as they are added to the membership within 30 days of their birth. Under a combined membership, the primary member is responsible for ensuring that each individual participating under the combined membership complies with membership guidelines and the Knew Health Principles of Membership.

Once a dependent child reaches the age of 26 or marries, that child is no longer eligible to participate under the combined membership. A dependent who wishes to continue participating as a member with Knew Health may complete an enrollment form. Any medical Needs that occur between the time when a child leaves their parent's membership and enrolls in their own membership are not shareable. If a dependent ages-out of their Knew Health membership but chooses to re-enroll at a later date, they will be subject to the limitations associated with pre-existing conditions.



Resp. Ex. 1

## 3. Newborns

Newborns whose birth is part of a shareable maternity Need will need to be added to the Knew Health membership within 30 days of the birth to be active as of their date of birth. In the case of a change in household enrollment type, the monthly contribution amount will be adjusted and accounted for at the time the newborn is added.

Newborns who are not born as part of a shareable maternity Need must be enrolled manually in a Knew Health membership, taking effect the 1st of the month following enrollment. Any genetic conditions or medical complications for newborns not born as part of a shareable maternity Need are considered pre-existing and subject to the same limitations as defined in the section "Medical Conditions Existing Prior to Membership".

## 4. Adoption

Knew Health regards adopted children the same as biological children regarding membership. Any physical conditions of which the adoptive parents are aware prior to the legal adoption of the child are considered pre-existing conditions and are subject to the sharing limitations and phase-in period outlined in the Member Guidelines. Adopted children cannot be added to a Knew Health membership prior to birth.

## 5. Grandchildren

A grandchild (or grandchildren) may be included as part of their grandparent's membership if they meet the following criteria.

1. The grandparent has legal custody of the grandchild.
2. The grandchild lives with their grandparents at least nine months out of the year.
3. There is no other agency, person, or group responsible for the grandchild's medical Needs.

## 6. Tobacco/Smoked Products

Knew Health households with one or more tobacco users are required to contribute a higher monthly contribution to maintain membership. The monthly tobacco or smoked product surcharge is $112.50 per household.

A household member who has used any tobacco or other smoked products one or more times a month within the past year is considered a tobacco user. Tobacco and smoked products include, but are not limited to, cigarettes, e-cigarettes, cigars, chewing tobacco, snuff, vape products, and pipe tobacco. Smoked cannabis products are considered tobacco for the purposes of the tobacco surcharge.

If a Member engages in tobacco/smoked product use after joining, they must contact Knew Health to have that change reflected on their membership. Please note that failure to report Tobacco/Smoked Product Use to Knew Health may result in termination of membership.



Resp. Ex. 1

# Member Responsibilities

All members of Knew Health share certain responsibilities to remain a part of the sharing Community. Because the actions of one member can affect the entire Community, each member will be held accountable for following these standards.

**1. Member Contributions**

Monthly membership contributions should be made in a timely manner. If contributions are not made within 30 days of the due date, the membership will be inactivated, and any Needs will not be shareable. See "Participation through Contributions " for more information.

**2. Proper Submission of Medical Needs to Knew Health**

For the Knew Health Community to share in a member's medical expenses, the member is responsible for submitting a complete and correct Need Request within six months of the treatment date to Knew Health. This process is outlined in the section titled "Submission of Medical Needs."

**3. Trust & Accountability**

Knew Health Community members are expected to act with honor and integrity. Members must not falsify medical Needs or medical records or use deceptive practices. Knew Health does not accept altered or changed medical records. If a member abuses the trust of Knew Health and its members, their membership will be revoked and may be subject to legal proceedings on behalf of the Community.

# General Wellness Sharing

The Knew Health Community proudly shares in the general wellness of our members, values the health of our community and is dedicated to their health and happiness.

For the following general wellness categories, members are not limited in their choice of licensed healthcare practitioner and general wellness is not subject to Initial Unshareable Amounts (IUAs). If general wellness visits or services result in the need for additional diagnostic testing, these future costs will be subject to a member's Initial Unshareable Amount (IUA) and a new Need. These allowances are based on a membership year *(EX: if your membership became effective on May 1st your membership Year is 05/01/XXXX through 04/30/XXXX).*


Resp. Ex. 1

# Shareable General Wellness

- Adult annual well-visit: one visit shareable up to $250/year
- Well-woman visit: one visit shareable up to $250/year, additional $150 for a pap smear
- Well-child visits: shareable up to $250/visit+immunizations costs based on age
    - Children Aged 0-12 months: 6 visits per year
    - Children Aged 13-24 months: 3 visits per year
    - Children Aged 25-36 months: 2 visits per year
    - Children Aged 36 months-18 years: 1 visit per year
- Screening Mammogram: Shareable up to $500 starting at age 40 *(schedule as recommended by healthcare provider)\**
- Screening Colonoscopy: Shareable up to $2500 starting at age 45 *(schedule as recommended by healthcare provider)\**
- STD Screenings: shareable up to $150 per year
- Birth Control: IUDs (intrauterine device) shareable up to $1000 every 3 years, all other forms are shareable up to $200 per year

*The Knew Health Community will share in the cost of alternatives to routine breast cancer and colorectal cancer screenings, such as thermograms, 3-D ultrasounds, stool tests, and sigmoidoscopies. We encourage members to work with their licensed healthcare providers to confirm the optimal testing for their health Needs and cancer screenings. If a member proceeds with alternatives to mammograms or colonoscopies and requires additional testing, these costs will be subject to the member's IUA before being eligible to share. Please note that this does not extend to full body thermograms or scans. If screenings are needed before the recommended age, a note from your licensed healthcare provider will be required detailing the necessity for early screening.

Adult Immunization Allowances:

- Chickenpox (Varicella): shareable up to $185 per dose
- Diphtheria, Whooping Cough (Pertussis), and Tetanus (TDAP): shareable up to $75 per dose
- Flu (influenza): shareable up to $50 per dose
- Hepatitis A: shareable up to $105 per dose
- Hepatitis B: shareable up to $155 per dose
- Human Papillomavirus (HPV): shareable up to $295 per dose
- Measles, Mumps, and Rubella (MMR): shareable up to $115 per dose
- Meningococcal: shareable up to $225 per dose
- Pneumococcal: shareable up to $275 per dose
- Shingles: shareable up to $225 per dose
- COVID-19 Vaccine (annual): $100 per dose (annual max)
- Respiratory Syncytial Virus (RSV): $250 per dose

*This maximum shareable cost includes a $25 administrative cost for self-pay patients.*



Resp. Ex. 1

Pediatric Immunization Allowances:

The Knew Health Community will share in pediatric immunization administrative fees and the cost of the vaccination, which are shareable up to 110% of the Private Sector Cost/Dose as published by the Center for Disease Control (CDC).

## General Lab Work

Lab work is an area where prices can vary drastically. To ensure that members can get fair rates on yearly lab work, Knew Health members have access to Evexia Diagnostics, whose rates run up to 90-95% lower than most other lab services. We encourage all members to use Evexia Diagnostics whenever possible.

Through Evexia Diagnostics, members have a selection of free tests, as well as individual tests, specialty kits, and panels. The lab allowance is applicable to blood work only (this does not include specialty kits).

The Knew Health Community will share up to $80 per member per year on general lab work. This allowance is based on a membership Year *(EX: if your membership became effective on May 1st, 05/01/XXXX through 04/30/XXXX)*.

## Self-Care Credit (Supplemental Allowance)

Knew Health members go above and beyond routine preventive care to stay as healthy as possible. To help manage the cost of additional preventive care, each membership receives $200 per year. This is not per member. This credit is based on a membership Year *(EX: if your membership became effective on May 1st, 05/01/XXXX through 04/30/XXXX)*.

Examples include:

- maintenance chiropractic
- acupuncture care
- massage therapy
- counseling/therapy (mental/behavioral health)
- gym memberships
- nutritional supplement costs
- additional lab work

This credit is in addition to routine, preventive sharing and cannot be used for expenses that would go towards your Initial Unshareable Amount for injury, illness, or pregnancy expenses.



Resp. Ex. 1

# Direct Primary Care

Members of Knew Health can receive a 10% discount on their monthly contribution when they combine their membership with a direct primary care (DPC) membership that meets the following criteria:

- A minimum of 50% of the household is active with a direct primary care provider
- The direct primary care provider's website must clearly demonstrate that they are a direct primary care practice
- The practice cannot accept insurance payments
- Virtual direct primary care may qualify if it meets all other criteria
- The membership must include routine primary care services

Please note that this discount is in lieu of sharing costs that are included with their direct primary care (DPC) membership. For any other general wellness services that are billed separately and not included in the direct primary care (DPC) membership, these costs can still be shared under the applicable allowance, i.e. immunizations, mammograms, etc.

To provide proof of DPC participation, members must provide a statement of participation from their practitioner or proof of payment. This needs to be emailed to hello@knewhealth.com. Proof of participation must be provided to Knew Health for every month of DPC Membership.

## How Medical Needs Are Shared

This section explains how the shareable amount of a member's medical expenses will be determined.

Medical Needs are submitted on a per member, per incident basis. Medical Needs may be injuries, illnesses, or pregnancies that result in medical expenses. These medical expenses may be incurred by receiving medically necessary treatment from licensed medical professionals and facilities, such as physicians, emergency rooms, and hospital facilities.

When a member has a medical expense to be shared, the member must submit original, itemized bills for the medical expense within six months of treatment (date of service). Bills submitted more than six months after the treatment will not be shareable. There is no lifetime limit on the number of conditions or the total dollar amount that may be shared.

### 1. Determination of a Need

Expenses related to the same medical condition, whether expenses for a single incident or separate incidents, will be shared as one Need. The related expenses will accumulate toward the total Need amount.

In the event that a member suffers injury at the hand of another person/party leading that person/party to be liable or potentially liable for payment and the liable party and/or their insurer refuses to pay unless or until a legal remedy is reached, the member will be responsible to pursue such legal remedy against the liable person/party. The Knew Health Community reserves the right to not share and/or place conditions on the sharing of these Needs requests until such matter is settled or adjudicated.



Resp. Ex. 1

## 2. Initial Unshareable Amount (IUA)

The Initial Unshareable Amount, or IUA, is the amount that a member will pay per Need before the Knew Health Community shares in eligible medical expenses. The IUA is also known as your personal responsibility. Knew Health has three primary levels of personal responsibility: $1000, $2,500, and $5,000. The lower your personal responsibility (or IUA), the higher your monthly contribution will be.

Eligible medical expenses submitted after the IUA is met for a specific Need are shareable. There is no annual or lifetime limit. You will not need to pay the IUA for a single Need again until you are symptom free for 12 months. Additionally, you will not be responsible for more than three IUAs in a membership year.

## 3. Changing Your IUA

Members may choose to change their IUA once a year on their membership anniversary. If an IUA is lowered, a 60-day waiting period will apply to all new Needs other than those resulting from an accident.

## 4. Maximum Shareable Amount

While there is no lifetime maximum amount eligible for sharing for any household or membership, sharing is limited by the aggregate amount available for sharing from member contributions. In order to ensure equitable sharing among members, no single Need Request may consume more than 10% of the aggregate amount available for sharing in any calendar year. The ability to share up to 10% of the aggregate amount available for sharing in any calendar year, may only occur up to a maximum of two years.

## 5. Multiple Needs in a 12-Month Period

Member households that experience multiple Needs will be responsible for up to three IUAs within a membership year. After a member has paid three IUAs in a membership year any additional shareable Needs that exceed $500 in that membership year will have the IUA waived.

## 6. Insurance Companies & Government Entities

Insurance companies and government entities are primarily responsible for the payment of a member's medical expenses. Members who are eligible for benefits through either insurance or government assistance must contact Knew Health before submitting their medical Need. Knew Health is not intended to share in co-pays or co-insurance, but the Knew Health Community may consider bills after they have been submitted to an insurance plan or government program. Explanations of benefits must be submitted for consideration in these circumstances.



Resp. Ex. 1

**7. Active Membership**

To participate in medical cost sharing with the Knew Health Community, a membership must be active. Membership is considered active when the member has paid their monthly contributions on time and is in good standing.

For a medical Need to be shared, the membership must be fully paid and active during the date(s) of service, when medical bills are received, and at the time the IUA is paid. If a membership deactivates before the determination of sharing is made, the bills will not be shared with the Community. Any pre-existing condition limitations are applied based on the first date of active membership.

**8. Late Fees and Interest**

Any late payment fees or interest charges that may accrue to medical bills before the member meets their IUA are the member's responsibility—they are not shareable.

Additionally, any late payment fees or interest charges caused by a member's delay in providing necessary documentation to Knew Health are not shareable.

**9. Appeals**

If a member believes that a limitation was incorrectly placed on Community sharing, an appeal may be submitted. Members may submit an appeal and provide supporting medical evidence to have the sharing determination or limitation removed. All appeals are reviewed by a committee that includes at least one Knew Health board member.

To file an appeal, send the medical evidence, an explanation of why you feel that the limitation was placed unfairly, and any supporting documentation through the Appeal Form located in the Knew Health Member Portal within 30 days of the original determination being issued.

## Medical Conditions Existing Prior to Membership

To keep membership contributions low for all members, Knew Health implements a waiting period for sharing of medical conditions that exist prior to enrollment in a Knew Health membership. This section defines medical conditions prior to membership and outlines the sharing limitations.

**1. Definition: 24 Months Symptom and Treatment Free**

Needs that arise from conditions that existed prior to membership are only shareable if the condition appears to be cured and 24 months prior to the effective date of membership have passed without symptoms, treatment, or medication (even if the cause of the symptoms are unknown or misdiagnosed).

Any medical condition that was symptomatic, suspected, diagnosed or required treatment within the 24 months prior to the effective date of membership is considered a pre-existing condition.



Resp. Ex. 1

## 2. Exceptions for High Blood Pressure, High Cholesterol, and Diabetes

High blood pressure, high cholesterol, and diabetes (types 1 and 2) will not be considered pre-existing conditions as long as the member has not been hospitalized for the condition in the 12 months prior to enrollment and is able to control it through medication and/or diet.

## 3. Pre-Existing Condition Phase-In Period

Pre-existing conditions have a phase-in period wherein sharing is limited. Starting from the membership effective date, members have a one-year waiting period before pre-existing conditions are shareable. After the first year, pre-existing Needs are eligible for sharing on a limited basis, with the amount increasing each membership year.

Knew Health attempts to negotiate all medical bills received. Even if a pre-existing condition is not shareable, members may still receive assistance to pursue discounts for their services through negotiation.

Shareable amounts for pre-existing conditions:

• Year One: $0 (waiting period)
• Year Two: $25,000 maximum per Need
• Year Three: $50,000 maximum per Need
• Year Four: $125,000 maximum per Need

After year four of membership, expenses related to pre-existing conditions will remain shareable at a maximum of $125,000 in a 12-month rolling period and resetting each membership year.

# Limitations On Sharing

Member Needs not associated with a prior medical condition are generally shareable. The following list reflects limitations on sharing. All shareable expenses are subject to the member's IUA.

## 1. ADHD and SPD

Maximum shareable amount of $1,000 per member per membership year.

## 2. Allergy Treatments

Allergy testing, curative treatments, and medication are shareable up to $2,500 per eligible Need and subject to pre-existing condition limitations. Needs arising from acute, non-seasonal allergies, such as an emergency room visit for an allergic reaction, are considered shareable. Each new acute episode is regarded as a new Need subject to the member's IUA. Such testing will not be shareable if ordered by alternative/functional/integrative medicine practitioners.



Resp. Ex. 1

### 3. Alcohol and Drug Abuse Treatment

Treatment for alcohol abuse, substance abuse, or chemical dependency is shareable up to a lifetime maximum of $3,000 per member. The Knew Health Community does not share costs for treatments related to addictions other than for alcohol abuse, substance abuse, or chemical dependency. Injuries or illnesses that directly result from a member abusing drugs, alcohol, or other controlled substances will not be shared.

### 4. Audiological

Audiological Needs to correct hearing loss are shareable up to a lifetime maximum of $10,000 per member. Expenses related to hearing aids are not shareable.

### 5. Complications of Non-Shareable and/or Elective Surgeries/Procedures

Generally not Shareable. Exceptions exist when a true complication occurs during or immediately after the surgery/procedure that results in a member needing and receiving emergency medical attention to address an issue unrelated to the original intent of the non-shareable surgery/procedure.

*Example: while receiving cosmetic breast implants, a member has a reaction to the anesthesia, resulting in emergency medical attention.*

Complications from elective or cosmetic procedures, including dissatisfaction, regret, failure to obtain the desired results, or failure of cosmetic devices are not considered shareable complications.

### 6. Cosmetic Procedures

Generally not shareable. Exceptions exist when such procedures are necessary because of disfigurement resulting from a shareable Need. A mastectomy, reconstruction, or cosmetic procedure occurring because of a new cancer diagnosis after a membership Effective Date, is also generally eligible for sharing subject to any other applicable limitations in the Guidelines. Members undergoing a mastectomy, reconstruction, or cosmetic procedure as part of a pre-existing cancer diagnosis are subject to the Pre-Existing Sharing Limitations. Complications related to a shareable Need are generally shareable. Cosmetic reconstruction when eligible for sharing is limited to a lifetime maximum of $20,000 per member. A member undergoing bilateral breast reduction as part of a shareable Need is eligible for up to a lifetime maximum of $10,000 per member. Complications including dissatisfaction, regret, or failure to obtain the desired results are not considered shareable.

### 7. Dental

Dental procedures, such as, but not limited to, tooth extractions, cavities, crowns, and root canals, are generally not shareable when the procedure is or can be ordered/provided by a dentist, dental surgeon, oral surgeon, orthodontist, periodontist, endodontist, or other dental professional.

Tooth damage caused by a traumatic accident or injury may be considered for sharing up to a lifetime maximum of $10,000 per member. Eating, chewing, and grinding related injuries are not considered a traumatic injury.

### 8. Diabetic Medication & Supplies

Any medical expenses related to supplies, medication, or other implements used to treat or manage diabetes are not shareable.

### 9. Dialysis/End Stage Renal Disease

Dialysis and/or End Stage Renal Disease shareable up to 12 months or $90,000 per Need whichever is exceeded first.



Resp. Ex. 1

## 10. Dermatology

Dermatological screenings, annual visits, and checkups are not shareable. Diagnosis and therapy for normal, non-cancerous dermatologic conditions related to aging are not shareable. Diagnosis and therapy for other dermatological illnesses that exceed a member's IUA are generally shareable subject to other applicable provisions in the Member Guidelines.

## 11. Emergency Visits

Emergency room visits are generally shareable separately or in conjunction with an eligible medical Need related to an illness, injury, or accident. The first ER visit for a medical condition is treated as a normal Need. Each additional emergency room visit related to the same condition requires the member to take on a personal responsibility of $500 in addition to the member's IUA.

Members with non-emergency Needs should seek out other treatment options such as doctor visits, telemedicine, urgent care clinics, or other appropriate care. Seeking proper non-emergency care reduces emergency room visits and the financial strain on the entire Community.

## 12. Emergency Transports

Emergency transports, including but not limited to ambulance and airlifts, for life threatening emergencies are shareable as part of a Need when they are medically required in relation to a specific shareable illness or injury and/or whenever practical due to the severity, proximity and circumstances associated with a specific illness or injury, shareable up to $10,000 per Need. Ambulance transports are not shareable for convenience purposes only or for scheduled appointments.

## 13. Fertility

Expenses related to fertility evaluations and treatments are not shareable.

## 14. Genetic Mutation and Testing

Needs resulting from a genetic mutation that existed prior to membership are subject to the same limitations as other pre-existing conditions. If the member did not receive a diagnosis, require treatment, present symptoms, or take medication for the genetic mutation in the 24 months prior to membership, Needs related to the condition are considered shareable without pre-existing condition limitations. Genetic testing will only be considered for sharing if it is required for the treatment of a shareable condition, such as breast cancer.

## 15. High-Cost Therapeutics

Experimental drugs and/or therapies, such as cell therapy, gene therapy, immunotherapy, biologics, or individual new therapeutics are not eligible for sharing.

## 16. Home Healthcare

Home healthcare expenses are shareable when related to an accident or injury and when the care has been prescribed by a licensed physician. Sharing of home healthcare expenses is limited to 30 days and $5,000 per Need.

## 17. Hospice Care

Hospice care is shareable for up to 60-days or $10,000, whichever occurs first, when ordered by and under the care of a licensed care professional and upon physician approval or certification of terminal illness.



Resp. Ex. 1

### 18. Hospitalization

Hospitalization is shareable at a semi-private room rate up to $250,000 per Need. If a medical provider prescribes ICU or quarantine, those expenses are also shareable up to $250,000 per Need.

### 19. Injections

Injections related to pain management or inflammation are shareable up to $5,000 per Need. Injections related to hormone therapy are shareable up to $3,000 per Need. Injections related to gender transitioning or sex reassignment therapy are not shareable.

### 20. Injuries Obtained from Certain Acts

Injuries or illnesses resulting from participation in a riot, an act of war (declared or undeclared), civil insurrection, rebellion, riot, criminal acts (whether or not charged), euthanasia, assisted suicide, use of illegal substances, gross negligence or other such acts are not shareable.

### 21. Laboratory Tests, Diagnostic Imaging, and Check-Ups

Laboratory tests, diagnostic imaging, and checkups are shareable as part of an eligible Need when prescribed by a licensed medical provider.

### 22. Long-Term Care and Skilled Nursing

Long-Term care and skilled nursing are shareable when prescribed by a licensed medical provider for recovery from a shareable injury or illness. Sharing for these services is limited to 60 days or $20,000, whichever occurs first, per medical Need.

### 23. Medical Equipment

Medical equipment, including durable medical equipment, is shareable if prescribed by a licensed medical provider and related to a shareable Need up to 70% of the cost of the medical equipment up to $25,000 per Need. The equipment must be a customary or necessary part of directly treating the condition (such as oxygen tanks and devices/respirators, special shoes, orthotics, crutches, etc.). Custom braces or orthotics are shareable up to one item or pair per body part, exceeding this limit needs prior approval.

### 24. Medical Practices (Alternative)

Some alternative medical treatments may be shared with the Knew Health Community with prior written approval from Knew Health. Toxic mold therapies, chronic lyme therapies, IV infusion therapies, ozone therapies, light therapies, and platelet rich plasma/stem cell (PRP) therapies are not eligible to be shared with the Knew Health Community.

For other alternative medical treatments to be considered for approval, the treatment plan must be considered safe and effective. A member and licensed provider must be able to demonstrate the proposed value of the alternative treatment versus using current standards of care (also referred to as traditional or conventional treatment).

Approving alternative Needs will be done on an equitable basis to the current standards of care of the same condition. Alternative treatments that are more costly than the current standards of care may be capped on the amount that will be eligible for sharing. Choosing to start with alternative treatment and changing towards current standards of care may limit sharing based on what was shared for the alternative method.



Resp. Ex. 1

Alternative treatments that need to go through the appropriate process include, but are not limited to:

- Acupuncture
- Homeopathy
- Naturopathy
- Functional and integrative medicine
- Nutritional supplements
- Detoxification
- Craniosacral therapy
- Use of diagnostics and therapeutics for Electromagnetic Hypersensitivity Syndrome, MCAS, chronic pain and other poorly characterized conditions
- Stem cell therapies (other than where proven effective)
- Non-FDA approved uses of cryotherapy and light therapy
- All diagnostics and lab tests performed on healthy people other than screening testing as recommended by the US Preventive Task Force.
- Heavily marketed diagnostics or therapeutics that lack sufficient evidence to gain FDA approval.

What is required for Knew Health to consider an alternative medical Need in place of the current standards of care?

• Explanation of why the alternative medical treatment is being selected over the current standards of care. This should include, but not be limited to, evidence of treatment efficacy for the condition substantiated by peer-reviewed medical journals.
• The treatment plan from the provider that includes notes, costs, estimated duration of care, and an explanation of treatment.

Knew Health considers alternative medical treatment plans on an individual basis and may put a cap on visits or shareable costs depending on the service. Any expenses incurred prior to receiving written approval are not shareable. If a healthcare provider cannot itemize the services being provided, we cannot share in these requests. Treatment plans have to be clearly broken down into details (services by code, number of services, any other items included with the plan, and a clear timeline). Treatment plans can only be approved for durations up to 1 month in advance.

## 25. Medical Supplies

Medical supplies that directly aid in the treatment of, or recovery from, a shareable Need are generally shareable for up to 90 days from the treatment start date as prescribed by a licensed medical provider. Medical supply costs must be over $100 per item to be shared. Knew Health will share the retail costs (or fair costs when applicable).



Resp. Ex. 1

**26. Mental Health**

Expenses related to medications or other treatment for any mental health illness or condition are not shareable. Mental health conditions may include anxiety, depression, mental illnesses, and other psychological conditions.

**27, Motor Vehicle Accidents**

Needs arising from motor vehicle (automobile, motorcycle, motorized scooter, etc.) accidents are only shareable when a third party or insurance entity is not liable. The Need Request must be submitted in writing to Knew Health within 6 months of the accident.

The Knew Health Community will not share in motor vehicle accidents in which the member did not have the required insurance and/or liability coverage. If the member's medical Need is being considered, or should be considered, by a third party or insurance entity, the Need is not shareable until Knew Health receives documentation to reflect a lack of liability or partial payment. If the member is suing another party for damages the Knew Health Community cannot share in the resulting medical expenses.

**28. Newborn Care**

Routine care for a newborn without complications is included with an eligible maternity Need. NICU (Newborn Intensive Care Unit) care and other complications are treated as a separate Need of the newborn. NICU care and complications resulting from premature birth are shared up to $250,000 per Need or 12 months, whichever comes first. Expenses related to circumcision are excluded from sharing.

**29. Non-Medical Expenses**

Telephone calls, cots, meals for visitors, shipping costs, and other expenses not directly related to medically necessary services are not shareable.

**30. Nutritionists and Dieticians**

Expenses related to nutrition and dietician services are not shareable unless prescribed by a licensed medical provider. Knew Health must provide approval for nutritionist and dietician services prior to sharing. All Knew Health members have access to complementary health coaching and fitness resources which can assist with nutrition and diet education as a part of their membership.

**31. Organ Transplants**

Organ transplants are shareable; however, they are subject to limitations for conditions existing prior to membership and are shareable up to $100,000 per member per lifetime.

If the member is an organ donor these costs are generally not shareable.



Resp. Ex. 1

## 32. Prescription Medications

Prescription medications are considered shareable if they are related to the treatment of an eligible Need and prescribed or ordered by a licensed medical doctor (MD). The sharing of medications is limited to 12 months per Need, not to exceed $10,000.

Long-term maintenance medications that a member has already been taking at the time of enrollment are not eligible for sharing.

## 33. Preventive (Prophylactic) Medicine

Needs used to prevent a condition that has not yet developed or been diagnosed, are not eligible for sharing in the first 12 months of membership. These procedures include but are not limited to mastectomies, hysterectomies, and salpingectomies/salpingo-oophorectomies.

If a member demonstrates medical indication of high risk for a future diagnosis of cancer and elects to undergo preventive surgery to reduce this risk, the costs associated with this surgery are generally shareable with prior approval from Knew Health after Year 2 of membership, up to $30,000 after the IUA has been met.

## 34. Recovery Allowance

Members receive an allowance of up to $7,500 per eligible medical Need related to seek the recovery care their licensed healthcare provider recommends.

As part of the allowance, eligible expenses include:
- Chiropractic Care
- Occupational Therapy
- Physical Therapy
- Speech Therapy
- Hyperbaric Therapy

*Any alternative treatments included with this allowance must be submitted to Knew Health as an alternative medical treatment for approval.*

Knew Health will review on a case-by-case basis for Needs resulting from more severe injuries or illnesses, such as stroke, heart attack, and serious accidents, that require treatment costs beyond the allowance amount.

Therapeutic massage therapy is not shareable.

## 35. Sleep Apnea

Sleep apnea-related expenses, including appointments, testing, and equipment, are not shareable.



Resp. Ex. 1

**36. Sports**

The Knew Health Community may share medical expenses related to sporting activities. Injuries or illnesses resulting from participation in professional sports or when the participant is paid to compete are not shareable. Hazardous sporting activities including, but not limited to, motorcycle racing, off-road vehicle competitions, hang gliding, parasailing, skydiving, drag racing, motocross racing, road racing, sporting stunts, and mixed martial arts (MMA) are not eligible for sharing.

**37. Sterilization**

Elective sterilization, such as a tubal ligation or a vasectomy, is not shareable.

**38. Suicide and Attempted Suicide**

In the event of a dependent suicide, financial assistance can slightly ease the burden on our members. For this reason, Knew Health will share in expenses related to the suicide or attempted suicide of an adolescent up to age 18, up to $25,000 and after a one-year waiting period of continuous membership.

**39. Surgical Procedures**

Prior medical review and approval is required for non-emergent surgical procedures to be eligible to share. Expert second opinions associated with the procedure are eligible to share. The Knew Health Community encourages the use of expert second opinions prior to surgical procedures and will assist in facilitating expert second opinions.

**40. Surrogacy**

Expenses related to a surrogate pregnancy, whether or not the surrogate is a member, are not shareable.

**41. Temporomandibular Joint Dysfunction (TMJ)**

TMJ-related expenses, including appointments, testing, and equipment, are shareable up to $1500 per member, per lifetime.

**42. Tobacco or Smoked Product Use over 50**

Sharing for the eligible Needs of tobacco or smoked product users 50 years of age and older is limited to $25,000 for each of the following conditions:

• Stroke
• Cancer
• Heart conditions
• Chronic obstructive pulmonary disease (COPD)
• Oral and Esophageal disease
• Gastric and Duodenal Ulcers



Resp. Ex. 1

**43. Vision**

Shareable for expenses due to glaucoma and other medical diseases or injury of the eyes. Cataract surgery is treated as a pre-existing condition and subject to a one-year waiting period before it is shareable. Cataract surgery is generally shareable, subject to a maximum of $5,000 per eye with each eye being subject to an IUA. Vision Therapy is subject to a maximum of $3,500 per separate Need. Lasik and other refraction correction surgery, eyeglasses, and contacts are not shareable.

**44. Weight Reduction**

Expenses related to weight reduction are shareable if prescribed by a licensed medical provider and approved by Knew Health. These expenses are shareable up to $3,000 per Need. Injections and medications related to weight loss are not shareable.

**45. Worker's Compensation**

Expenses related to a work injury are not eligible for sharing.

## Maternity Needs

As a general rule, maternity Needs are shareable and are treated like any other medical Need as long as the estimated delivery date falls after the first 12 months of membership.

**1. General**

As with any other medical Need Requests, expectant mothers pay a single IUA for all expenses related to their maternity Need Request. Shareable expenses may be related to miscarriage, prenatal care, postnatal care, and delivery.

Please submit your maternity Need Request as soon as possible, but no later than 6 months from pregnancy confirmations so we can best assist you with your maternity Need Request.

**2. Seperate Needs**

Any Need of the baby, whether occurring before or after birth, is separate from the mother's maternity Need. Expenses for any pregnancy or birth-related complications of the mother will be shared as part of the maternity Need.

**3. Early Sharing Requests**

A maternity care provider may reduce normal charges if a member prepays some or all of the bill. If this is the case, Knew Health will consider sharing the maternity Need prior to delivery. To be considered for early sharing, the member must submit an estimate from the provider with the Need Request form.



Resp. Ex. 1

**4. Pregnancy Prior to Membership**

A pregnancy that begins prior to membership is not shareable.

For any pregnancy that is not shared as an eligible maternity Need with Knew Health, any complications or conditions present at the time of birth are considered pre-existing and are subject to the applicable waiting periods for sharing.

**5. Waiting Period**

Maternity expenses incurred prior to the member's effective date of membership are not shareable. Likewise, maternity expenses for a pregnancy with an expected delivery date in the first 12 months of membership are not shareable.

Newborns who are not born as part of a shareable maternity Need must be enrolled manually in a Knew Health membership no later than 30 days after the date of birth to be effective on the date of birth. If manually enrolled 30 days after the date of birth, the newborn's membership will begin on the 1st day of the next month. Any genetic conditions or complications for newborns not born as part of a shareable maternity Need are considered pre-existing and subject to the same limitations as defined in the section "Medical Conditions Existing Prior to Membership".

**6. Premature Birth**

Newborns born as a part of a shareable maternity Need are fully shareable, even if the baby is born prematurely. Any services not included in a standard maternity Need would be considered a separate Need of the newborn.

**7. Adding Newborn To Membership**

For a newborn to be added to a membership effective as of the date of birth, the request must be submitted to Knew Health within 30 days of the date of birth. If the request is received beyond 30 days after the date of birth, the newborn's membership will begin on the 1st day of the next month.

**What is Shareable**

Many times, maternity services are billed as a global fee or as a part of a financial agreement. This will generally include all professional obstetric or midwifery services for routine antepartum care, delivery services, and postpartum care. The Knew Health Community can share up to an additional 30% above the average local global maternity fee for a midwife, birthing center, or obstetrics clinic.

If a member prepays their global fee and switches to a new provider before the end of the pregnancy, sharing may be limited for additional global and/or other fees.



Resp. Ex. 1

## Prenatal

- Routine office visits
- Routine lab work
- Most immunizations (such as flu shots)
- Fetal non-stress test (after 36-weeks)
- Up to three standard ultrasounds (unless an unexpected complication requires additional scans)
- STD/STI screenings prescribed by a licensed practitioner as part of routine prenatal care
- Chiropractic care shareable up to 8 sessions, whether occurring prenatal or up to 2 months post delivery
- Pelvic Floor Therapy shareable up to 2 sessions, whether occurring prenatal or up to 3 months post delivery

## Delivery

- OB/GYN labor and delivery
- Cesarean Multiple births
- Hospital labor and delivery
- Hospital room and board
- Anesthesiologist
- Legally practicing midwives
- Home births
- Birthing centers
- Charges related to unexpected complications with mother
- One in-hospital pediatrician visit, including routine immunizations, routine lab work, and routine hearing tests (these are shareable when the baby is added to the membership within 30 days of delivery and when these services occur prior to discharge from hospital)

## Postnatal

- Mother's six-week postpartum checkup with pap test
- 2-week cesarean post-op appointment
- Chiropractic care shareable up to 8 sessions, whether occurring prenatal or up to 2 months post delivery
- Pelvic Floor Therapy shareable up to 2 sessions, whether occurring prenatal or up to 3 months post delivery
- Postpartum depression care shareable up to $3500 per pregnancy



Resp. Ex. 1

## What is Unshareable

Prenatal

- 3D & 4D ultrasounds
- Non-prescription supplements
- Massage Therapy
- Genetic testing, including but not limited to
    - Amniocentesis Inhibin A
    - Alpha-Fetoprotein Serum (AFP)
    - NIPT testing
    - Services by companies providing genetic testing

Delivery*

- Doula services
- Birthing tubs (or other items)
- Placenta encapsulations
- Circumcision

*Other services may be ineligible as determined by Knew Health. If you have questions about a specific service, please contact Knew Health prior to receiving care.*

Postnatal

- Breast pumps
- Lactation consultant
- Mother's immunizations
- Massage Therapy
- Additional postpartum services

If you have questions about a specific service, please contact Knew Health prior to testing. All genetic testing will be the responsibility of the member.

Check-ups for the baby after delivery are not part of the maternity Need request. These would either fall under general wellness, or would be considered a separate Need Request and subject to Member Guidelines eligibility determination.

Complications of the newborn would be considered a separate Need Request and subject to eligibility determination based on the Member Guidelines.

## IUA Payments

Like any other shareable medical expense, the IUA must be paid prior to Community sharing. The IUA must be paid within six months of the first day of service, or the maternity Need Request may become ineligible for sharing. Consideration will be given for situations where the cost of treatment has not exceeded the IUA after six months. Please contact the Needs Team in this situation. Any late payment fees or interest charges incurred because of a late IUA payment are not shareable.

Members will make payments equivalent to their IUA directly to providers for shareable services. In the event of overpayment, IUA reimbursements can be given to the member.



Resp. Ex. 1

## Switching Providers

If a member begins their pregnancy care with one provider with a global fee and then switches to another provider later in their pregnancy, future sharing for the pregnancy may be limited up to 50%.

## Separate Need Requests

Any additional Need Requests of the baby after birth, whether the condition existed before or after birth (including congenital conditions), is separate from the mother's maternity Need Request and will require a new medical Need Request submission and IUA for each baby. Expenses for any pregnancy or birth-related complications of the mother are considered for sharing as part of the maternity Need Request.

## Premature Birth

The baby's eligible Need Requests are considered shareable as part of an eligible maternity Need, even if the baby is born prematurely. Any services not included in a standard maternity Need would be considered a separate Need for the baby and will require a new medical Need Request submission and new IUA for each baby. NICU (Newborn Intensive Care Unit) care and other complications are treated as a separate Need of the newborn. NICU care and complications resulting from premature birth are shared up to $250,000 per Need or 12 months, whichever comes first.

## In Vitro Fertilization (IVF)

Expenses related to fertility treatments are not shareable.

## Elective C-Sections

If a member elects a c-section when not medically necessary, sharing for the delivery may be limited up to 80% of the total cost.

## Miscarriage

Any expenses related to a miscarriage that are associated with an eligible maternity Need are shareable if the costs exceed your IUA.

Expenses related to a miscarriage that is not associated with an eligible maternity Need are shareable as a regular Need Request.

## Abortion

Abortion expenses that relate to an eligible maternity Need are reviewed on a case-by-case basis for sharing eligibility. If eligible for sharing, these costs may be subject to limitations.

## Gestational Diabetes

Gestational diabetes is considered a complication of pregnancy, and members who develop this condition are encouraged to follow the recommendations of their treating providers.

Gestational diabetes is not considered insulin-dependent. Therefore, costs of medications prescribed to treat gestational diabetes, including insulin, can be shared according to our prescription sharing guidelines.

Members are encouraged to seek counsel from their OB/GYN on dietary changes and exercise. Glucometers and test strips can be purchased at local pharmacies or online at reasonable costs. For these reasons, nutritionists, other therapists, and testing supplies are not shareable.



Resp. Ex. 1

# Submission Of Medical Needs

Knew Health strives to share in its members' medical Needs in a timely, accurate manner. To do this, it is crucial for members to submit medical Needs correctly and include all required documentation.

## 1. Submitting a Needs Request

Members are responsible for collecting all relevant documentation and submitting that to Knew Health. Need Requests must be submitted through the Knew Health Member Portal. Need Requests should be submitted as soon as possible. Most non-emergency Need Requests, such as surgical procedures, should be submitted prior to the date of service. For any help with this process, members may contact Knew Health directly during business hours.

## 2. Required Documentation

Need Requests must contain all required documentation, including but not limited to the following:

• Itemized bills*
• Proof of IUA payment
• Medical records, Letters of Medical Necessity and other additional documents
• Treatment plans

*If a healthcare provider cannot itemize the services being provided, these costs cannot be shared with the Knew Health Community. Treatment plans have to be clearly broken down into details (services by code, number of services, any other items included with the plan, and a clear timeline). Treatment plans can only be approved for durations of up to 1 month in advance.

## 3. Time Limit for Providing Documentation

Original, itemized bills should be submitted promptly to Knew Health along with the Need Request form in order for Knew Health to process your Need as soon as possible. In order to be shared, bills and Need Requests must be submitted within six months of the date of service.

## 4. Meeting the IUA

Needs are only shareable with Knew Health after the member has met their IUA. Members should provide documentation to Knew Health of all payments that may contribute toward the member's IUA. The IUA must be paid within six months of the Need Request submission or bills may become ineligible for sharing.

## 5. Negotiating Medical Bills

The Knew Health Community prefers to share quickly and negotiate the best rates for healthcare services. This helps Knew Health keep rates low for members.

Members should inform Knew Health about any potential cash-pay discounts and consult with the Member Care Team prior to signing any payment arrangements. Knew Health is happy to participate in cost negotiations for its members.



Resp. Ex. 1

**End of Life Assistance**

If a member, or a member's dependent, dies after one year of uninterrupted membership, financial assistance will be provided to the surviving family. The Knew Health Community will provide assistance upon receipt of a copy of the death certificate.

Financial assistance will be provided to the surviving family as follows:

- $10,000 upon the death of a primary member
- $10,000 upon the death of a dependent spouse
- $2,500 upon the death of a dependent child

## Appendix A: Defined Terms

### 1. Annual limit

While there is no lifetime maximum amount eligible for sharing for any household or membership, sharing is limited by the aggregate amount available for sharing from member contributions. In order to ensure equitable sharing among members, no single Need Request may consume more than 10% of the aggregate amount available for sharing in any calendar year. The ability to share up to 10% of the aggregate amount available for sharing in any calendar year, may only occur up to a maximum of two years.

### 2. Application date

The date Knew Health receives a complete membership application.

### 3. Contribution list

A list of members who are being billed by payroll deduction through a company opposed in lieu of direct billing from Knew Health.

### 4. Date of Service

The day medical services were rendered on behalf of a participating member.

### 5. Dependent

The head of the household's spouse, domestic partner, or unmarried children under the age of 26, who are the head of household's dependent by birth, legal adoption, or marriage, and who are participating under the same combined membership. Unmarried children under 26 years of age may participate in the membership as a dependent.

### 6. Effective date

The date a person's membership begins.

### 7. Eligible Need

A medical Need that qualifies for sharing via the contributions of Knew Health membership.

### 8. Head of household

The oldest participating member in the household, whose age determines the monthly contribution cost.

### 9. Household membership

One or more family members participating under the same membership.



Resp. Ex. 1

## 10. Healthcare sharing or medical cost sharing

A membership-based, non-insurance arrangement established for the purpose of sharing legitimate healthcare expenses between members.

## 11. Inactive member

A contributor, and contributor's dependents if applicable, who has/have not submitted monthly contributions in the manner established by the Member Guidelines. An inactive member is not eligible for sharing.

## 12. Ineligible Need

A Need disqualified from voluntary sharing of contributions from member contributions due to a policy set forth in the Member Guidelines.

## 13. Initial Unshareable Amount (IUA)

The specified financial amount that members are required to bear on their own prior to any amount that may be eligible for sharing.

## 14. Licensed medical professional

An individual who has successfully completed a prescribed program of study in a variety of health fields and who has obtained a license indicating their competence to practice in that field (MD, DO, NP, PA, CNM). They must be listed on the National Provider Registry (NPI).

## 15. Maternity Need

A Need Request that must be submitted once a member becomes pregnant within 30 days of confirmation of pregnancy from a licensed medical professional.

## 16. Maximum shareable amount

The maximum dollar amount (limit) that can be shared for any one Need. Certain medical Needs have a maximum shareable amount or sharing limitation as described in the Guidelines.

## 17. Medically necessary

A service, procedure, or medication necessary to restore or maintain physical function and that is provided in the most cost-effective setting consistent with the member's condition. The fact that a provider may prescribe, administer, or recommend services or care does not make it medically necessary. This applies even if it is not listed as a membership limitation, or in the Member Guidelines. To help determine medical necessity, Knew Health may request medical records and information from licensed medical professionals.

## 18. Member(s)

A person or people (or dependent thereof) who has agreed in writing to abide by the requirements of Knew Health and is thereby eligible to participate in the sharing of medical Needs with other members in accordance with the Member Guidelines and membership type.



Resp. Ex. 1

**19. Membership**

This term applies to the collective body of all active, participating members of Knew Health.

**20. Membership Cancellation Request**

A request by a member to Knew Health requesting that their membership be canceled. The request must include the reason for cancellation and the requested month in which the cancellation of the membership is to be effective. Knew Health requires 15 day notice prior to your payment draft date. Knew Health does not prorate cancellations or gift refunds. Cancellations become effective on the last day of your monthly billing anniversary following the timely receipt by Knew Health of your membership cancellation request.

**21. Membership commitment**

The required principles and ongoing behavioral code attested to by members as required for membership.

**22. Member responsibility amounts**

Amounts needed to be paid by the member for medical costs that are not shareable with the Knew Health Community.

**23. Membership update**

A communication from the member to Knew Health providing any changes to the details of their membership information (i.e. change of address, phone number, etc.) or requesting that their membership be changed. The change request or update may take up to three business days to complete. Once a representative of Knew Health approves the requested changes, the approved changes may go into effect on the monthly membership anniversary.

**24. Membership limitation**

A specified medical condition for which medical Needs arising from or associated with the condition are ineligible for reimbursement from the Community. An associated condition is one that is caused directly and primarily by the medical condition that is specifically ineligible. The membership limitation will be issued during the application process and may be subject to medical record review.

**25. Membership options**

A variety of sharing options are available with different Initial Unshareable Amounts (IUA) and sharing limits, as selected in writing on the membership application or enrollment portal and approved by Knew Health.

**26. Membership withdrawal**

When a membership has been or will be canceled due to the submission of a Membership Cancellation Request, a violation of the Knew Health' s Principles of Membership, or non-receipt of a voluntary monthly contribution or annual membership fee for more than 30 days past the date such payment was due (delinquent). Such cancellation of membership is referred to as membership withdrawal or a delinquent membership.



Resp. Ex. 1

## 27. Membership Year

The twelve month period immediately following the effective date of membership and beginning again each anniversary of the membership effective date.

## 28. Monthly contributions

Monetary contributions are given voluntarily and placed in the care of the Knew Health Community by a member to maintain active membership and to be disbursed to the eligible Needs of its members in accordance with the Member Guidelines. Contributions are made monthly on an automatic subscription and are applied to the next month of membership. For example, when a monthly contribution is made in May, it applies to membership for the month of June.

Knew Health does not encourage or condone that monthly contributions be paid by anyone other than a participating member. Knew Health will not be able to discuss membership or payment information with anyone but the participating member without the express written permission of the participating member.

## 29. Need Request

A Request that is required to process medical Needs for accidents, injuries, or medical conditions that result in medical costs. Need Requests must be submitted via the Knew Health Member Portal. The Need Request must be submitted to Knew Health within six months of the start of the condition to be eligible for sharing and bills must be submitted within 6 months of the date of service to be eligible for sharing.

## 30. Office visit

Sick visits, wellness visits, specialists, and urgent care are generally considered to be office visits. The medical bill must include an office visit CPT code for the Need to qualify as an office visit. Qualifications for sharing eligibility include exclusion of prior medical conditions and meeting your Initial Unshareable Amount (IUA).

## 31. Membership administration

A collaborative process of planning, evaluating, facilitating, coordinating, and advocating for options and services to meet a participating member's eligible Needs through available resources to promote quality, cost-effective results.

## 32. Pre-existing condition

Any medical condition that was symptomatic, suspected, diagnosed or required treatment within the 24 months prior to the effective date of membership is considered a pre-existing condition. For information on sharing for pre-existing conditions, see the section of the Member Guidelines titled "Medical Conditions Existing Prior to Membership."



Resp. Ex. 1

**33. Proof of Cessation for Tobacco Use**

To prove cessation of tobacco use, a member will be required to show cessation of tobacco for a 12-month period. To do this, a member is required to submit three (3) negative cotinine tests: 1) the first negative cotinine test date triggers the start of the 12-month period; 2) the second cotinine test can be submitted any time during the next 10 months; and 3) the third negative cotinine test must occur during the month preceding the 12-month anniversary of the first test. A member will also be required to submit an affidavit or acknowledgement stating the last date of tobacco use upon submitting their third negative cotinine test. Once the 12 months have passed and Knew Health has received all required tests and affidavit/acknowledgement, the member will no longer be subject to the monthly tobacco surcharge on their membership contribution. The limitations for sharing in Needs related to stroke, cancer, heart conditions, chronic obstructive pulmonary disease (COPD), oral and esophageal disease, and gastric and duodenal ulcers for members over the age of 50 are still in effect even with proof of cessation.

**34. Proration**

If shareable Needs are ever significantly greater than shares available in any given month, Knew Health may prorate the Need amount requested for medical expenses. This involves an across the board percentage reduction of Need payments but does not necessarily mean that all member Needs will not be met in that month.

**35. Shareable amount**

The amount of the Need Request that remains after the member's Initial Unshareable Amount (IUA) has been satisfied and falls within the guidelines for sharing within the membership.

**36. Explanation of Sharing (EOS)**

Correspondence that is delivered to the participating members once medical Needs have been processed, are pending, or have been rejected. The Explanation of Sharing Summary will state their member responsibility amount or IUA as well as any amounts shared by the Community on the member's behalf.

**37. Usual reasonable and customary costs (URC)**

The general cost of medical services in a geographic area, as determined by Knew Health, based on what providers in the area usually charge for the same or a similar medical service. The Knew Health Community may limit sharing based on UCR.

**38. Unshareable amount(s)**

A medical expense incurred by a member that is not shareable for one or more of the following reasons: a member's violation of the Knew Health's Principles of Membership, delinquent membership status, or any other condition or requirement that is excluded by the Member Guidelines.



Resp. Ex. 1

# Appendix B: Frequently Asked Questions

**What does Knew Health believe?**

Knew Health believes that its members, in concert with the medical providers of their choosing, have a natural incentive to do what is best for themselves and their families. We also believe individuals have the primary responsibility for making their own healthcare decisions. When members have financial needs due to illness that are greater than they can bear individually, the goal of the Knew Health Community is to assist members in carrying one another's burdens. The method by which Knew Health seeks to facilitate the sharing of members' medical costs is to teach and apply these principles of community and responsibility as an integral part of its sharing philosophy.

**What kind of company is Knew Health?**

Knew Health is a Delaware corporation and is not an insurance company. Knew Health provides the framework and administrative support for the membership program.

**Isn't Knew Health really just another health insurance company?**

No. Insurance arrangements are a contract whereby one party agrees to be legally responsible for and accept another party's risk of loss in exchange for a payment—a premium. Knew Health memberships provide an arrangement whereby members agree to share medical expenses through the act of voluntary giving. Knew Health is not licensed or registered by any insurance board or department. Knew Health does not assess applicants' health risks because neither Knew Health nor its members are assuming financial liability for any other member's risk. Unlike insurance, the focus of Knew Health is to provide an avenue for members to help each other bear their immediate healthcare expenses.

**What's the advantage of Knew Health not being a health insurance company?**

When health care costs are paid by someone other than the person receiving care, as is typically the case when an insurance company or government entity agrees to cover such costs, the healthcare model can be undermined. Knew Health believes many of the current problems with the healthcare system are the direct result of restricting personal freedom and responsibility through dependence on third-party payers. Knew Health is designed to allow members to help one another while maintaining freedom of choice and personal responsibility.

**How are members of Knew Health affected by the federal healthcare law (including the Affordable Care Act)?**

Beginning in 2019, individuals are no longer required to obtain minimum health insurance coverage pursuant to the "individual mandate " under the Affordable Care Act and will not be penalized for failing to purchase health insurance.



Resp. Ex. 1

**How does Knew Health handle medical Need Requests?**

Because there is no transfer of risk, as defined in applicable insurance rules and regulations, with respect to Knew Health, no "claim" is ever owed by a Knew Health on behalf of any member. When members incur medical expenses, they experience medical Needs that may or may not be eligible for reimbursement from the Community. Knew Health members are required to submit proof of their medical expenses to Knew Health. Knew Health then evaluates each submission for eligibility or ineligibility based on the Member Guidelines. Eligible Needs are designated for sharing using the funds accumulated through monthly member contributions.

**What procedure should I follow to request reimbursement for my medical bills when I have a Need?**

At or before the time a member receives medical service, the member should inform their medical providers (doctors, laboratories, clinics, hospitals, etc.) that they are a self-pay patient. Healthcare providers can send bills directly to Knew Health. Any proof of payment made towards their IUA (Initial Unshareable Amount) should be submitted to Knew Health. Knew Health will review the submitted documentation for sharing with the Community. Knew Health's Member Care Team may contact the providers to discuss the appropriate payment for the services that were performed and determine if negotiations are applicable for the billed amounts.

**How long does it take Knew Health to process a medical Need?**

Typically, eligible reimbursement is made to members within 1-2 weeks once all documentation has been received.

**Can I choose my own doctors and hospitals without being penalized?**

Yes. Each member's personal freedom to select the medical providers of their choice is fundamental to Knew Health's philosophy. Knew Health endeavors to provide members with detailed and current information and recommendations to help them identify and receive treatment from the highest quality health provider(s). Accordingly, there are no out-of-network penalties or other restrictions.

**Does Knew Health charge monthly premiums?**

Because Knew Health is not insurance, it does not charge premiums. Rather, Knew Health's members freely choose to assist other members with their medical expenses by contributing a predetermined amount each month; called a "monthly contribution".

**Does Knew Health use deductibles and coinsurance?**

Because Knew Health is not insurance, it does not charge premiums. Rather, Knew Health's members freely choose to assist other members with their medical expenses by contributing a predetermined amount each month; called a "monthly contribution". These shares or membership contributions make up the Community Fund, which are then used to share in members' eligible medical expenses. Knew Health's process differs significantly from insurance practices in this regard; to our members' advantage. Insurance deductibles are cumulative over the course of a predetermined plan period. Co-insurance is the portion of the medical expense owed by the patient. Conversely, when members incur an eligible medical expense that exceeds the Initial Unshareable Amount (IUA), any amount above the Initial Unshareable Amount may be eligible for sharing. On the fourth medical Need in a household, the member no longer needs to pay the IUA if the additional medical expenses are more than $500.



Resp. Ex. 1

**Will Knew Health share medical costs that were incurred outside of the United States?**

Eligible medical expenses that exceed a member's IUA that occur overseas as a result of a medical emergency are shareable. Bills from medical treatments that occurred overseas must be written in or translated into English and the price converted to U.S. dollars before the Need is submitted. They are then processed in the same manner as bills from medical treatments that occur in the U.S.

Non-emergency services that occur overseas are generally not eligible to share, regardless of cost savings.

**What constitutes a medical emergency?**

Emergency care refers to medical services provided for conditions that require immediate attention to prevent serious harm or risk to life. It typically involves sudden and acute symptoms or injuries that could lead to significant disability or death if not treated promptly. Examples include, but are not limited to, heart attacks, strokes, severe bleeding, or acute respiratory distress. Emergency care is characterized by urgent interventions to stabilize patients, manage pain, and address life-threatening conditions, often provided in emergency departments or during ambulance services. The primary goal is to prevent deterioration of the patient's condition and provide immediate relief from severe symptoms.

**What are Knew Health's membership requirements?**

Knew Health members must agree to the Principles of Membership and be under 65 years of age.

**Can my membership be dropped if I have very high medical Needs?**

Members cannot be dropped from the sharing program due to their medical Needs. Neither membership nor monthly contribution is adversely impacted by the amount of medical expenses a member or their family members may have.

**Can my family members participate in the Knew Health Community?**

Spouses, domestic partners, and dependent children are welcome to participate in the Community.

**What if my dependents do not agree to abide by the Knew Health Member Guidelines?**

All Members of Knew Health must agree to abide by the Knew Health membership requirements as directed by Knew Health. For children under the age of 26 who are living with their member parent or guardian, Knew Health requires that the member hold their children responsible for compliance with all requirements stated in the Member Guidelines. For example, Knew Health does not approve the sharing of medical expenses for injuries resulting from the use of illegal substances. Hence, medical expenses incurred by a member's child who is injured while he/she is under the influence of an illegal substance are generally not eligible for sharing.

Is there a lifetime or yearly maximum amount that is eligible for sharing for any one person or family?
There are no lifetime or annual maximum amounts eligible for sharing for most medical Needs. Some conditions have limits, generally calculated per Need, as described in the section "Limitations on Sharing." There is no limit on the number of Needs that an individual member or household may have. While there is no lifetime maximum amount eligible for sharing for any household or membership, sharing is limited by the aggregate amount available for sharing from member Contributions. In order to ensure equitable sharing among members, no single Need Request may consume more than 10% of the aggregate amount available for sharing in any calendar year. The ability to share up to 10% of the aggregate amount available for sharing in any calendar year, may only occur up to a maximum of two years.



Resp. Ex. 1

**What kinds of Needs do Knew Health members share?**

In general, Needs for illnesses, injuries, and pregnancies resulting in visits to licensed medical providers, emergency rooms, testing facilities, or hospitals are shared on a per person, per incident basis once the member has met their personal responsibility by paying their Initial Unshareable Amount (IUA).

**What kinds of Needs do Knew Health members not share?**

Needs resulting from medical conditions that existed prior to the effective date are typically not shared or are shared in a limited capacity. Each member has an IUA (Initial Unshareable Amount) for which reimbursement from the Community Fund will not be made.

**What amounts do members share for maternity Needs?**

Pregnancies with an estimated delivery date that falls after the first 12 months of membership are shared like any other Need. For a pregnancy that began prior to a member's effective date or with an estimated delivery date that falls within the first 12 months of membership, pregnancy is treated as a pre-existing condition and not shared.

**What if I lose my job or change employers? Can I take my Knew Health membership with me?**

Yes, continuation of membership in Knew Health Community after termination of employment is a simple process. Because membership is individually based, members can change the billing method at any time.

**This program sounds kind of unusual; does it really work?**

The concept of medical cost sharing has been highly successful within the confines of faith based groups for more than forty years. During this time period, hundreds of thousands of individuals, families, and businesses have shared hundreds of millions of dollars in medical expenses. As a result, there is a strong foundational precedent in the concept of medical cost sharing.

A community of health-conscious individuals who care for one another can successfully participate in the sharing of medical expenses in a manner that will reduce the financial burden of receiving medical care for all members. Members should note, however, that past successes by faith-based sharing groups assisting one another is no guarantee of the future success of similar programs. There is no promise or contract by Knew Health or the members to contribute toward any Need any other member might have in the future.

**What happens if Knew Health's members' Needs are greater than the monthly contributions received?**

Knew Health keeps excess funds to share member Needs in the event that Needs for a month exceed the monthly contributions received. To date, all eligible Needs have been shared in full without need to draw from the excess funds.

However, if the rare event occurs that all Needs cannot be met for a given month, Knew Health uses a prorating method to evenly distribute the available funds among members with Needs. For example, if the monthly contributions received for a given month amounts to 80% of the Needs submitted for that month, each member would have 80% of their eligible expenses shared that month. The Knew Health Community has not needed to prorate member Needs in the past and has ample excess sharing contributions to draw from, but has these procedures in place to account for every possibility.



Resp. Ex. 1

**How much does it cost to belong to Knew Health?**

Every member provides a specific monthly contribution depending on their membership type, age, and chosen Initial Unshareable Amount. Employer contributions, if applicable, can also affect the monthly cost to the member. See the Knew Health website for current monthly contribution rates. Monthly contributions are subject to change by vote of Knew Health's board of directors.

**Can my employer pay some, or all, of my monthly contribution amount?**

Yes, there is no limit (other than business financial restraints) as to how much your employer can contribute towards your required monthly contribution.

**How is my portion of the monthly contribution collected?**

Knew Health offers multiple payment options for members to pay their monthly contributions via automatic monthly subscriptions through a credit or debit card.

**Are my monthly contributions higher if I, or a participating member in my family, uses tobacco or other smoked products?**

Yes. Tobacco or smoked product use of any kind is clinically proven to cause serious health conditions. Due to the increased likelihood of higher medical costs associated with tobacco use, Knew Health households with one or more tobacco or smoked product users are required to contribute a higher monthly contribution amount to maintain membership. Additionally, medical Needs for tobacco or smoked products users aged 50 and older are limited to $25,000 for each of the following four disease categories: stroke, cancer, heart conditions, COPD, oral and esophageal disease, and gastric and duodenal ulcers.

**Are my monthly contributions a pre-tax deduction like health insurance premiums?**

No. The monthly contribution is a voluntary contribution towards a membership program that facilitates the sharing of member's medical bills. As such, the money members contribute to the Knew Health program is a post-tax contribution.

**How often can the monthly contribution amounts be changed?**

Monthly contribution amounts can be changed twice a year, in accordance with the policies and procedures set forth in these guidelines. The monthly contribution can only change when approved by Knew Health's board of directors. To date, Knew Health has never had to increase the monthly contribution rate and does not plan to do so in the near future.

**Are my pre-existing conditions always unshareable?**

In the first year of membership, pre-existing conditions are not shareable with the Knew Health Community. Pre-existing conditions become shareable on a limited basis after one year of continuous membership, with the limit increasing to a maximum of $125,000 per Need in the fourth year of membership and onward. For more information, see the section "Medical Conditions Existing Prior to Membership."



Resp. Ex. 1

## Appendix C: Company FAQs

**Is Knew Health a group benefit?**

No, Knew Health is an individual and family sharing Community. We allow for a company contribution list. Employees who participate can be added or removed from the contributions list at any time and billed directly.

**Why should my company participate in Knew Health?**

Participation in Knew Health's program is always voluntary, both from the company's and the employee's perspectives. Business owners choose to work with Knew Health because they value community and personal responsibility and because they want to use a community sharing approach to ensure provision of quality healthcare for their employees. There are numerous factors that contribute to Knew Health's greater efficiencies for both companies and employees.

**Does Knew Health comply with the Affordable Care Act requirements?**

Knew Health is not a substitute for insurance as defined by the Affordable Care Act and therefore does not meet the requirements by itself.

**What are the risks and liabilities my company may be exposed to through participation in Knew Health?**

Knew Health is a voluntary program. It is not insurance. Companies are not purchasing insurance coverage by participating in the program. By participating in the program, companies are neither promising their employees that their larger medical bills will be paid, nor are they taking on liability to pay those bills as a company. Companies can choose to contribute on behalf of their employee members.

**Can my employee's monthly contributions be collected via payroll deductions?**

Yes. Knew Health allows members to join a contribution list of members who are part of a company. Employers can deduct member contributions by payroll deduction on a post-tax basis.

**Can my company pay some or all of its employee's monthly contributions?**

Yes. Participating companies can contribute as much of the employee's monthly contributions as they wish. It should be recognized that this is viewed as a component of the employee's total compensation. Companies can tier their employees based on legal requirements and offer different product bundles to each tier. Talk to your legal representative about legal requirements on tiering qualifications.

**How do I set up my employees' withholding amounts?**

Companies should consult with their own legal and tax advisors for more information regarding payroll and income tax implications for their specific situations.



Resp. Ex. 1

**Is there any additional administration or work for my company as a result of participation?**

The Knew Health team is glad to assist with any questions you or your staff might have regarding monthly contributions and the entire Knew Health process.

**The cost savings sounds great, but how will my employees be affected by the Knew Health Community?**

The employees of participating businesses are granted the opportunity to voluntarily join Knew Health. As such, participating employees voluntarily choose to pay the portion of the monthly contribution that is not carried by their company. Any employee can withdraw from the program at any time, but if they do, they will no longer be eligible to receive contributions towards their medical expenses in the event that they incur a medical Need.

---

### Disclaimer

*Knew Health is not an insurance company. Neither this publication nor membership in Knew Health are issued or offered by an insurance company. The purpose of these Member Guidelines is to help members understand and identify medical Needs that qualify for potential sharing and the process by which payments are made. The Member Guidelines are not for the purpose of describing to prospective members what amounts will be reimbursed by Knew Health. While Knew Health has shared all eligible Needs of its members to date, membership does not guarantee or promise that your eligible needs will be shared. Rather, membership in Knew Health merely guarantees the opportunity for members to care for one another in a time of need and present their medical Needs to other members as outlined in these membership guidelines. The financial assistance members receive will come from other members' monthly contributions and not from Knew Health.*

*This publication and membership in Knew Health should never be considered a substitute for a health insurance policy. If the Membership is unable to share in all or part of a member's eligible medical Needs, each member will remain solely financially liable for any and all unpaid medical Needs. These Guidelines do not create a legally enforceable contract between Knew Health and any of its members. Neither these Guidelines, nor any other arrangement between members and Knew Health create any rights for any member as a reciprocal beneficiary, a third-party beneficiary, or otherwise. An exception to a specific provision and does not supersede or void any other provisions. The decision by Knew Health to reimburse a member's eligible Needs does not and shall not constitute a waiver of this provision or establish by estoppel or any other means any obligation on the part of Knew Health to reimburse a member's eligible Needs.*



Resp. Ex. 1

# EX 1.13



# ACCESS+ Membership Guidelines

Medical Cost Sharing for Families and Individuals



Version: ACCESS+ 231001

Updated: October 1, 2023

*Guidelines are subject to change

Resp. Ex. 1

# What is Sedera?

## Welcome to the Sedera Medical Cost Sharing Community!

It's no secret that America's healthcare system has problems. Healthcare costs are increasingly unaffordable for ordinary people. Health insurance often limits people's access to providers of their choice. Costs lack transparency and providers lack accountability. These problems make people feel frustrated, confined, and overwhelmed; but it doesn't need to be this way.

That is why Sedera was created.

Sedera is a Medical Cost Sharing Community, providing individuals and families a new approach to manage their healthcare needs. Sedera Members join a Community of like-minded individuals who are committed to leading a healthy lifestyle and want to be active and engaged participants in their healthcare decision making.

Members of the Sedera Medical Cost Sharing Community ("Sedera MCS Community") remain responsible for paying their own healthcare costs. But, if these healthcare costs are shareable as agreed to and outlined in the Community's guidelines, the other Members of the Community can contribute funds to partially offset these healthcare costs. This Sedera model is built on the legacy of the faith-based Medical Cost Sharing platform and borrows from the best innovations of the modern sharing economy.



The Sedera MCS Community promotes open access to healthcare, and it gives Members the freedom to choose their medical providers. There is no provider network. Instead, Members seek cost savings and obtain more transparency from medical professionals.

Sedera's goal is to provide exceptional service to Members of our Community, reduce their healthcare costs and empower them to lead healthier lives. Together, we are tapping the power of community to create a new normal in healthcare.

# Organization and Membership

The Sedera Medical Cost Sharing Community ("Sedera MCS Community") is a membership-based non-insurance Community of like-minded individuals established for the purpose of sharing legitimate healthcare expenses between Members, as more particularly described in these Membership Guidelines. The Sedera MCS Community is modeled after a number of proven and highly successful medical sharing ministries that have facilitated the sharing of their members' healthcare expenses for more than two decades within the confines of the Christian community. The sharing model has its roots philosophically in religious movements that can be traced back to the time of Christ.

The Sedera MCS Community was founded in response to the urgent need of people to find affordable ways to help with their healthcare costs. Sedera's founders have been deeply involved in issues of medical cost containment for the past 22 years, working with clients all around the country with Members across the United States. Sedera's administrative offices are located in Austin, Texas. Sedera's purpose is to assist its Members in the sharing of legitimate medical expenses by and for the exclusive use of its Members.

The Sedera MCS Community emphasizes facilitating a Medical Cost Sharing Community for Members through the sharing of their financial needs, and by encouraging one another with practical tools to maintain their health. The Sedera MCS Community Members willingly assist one another with healthcare costs through voluntary monthly giving.

Membership in the Sedera MCS Community, by and of itself, is not qualifying coverage as defined by the Affordable Care Act (ACA). However, some third-party affiliates provide other solutions that satisfy the ACA or state law requirements without compromising the moral and/ or spiritual beliefs of the Sedera MCS Community Members.*

Participating Member households are required to abide by the Sedera Membership Guidelines, as set forth in this document. Memberships are not refused on the basis of the health status of individual Members, although medical conditions that existed prior to membership may be limited or excluded from sharing.

No one is denied membership based on Pre-existing Medical Conditions, but any conditions that existed prior to membership would not be shareable with the Community until certain membership longevity requirements are met.

*Any group self-insurance plan is not provided by or affiliated with the Sedera MCS Community. It is typically administered by a Third-Party Administrator.

# Key Terms for Understanding

| Basic Sedera Terms | Definition |
| --- | --- |
| Member | A person, or Dependent thereof, who has agreed in writing to abide by the requirements of the Sedera MCS Community and made their Monthly Contribution and is thereby eligible to participate in the sharing of Needs Cases with other Members. |
| Need | One or more Medical Bills caused by an injury, illness, or a medical event to an eligible Member. |
| Needs Case | A Need submitted to the Community for sharing consideration. |
| Medical Bill | A medical expense presented to the Community as part of a Needs Case. |
| Shareable | Eligible for sharing with the Community as outlined by the Membership Guidelines. |

| Other Sedera Terms | Definition |
| --- | --- |
| Ancillary Member Services (AMS) | Ancillary Member Services (AMS') are the portion of peripheral services that are made available to Members along with their membership in the Sedera MCS Community. AMS' are designed to enhance the membership experience, as well as reduce costs. |
| Application Date | The date a Member's application/enrollment is completed and received by Sedera for membership in the Sedera Medical Cost Sharing Community. This date may be different from the Start Date. |
| Benevolence Organization | An organization whose primary purpose is to care for the needs of the persons/members who make up the membership. |
| Community Stewardship Board (CSB) | A board comprised of Sedera MCS Community personnel, including medical professionals, tasked with reviewing the application and/or interpretation of the Guidelines by the Needs Coordination Team. |
| Dependent | A minor under the age of 18 or an unmarried individual between the ages of 18-26 who is a natural offspring, stepchild, adopted child, or otherwise under legal guardianship of a Member. Please see Section 3 for more details. |
| Expert Second Opinion Program | A consultation with a medical expert, other than the patient's current doctor, in order to confirm the diagnosis/treatment plan or gain new perspective on available treatment alternatives. |
| Household | A term used to describe the individual and/or family unit participating in the Sedera Medical Cost Sharing Membership that encompasses all |

|  |  |
|---|---|
|  | Membership types including Member Only, Member+Spouse, Member+Child(ren), and Member+Family. |
| **Initial Unshareable Amount (IUA)** | The specified financial amount (in dollars) that Members are required to bear on their own prior to any amount that may be eligible for sharing. The IUA is applied on a per Need basis. |
| **Life Change Event (LCE)** | A life event that allows a Member to make changes to certain aspects of the Member's Sedera Membership outside of the Member's standard yearly renewal period. Please see Section 2 for more details on the LCE. |
| **Maximum Shareable Amount ("limit")** | Certain medical conditions have a maximum dollar amount (limit) that can be shared for any one Need as described in the Membership Guidelines. |
| **Medical Cost Sharing (MCS) / Health Care Sharing (HCS)** | A membership-based non-insurance arrangement established for the purpose of sharing legitimate medical expenses between Members. |
| **Medical Necessity** | The accepted health care services and supplies provided by that are appropriate to the evaluation and treatment of a disease, condition, illness, or injury and consistent with the applicable standard of care and supervised by clinical professionals working within their scope of practice. |
| **Member** | A person, or Dependent thereof, who has agreed in writing to abide by the requirements of the Sedera MCS Community and made their Monthly Contribution and is thereby eligible to participate in the sharing of medical Needs with other Members. |
| **Membership** | Term used to describe participation in the Sedera MCS Community. |
| **Membership Advisor** | A Sedera team member dedicated to assisting Members. Member Advisors can be reached at 1-855-973-3372. |
| **Membership Requirements** | The required principles and ongoing behavioral code attested to by Members, as required for membership in the Sedera MCS Community. |
| **Membership Year** | The effective period of time in which a Member is eligible for Ancillary Member Services, patient advocacy and participation in Medical Cost Sharing.  The Membership Year begins on the Start Date of membership and continues until the one-year anniversary of that date. |
| **Minimum Essential Coverage (MEC)** | Minimum Essential Coverage (MEC) is a requirement of the Affordable Care Act. Membership in the Sedera Medical Cost Sharing Community does not provide Minimum Essential Coverage as required by any federal or state law. |
| **Monthly Member Contribution** | The monetary amount that each Household contributes on a monthly basis to be a Member in the Sedera Medical Cost Sharing Community. This includes the Member Share Amount, Member Services Fee, and various other expenses. |
| **Monthly Share** | The monthly monetary allotment contributed to the Sedera MCS Community for participating Members in order to remain an active Member. |

| | |
|---|---|
| **Patient Advocate/Advocacy** | A third-party advocate that works on behalf of a Member/the Community. For example, a Member's Needs Coordinator may assign a dedicated Patient Advocate to communicate directly with the Member's healthcare providers to help reduce their medical bills. |
| **Pre-existing Medical Conditions** | Any medical condition that existed prior to membership (diagnosed, suspected, or producing observable signs or symptoms) is considered a Pre-existing Medical Condition. Needs that result from Pre-existing Medical Conditions are subject to sharing limitations (as presented in these Guidelines) <u>unless</u> 36 months immediately prior to membership Start Date has passed without any signs or symptoms of the condition, without any treatment needed, without any medication prescribed or taken, and without any suspicion by the patient or doctors that the condition is resurfacing. This applies whether or not the cause of the symptoms is unknown or misdiagnosed. Please see Section 5 for the more detailed explanation. |
| **Proration** | If shareable Needs are ever significantly greater than shares available in any given month, the Sedera MCS Community may prorate the Needs amount requested for medical expenses. This involves an across-the-board percentage reduction of Needs payments but does not necessarily mean that all Member Needs will not be met in that month. |
| **Routine Medical Care** | Includes medical examinations and tests that doctors provide to patients who are healthy, as far as they know, in order to screen them for medical issues that may not yet be causing symptoms.

Also includes medical services that are prescribed on a regularly scheduled basis for the purpose of screening and monitoring known risk situations or cured medical conditions, e.g., annually, biennially. |
| **Spouse** | A husband or wife who has legally entered into marriage as defined or recognized under state law for purposes of marriage in the State in which the marriage was entered into or, in the case of a marriage entered into outside of the United States, if the marriage is legal in the place where entered into and could have been entered into in at least one State. |
| **Start Date** | The date an applicant/Member starts their membership in the Sedera Medical Cost Sharing Community. This date may be different from the Application Date. |
| **Tobacco/Vape User** | A Member who engages in regular use of cigarettes, cigars, pipes, smokeless tobacco, e-cigarettes, nicotine products, and vaping products. |
| **Unshareable Amount(s)** | A medical expense incurred by a Member that is not shareable for one or more of the following reasons: violation of Member responsibilities, non-current membership status, or any other condition that is excluded by the Guidelines. |

Resp. Ex. 1

# Table of Contents

WHAT IS SEDERA? .................................................................................................................. 2

ORGANIZATION AND MEMBERSHIP ...................................................................................... 3

KEY TERMS FOR UNDERSTANDING ...................................................................................... 4

SEDERA MEMBERSHIP GUIDELINES ..................................................................................... 8

   **1.**   SEDERA MCS COMMUNITY PRINCIPLES OF MEMBERSHIP ........................................ 8

      A)   *Sedera Ethical Beliefs and Principles* ...................................................................... 8

      B)   *Disclaimer* ................................................................................................................. 9

      C)   *Member Commitments* .............................................................................................. 11

   **2.**   MEMBER RESPONSIBILITIES ...................................................................................... 13

   **3.**   PROCESS AND ADMINISTRATION ............................................................................... 16

      A)   *Membership Requirements and Management* ........................................................ 16

      B)   *Submission of Needs Case* ...................................................................................... 19

      C)   *Binding Decisions* .................................................................................................... 20

      D)   *Disputes and Reconciliation* .................................................................................... 21

      E)   *Amendment of Guidelines* ........................................................................................ 23

   **4.**   SHAREABLE NEEDS CASES ........................................................................................ 24

      A)   *Basic Need Levels* .................................................................................................... 24

      B)   *Payments from others who are obligated to pay* .................................................... 25

   **5.**   MEDICAL CONDITIONS EXISTING PRIOR TO MEMBERSHIP ...................................... 27

   **6.**   SHAREABLE CONDITIONS ........................................................................................... 28

      A)   *Shareable Conditions for which Medical Bills are Eligible for Sharing* ................... 28

      B)   *Needs Cases for which Medical Cost Sharing is Limited* ........................................ 29

      C)   *Injuries Involving Motor Vehicles* ............................................................................ 38

      D)   *Miscellaneous Items Not Shared* ............................................................................ 39

   **7.**   MATERNITY NEEDS ..................................................................................................... 40

      A)   *Maternity Needs Cases That Are Shareable* .......................................................... 40

      B)   *Application of Maternity Initial Unshareable Amount* .............................................. 41

      C)   *Maternity Sharing Restrictions and Limits for Conditions that Existed Prior to Membership* ............ 41

APPENDIX ............................................................................................................................. 42

Resp. Ex. 1

# Sedera Membership Guidelines

The Sedera Membership Guidelines consist of the Administrative Guidelines and Sharing Guidelines and are commonly referenced as the Membership Guidelines, Sharing Guidelines, or Guidelines.

# Administrative Guidelines

## 1. Sedera MCS Community Principles of Membership

*The following requirements protect all Members by assuring honor and integrity on the part of Members and by minimizing medical risks and ensuring proper accountability while encouraging good health practices.*

Membership in the Sedera Medical Cost Sharing Community, a Covenant Healthshare Inc. Benevolence fund, requires agreeing to all of the following commitments of this section as well as the submission of an application for membership. As long as Members continue to meet these requirements and fulfill all membership duties as determined by the Board of Directors, their membership will continue. If at any time a Member no longer meets all these membership requirements, they must notify Sedera immediately, and their Sedera MCS Community membership and all privileges will cease, unless otherwise indicated.

While Member health status has no effect on eligibility for membership, there are limitations on the sharing of Needs Cases for some conditions that existed prior to the membership Effective Date. See Sections 6-9 for a detailed list of Shareable and non-shareable Needs Cases.

### A) SEDERA ETHICAL BELIEFS AND PRINCIPLES

The Ethical Beliefs of our Community:

The Members of the Sedera Medical Cost Sharing Community are united by a shared faith in the following beliefs and principles. As a demonstration of these beliefs and principles we have decided to come together to support each other and share medical needs according to the Membership Guidelines with all-comers from all backgrounds, nationalities, ethnicities, and races, as long as each Member accepts the beliefs of this Community as outlined in these Ethical Beliefs and Principles:

1. We share a faith in each other and in the strength of our Community.

2. We are committed to the idea of assisting one another, believing that strengthening the well-being of all humanity, both in the present and the future, is a virtuous pursuit. Moreover, we see it as our moral and ethical duty to willingly provide voluntary support to our fellow Community Members for their medical needs.

3. The fundamental belief within our Community is that we support one another by sharing in the medical cost burdens of fellow members whenever possible and when resources are available. This commitment is rooted in the principle of treating others as we would want to be treated, as articulated in the saying, "Do unto others as you would have them do to you."

4. Our Community is guided by principles that encourage generosity in every aspect, with the aim of producing gratitude. We are dedicated to acts of benevolence, charity, and missions, both domestically and globally. We accomplish these acts of

social responsibility through volunteer work and financial contributions, all supported by the integrity, honesty, and personal accountability of our Community members. We believe in personal accountability for our decisions and responsible stewardship of all that is entrusted to us and share faith that all Members of our Community will be empowered to apply these beliefs and principles in their day-to-day lives.

5. We place a strong emphasis on personal accountability, as we believe that each member of the Community is responsible for being good stewards of our resources to strengthen the Community. We believe in living out our beliefs and principles in our daily lives, as they guide us in the responsibility we have towards our collective well-being.

6. We firmly believe that our bodies are precious, and it is our duty to honor them. This belief stems from the principle that we are entrusted with our well-being, and we strive to maintain our physical and mental health. As a result, we are committed to avoiding the consumption of illegal substances and refraining from engaging in dangerous, illegal, and unlawful activities. These actions not only have an adverse impact on us but also affect the well-being of our Community as a whole.

7. We are committed to the idea of maintaining good health as an essential part of our dedication. We strive for prosperity and well-being, mirroring the sentiment of valuing physical and mental health. To achieve this, we prioritize healthy practices, avoid harmful substances and addictive behaviors, and actively pursue a balanced and harmonious way of life.

8. We firmly believe it is our Community Members' fundamental right to make our own health choices, and we believe in seeking guidance from knowledgeable healthcare professionals and advisors. We also believe in seeking spiritual guidance in making decisions about our health.

9. We fully embrace our fundamental rights, as provided and protected by the U.S. Constitution, to exercise our faith and values by coming together as a healthcare sharing ministry to bear each other's medical burdens. We achieve this by commitment by directly and willingly sharing in the costs associated with our members' healthcare. among our members. We strongly believe that our faith and values bring us together and that the shared accountability of our Community, allows for each individual to be supported by the Community with compassion.

10. Our Community believes in its collective ability to make educated, informed and knowledgeable consumer decisions that create value for themselves and the American healthcare system.

## B) DISCLAIMER

WARNING: The Sedera Medical Cost Sharing Community, a Covenant HealthShare, Inc. Benevolence fund (hereinafter "Sedera"), is not an insurance company nor is it insurance. Membership in Sedera is not issued or offered by an insurance company. Whether a member/household chooses to provide monetary assistance to you and/or your household to help with your medical expenses is entirely voluntary. Neither you nor Sedera has any right to compel payment of medical cost sharing costs from any

Resp. Ex. 1

member. A membership with Sedera should never be considered similar to a group insurance policy or an individual insurance policy.

Transparency in Healthcare Sharing Ministry:

As a healthcare sharing ministry, It is important to understand that these ministries are not insurance providers. Instead, they function as communities where members voluntarily contribute funds to assist fellow members with their medical expenses.

Unlike insurance policies, participation in a healthcare sharing ministry is entirely optional, and members decide whether or not to provide financial support to other members in need. Neither the individual seeking assistance nor the healthcare sharing ministry can demand or require payment from its members.

A healthcare sharing ministry should not be viewed as an insurance policy, either group or individual, as it operates on principles of voluntary financial assistance among its members. It's crucial to recognize these distinctions when considering participation in such a community.

In your capacity as a member of this Healthcare Sharing Ministry, it is crucial to understand that regardless of whether you receive financial assistance for medical expenses or if this membership continues to operate, you will always be personally responsible for any unpaid medical bills. You do not possess any legal entitlement to seek reimbursement or indemnification for such expenses from Sedera, Covenant Health Share Inc., or any other member or household.

This agreement does not constitute a legally binding commitment to reimburse or indemnify you for your incurred medical costs. Instead, it serves as an opportunity for you to assist fellow members in need and, when you find yourself in need, to present your medical bills to other members and households in accordance with the outlined Membership Guidelines. Any financial assistance received will be provided by fellow members and/or households that are managed through the Sedera Medical Cost Sharing Community, a Covenant HealthShare Inc. Benevolence fund.

Resp. Ex. 1

## C) MEMBER COMMITMENTS

<u>Personal Commitments</u>

On behalf of myself and my household:

1. I have read and understand the Guidelines and am confirming that all of my answers in this application process are true and accurate and indicate my commitment to abide by the Guidelines.

2. I acknowledge and comprehend that my participation in the Sedera Medical Cost Sharing Community is not insurance and is not provided or underwritten by any insurance provider. While every endeavor will be taken to facilitate the sharing of my medical expenses as a member, it is important to note that the Sedera Medical Cost Sharing Community, along with its partners and affiliates, cannot and do not guarantee payment for any medical bills.

3. I consent to engage in mediation and, if required, subsequent binding arbitration, in the event of any dispute arising between me and the Medical Cost Sharing Community or its affiliates, as elaborated in Section 3.D of the Guidelines. I hereby knowingly, willingly, and with full understanding, waive my right to a trial by jury to the maximum extent allowed by applicable law.

4. I understand that as a participant of a benevolence fund of a medical cost sharing community, like this Cost Sharing Community, there is no guarantee of payment for any medical expenses by the community or other Members. The concept of a cost sharing community involves individuals coming together to collectively share the burden of medical costs. It operates on the premise that Members contribute towards each other's medical expenses. Consequently, the sharing of medical expenses is entirely dependent on the contributions of Members, and as a result, the corresponding medical expense requests from Members may lead to sharing being prorated or possibly unavailable in a particular month.

5. I pledge, in a spirit of the ethical principles and moral responsibility to the community, to abstain from the use of any illegal substances. I am aware that medical Needs or requests arising from engaging in activities that are illegal or in violation of federal law will not be eligible for sharing within the Medical Cost Sharing Community.

6. As the head of household, I accept the responsibility to notify, educate and inform all persons listed on my application concerning their participation in the Community as well as their responsibilities, their obligation to the Community, and the basic constructs for sharing Needs Cases (If applicable).

7. I understand that my Monthly Member Contribution is composed of my Medical Cost sharing contribution plus any  additional subscription services I elect to join alongside my Medical Cost Sharing membership.

Resp. Ex. 1

**8.** I confirm and affirm that I am legally capable of agreeing to these declarations, and I possess the full authority to make such acknowledgements on behalf of all household members.

**9.** I acknowledge that Community utilizes the contact details I've supplied for all forms of communication, and it is my responsibility to keep my email addresses, phone numbers, and mailing addresses accurate at all times. I grant the Medical Cost Sharing Community permission to use the provided contact information for any communication pertaining to my Community Membership. I am also aware that Membership may not be accessible in certain states or jurisdictions, and if I move to such an area, the Medical Cost Sharing Community reserves the right, at its discretion, to terminate my membership. You can find information on Sedera Medical Cost Sharing State Availability on the website.

## Community Commitments

**1.** I understand that I am joining a Community of moral, ethical, health-conscious people who are voluntarily sharing each other's medical expenses. The fundamental belief within our Community is that we support one another by sharing in the medical cost burdens of fellow members whenever possible and when resources are available. This commitment is rooted in the principle of treating others as we would want to be treated, as articulated in the saying, 'Do unto others as you would have them do to you.

**2.** I acknowledge that I am a self-pay (Cash) patient for medical services and that actively seeking equitable pricing for my medical care is advantageous for both my own well-being and the broader Community.

**3.** I commit to choosing medical professionals and hospitals based on transparent and good prices, am willing to travel to get the best value for elective procedures, select doctors and facilities that publish and charge fair and reasonable prices, and actively participate in the negotiations process.

**4.** I understand that the Community, by and of itself does not make any representations that it satisfies any federal or state law requirements for healthcare coverage or insurance.

**5.** I acknowledge that other obligated insurance, governmental entities, or responsible parties are always considered the primary payors, and I pledge to utilize these primary sources of coverage before submitting any potential Shareable Needs Case to the Community.

**6.** I understand that my participation in this voluntary program entails making contributions, and I am aware that my membership automatically continues from year to year unless I voluntarily notify the Community of my desire to terminate my membership.

**7.** I understand that I can notify the Community of my desire to cancel my membership at any time.

Resp. Ex. 1

<u>Needs Sharing Commitments</u>

1. I understand that participation with the cost-sharing Community will not be denied based on pre-existing medical conditions. However, any conditions pre-existing before joining the Community may not be eligible for sharing until specific membership longevity requirements have been fulfilled.

2. I recognize that community members are conscious of the fact that, when requesting sharing assistance from others, the Community follows the Guidelines to determine which expenses qualify for sharing. Members do not expect the Community to include costs associated with unverified treatments and tests, extremely expensive healthcare providers, or hospitals.

3. I pledge to wholeheartedly collaborate with the Community and its affiliated partners in evaluating the shareability of Needs Cases, including providing requested documents, signing required releases, and engaging in communication with my Needs Coordinator as needed.

4. I solemnly commit to upholding principles of honor and integrity in all my dealings within the Community. I am aware that presenting a fraudulent Needs Case, involving myself in deceptive actions, or assisting another Member's breach of trust may result in the termination of my Household's membership. Furthermore, the Community maintains the right to investigate all instances of fraudulent behavior and cooperate with law enforcement authorities to the maximum extent allowed by the law.

5. I acknowledge the presence of a three-step internal appeals process detailed in Section 3.D.1. of the Guidelines and pledge to adhere to this process for all matters that require such escalations.

6. I acknowledge that my participation necessitates monthly contributions prior to accessing the cost-sharing membership services. Additionally, if I submit a Need, I understand and agree that any outstanding commitments related to my membership must be resolved before the Community can commence sharing. In essence, without a prior contribution, participation in community sharing is not possible.

## 2. Member Responsibilities

Members should familiarize themselves with the following responsibilities in order to participate in Medical Cost Sharing more effectively. Each Member's faithful participation directly contributes to other Members.

1. New Members — Must fully complete the Sedera MCS Community online enrollment flow. Your Monthly Member Contribution will be collected from the bank account or credit card you specified when you completed the Sedera MCS Community application process.

2. Monthly Member Contributions — The Monthly Member Contribution includes the Member Share Amount ("monthly shares"), the Member Services Fee, and other service costs. All of these are broken out in the Member's Monthly Contribution statement. All contributions are entirely voluntary. NO ONE is ever obligated to be a

part of this Medical Cost Sharing membership. Each month the monthly shares that Members have contributed are made available to other Members who have Shareable Needs Cases. The amount each individual Member contributes depends on the Member's household size, IUA selected, and Primary Member's age.

3. Submission of Needs Cases to Sedera — See Section 3.B. for full details.

4. Misuse of Trust and Accountability — At all times, Sedera Members are expected to act with honor and integrity. Members presenting a falsified Needs Case, using deceptive practices, or participating in another Member's misuse of trust will have their membership cancelled. When a Needs Case is submitted requesting other Members to share financially in order to relieve the burden of a medical expense, the Member submitting the Needs Case is committing that those monies will be used to help pay their financial obligations to their medical providers, as directed by Sedera to the extent of the monthly shares received. Members submitting Needs Cases further commit to work with Sedera's staff and its authorized affiliates to seek equitable prices from providers and to document amounts paid to providers. The Member may request resolution of the question through the mediation and arbitration provisions described in the Guidelines.

5. Member Cooperation — At all times, Sedera Members are expected to fully cooperate with Sedera and its partners. This includes fully cooperating in any determination concerning whether Needs Cases are Shareable and/or the extent to which Needs Cases are Shareable. Members agree to obtain any documents or sign an authorization as requested by Sedera or its partners. Furthermore, to the extent that any Medical Bill could be the responsibility of a third party, Sedera Members agree to fully disclose the same and cooperate in any investigation/inquiry conducted by Sedera and/or its partners. Sedera Members with minor Dependents agree to fully cooperate on behalf of the minor Dependent. Sedera reserves the right to not share in the Needs Cases if the Member Responsibilities are not met and /or the Membership Guidelines are not followed. Furthermore, Sedera may close any Needs Case and determine that the Needs Case is unshareable if a Needs Case remains inactive for 6 months, the Member fails to provide requested information in 6 months of the request, and/or the Member fails to respond to Sedera for a 6-month period. Upon request by Sedera or its authorized partner, Sedera Members are expected to make reasonable efforts to contact their medical provider's offices via telephone and/or in writing who are non-responsive for billed amounts that are deemed unreasonable.

6. Member Behavior — Each Member has voluntarily chosen to join a Community of moral, ethical, and health-conscious individuals, and each Member agrees to refrain from the use of threatening, aggressive, harassing, or abusive language and/or behavior when interacting with Sedera employees or other Members of the Sedera Community. This specifically includes, but is not limited to, the use of personal or legal threats. Members understand that engaging in such behavior can result in termination of their membership.

7. Member's Responsibility for Stewardship — The Member understands that they are cash pay patients for medical services and agrees to seek fair pricing for their medical services, which benefits both the individual Member and the Community. The Member realizes the importance of shopping for medical services and commits to shopping for the best value (cost and quality). The Member will attempt to choose medical

professionals and hospitals based on transparent and reasonable prices and is willing to consider traveling to get the best value for elective procedures, select doctors and facilities that charge fair and reasonable prices, and actively participate with Sedera on behalf of the Community to negotiate down overpriced medical bills that the Member and their household may incur. For non-emergent care, if a Member has been informed that their medical bill or estimate is overpriced or their provider is unwilling to negotiate, Sedera, with full discretion can limit sharing of any Medical Bills that are not fairly and reasonably priced. Additionally, if a Member continues to submit overpriced Medical Bills, Sedera may determine that no Medical Bills or Needs Cases will be shared and ultimately can terminate membership. If a Member is unable to meet their IUA obligation and it results in a discount being lost, the lost discount amount will not be eligible for sharing.

8. Authorization Requirement — The majority of medical bills are grossly inflated. Therefore, Member cooperation with bill negotiation is required on medical bills that exceed the Member's IUA. Members agree to authorize Sedera and/or its affiliates to negotiate billed charges on their behalf. Members who refuse bill negotiations negatively impact the Sedera MCS Community as a whole. Consequently, Sedera reserves the right to reduce the amount shared by 50%, off billed charges for bills over $500, in cases where a Member refuses authorization to negotiate on their behalf.

9. Expert Second Opinion (ESO) program[1] — In order to ensure that Members receive the most up-to-date and effective medical treatment available, Members may be asked, and the Member agrees to complete an ESO Consultation prior to the Community sharing in non-emergency treatments. Please note that participation in the ESO program prior to a Member's procedure does not guarantee or create a legally enforceable right or entitlement to the sharing of a particular Needs Case since there is not a contractual promise or legally enforceable right to the sharing of Needs Cases under the Membership Guidelines. Finally, Sedera has the right to ask a Member and the Member agrees to engage in the ESO program at any time to help support the determination/application of the Membership Guidelines to a specific Needs Case. Sedera also has the right to ask a Member and the Member agrees to provide a reason/justification if the ESO program suggests a less invasive surgery/treatment and the Member decides not to change their treatment plan.

10. Advance Payment for Medical Services — Sharing is meant to occur after a medical expense has been incurred. The Sedera Medical Cost Sharing Community understands that in some instances medical providers require up-front or advance payments prior to delivering service. In these instances, Members should make every effort to limit the up-front payment to their selected IUA and request to be billed for any remaining charges. Please contact your Needs Coordinator early on in the process if you suspect or believe that an up-front payment may be required. Your Sedera Needs Coordinator can help you explore cash pay provider and service options. Special consideration can be given for up-front payment requests that exceed $3,000 with necessary documentation. Notification to Sedera for up-front sharing requests must occur at least 14 days prior to the scheduled medical procedure in order to allow for adequate time to process and share the Good Faith Estimate. Please note that up-front sharing is not available for continuous treatment protocols. In instances where medical providers require payment prior to service, Sedera Members should make every effort

[1] - PLEASE REMEMBER: The Expert Second Opinion program only provides information services and no doctor patient relationship is being created. Please review the terms of service/use for the program for further details.

Resp. Ex. 1

to avoid paying full-billed charges for services in excess of their IUA, as this eliminates the ability to negotiate highly inflated medical bills. Paying highly inflated amounts for medical services reduces the effectiveness of the cash-pay patient approach and ultimately results in higher costs to the Community as a whole. As such, Sedera reserves the right to reduce sharing by up to 50% per bill for Members who pay full-billed charges in advance of the procedure which exceed industry price norms.

11. Members are responsible for ensuring that Sedera has accurate contact information, including but not limited to email address, phone number(s), and mailing address. Sedera may use the provided contact information for all communication with the Member(s) related to the Household Membership, Needs Cases, or any other related purpose. I understand that there may be States or Jurisdictions in which Sedera membership is or may become unavailable and that upon notification of my relocation to such a State or Jurisdiction, Sedera, in its full discretion, may terminate my membership. Sedera Medical Cost Sharing State Availability.

## 3. Process and Administration

### A) MEMBERSHIP REQUIREMENTS AND MANAGEMENT

There are four primary levels of household participation for Sedera membership. The Monthly Member Contributions are derived from household membership status. See Section 3.A.2 for details.

Unmarried children aged 18 and younger, and unmarried children ages 19-25 who meet the requirements of Section 3.A.3 below, may be included as a child in a family membership and may submit Needs Cases for sharing if they meet the Member requirements as listed above and are included on the membership enrollment form.

| 3.A.1. | Application and Start Date Limitations | None. Unlike health insurance plans, membership in the Sedera Medical Cost Sharing Community has no calendar date restrictions for enrollment. However, the membership Start Dates must occur within 3 months of completing the Sedera MCS Community online enrollment flow (Application Date). |
|---|---|---|
| 3.A.2. | Determination of Membership Level | Four tiers (Household Members):<br><br>•Member Only (MO)<br>•Member & Spouse (MS)<br>•Member & 1 or more Child (MC)<br>•Member & Family (MF)<br><br>Please Note: The Monthly Member Contribution varies depending on each Member household's dependent status and age. This determination is based on the age of the household's oldest Member as of the membership start date. |
| 3.A.3. | Child Dependent Participation | Dependents of a Member may participate in the Sedera Medical Cost Sharing Community.<br><br>Sedera will give special consideration, on a case-by-case basis, to unmarried children ages 26 and over that may qualify as a Dependent due to legal guardianship. Any such determination will be made by Sedera, at its sole discretion. |

|  |  | As a general rule, married children, and those age 26 and over, are not eligible to participate on their parent's membership at the end of the month during which they turn 26. Married children and those age 26 and over therefore must establish a new distinct membership with the Sedera MCS Community. |
|---|---|---|
| 3.A.4. | Marriage | When a Member's child Dependents gets married, they must request their own membership. |
| 3.A.5. | Newborn | Newborns will be included within the household membership retroactive to the date of birth as long as the Member notifies Sedera to add the child to the membership no later than 30 days after birth. Otherwise, the newborn's Start Date will be no earlier than the date of notification to Sedera. **REMEMBER: Failure to add the newborn within 30 days after birth will result in all newborn's prior medical bills being unshareable.** Sedera should be notified as soon as possible to add subsequent newborn children to the membership. Please be aware that there are specific Guidelines that address sharing Needs for a newborn. See Section 7. |
| 3.A.6. | Adoption | New adoptions will be included within the household membership retroactive to the date of adoption as long as the Member notifies Sedera to add the child to the membership no later than 30 days after the adoption. Otherwise, the Start Date will be no earlier than the date of notification to Sedera. Sedera should be notified as soon as possible to add subsequent adopted children to the membership. Member is required to provide adoption documentation to verify this Life Change Event.

Adopted, unmarried children are considered Members of the household the same as biological children. Any physical condition of which the adopting parents are aware that the adopted child has prior to the adopting parents being legally responsible for the child's expenses, or prior to the child's Start Date within his parents' membership, will be considered a "medical condition that existed prior to membership" under Section 5. |
| 3.A.7. | Cancellation and Termination of Membership | Cancellations and terminations have to do with ending your membership with the SMCSC. Cancellations are initiated at the Member's request. Terminations are initiated by Sedera for lack of payment and/or violation/abuse of Sedera's Guidelines.

Cancellation: Members can notify the Sedera MCS Community of their desire to cancel their membership at any time or log on to their Member Portal and cancel their membership; however, the cancellation will generally become effective at midnight on the last day of the billing cycle in which the cancellation occurs. Please note that due to banking requirements, cancellations that occur on the last day of a billing cycle or on a banking holiday may not actually occur until the end of the next billing cycle.

Termination: Sedera may terminate a membership as provided in these Membership Guidelines. The termination will generally become effective at midnight on the last day of the billing cycle in which the termination occurs. Please note that due to banking requirements, terminations that occur on the last day of a billing cycle or on a banking holiday may not actually occur until the end of the next billing cycle. Terminations may be retro-dated to the end of the billing period for which Sedera received contributions. |

Resp. Ex. 1

| 3.A.8. | Reinstatement of Membership | Cancellation: Members who cancel their Sedera Membership may re-enroll for membership. In general, re-enrollments that are more than 30 days past cancellation, are treated as new enrollments.<br><br>Termination: Members who have been terminated may reapply for membership with the Sedera Medical Cost Sharing Community; however, Sedera in its sole discretion may deny any such request to re-enroll. If a member is allowed to re-enroll, they are treated as new enrollments, regardless of the elapsed time between termination and new Start Date. |
|---|---|---|
| 3.A.9. | Maximum Membership Age of 65 | Eligibility for Sedera MCS Community Access Membership terminates at age 65. As such, a Member's membership terminates on the last day of the billing cycle in which they turn 65. This termination occurs regardless of whether the Member is eligible for Medicare. |
| 3.A.10. | Changes to Membership During the Membership Year - Life Change Event (LCE) | Every Sedera Membership has a yearly anniversary date based on the membership Start Date (Membership Year) when a Member can make certain changes to their Membership options. Membership options include items such as household Membership level, IUA level, and additional services purchased.<br><br>A Life Change Event (LCE) also allows a Member to make changes to their dependents and/or Membership level during the Membership Year within 30 days of the LCE and will be made effective at the start of the next billing cycle. An LCE includes:<br><br>1. Changes in your household: a) A Member or Spouse having a baby or adopting a child; b) A Member or Dependent getting married or divorced; c) A Member or Dependent dying; d) A Dependent turning 26 years old.<br>2. Changes in your employment status.<br><br>Please Note: Automatic changes to membership based on changes in a Member's age take effect on the first day of the next contribution cycle after the Member's birth date. |
| 3.A.11. | Death of a Member | Upon the death of a Member, please notify a Sedera Member Advisor as soon as possible. Sedera will likely require certain documentation to efficiently handle any existing Needs Case(s) and/or close or make changes to an existing Sedera Membership. A Sedera Member Advisor can also help answer any questions about submitting a Needs Case on behalf of a deceased Member or how Medical Cost Sharing works. |
| 3.A.12. | Change to Selected IUA | A Member's chosen IUA affects the Monthly Member Contribution and therefore the amount available to the Community for Medical Cost Sharing.<br><br>**Increase.** A Member can choose to increase their selected IUA at any time. The new Monthly Member Contribution will go into effect/be pulled/reflected on the next billing cycle. Please contact a Sedera Member Advisor if you have any questions. Sedera reserves the right, at its sole discretion to determine an exception to this general rule.<br><br>**Decrease.** A Member may decrease their IUA only during the month prior to the anniversary of their Start Date. The IUA can only be decreased by one IUA lower than the current selected IUA. For example, if your IUA was $1,500, the Member could only decrease their IUA to $1,000. The new Monthly Member Contribution will go into effect/be pulled/reflected on the next billing cycle. |

| | | Please Note: Any change in a Member's IUA will not affect any open or ongoing Needs Case. |
|---|---|---|
| 3.A.13. | Changes to Household/Member Contact Information | Changes to Household/Member Contact information, including email, phone number, and mailing address, must be updated in the Member Portal. |
| | | Members are required to maintain accurate records. Sedera may be restricted from servicing membership in certain States or Jurisdictions, and upon notice of a Membership relocating to any of those territories, Sedera, in its full discretion, may terminate the Membership. Sedera Medical Cost Sharing State Availability. |

**B) SUBMISSION OF NEEDS CASE**

Eligible medical expenses will be shared for all Household Members who meet the membership requirements in Section 1. For a Needs Case to be Shareable, the Member Household must be current with their annual membership meaning all Monthly Member Contributions and Monthly Shares are paid-to-date. Members are advised to carefully follow these instructions for submitting their Needs Cases.

The following diagram depicts the general process for processing a Member Needs Case:



**The Process**

1. As soon as a Member anticipates the likelihood of a medical Need (non-emergency), they should contact a Sedera Member Advisor at 1-855-973-3372 (See Section 6.A.7.) so that Sedera may assist them through the process. Note: Emergency medical Needs should be addressed immediately by the nearest qualified emergency professional. Please notify a Member Advisor as soon as reasonably possible after an emergency care visit.

2. Members who have already experienced a Need that exceeds their Initial Unshareable Amount (IUA) should access their Sedera Member Portal online to open a Needs Case.

3. The Member then organizes their Medical Bills, goes online to sederamcs.org/login, clicks on "Needs Management" from the menu bar, and completes the online Needs Case Submittal Process. This includes uploading copies of all relevant Medical Bills and any proof of payments made towards the Member's Initial Unshareable Amount (IUA). If you have any questions about

Resp. Ex. 1

the Needs Case Submittal Process, please feel free to contact a Sedera Member Advisor.

4. Upon completion of the online Needs Case Submittal Process, Sedera will review the Needs Case and the submitted documentation against the Membership Guidelines. If the Needs Case is determined to be Shareable processing of your Medical Bills will begin.

5. Inflated Medical Bills, and those over $1,000.00 may go through the bill negotiations process. If bill negotiation is necessary, your Needs Coordinator will help you throughout the process as our bill negotiators work to reduce your Medical Bills on your behalf. Once bill negotiations are complete, your Shareable Medical Bills will be shared with the Community and funds will be sent to you so you can pay the negotiated balance.

Negotiations for reductions — One of the primary contributors to the Sedera MCS Community's ability to maintain low Monthly Contribution requirements is the success we have historically achieved by bill reductions from inflated original invoices through our skilled negotiators. Sedera encourages Members to only pay their Initial Unshareable Amount (IUA), so that outside bill negotiators can negotiate the remaining bills on behalf of the Member. When Members submit medical bills for sharing, they are committing to cooperate with Sedera's staff and representatives to seek equitable prices from providers and to document amounts the Member has paid to providers.

As long as the monthly Needs Cases requested are less than the Monthly Member Contributions received, Shareable Needs Cases/Medical Bills will be fully shared. In the event that Needs Cases are more than the Monthly Member Contributions, sharing of Needs Cases may require proration. For more information on proration please see Section 4.B. of these Guidelines.

6. Sedera Members are responsible for paying their providers directly. Sedera does not pay medical providers on behalf of Members, so Needs Case payments are sent directly to your external bank account connected to your Medical Cost Sharing Account created at enrollment. Members also receive an Explanation of Needs Shared which explains the dollar amount Members need to pay to which providers.

## C) BINDING DECISIONS

Although Sedera's staff members are trained to be forthright in phone conversations, oral opinions offered by any Sedera employee do not constitute or ensure a binding decision. Members who call to inform us of their circumstances in order to discover if the Need qualifies will be given an opinion — not a binding decision. Written rulings will be issued only to Members who submit requests in writing. The written inquiry must explain the circumstances and medical procedures involved and specify that a written ruling be returned in writing. Such written response from Sedera will constitute a decision that will commit Sedera to share the bill through the normal Needs sharing process.

## D) DISPUTES AND RECONCILIATION

The Sedera MCS Community serves a Community of like-minded individuals who wish to help one another. Members resolve to handle disputes fairly between each other or with Sedera in private or within the Community. A Member who chooses to violate this common belief and covenant and takes a dispute to court demeans the entire Sedera membership and places undue strain on the Community. Sedera Members who pursue court proceedings against the Sedera MCS Community, its Members or its affiliates, understand that their memberships will be consequently terminated.

Therefore, in becoming a Member or reaffirming one's membership, Members agree that any claim or dispute, with or against the Sedera MCS Community, its employees, directors, other Members or associate Members, that is related to the Sedera MCS Community and the Sedera membership in any way, shall be settled by non-biased mediation or, if mediation is unsuccessful, by legally binding arbitration. Sedera agrees similarly with respect to any matter that it may have against a Member. Any such mediation and/or arbitration shall take place in Austin, Travis County, Texas. The procedure to be used depends upon the nature of the issue as explained in paragraphs A and B.

### 1. Questions Regarding Whether a Need is Shareable/Appeals Process

Nearly all Needs Cases can be determined to be Shareable or not shareable according to the Guidelines. In matters where the Guidelines may not provide absolute clarity, Sedera shall have the sole discretion to determine whether the Needs Case should be Shareable. Sedera may, but shall not be required to, consider prior procedure and precedent in making such a determination. Any such determination shall be final and binding.

If a Needs Case is determined to be not shareable, and the Member believes that the Sedera Needs Coordinator is misinterpreting the Guidelines or the Member's particular circumstances, then the Member may seek reconsideration of the decision by the appeals process generally described below. Please note that regardless of the outcome of the appeals process, the existence of an appeals process should not and does not create a legally enforceable right or entitlement to the sharing of a particular Needs Case since there is not a contractual promise or legally enforceable right to the sharing of Needs Cases under the Membership Guidelines. A Member has 90 days from the date the determination in question was rendered to initiate the first step in the appeals process.

The appeals process is a three-step process: 1) The Member may call a Member Advisor or Needs Coordinator and request that the Sedera Needs Operations Manager review the decision made by the Needs Coordinator assigned to the Member's Needs Case(s). The Needs Operations Manager will provide their decision, usually within 10 business days; 2) If the Member believes that the Needs Operations Manager is still misinterpreting the Guidelines or the Member's particular circumstances, then the Member has 90 days from the day the determination in question was rendered by the Needs Operations Manager to make a written request to Sedera to have the Needs Case submitted to the Sedera Community Stewardship Board (CSB) to determine if, or how much, of a Needs

Case will be Shareable. The CSB reserves the right to recommend partial sharing (less than the full amount) of a Needs Case. Please contact your Member Advisor or Needs Coordinator to receive a copy of the Needs Appeal Form to make this written request. 3) If the Member believes that the CSB is still misinterpreting the Guidelines or the Member's particular circumstances, then the Member has 30 days to make a written request to have the Needs Case(s) submitted to a panel of seven randomly chosen Members who have agreed to review the Need to determine whether it is shareable ("Member Review Panel" or "MRP"). If any two Members out of the seven Member MRP agree that the Needs Case(s) should be Shareable, then Sedera will treat the Needs Case(s) as Shareable in the usual fashion.

If the Member still believes that the conclusion of the MRP is wrong, the dispute will be settled by mediation, and if unsuccessful, by binding arbitration. Any such mediation and/ or arbitration shall be conducted solely in Austin, Travis County, Texas subject to the laws of the state of Texas. Such arbitration shall be conducted in accordance with the rules of arbitration published from time to time by the American Arbitration Association. The Sedera MCS Community and the Sedera Member agree that each party shall bear its own costs and evenly split the cost of any mediator(s) or arbitrator(s). The Sedera MCS Community and the Member agree to be legally bound by the Arbitrator's decision.

## 2. Resolution of All Other Issues

Any issue not included under paragraph A to be resolved by the Member panel shall be settled in accordance with mediation and if such mediation is unsuccessful, by binding arbitration. Any such mediation and/or arbitration shall be conducted solely in Austin, Travis County, Texas subject to the laws of the state of Texas. Such arbitration shall be conducted in accordance with the rules of arbitration published from time to time by the American Arbitration Association. Sedera and the Member agree that each party shall bear its own costs and evenly split the cost of any mediator(s) or arbitrator(s). The Sedera MCS Community and the Member agree to be legally bound by the Arbitrator's decision. However, if both the Sedera MCS Community and the Member agree, the dispute may be submitted to a randomly selected panel of seven Members instead.

## 3. Agreement Not to Go to Court

Members understand that these methods shall be the sole remedy for any controversy or claim arising out of their relationship with the Sedera MCS Community and to the extent permitted by law, expressly waive their rights to file a lawsuit in any civil court against the Sedera MCS Community, its employees, Members, associate Members and directors, for such disputes, except to enforce an arbitration decision obtained under paragraphs A or B. This also includes any determinations as to whether the matter in dispute comes within this arbitration agreement or can be required to be arbitrated. Judgment upon an arbitration award under either paragraph A or B may be entered only in the District Court of Travis County, Texas. To the greatest extent permitted by law, each Member hereby waives the right to trial by jury.

## E) AMENDMENT OF GUIDELINES

The Sedera Medical Cost Sharing Guidelines are a Community and Member resource to understand available sharing for medical procedures, illnesses, etc., and what limits may exist for certain Needs/Community sharing. Changes to the Guidelines are made with the Community in mind, as it continues to grow in numbers and diversity. The decisions made when changing the Guidelines are a balance between the desire to share in reasonable, unexpected, necessary medical expenses and the desire to have a reasonably priced membership. The Guidelines are adjusted and created to best align with the current medical and scientific findings and practices. While some medical procedures or practices find themselves charged with political connotations Sedera's decisions are not and should not be seen or understood as the Community taking any political positions.

The Sedera MCS Board reserves the right to make changes as necessary to the Guidelines to ensure that the Community is serving its Members and protecting the Community's ability to share in Needs. These changes and clarifications range from adjusting limits on sharing in certain procedures, deciding to no longer share or deciding to fully share in new procedures, etc. As the Guidelines change, we encourage Members to review the changes as they are announced, as they will become effective for each Member on the effective date. Please Note: As a general rule, the Member's Need(s) are shared in accordance with the Guideline effective at the time that the Need is incurred.

### 1. Procedures

These Guidelines may be amended by the Sedera MCS Community Board of Directors. The Board has the option of first taking an advisory vote of Members and/or households in good standing.

### 2. Effective Date

Amendments to the Guidelines will go into effect as soon as administratively practical or as designated by the Board. If Members have a Need that began prior to the adopted change, the sharing of bills related to that Need will be determined by the Guidelines as they existed on the date the bills were incurred. If a Member's ongoing/open Need would be affected by any Guideline change or amendment, those changes will be reflected on the sharing of that Need on the same date that the amended Guidelines go into effect. A Member can request review by the CSB if they believe this change would cause financial hardship.

### 3. Notice of Amendments

Members will be notified of changes to the Guidelines through postings on the Sedera website, or by provision of updated Guidelines when they are notified that their Membership renewal is due.

# Sharing Guidelines
## 4. Shareable Needs Cases

This section explains how the shareable amount of a Member's Medical Bills will be determined. There is no annual limit on the number of Needs Cases that may be shared. Original, itemized Medical Bills that Members want considered for sharing must be submitted within 6 months of the date of service. Medical Bills submitted more than 6 months after the service date of service will not ordinarily be Shareable.

### A) BASIC NEED LEVELS

Needs Cases are submitted on a per Member, per incident, basis. These are injuries, illnesses, and medical events resulting in Medical Bills incurred by receiving medically necessary treatment from licensed medical professionals; including physicians, emergency rooms, hospital facilities (whether inpatient or outpatient), and in certain circumstances the costs related to medical case management.

| | | |
|---|---|---|
| 4.A.1. | Initial Unshareable Amount (IUA) | The financial portion ($500, $1,000, $1,500, $2,500, or $5,000 U.S. dollars) that Members pay their medical provider(s) prior to any amount being eligible for sharing. After the IUA has been satisfied, a Shareable Needs Case, as determined by the Guidelines, becomes eligible for sharing consideration. |
| 4.A.2. | Maximum Shareable Amount per Needs Case | While there is no lifetime maximum amount eligible for sharing for any Household, sharing is limited to the total number of shares made available by the collective participants. No single Needs Case may consume more than one third of the total number of shares available in order to assure adequate shares for all Members.\n\nThe Member Share Amounts are allocated as needed to handle both large and small medical bills that qualify for sharing. Because large bills are a fact of life in any community, Sedera allocates a specific portion of every month's Member Share Amounts to the very large medical costs requested in that month. Fifteen percent of the Member Share Amount received each month is allocated to very large Needs Cases. |
| 4.A.3. | Determination of "Needs Case" | Expenses related to the same medical condition, including those for separate incidents, (e.g., separate treatments or episodes of symptoms) will be shared as one Needs Case and accumulate towards the total Needs Case amount. When 12 consecutive months have passed without any symptoms, medication, or other treatment for the condition that originally created the Need, or related subsequent conditions, and the condition recurs, it would be treated as a new Needs Case. |
| 4.A.4. | Multiple Needs Cases Within a 12-month Period | Members and Households that experience multiple Needs Cases within their 12-month Membership Year are required to pay the first three IUAs at the selected amount. If there is a fourth Needs Case during the same Membership Year, no IUA would apply. The fourth Needs Case, and any subsequent Needs Case(s), would be eligible for sharing with no IUA subject to any stated restrictions or limitations in the Guidelines. (Please remember that to qualify as a Needs Case, the medical expense must first exceed the Member's IUA.) |
| 4.A.5. | Effect of Discounts | Keeping medical expenses to a minimum is an advantage to all Sedera MCS Community Members. Therefore, Members are asked to contact |

|  |  | their Member Advisor in all medical incidents that are not emergency situations. If you are involved in a medical emergency, please contact your Member Advisor within 48 hours, or as soon as reasonably possible. Members who pay full-billed charges for medical services which exceed industry price norms may be subject to sharing reductions. See Section 2 for further details. |
|---|---|---|
| 4.A.6. | Multiple Simultaneous/Related Needs Cases | If more than one Shareable condition is treated during the same period of time (unless associated with a single incident/accident), the Member must submit separate Need Cases for each condition. Each Need Case must be submitted with through a separate Needs Case Submittal Process. The Member's IUA will apply to each Need Case, subject to the multiple Need Case limits. See 4.A.4.

Excluding emergencies, each Shareable Needs Case performed on a joint, eye or other body part to treat aging–related degenerative diseases (examples include treatment of knee osteoarthritis, cataracts) is treated as a separate Needs Case, even if there is a single underlying diagnosis that necessitates the procedures. |
| 4.A.7. | Advanced Notification | Notifying your Sedera Member Advisor as soon as possible of a new medical diagnosis or medical incident (e.g., within three days of receiving notice from your doctor) is strongly encouraged. Doing so enables Sedera to assist Members in locating and utilizing highly qualified medical providers at fair prices. We refer to these as "Best Value" providers.

Member Advisors are equipped with access to multiple data resources to assist in determining high quality medical care at fair and reasonable rates and are empowered to reward Members who embrace using Best Value providers. For example, by reducing or waiving the Member's IUA. |
| 4.A.8. | Medical Case Management | Medical Case Management is a collaborative process that helps plan, coordinate, and/or facilitate treatment plans to help arrange the appropriate medical care for disabled, ill, or injured individuals. In certain circumstances the costs of these services are Shareable with the Sedera Medical Cost Sharing Community. Please contact your Sedera Needs Coordinator for further details. |
| 4.A.9. | IUA Reduction for Free Market, Transparent Priced Procedures | If a Member shops for and obtains their sharable procedure or intervention from a surgical center or provider which posts non-hyperinflated prices transparently, their IUA may be reduced or waived. |

## B) PAYMENTS FROM OTHERS WHO ARE OBLIGATED TO PAY

| 4.B.1. | Insurance Entities and/or Government Programs | Obligated insurance and/or government entities are always considered the primary payor for any Member's Medical Bills. Members who are eligible for benefits through either insurance arrangements or government programs are required to contact their Sedera Member Advisor before submitting their Needs Case. The Member Advisor can assist in submitting the Member's Medical Bills to the entity (e.g., Medicare, Medicaid, Worker's Compensation, or any other responsible private insurance payor) prior to submitting them to Sedera. Notice of payment, or rejection, must be received from the potentially liable party before Sedera will consider whether the Needs Case is Shareable. Any amount paid by an obligated third-party payor will reduce |
|---|---|---|

| | | |
|---|---|---|
| | | the Members IUA, dollar for dollar, up to the full amount. Amounts paid over and above the IUA by obligated third parties will not be shared.<br><br>Example: A Member's child is playing at a friend's home and suffers a fall down the stairs. The child requires treatment for lacerations and a broken wrist. The total negotiated medical expenses come to $4,000. The accident was later attributed to a toy being left on the stairway, causing the child to trip. The Member discovers that the parents' homeowners' policy has a $1,000 medical liability provision and the property insurance company awards a claim to the Member's medical provider. In this case, the Member's Initial Unshareable Amount (IUA) would be eliminated and the burden for Sedera Members would also be reduced as follows:<br><br>    a. Original Needs Case; $4,000 medical expense - $500 Member portion IUA = $3,500 Sedera MCS Community Shareable amount<br><br>    a. Adjusted Needs Case, after insurance award; $4,000 medical expense - $1,000 insurance award $0 Member IUA eliminated = $3,000 adjusted Sedera MCS Community Shareable amount |
| 4.B.2. | Pursuing Legal Remedy | In the event that a Member suffers injury at the hand of another person/party leading that person/party to be liable or potentially liable for payment and the liable party and/or their insurer refuses to pay unless or until a legal remedy is reached, the Member will be responsible to pursue such legal remedy against the liable person/party. Sedera reserves the right to not share and/or place conditions on the sharing of these Needs Cases until such matter is settled or adjudicated. Please contact your Member Advisor if you have questions related to a specific situation. |
| 4.B.3. | Other Available Assistance | Members must seek reimbursement from other responsible payers, including government entities, for any portion of their Needs Case, when the Member is eligible for such benefits. |
| 4.B.4. | Discounts | Discounts given by any healthcare provider should be listed when completing the online Needs Case Submittal Process and will not be eligible for sharing. Generally, we encourage Members to only pay their Initial Unshareable Amount (IUA) at the point of service so that Sedera's staff will have the opportunity to negotiate the rest of the Medical Bills for that Needs Case. See also Section 4.A.5. |
| 4.B.5. | Balancing Needs Cases and Shares/Proration | The amount of a Needs Case that is Shareable may be affected by the amount of other Members' Needs Cases. Each month there is a fixed amount of committed Monthly Shares available from Members to be sent out to meet Needs Cases. However, the Needs Cases of Members fluctuate, and in any one month may be greater, or lesser, than the shares available. Needs Cases take varying amounts of time to process to be ready for sharing, and there is rarely an exact match between the amount of shares available for a month and the Needs Cases. Many times, the mismatch between Needs Cases and shares is remedied by overlapping Needs Cases received over two months, but occasionally the discrepancy is too large for this simple adjustment. The handling of large fluctuations is described as follows:<br><br>1. **When Monthly Shares exceed Needs Cases —** If the available Monthly Shares exceed the Sharable Needs Cases in any given month, and all of the prorated Needs Cases from the previous month have also been met, the additional Monthly Shares may be used to offset Needs Cases for the following months. |

Resp. Ex. 1

|  |  | **2. When medical Needs Cases exceed Monthly Shares/Prorating —** Sedera's goal is that all Members Shareable Needs Cases will be shared. However, in the event that the Shareable Needs Cases are significantly greater than the Monthly Shares available for that particular month, we may use a prorating contingency plan. |
|  |  | Example: if $500,000 in total Needs Cases are shared in a given month, but only $400,000 in Monthly Shares are available, Sedera would take the percentage of Monthly Shares as compared to Needs Cases—$400,000/$500,000 = 80%—and apply that percentage to each Needs Case. Thus, Sedera Members would share 80% of the normal Shareable amount of each Needs Case presented for that particular month. If a Member has a Needs Case for which the Sedera MCS Community would normally share $1000, $800 would be available for sharing. Importantly, experience to date has shown that through our bill negotiations process adequate funds have been available to meet the final negotiated costs of all Sharable Needs Cases. |
| 4.B.6. | Time Limit for Sharing Documentation | The earlier that Medical Bills are submitted typically enables the best opportunity for price reduction via negotiations with medical providers. When there are a number of Medical Bills related to treating the same incident, it is helpful for them to be submitted together if they can all be obtained within a 30-day period. |
|  |  | Original, itemized Medical Bills should be submitted to Sedera via the online Needs Case Submittal Process as soon as possible. Barring extraordinary circumstances, bills submitted more than 6 months from the date of service ("DOS") will not ordinarily be shared. However, exceptions will be considered for bills that will be applied towards a Members IUA for up to 12 months from DOS. Members are encouraged to open a Needs Case upon first DOS, regardless of exceeding IUA, to utilize Sedera navigation resources and maximize processing efficiency. |
| 4.B.7. | Other Medical Cost Sharing Communities | Sedera Members are free to participate in other Medical Cost Sharing communities in addition to Sedera. However, a Sedera Member should not profit from incurring a medical Need or unduly burden one community over another. Members with a Shareable Needs Case in Sedera, while a member of multiple sharing communities, will need to cooperate and provide supporting documentation to show what is shareable/has been shared by another community. The Sedera MCS Community will share in its proportional share of the Needs Case. |
|  |  | Example: If Sedera is one of two responsible MCS Communities, Sedera will share 50% of the Needs Case; if Sedera is one of three responsible MCS Communities, Sedera will share in 1/3 of the Needs Case; etc. |

# 5. Medical Conditions Existing Prior to Membership

Medical Bills for any medical service/treatment provided during membership which meets these Guidelines are Shareable while being a Member in good standing, except as explained below or as otherwise agreed prior to membership.

| 5.A.1. | Chronic or Recurrent Conditions | With the exception of specified time periods stated in Section 6 below, medical Needs Case that result from a chronic or recurrent Pre-existing Medical Condition are subject to sharing limitations, <u>unless</u> 36 months immediately prior to membership Start Date have passed without any signs |

| | Existing Prior to Membership | or symptoms of the condition, without any treatment needed, without any medication prescribed or taken, and without any suspicion by the patient or doctors that the condition is resurfacing. This applies whether or not the cause of the symptoms is unknown or misdiagnosed. |
|---|---|---|
| | | Recurrent acute severe allergic reactions (hives, swelling, swollen airways, shock, anaphylaxis) requiring urgent or emergent intervention will be considered a chronic/recurrent condition and will be subject to pre-existing condition sharing limitations if such events have occurred 3 or more times in the 36 months prior to membership Start Date, regardless of the triggering allergen. |
| | | Please Note: Sedera may require that the Member provide a written statement from a physician that the current Needs Case was not caused by the prior condition. |
| | | If you can or could have answered "Yes" to any of the below, you most likely have a pre-existing condition that will be subject to the pre-existing condition sharing limits. See section 6 for more information.<br><br>1. Have you met with a doctor or other medical professional to discuss a medical situation within the last 36 months?<br>2. Are you thinking about going to see a doctor or other medical professional because something is bothering you?<br>3. Are you taking medication(s) for any condition or symptom? |
| 5.A.2. | Verification for Certain Conditions | For some conditions listed below (all of Section 6 and Appendix), a written verification signed by both the Member and the Member's treating physician must be submitted to substantiate that there have been no signs or symptoms of the condition, no treatment needed, no medication recommended or taken, and no suspicion by the patient or doctors that the condition was resurfacing for at least 36 months prior to membership Start Date. |

## 6. Shareable Conditions

### A) SHAREABLE CONDITIONS FOR WHICH MEDICAL BILLS ARE ELIGIBLE FOR SHARING

Medical Bills are Shareable if they fit within the Guidelines approved by the Board of Directors. The Guidelines place some limitations on the types of physical maladies and medical services for which Needs Cases are shared and limit the sharing of Medical Bills incurred due to illnesses related to certain Pre-existing Medical Conditions.

This section is designed to enable Members to determine whether the medical services required for specific injuries, illnesses, and medical event would be Shareable, and to confirm if or when medical expenses would be Shareable for known medical conditions. There are some services and charges that are not Shareable (Sections 6.C. & 6.D.). Members are advised to contact their Sedera Member Advisor if they have any questions regarding the application of these Guidelines. Also, see Section 3.A.3 regarding Binding Decisions.

Most physical conditions are eligible for sharing within a range of special provisions for certain conditions as explained below.

Resp. Ex. 1

Member Needs Cases resulting from conditions within the time periods indicated prior to membership, require a verification statement signed by both the Member and their doctor, as described in Section 5.A.2. This is to ensure that the condition did not exist prior to membership, or that the Member had no signs or symptoms of the condition, no treatment was needed or undertaken, no medication prescribed or taken, and there was no suspicion by the patient or doctors that the condition was resurfacing. This applies whether or not the cause of the symptoms is unknown or misdiagnosed.

## B) NEEDS CASES FOR WHICH MEDICAL COST SHARING IS LIMITED

Visits to licensed medical providers, emergency rooms/urgent care centers, hospitals, laboratory, and testing facilities, as well as out-patient surgery centers for physician-ordered lawful medical treatments for illnesses, injuries, and medical events are generally Shareable. Expenses for services rendered outside of the United States are shareable provided the documentation meets the requirements in the Appendix.

A look-back period of 36 months applies to all Pre-existing Medical Conditions for Sedera MCS Community applicants. A Pre-existing Medical Condition, as previously defined, is subject to sharing limitations unless 36 months immediately prior to membership Start Date has passed without any signs or symptoms of the condition, without any treatment needed, without any medication prescribed or taken, and without any suspicion by the patient or doctors that the condition is resurfacing. This applies whether or not the cause of the symptoms is unknown or misdiagnosed.

A new Pre-existing Medical Condition occurring after a Member's Application Date and within the 60 days immediately preceding the Start Date will not be subject to the Pre-existing Medical Condition limitations. Other limitations may still apply.

Sharing Limitations for Pre-existing Medical Conditions are gradually removed according to the following schedule:

| Time Constraints for Pre-Existing Medical Conditions after Membership Start Date | Sharing Eligibility |
|---|---|
| First 12 Months | Not Shareable |
| Months 13 – 24 | Shareable to $15,000 |
| Months 25 – 36 | Shareable to $30,000 |
| Months 37 and after | Fully Shareable |

*See Appendix for details pertaining to special provisions for conditions stated in the above table.*

A look-back period of 12 months applies to all potential Tobacco/Vape User applicants. If at any time during the 12 months preceding the Application Date a Member meets the Tobacco/Vape User definition, then the Member is considered a Tobacco/Vape User. Additionally, if at the Application Date a Member was not considered a Tobacco/Vape User and the Member engages in the outlined Tobacco/Vape User behavior, the Member must contact a Sedera Member Advisor to have that change reflected in their membership. Tobacco/Vape User Members are

subject to the following additional restrictions and the Proof of Cessation requirements as outlined in the Appendix.

| Additional Sharing Restrictions for Tobacco/Vape Users: |
| --- |
| Cigarette smoking is the leading preventable cause of death in the U.S. Sedera Medical Cost Sharing Households with one or more Tobacco/Vape Users are required to share a higher Monthly Contribution amount to incentivize the Member(s) to stop tobacco use or vaping. |
| Exceptions: The occasional celebratory cigar or pipe is acceptable. |
| Until the Member(s) meets the Requirements to Prove Cessation of Tobacco as outlined in the Appendix, Tobacco/Vape Users age 50 and older, in addition to the higher Monthly Contribution amount also have a Shareable limit of $25,000 for each of the following conditions: |
| 1. Cancer |
| 2. Respiratory Disease |
| 3. Vascular disease including coronary disease and stroke |
| 4. Oral and Esophageal disease |
| 5. Gastric and Duodenal Ulcers |
| Please note that failure to report a Tobacco/Vape User to Sedera may result in termination of Membership. |

**There are special rules and limitations for certain services and some services are not shareable as indicated below:**

| 6.B.1. | ADD, ADHD, Autism, and SPD Treatment | Maximum shareable amount of $1,500 per Member per Membership Year. |
| --- | --- | --- |
| 6.B.2. | Allergy/ Allergies | Generally Shareable. However, special considerations are noted here: |
| | | **Acute Allergic Reactions:** Treatment for acute allergic reactions is Shareable unless subject to pre-existing condition limitations (See Section 6.B.). Each discrete episode of acute allergic reaction *is considered a separate Need with its own IUA* applied before sharing. |
| | | **Allergy Diagnostic Testing:** Sharable after IUA only if ordered by a physician who is trained adequately to understand and interpret the ordered testing (usually this means allergists). Such testing will not be Shareable if ordered by alternative/functional/integrative medicine practitioners. |
| | | **Allergen Immunotherapy for allergic disease:** |
| | | 1. Injected or oral/sublingual immunotherapy for food allergy (including peanut (*Palforzia*) is not Sharable. |
| | | 2. Injected or oral/sublingual immunotherapy for inhalant allergies is partially shareable (50%), after IUA, when overseen or ordered by physicians who are trained adequately to provide these therapies and who are not alternative/ functional/ integrative practitioners. (Injectable Epinephrine is addressed in section 6.B.28.) |
| 6.B.3. | Alternative Medical Practices | Unproven and insufficiently proven diagnostics and therapeutics are considered Alternative and are not Shareable. Alternative practice methods include ayurvedic, acupuncture, homeopathy, naturopathy, |

|  |  | functional/integrative medicine, most use of CBD and all marijuana, and any practice that promotes insufficiently proven methods. See Section 6.B.12. for sharing considerations for chiropractic. All of the following are also considered alternative/insufficiently proven diagnoses and treatments: nutritional supplements, detoxification, stem cell or platelet-rich plasma (PRP) therapies (other than where proven effective), or other regenerative diagnostics or therapeutics; non-FDA approved uses of cryotherapy and light therapy, IV Infusion Therapy performed at wellness centers or medical spas, and all diagnostics and lab tests performed on healthy people other than screening testing as recommended by the US Preventive Service Task Force; and use of diagnostics and therapeutics for mold toxicity, chronic Lyme, Electromagnetic Hypersensitivity Syndrome, and other poorly-characterized conditions;. Alternative therapeutics may be considered for limited (partial) sharing if the CSB is provided convincing evidence of the value/effectiveness for the specific disease being treated. A Sedera Member Advisor or Needs Coordinator is available to discuss the submission process. |
|---|---|---|
| 6.B.4. | Alcohol or Drug Abuse Treatment | Treatment for Alcohol / Substance Abuse / Chemical Dependency is Shareable to a maximum of $1,500 per separate Needs Case. |
| 6.B.5. | All Other Addiction Treatment | Not shareable. The Sedera MCS Community does not share costs for treatments related to addictions other than for Alcohol/Substance Abuse & Chemical dependency. However, Sedera's Member Advisors are available to assist Members in locating qualified medical providers and/or alternative treatment options. |
| 6.B.6. | Ambulance Transports | Shareable as part of a Needs Case whenever medically indicated by a licensed medical doctor, and/or whenever practical due to the severity, proximity and circumstances associated with a specific illness or injury. Not Shareable for convenience purposes only. |
| 6.B.7. | Audiological | **Audiological Testing:** Shareable above IUA for assessment of hearing loss subject to the Pre-existing Condition sharing limitations.<br><br>**Cochlear Implants:** Shareable as outlined in Section 6.B.26. ("Implanted Medical Devices & Internal Prosthetics") and Section 6.B.31. ("Medical Equipment & External Prosthetics") if prescribed by a licensed medical provider.<br><br>**Hearing Aids:** Generally not Shareable. Shareable one time per Member at 50% of the cost up to $1,000 if a result of a new traumatic injury or new acute illness leading to hearing loss. |
| 6.B.8. | Autopsy | Generally not Shareable. |
| 6.B.9. | Breast Surgery – Cosmetic, Cancer, Mastectomy, Reduction | **Cosmetic:** Not Shareable. Note: this includes, but is not limited to, breast augmentation and implants. See Section 6.B.15. for more details.<br><br>**Cancer:** A mastectomy, reconstruction, or cosmetic procedure occurring because of a new cancer diagnosis after Membership Start Date, is generally eligible for sharing subject to any other applicable limitations in the Guidelines. Members undergoing a mastectomy, reconstruction, or cosmetic procedure as a part of a pre-existing cancer diagnosis are subject to the Pre-existing Sharing Limitations. |

| | | Complications related to a Shareable Needs Case are generally Shareable. Cosmetic Reconstruction after Cancer:<br><br>• Shareable up to $20,000 per breast and 50% sharing for any amount above the $20,000.<br><br>**Preventive Mastectomy:** Please see Preventive Cancer Surgeries, Section 6.B.43.<br><br>**Breast Reduction:** A Member undergoing a breast reduction as part of a Shareable Needs Case is eligible for up to 75% sharing.<br><br>Please Note: Complications including dissatisfaction, regret, or failure to obtain the desired results are not considered Shareable complications. |
|---|---|---|
| 6.B.10. | Cancer/Chronic Illness Diagnosis | Generally Shareable for a new diagnosis. If related to cancer/chronic illness of a type the Member had prior to their Membership Start Date, then it may be subject to the Pre-existing Conditions sharing limitations. A Member diagnosed with cancer or another chronic illness, should notify a Sedera Member Advisor as soon as possible to discuss the tools and resources that may be available to help them. |
| 6.B.11. | Chaplaincy | Not Shareable outside of Sedera's ancillary services network, however access to Chaplains is provided as part of the Ancillary Member Services program. Chaplains, both male and female, are available to Members via telephone. They are experts in listening and providing spiritual support and encouragement. |
| 6.B.12. | Chiropractic | Services related to treatment of a specific musculoskeletal injury or musculoskeletal disease are Shareable for Members 18 years of age and older sharing limited to $3,000 per Needs Case with a maximum of $3,000 per Membership Year, including related items for treating the musculoskeletal injury or musculoskeletal disease such as prescribed X-rays. Maintenance treatments are not Shareable. All other chiropractic services, including any treatments on Members under 18 years of age, will be considered "Alternative Medical Practices" per the Guidelines. |
| 6.B.13. | Colonoscopy | **Diagnostic Colonoscopy:** Shareable *after* IUA for a *diagnostic* colonoscopy when ordered and performed by a licensed medical provider to evaluate signs/symptoms related to a potentially Shareable Needs Case.<br><br>**Screening Colonoscopy:** Shareable without an IUA up to a maximum of $2,500 per Member per colonoscopy (as a well-patient procedure) after a continuous membership of 6 months or more. Shareable with an IUA with a membership of less than 6 months. Only eligible for sharing when a screening colonoscopy is performed as recommended by the U.S. Preventive Service Task Force on a Member age 45 or older who does not have signs/symptoms or history of colon disease.<br><br>If a screening colonoscopy identifies a colon abnormality, such as a polyp or diverticula, that colonoscopy will then be considered a diagnostic colonoscopy with no IUA. The $2,500 per Member per colonoscopy limit will still apply to that colonoscopy and all future |

| | | colonoscopies will be considered diagnostic and be shared only after IUA. |
|---|---|---|
| 6.B.14. | Complications of a Non-Shareable Surgery/Procedure | Generally not Shareable. Exceptions exist when a true complication occurs during or immediately after the surgery/procedure that results in a Member needing and receiving emergency medical attention to address an issue unrelated to the original intent of the non-shareable surgery/procedure. Example: while receiving cosmetic breast implants, a Member has a reaction to the anesthesia, resulting in emergency medical attention.<br><br>Please Note: Complications from cosmetic procedures, including dissatisfaction, regret, failure to obtain the desired results, or failure of cosmetic devices are not considered shareable complications. |
| 6.B.15. | Cosmetic Surgery/Procedures | Generally not Shareable unless necessary because of disfiguration due to a Shareable Needs Case. |
| 6.B.16. | Counseling/Psychological Services | Shareable to a maximum of $750 per Needs Case with a maximum of $750 per Membership Year. |
| 6.B.17. | Dental & Oral | Generally not shareable when the procedure is or can be ordered/provided by a dentist, dental surgeon, oral surgeon, orthodontist, periodontist, endodontist, or other dental professional, **except** when performed to repair new dental problems suffered as part of a traumatic injury. Please Note: eating, chewing, and grinding related injuries are not considered a traumatic injury. |
| 6.B.18. | Dermatology | Dermatology screenings, annual visits, and checkups are considered Routine Medical Care and are not Shareable. Diagnosis and therapy for normal non-cancerous dermatologic conditions related to aging are not Shareable. Diagnosis and therapy for other dermatological illnesses that exceed a Member's IUA are generally Shareable subject to other applicable provisions in the Membership Guidelines. |
| 6.B.19. | Diagnostic Neuropsychological Testing | Shareable once for each Member under the age of 18 or brain injury victim up to $2,000 per Member, if the Member is not eligible for any public or governmental diagnostic testing program that pays for or provides the testing. |
| 6.B.20. | End Stage Renal Disease ("ESRD") | Generally not Shareable unless the Member is not eligible for ESRD Medicare and provides reasonable proof of their ineligibility or denial. |
| 6.B.21. | Fertility/Infertility | Not Shareable. |
| 6.B.22. | High-Cost Therapeutics | Sharing in high-cost medications, cell therapy, gene therapy, and other individual new therapeutics is limited to $250,000 per Needs Case and is subject to all other applicable limitations and conditions in these Guidelines including, but not limited to, the Pre-existing Medical Condition sharing limitations and IUA. |
| 6.B.23. | Hospice/Palliative Care | Shareable as ordered by a licensed physician is shareable to a maximum of $200 per day and a maximum of 90 days per Member. Additional partial sharing may be considered by the Community Stewardship Board. |

Resp. Ex. 1

| 6.B.24. | Hospital Emergency Rooms, Hospitalization, and Urgent Care Facilities | Generally Shareable for medically necessary services resulting in Medical Bills that exceed the Member's chosen IUA. |
|---|---|---|
| 6.B.25. | Immunizations | Except for an annual Influenza vaccination (flu shot), adult immunizations are a Member responsibility so are not Shareable. Routine Childhood immunizations are Sharable for children from birth through age 18 for:<br><br>• Diphtheria, Tetanus, Pertussis (Whooping Cough)<br>• Haemophilus influenza type b<br>• Hepatitis A<br>• Hepatitis B<br>• Human Papillomavirus (HPV)<br>• Inactivated Poliovirus<br>• Influenza (flu shot)<br>• Measles<br>• Meningococcal<br>• Pneumococcal<br>• Rotavirus<br>• Varicella (Chickenpox) |
| 6.B.26. | Implanted Medical Devices & Internal Prosthetics | For a new diagnosis, implanted medical devices are generally Shareable, subject to any applicable provision or limitations of the Guidelines. This includes the reasonable/medically necessary maintenance/repair/replacement of the implanted medical device. Pre-existing implanted medical devices and their maintenance/repair/replacement are subject to the Sharing Limitations for Pre-existing Medical Conditions.<br><br>Please Note: The maintenance/repair/replacement of the external components of implanted medical devices are considered "Medical Equipment & External Prosthetics" and subject to the applicable sharing restrictions. |
| 6.B.27. | In-Home Nursing Care | Shareable as ordered by a licensed physician for the purpose of recovering from an illness or injury is shareable to a maximum of $200 per day and a maximum of 90 days per Needs Case. Additional partial sharing may be considered by the Community Stewardship Board. |
| 6.B.28. | Injectable Epinephrine | Injectable Epinephrine kept on hand for acute treatment of allergic reactions is considered by Sedera to be a maintenance medication and therefore is not Sharable after the first prescription, except that replacement epinephrine injectors will be shared up to a maximum of $200 after IUA when previous supply was used during a recent allergic reaction.<br><br>Please Note: Most generic two-packs can be found for less than your IUA and less than $200. A Sedera Member Advisor can help you find reduced prices for most medications. |
| 6.B.29. | Laboratory Tests | Shareable only when prescribed by a licensed medical provider to diagnose the cause of signs and symptoms of a condition when not subject to limitations for Pre-Existing Conditions. |

| | | The Sedera MCS Community will not share in laboratory diagnostics for which the practice either receives a kickback or upcharges more than 10% over the available wholesale lab price. This is to avoid the conflict of interest that induces certain doctors to order excessive tests. |
|---|---|---|
| 6.B.30. | Mammography / Mammograms | **Diagnostic Mammograms:** Shareable after IUA when ordered by a licensed medical provider to evaluate signs/symptoms related to a potentially Shareable Needs Case.<br><br>**Screening Mammograms:** Shareable without IUA up to a maximum of $600 per Member per Mammogram (as a well-patient procedure) after a continuous membership of 6 months or more. Shareable with an IUA with a membership of less than 6 months. Only eligible for sharing as a routine biennial screening mammogram performed on a Member, age 40 and older as recommended by the U.S. Preventive Service Task Force who does not have signs/symptoms of breast disease.<br><br>Shareable after IUA when ordered by a licensed medical provider if the Member has a genetic risk or family history of breast cancer, as recommended by the US Preventive Services Task Force. |
| 6.B.31. | Medical Equipment & External Prosthetics- Rental/Purchase | Shareable at 75% of the cost of the medical equipment if prescribed by a licensed medical provider up to $25,000 per Needs Case. Medical equipment costs above $25,000 are generally not Shareable. Medical equipment costs above $25,000 may be considered for additional partial sharing by the Community Stewardship Board.<br><br>a. Qualifying equipment: The equipment must be customary or necessary part of directly treating the condition (such as oxygen tanks and devices/respirators, special shoes, orthotics, crutches, compression socks, etc.).<br><br>b. Maintenance/Repair/Replacement: The cost of maintaining, repairing, or replacing equipment is not shareable. |
| 6.B.32. | Medical Supplies | Generally Shareable within 120 days of treatment start as prescribed by a licensed medical provider. |
| 6.B.33. | Naturopathic Medicine | Treated as "Alternative medical practices" as outlined in Section 6.B.3. |
| 6.B.34. | Newborn Care | See Maternity Guidelines Section 7. |
| 6.B.35. | Nutritionists | Not Shareable unless prescribed by a licensed medical provider. "Alternative Medical Practices" provisions apply. |
| 6.B.36. | Optical/Eye Disease | Shareable for expenses due to glaucoma and other diseases or injury to eyes. Cataract surgery is generally shareable subject to a maximum of $5,000 per eye, each eye is treated as a Separate Needs Case. Vision Therapy subject to a maximum of $3,500 per separate Need Case. Lasik and other refraction corrective surgery, eyeglasses, and contacts are generally not Shareable. |
| 6.B.37. | Organ Transplants | **For Members needing an organ transplant:** Generally Shareable. Sharing is subject to Pre-existing Condition sharing limitations and |

|  |  | price negotiation and may require proof of ineligibility or denial for public or nonprofit organ donor programs.<br><br>**Donor Member to Recipient Non-Member:** Generally not Shareable. |
|---|---|---|
| 6.B.38. | Osteopathic | Shareable for adjustments and manipulation, up to a maximum of $1,500 per separate Needs Case. Other medical treatments Shareable subject to meeting medical necessity requirements. |
| 6.B.39 | Outpatient Surgery Centers | Generally Shareable for medically necessary services resulting in expenses that exceed the Member's selected Initial Unshareable Amount (IUA). |
| 6.B.40. | Out-of-country (USA) Medical Expenses | Generally Shareable for medically necessary services resulting in expenses that exceed the Member's selected Initial Unshareable Amount (IUA). |
| 6.B.41. | Physician Office Visits | Generally Shareable for medically necessary services due to illness or injury resulting in expenses that exceed the Member's selected Initial Unshareable Amount (IUA). |
| 6.B.42. | Prescriptions | Prescribed and/or injectable medications related to a qualifying medical condition are Shareable for the customary cost of the first 120 days after a new diagnosis. (Treatments for cancer and sublingual immunotherapy — a curative treatment for allergies — are not subject to this limitation; medications related to organ transplants are limited to 12 months duration.) All medications, prescribed or not, administered during inpatient hospital stays will be shareable. Sedera has various mechanisms in order to substantially reduce the cost of maintenance medications, including the use of a discount pharmacy program. Curative medications are prescribed with the intent to cure a disease or ailment, serve a short-term bridge toward recovery/healing (e.g., antibiotics, chemotherapy medications, or short-term pain medication, etc.). Maintenance medications are prescribed to control a medical condition (e.g., cholesterol medication, blood pressure control, thyroid medications, etc.). Please Note: Sedera Members do not share the cost of prescriptions for maintenance of chronic or recurring conditions (e.g., diabetes, eczema, blood pressure control) beyond the initial 120-day period. |
| 6.B.43. | Preventive Cancer Surgeries | If a Member demonstrates medical indication of high risk for a future diagnosis of Cancer and elects to undergo preventive surgery to reduce this risk, the costs associated with this surgery are generally Shareable, up to 75% after the IUA. Reconstructive surgery post-preventive surgeries/procedures and/or post-surgery hormone replacement are not Shareable. |
| 6.B.44. | Prosthetics and Orthotics | Generally Shareable, but not for cosmetic only purposes. |
| 6.B.45. | Psychiatric Care | Inpatient psychiatric care and outpatient psychiatric care for the treatment for injuries and detectable organic agents causing cognitive disabilities are shareable up to $7,000 per separate Needs Case. Prescribed psychotropic medications are shared as other prescription medications (see Section 6.B.42.). Other types of |

37        Sedera Medical Cost Sharing - ACCESS+ Membership Guidelines – 20231001

| | | psychiatric care or services are shareable to a maximum of $1,500 per separate Needs Case. |
|---|---|---|
| 6.B.46. | Sexually Transmitted Diseases/Illnesses (STDs/STIs) | HIV, AIDS, and other STD/STI treatments are generally Shareable. Previous diagnosis of HIV, AIDS, or other STDs/STIs are subject to the Pre-existing Condition sharing limitations. If the HIV, AIDS, or other STD/STI was contracted during an illegal use of needles or drug activity, the Needs Case would not be considered shareable. |
| 6.B.47. | Skilled Nursing Facilities / Long-Term Care Facilities (Nursing Homes) | Shareable prescribed by a licensed medical provider. Sharing is limited to 60 days or $25,000 per Needs Case, whichever comes earlier. Long-term care/ Skilled Nursing costs above $25,000 are generally not Shareable, however they may be considered for additional partial sharing by the Community Stewardship Board. |
| 6.B.48. | Sleep Apnea | **Equipment:** For new diagnosis, Sleep Apnea equipment including, but not limited to, MAD, CPAP, APAP and BiPAP devices is limited to a maximum Shareable amount of $2,500 per Needs Case. For existing diagnosis, please see "Medical Equipment & External Prosthetics" for maintenance/repair/replacement and the applicable sharing restrictions.<br><br>**INSPIRE Sleep Apnea Surgery:** Sharing in INSPIRE surgical treatment for sleep apnea is available only if standard and specific clinical criteria are met. Requests for partial sharing must be approved by the CSB in advance of the procedure. |
| 6.B.49. | Sterilization | Elective sterilization such as tubal ligation and vasectomy, or the reversal of the same, is not Shareable. |
| 6.B.50. | SYNAGIS | SYNAGIS is a prescription medication that is used to help prevent a serious lung disease caused by respiratory syncytial virus (RSV) in certain children with specific diseases. Synagis is Shareable if prescribed and provided in accordance with the most recent clinical guidelines for its use as established by the American Academy of Pediatrics. |
| 6.B.51. | Temporomandibular Joint Dysfunction (TMJ) Syndrome | Shareable subject to a lifetime sharing limit of $1,500 per Member. |
| 6.B.52. | Therapy | Outpatient or inpatient Physical Therapy, Occupational Therapy, and Speech Therapy are each individually Shareable for up to $3,000 per Membership Year (not per Needs Case) when clearly indicated to reverse, control, or recover from a medical condition, subject to pre-existing condition limitation and IUA. Exception: In the case of a child (under age 18), if the disease/injury that caused the need for therapy began after the membership Start Date, the Member may request an exception to the $3,000 sharing limit per Membership Year, which if granted, may require additional conditions be in place.<br><br>Specific therapies outlined here, including Physical, Occupational, Speech, and Vision (Optical) are shareable as outlined. All other therapies are generally not Shareable. |
| 6.B.53. | Transplants | See Organ Transplants. See Section 6.B.37. |

| 6.B.54. | Travel Expenses | Basic lodging and air/ground transportation are generally Shareable for Member and one travel companion when a Member can demonstrate the cost of the procedure plus travel results in significant savings for the Community. |
|---|---|---|
| 6.B.55. | Varicose Veins | Varicose Veins procedures are generally not Shareable. Such procedures are generally considered cosmetic procedures, however there are instances where they can cause medical danger. In such instances, Sedera will require medical records that include a written physician statement that the varicose veins are a significant medical danger. After these materials are provided, the varicose veins procedure is eligible for sharing subject to a lifetime maximum sharing limit of $2,500 per Member. |
| 6.B.56. | Weight Reduction | Shareable only if prescribed by a licensed medical provider and a $1,500 maximum shareable amount per Member. |

## C) INJURIES INVOLVING MOTOR VEHICLES

Most Needs Cases for motor vehicle related injuries are Sharable. A "motor vehicle" is any vehicle with an engine/motor used for transportation, work, or recreation. Medical Bills must be submitted to any responsible or liable party before they will be considered for sharing. See Section 4.B.1.

| 6.C.1. | Shareable with Requirements | Needs Cases from injuries in an accident where the Member is an operator or passenger (in, on, or being towed by the vehicle) of on-road, or off-road motor vehicles such as snowmobiles, go-karts, off-road motorcycles, four-wheel ATVs, tractors, farm implements, construction equipment, six-wheel ATVs, golf carts, personal moving devices, motorized watercraft of all kinds, and all aircraft, will be Shareable for the Medical Bills of the Needs Case that are not the responsibility of any insurance entity or other liable party, and if all of the following conditions are met. The operator and any rider: <br><br>a. Were appropriately licensed, as required by applicable law, to operate the vehicle involved in the incident, and <br><br>b. Were not engaged in formal racing or stunt competition, and <br><br>c. Were not operating the vehicle recklessly, or under the influence of alcohol or any illegal substance, in accordance with Federal laws. |
|---|---|---|
| 6.C.2. | Shareable Expenses | Needs Cases from injuries sustained in a motor vehicle accident where the Member **is not** an operator or passenger (in, on, or being towed by the vehicle), but a pedestrian, bicyclist, bystander, etc., is Shareable for the Medical Bills of the Needs Case that are not the responsibility of any insurance entity or other liable party. |

### D) MISCELLANEOUS ITEMS NOT SHARED

| | | |
|---|---|---|
| 6.D.1. | Abortion | Needs Cases resulting in expenses for abortion of a living, unborn baby will not be shared. |
| 6.D.2. | Abuse of Drugs or Alcohol | Injuries or illnesses that directly result from a Member abusing drugs or alcohol will not be shared. |
| 6.D.3. | Accidents to Teeth While Chewing | Needs Cases resulting from breaking or injury to natural teeth and teeth structure by accident while chewing are not Shareable. |
| 6.D.4. | Armed Conflicts | Needs Cases resulting from a Member's active participation as a combatant in an armed conflict, but not including acting in self-defense or in defense of hearth or home, are not Shareable. |
| 6.D.5. | Infertility Expenses | Needs Cases resulting in expenses for prescriptions, tests, treatment, in vitro fertilization, or other procedures related to infertility are not Shareable. |
| 6.D.6. | Injuries Obtained from Certain Acts | Needs Cases caused as a result of participation in a public riot, criminal act, assisted suicide, or euthanasia are not Shareable. |
| 6.D.7. | Monetary Interest/Late Charges | Financial charges incurred for late payment or interest charges from any care provider or interest or finance charges from any lending institution that a Member borrows from to pay Medical Bills are not Shareable unless a substantial savings for early payment (40% or greater) will result. |
| 6.D.8. | Non-medical Expenses | Telephone calls, cots and/or meals for visitors and other expenses not directly related to medically necessary services are not Shareable. |
| 6.D.9. | Over the Counter Products | Herbs, vitamin supplements, teas etc., are not shareable unless prescribed by an authorized member of a hospital staff for a hospitalized patient. The Guidelines for "Alternative Medical Practices" also apply. See Section 6.B.3. |
| 6.D.10. | Routine Medical Care | Expenses such as routine physicals, checkups, vaccinations, other than Influenza shots, IUDs/Birth control/contraceptives, long-term maintenance prescriptions and other routine medical expenses are generally not Shareable.<br><br>Exception: Diagnostic procedures prescribed on a regularly scheduled basis for the purpose of screening and monitoring known risk situations or cured medical conditions when ordered by a licensed medical provider (e.g., colonoscopies, mammograms, endoscopies, et al.). Pre-existing condition limitation rules apply. Member's selected IUA applies in all Needs Cases.<br><br>Some exceptions exist for colonoscopies, mammograms, and childhood vaccinations as described throughout these Guidelines. |
| 6.D.11. | Self-inflicted Injuries & Suicide | Generally Shareable for medical expenses related to non-accidental, self-inflicted injuries or attempted or threatened suicide for Members under 18 years of age. |

Resp. Ex. 1

| | | Necessary follow-up psychiatric treatment is subject to the stated Psychiatric Care amounts. See Section 6.B.45. |
| 6.D.12. | Surrogacy | Medical Bills related to a surrogate pregnancy, whether or not the surrogate is a Member, are not Shareable. |
| 6.D.13. | Wisdom Teeth Extractions | Not shareable. See "Dental & Oral" Section 6.B.17. |

# 7. Maternity Needs

In general, maternity Needs Cases include Medical Bills for prenatal care, delivery, postnatal care, and miscarriage.

Medical cost sharing for maternity Needs Cases differs from other Shareable medical Needs Cases as follows:

1. Medical Bills for childbirth that have an expected delivery date within the first 12 months of membership are not Shareable.

2. Normal vaginal deliveries and emergency Cesarean section deliveries for Shareable maternity Needs Cases have a total Maternity Initial Unshareable Amount (Maternity IUA) of $5,000. Non-emergency/elective Cesarean section deliveries have a total Maternity IUA of $7,500. The standard IUA levels of $500 - $5,000 <u>do not</u> apply for Maternity Needs Cases. Medical Needs Cases resulting from miscarriages will revert to the Member's standard IUA.

3. Newborns will be included within the Household membership retroactive to the date of birth as long as the Member notifies Sedera to add the child to the membership no later than 30 days after birth.  Please see section 3.E. for further details.

Access to Sedera's Member Services and Patient Advocacy teams is available to all Members, whether or not the Member is pregnant at time of membership.

The specific Guidelines for maternity Needs Cases that are Shareable can be found in Sections A, B and C below:

### A) MATERNITY NEEDS CASES THAT ARE SHAREABLE

| 7.A.1. | General Rule | Maternity expenses incurred after 12 months of continuous paid membership are generally shareable. Shareable maternity Needs include expenses for prenatal care, delivery, postnatal care, miscarriage, and congenital conditions. There are special criteria for sharing Needs of the child from genetic defects and hereditary diseases. See the Appendix. |
| 7.A.2. | Adopted Child | Medical Bills of the birth mother and an adopted child, for which the adopting parents are liable, and which are not from a "medical condition existing prior to membership," are Shareable the same as other maternity Needs Case, less any credit amount to which the Member is entitled under the federal adoption income tax credit due solely to those Medical Bills. However, any physical condition which the adopted child has prior to the adopting parents being legally responsible for the child's expenses, or prior to their Start Date |

Resp. Ex. 1

| | | within their parents' membership, will be considered a "medical condition existing prior to membership" under Section 5. |
|---|---|---|
| 7.A.3. | Early Sharing Request | Early Sharing Requests for maternity Needs Cases are not available for Members with pre-existing pregnancies. Members generally pay their medical providers at reduced rates, due to their cash pay status, and submit their Medical Bills/Needs Case(s) to Sedera after delivery. |
| | | If a maternity care provider will reduce the normal charges if a Member prepays some or all of the Medical Bill, Sedera will consider sharing the maternity Needs Case prior to the birth. The Member must request an estimate and submit it via the online Needs Case Submittal Process. |
| | | If the resulting Medical Bills are less than the pre-paid amount, the Member must contact a Sedera Member Advisor who will advise where to send the excess amount. Requested surplus amounts not returned to Sedera will be charged back to the Member. Failure to return excess amounts could result in termination of membership. |
| 7.A.4. | Separate Needs Cases | Medical Bills for all pregnancy and birth-related complications of the mother will be shared as a part of the maternity Needs Case. Routine postnatal care of the child, including no more than one routine outpatient doctor visit, will be part of the mother's maternity Needs Case. Any pre-birth Needs Case of the child or a post-birth Needs Case of the child beyond routine natal care will be considered a Needs Case separate from the mother's maternity Needs Case, if the newborn is added within 30-days from the birth date. |

### B) APPLICATION OF MATERNITY INITIAL UNSHAREABLE AMOUNT

| 7.B.1. | Maternity Cost Sharing | Only the portion of a maternity Medical Bills that exceeds the Member's Maternity IUA will be eligible for sharing. |
|---|---|---|
| 7.B.2. | Maternity IUA | The Maternity IUA is the IUA that applies to eligible maternity Needs Cases. Normal vaginal deliveries and emergency Cesarean section delivers have a total Maternity IUA of $5,000. Non-emergency /elective Cesarean section deliveries have a total Maternity IUA of $7,500. |

### C) MATERNITY SHARING RESTRICTIONS AND LIMITS FOR CONDITIONS THAT EXISTED PRIOR TO MEMBERSHIP

| 7.C.1. | General Rule | Maternity expenses incurred prior to the Member's effective date of membership are not shareable. Likewise, maternity expenses for a pregnancy with an expected delivery date that is less than 12 months from the membership effective date are not shareable. |
|---|---|---|
| 7.C.2. | Ancillary Advocacy Services | Both Member Services and Patient Advocacy services are available to assist active Members during a pregnancy regardless of their membership Start Date or expected delivery date. |

| 7.C.3. | Breast Pumps | Medically necessary breast pumps are shareable with the Sedera Medical Cost Sharing Community up to $200 for one breast pump per household when it is not covered under a MEC or other applicable plan or program. |
| --- | --- | --- |
| 7.C.4. | Complications and Conditions After Birth | Any complication of the mother which first produces symptoms and is first discovered after birth will be considered part of the mother's Shareable maternity Needs Case provided that the General Rule in 7.C.1. is satisfied. Any complication to or defects in the child which first produces symptoms and is first discovered after birth will be a regular Needs Case of the child's if the child is a Member at birth. |
| 7.C.5. | Complications and Conditions Through Birth | If the Member's expected delivery date is determined (by a qualified medical provider) to be on or after the 1st year membership anniversary date any Needs due to complication of pregnancy will be fully shareable after the Maternity IUA has been met. Conversely, any medical expenses incurred, including complications of pregnancy, will not shareable if the Member's expected delivery date is determined to be prior to their 1st year membership anniversary date. Expenses related to miscarriages are generally shareable after IUA. |
| 7.C.6. | Doulas | Costs related to Doulas are not Shareable. |
| 7.C.7. | Expenses Prior to Membership | Any maternity expenses incurred while the mother is not a Member are not Shareable. |
| 7.C.8. | Premature Births | The baby's Needs Case is fully Shareable for a baby born prematurely requiring extraordinary medical care. |
| 7.C.9. | Routine Maternity Expenses After Membership | Generally not Shareable. |
| 7.C.10. | Surrogacy Costs | Costs related to surrogacy are not Shareable. |

# Appendix

| Medical Condition | Sharing Status | Modifier/Exception |
| --- | --- | --- |
| **1. Back Problems** | Shareable | During the first **three** years of membership the statement described in Section 5.A.2. must be provided. Sharing limits stated in Section 6.A. and 6.B. will apply if a Need request is determined to be a medical condition that existed prior to membership. |
| **2. Complications from Maternity** | Shareable | Only if the expected delivery date for the child is determined to be 12 months, or later, from the effective date of membership. |

Resp. Ex. 1

|  |  | Expenses due to medical complications to the mother are considered part of the maternity Need. |
|---|---|---|
| **3. Diabetes that doesn't require insulin (including most Type 2 diabetics)** | Shareable | Except maintenance medications as described in Section 6.B.42. During the first **three** years of membership the statement described in Section 5.A.2. must be provided. Sharing limits stated in Section 6.A. And 6.B. will apply if a Need request is determined to be a medical condition that existed prior to membership. |
| **4. Genetic Defects** | Shareable when at least **one** of the following is true: 1. The condition had not been diagnosed nor exhibited observable symptoms in the 36 contiguous months prior to the effective date of membership; 2. Neither the condition nor a symptom of the condition was discovered until after membership had begun; 3. The condition exists in a person who has been included in a membership from birth and the mother was included in a membership prior to the delivery; or 4. If the condition exists in a person who was adopted, the person has been included in a membership since the adoption, and the adopting parents were unaware of the condition at the time the adoption was finalized. | Sharing limits stated in Section 6.A. and 6.B. will apply if a Need request is determined to be a Pre-existing Medical Condition. |
| **5. Heart Conditions** | Shareable | During the first **three** years of membership the statement described in Section 5.A.2. must be provided. See high blood pressure exception below. Sharing limits stated in Section 6.A and 6.B. will apply if a need request is determined to be a medical condition that existed prior to membership. |
| **6. Hereditary Diseases** | Shareable | Under the same conditions as Genetic Defects. |

Resp. Ex. 1

| 7. High Blood Pressure | Shareable | Provided the Member has not been hospitalized for high blood pressure within **three** years prior to membership and has been able to control this condition through medication and/or diet. An incident that begins after membership becomes effective is shareable and would qualify for one 120-day period for sharing of prescription expenses (See Section 6.B.42.) Medication thereafter for maintaining a chronic condition is not shareable. |
|---|---|---|
| 8. Sharing Outside of the United States | | If a Member has an eligible Need that occurs outside of the United States, that Member will be required to provide Sedera the itemized bill translated into English and the price converted into U.S. Dollars. |
| 9. Requirements to Prove Cessation of Tobacco | | To prove Cessation of Tobacco, a Member will be required to show Cessation of Tobacco for a 12-month period. To do this, a Member is required to submit three (3) negative cotinine tests: 1) the first negative cotinine test date triggers the start of the 12-month period; 2) the second negative cotinine test can be submitted any time during the next 10 months; and 3) the third negative cotinine test must occur during the month preceding the 12-month anniversary of the first test. A Member will also be required to submit an affidavit or acknowledgement stating the last date of tobacco use upon submitting their third negative cotinine test. Once the 12-months have passed and Sedera has received all required tests and affidavit/acknowledgement, the Member will no longer be subject to the Tobacco/Vape User fee or the limitations placed on the tobacco/vape related illnesses, which will take effect at the start of the next billing cycle. If a Member becomes a Tobacco/Vape User during the aforementioned 12-month period, the 12-month period will restart upon submittal of a negative cotinine test. Note: Nicotine usage will make these tests positive, so all nicotine supplements need to be stopped as well. |
| 10. Requirements to Prove Cessation of Vaping Non-nicotine | | To prove that a Member has stopped vaping any non-nicotine product, the Member will need to submit an affidavit or acknowledgment indicating that their last vape of non-nicotine product was at least 3 months prior to the date of submission. Provided that the Member is not a tobacco |

|  |  | user, the Member will no longer be subject to the Tobacco/Vape User fee or the limitations place on the tobacco/vape related illnesses, which will take effect at the start of the next billing cycle. Please Note: Cessation of Tobacco is outlined in this Appendix. |
|--|--|--|

# EX 1.14



How It Works     Reviews     Pricing     More ⌄     Member Login

Sign up

# Member Guide



**Table of Contents**

Everyone Hates Member Guides

What is CrowdHealth?

CrowdHealth is a Caring Community

CrowdHealth is Access to Care

CrowdHealth is Crowdfunding

Who is the Crowd?

Savvy and Generous

Like-Minded and Health Aware

Resp. Ex. 1

*LAST UPDATED: 1/1/25*

View the summary of recent changes here.

## Everyone Hates Member Guides

We know, we know. Member handbooks, user guidelines, terms and conditions. They're the worst. Well, not *the* worst. Health insurance is the real worst. But guidelines and fine print can be exhausting to navigate, too. So, we're starting here with making your CrowdHealth Member experience refreshingly simplified and different, in a good way.

Here, you'll find what you need to know about being a Member of CrowdHealth.

## What is CrowdHealth?

Finding and funding the healthcare you need shouldn't feel isolating or overwhelming. so together with our Members, CrowdHealth is changing your healthcare experience.



CrowdHealth's Guiding Principles

Simplicity: No More

**Your CrowdHealth Membership provides you a crowdfunding platform, Community, and toolkit to help you find and fund your healthcare outside the insurance system, with personalized support along the way.**

As a CrowdHealth Member, you participate in the healthcare system as a self-pay patient, cutting out the health insurance middleman. While you maintain the ultimate responsibility for paying your own medical bills, you can expect to pay for the smaller expenses on your own and to submit your larger medical expenses to the Crowd for funding. In turn, you'll be invited to help crowdfund other Members' larger medical expenses, too.

At CrowdHealth, Members have access to lower medical costs through the power of consumerism and self-pay while avoiding outrageous health insurance premiums, deductibles, and out-of-pocket maximums. With CrowdHealth, you can save thousands of dollars every year while experiencing real healthcare freedom.

## CrowdHealth is a Caring Community

At CrowdHealth, you're not alone.

CrowdHealth is building a Crowd of people like you – savvy, generous, and responsible -- to support one another in accessing and paying for healthcare.

Your Care Advocate provides caring, personalized support throughout your healthcare journey, like finding fairly priced, high-quality care options while guiding you through the administration and logistics of the healthcare system.

## CrowdHealth is Access to Care

CrowdHealth helps you access the care you need, when you need it. CrowdHealth helps you access the care you need, when you need it. For a low, monthly Advocacy Fee, you have access to virtual primary and urgent

care, virtual talk therapy, a personal Care Advocate, cash-pay patient rates, discount prescriptions, bill negotiation support, and more.

CrowdHealth offers access to a robust virtual care platform, available 24/7 through the app.

We can help you find quality, cash-pay friendly care in your area, or if you've already got a favorite doc, that's great too! There are no doctor networks to limit you here, just a request that all Members shop smart for their care.

And, your Membership gets you access to discounted prescription pricing, all at your fingertips through the CrowdHealth mobile app.

## CrowdHealth is Crowdfunding

Each month, Members commit to helping crowdfund their fellow Members' bills when asked. As health expenses from Members arise, CrowdHealth communicates these needs among the Crowd. Then, CrowdHealth facilitates the crowdfunding of expenses by inviting Members to voluntarily give to help fund the medical bills of other Members.

# Who is the Crowd?

The power of CrowdHealth is our vibrant, health-conscious and generous group of Members, a.k.a. "The Crowd." Together, we're achieving something bigger, better, and altogether different than if we tackled the complexity and unaffordability of healthcare costs alone.

Our Members are savvy and generous, like-minded and health aware, responsible and accountable. If that's you, you're really going to like it here!

(On the flip side, if you're looking for a way to "work the system" and mooch off others without being generous yourself...  keep looking. You'll be out of place in the Crowd.)

The Crowd comprises Members from babies through age 64 who provide biometric values and health history information upon joining. The Crowd welcomes Members with varied health histories while giving transparent, specific terms for how care for previously documented, diagnosed, or symptomatic conditions are funded. All these details are in place so Members can be confident about who and what your dollars are funding.

## Savvy and Generous

You've probably joined the Crowd because you've been failed by the legacy health insurance system and are tired of paying too much for your healthcare.  As a savvy Member, you're looking for the best service at a great price and are too smart to be fooled by healthcare players who don't have your best interest in mind.

Through your generosity, you keep up with your monthly commitment to help fund healthcare for the Crowd. When you need help with your bills, your fellow generous Members will help fund your care, too.

CrowdHealth uses Generosity Scores and Health Cost Ratings to operate in a transparent way. Your Generosity Score reflects your crowdfunding activity, while your Health Cost Ratings show how reasonable the prices are for the care you receive. To learn more about how these features help you and the Crowd find and fund your healthcare in a different way, see "How CrowdHealth Works" below.

## Like-Minded and Health Aware

CrowdHealth Members have like minds in seeking something trustworthy, simplified, and freeing -- a new solution that is changing the game and is bigger than fighting for healthcare freedom on your own.

And, by being health aware, you know that staying engaged with your own health helps not just you but the Crowd as a whole, too. Males over 260 lbs and females over 220 lbs are not able to participate in CrowdHealth.

Resp. Ex. 1

## Responsible and Accountable

CrowdHealth Members are responsible and accountable to each other, which lets us care abundantly for each other. That's good news for all of us.

To help the entire Crowd thrive, you and your fellow Members can count on one another to:

- Ensure that your Advocacy Fee is paid in a timely and consistent manner.
- Participate when asked to crowdfund fellow Members' bills.
- Trust that you can get the best care without paying the highest price, and be willing to choose high-quality clinicians near you who charge reasonable and fair prices.
- Only submit legitimate, medically necessary bills for crowdfunding within 6 months of the date of service barring extenuating circumstances.
- Care about your own health and that of the people around you, proactively engaging with your health and spending wisely on your own healthcare.
- Trust the Crowd to help fund your health expenses while understanding that ultimately, each Member is responsible for their own medical bills.

We're so glad you've joined us. The Crowd is better with you in it!

# CrowdHealth's Guiding Principles

CrowdHealth is founded and run by people who think and feel like you. Healthcare can feel complex, expensive, and lonely, so we've reimagined a different solution with you in mind, embracing the guiding principles of Simplicity, Affordability, Community, and Quality.

## Simplicity: No More Health Plan Confusion

The fine print of insurance plans – in-network vs. out-of-network coverage, deductibles, copayments, and out-of-pocket maximums – is confusing and frustrating. That's why CrowdHealth is committed to Simplicity in each experience, for every Member, with:

Resp. Ex. 1

## Three Simple Steps.

1. Let CrowdHealth know about a new health event and/or upcoming medical visit, and let us help you navigate care *before* scheduled or expensive procedures.
2. Fund the first $500, a.k.a. your Member Commitment, of each health event yourself.
3. Upload medical bills and receipts through the app, and let CrowdHealth submit your eligible expenses over $500 per event to the Crowd for funding.

## Technology that Works for You.

When you start your healthcare journeys through the CrowdHealth app, you get the most from your Membership – the best value, the simplest payment process, and the support of a Care Advocate, who's there to walk with you from scheduling to bill payment and everything in between.

## Quick, Simple Funding.

Through CrowdHealth's smooth digital process, crowdfunding by the Member Community happens fast, making things easier both for Members and for the clinicians who provide your care.

We strive to send eligible crowdfunding requests to the Crowd as soon as reasonably possible. Members have two days to approve or deny each request. CrowdHealth will promptly transfer approved funding requests to the receiving Member's crowdfunding account.

# Affordability: Helping the Crowd Save Money

Healthcare can be incredibly expensive. Here, the Crowd is built on a commitment to Affordability and the belief that the best care doesn't have to be the priciest. That means:

### You Use the Power of Consumerism.

Members participate in the healthcare system as self-pay patients. This lets you access high-quality care for less than the insurance sticker price. Our Members regularly benefit from self-pay discounts ranging from 25% to 85% off normal billed charges.

### We Use the Power of Negotiation.

We leverage relationships with providers to offer pre-negotiated and bundled pricing options for your scheduled care. And, when you face an unexpected health event and a big bill comes with it, CrowdHealth and our partners can step in on your behalf to negotiate it down to a fair price.

## Community: Transforming healthcare, Together

CrowdHealth is built by people who care, for people who care. As a Member, you and the Crowd are:

### Building the Future.

You want to be part of a new solution that gives you and your family a totally different experience, not a marginally better option than the health insurance you had before. With you and the Crowd, we're building a better future and transforming healthcare as we grow.

### Power in Numbers.

The problems of the American healthcare system – unfair pricing, hidden billing practices, mismatched incentives between patients and insurers – are too big for any of us to take on alone. But with CrowdHealth, you're joining forces with Members and a team who are taking on the broken system with you.

### Not Alone.

Resp. Ex. 1

Navigating your health shouldn't leave you feeling like you don't know who you can trust. With the Crowd, your health journeys happen within a transparent, trustworthy Community you can count on.

## Quality: Only the Best for You

Support isn't a buzzword here, and you deserve the best. With personalized care navigation provided by a team of Member Care Advocates, we mean it when we say you'll have a high-quality Member experience you love, through:

### No Doctor Networks (Seriously)!

CrowdHealth does not limit your access to care through stifling doctor networks. You can keep seeing your favorite doc, or talk to a Care Advocate if you need help finding a new high-quality provider.

In the best interest of the Crowd, Members allow CrowdHealth to navigate planned procedures, whenever possible, to high-quality, cash-pay friendly docs, which saves money for you and your fellow Members. Read more about this in How CrowdHealth Works, below.

### Healthcare Freedom.

At CrowdHealth, you're free to get the care you need when you need it, without feeling locked into a burdensome insurance plan.

### Technology that's Always Improving.

We're building the best app and resources to make your life easier, and it just keeps getting better.

# How CrowdHealth Works

Resp. Ex. 1

## No, It's Not Health Insurance – and Why That's a Good Thing

One of the biggest questions we get is, "How is CrowdHealth so much cheaper than other health insurance?" And the answer is simple: CrowdHealth isn't health insurance. It's a platform, community, and toolkit to help you find and fund your healthcare outside the insurance system, including a healthcare crowdfunding platform for your big bills. This means your Membership is designed and funded differently than health insurance, and that CrowdHealth has different priorities (like putting you, our Member, first!).

We have developed systems and processes that allow the Community to fund medical expenses; **however, your Membership is not insurance, and therefore CrowdHealth cannot guarantee that your medical bills will be funded**. **Ultimately, Members are responsible for their own medical bills.**

## What Members Pay

### Advocacy Fee Payments and Monthly Crowdfunding Requests

Compared to painfully expensive insurance premiums, CrowdHealth Members pay a low monthly Advocacy Fee to have access to cash-pay resources and specialized support, as well as commit to helping fund other Members' medical bills each month. Advocacy Fee amounts are the same for everyone, and monthly crowdfunding maximums are different based upon anticipated healthcare needs of certain age groups. Here's how it breaks down:

Resp. Ex. 1

| MEMBERS AGES 0-54 | MEMBERS AGES 55-64 | FAMILIES OF 4+ |
|---|---|---|
| ADVOCACY FEE | ADVOCACY FEE | ADVOCACY FEE |
| **$55** PER MONTH | **$55** PER MONTH | **$55** PER MONTH PER MEMBER |
| FOR CROWDFUNDING | FOR CROWDFUNDING | FOR CROWDFUNDING |
| UP TO **$140** PER MONTH | UP TO **$280** PER MONTH | UP TO **$420** PER MONTH PER FAMILY |
| MEMBER COMMITMENT | MEMBER COMMITMENT | MEMBER COMMITMENT |
| **$500*** | **$500*** | **$500*** |
| *Amount paid by Member per unique health event before expenses are eligible for funding by the Community. | *Amount paid by Member per unique health event before expenses are eligible for funding by the Community. | *Amount paid by Member per unique health event before expenses are eligible for funding by the Community. |

Resp. Ex. 1

# MEMBERS AGES 0-54

## ADVOCACY FEE

# $55 PER MONTH

---

## FOR CROWDFUNDING

UP TO **$140** PER MONTH

---

## MEMBER COMMITMENT

# $500*

*Amount paid by Member per unique health event before expenses are eligible for funding by the Community.

Resp. Ex. 1

# MEMBERS AGES 55-64

## ADVOCACY FEE

# $55 PER MONTH

---

## FOR CROWDFUNDING

UP TO **$280** PER MONTH

---

## MEMBER COMMITMENT

# $500*

*Amount paid by Member per unique health event before expenses are eligible for funding by the Community.

FAMILIES OF 4:

FAMILIES OF 4+

## ADVOCACY FEE

# $55 PER MONTH PER MEMBER

---

## FOR CROWDFUNDING

UP TO # $420 PER MONTH PER FAMILY

---

## MEMBER COMMITMENT

# $500*

*Amount paid by Member per unique health

event before expenses are eligible for

funding by the Community.

*Members in Colorado can opt out of advocacy fees but will lose access to
personal Care Advocacy, Bill Negotiations, the CrowdHealth App (including
virtual urgent and primary care, and virtual talk therapy). Members opting out
of advocacy fees are required to mail in their bills for crowdfunding, which

are subject to a 20% administrative fee. Please contact
hey@joincrowdhealth.com if you would like this option.

## More About Crowdfunding

The maximum monthly crowdfunding amounts listed above are not fixed and
can be adjusted based on the actual spending of you and the Crowd. If you
and the Crowd spend less in a given month, your total monthly crowdfunding
request may be lower. Making healthy and smart spending choices benefits
both you and the whole Crowd together.

At the beginning of every month we will provide an estimate of how much
each member will be asked to contribute in that month. However, members
might be asked to give slightly more or slightly less than the estimate, given
the timing and dollar amount of the bills submitted for crowdfunding. Not all
members will give the same amount each month but the variation will be
small.

When you or someone in your family turns 55, the maximum crowdfunding
amount will increase to $280 on the first billing date following the birthday.

If you're 64 years old, we'll be in touch with you before your next birthday
about transitioning out of CrowdHealth. Your Membership ends when you
turn 65.

### Transparency in Crowdfunding

Choosing to help other Members pay their medical bills is voluntary. To help
you understand who and what you're being asked to fund, each Member
receives a Generosity Score, and each crowdfunding expense receives a
Health Cost Score. These factors determine whether a crowdfunding request
is rated GREEN or RED.

### Member Generosity Scoring

Member Generosity Scores are calculated based on the amount a Member has given in crowdfunding, compared to the total amount they have been asked to give.

If you agree to fund 100% of the fair-priced crowdfunding requests you receive, you will maintain a 100% Generosity Score. If you choose not to participate in funding other Members' fair-priced bills, your Generosity Score will be affected by the proportion of what was requested of you versus what you gave.

A Generosity Score of less than 90% will lead to a RED rating of your crowdfunding request.

*Bills that are scored red due to a low generosity score and are not fully funded by the Community in the first crowdfunding request can be rerun through crowdfunding as green once the member's generosity score reaches 90% so long as the date of service on the bill is less than 12 months old.*

## Health Cost Scoring

CrowdHealth's navigation services help Members access quality care and ensure that crowdfunding requests reflect reasonable cash-pay pricing. If you need a surgery or other scheduled procedure, treatment, or diagnostic (including labs and imaging) we can compare estimates from other providers and offer competitive rates for high quality care.

If you pick a provider that charges more than 120% of the fair market price for the treatment or procedure, the expenses will receive a poor Health Cost Score and lead to a RED rating of your crowdfunding request.

Please note that Health Cost Scoring applies not just to large/expensive planned procedures, but also to smaller expenses like labs and imaging. Please contact your Care Advocate before having any scheduled diagnostic, lab, imaging, or other planned test done, and we will gladly help you shop, and when available, connect you with a discount voucher for the same

Resp. Ex. 1

service in your area. Failure to notify CrowdHealth before costs over 120% of our discount options are incurred will result in a RED rating of these bills.

**Staying GREEN**

The following factors contribute to a GREEN crowdfunding request rating:

- The requesting Member has Generosity Score of 90% or above;
- Health costs for the request are within 120% of fair market rates, considering factors like:

1. Previously crowdfunded procedures in the Member's regional market within the last year,
2. Third-party partner securing a single-case agreement (SCA), cash-pay bundle, or discount voucher,
3. No reasonable alternatives within the nearest major metro area for procedures under $10,000,
4. No reasonable alternatives within 1000 miles of home ZIP code for procedures equal to or more than $10,000,
5. Medically urgent, critically time-sensitive, or emergency event, or
6. Extenuating circumstances.

- *In the case of travel to a provider navigated by CrowdHealth, all travel expenses including airfare, rental car/mileage, hotel, and food are eligible to be submitted to the Crowd.*

If you are a generous Member, and your healthcare costs are in line with fair-market rates, your crowdfunding requests will be rated GREEN, which tells your fellow Crowd Members they can have peace of mind in funding your request.

**Avoiding RED**

Reasons an expense may receive a RED score include:

- The requesting Member has Generosity Score below 90%;

- Price is more than 120% of fair market rates, when compared to other options identified by CrowdHealth;
- Choosing a non-medically necessary, experimental, or non FDA approved option for care, without demonstrably better patient outcomes in comparison to other options for treatment, as determined by a third-party clinical review;
- Failure to take advantage of negotiated discount, e.g. due to Member negligence or unresponsiveness;
- Paying inflated prices for care through an insurance plan or toward a deductible; or
- Failing to cooperate with CrowdHealth in the negotiation of medical bills or failing to comply with negotiated payment terms.

If you are not generous to other Members in need, OR your healthcare costs are out of line with fair-market rates, your crowdfunding requests may be rated RED, which may cause fellow Crowd Members to hesitate in funding your request.

Members will not be penalized for denying crowdfunding requests rated RED.

## Crowdfunding Request Settings

Most Members choose to help with every GREEN crowdfunding request, which makes things easy and keeps your Member Generosity Score at 100%.

The default settings for crowdfunding are to immediately approve GREEN requests and immediately deny RED requests. (Your generosity score is not negatively impacted by denying RED requests.)

If you would like time to review crowdfunding requests before paying them, you may change your settings within the mobile app. Turning the default settings OFF will give you two days to respond to a crowdfunding request., If you do not manually respond to the request within those two days, green requests are automatically approved and your card on file will be charged. Because these funds go directly to other members, they are nonrefundable. Red requests are automatically denied.

When you approve a crowdfunding request, your payment method on file will be charged for the requested amount.

## Family Memberships

Family Memberships are available for families with four or more Members. To be eligible for a Family Membership, you must meet at least one of these conditions:

- A parent, under age 65, with three or more children, by legal and/or blood relation, who are under age 26;
- Two parents domiciled together, under age 65, with two or more children, by legal and/or blood relation, who are under age 26;
- A group of four or more siblings, by legal and/or blood relation, who are under age 26.

## Member Commitments Instead of Deductibles

The Crowd exists without the burden of an annual health insurance deductible.

Insurance deductibles can mean you pay $3,000, $5,000, or even $10,000+ in health expenses for your family, on top of those high monthly premiums, *before your coverage kicks in at all*.  After your deductible is met for the year, you may continue to pay a percentage of the costs up to an out-of-pocket maximum that's much higher than your deductible. Ouch!

CrowdHealth is different. Your Membership means you commit to your fellow Crowd Members that you'll pay your $500 Member Commitment for each valid health event, and we'll ask the Crowd to fund the rest of the eligible expenses. There is no maximum limit to the amount of bills you can submit for crowdfunding as a CrowdHealth Member.

## What Do You Mean by "Health Event"?

A health event is any unique health scenario that comes up for a Member and includes all the expenses related to it. It could be something big, like a knee surgery (which might entail doctor's visits; the surgery itself including physician's fees, facility, and anesthesia; physical therapy; and pain meds) or something minor, like one of your kids needing to see the pediatrician for a sore throat.

With each valid health event, Members pay the first $500 as your Member Commitment. For many health events, your bill(s) will total much less than $500 – for example, a standard doctor's visit and prescription for strep throat will cost you much less than $500, so this isn't something you would submit for crowdfunding. But, for larger events, like the knee surgery example above, you'll pay the initial $500, and all valid expenses over your Member Commitment will be submitted to the Crowd for funding.

For health events lasting longer than twelve months (starting with the original date of service for the visits and bills in the event), the $500 initial Member Commitment will reset in the thirteenth month.

## Our Commitment to Revenue Transparency

Some of the main factors in rising healthcare costs are the mismatched incentives built into the system's financial structure: health insurance companies profit off a percentage of customer premiums, so they can make more money by hiking up prices.

CrowdHealth is different. We have intentionally established our revenue to align our incentives 100% with the goals of the Crowd, and we're committed to being transparent about it.

CrowdHealth receives revenue from Members' Monthly Advocacy Fees. Since CrowdHealth doesn't make money as a percentage of crowdfunding, we have no interest in denying the crowdfunding of Members' bills to increase our profits. We are here to help you and the Crowd save, always.

Resp. Ex. 1

# Using Your Membership

## Membership Basics

### Membership Accounts and Crowdfunding Bank Accounts

CrowdHealth Primary Members will have both a Membership Account and a Crowdfunding Bank Account in order to be an active Member of CrowdHealth. Your Membership Account involves the information you enter during the online signup process. Your Crowdfunding Bank Account is an FDIC insured bank account that enables the sending and receiving of crowdfunded monies between Member crowdfunding accounts and for the payment of healthcare services.

### Getting Oriented

Because CrowdHealth is different, we want to make sure Members understand the tools that help you navigate your healthcare without insurance. To help you get the most out of your Membership, CrowdHealth requires the Primary Member to complete a short New Member Orientation video and quiz.

### Notifying Us of Your Events

For your healthcare to be eligible for funding by the Crowd after your $500 Member Commitment is met, you must initiate your health events through the CrowdHealth mobile app. A Care Advocate will assist you and gather additional information to help you through your health event.

Members should initiate all planned care through the platform, regardless of whether it is expected to exceed the $500 Member Commitment. That way, your bill payment process is kept simple, and your Care Advocate can support you along the way, Even if you need care that isn't eligible for crowdfunding, we can still help navigate you to fair price and high-quality care.

If multiple Members of your family are involved in the same health event, like both kids getting the flu the same week (hang in there!), you'll need to open separate health events for each person, and each person's care will be subject to a separate $500 Member Commitment.

### Choosing Your Doctor

CrowdHealth does not participate in a provider network. You can see your existing doctors, or let your Care Advocate know if you need help finding a new one.

For your healthcare to be eligible for crowdfunding, it must be performed by a licensed or board-certified practitioner.

To uphold the integrity of the crowdfunding process on behalf of the Crowd, Members should not knowingly or repeatedly visit a medical practitioner who is unreasonable or unfair in their billing rates and practices.

### Submitting Your Bills & Receipts

When you receive a bill, scan it into the CrowdHealth app and attach it to your health event. If your bill needs to be negotiated, we'll coordinate with our partners to help you get the best discounts.

Once all necessary information is uploaded, we will review and submit approved bills for crowdfunding quickly and easily.

### Handling Big Bills

The CrowdHealth platform is designed to maximize the probability that all Members' eligible bills can be fully crowdfunded.

For big, planned expenses (like surgeries), CrowdHealth can make sure your estimate is GREEN and find other options for care if necessary, oftentimes saving you 30-80%! Always contact your Care Advocate before a scheduled surgery to allow time for this negotiation.

Resp. Ex. 1

For emergency expenses, CrowdHealth provides specialized post-negotiation support to work down balances before they are paid, sometimes up to 95% off. Contact your Care Advocate before you pay a big bill for emergency care, so we can help.

**Online Platform and Mobile App Access**

As soon as you sign up for your CrowdHealth Membership, you can download and log into the CrowdHealth mobile app and will be able to access your Member Portal through the website. Because our app and portal contain information and tools that are reserved for active and oriented Members, you will not be able to utilize the full app functionality until your Membership start date. Please note that without access to our app via a smart device, you will not be able to utilize certain features of your CrowdHealth Membership.

If you have any questions or issues with logging in or accessing the Member Portal or the CrowdHealth mobile app, please email us hey@joincrowdhealth.com.

**Self-Pay Patient Status**

CrowdHealth isn't insurance, so you do not have an ID card, Member number, or benefits group to submit on patient intake or other insurance-type forms. At any medical visit, you'll just indicate that you are an uninsured, or "self-pay," patient.

## Health Event Specifics

**Virtual Care**

Because the Crowd cares about your well-being and wants to encourage access to high-quality healthcare when you need it, virtual visits – including services like virtual urgent care, virtual primary care (VPC), and virtual talk therapy (including teen and couples talk therapy) -- through the CrowdHealth mobile app. For virtual primary care and virtual urgent care, payment is

Resp. Ex. 1

required at the time of service and these visits are fully crowdfundable once you submit your receipt. For virtual talk therapy, there is no upfront payment required. CrowdHealth will automatically generate a crowdfunding request for your virtual talk therapy visits.

**Annual Wellness**

CrowdHealth Members can submit up to $300 for ONE basic wellness event per year to be crowdfunded. This wellness event can be utilized for any one preventative or screening exam or test, performed by a licensed or board-certified practitioner.

The Crowd waives the $500 Member Commitment for one annual wellness event per Member (ages three and over). Annual wellness spending beyond this $300 crowdfunding threshold will be funded by the Member.

Please note that if after a basic wellness event, your doctor orders specialized diagnostics, imaging, additional lab work, or other follow-up care related to a new concern or acute condition identified at your wellness visit, that will initiate a new, separate health event and will be subject to the $500 Member Commitment.

Screening colonoscopies are valid health events and are separate from the basic wellness event described above. Expenses related to screening colonoscopy events can be navigated by your Care Advocate and submitted for crowdfunding when the $500 Member Commitment has been met. All other preventative care is the full responsibility of the Member and is not eligible for crowdfunding. Talk to your Care Advocate about how to make the most of your annual wellness health event.

Your wellness care must be completed by December 31 to apply for that calendar year.

Given the frequency of recommended well checks for our littlest Members, health events for Newborn and Children's Wellness are treated differently up to three years of age. See "Caring For Your Family" below.

### Scheduled (Non-Emergency) Care

For minor appointments, notify your doctor that you are a self-pay patient and pay the doctor at the time of your visit.

If your doctor requests labs, imaging, or other follow-up care, please get the orders from your doctor at your appointment and send them to your Care Advocate, who can help you navigate the next steps with high-quality care and fair pricing.

For major non-emergency care, such as a scheduled surgery, **please contact a Care Advocate in advance.** To validate potentially expensive and/or complex health events on behalf of the Crowd, CrowdHealth may engage a trusted third party to provide clinical review and/or pre-negotiation services for procedures and treatments. **A failure to notify CrowdHealth before your scheduled health event, which prevents CrowdHealth from performing appropriate due diligence and fair price comparison, may impact your Health Cost Score or eligibility for funding.**

### Emergency & Urgent Care

For all unplanned urgent or emergency care, inform your Care Advocate as soon as possible about the health event, so we can guide you through your health journey and offer you the best Member support possible.

When receiving urgent or emergency care, state that you are a self-pay patient and ask to be billed after your care. **CrowdHealth can facilitate negotiation on your behalf for emergency room bills before you pay them.**

### Prescriptions

For your prescriptions to be eligible for crowdfunding, you must use your prescription discount and choose a generic option if available when purchasing. You will show your RX discount card (accessible through your Member profile in the app) at the pharmacy to get the best price, pay at checkout, and submit the prescription receipt through the app for

crowdfunding.Maintenance prescription drug costs eligible for crowdfunding are generally limited to a 120-day supply per valid health event.

**Children's Immunizations**

For all children's immunizations, **you must use a Vaccines For Children (VFC) provider for any related expenses to be eligible for funding as part of the valid health event**. Learn more under "Caring for Your Family," below.

## How It All Comes Together

To help you get a clearer idea of the Member experience, below is an example to walk you through the process.

A family of four (two parents in their thirties, a toddler, and an elementary schooler) pays $55 per person each month for cash-pay resources and advocacy support. This month, their crowdfunding requests totaled $400, meaning they're spending $565 as a part of the Crowd and saving over $900 compared to the $1500 in health insurance premiums they were paying before (in addition to satisfying large deductibles before their coverage kicked in, plus ongoing copays and expensive coinsurance—yuck!).

Here's what navigating a health event looks like for these Members:

The family ventures out for a hike one Saturday morning, and Dad takes a bad fall and hurts his knee. He's in a good bit of pain, but it's not an emergency, and it's the weekend. Conveniently, he opens the CrowdHealth app, logs a new health event, and requests a virtual urgent care appointment. The virtual doctor is available fast and, between a video evaluation and listening to Dad describe his symptoms, diagnoses a sprain.

The doctor writes a prescription for pain medication, so Dad goes to his neighborhood pharmacy and uses the CrowdHealth prescription discount tool to get a great price. He shows his digital RX card and pays for the prescription at checkout. The virtual doc also recommends a follow-up appointment in person, so Dad contacts his Care Advocate, who helps him find a high-quality, fairly priced orthopedist in his area. When Dad arrives at

his appointment, he lets them know he's a self-pay patient and pays for his visit at checkout.

Dad's knee is starting to feel better as the swelling goes down, but the orthopedist says he'll need a few sessions of physical therapy to be back to 100%. Dad gets a referral from his doctor for a highly-regarded PT and calls the office to ask for a cash pay estimate before he schedules. He sends the pricing to the Care Advocate, who confirms it's a reasonable price for his care, then schedules the appointments he needs.

Four weeks later, he's done with PT, and his knee is feeling great. He has scanned in the receipts for his prescription, orthopedist visits, and physical therapy sessions in the CrowdHealth app. His bills totaled $725 for the health event, so $225 (the event-related expenses beyond his initial $500 Member Commitment) is submitted for crowdfunding. Through the easy-to-use CrowdHealth platform, with support from the Care Advocate, and thanks to the generous Member Community, Dad got the quality care he needed right when he needed it.

## Caring Abundantly

When you join the Crowd, you're there for your fellow Members in their time of need. And, when you help crowdfund other Members' expenses each month, you're supporting the very people who will step up for you when you have your own health events. We call it caring abundantly, and we believe it's a beautiful thing. When we each give a little, we find there's plenty for all.

### Caring for You

As a Member of CrowdHealth, you have access to the tools and support you need to lead the healthy, thriving lifestyle you desire.

We want to see the Crowd flourishing, meaning you receive the care you need without fear of how you'll pay for it. CrowdHealth takes the guesswork

out of how healthcare gets funded, and our exceptional Care Advocates are here to help you every step of the way.

## Caring for Your Family

### Maternity and Newborn Care

Member maternity care that is eligible for crowdfunding includes your whole pregnancy through your baby's birth and beyond. All three phases of pregnancy care (prenatal, labor and delivery, and postpartum) are represented in a single Global Pregnancy health event with a $3000 Member Commitment.

Your child's standard newborn wellness care (birth until six months old) is a separate health event from maternity and is an eligible health event for the baby when added as a new Member within 30 days of birth. If your baby gets sick or has complications at birth, the illness or injury will be treated as a separate health event from this newborn wellness health event.

Please note that maternity expenses for a pregnancy with an expected delivery date less than 300 days after the mother's Membership start date are not eligible for crowdfunding, and the baby cannot join the Crowd until six months of age. Pregnancies that are in question regarding this timeline may require a third-party clinical review before they are eligible for funding.

### Adding Children by Birth

For pregnancies that are eligible for crowdfunding, your newborn musty be added to your Membership within 30 days of birth for his/her health events to be eligible for funding retroactively, starting at the date of birth.

For pregnancies that are not eligible for crowdfunding, a baby may be added to your Membership at two weeks of age, effective at the start of the next billing cycle.

Resp. Ex. 1

Please see "Maternity and Newborn Care" above for more on these health events.

## Adding Children by Adoption

You may add an adopted child to your Membership within 30 days of their birth  for health expenses to be eligible for funding retroactively, starting at the child's birth date.

If you are unable to add them within 30 days of their birth, you can add them within 30 days of joining your family and their membership will begin at the start of your next billing cycle. Bills incurred prior to active membership will not be eligible for crowdfunding.

## Adding Additional Family Members

The addition of family members (e.g. children over two weeks old, spouse, etc.) to a primary Member's account may be initiated at any time. These added Memberships will be active at the start of the next billing cycle.

## Children's Wellness Visits and Vaccinations

For children conceived and born or added to a family by adoption after one or both parents join CrowdHealth, standard newborn wellness care (birth until six months old) is treated as one health event with one $500 initial Member Commitment. Existing children in a CrowdHealth Member family are eligible for Membership after they turn six months old.

For children ages six months until three years, your child's wellness checks are treated as a single health event with one $500 Member Commitment. Starting at age three, your child's annual visits will be treated like basic annual Member wellness events. For Members of any age, all illnesses or injuries will be treated as separate health events from wellness visits.

**Please note that you must utilize the Vaccines For Children (VFC) program or a similar community clinic/vaccine discount program in order for any**

Resp. Ex. 1

**expenses related to your child's vaccinations to be eligible for crowdfunding**. For more information on how to find a Vaccines for Children clinic in your area, contact a Care Advocate or visit this link: https://www.cdc.gov/vaccines-for-children/vfc-information-for-parents/index.html

## Caring for The CrowdHealth Community

The CrowdHealth Community is committed to crowdfunding the healthcare Members need without wasting funds on unnecessary or unproven treatments. This means some things, which are outlined in the table below, are not eligible for crowdfunding. To consistently offer the best care and support possible to the Crowd, we may still assist you in negotiating care that is not eligible for crowdfunding.

Any disputes that arise related to a health event's eligibility for crowdfunding will be decided by an independent third party hired to represent the Crowd. If necessary, a five person panel comprised of CrowdHealth Members will reassess the decision and determine if the Member Guide is being applied accurately. We believe you have each other's best interests in mind, and we are grateful for the caring Crowd we're building together.

### Generally Excluded or Restricted Procedures and Treatments

**Alternative therapies**

*Holistic and naturopathic treatments must be performed by a licensed and/or board-certified medical practitioner whose credentials are recognized in the state of service. Prepayments for multi-visit memberships and other treatment plans are not eligible for crowdfunding. Members should seek only the treatment necessary to treat their conditions. Any non-medically necessary, experimental, or non FDA approved treatments are considered alternative and will be subject to a second opinion clinical review to determine eligibility.*

Resp. Ex. 1

**Therapies and chiropractic care**

Physical therapy and occupational therapy (if not ordered by a doctor as part of a valid health event), speech therapy, maintenance chiropractic care

Chiropractic care when being used to treat musculoskeletal injuries is eligible. Care from a chiropractor for medical issues outside of musculoskeletal injuries requires a Second Opinion Clinical Review to determine eligibility.

**Cosmetic procedures**

Breast implants, hair loss treatment, weight loss programs, surgery, or other treatments (including prescriptions, etc.), and any other non-medically necessary cosmetic procedure, or complications from ineligible treatments

**Mental health**

ADD/ADHD, counseling/talk therapy (except for virtual talk therapy provided through the CrowdHealth app), diagnostic neuropsychological testing, out-patient psychiatric treatment, rehabilitation facilities and expenses (e.g. addiction, eating disorders), or complications from ineligible treatments

**Personally assumed risk**

Injuries or conditions indirectly or directly attributable to gross negligent acts, hazardous activities, under the influence of drugs or alcohol, or illegal acts; injury resulting from failure to comply with medical advice, injury from war/armed conflict, or self-inflicted injury, or complications from ineligible treatments.

*Hazardous activities include hazardous sporting activities (including, but not limited to, motorcycle racing, off-road vehicle competitions, hang gliding, parasailing, skydiving, drag racing, motocross racing, road racing, sporting stunts, and mixed martial arts [MMA]); lighting self on fire, swimming during a lightning storm, swimming with sharks, trying to break a world record by holding breath underwater, training aggressive predators (e.g. tigers, lions),*

*prostitution, walking home in the dark on a freeway, and using recreational drugs.*

*An independent third party hired to represent the Crowd has the full discretionary authority to determine if an activity is considered hazardous. In the spirit of CrowdHealth, this exclusion is not here to be a loophole for denying the crowdfunding of expenses from health events that result from Members living active, normal lives. Rather, it's to keep people from being idiots and, say, lighting themselves on fire, diving into a pool of hungry sharks, etc., then expecting the Crowd to fund it.*

**Prescriptions**

Experimental drugs, high-cost therapeutics, injectable epinephrine, orphan drugs, weight loss drugs, and any prescriptions or vaccines purchased without the CrowdHealth discount tool, name brand prescriptions when a generic option is available, or complications from ineligible treatments

**Reproductive Health**

Adoption, abortion, contraceptives, In vitro fertilization (IVF) treatment, impotence treatment, pregnancy conceived before Membership was active (incl. prenatal, labor/delivery, and postpartum maternal care, congenital/hereditary conditions for baby, first six months of infant healthcare, or treatment for complications known prior to membership), gender reassignment procedures and treatments, surgical sterilization, or complications from ineligible treatments

**Vision and Dental**

Dental care; including, but not limited to care received from a dentist, dental hygienist, dental assistant, etc, (except as a qualifying annual wellness event), wisdom teeth removal, dental implants, bridges, crowns, dentures, root canal, or oral surgery, non-ophthalmologic eye care, including but not limited to care received from an optometrist, optometry assistant, etc, (except as a qualifying annual wellness event), or complications from ineligible treatments.

Resp. Ex. 1

**Durable Medical Equipment**

Durable Medical Equipment must be prescribed by a licensed medical professional and must be a necessary part of treating the condition. Disposable or single use DMEs are limited to a 120 day supply per valid health event. Replacement or maintenance devices, equipment, attachments, supplies, etc are generally not eligible for crowdfunding.

**Other**

Custodial (nurse or similar) care when not treating illness or injury, euthanasia, food or infant formula, healthcare charges incurred before you were a Member, international air ambulances/medical evacuations, late fees or billing irregularities due to patient negligence, over the counter medicines and personal comfort devices, subacute care or skilled nursing care, long term or hospice care beyond 30 days, exercise programs, colonics, massage therapy, medical marijuana/CBD, elective genetic screenings and testing, supplements, and any other non-medically necessary service or treatment or complications from ineligible treatments

## Previously Documented, Diagnosed, or Symptomatic Conditions

The Crowd welcomes Members with varied health backgrounds. However, there are limitations on funding health events related to conditions that have been Previously Documented, Diagnosed, or Symptomatic. This includes conditions such as asthma, congenital conditions (except for children who become CrowdHealth Members at birth), diabetes, genetic disorders, heart conditions, sleep apnea, and any other medical condition which was Previously Diagnosed, Documented, or Symptomatic. This is not an exhaustive list.

Those conditions that have been Previously Documented, Diagnosed, or Symptomatic within five (5) years of joining CrowdHealth are eligible for limited funding starting in the third year of Membership. This includes any condition that was diagnosed, symptomatic, suspected, or has required

Resp. Ex. 1

treatment. Specifically, any condition, illness, or injury that was Previously Documented, Diagnosed, or Symptomatic is not eligible for funding in years one and two of Membership, and a maximum crowdfunding limit of $25,000 per year related to these conditions applies in years three and following.

High cholesterol and high blood pressure are not subject to these Previously Documented, Diagnosed, or Symptomatic Condition limitations.

# More Membership Details

Since we're doing something different here, there are a few more things we want to make sure you know about your CrowdHealth Membership.

### Minimum Essential Coverage (MEC)

**Since your CrowdHealth Membership is not insurance or health coverage, it does not satisfy any federal or state individual Minimum Essential Coverage (MEC) mandate under the Affordable Care Act (ACA).**

If you live somewhere (e.g. California, District of Columbia, Massachusetts, New Jersey, Rhode Island, Vermont) with a state-level individual MEC mandate, you are responsible for securing coverage to satisfy those mandates independently from your CrowdHealth Membership. Links to more information about these mandates are below.

If you have a MEC health plan, you are expected to utilize this coverage for all eligible care before submitting bills to CrowdHealth.

State Information about MEC Mandates:

California
Washington, DC
Massachusetts
New Jersey
Rhode Island
Vermont

## Other Coverage

To avoid unfairly burdening the Crowd with unnecessary bills, Members must pursue payment from applicable payor sources (e.g. car insurance, MEC, worker's comp, etc.) for health events before submitting any remaining medical expenses for crowdfunding.

If you have health insurance in addition to your CrowdHealth Membership (e.g. car, home, or health insurance, MEC, worker's comp, government aid, financial assistance, etc.) talk to a Care Advocate about how to be a smart consumer for your expenses.

## Taxes

Your Monthly Membership Fee and all crowdfunding participation represent voluntary participation in a Membership that facilitates the funding of fellow Members' medical bills. These should not be considered as a health insurance premium, nor should they be considered as contributions to a healthcare sharing ministry. These amounts are not tax-deductible. Please consult a tax professional for guidance on any tax-related questions.

## Legal Action

The ability to pursue fair healthcare costs on your behalf as a self-pay patient is an important part of how CrowdHealth operates and cares for the Crowd. In the case that a provider bills an unfair amount and is unwilling to negotiate, CrowdHealth requires Members to give us the right to pursue legal action against that provider on your behalf.

## Access to Your Health Records

When you join CrowdHealth, you agree to give specific individuals at CrowdHealth and our partners access to your health records upon request.

In the instance of a telemedicine visit or a health event, CrowdHealth may receive information such as the following from your medical practitioner(s):

patient name, date & time of appointment/call, outcome or diagnosis, prescriptions, etc.

We reserve the right to request medical records, which are used to assist with care navigation and to protect you and the Crowd by providing important context about your medical history and helping validate your bills. Members are required to execute HIPAA authorizations to allow CrowdHealth and our partners to access this private information. Failure to do so may delay or limit your care navigation and/or the crowdfunding of your health event.

## Protecting Your Personal Information

CrowdHealth understands that privacy is important to our Members. As such, CrowdHealth makes every attempt to keep your information, including personal health information, secure and protected. To learn more about how we protect your information, please email hey@joincrowdhealth.com.

In addition, for CrowdHealth to provide support for many of our services, we may ask Members to sign HIPAA authorization forms allowing for the release of protected health information to CrowdHealth from certain medical providers.

## Promotion Codes

If you signed up for your Membership using a promotional code, all responsibilities as outlined in this Member Guide still apply. Only one promotional code may be used per Member.

## International Travel Policy

International care is eligible on a valid health event but will be fair market price compared against similar or reasonable standard of care services in the United States.However, please note that expenses relating to international air ambulances or medical evacuations are NOT eligible for crowdfunding.

## Clinical Review

CrowdHealth may engage trusted partners to assist with clinical reviews for certain health events, like surgeries and major scheduled procedures/treatments. These clinical reviews help ensure high-quality outcomes for Members at the best value to the Crowd. Clinical review services include but are not limited to: clinical and medical appropriateness reviews, evaluating a health event for eligibility under the terms of a CrowdHealth Membership, and remote second opinions (RSOs). If CrowdHealth engages a third-party to review your event, you will be notified by our Care Advocacy team. Self-disclosed medical history is treated as an aspect of the Member's medical record and is subject to clinical review.

Costs related to clinical reviews are considered part of the health event costs and are eligible for crowdfunding.

## Specialized Negotiation Support

CrowdHealth may engage trusted partners to provide specialized negotiation support for certain health events. This negotiation support is performed on your behalf to assist in negotiating fair and reasonable charges for Member health events. These pre- and post-event negotiation services help ensure that CrowdHealth Members are not over-billed for care and that the Crowd's funds are maximized for the benefit of all Members. If CrowdHealth engages our partner to assist in negotiating your event, you will be notified by our Care Advocacy team.

It is the Member's responsibility to respond to the CrowdHealth team and negotiation partners regarding information, updates, and action related to bill negotiation. If a Member is unresponsive in the negotiation process, including an unwillingness to explore reasonable discount options, and/or if a Member fails to take advantage of a negotiated discount during a designated time period resulting in a loss of discount, the bill's Health Cost Score may be impacted.

Because all bills remain the responsibility of the Member, there may be a rare scenario where a paid bill is negotiated to a lower price AFTER crowdfunding, resulting in a refund to the Member. In this case, the Member must, in good faith, return any refunded money to the Crowd, to be used for crowdfunding other Member's health events.

Costs related to negotiation services are considered part of the health event costs and are eligible for crowdfunding.

## Crowdfunding Account Management

Each month, your Membership Fee comes to CrowdHealth, and your crowdfunding flows through your Crowdfunding Bank Account to fund other Members' bills. See our Terms of Service for more information on Crowdfunding Bank Accounts.

Your CrowdHealth Membership is active after your bank account identity verification has been successful and your payment method has been successfully charged.

Your crowdfunding participation voluntarily funds medical bills for the Crowd. When other Members fund your bills, the crowdfunding will be transferred to your Crowdfunding Bank Account.

## Missed Advocacy Fee Payments

To maintain an active CrowdHealth Membership, Members must keep Monthly Advocacy Fee payments current. If you fail to pay your Monthly Advocacy Fee on time, you will be notified, and your Membership will become suspended as of the day of the failed payment. Membership accounts with unpaid Advocacy Fee balances after 21 days will be terminated and subject to terms of cancelation outlined below ("Canceling Your Membership").

Members who miss crowdfunding requests because of a temporary

Resp. Ex. 1

Suspended account status may be asked to make up crowdfunding by receiving additional requests that month.

Exclusions apply for members residing in Colorado. Contact hey@joincrowdhealth.com for more details.

### Charge Disputes

Choosing to dispute your Advocacy fee or crowdfunding request payment after payment has processed directly impacts the Community. If you dispute a payment through your card provider or bank, instead of talking to CrowdHealth about your charge issues first, your CrowdHealth membership will be terminated.

### Canceling Your Membership

You may cancel your Membership at any time. Cancelations are effective at the end of your current billing cycle. You must cancel 10 days prior to your next billing date to avoid being charged for the next month of your Membership.

If you decide to leave and want to rejoin CrowdHealth later, there is a minimum waiting period of six months (180 days) between your cancelation and the start of your new Membership.

Please Note: For your expenses to be eligible for crowdfunding, you must be an active Member both at the time the expense is incurred AND at the time the expense is sent to the Crowd for funding.

## Member Manifesto

**1. I understand that CrowdHealth is not health insurance, and I think that's a good thing!**

**2. I have fully read and understand this Member Guide that describes my CrowdHealth Membership and how it will help me pay for my healthcare**

costs, including my $500 Member Commitment for each health event and the specified limitations and exclusions set forth herein.

3. I understand that for my Membership to remain active, I must keep my Monthly Membership Fee payments current

4. I understand that my participation in the crowdfunding of the Community's medical costs is voluntary, but failing to participate in funding others' bills will negatively affect my Generosity Score.

5. I understand that my health visits, except for unplanned urgent or emergency care, should be initiated through the CrowdHealth platform, or they may not be eligible for crowdfunding.

a. I understand that the ability to negotiate on my behalf as a self-pay patient is an important part of how CrowdHealth operates, so I agree to let my providers know I am a self-pay (uninsured) patient at each appointment.

b. If a medical practitioner of my choice bills me an unfair amount and is unwilling to negotiate, I give CrowdHealth the right to pursue legal action against that provider on my behalf.

6. I understand that both the Crowd and I benefit when Members make smart, mindful health and healthcare spending decisions.

a. To care for myself and my fellow Crowd Members, I commit to maintaining a healthy lifestyle, including abstaining from any illegal drug use or activities.

b. To uphold the integrity of the crowdfunding process on behalf of the Crowd, I commit to not knowingly or repeatedly visit a medical practitioner who is unreasonable or unfair in their billing rates and practices.



Contact Us     FAQs     Blog and Media     Reviews     Careers     Clinicians

   

CrowdHealth is a financial technology company, not a bank. Banking services are provided by Regent Bank, Member FDIC. FDIC insurance only covers failure of insured depository institutions. Certain conditions must be satisfied for pass-through FDIC deposit insurance to apply.

© CrowdHealth, Inc. All rights reserved.     Privacy Policy     Terms and Conditions

Resp. Ex. 1

# EX 1.15

2/13/25, 9:22 PM                                                      About Altrua HealthShare

SHARE THE CARE  |  PROVIDERS  |  SIGN IN

  **HealthShare**

HOW IT WORKS ▢      RESOURCES ▢                    1.888.244.3839        BECOME A MEMBER

# About Altrua HealthShare

We are a unique health care sharing ministry that does not require a pastor, elder or representative from a local church to sign an acknowledgement verifying church attendance or validation of medical needs being submitted to the membership for sharing.

Each eligible medical need submitted to the membership is shared according to the Escrow Instructions and the Membership Guidelines.

Our members do not have to wait on other members to send individual checks for medical needs.

Our members do not participate in subsidizing or paying for certain lifestyles that continue to add to the rising costs associated with insurance companies. Our members are considered by the medical profession to be self-pay patients and typically enjoy lower costs than members of health insurance companies.

Find out how much your family could save—NO OBLIGATION!

First Name*

Last Name*

Email*

Phone*

Zip*

**Consent Disclaimer:**
By clicking 'Submit' below I expressly consent to the receipt of promot... read more

[ ] I'm not a robot
                                    reCAPTCHA
                                    Privacy - Terms

SUBMIT

Resp. Ex. 1

2/13/25, 9:22 PM                          About - Altrua HealthShare

SHARE THE CARE  |  PROVIDERS  |  SIGN IN

## Altrua HealthShare

HOW IT WORKS ⌄      RESOURCES ⌄              1.888.244.3839        BECOME A MEMBER

 

Altrua Ministries (dba Altrua HealthShare, dba Altrua SmileShare) is NOT an insurance company nor is the membership offered through an insurance company. Members are self-pay patients. Altrua Ministries is a 501(c)(3) nonprofit corporation. Translated content is not an exact copy and may not include all content available in English. | Article 48, Section 1-202(4) — Notice: This publication is not issued by an insurance company nor is it offered through an insurance company. It does not guarantee or promise that your medical bills will be published or assigned to others for payment. No other subscriber will be compelled to contribute toward the cost of your medical bills. Therefore, this publication should never be considered a substitute for an insurance policy. This activity is not regulated by the State Insurance Administration, and your liabilities are not covered by the Life and Health Guaranty Fund. Whether or not you receive any payments for medical expenses and whether or not this entity continues to operate, you are always liable for any unpaid bills. | © 2023 Altrua HealthShare — All rights reserved

EN | ES | KO

Find out how much your family could save—NO OBLIGATION!

**Consent Disclaimer:**
By clicking 'Submit' below I expressly consent to the receipt of promot... read more

Resp. Ex. 1

# EX 1.16

Select Page ☰





# FREQUENTLY ASKED QUESTIONS

### HOW DO HEALTH CARE SHARING MINISTRIES WORK? 

### HOW IS HEALTH CARE SHARING MINISTRIES DIFFERENT THAN INSURANCE? 

### HOW DO I IDENTIFY A TRUSTED HEALTH CARE SHARING MINISTRY? 




### DO HEALTH CARE SHARING MINISTRIES "COVER" PRE-EXISTING CONDITIONS? 

### DO HEALTH CARE SHARING MINISTRIES "COVER" PRESCRIPTION MEDICATION? 

### CAN I TRUST HEALTH CARE SHARING MINISTRIES WITH MY MEDICAL BILLS? 

### WHY DO SO MANY AMERICANS CHOOSE A HEALTH CARE SHARING MINISTRY?

Health Care Sharing Ministries are a practical option for many Americans, and more than 1.5 million people have chosen Health Care Sharing Ministries as their health care solution. They offer principled, high-quality care at a price often more affordable than what is offered by Big Insurance or the hyper-regulated federal exchange. Health Care Sharing Ministries share more than health expenses, they offer spiritual support with prayer over the phone, encouraging notes, and community prayer requests for members.

Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 306 of 547

## IS ANYONE ABLE TO JOIN?                                      ⊕

## WHO IS IN THE ALLIANCE FOR HEALTH CARE SHARING MINISTRIES?    ⊕

To interview a representative from The Alliance of Health Care Sharing Ministries, contact Media@HamiltonStrategies.com, Beth Harrison, 610.584.1096, ext. 105, or Deborah Hamilton, ext. 102.





Resp. Ex. 1



# EX 1.17

Membership GEMs 2022 - Altrua HealthShare

# Feel confident to make the right choice for your family.

We offer a 30 day trial experience.

If it's not the right fit, we will refund your first month's contribution.

[ SIGN UP NOW ]

N MORE

SHARE THE CARE | PROVIDERS | SIGN IN

**Altrua** HealthShare

HOW IT WORKS ▢    RESOURCES ▢

1.888.244.3839    [ BECOME A MEMBER ]

Resp. Ex. 1





## Get More from Membership

Members have access to so many health care services like telemedicine and counseling, discounts on prescriptions, great member service and so much more — all without an increase to their 2021 contribution amount.

View Contribution Amounts

## Pooled Office Visits

We are providing a better opportunity to use all of the office visits included with a membership. Families now have greater flexibility to use their office visits by sharing with other household members that need them.

Learn More

## Years of Sharing Experience

We have been managing our member's medical needs for over 2 decades and readily help our members with the knowledge and experience necessary to navigate the health care world.

See What Our Members Say

# Four Memberships to Choose From

SHARE THE CARE | PROVIDERS | SIGN IN

**Altrua** HealthShare

HOW IT WORKS □    RESOURCES □

1.888.244.3839    BECOME A MEMBER

Resp. Ex. 1

Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 311 of 547

| Diamond | Emerald | Sapphire | Ruby |
|---|---|---|---|
| CONTRIBUTIONS AS LOW AS | CONTRIBUTIONS AS LOW AS | CONTRIBUTIONS AS LOW AS | CONTRIBUTIONS AS LOW AS |
| **$356.00** /mo | **$318.00** /mo | **$173.00** /mo | **$136.00** /mo |
| Perfect for growing families that want a low *MRA*. | Lower contributions for a lower Lifetime Limit. | Great for two people that want the added security. | For a healthy individual unconcerned with a higher *MRA*. |
| BECOME A MEMBER | BECOME A MEMBER | BECOME A MEMBER | BECOME A MEMBER |
| 6 *Pooled Office Visits* per Member | 6 *Pooled Office Visits* per Member | 6 *Pooled Office Visits* per Member | 6 *Pooled Office Visits* per Member |
| Unlimited Telemedicine | Unlimited Telemedicine | Unlimited Telemedicine | Unlimited Telemedicine |
| Maternity sharing | Maternity sharing | Cancer Treatment sharing | Cancer Treatment sharing |
| Adoption sharing* | Adoption sharing* | Annual Limit is $250,000 | Annual Limit is $150,000 |
| Cancer Treatment sharing | Cancer Treatment sharing | Lifetime Maximum Limit $1,000,000 | Lifetime Maximum Limit $1,000,000 |
| Laboratory Services | Laboratory Services | | |
| No Annual Limit up to the Lifetime Maximum Limit of $2,000,000 | No Annual Limit up to the Lifetime Maximum Limit of $1,000,000 | | |

*Void where prohibited: Although Altrua HealthShare offers memberships nationwide, some of the sharing options contained in the Membership Guidelines may NOT be available to Members in all geographic locations or jurisdictions.
Adoption and Funeral sharing options are NOT available to Texas residents.

N MORE

SHARE THE CARE  |  PROVIDERS  |  SIGN IN

Altrua HealthShare    HOW IT WORKS    RESOURCES

1.888.244.3839    BECOME A MEMBER

Resp. Ex. 1

Case No. 1:24-cv-01386-GPG-STV     Document 76-1     filed 06/27/25     USDC Colorado
pg 312 of 547

# What Our Members Give to the Membership

## Monthly Contribution Requests

The Head of Household or Primary Member is sent monthly contribution requests based on age and/or number of household members, which they submit to stay active in the membership.* Use the chart to find out what your contribution amount would be. A Family membership is a household membership with 3 or more members.

**NOTE**

Members whose weight exceeds the membership standard will have a share increase added to their monthly contribution.

| MEMBERSHIP | AGE* | MEMBER | MEMBER +1 | FAMILY** |
|---|---|---|---|---|
| Diamond | 0–39 | $356 | $528 | $706 |
| | 40–49 | $388 | $586 | $796 |
| | 50–59 | $478 | $821 | $973 |

SHARE THE CARE  |  PROVIDERS  |  SIGN IN

**Altrua** HealthShare       HOW IT WORKS ▢   RESOURCES ▢                     1.888.244.3839       BECOME A MEMBER

Resp. Ex. 1

| | | | | |
|---|---|---|---|---|
| **Emerald** | 0–39 | $318 | $496 | $661 |
| | 40–49 | $356 | $547 | $725 |
| | 50–59 | $439 | $757 | $884 |
| | 60–64 | $528 | $967 | $1,056 |
| **Sapphire** | 0–39 | $173 | $345 | $468 |
| | 40–49 | $259 | $382 | $511 |
| | 50–59 | $345 | $597 | $639 |
| | 60–64 | $424 | $769 | $849 |
| **Ruby** | 0–39 | $136 | $200 | $265 |
| | 40–49 | | | |
| | 50–59 | | | |
| | 60–64 | | | |

*The Head of Household is the oldest member in the household. **If a Household has more than five family members, the monthly contribution amount is increased by an additional $50 for each additional dependent (Diamond, Emerald & Sapphire Memberships). For Ruby, the monthly contribution amount is increased by an additional $50 for each additional dependent over 3 members.

N MORE

| 1ST MRA | The member is responsible for $500 per person per calendar year before the 2nd MRA applies. | The member is responsible for $1,000 per person per calendar year before the 2nd MRA applies. | The member is responsible for $1,500 per person per calendar year before the 2nd MRA applies. | The member is responsible for $7,500 per person per calendar year. |
|---|---|---|---|---|
| 2ND MRA | The member is responsible for 25% of the next $10,000 in eligible medical needs, maximum of $2,500 to the licensed medical professional/facility. | | | n/a |
| OFFICE/URGENT CARE/SPECIALIST VISIT MRA | The member pays $35.00 to the licensed medical professional of their choice. This is not applied to the 1st or 2nd MRA. | | Up to $300.00 of the charges per visit is applied to the 1st then 2nd MRA. | |
| MATERNITY MRA | $5,000 MRA per pregnancy. | | Maternity is not included. | |
| ADOPTION MRA** | $5,000 MRA per event. An adoption event may have more than one child. | | Adoption is not included. | |
| CANCER MRA | Year 1 – $4,000 MRA, Year 2 – $3,000 MRA, Year 3+ – $2,000 MRA. Subject to annual and lifetime maximums. | | 1st, then 2nd MRAs apply. Subject to annual and lifetime maximums. | |

## MRAs (Member Responsibility Amounts)

Members are responsible for a financial portion of *eligible* medical needs.

### 1st MRA

The member's first responsibility amount before the membership shares in eligible needs (any amount not related to office visits, wellness visits, sick visits, check-ups, follow-up visits, etc.).

### 2nd MRA

The percentage members are responsible for, after the 1st MRA is met, and before the membership shares in eligible needs. The membership shares



SHARE THE CARE  |  PROVIDERS  |  SIGN IN

HOW IT WORKS ⬚   RESOURCES ⬚                1.888.244.3839    BECOME A MEMBER

Resp. Ex. 1

# What Our Members Receive from the Membership

| INCLUDED | Diamond | Emerald | Sapphire | Ruby |
|---|---|---|---|---|
| **6 *POOLED* OFFICE/URGENT CARE/SPECIALIST VISITS ANNUALLY** | Up to $300 is shared on the member's behalf per visit after $35 office visit MRA. Visits are per member, per calendar year and are *pooled*.  Households combine their individual office visit allotment so that unused office visits of one household member can be used by another household member if needed. | | Members submit the full or discounted charges of the eligible medical need to the licensed medical professional and the membership allows up to $300 of charges per visit to be applied to the 1st then 2nd MRA. Visits are per member, per calendar year and are *pooled*. | |
| **MAMMOGRAM** | Female members age 40 and over and male members age 50 and over. Eligible for sharing of one additional office visit during the calendar year. Female Members age 40 and over for a mammogram visit, the membership will share up to $500 on a routine screening mammogram or a routine screening breast ultrasound, the membership will share up to $500 after the $35 office visit MRA. | | Female members age 40 and over and male members age 50 and over. Eligible for sharing of one additional office visit during the calendar year. Female Members age 40 and over for a mammogram visit, the membership will share up to $500 on a routine screening mammogram or a routine screening breast ultrasound, the membership will allow up to $500 to be applied towards the MRA. | |
| | Maximum sharing limit per pregnancy applies: | | | |

**Altrua** HealthShare    HOW IT WORKS ☐    RESOURCES ☐

SHARE THE CARE  |  PROVIDERS  |  SIGN IN

1.888.244.3839    BECOME A MEMBER

Resp. Ex. 1

| ADOPTION** | $5,000 eligible for sharing once the $5,000 Adoption MRA has been met. (12 month wait) | | Adoption is not included. |
|---|---|---|---|
| CANCER TREATMENT | Maximum sharing amount Year 1 – $10,000 and Years 2+ – Subject to annual and lifetime max after Cancer MRA has been met. Biennial screening requirements for females 40 and over and males 50 and over and 90 day wait | | 1st, then 2nd MRAs apply. Biennial screening requirements for females 40 and over and males 50 and over. 12 month waiting period |
| LABORATORY SERVICES | $500 Laboratory MRA applies. $1,000 maximum sharing limit, per member, per calendar year. Laboratory services must be obtained through an in-network facility to be eligible for sharing. 90 day waiting unless billed with an eligible office visit or hospital stay or is part of a wellness or preventative care visit. | $500 Laboratory MRA applies. $500 maximum sharing limit, per member, per calendar year. Laboratory services must be obtained through an in-network facility to be eligible for sharing. 90 day waiting unless billed with an eligible office visit or hospital stay or is part of a wellness or preventative care visit. | Applied towards 1st, then 2nd MRAs. Allowed up to $4,000, per member, per calendar year. 90 day waiting period unless part of wellness or preventative care visit. |
| TELEMEDICINE | Unlimited utilization, with no consultation fee | | |
| PRESCRIPTIONS | Altrua HealthShare members are allowed discounts for name brand and generic prescriptions. | | |

SHARE THE CARE  |  PROVIDERS  |  SIGN IN

Altrua HealthShare

HOW IT WORKS     RESOURCES

1.888.244.3839     BECOME A MEMBER

Resp. Ex. 1

2/13/25, 9:27 PM                                    Membership Gems 2022 - Altrua HealthShare

| FUNERAL NEEDS** | $5,000 maximum sharing limit per household, per calendar year. Discounts are available through Dignity Memorial, click here to learn more. | | Funeral needs are not included. Discounts are available through Dignity Memorial, click here to learn more. |
|---|---|---|---|
| SHARING AFTER 1ST AND 2ND MRAS ARE MET | The membership shares 100% of eligible medical needs for the remainder of the calendar year up to any maximum sharing amounts as listed in the Membership Guidelines. | | |
| MAXIMUM AMOUNT SHARED DURING THE LIFETIME OF YOUR MEMBERSHIP | Lifetime Limit of $2,000,000 per member. No maximum per calendar year. | Lifetime Limit of $1,000,000 per member. No maximum per calendar year. | Lifetime Limit of $1,000,000 per member with a limit of $250,000 per calendar year. | Lifetime Limit of $1,000,000 per member with a limit of $150,000 per calendar year. |

**Void where prohibited: Although Altrua HealthShare offers memberships nationwide, some of the sharing options contained in the Membership Guidelines may NOT be available to Members in all geographic locations or jurisdictions. Adoption and Funeral sharing options are NOT available to Texas residents.



SHARE THE CARE | PROVIDERS | SIGN IN

Altrua HealthShare    HOW IT WORKS ⊡    RESOURCES ⊡                1.888.244.3839    [ BECOME A MEMBER ]

Resp. Ex. 1

2/13/25, 9:27 PM                    Membership GEMs 2022 - Altrua HealthShare

Every membership includes access to services and discounts that help our members maintain a healthy
emotional, mental and physical lifestyle.

## Membership Services & Discounts

SHARE THE CARE  |  PROVIDERS  |  SIGN IN

Altrua
HealthShare

HOW IT WORKS ⬚    RESOURCES ⬚

1.888.244.3839    BECOME A MEMBER

N MORE

2/13/25, 9:27 PM                     Membership GEMS 2022 - Altrua HealthShare



## Get to Know the Membership

What should I tell my doctor? How do I submit a medical need?
Answers to questions about the Membership can be found in the Membership Guidelines.

TAKE A LOOK

# What Our Members Say



**Russ Murphy**
6 days ago
★★★★★



**Dan Williams**
15 days ago
★★★★★



**Nara English**
15 days ago
★★★★★

SHARE THE CARE  |  PROVIDERS  |  SIGN IN

HOW IT WORKS    RESOURCES

1.888.244.3839    BECOME A MEMBER

Resp. Ex. 1

Read more

 **s S**
22 days ago

⭐⭐⭐⭐⭐

Clear explanation, good customer service, fast and helpfully. Thank you

 **Cristina Eppers**
1 month ago

⭐⭐⭐⭐⭐

Signing up with Altrua Healthshare was very simple and easy to do, once I had
Read more

 **Greensboro MadSp...**
1 month ago

⭐⭐⭐⭐⭐

Local agent Chris was great. He made it easy yo understand and easy to get
Read more

 **Michelle Carabini**
2 months ago

⭐⭐⭐⭐⭐

It was great. Easy,

 **Emily Ren**
2 months ago

⭐⭐⭐⭐⭐

Altrua is very unique and user friendly using new technologies. It really helps
Read more

 **boogiz61**
2 months ago

⭐⭐⭐⭐⭐

It was a great experience, I spoke with agent Joyce she was very kind and
Read more

**LOAD MORE**

N MORE

SHARE THE CARE  |  PROVIDERS  |  SIGN IN

 **Altrua** HealthShare

**HOW IT WORKS** ⌄    **RESOURCES** ⌄

1.888.244.3839    **BECOME A MEMBER**



The Altrua HealthShare App

☐ Check your medical need status

☐ Find a medical provider near you

☐ See your digital wallet & Membership ID Card

☐ Get additional membership benefits for completing Health Journey goals

GET THE APP

SHARE THE CARE  |  PROVIDERS  |  SIGN IN

HOW IT WORKS ☐     RESOURCES ☐

1.888.244.3839     BECOME A MEMBER

Resp. Ex. 1

2/13/25, 9:27 PM                        Membership Gems 2022 - Altrua HealthShare

 Apply Online       Get Approved       Start Saving

BECOME A MEMBER



ABOUT                          ARTICLES
CONTACT                        PRIVACY
ALTRUA MINISTRIES              DISCLAIMERS & LEGAL

   

Altrua Ministries (dba Altrua HealthShare, dba Altrua SmileShare) is NOT an insurance company nor is the membership offered through an insurance company. Members are self-pay patients. Altrua Ministries is a 501(c)(3) nonprofit corporation. Translated content is not an exact copy and may not include all content available in English. | Article 48, Section 1-202(4) — Notice: This publication is not issued by an insurance company nor is it offered through an insurance company. It does not guarantee or promise that your medical bills will be published or assigned to others for payment. No other subscriber will be compelled to contribute toward the cost of your medical bills. Therefore, this publication should never be considered a substitute for an insurance policy. This activity is not regulated by the State Insurance Administration, and your liabilities are not covered by the Life and Health Guaranty Fund. Whether or not you receive any payments for medical expenses and whether or not this entity continues to operate, you are always liable for any unpaid bills. | © 2023 Altrua HealthShare — All rights reserved

EN | ES | KO

LEARN MORE

Resp. Ex. 1

# EX 1.18

2/13/25, 9:29 PM                           Healthcare Programs | Christian Healthcare Ministries

 **Christian Healthcare Ministries**



# Gain **freedom** over your healthcare options.

**CHM PROGRAMS**

# Enroll in one of our programs with **anytime enrollment.**

Our programs are simple and transparent, making it easy for you to compare pricing. You can customize your level of care with CHM Plus, a low-cost addition for eligible medical bills over $125,000.

We share 100% of eligible medical bills according to our Guidelines. At CHM, we use a unit system—no family pays for more than three units per month, regardless of the number of dependent children.

Resp. Ex. 1

**EXPLORE YOUR OPTIONS**

Choose one of our programs
Explore our programs, CHM Gold, CHM Silver, CHM Bronze, or CHM SeniorShare™, and add the optional CHM Plus program to protect against catastrophic medical bills. Christian Healthcare Ministries also has group program options for employers.

| | CHM GOLD LEARN MORE → | CHM SILVER LEARN MORE → | CHM BRONZE LEARN MORE → | CHM SENIORSHARE™ LEARN MORE → |
|---|---|---|---|---|
| Per unit, per month | $255 | $148 | $98 | $115 |
| Minimum amount to qualify per incident/illness | $1,250 | $3,000 | $6,000 | $500 |
| Personal Responsibility | $1,250 | $3,000 | $6,000 | $0 |
| Maternity Personal Responsibility | $2,500 | $5,000 | $9,000 | N/A |
| Lifetime maximum per illness without CHM Plus* | $125,000 | $125,000 | $125,000 | Unlimited |
| All programs include telemedicine services, inpatient and outpatient hospital incidents and surgery, maternity care, physical therapy, home healthcare (up to 45 visits per injury/sickness), and incident-related doctor's office visits and prescriptions. | ✓ | ✓ | ✓ | ✓ |

*As long as all other Guidelines are met. All programs have an illness cap of $125,000 per illness unless adjusted by the CHM Plus add-on option.

Resp. Ex. 1

For Maryland residents only: Learn additional information regarding CHM membership. **LEARN MORE** →

**JOIN NOW**



# CHM Plus

CHM Plus is your safeguard against catastrophic illness or injury. For only $32 a month, this low-cost add-on takes care of medical bills that exceed the $125,000 limit per illness specified in the CHM Guidelines.

Discover CHM Plus: what's eligible, why our members love it, and if it's right for you and your family.

**LEARN MORE**

Resp. Ex. 1



# Group health programs

CHM has over 700 participating groups with Christian staff. These programs allow faithful employees to express their faith through the biblical community that CHM provides.

DOWNLOAD GROUPS INFO PACK

"While I've always been fond of the health cost sharing model, Christian Healthcare Ministries stands out above the rest."
– Dr. Joel Judah, M. D., Macon, Georgia

# Find your program

Answer just a few questions to help figure out what program is right for you or your family. Control your healthcare and decide what's important for your future.

WHAT'S YOURS?





**1-800-791-6225**

127 Hazelwood Avenue
Barberton, OH 44203

**ABOUT**
By the numbers

**HOW IT WORKS**

**PROGRAMS**
CHM Gold
CHM Silver
CHM Bronze
CHM SeniorShare™
Groups

**HEALTH AND WELLNESS**
Blog
Newsroom

**CONTACT US**
Stay Connected

FAQS

FOR PROVIDERS

GLOSSARY

↑



Resp. Ex. 1

DONATE →

ACCREDITATIONS





© 2025 Christian Healthcare Ministries. All rights
reserved.

Careers    Legal Notices    Terms and Conditions of Use    Privacy Policy

# EX 1.19

Previous Episode                                                                                    Next Episode



MEDI-SHARE COMPLETE WEBINAR AND SHARING GUIDE VIDEOS >  What is an Annual Household Portion (AHP)?

Resp. Ex. 1

# EX 1.20

Resp. Ex. 1

us Episode                                                                                    Next Ep



MEDI-SHARE COMPLETE WEBINAR AND SHARING GUIDE VIDEOS > Where can I find my Member ID card?

Resp. Ex. 1

# EX 1.21

# Program Guidelines

Medi-Share®
COMPLETE



Resp. Ex. 1

*As of April 1, 2024*

# Medical Bill Sharing

Medi-Share® is administered on behalf of its members by Christian Care Ministry, Inc. (also referred to as Christian Care Ministry, Christian Care, and CCM). Although Medi-Share® is not subject to state and federal insurance regulation, certain states require publication of the following disclosure to meet exemption qualifications:

NOTICE: Medi-Share is not insurance or an insurance policy nor is it offered through an insurance company. Whether anyone chooses to assist you with your medical bills will be totally voluntary, as no other member will be compelled by law to contribute toward your medical bills. As such, Medi-Share should never be considered to be insurance. Whether you receive any payments for medical expenses and whether or not Medi-Share continues to operate, you are always personally responsible for the payment of your own medical bills. Medi-Share is not subject to the regulatory requirements or consumer protections of your particular State's Insurance Code or Statutes.

We encourage you to seek the advice of a health insurance professional to further explain the difference between state-regulated health insurance and mutual sharing ministries such as Medi-Share®.

As a Member of Medi-Share Complete, which is one of CCM's programs, we often refer to you as a Member of CCM. This membership entitles you to receive and gain access to all of our free services and resources. In turn, we ask for your prayerful support of our efforts on behalf of the Christian community. Under Florida statutes, membership does not entitle you to any rights as a member of a corporation not for profit or otherwise.

Copyright 2023 © CCM. All Rights Reserved.
Any biblical references contained herein are cited from THE HOLY BIBLE, NEW INTERNATIONAL VERSION®, NIV®
Copyright © 1973, 1978, 1984, 2011 by Biblica, Inc.™ Used by permission. All rights reserved worldwide.

Resp. Ex. 1

## QUICK REFERENCE



### Christian Care Ministry
P.O. Box 120099
West Melbourne, FL 32912-0099

Street Address:
4150 West Eau Gallie Blvd.
Melbourne, FL 32934

Phone: (800) 264-2562
Fax: (321) 308-7779



### Member Services
(800) 264-2562

memberservices@mychristiancare.org



### Medi-Share Website
MediShare.com



### Inquirers
(800) PSALM 23 (800-772-5623)

info@medishare.com



### Fax Applications
(321) 722-5134

# Table of Contents



**MEMBERSHIP**     **5**

**I. Medi-Share Complete Overview**    **6**

A. Biblical Model
B. Have a Vote
C. Guidelines Govern
D. No Ministry or Other Member Liability

**II. Membership Qualifications**    **8**

A. Christian Testimony
B. Healthy Lifestyle
C. Application Review
D. Health Partners
E. Spouse and Children
F. Adult Children of Members
G. Children of Members Who Apply for Individual Membership
H. 65 Years of Age and Older
I. U.S. Citizens Who Live Abroad
J. Non-U.S. Citizens
K. Life Milestones

**III. The Member's Role**    **13**

A. Medi-Share Is Not a Substitute for Insurance Required By Law

B. Individual Financial Institution Accounts
C. Review Monthly Share Notice
D. Praying and Sharing
E. Pre-Notification
F. Sharing Assistance
G. Cancellations and Withdrawals
H. Reapplication After Cancellation

**SHARING**     **17**

**IV. Medi-Share Complete Program Options**    **18**

A. Annual Household Portion (AHP)
B. Changing Annual Household Portion
C. Maximum Sharing Limits
D. Health Incentive
E. Provider Fee

**V. Preferred Provider Organization (PPO)**    **20**

A. Using the Preferred Provider Organization (PPO)
B. Using Non-PPO Providers

**VI. Details of Sharing**    **22**

A. CMS and FDA Approved Treatment
B. Sharing During the First Month of Membership
C. Determining Eligibility for Sharing
D. Lifestyle
E. Sharing for Members 65 and Older
F. Pre-Existing Medical Conditions or Related Conditions
G. Pre-Eligibility Review for Medical Conditions prior to Surgical/Medical Procedures
H. Care Management and Cost Management Support
I. Medical Conditions and Services Subject to Limited Sharing
J. Medical Conditions and Services Not Eligible for Sharing
K. Conflicts of Interest
L. Extra Blessings
M. Program Blessings

Resp. Ex. 1

# Table of Contents

## SHARING (CONTINUED)

**VII. Maternity**                                    **32**
- A.  Eligibility for Sharing
- B.  Maternity Complications
- C.  Multiple Births
- D.  Newborn Status
- E.  Well-Child Care
- F.  Pregnancies of Unwed Mothers

**VIII. Adoption**                                    **34**

**IX. Motorized Vehicle Accidents**                   **36**
- A.  Age, Safety Equipment and Lifestyle
- B.  Motorcycle Injuries
- C.  Reporting Injuries

**X. When a Member Dies**                             **37**

**XI. Medical Expenses For Which Third Parties Are Responsible**    **37**
- A.  Exclusion of Expenses
- B.  Waiver of Expense Exclusion
- C. CCM Subrogation Right
- D. Right Of Reimbursement
- E. Lien On Third Party Recoveries

**XII.  Appeals**                                     **39**
- A.  Impartiality
- B.  Sharing Appeal
- C.  Biblically-Based Mediation and Arbitration

**GLOSSARY OF TERMS**                                 **41**

Resp. Ex. 1

# Membership



Resp. Ex. 1

5

# I. MEDI-SHARE COMPLETE OVERVIEW

## A. Biblical Model

Medi-Share Complete is a healthcare sharing ministry program administered by Christian Care Ministry, Inc. ("Christian Care Ministry" or "CCM"). Christian Care Ministry is a Florida not for profit corporation that is recognized as tax exempt under Internal Revenue Code 501(c)(3).

The purpose of Medi-Share is to bring Christians together to share God's blessings and to share each other's burdens. The concept of "sharing" is not new. For centuries, Christians all over the world have shared their lives, resources, and blessings as first outlined in the book of Acts.

Each month, the Members of Medi-Share contribute toward the Eligible Medical Bills of other Medi-Share Members, and are notified as to which Members their share dollars are helping. Eligible Medical Bills are paid with the funds of Members who faithfully share. The following Guidelines explain the program requirements and how CCM facilitates medical bill sharing.

## B. Have a Vote

Medi-Share Members have the opportunity to help create, amend and change these program Guidelines. Changes to the Guidelines may be made by the following:

1)  By the Members – Once or twice a year, ballots with significant proposed changes to the Guidelines are submitted to the Members for voting. If at least 67% of the Members voting approve a Guideline change, then the change will be implemented.

2)  By the Medi-Share Steering Committee – The Medi-Share Steering Committee is a group of Medi-Share Members. They are independent of CCM staff and not controlled by CCM's Board of Directors. The Steering Committee may modify the Guidelines on the Members' behalf if the changes do not involve major new restrictions or relaxations.

3)  By the Board of Directors – The CCM Board of Directors aims to strengthen the Medi-Share program and/or protect its Members. They act independent of CCM staff. The Board may modify these Guidelines. Proposed Guideline changes by the Board of Directors must be presented to the Members on an upcoming ballot within 12 months of the Effective Date of the Board action. If the change is ratified by at least 67% of Members voting, then the change will become permanent. If not, the Guideline change will revert to its previous version at the close of balloting.

A list of Guideline changes is available at *MyChristianCare.org* for at least 24 months from the date of the change.

Resp. Ex. 1

## C. Guidelines Govern

The Guidelines current at the time of service govern the program, not the Guidelines in effect when a Member joined. The most current version of the Guidelines is available at *MyChristianCare.org*. The Guidelines are final and will overrule any verbal statement made by anyone regarding the Medi-Share program.

## D. No Ministry or Other Member Liability

Medi-Share is not insurance. Medi-Share is a Healthcare Sharing Ministry as outlined in the Patient Protection Affordable Care Act. Each Medi-Share Member is solely responsible for the payment of his or her own medical bills at all times. Neither CCM nor other Members guarantee or shall be liable for the payment of a Member's medical bill. Further, no Member may or shall be compelled to make sharing contributions. If sharing occurs, the shared medical bills are paid by the Member that incurred the bill solely from voluntary contributions of Members, not from funds of CCM itself.

Neither CCM, Medi-Share nor its Members are insurance or an insurance company. The payment of your medical bills through Medi-Share or otherwise is not guaranteed in any way. Medi-Share is not, and should never be construed as, a contract for insurance or a substitute for insurance. There is no transfer of risk for any purpose from a Member to CCM or from a Member to other Members; nor is there a contract of indemnity between CCM and any Member or between the Members themselves.

Resp. Ex. 1





# II. MEMBERSHIP QUALIFICATIONS

## A. Christian Testimony

Medi-Share membership is built on a foundation of like ideals agreed upon by the Members. The peace of mind of knowing the people sharing your contributions are not using your money for things that conflict with your faith is a blessing many Members enjoy.

All adult Members age 18 and older must attest to a personal relationship with the Lord Jesus Christ.

Adult Members profess the following Statement of Faith to qualify for Medi-Share Complete membership:

- I believe that there is only one God eternally existing in three Persons: the Father, Jesus Christ the Son, and the Holy Spirit. I believe Jesus is God, in equal standing with the Father and the Holy Spirit. [1]

- I believe the Bible is God's written revelation to mankind, divinely given through human authors who were inspired with the Holy Spirit. It is completely authoritative, and entirely true. [2]

- I believe in the deity of Jesus Christ who existed as God before anything was created, His virgin birth, sinless life, miracles, death on the cross to provide for

Resp. Ex. 1

our redemption, bodily resurrection and ascension into heaven, present ministry of intercession for us and His return to earth in power and glory. He is the world's only Savior and is the Lord of all. [3]

- I believe in the personality and deity of the Holy Spirit, that He performs the miracle of new birth in an unbeliever and indwells believers, enabling them to live a godly life. [4]

- I believe man was created in the image of God, but because of sin was alienated from God. Alienation can be removed by accepting God's gift of salvation by grace through faith which was made possible by Christ's death and resurrection. This faith will be evidenced by the works that we do. [5]

All Members agree to the following:

- Live by biblical standards
- Believers are to bear one another's burdens
- Attend and actively support a fellowship of believers regularly

---

**1** Deuteronomy 6:4, Matthew 28:19, Colossians 1:15-20, 2:9

**2** 2 Timothy 3:16-17

**3** John 1:1, Matthew 1:23, Hebrews 4:15, 1 Peter 2:24, 1 Corinthians 15:3-8, Hebrews 7:24-25, Matthew 24:30, John 14:6, Acts 4:12, Isaiah 45:21-23

**4** Acts 5:3-4, 1 Corinthians 3:16, Romans 8:14

**5** Ephesians 2:8-10, James 2:17, 26

Resp. Ex. 1

## B.  Healthy Lifestyle

Members highly value the biblical principle that our physical bodies are temples of the Holy Spirit and should be kept pure. Members should strive to maintain healthy lifestyles, as this glorifies God and keeps medical costs down. Examples of unhealthy lifestyles include, but are not limited to, the following:

- Use of tobacco
- Use of illegal drugs

Applicants need to have abstained from the use of tobacco or illegal drugs for at least the 12 months prior to application in order to be eligible for membership. Applicants attest that they have not abused legal drugs, such as prescriptions or over-the-counter medication, or alcohol for at least the 12 months prior to application in order to be eligible for membership.

Members must only engage in sexual relations within a Biblical Christian Marriage.

An adult child (18-22) needs to meet the same faith and lifestyle requirements expected of all adult Members in order to stay on his or her parent(s) household membership. The child must certify that he/she understands and lives by these requirements. If certification is received within 60 days of a child's 18th birthday, the child's membership may continue. If not, only Eligible Medical Bills incurred before the 18th birthday will be considered for sharing.

# II. MEMBERSHIP QUALIFICATIONS
## (CONTINUED)

## C. Application Review

Applicants and dependents provide medical and lifestyle information during the application process via an Online Medical Questionnaire (OMQ). The Head of Household should answer these questions for all members of the household. This helps determine qualification for Medi-Share membership and eligibility for sharing. Some limitations apply.

If a Member or Applicant becomes aware of any medical history not reported during the application process, that information should be immediately submitted in writing to Medi-Share. If information that would disqualify them from membership is omitted, Eligible Medical Bills may not be shared and/or membership may be cancelled.

## D. Health Partners

Medi-Share cares deeply about the health and well-being of all Members. For this reason, some Applicants may be required to become a Health Partner. Health Partners are Members who may be at higher risk for disease. CCM believes certain conditions are likely to be reversed through a healthy lifestyle. By reversing and/or preventing certain diseases, people are able to live healthier and fuller lives, ultimately being able to do more work for the Kingdom of God. CCM's goal is to help all Members reach their individual

Resp. Ex. 1

health goals so they can live more enriched lives.

A Health Partner is a Medi-Share Member who has access to unique online health content and personalized telephone-based coaching. The Health Partnership Program is designed to support Members in reducing the risk for major disease. Each Health Partner will develop and follow a personal plan for achieving health goals. Health Partners pay a monthly fee in addition to their Monthly Share. Many Members experience life-changing results such as lower cholesterol, healthy weight loss, and the reversal of diabetes.

## E. Spouse and Children

The following family members may be included or added to the Member Household if they meet the qualifications for membership:

• Spouse
• Biological children*
• Adopted children**
• Children in full legal custody or guardianship**
• Children in legal custody whose adoption is pending and have a legal placement agreement**

*Please see Section VII. D. to review how to add a newborn.
**Please review Section II. K. for additional information.

If the application to add a spouse is submitted and approved before or within 30 days after the marriage date, sharing in eligible needs including a pregnancy occurring on or after the

marriage date will start on the marriage date. The share increase will take effect on the first day of the month following approval.

## F.  Adult Children of Members

Unmarried adult children of Members may be part of the parent(s) Member Household until they reach age 23* if they have a verifiable Christian testimony and commitment to healthy lifestyle outlined in these Guidelines. Within 60 days after the adult child's 18th birthday, he or she must complete the following to remain on his or her parent(s)' Member Household:

- Sign Medi-Share Testimony and Commitment form which includes:

  ○ a verifiable Christian Testimony
    (see Section II. A.)

  ○ an individual commitment to a healthy lifestyle
    (see Section II. B.)

*An exception would be those adult children 23 and older who are severely disabled and unable to live or work outside a special environment, who are still dependent upon and under the care of their parent(s).*

It is the responsibility of the Member to notify Medi-Share when an adult child no longer qualifies as part of the Member Household. Continuing to submit the Monthly Share at the level that includes the adult child does not extend the membership. An adult child may be added to a Member Household if they meet qualifications for membership.

Resp. Ex. 1

## G.  Children of Members Who Apply for Individual Membership

Upon reaching 18 years of age, a child participating under his or her parent(s) Member Household may apply for his or her own membership. The application and Medi-Share membership fees will be waived. The restrictions on sharing during the first month of membership detailed in Section VI. B. will be waived. Any medical conditions previously eligible for sharing will continue to be eligible under the Individual membership.

## H.  65 Years of Age and Older

Applicants who are 65 or older are ineligible for Medi-Share Complete. However, applicants who are 65 or older are eligible for Medi-Share 65+. Medi-Share 65+ is a healthcare sharing program designed for seniors with Medicare Parts A and B.

Members who turn 65 and have Medicare Parts A and B should transition to Medi-Share 65+. Members who are not eligible and/or do not qualify for Medicare Parts A and B may remain on Medi-Share Complete.

## I.  U.S. Citizens Who Live Abroad

There are no additional membership qualifications for U.S. citizens who live or have lived abroad.

# II. MEMBERSHIP QUALIFICATIONS
## (CONTINUED)

## J.  Non-U.S. Citizens

Legal aliens who live full-time in the U.S. can qualify for Medi-Share membership. Medical Bills incurred while not a legal resident of the U.S. are not eligible for sharing.

## K.  Life Milestones

Medi-Share changes and grows with Members as they go through life. The following are instances where life changes may call for a Member to take action to maintain membership:

### 1. Adult Child*

- 18 to 22 years of age – Member must qualify to participate in membership.

- 18th birthday – The child Member must complete a Medi-Share Testimony and Commitment form to remain under his or her parent(s) Member household or apply for individual membership.

- 23rd birthday – A child Member turning 23 can apply for individual membership before the birthday, as he or she no longer qualifies to participate as part of the parent(s)' Member Household.

- Getting Married – The child Member may no longer participate under the Member Household of the parent(s) and must apply for his or her own membership.

*Continuing to submit Monthly Shares does not extend the child's membership.

Resp. Ex. 1

### 2. Marriage/Divorce

- Marriage – A spouse must apply and qualify to be added as a Member. The application can be submitted before or after the marriage. Membership can start on or after the marriage date.

- Member on a $1,000 Annual Household Portion (AHP) marries, the AHP must be changed.

- Divorce – Members who are going through a divorce or whose marriage has ended in divorce should contact Member Services for information regarding their options and continuing their membership.

### 3.  Adding Children

A child can be added to membership by submitting an Application to Add-on Family Member(s).

A newborn can be a member from birth if the application is submitted within 30 days of birth. If the application is not submitted within 30 days of birth, the newborn's effective date will be the first day of the month following approval of the Application to Add-on Family Member(s).

When a Medi-Share Member adopts a child or otherwise has obtained legal custody with legal responsibility for a child's medical care, that child can be added to the Member household by submitting an Application to Add-On Family Member(s) with acceptable forms of proof listed below:

- Valid, signed court order of adoption
- Valid pre-adoption placement order issued by a licensed child placement agency
- Adoption certification
- Adoption placement and petition for adoption

The child can be a member from the time of placement, court order or other legal procedure if the application to Add-on Family Member(s) is submitted within 30 days of any such action. If the application is not submitted within 30 days, then the child's effective date of membership would begin on the first day of the month following approval of the Application to Add-on Family Member(s).

If the adopted child is eligible/qualified for any other source of payment for the child's medical bills, the Member must cooperate with Medi-Share in qualifying for such payments and those resources must be exhausted before medical bill(s) will be considered for sharing, pursuant to Section XII. A.

#### 4. Turning 65
- Members should transition to Medi-Share 65+ when they turn 65. Medi-Share 65+ is a program for individuals 65 or older with Medicare Parts A and B.
- Members who are not eligible and/or do not qualify for Medicare Parts A and B may remain on Medi-Share Complete.

#### 5. Age Affects Share Amount
- A change of share amount may occur annually based on the date of birth of the oldest person in the Member Household.

Resp. Ex. 1

- Because the $1,000 AHP program is only available for single memberships for unmarried people ages 18-29, when a 29-year-old Member on the $1,000 AHP turns 30, the AHP will automatically change to the next level of $3,000 AHP with no fee or waiting period.
- A Member Household will be notified when its share amount changes.

# III. THE MEMBER'S ROLE

## A. Medi-Share Is Not a Substitute for Insurance Required By Law

Medi-Share is not insurance. However, Medi-Share can be used as a substitute for or an exemption from mandated insurance coverage to satisfy certain individual mandates passed by individual states requiring residents to either have insurance or an exemption, the absence of which may subject them to a tax penalty.

This is the only exception. Otherwise, Members must not certify that Medi-Share is insurance to avoid purchasing insurance required by law, rule or regulation (e.g. worker's compensation insurance or sports activity insurance).

# III. THE MEMBER'S ROLE

**(CONTINUED)**

## B. Individual Financial Institution Accounts

To make Medi-Share more convenient for Members, Members share with each other using individual accounts at a financial institution. As part of the enrollment process, Members open an account at a financial institution designated by CCM, and Members authorize CCM to: 1) transfer funds between the Member Sharing Accounts to facilitate sharing, and 2) deduct program fees.

## C. Review Monthly Share Notice

Members receive monthly notices regarding their Monthly Share amount. Members, who want to participate in sharing, deposit their Monthly Share amount into their individual accounts for facilitation of bill sharing and continued membership. Members contribute an additional amount to the Extra Blessing fund when Monthly Shares are deposited after the due date. This contribution is $5.00 or 5% of the late amount, whichever is greater (see Section VI. L.).

## D. Praying and Sharing

An added benefit of being involved in Medi-Share is the prayer and community within the membership. Your Monthly Share Portion is assigned to another Member or other Members for payment of their Eligible Medical Bills.

## E. Pre-Notification

Members are required to direct their providers to pre-notify Medi-Share for any of the following treatments to be eligible for sharing:
- Inpatient hospitalizations
- Non-emergency surgeries
- Elective cardiac procedures
- Cancer diagnosis or treatment *(including medication)*
- Organ/tissue transplant services
- Specialty medications
  *(including Infusions/injections given at home or in a doctor's office)*

Providers pre-notify online at *MyChristianCare.org/ForProviders* or by calling (321) 308-7777. To expedite the pre-notification process, providers should include applicable medical records.

In the event of emergency/urgent care, the Member or provider needs to provide notification within 72 hours of when care was given.

Pre-notification of medical bills does not guarantee eligibility or sharing.

## F. Sharing Assistance

Christian Care Ministry understands some medical situations may cause financial hardship for Medi-Share Members. Monthly Shares may be waived for up to 3 months per 12 month period if a Member's illness or injury causes loss of income. This is subject to the approval of and monthly review by CCM. The Member is to submit supporting evidence regarding the situation. The illness or injury cannot be related to a medical condition, diagnosis, or treatment listed in Section VI. J.

Resp. Ex. 1

## G. Cancellations and Withdrawals

Medi-Share membership will be cancelled if a Member does not deposit the Monthly Share for more than two months. The Cancellation Date will be the last day of the month for which the last Monthly Share was deposited. Only Eligible Medical Bills incurred on or before the Cancellation Date will be considered for sharing.

To prevent cancellation, Members can deposit each Monthly Share plus the late fee for Extra Blessings (see Section VI. L.). This deposit needs to be made within two months from the earliest due date. Eligible Medical Bills incurred during that time may still be submitted for sharing consideration.

Membership may also be cancelled if a Member acts in a manner inconsistent with their Christian testimony, for example, by submitting fraudulent bills or information, using inappropriate language with staff, violating the Medi-Share Lifestyle Agreement, or misusing funds intended to share in medical needs.

If a Member wishes to withdraw his or her individual membership, a family member or the entire family, they should notify Medi-Share by mail, e-mail, fax or phone. This action must be taken at least 15 days before the desired Cancellation Date. All changes in membership are effective on the first day of the applicable month.

✉ **Mail:** P.O. Box 120099, West Melbourne, FL 32912-0099

📧 **E-mail:** memberservices@mychristiancare.org

📄 **Fax:** (321) 308-7779

📱 **Phone:** (800) 264-2562 Resp. Ex. 01





## III. THE MEMBER'S ROLE
**(CONTINUED)**

### H. Reapplication After Cancellation

Members who were cancelled for not sharing faithfully are welcome to reapply. If approved for membership, Eligible Medical Bills will be shared after the first three months of the new membership term. All medical conditions arising before the date of reapplication will be subject to the Guidelines, including those outlined in Section VI. F. This includes the medical conditions that arose during the prior Medi-Share membership.

> *I had spent four days in the hospital. Just this past week, I received my Medi-Share billing statement. On it was a three page, itemized list of all the members of Medi-Share who shared in my medical need to the tune over $32,000. It was just humbling, to read name after name, of the people who shared their dollars to pay for my medical costs. Proud to be part of this family of believers.*

—**SARAH M.**

Resp. Ex. 1

# Sharing





And do not forget to do good and to share with others, for with such sacrifices God is pleased.

**HEBREWS 13:16 NIV**

Resp. Ex. 1

17

# IV. MEDI-SHARE COMPLETE PROGRAM OPTIONS

## A. Annual Household Portion (AHP)

The Annual Household Portion (AHP) is the dollar amount that a Member Household agrees to pay toward Eligible Medical Bills before any eligible bills may be shared among the Members. The AHP amount resets every 12 months on the Effective Date. Even if the AHP is not yet met, providers should still submit all medical bills to Medi-Share for processing. This ensures all Eligible Medical Bills will be applied toward the AHP and allows for the possibility of discounts.

**Co-Share Option:** Members participating at the 3,000, 6,000, or 9,000 AHP level may elect the co-share option at a lower monthly share amount. Once the AHP has been met, the Member Household will be responsible for an additional 30% of their eligible medical bills until the maximum annual co-share responsibility has been met. This includes the original AHP. Provider fees are not applied to the AHP or the co-share responsibility.

*For Example:* A Member with a 3,000 AHP with co-share option who incurs a $100,000 eligible medical event, will pay $3,000 toward their AHP and an additional $7,000 (30% of eligible medical bills) in co-share responsibility. Once the maximum co-share responsibility of $10,000 (AHP + co-share) has been met, remaining eligible medical bills will be shared at 100%.

Resp. Ex. 1

**DPC Option:** Members on the 12,000 AHP can elect the Direct Primary Care (DPC) option. DPC membership fees are eligible for sharing for members on the 12,000 AHP level with DPC option. DPC membership fees will be applied to the AHP and are eligible for sharing up to $1,800 per family, per AHP year. Members who select this option will utilize their DPC provider for annual physicals, clinical, and laboratory services in lieu of submitting those bills for sharing.

Members are able to customize their family's health care by choosing which option best meets their family and budgetary needs. See chart below for options.

| Annual Household Portion (AHP) Program Level | Co-Share | Max Responsibility for Eligible Medical Bills |
|---|---|---|
| $3,000 | 0 | $3,000 |
| $3,000 w/Co-Share | 30% | $10,000 ($3,000 AHP + 30% Co-Share until $7,000) |
| $6,000 | 0 | $6,000 |
| $6,000 w/Co-Share | 30% | $10,000 ($6,000 AHP + 30% Co-Share until $4,000) |
| $9,000 | 0 | $9,000 |
| $9,000 w/Co-Share | 30% | $12,000 ($9,000 AHP + 30% Co-Share until $3,000) |
| $12,000 | 0 | $12,000 |
| $12,000 w/DPC | 0 | $10,200 ($12,000 AHP – Direct Primary Care Fees up to $1,800) |

*\*Provider Fees apply to every visit, even if AHP or maximum co-share responsibility have been met, and do not count towards AHP or co-share.*

## B. Changing Annual Household Portion

Members may change their AHP amount. See chart below for conditions:

| AHP resets to $0 with every AHP level change | When can a Member change AHP levels? | When does the new AHP level go into effect? |
|---|---|---|
| Changing from LOWER AHP to HIGHER AHP <br> *(includes moving from AHP to same AHP with co-share)* | Anytime, unless pregnant | Effective the 1st of the next month* |
| Changing from HIGHER AHP to LOWER AHP <br> *(includes moving from AHP to same AHP with co-share)* | One level of AHP at a time, unless pregnant | Effective the 1st of the 4th month following the request to change |

*\* When moving from a lower to higher AHP (including the same AHP with co-share), the request must be made by the first of the month for an effective date of the following month. If the change is requested after the first, the effective date will be the first of the second month following the request.*

*When moving from one AHP with co-share to another AHP with co-share, both the AHP and the accumulation towards maximum co-share responsibility will reset to $0.*

Bills will be processed according to the member's AHP at the time the bills were incurred. Once the AHP change is made, the Effective Date changes to the date the new AHP begins. Any change in the AHP causes the amount of Eligible Medical Bills paid toward the AHP to reset to $0.

For example: On March 30 you are an active Member with a $3,000 AHP; you have incurred $1,000 toward your AHP and are approved for a lower AHP. On July 1 your lower AHP amount becomes effective. The amount of Eligible Medical Bills paid toward your new AHP now resets to $0 on July 1. However, the bills incurred prior to July 1 will continue to be applied towards the previous $3,000 AHP.

Resp. Ex. 1

## C.  Maximum Sharing Limits

Each Member enjoys sharing of his or her Eligible Medical Bills with no annual or lifetime limit. There are some exceptions for pre-existing conditions (Section VI. F.), maternity (Section VII.), motorcycle events (Section X. B.), and during the first month of membership (Section VI. B.).

## D.  Health Incentive

Medi-Share Members value a commitment to healthy living; therefore Members can be rewarded for their healthy choices, through a health incentive or in the form of a decreased monthly share. A Member Household (Head of Household and spouse) must apply as individuals and meet the criteria of certain health standards annually. Instructions and criteria can be found at MediShare.com/health-incentive. Active Health Partners are not eligible for the Health Incentive.

If a lifestyle-related condition (such as hypertension, type 2 diabetes, hypercholesterolemia, or fatty liver) is discovered during the active 12-month incentive period, Medi-Share may revoke the Health Incentive Discount.

## E.  Provider Fee

The provider fee is $35 for each office or hospital visit, or $200 for every emergency room visit. It is the Member's responsibility to pay the applicable provider fee at time of service or upon being billed by the provider at a later time. The provider fee is an initial payment applied toward the total office visit charges. The provider fee does not count toward the AHP or the co-share responsibility and continues to be applied even after the AHP and the maximum co-share responsibility are met.



Resp. Ex. 1

# V. PREFERRED PROVIDER ORGANIZATION (PPO)

## A. Using the Preferred Provider Organization (PPO)

To get the most from sharing, Members should use PPO providers whenever possible because these providers have agreed to discount their fees to Members. Consequently, using this network generally offers significant savings, both for individual Members in the form of lower out-of-pocket expenses and also for the membership in the form of lower Monthly Share amounts. Specialty medications (including infusions/injections given at home or in a doctor's office) should be arranged with Medi-Share.

It's best to identify network providers and facilities in your region before you seek care. To do so simply go to member.medishare.com, or call the provider number on your Medi-Share ID card.

Your Medi-Share ID card must be presented to the provider before services are rendered or the discount may not be honored.

As a courtesy, many PPO providers also honor their discount agreement for services ineligible for sharing (such as routine care) if Members make payment promptly after receiving the Explanation of Sharing (EOS).

## B. Using Non-PPO Providers

If a Member uses a non-PPO provider, certain additional amounts will be ineligible for sharing and will be the Member's responsibility. In addition to the Member responsibility for Medi-Share program elements such as the AHP and provider fees, Members will be responsible for anything in excess of:

• 150% of Medicare allowable rate for Professional Services (excluding Anesthesia)

• 200% of Medicare allowable rate for Facility Charges, or 80% of total charges for any hospital or other facility where there is no available Medicare allowable rate

• 250% of Medicare allowable rate for Anesthesia

The additional responsibility associated with out-of-network costs may be waived in cases where there was a life-threatening emergency or when the travel distance to the nearest PPO qualified provider is more than 25 miles from home.

If pre-notification as described in Section III E. is not met, the additional responsibility may not be waived. Waivers can be requested by contacting Member Services. Waivers will be given after a balance bill has been issued by the provider. The request for the waiver must be received within 90 days from the date the Explanation of Sharing (EOS) was issued or within 12 months from date of service, whichever is greater. A request for a waiver does not guarantee approval.

> *With a sudden diagnosis of brain cancer, my wife's medical expenses began to quickly mount. As we soon discovered, the Medi-Share ministry would become a large part of our lives. Although our faith has remained strong, we were not expecting the level of support and partnership we have received from the Medi-Share staff, as well as the prayers and sharing support of the other members.*
>
> **—RONALD R.**

Resp. Ex. 1

# VI. DETAILS OF SHARING

## A.  CMS and FDA Approved Treatment

The cost of both CMS and FDA approved testing, treatments, and up to six months of FDA approved prescription drugs per eligible condition will be considered for sharing if they are FDA approved for treating that condition. They must be ordered by one of the following:

- Medical Doctor (M.D.)
- Doctor of Osteopathy (D.O.)
- Nurse Practitioner (N.P.)
- Physician's Assistant (P.A.)
- Doctor of Podiatric Medicine (D.P.M.)
- Dentist (D.D.S. or D.M.D.)
- Midwife
- Optometrist

These CMS and FDA approved tests and treatments are to be performed at one of the following:

- Hospital
- Surgery center
- Clinic
- Doctor's office
- Diagnostic facility

For other locations to be considered, a pre-eligibility review is required.

To be considered for sharing, diagnosis and treatment are to be performed in the U.S. except in emergencies or when living abroad.

The provider must submit medical bills on a CMS 1500 or a UB and IB form (healthcare industry standard forms) to be considered for sharing.

## B.  Sharing During the First Month of Membership

Members are eligible to receive up to $50,000 of their Eligible Medical Bills shared during their first month of membership. Members who went from being under a parent(s) Member Household to an individual membership have no cap on the amount of Eligible Medical Bills that can be shared during the first month of individual membership. (see Section II. F.).

## C.  Determining Eligibility for Sharing

For care not requiring pre-notification, the eligibility of a medical bill for sharing is determined after medical services are rendered. Medical and lifestyle information help determine eligibility. Medical records from 36 months prior to membership may also be needed. The need for medical records is determined by the nature of the illness or the circumstances of the injury. If access to requested medical records is refused, the medical bill(s) cannot be shared.

Resp. Ex. 1

## D. Lifestyle

Members must follow the Christian lifestyle and agree to the Statement of Faith. This is essential for Eligible Medical Bills to be shared. Members who do not follow the Christian lifestyle will have their membership cancelled. Examples of behavior that can lead to non-sharing and/or cancellation of membership include, but are not limited to::

- the use of tobacco in any form, including the use of e-cigarettes, vaping, or nicotine replacement

- the use of Illegal Drugs

- the abuse of drugs including legal drugs, such as, alcohol, prescription and over-the-counter medications

- sexual relations outside of Biblical Christian marriage

- participation in activities that represent a willful disregard for personal safety

If a Member experiences significant weight gain, he or she will be required to participate as a Health Partner (see Section II. D.).



Resp. Ex. 1

MediShare.com



Resp. Ex. 1

MediShare.com

# VI. DETAILS OF SHARING
### (CONTINUED)

## E. Sharing for Members 65 and Older

Members who are eligible and qualify for Medicare Parts A and B should enroll in Medicare and switch to Medi-Share 65+.

When a Member has Medicare, Medi-Share will be secondary. Sharing of Eligible Medical Bills incurred on or after the first day of the month a Member turns 65 is based on the difference between the Medicare-allowable charges and the actual amounts paid by Medicare. The provider must submit a copy of the Medicare Explanation of Benefits and the CMS 1500, or UB and IB form.

## F.  Pre-Existing Medical Conditions or Related Conditions

A pre-existing medical condition is defined as signs/symptoms, testing, diagnosis, treatment, OR medication for a condition within 36 months prior to membership (based on medical records). A pre-existing medical condition will ONLY be eligible for sharing as follows:

- Up to $100,000 per Member per year (based on effective date) once the Member has been faithfully sharing for 36 consecutive months.

- Up to $500,000 per Member per year (based on effective date) once the Member has been sharing faithfully for 60 consecutive months.

The cost of prescription medications for pre-existing conditions is never eligible for sharing.

Any congenital condition will only be eligible for sharing at the above referenced amounts once the member has been faithfully sharing for 36 or 60 consecutive months respectively.

High blood pressure or cholesterol that is controlled through medication or lifestyle will not be considered a pre-existing medical condition for purposes of determining eligibility for future vascular events.

Where there has been a lapse in Membership, a condition will not be considered pre-existing if the first instance of the condition appeared during the previous Membership, unless the lapse was due to cancellation for non-sharing or lifestyle

Resp. Ex. 1

requirements. An exception would be maternity that occurred outside the current Membership period, which will not be eligible for sharing.

## G.  Pre-Eligibility Review for Medical Conditions Prior to Surgical/Medical Procedures

A Member can receive a preliminary determination of whether or not his or her proposed treatment appears to be eligible for sharing. This is done by requesting a medical review to determine if the condition or treatment/procedure is eligible for sharing per the member voted guidelines. To request a review, contact Member Services at (800) 264-2562. Final eligibility determination is always made after the medical bills are submitted for processing. It is possible a treatment that appeared to be eligible for sharing during the preliminary review will be determined to be ineligible if:

- New information or additional medical records are provided that make the treatment ineligible due to pre-existing condition(s).

- New information or additional medical records are provided that make the treatment ineligible due to lifestyle issue(s).

The number of days required to complete a preliminary review depends on the responsiveness of the providers who are asked to send in medical records.

# VI. DETAILS OF SHARING
### (CONTINUED)

## H. Care Management and Cost Management Support

Engagement with Care and Cost Management is required for Members with significant medical needs and for Members with certain medical conditions like cancer, organ transplant or intensive care hospitalizations for support in understanding and interpreting options for medical care. Members should contact Member Services at (800) 264-2562.

## I. Medical Conditions and Services Subject to Limited Sharing

Listed below are the treatments, medical conditions, procedures, and services with sharing stipulations:

- Ambulance or other medical transport services may be eligible for sharing when medically necessary or required for transportation between facilities. Pre-eligibility review is recommended for non-emergency medical transport.

- Annual Physicals for each member of the household are eligible for sharing for members who join or change AHP levels on or after September 1, 2020. Basic lab tests, limited to A1c test and lipid panel, are also eligible for sharing if recommended as part of the annual physical.

- Cardiac rehabilitation is eligible for sharing for up to 36 sessions following hospitalization for an eligible cardiac condition or a cardiac procedure such as angioplasty or stenting, when ordered by a qualified provider, if initial session begins within 6 months of cardiac event.

- Chiropractic care — In cases which have been diagnosed by a licensed physician (M.D. or D.O) and the Member is offered only a surgical option, a chiropractic resolution may be eligible for sharing in lieu of surgery. The Member's physician must provide a case history, x-rays and a recommendation for chiropractic resolution. If approved, chiropractic care is limited to a maximum of 20 visits within a six week period. Tests ordered by a chiropractor are not eligible for sharing.

- Direct Primary Care (DPC) membership fees (up to $1,800 per year), are eligible for sharing for members on the 12,000 AHP level with DPC option. DPC membership fees will be applied to the AHP and are eligible for sharing once the AHP has been met. Members who select this option will utilize their DPC provider for annual physicals, clinical, and laboratory services in lieu of submitting those bills for sharing.

- Durable Medical Equipment (DME) is eligible for sharing if the DME is ordered by a qualified CMS approved provider for the treatment of an eligible need. Motorized locomotion equipment (such as motorized wheelchairs and scooters), exercise equipment, and home modifications are not eligible for sharing. DME will not be rented for more than 6 months. Alternatively, a one time purchase of DME may be eligible for sharing. In order to be eligible for sharing DME must be obtained from a CMS approved DME provider.

Resp. Ex. 1

- Genetic testing is not eligible for sharing in most cases. Genetic testing will only be considered for sharing if not available through a patient assistance program and is required for the personal treatment of a diagnosed condition. If genetic testing is determined eligible for sharing, it will be shared at the Medicare allowable rate. Genetic screenings are not eligible for sharing.

- Home Care is limited to treatment related to an eligible need ordered by a qualified provider for Members who are homebound for that need. A copy of the provider's order for the care must accompany the bill. Home Care services, including home hospice, are limited to 60 calendar days from the first date of service for Home Care.

- Non-hospital admissions In-patient admission to a skilled nursing facility, rehabilitation facility, long-term acute care facility, or in-patient hospice is eligible for sharing for 30 days if ordered by a qualified Provider for an eligible condition in order to provide care that would otherwise need to be provided in an acute care setting. Eligibility for more than one referral for the same diagnosis will require a case manager medical review.

- Outpatient speech therapy is eligible for sharing up to 10 visits if post-stroke, post-surgery, or post-trauma. Swallow therapy is eligible for up to 10 visits. A copy of the provider's order or referral for treatment must accompany the bill.

- Physical Therapy (PT), Occupational Therapy (OT), and Osteopathic Manipulation Therapy (OMT) are eligible for sharing if performed by a licensed therapist (massage therapists are not eligible) or Doctor of Osteopathy, related to an eligible diagnosis, and ordered by a qualified provider (See Section VI.A) for up to 20 visits combined. A copy of the provider's order or referral for treatment must accompany the bill. Eligibility for more than one referral for the same diagnosis will require medical review.

Resp. EX. 1



MediShare.com

# VI. DETAILS OF SHARING
## (CONTINUED)



Resp. Ex. 1

- Prescription drugs – Prescription medications, including maintenance medications, are eligible for sharing for six months from the date of diagnosis, per each new condition that is not pre-existing. This includes prescription drugs that may be dispensed, infused, injected, or administered by a Medical Doctor (M.D.), Doctor of Osteopathy (D.O.), Nurse Practitioner (N.P.), Physician Assistant (P.A.), or Doctor of Podiatric Medicine (D.P.M.). Exceptions may be made in the case of medications for cancer and transplant recipients.

  A new medication for an existing condition does not restart the six-month timeline.

  Exceptions may be made in the case of medications for cancer and transplant recipients. Requirements for exception consideration include application to a Patient Assistance Program (PAP) and other available programs for medication cost when available. Use of Medi-Share preferred specialty pharmacy formulary and providers are required when applicable.

- Prostheses are eligible for sharing if ordered by a qualified Provider to treat an eligible need and meet CMS criteria. All prostheses require medical review. Only one prosthetic treatment plan per diagnosis is eligible for sharing. Replacement, repair and maintenance of prosthesis are not eligible for sharing. (See Glossary of Terms for definition of prosthesis and examples.).

- Psychiatric or primary care evaluation, as well as associated lab tests and medications, for mental illness related to an eligible medical condition, is eligible for sharing for six months per each new condition. Counseling and psychotherapy are not eligible for sharing.*

  *Short-term counseling services are available by phone at no cost through Medi-Share's telemental health service.*

- Sleep Apnea Studies are eligible for sharing if they are ordered by a qualified provider (Section VI.A) for an eligible need. Provider must submit case history with the recommendation for the sleep study. Sleep studies ordered for insomnia are not eligible for sharing.

- Telehealth and Virtual Office Appointments: Outpatient evaluation and management visit costs are eligible for sharing at the Medicare allowable rate if the visit occurs directly between the member and provider and is for an otherwise eligible service per the guidelines. Virtual physical/occupational therapy and annual wellness preventative visits are not eligible for sharing.

## J.  Medical Conditions and Services Not Eligible for Sharing

If a medical bill is related to a diagnosis, treatment or procedure that is ineligible for sharing in any way, that medical bill is also ineligible. Listed below are the treatments, medical conditions, procedures and services that are ineligible for sharing:

- Expenses related to non-Biblical lifestyles and choices – including, but not limited to:
  – Abortion of a live fetus (baby)
  – Alcohol and drug related injuries and illnesses
  Resp. Ex. 1

  – Sexually transmitted diseases (STDs) including HIV – Exceptions include innocent transmission via transfusion, rape, work-related needle stick or sex within marriage
  – Illegal acts – Any charges for a condition, disability or expense resulting from being engaged in an illegal occupation or the commission of or attempted commission of a crime
  – Intentionally self-inflicted injuries (e.g. suicide or attempted suicide)
  – Maternity expenses for children conceived out of wedlock with an exception for pregnancy resulting from rape

- Alternative Care including, but not limited to:
  – Vitamins/Supplements without a diagnosis of a specific deficiency
  – Acupuncture
  – Services from unapproved providers
  – Experimental or investigational treatments
  – Integrative medicine
  – Functional medicine
  – Regenerative medicine

- Behavioral/Mental Health care – including, but not limited to:
  – Psychiatric or psychological care*
  – Special education charges
  – Counseling or care for learning deficiencies or behavioral problems, whether or not associated with a manifest mental disorder or other disturbance (e.g. Attention Deficit Disorders or Autism)

  *Short-term counseling services are available by phone at no cost through Medi-Share's telemental health service.*

# VI. DETAILS OF SHARING
(CONTINUED)

## J. Medical Conditions and Services Not Eligible for Sharing (continued)

- Cosmetic procedures – including, but not limited to, breast augmentation, lift or reduction, body or facial contouring, scar revision, tattoo removal, electrolysis, cosmetic Botox.

  Cosmetic breast reconstruction after breast cancer is eligible for sharing for the affected breast and the non-affected breast if recommended for purposes of symmetry and only if the breast cancer is eligible for sharing. Revisions of initial breast reconstructions are ineligible for sharing except in cases of infection, necrosis or treatment of lymphoma.

- Dental and periodontal services – including, but not limited to:
  – Removal of wisdom teeth
  – Orthodontic/oral surgery (exception for trauma within one year of diagnosis)
  – Repair or replacement of dentures, bridges, and appliances
  – Diagnosis and treatment of temporal mandibular joint (TMJ) dysfunction or disease related to the joint that connects the jaw to the skull. This includes, but is not limited to braces, splints, appliances or surgery of any type
  – Complications or infections related to dental procedures

- Durable Medical Equipment – Motorized locomotion equipment (such as motorized wheelchairs and scooters), exercise equipment and home modifications.

Resp. Ex. 1

- Fertility/infertility care – including, but not limited to:
  – Birth control procedures, such as IUD, and/or related supplies
  – Infertility testing and treatment
  – Sterilization or reversals (vasectomy and tubal ligation)
  – Embryo donation or adoption

- Gender reassignment surgery or other treatment related to gender identity disorder, including but not limited to hormone treatment.

- Medication or treatment for sexual health or dysfunction

- Miscellaneous care
  – Care for symptoms not related to a specifically diagnosable disease or injury, such as ongoing fatigue and malaise
  – Counseling or consultation expenses including, but not limited to:
    • Dietary counseling
    • Diabetic counseling
    • Lactation counseling
    • Genetic counseling

  – Custodial Care/Long-term Care

  – Educational services and materials including, but not limited to:
    • Lamaze classes
    • Breast feeding classes
    • Early childhood intervention

  – Hearing aids

  – Non-prescription (over-the-counter) drugs and medical supplies/equipment. Supplies are defined as medical equipment which is disposable (requiring replacement within six months) which is purchased by the member for use at home outside of home health needs. This includes but is not limited to:
    • Diabetic supplies
    • Wound care supplies

- Ostomy supplies
- Custodial care supplies
– Missed appointment fees
– Podiatric Orthotics (shoe inserts)
– Veteran Administration care and treatment
– Weight control and management

- Routine and Preventive care—including, but not limited to, all well-patient care and screening tests and procedures, such as:*
  – Physicals
  – Immunizations and vaccinations
  – Lab studies
  – Screening mammograms
  – Screening colonoscopy
  – Vision Services and routine optometry care, including but not limited to:
    - All services related to nearsighted/farsighted/astigmatism, including contacts and eyeglasses
    - Refractive services
  – Routine optometric care and refractions
  – Prophylactic and preventive surgery without personal history of diagnosis and doctor recommendation

*There are exceptions for routine well-child care (see Section VII.) and annual physicals, which are eligible for sharing for members who join or change their AHP level on or after September 1, 2020.*

- Sleep studies not related to a specific disease or disorder, including but not limited to:
  – Insomnia
  – Hypersomnia

- Billing irregularities
  – Delayed Submissions  - Bills are to be received by Medi-Share within 12 months from the date of service to be considered for sharing. Reimbursement forms and proof of payment for DPC fees must be submitted within 12 months of the date for which the DPC fee applies. Additional information requested from the Member and/or provider needs to be received by Medi-Share within the 12 months of service or the 90 days from the date requested, whichever is greater.

  – Improper Submissions - Bills are to be submitted by the provider following standard healthcare industry submission and coding guidelines. This is necessary for bills to be considered for sharing.
    - Improperly coded or submitted bills will not be shared.

  – Excessive or unnecessary provider charges are not eligible for sharing and are defined as:
    - Charges greater than 200% of Medicare allowable rate for Professional services (excluding Anesthesia)
    - Charges greater than 300% of Medicare allowable rate for Facility Bills and Anesthesia
    - Charges greater than the 70th percentile of U&C for services with no Medicare Reimbursement rate
    - Additional charges including but not limited to afterhours, holiday and weekend fees, that are not CMS approved

Resp. Ex. 1

# VI. DETAILS OF SHARING
(CONTINUED)

## K.  Conflicts of Interest

Medical bills will be ineligible for sharing if the provider or ordering provider is related to the Member by blood, marriage, or adoption or if the Member has a financial interest in the provider. If the member is a medical professional and orders his/her own testing/treatment, bills will be ineligible for sharing.

## L.  Extra Blessings

The Extra Blessings program is designed to assist members with eligible adoption expenses after two events (see Section VIII.) or significant bills that are ineligible for sharing because they exceed the sharing limits in these guidelines, including the maternity sharing limits. To be considered for Extra Blessings, the dates of service must occur after the member has been faithfully sharing for 12 months.

If a condition is ineligible for sharing based on Sections VI. I., J., or K., it is NOT eligible for Extra Blessings.

Extra Blessings gifts are used to fund the eligible Extra Blessings needs up to 100% unless the needs exceed the Extra Blessings contributions, in which case they will be distributed on a pro-rated basis. At the end of each quarter, any Extra Blessings contributions remaining after all eligible pending Extra Blessings needs have been met may be used for general sharing. For more information, Members should contact Member Services at (800) 264-2562.

## M. Program Blessings

Members may qualify for public assistance or private benevolence programs. Those who use programs such as these will receive an incentive in the form of a share credit.

# VII. MATERNITY

## A.  Eligibility for Sharing

Married* pregnant Members with an Annual Household Portion of $3,000 or higher who have faithfully shared from the month of conception through the month of delivery are eligible for maternity sharing.

Sharing is limited to $125,000 for any single pregnancy event, to include antepartum care, the cost of delivery and complications to the mother and/or child(ren) and postpartum care.

To be eligible, delivery must be performed by one of the following:

• Medical Doctor

• Doctor of Osteopathy

• Midwife who is properly licensed, certified and/or registered in the state of delivery as required by state law. In the absence of state law requirement, Medi-Share requires at least a minimum of North American Registry of Midwives credential.

*Members who join or change their AHP level on or after September 1, 2020 must indicate "married" upon application or when changing their AHP level in order for maternity to be eligible for sharing.

Resp. Ex. 1

## B. Maternity Complications

If the maternity is eligible for sharing, the cost of treatment for complications to the mother is also eligible for sharing. The cost of treatment for child(ren) who become Members at birth is eligible for sharing.

## C. Multiple Births

Multiple births are considered a single pregnancy event.

## D. Newborn Status

If a parent is a Member at the time of delivery:

- The newborn can be a Member from birth if the Application to Add-on Family Member(s) is submitted within 30 days of delivery;

- If the newborn is not added to membership within 30 days of delivery, the child's Effective Date will be the first day of the month following approval of the Application to Add-on Family Member(s) ), and pre-existing and congenital condition limitations will apply.

If the mother is not a Member from the time of conception through delivery, the following are instances where maternity bills are ineligible for sharing:

- Eligible Medical Bills incurred before the newborn's Effective Date
- Unresolved maternity medical conditions of child or mother

If the mother is not a Member at the time of conception through delivery, the mother and/or child(ren) are ineligible for Extra Blessings for that pregnancy or complications from that pregnancy.

Resp. Ex. 1



MediShare.com



Resp. Ex. 1

MediShare.com

## E. Well-Child Care

Medi-Share highly values the importance of family and wants to ensure newborns and children receive the very best care in the early stages of their life. Sharing for routine well-child care is eligible until the child reaches the age of six. Well-child care is defined as recommended, routine check-ups and associated lab work, excluding vaccinations and/or immunizations. Well-child care is not shared for members who select the DPC program option, as members who utilize a DPC provider will have access to well-child care through their DPC arrangement.

## F. Pregnancies of Unwed Mothers

Members agree that sex should be exclusively within Biblical Christian Marriage. Thus, maternity medical expenses for newborns conceived outside of marriage are ineligible for sharing. Pregnancies resulting from rape reported to a law enforcement authority are the only exception.

In order to encourage and support the preservation of the lives of these unborn children, Medi-Share is dedicated to assisting in arranging for maternity and adoption services through Christian organizations.

# VIII. ADOPTION

The Medi-Share program allows Members to share in adoption costs. Up to two adoption events can be shared per Member Household. The adoption of multiple children at the same time is considered one event. Sharing is available according to the following chart. For adoptions, the AHP does not have to be met for sharing to occur. The adopted child(ren) cannot be related to the Member or spouse by blood or marriage.

| Annual Household Portion (AHP) | Adoption Sharing Limit |
|---|---|
| $3,000 | $4,100 |
| $4,250 | $3,600 |
| $5,500/$6,000 | $3,100 |
| $8,000/$9,000 | $2,100 |
| $10,500/$12,000 | $1,100 |

*\* Adoption sharing is not available for Members with a $1,000 or $1,750 AHP.*

The first event is eligible for sharing after the Member shares at a level set for two or more persons for 24 continuous months prior to the adoption becoming final.

The second event will only be considered for sharing if:

- membership has been without break since the first finalized and shared adoption event, and
- at least 12 months have passed since the first finalized adoption event to the second finalized adoption event, and
- sharing was at a level set for two or more persons for the entire period between adoption events.

Resp. Ex. 1

An adopted child who qualifies for membership will still be subject to the same limitations as any new Member.

If they have been Members for the timeframes outlined above, Members may apply for Extra Blessings (see Section VI. L.) to receive additional monetary assistance for adoption costs after the second adoption event. The Extra Blessings amount cannot exceed the original adoption sharing limit per program listed in the previous chart.

# IX. MOTORIZED VEHICLE ACCIDENTS

## A. Age, Safety Equipment and Lifestyle

If a motor vehicle or aircraft accident occurs, there are some additional considerations for sharing eligibility. Diagnosis and treatment of injuries will not be eligible to be shared if any of the following applies:

- There was abuse of alcohol or legal drugs, or the use of Illegal Drugs.

- The vehicle or aircraft was used in a race, to perform a stunt, or in the commission of a crime.

- The minimum operator age recommended by the manufacturer or required by law was not followed.

These apply regardless of whether the Member was operating the vehicle or was a passenger.

Helmets and seatbelts are expected to be worn when they are legally required. If either was not used but was legally required, Members have an additional Member portion. This additional amount is calculated as 15% of the first $100,000 of Eligible Medical Bills related to a motorized vehicle or aircraft accident. This 15% is in addition to the Member's AHP.

Resp. Ex. 1

## B. Motorcycle Injuries

A Member can receive up to $100,000 in sharing of Eligible Medical Bills toward diagnosis and treatment of motorcycle accident injuries incurred in a 12-month period. A motorcycle is defined as a two-wheeled, motorized vehicle with an engine size displacement of at least 50 cubic centimeters. A Member who is injured, while on a motorcycle used to perform mission work outside of the U.S., is exempt from this $100,000 limit.

## C. Reporting Injuries

Members call Member Services (800-264-2562) to report injury details of motorized vehicle accidents. The following documents may be necessary to determine eligibility for sharing:

- A copy of the insurance policy for an owned vehicle or aircraft (or the contract if rented or leased)

- The official accident report

- Medical records relating to the care and transportation of the injured Member(s)

- Information that pertains to other vehicle(s) and parties involved in the accident

# X. WHEN A MEMBER DIES

There are provisions when a Member dies to help ease the burden on the family. Up to $5,000 of the final expenses listed below are eligible for sharing if the Member met the "Membership Qualifications" at the time of death.

Final expenses eligible for sharing are limited to the following expenses:

- embalming
- cremation
- casket
- headstone
- burial plot
- funeral director's costs
- flowers
- travel expenses for the Member's body

The original bill(s) and a certified copy of the death certificate(s) are to be submitted to Medi-Share within one year of the death of the Member.

Up to $5,000 in burial expenses for stillborn children are eligible for sharing per pregnancy.

# XI. MEDICAL EXPENSES FOR WHICH THIRD PARTIES ARE RESPONSIBLE

## A.  Exclusion of Expenses

Medical expenses incurred by a Member are not eligible for sharing if such expenses are covered by insurance of any kind available to the Member (including, without limitation, worker's compensation, fraternal benefits, health insurance or any other applicable insurance), or if a third party is responsible to pay such expenses. For example, if a Member is injured in a car accident, the Member's automobile insurance may provide coverage and an at fault third party may be liable for the Member's medical expenses. Under either circumstance, such medical expenses are not eligible for sharing.

## B.  Waiver of Expense Exclusion

CCM may, in its sole discretion, waive the foregoing exclusion as applied to specific medical expenses and determine whether such expenses are otherwise eligible for sharing under these Guidelines. However, CCM has no obligation to waive the exclusion, and specifically reserves the right to exercise or not exercise its waiver discretion. CCM may condition waiver of the exclusion on the Member entering into an agreement with CCM for subrogation, reimbursement and lien rights.

Resp. Ex. 1

# XI. MEDICAL EXPENSES FOR WHICH THIRD PARTIES ARE RESPONSIBLE
**(CONTINUED)**

## C. CCM Subrogation Right

If a Member's specific medical expenses subject to the foregoing exclusion are paid through Medi-Share, then the Member's rights to recover all or part of such medical expenses from an insurer or responsible third party are transferred to CCM for the benefit of the Members. The Member shall do nothing after incurring such expenses to impair such rights of recovery. At CCM's request, the Member agrees to take all reasonable steps to assist CCM in enforcing such rights including, but not limited to, bringing suit at CCM's expense against an insurer or responsible third party. Any amounts CCM recovers through its subrogation efforts will first be paid to reimburse CCM for its recovery expenses, and will then be paid to the Members up to the amount of medical expenses paid through Medi-Share, with any remainder to be paid to the Member.

## D. Right Of Reimbursement

If a Member's specific medical expenses subject to the foregoing exclusion are paid through Medi-Share, and the Member recovers all or part of such medical expenses from an insurer or responsible third party, the Member agrees to reimburse the Members within 30 days after the Member receives payment from such insurers or responsible third parties.

## E. Lien On Third Party Recoveries

If a Member's specific medical expenses subject to the foregoing exclusion are paid through Medi-Share, and the Member recovers all or part of those medical expenses from an insurer or responsible third party, the Member hereby grants a lien to CCM for the benefit of the Members on the proceeds of any monetary recovery the Member obtains from any insurer or responsible third party, and the Member agrees to take any actions or steps necessary to secure and enforce this lien. To the extent the Member has engaged an attorney to assist in the recovery of medical expenses (such as a personal injury attorney), the Member agrees to inform the attorney of such lien.

Resp. Ex. 1

# XII. APPEALS

## A. Impartiality

Christian Care Ministry serves Members who share in the burdens of fellow Christians. CCM does not gain financially by determining medical bills are ineligible for sharing among Members. CCM is a not-for-profit corporation, recognized as tax exempt under Section 501(c)(3) of the Internal Revenue Code. CCM has no owners, stockholders or investors. CCM impartially carries out the wishes of the Members as expressed in these Medi-Share Guidelines.

## B. Sharing Appeal

A Member can appeal bill-sharing decisions with which they disagree. Before appealing, a Member should engage in careful thought and prayer about whether he or she honestly believes an error was made. Members have 90 days from the day the decision in question was made to request a review by CCM.

A Member can issue an appeal if:

- the medical records were misread,
- the Guidelines were misapplied, or
- one or more of the Member's providers incorrectly recorded the medical history.

The appeals process is not to be used to request changes or exceptions to these guidelines.  Recommendations for guideline changes can be submitted through e-mail to *guidelines@ medishare.com*.

Resp. Ex. 1

After a review by CCM, if the Member disagrees with CCM's decision, the Member has 90 days to request a review by a Seven Member Appeal Panel. CCM and the Member will both submit a written position statement to the panel. A teleconference will be held where the panel can ask questions of both the Member and CCM. A simple majority vote (four out of seven) will carry the decision.

## C. Biblically-Based Mediation and Arbitration

As Christians, the Members and the staff of Christian Care Ministry believe that the Bible commands them to make every effort to live at peace and to resolve disputes with each other in private or within the Christian community in conformity with the biblical injunctions of 1 Corinthians 6:1-8, Matthew 5:23-24, and Matthew 18:15-20. Therefore, the parties agree that any claim or dispute arising out of, or related to, this agreement or any aspect thereof, including claims under federal, state, local statutory or common law, the law of contract or law of tort, that may remain after a Member has exhausted his appeals provided for in Section XIII. B., including a determination whether this arbitration provision is valid, shall be settled by biblically-based mediation. The mediation shall be conducted in accordance with the Rules of Procedure for Christian Conciliation of the Institute for Christian Conciliation, a division

# XII.  APPEALS
**(CONTINUED)**

## C.  Biblically-Based Mediation and Arbitration
### (continued)

of Peacemaker Ministries (complete text of the rules is available at *HisPeace.org*), with each party to bear their own costs, attorney's fees and 50% of the mediator's fee, and with the mediation filing fee to be borne by CCM.

If resolution of the dispute and reconciliation do not result from mediation, the matter shall then be submitted to an independent and objective arbitrator for binding arbitration. The parties agree that the arbitration process will also be conducted in accordance with the Rules of Procedure for Christian Conciliation, with each party to bear their own costs, attorney's fees, and 50% of the arbitrator's fee, and with the arbitration filing fee to be borne by CCM. Each party shall agree to the selection of the arbitrator. If there is an impasse in the selection of the arbitrator, the parties agree that the Institute for Christian Conciliation shall choose the arbitrator.

The parties agree that these methods of dispute resolution shall be the sole remedy for any controversy or claim arising out of this agreement, and they expressly waive their right to file a lawsuit against one another in any civil court for such disputes, except to enforce a legally binding arbitration decision.

Resp. Ex. 1

# AT YOUR REQUEST

The contact information for the following groups and organizations associated with the Medi-Share program is available to Members upon request:

- **BOARD OF DIRECTORS**
- **BANK REFERENCES**
- **CERTIFIED PUBLIC ACCOUNTANTS**
- **MINISTRY ATTORNEYS**
- **REFERENCES**

Upon request and with notice, the following information can be provided to an inquirer or Member:

- **ANNUAL BALLOT RESULTS**
- **ANNUAL AUDITED FINANCIAL STATEMENTS**
- **501(C)(3) DETERMINATION LETTER**

# Glossary of Terms





Resp. Ex. 1

41

**Annual Household Portion (AHP)** – The dollar amount a Member Household must pay toward their Eligible Medical Bills during a 12-month period before their Eligible Medical Bills will be approved for sharing. The AHP 12-month period begins with the Effective Date.

**Biblical Christian Marriage** – A marriage which is a union of one man and one woman. (Genesis 2:22-24, Matthew 19:5, Ephesians 5:22-32)

**Bill Approved for Sharing** – An Eligible Medical Bill that meets the criteria for sharing in the Guidelines and meets the other conditions for sharing, including whether the Member's AHP has been met and if other sharing limits have not been exceeded.

**Cancellation Date** – The month and day membership ends due to the Member's withdrawal, for reasons including not following the Guidelines or for nonpayment of monthly shares.

**CMS** – The Centers for Medicare & Medicaid Services is nationally recognized and provides listings for providers, services, procedures and facilities to ensure they meet specific criteria to ensure the safety of the beneficiaries receiving these services.

**Co-Share Responsibility** – The portion of eligible medical bills (30%) a Member Household with the co-share option must pay after their AHP has been met until the maximum co-share responsibility of $10,000 has been met.

**Effective Date** – The month and day membership begins or the month and day of the most recent Annual Household Portion (AHP) change. Effective Date is used to determine when the 12-month period begins and ends for the purpose of the Annual Household Portion.

Resp. Ex. 1

**Eligible for Sharing** – Any testing, treatment, procedure or service that meets the criteria for sharing as established in the Guidelines.

**Eligible Medical Bill** – An incurred medical bill that meets the criteria for sharing as established in the Guidelines. The Eligible Medical Bill will be reduced by any discounts, fees or other sources of payment.

**Explanation of Sharing (EOS)** – A statement for Members and providers that reflects how medical bills are processed. The EOS reports how much of the bill was shared, how much was discounted through the PPO network, and the amount of the Member's responsibility, if any.

**FDA** – The Food and Drug Administration is responsible for protecting the public health by assuring the safety, efficacy and security of human and veterinary drugs, biological products, medical devices, our nation's food supply, cosmetics, and products that emit radiation.

**Global Maternity Bill** - The global maternity allowance is a complete, one-time billing with routine global billing CPT codes. Providers can either bill for all care during the maternity or for the specific portion of the maternity care that they administered (Prenatal, Delivery, and/or Postpartum). Diagnostic services, facility charges, and perinatal specialists are not typically included in the Global bill. Only one global bill for each portion of service will be eligible for sharing after the service has been rendered.

**Illegal Drugs** – Drugs which are classified as Schedule 1 in Title 21 United States Code Controlled Substances Act.

**Incident** – The occurrence of an illness or an injury of a Member, requiring a diagnosis of symptoms and treatment of a specific condition.

**Maximum Co-Share Responsibility** – The maximum amount a member with the co-share option will be responsible for ($10,000), which includes their AHP and their co-share responsibility, before their eligible medical bills will be shared at 100%.

**Member** – Any Member of Medi-Share, including each family member participating in a Member Household.

**Member Household** – Every Member who participates in Medi-Share with his or her immediate family under the same monthly share and AHP. A single Member is also considered a Member Household.

**Monthly Share** – The dollar amount that a Member faithfully contributes each month as his or her Monthly Sharing Portion and Monthly Administrative Portion. The Monthly Share is subject to change without notice.

• Monthly Sharing Portion – The dollar amount of a Monthly Share that pays all or part of one or more of another Member's Eligible Medical Bills.

• Monthly Administrative Portion – The dollar amount of a Monthly Share that is transferred to CCM for the payment of its administrative expenses.

**Notification of Sharing** – The act of notifying the membership of an Eligible Medical Bill that is approved for sharing.

**Pre-existing** - A sign, symptom, diagnosis, testing (including labs and/or radiology studies), medication, or treatment of a condition that a Member has before the start of membership.

**Provider Fee** – The portion of a medical bill that a Member pays at each visit to a medical provider, which applies even after the Annual Household Portion (AHP) has been met or exceeded. The Provider Fee is not applied toward the AHP or the co-share responsibility. The Provider Fee is an initial payment applied toward the total office visit charges.

**Prosthesis** – A device, either external or implanted, that substitutes for or supplements a missing or defective part of the body.

• External prosthetic devices include: Artificial limbs and facial structures; externally worn breast prostheses following mastectomy

• Implanted prosthetic devices include: artificial joints, artificial heart valves, artificial eyes/lenses, cochlear implants, surgically implanted breast implants following mastectomy.

**Sign** - An objective observation or finding.

**Specialty Pharmacy** – A high cost medication used to treat complex conditions. These may be oral, injected or infused. These may be self-administered in the home, administered with the support of a home health care professional, in a doctor's office or a hospital clinic. Some conditions that may be managed by specialty pharmacies include but are not limited to oncology/cancer, multiple sclerosis, rheumatoid arthritis, Crohn diseases, liver disease, organ transplant, hemophilia/bleeding disorders, cystic fibrosis, neurologic disorders, immune system disorders and growth hormone disorders, among others.

**Standard of Care** – Treatment that is accepted by medical experts as a proper treatment for a certain type of disease and that is widely used by healthcare professionals.

**Symptom** - A subjective experience, observation or finding.

Resp. Ex. 1



## COMPLETE

### STAY CONNECTED AND SAY HELLO

    

✉ P.O. Box 120099  •  West Melbourne, FL 32912-0099

📱 (800) PSALM 23 (800-772-5623)

🌐 **MediShare.com**

*Medi-Share is not insurance. Effective April 1, 2024.*

04012024

# EX 1.22



SHARE THE CARE | PROVIDERS | SIGN IN

HOW IT WORKS ☐    RESOURCES ☐

1.888.244.3839

**BECOME A MEMBER**

# Virtual Membership ID Card

## Save on all prescriptions!

We have partnered with ManifestRx to provide a Generic and Name Brand discount program to our members. ManifestRx is accepted at more than 62,000 pharmacies – Including most major drug store chains, big box retailers, independents, and mail-order pharmacies. NOTE: ManifestRx Pharmacy's online pricing includes free home delivery!

Access your Virtual Membership ID Card using the Altrua HealthShare App, or sign in to your Member Portal online to print your card. Simply present your Virtual Membership ID card at the pharmacy of choice and get prescriptions processed for any qualifying discount.

Not all prescriptions are eligible for a discount. Mental Health, Birth Control and other ineligible needs are not eligible for discount through our ManifestRx partnership. See Membership Guidelines to check eligibility of discounted prescriptions.

**GET THE APP**

**LEARN MORE**





ABOUT                                                          SHARE THE CARE  |  PROVIDERS  |  SIGN IN

CONTACT
HOW IT WORKS □    RESOURCES □
ALTRUA MINISTRIES                        1.888.244.3839            BECOME A MEMBER

ARTICLES
PRIVACY
DISCLAIMERS & LEGAL

Altrua Ministries (dba Altrua HealthShare, dba Altrua SmileShare) is NOT an insurance company nor is the
membership offered through an insurance company. Members are self-pay patients. Altrua Ministries is a 501(c)(3)
nonprofit corporation. Translated content is not an exact copy and may not include all content available in English. |
Article 48, Section 1-202(4) — Notice: This publication is not issued by an insurance company nor is it offered through
an insurance company. It does not guarantee or promise that your medical bills will be published or assigned to others
for payment. No other subscriber will be compelled to contribute toward the cost of your medical bills. Therefore, this
publication should never be considered a substitute for an insurance policy. This activity is not regulated by the State
Insurance Administration, and your liabilities are not covered by the Life and Health Guaranty Fund. Whether or not
you receive any payments for medical expenses and whether or not this entity continues to operate, you are always
liable for any unpaid bills. | © 2023 Altrua HealthShare — All rights reserved

EN  |  ES  |  KO

Find out how much your family could save—NO OBLIGATION!

**Consent Disclaimer:**
By clicking 'Submit' below I expressly consent to the receipt of promot... read more

LEARN MORE

Resp. Ex. 1

# EX 1.23

Contact Us (https://www.onesharehealth.com/en/contact)    |

Referral Program (https://referral.onesharehealth.com/v2/7/register)



(https://www.onesharehealth.com/en/)

**Become a Member**

(https://www.onesharehealth.com/cs/c/?cta_guid=e33f6cf3-c109-4e17-80a8-MVrcK898yWoU8f1Fdd2WFqmNdbCQifbTOF_Dlv6Wcr0vQ0qK22UkyKf6qntx6 gI5m33ZSd2hKs9Alv0Rw1yknWgJ0f4xWRCbozrrMAmYZMQJBcjgHKimFrxAebn page)

# HOW TO CHOOSE YOUR DOCTOR

## WITH THE FIRST HEALTH NETWORK



## About Your Choice of Providers

At OneShare Health, our Members have access to the First Health Network. Members are not required to use a network Provider but could end up with additional sharing responsibility if they choose an out-of-network Provider.



———

Members have access to an easy-to-use Provider Locator tool from First Health to find network Providers. Members are not required to use a network Provider but could end up with additional sharing responsibility if they choose an out-of-network Provider.

Find a Provider

Resp. Ex. 1

# How to Find or Choose Your Doctor

At OneShare Health, our Members are not restricted to an In-Network/Out-of-Network requirement when it comes to Physicians and Facilities. You are free to see your selected Provider.

However, to maximize your Program, receive care from whomever you want without restriction, and stretch your healthcare dollar further, our Members can follow this simple Freedom of Choice Guide!

**Step 1. Visit Virtual Urgent Care:** Remember that Virtual Urgent Care visits are always 100% shared at OneShare Health; It's your go-to for common ailments!

**Step 2. Check Your Program Features:**

For conditions more serious than those that could be resolved with a Virtual Urgent Care visit through Clever Health, but which are not Life-Threatening or Life-Altering, your next line of defense is your Primary Care Physician or an Urgent Care Facility. But, keep in mind that not all OneShare Programs provide sharing eligibility for these visits, and, even when Eligible, sharing is limited to a certain number of visits per Program Year.

If your medical condition is a Life-Threatening or Life-Altering emergency, seek Emergency Care immediately. All OneShare Programs provide sharing eligibility for Emergency Care (for Eligible conditions only). If your Program does not provide eligibility for Primary Care Physician visits if you have exceeded your Program's maximum visits for Primary Care, or if you simply want a streamlined and easy way to access a Primary Care Physician, Virtual Primary Care visits are available through the Clever Health App for a very reasonable cost. Virtual Primary Care visits are Not Eligible for Sharing.

**Step 3. Find a Provider:** Our Members have access to an easy-to-use Provider Locator tool from First Health to find network Providers. Members are not required to use a network Provider, but you could end up with additional sharing responsibility if you choose an out-of-network Provider. To search for a Provider, click here (https://providerlocator.firsthealth.com/fhhspn).

Resp. Ex. 1

Resp. Ex. 1

**Contact Us (https://www.onesharehealth.com/en/contact)**

(https://www.oneshealth.com/en/OneShareHealthMinistry)

OneShare (www.onesharehealth.com)

**Leadership Team (https://www.onesharehealth.com/oneshare-health)**

(https://twitter.com/OneShareHealth)

(https://www.linkedin.com/company/onesharehealth)

**Proud Member of**

(http://ahcsm.org/)

health
leadership
board)
(https://www.bbb.org/us/il/chicago/profile/health-sharing-ministries/oneshare-health-0875-91021818/#sealclick)

**Sharing by the Numbers (https://www.onesharehealth.com/sharing-by-the-numbers)**

**Careers (https://www.onesharehealth.com/en/careers)**

**Appeals & Disputes (https://www.onesharehealth.com/member-disputes)**

(https://www.youtube.com/channel/UClRsU3XL9sGPaETD-67wc1g)

*'Therefore encourage one another and build one another up, just as you are doing.'*

*1 Thessalonians 5:11 (ESV)*

1125 Executive Circle, Suite #130
Irving, Texas 75038

OneShare Health, LLC is not an insurance company but a religious health care sharing ministry. For our full disclosures, see www.onesharehealth.com/legal-notices (https://www.onesharehealth.com/legal-notices) for the most up to date state availability listing.

Copyright © 2023 OneShare Health, LLC, All rights reserved.

Sitemap (https://www.onesharehealth.com/sitemap.xml) | Privacy Policy (https://www.onesharehealth.com/privacy-policy) | Disclaimers (https://www.onesharehealth.com/legal-notices) | ACA Exempt (https://www.onesharehealth.com/en/aca-exempt)

Resp. Ex. 1

# EX 1.24

 (https://www.onesharehealth.com/en/)



# JOIN THE TEAM, LET'S BE BETTER TOGETHER

**Looking to Expand Your Portfolio and Build Residual Income? Become a OneShare Health Producer Today!**

**Apply Now!**

Resp. Ex. 1

**OneShare Health has an exciting opportunity for agents with a sales background, strong work ethic, desire to help others, and an entrepreneurial spirit. We're growing quickly and looking for talented individuals to join our nationally-recognized sales team!**

# Want to Get Started?

Simply fill out the form below to be contacted by our Producer Success Team and hear about the opportunity to grow with OneShare Health!

**FIRST NAME***

**LAST NAME***

**PHONE NUMBER***

**EMAIL***

**COMPANY NAME***

**PRIMARY LINE OF BUSINESS***

Please Select

**STATE/REGION***

**HOW DID YOU HEAR ABOUT US?***

☐ **I AGREE TO RECEIVE CALLS AND TEXT MESSAGES FROM ONESHARE HEALTH. REPLY STOP TO END. PRIVACY POLICY (HTTPS://WWW.ONESHAREHEALTH.COM/PRIVACY-POLICY).**

Resp. Ex. 1



# Why Should You Join the OneShare Health Team?

- Enjoy the benefits of a continuous income
- Level commission for as long as the member is active
- Enroll in over 40 states, 365 days a year
- Ongoing training and support with a full suite of approved marketing materials
- Perfect to bundle with ancillary products such as:
    - Accident, Critical Illness,  Hospital Indemnity, & Limited Med
    - Dental, Vision, & Life Insurance



Resp. Ex. 1

Resp. Ex. 1

Resp. Ex. 1

Resp. Ex. 1

# EX 1.25

## Samaritan Ministries Groups: a Christian solution to health care for your team

### Biblical Approach

Samaritan Ministries uses a direct sharing model that is fundamentally different from health insurance. Meaning, your monthly share amount will directly support other members in need, embodying the Biblical principle of bearing one another's burdens and embracing your Christian values.

### Affordable

As an employer, it's an affordable solution. The annual amount for an entire family can be as low as $4,074. Plus, we'll equip you and your team with tools to manage healthcare costs.

### Health Care Freedom

We believe that you should have confidence in the medical providers you choose, which is why we put your health care in your hands. With no networks, you choose trusted, quality providers and have an active role in your medical care.

We use cookies on our website. To learn how we use this information, please read our Privacy Policy.

Resp. Ex. 1

02:52

## Programs to fit your team, your budget

Samaritan Ministries Groups is a way for you, as an employer, to pay for your employees' individual Samaritan memberships.

Consider it a vital part of your healthcare offerings. When you sign up for Samaritan Groups, you can tell your current employees and new hires that you have a Biblical, affordable employee benefit that also puts their health care in their hands.

Samaritan Ministries Groups is for your whole team or just part of your team. How you choose to structure the group is your decision. It's a simple solution.

### Collective Share Group

The organization is set up as a "group parent." You receive and send one share assignment for

We use cookies on our website. To learn how we use this information, please read our Privacy Policy.

Resp. Ex. 1

all participating employees.

## Individual Share Group

The organization includes the amount of the monthly share, in full or in part, into the employee's paycheck. It's then the employee's responsibility to send out their monthly share.

## Eager to learn more, or ready to sign up?

Churches

Small Businesses

Nonprofit Organizations

**Small Businesses**

As a business owner, you want to care for your employees well. Samaritan Ministries can help you do that by providing a healthcare solution that aligns with your Biblical values, fits your budget, and puts health care in your employees' hands—which is exactly where it should be!

Unlike insurance, Samaritan Ministries has a straightforward cost structure, simplifying the budgeting process, and it may be lower than what you're paying now. And unlike insurance plans with network restrictions, Samaritan Ministries gives your employees the freedom to choose the medical providers they trust wherever they are.

Health care sharing is not insurance, but it offers a solution rooted in community and faith, and considers the unique needs and values of your employees.

Affordable healthcare, more money for your mission

We use cookies on our website. To learn how we use this information, please read our Privacy Policy.

Resp. Ex. 1

It's undeniable, medical costs continue to be on the rise, and small firms, churches, and nonprofit organizations like yours are feeling the pinch. And according to a 2023 Kaiser Family Foundation (KFF) study, small firms (3-199 employees) are paying about the same amount for health insurance for their employees as larger employers do.

The study also concluded that small firms pay an average of about $8,435 a year for single coverage per covered worker and an average of $23,968 for family coverage per covered worker. And most of the burden falls on the employer.

Samaritan Groups, in most cases, will save you 50% or more in your annual healthcare costs.

## Samaritan Basic*

### $1,528 - $5,874

**per household per year**

## Samaritan Classic*

### $2,452 - $10,266

**per household per year**

*There is a one-time $200 fee per employee at time of sign up.*

## Get a quote today!

We use cookies on our website. To learn how we use this information, please read our Privacy Policy.

Resp. Ex. 1

# EX 1.26

Resp. Ex. 1









SHARE THE CARE | PROVIDERS | SIGN IN

Altrua HealthShare HOW IT WORKS RESOURCES 1.888.244.3839 BECOME A MEMBER

Join Now & Your First Month is Free

This offer expires March 31, 2025

"What if I could
*save $600 on health care?"*

Join Like-minded People to Discover Possibilities and Savings Today.

CALL NOW VIEW MEMBERSHIPS

Thousands of individuals, families, churches and organizations rely on each other for their medical needs.

SEE HOW IT WORKS

## Four Memberships to Choose From

Diamond | Emerald | Sapphire | Ruby

LEARN MORE

Resp. Ex. 1

2/13/25, 9:49 PM                                              Altrua HealthShare



6 *Pooled Office Visits* per Member

Unlimited Telemedicine

Maternity sharing

Adoption sharing*

Cancer Treatment sharing

Laboratory Services

No Annual Limit up to the Lifetime Maximum Limit of $2,000,000

6 *Pooled Office Visits* per Member

Unlimited Telemedicine

Maternity sharing

Adoption sharing*

Cancer Treatment sharing

Laboratory Services

No Annual Limit up to the Lifetime Maximum Limit of $1,000,000

6 *Pooled Office Visits* per Member

Unlimited Telemedicine

Cancer Treatment sharing

Annual Limit is $250,000

Lifetime Maximum Limit $1,000,000

6 *Pooled Office Visits* per Member

Unlimited Telemedicine

Cancer Treatment sharing

Annual Limit is $150,000

Lifetime Maximum Limit $1,000,000

*Void where prohibited: Although Altrua HealthShare offers memberships nationwide, some of the sharing options contained in the Membership Guidelines may NOT be available to Members in all geographic locations or jurisdictions.
Adoption and Funeral sharing options are NOT available to Texas residents.

## GEM Memberships Include

Counseling Services, Telemedicine, Discounts on Dental, Vision and Hearing.

SEE DETAILS



Find out how much your family could save—NO OBLIGATION!

First Name*

Last Name*

Email*

Phone*

Zip*

**Consent Disclaimer:**
By clicking 'Submit' below I expressly consent to the receipt of promot... read more

I'm not a robot
reCAPTCHA
Privacy - Terms

LEARN MORE

Resp. Ex. 1

2/13/25, 9:49 PM                                    Altrua HealthShare

SHARE THE CARE | PROVIDERS | SIGN IN

Altrua    HOW IT WORKS ⌄    RESOURCES ⌄                              1.888.244.3839    BECOME A MEMBER

## What Our Members Say

 **Russ Murphy**
6 days ago
★★★★★
Enrollment process very simple! Cost effective product that provides peace of mind.

 **Dan Williams**
15 days ago
★★★★★
Easy, straight forward and efficient application process!

 **Nara English**
15 days ago
★★★★★
Mike was so wonderful. He went above and beyond. What a kind, patient, knowledgeable young
Read more

 **s S**
22 days ago
★★★★★
Clear explanation, good customer service, fast and helpfully. Thank you

 **Cristina Eppers**
1 month ago
★★★★★
Signing up with Altrua Healthshare was very simple and easy to do, once I had all of my questions
Read more

 **Greensboro MadSplatter**
1 month ago
★★★★★
Local agent Chris was great. He made it easy yo understand and easy to get signed up.
Read more

 **Michelle Carabini**
2 months ago

★★★★★
It was great. Easy,

 **Emily Ren**
2 months ago
★★★★★
Altrua is very unique and user friendly using new technologies. It really helps customers get good
Read more

 **boogiz61**
2 months ago
★★★★★
It was a great experience, I spoke with agent Joyce she was very kind and knowledgable helped me
Read more

[ LOAD MORE ]

## Signup is Easy.

📄 Apply Online     ✅ Get Approved     💰 Start Saving

[ BECOME A MEMBER ]

Find out how much your family could save—NO OBLIGATION!

**Consent Disclaimer:**
By clicking 'Submit' below I expressly consent to the receipt of promot... read more

LEARN MORE

Resp. Ex. 1

2/13/25, 9:49 PM                                        Altrua HealthShare

SHARE THE CARE  |  PROVIDERS  |  SIGN IN

Altrua    HOW IT WORKS ⌄    RESOURCES ⌄                          1.888.244.3839    BECOME A MEMBER

State Insurance Administration, and your liabilities are not covered by the Life and Health Guaranty Fund. Whether or not you receive any payments for medical expenses and whether or not this entity
continues to operate, you are always liable for any unpaid bills. | © 2023 Altrua HealthShare — All rights reserved

EN  |  ES  |  KO

Find out how much your family could save—NO OBLIGATION!

**Consent Disclaimer:**
By clicking 'Submit' below I expressly consent to the receipt of promot... read more

LEARN MORE

Resp. Ex. 1

# EX 1.27

Resp. Ex. 1



Member Login    |    Providers    |    Help Center

 

ENROLL NOW



# PRICED OUT OF HEALTHCARE?

SEE PRICES

## YOUR SOLUTION TO THE RISING COST OF HEALTHCARE

Impact Health Sharing delivers a modern and affordable alternative to health insurance, where most save **30-50%** when they join.

In some ways, it functions the same as your current health plan, but it's different in ways that matter!

Works Better, Feels Better



2/13/25, 9:50 PM                    Impact Health Sharing - An Affordable Alternative to Health Insurance

Finally, a way to take control of your healthcare expenses.  Impact Health Sharing is a caring community of
people who share in each other's medical bills.  Impact is for anyone who is interested in sharing, acting

            



## An Affordable Alternative To Health Insurance

Impact puts the power, the freedom, and the control in paying for health care back into your hands. Learn
more about how you can join our community and discover how most members save 30-50% on their
healthcare costs.





2/13/25, 9:50 PM                    Impact Health Sharing - An Affordable Alternative to Health Insurance



### $378 for families.

**SEE PRICES**

# Healthcare Solutions Designed To Care For You

📱

### TELEMEDICINE

Access a licensed doctor from the comfort of your home 24/7 with a $0 provider fee.

**$**

### GREAT RX PRICING

Receive industry-leading discounts on everyday prescriptions.

✕

Impact Health Sharing – An Affordable Alternative to Health Insurance

**COMPREHENSIVE MEDICAL**

Sharing includes medical services for preventative, maternity, accident, illness, and injuries.



 | 

**ENROLL NOW**





## Families Are Saving Thousands!

# Families Are Saving Thousands!

"With five kids, we *were* paying $2,000 a month! We are now paying a little over $500 for our family! You NEED Impact!"

Request More Information

# Empowering Change: Impact's Vision for Health Care

Healthcare isn't as simple as it used to be. At Impact, we believe you should be an informed and educated advocate in your health care. You will find more useful tools and information in our blog.

First Name    *

_____

Last Name    *

_____

Email    *



2/13/25, 9:50 PM                    Impact Health Sharing - An Affordable Alternative to Health Insurance



📞 | 🔍        ENROLL NOW        ☰

By clicking the button, I agree to the Privacy Policy and consent to Impact Health Sharing contacting me via email or phone.

REQUEST INFO



## HOW DOES IMPACT HEALTH SHARING WORK?

START READING →



✕

2/13/25, 9:50 PM                    Impact Health Sharing - An Affordable Alternative to Health Insurance



 

**ENROLL NOW**



THE HIDDEN COSTS OF MEDICARE: MARILYN'S EXPERIENCE



## A LOOK AT PRESCRIPTION PRICING

START READING →

Exit Impact    |    Guidelines    |    Help Center    |    Share Your Story    |    Providers    |    Contact Us



*Impact Health Sharing is a not-for-profit corporation that exists to create, exercise, and express practical applications of Christian faith, beliefs, and ethics. We believe in bringing together individuals and families in shared acts of common*



      

ENROLL NOW

disclosure required for the state in which you reside here: View Disclosures.

© Copyright 2025. All rights reserved. Not available in NJ., RI., and WA.    Privacy Policy | Terms & Conditions

            

Resp. Ex. 1

# EX 1.28

Resp. Ex. 1

2/13/25, 9:52 PM                    Healthshare Plans | Jewish Healthcare/Sharing Ministry | United Refuah HealthShare



**Phone: (440) 772-0700**

# Lower your medical expenses
# without compromising on quality of care.

### Affordable Monthly Sharing Options:

| Single: $199/Month | Couple: $349/Month | Family (3-6 Members): $499/Month |

## UNITED REFUAH HEALTHSHARE IS THE FIRST AND ONLY JEWISH HEALTHSHARING ORGANIZATION WITH THE MISSION TO:

- **Give back your control, freedom, and flexibility.** Use the doctor and hospital of your choice, anywhere in the world. Our higher reimbursement rates help you get the care that you want. You won't hear from us the words 'out-of-network'.

- **Put money back in your pocket.** Families typically can save $10,000 to $20,000 every year over other healthcare options.

- **Share with your community in accordance with Torah values.** Your hard earned healthcare dollars will be used to share in the medical needs of our healthsharing community instead of going toward multi-billion dollar corporate overhead and profit, and procedures that run contrary to our Torah values.

[ Learn More › ]

## Apply for Membership Now ✔

## AFFORDABLE MONTHLY PROGRAMS BASED ON YOUR FAMILY SIZE:

| MONTHLY CONTRIBUTION: | BANK DEBIT | CREDIT CARD |
|---|---|---|
| Single | $199 | $209 |
| Couple | $349 | $359 |
| Family 3-6 members. $50 each additional. | $499 | $519 |

| ANNUAL PLAN LIMITS | PRE-SHARE | 20% CO-SHARE MAXIMUM |
|---|---|---|
| Single | $500 | $1,000 |
| Couple | $1,000 | $2,000 |
| Family | $1,500 | $4,000 |

After members have met their Annual Pre-Share Amount, United Refuah HealthShare will share 80% of eligible medical expenses, and the member will be responsible for a 20% Co-Share. The 20% Member Co-Share is limited to an annual Co-

Resp. Ex. 1

Share Maximum. Once this maximum is reached, eligible expenses are shared at 100% up to $1,000,000 per incident. Couple memberships are responsible for an additional $900 Pregnancy Pre-Share in the event of a birth. Single memberships are responsible for an additional $2500 Pregnancy Pre-Share in the event of a birth.

# Ready to start saving?

**Apply for Membership**





**United Refuah HealthShare**
**4.9** ★★★★⯪
Based on 204 reviews
powered by Google

review us on



**Deborah Tutnauer**
20 days ago
★★★★★
I have to post again because I am so enamored with United Refuah. At a time when most companies are becoming more and more impersonal and



**D H**
27 days ago
★★★★★



# Let's Talk!

**440-772-0700**

Name

Phone

Email

Submit

Resp. Ex. 1

We're on standby, ready to answer
any and all of your questions. If you prefer to
have us contact you, let us know the best way to
reach you, and we'll be in touch shortly!

**Get affordable healthcare, right here in our healthsharing community.**

**United Refuah Healthshare is not insurance, it's a group of people like you who share one another's healthcare expenses.**

© Copyright – United Refuah Health Share

# EX 1.29

Resp. Ex. 1

2/13/25, 9:53 PM                    Affordable Christian Healthcare Sharing Ministry | WeShare® By UHSM

📞 800-900-8476(tel:800-900-8476)    👤 Member Portal(https://uhsm.my.site.com/members/s/login/?ec=302&startURL=%2Fmembers%2Fs%2F)


(https://www.weshare.org)

≡

# Slash your medical premiums by up to 50%

WeShare offers **faith-based Christian healthcare-sharing programs** that provide a community-driven, cost-effective alternative to traditional insurance, allowing members to share medical expenses while promoting holistic wellness, transparency, and simplicity.

Speak to an agent
(tel:+18009008476)

Savings calculator
(https://www.weshare.org/comprehensive-program/#calculator)



Privacy · Terms

# What is WeShare® Healthcare?

As healthcare costs continue to skyrocket and traditional insurance are beset with rising premiums and complicated protocols, Americans are seeking a simpler, more cost-effective healthcare alternative. For many, WeShare's community-driven, faith-based Christian healthcare sharing programs are the answer.

WeShare®, Healthcare by UHSM, provides streamlined solutions aimed at restoring faith in healthcare, simplifying our members' healthcare journey and bringing wellness within reach.

Benefits of joining
(https://www.weshare.org/benefits-
of-joining/)



Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 420 of 547

**1**

Contribute your monthly share amount.

**2**

Locate a provider within our network and provide your WeShare membership ID information when scheduling.

**3**

Eligible medical expenses submitted by the provider are assigned to be paid (from the shared dollars accumulated through monthly contributions).

UHSM is proud to serve as an inclusive community that welcomes individuals and families committed to the principles of holistic wellbeing.

WeShare®, healthcare by UHSM, brings wellness within reach for those who take a proactive, preventative approach to their health.

When our members require medical care, we partner with providers to manage the administrative work of bill submission, processing and payment. That allows our members to focus on their health and wellbeing, rather than the paperwork and stress of waiting for reimbursement.

## Speak to an agent
## (tel:+1%20800-900-8476)

### or

## Self enroll today
## (https://www.weshare.org/selfenroll-weshare-org/)

Resp. Ex. 1

# WeShare® Programs

Save on your healthcare – explore our Christian healthcare programs aligned with your lifestyle and values. Choose from **Comprehensive Program – WeShare® or Catastrophic Program – WeShare Access™.**

# WeShare® Member Testimonials

Discover how WeShare® is dedicated to making healthsharing simple, clear and affordable.

‹  ›

## 'Always Nice And Professional'

'Customer Service team helped me out tremendously by bringing me comfort in a time of uncertainty. They are always nice and professional. I love the fact that this is a Christian company.'

**-Denise**

Resp. Ex. 1

'Taken Care Of All My Bills'

'UHSM has been very nice and taken care of all my bills on time, every time. Nothing
has been an issue with UHSM.'

**-Barbara**

'Huge Savings For Us, Huge!'

'Huge savings for us, huge! Such an amazing experience that we wanted to make
sure our other friends and family members applied for the same healthcare through
UHSM.'

**-Rebecca**

# 3 simple steps to get started

# Request information from our enrollment team

First name  *                                    Last name  *

Email  *                                         Mobile  *

Zip  *

By clicking below, I agree to the privacy policy. I agree to receive calls and text messages (including by autodialer/pre-recorded message)
regarding healthcare at my phone number above. This consent does not require me to purchase anything.

☐ I agree to the Privacy Policy (https://www.weshare.org/privacy-policy/)

Submit

How Do I Join WeShare®(https://www.weshare.org/how-do-i-join-weshare/)

Do I Qualify(https://www.weshare.org/do-i-qualify/)

Blog(https://www.weshare.org/blog/)

UHSM Ministry(https://www.weshare.org/uhsm-ministry/)

Resp. Ex. 1

Find a Provider(https://www.weshare.org/find-a-provider/)

For Providers(https://www.weshare.org/for-providers/)

Careers(https://www.weshare.org/about-weshare/)
FAQ's(https://www.weshare.org/faqs/)

Contact Us(https://www.weshare.org/contact-weshare/)

Privacy Policy(https://www.weshare.org/privacy-policy/)

Regulatory Information(https://www.weshare.org/regulatory-information/)

© 2023 Unite Health Share Ministries™ and WeShare®

**WeShare® is not a reimbursement program.** WeShare® is not an insurance company nor is the membership offered through an insurance company. WeShare® membership is offered and administered by Unite Health Share Ministries™ (UHSM), a nonprofit, religious healthcare sharing ministry that facilitates member-to-member sharing of medical expenses. WeShare® is connected through partnerships to provide resources, community, and healthcare for all WeShare® members.

WeShare® members have access to pre-negotiated rates for medical services through vast networks, including the PHCS® PPO, CVS Caremark™, BetterHelp, DocDay and CVS MinuteClinic™ networks.

Members should never have to pay cash up-front for services in-network, with the only payment incurred at the time of service being the per member, per visit, consultation fee, as outlined in the Membership Guidelines. All Sharing Members are responsible for their own medical expenses, less amounts paid from shared dollars.

Site built by Flowz (https://flowz.com)

# EX 1.30

Resp. Ex. 1



Programs        Reviews        Resources        Contact Us        🔍

Member Login              **Join Now**



# An Affordable, Reliable Health Care Alternative



Nationally Accredited



98% Satisfaction



Faith Based



Est. 1993

# Your Health __Care__ is our __Calling__

At Medi-Share we believe in the power of community. We mean it when we say our members come first, because serving you is our calling.

**Get Your Price**

# Flexible Program Options to __Fit Your Needs__

Resp. Ex. 1

2/13/25, 9:55 PM                    Medi-Share - Christian Health Care - 98% Member Satisfaction

Our programs are tailored to meet your health care needs at every stage of life, providing you high quality care at an affordable cost.



## Individuals & Families

Affordable options that provide you with:

- 24/7 Telehealth
- Nationwide Provider Access
- Hospital and Surgery
- Dental, Vision, and Prescription Discounts
- And More!

Learn More



## Seniors 65+

Designed to work with Medicare Parts A & B:

- As Low As $99/Mo
- $500 Annual Costs
- Sharing in Medicare Eligible Costs
- Dental, Vision, and Prescription Discounts
- And More!

Learn More

## Why Choose Medi-Share?

Discover the Difference

# When You Share, You Save with Medi-Share

For over 30 years, Medi-Share has relentlessly pursued a biblical model of sharing for our Christian community. On average our members across the nation save up to 50% on their health care compared to health insurance. As the nation's leading health care sharing ministry, Medi-Share is proud to share in over $50M in medical needs each month.



# The Medi-Share Difference

Resp. Ex. 1

2/13/25, 9:55 PM                    Medi-Share® Christian Health Care - 98% Member Satisfaction

 $8B+ Medical Bills Shared & Discounted

 No Annual Caps or Lifetime Limits

 98% Member Satisfaction Rating

Quick Bill Share

 Know Before You Go Pricing

 24/7 Access to Telehealth

 No Minimum Bill Submissions

 Patented Technology

## Refer-A-Friend and Earn $100 for Everyone Who Joins Medi-Share!

**Refer-A-Friend**



## Health Care Made For You

Medi-Share is designed for individuals just like you. No matter what stage of life you're in, Medi-Share wants to be there for you.

Learn More

Resp. Ex. 1

# Medi-Share Works For You



*"It's very intentional how they try to bless people. It is a ministry."*

## Ginny B.
Medi-Share Member

PRICING

HOW TO JOIN

FREQUENTLY ASKED
QUESTIONS

MEDI-SHARE BLOG

CHRISTIAN CARE MINISTRY

SHARE YOUR STORY

EMPLOYMENT

CONTACT US

FIND A PROVIDER

FOR PROVIDERS

MEDI-SHARE GUIDELINES

PRIVACY POLICY

PRESS ROOM

## Subscribe to our Medi-Share blog

| Email* | Subscribe |

By entering my information, I consent to receive communications (email, text, phone calls) from Medi-Share / Christian Care Ministry and agree to the Privacy and Messaging Policies.



*Healthcare Bluebook and Fair Price are trademarks of CareOperative LLC.

© 2025 Christian Care Ministry

Medi-Share is a nonprofit health care sharing ministry of Christian Care Ministry, Inc ("CCM"). Medi-Share members voluntarily share each other's medical expenses in accordance with guidelines adopted by the members and administered by CCM. Medi-Share is not insurance and is not regulated as insurance. Neither CCM nor any Medi-Share member assume any legal obligation to share in the payment of any medical expense incurred by another Medi-Share member. Medi-Share

Resp. Ex. 1

Medi-Share® Christian Health Care - 98% Member Satisfaction

members are exempt from the individual mandate in the Patient Protection and Affordable Care Act. See 26 U.S.C §5000 A(d)(2)(B). Certain states expressly exempt from insurance regulation healthcare sharing ministries that, among other things, post a specific notice. Although Medi-Share does not rely on such express exemptions, Medi-Share has elected to publish theses notices. You can review the disclosure required for the state in which you reside: KY, MD, PA, WI - All Other States. - Click to view our privacy policy.

Resp. Ex. 1

# EX 1.31



Programs    Reviews    Resources    Contact Us    🔍

Member Login    Join Now



# Medi-Share Complete

## An Affordable, Reliable Health Care Alternative


24/7 Telehealth


1M+ Provider Network


Provider Flexibility


Perfect For Families

# What is Medi-Share Complete?

Medi-Share Complete is a comprehensive alternative to health insurance. Medi-Share provides you with access to quality health care at an affordable monthly cost. With annual household amounts from $3k to $12k, Medi-Share Complete has options that fit your needs and budget.

# Medi-Share Complete Includes:







## Surgery & Hospitalization

- $35 Provider Fee*
- No limit for eligible procedures and admissions.
- Receive the care and treatment you need.
- We negotiate on your behalf and facilitate direct payment to Providers.

*Maternity Exception (Section VI. A) for more details and information.

## Included & Unlimited Telehealth Visits

- Access board certified doctors.
- Receive the care you need.
- Get a prescription, if needed.
- Usually takes 30 minutes or less.
- No out of pocket costs.

# Experience More from Your Health Care

 **Access to 1M+ Providers Nationwide**
Nationwide provider access and price transparency through Healthcare Bluebook.

 **Perfect For Families**
One affordable household amount regardless of household members.

 **Direct Bill Management**
Medi-Share directly manages medical bills on your behalf.

 **No Minimum Bill Submissions**
No qualifying minimum to submit for reimbursement.

# Why Choose Medi-Share Complete?

Medi-Share Complete provides you with a seamless transition to an affordable membership with nationwide provider flexibility. Enjoy peace of mind, knowing your medical bills are being cared for by a Christian Community.



Resp. Ex. 1

# Medi-Share Works For You

"It's very intentional how they try to bless people. It is a ministry."

## Ginny B.

Medi-Share Member



PRICING

HOW TO JOIN

FREQUENTLY ASKED QUESTIONS

MEDI-SHARE BLOG

CHRISTIAN CARE MINISTRY

SHARE YOUR STORY

EMPLOYMENT

CONTACT US

FIND A PROVIDER

FOR PROVIDERS

MEDI-SHARE GUIDELINES

PRIVACY POLICY

PRESS ROOM

## Subscribe to our Medi-Share blog

Email*    Subscribe

By entering my information, I consent to receive communications (email, text, phone calls) from Medi-Share / Christian Care Ministry and agree to the Privacy and Messaging Policies.



*Healthcare Bluebook and Fair Price are trademarks of CareOperative LLC.

© 2025 Christian Care Ministry

Medi-Share is a nonprofit health care sharing ministry of Christian Care Ministry, Inc ("CCM"). Medi-Share members voluntarily share each other's medical expenses in accordance with guidelines adopted by the members and administered by CCM. Medi-Share is not insurance and is not regulated as insurance. Neither CCM nor any Medi-Share member assume any legal obligation to share in the payment of any medical expense incurred by another Medi-Share member. Medi-Share members are exempt from the individual mandate in the Patient Protection and Affordable Care Act. See 26 U.S.C §5000 A(d)(2)(B). Certain states expressly exempt from insurance regulation healthcare sharing ministries that, among other things, post a specific notice. Although Medi-Share does not rely on such express exemptions, Medi-Share has

Resp. Ex. 1

Medi-Share Complete

elected to publish theses notices. You can review the disclosure required for the state in which you reside: KY, MD, PA, WI - All Other States. - Click to view our privacy policy.

Resp. Ex. 1

# EX 1.32



(737) SHARING

How Sharing Works

Why Solidarity

News & Blog

Member Login

**Enroll Now**



Why Solidarity?

# We're Making Healthcare Ethical, Affordable, and Truly Comprehensive.

Memberships starting at:

**$85** - Single

**$336** - Couple

**$512** - Family

| First Name |
| Last Name |
| Email Address |
| Phone Number |
| Select an option ⌄ |

**By entering my information, I consent to receive communications (email, text, phone calls) from Solidarity HealthShare and agree to the Communications Policy**

☐ **Yes, send me information about Solidarity!**

**CHECK PRICES**

- OR -

**ENROLL NOW**

# Affordable Care

Rising healthcare costs have inflicted a burden on many families across our country. That's why Solidarity HealthShare offers a refreshingly affordable alternative. With our customizable programs, you have the freedom to choose the Membership that suits your unique needs. Say goodbye to sky-high premiums and hello to budget-friendly options that don't compromise on quality.

## Make Room For What Matters

With Memberships starting at **$85 for a Single**, or **$512 for a Family**, we offer options that work with your budget. We believe that healthcare costs shouldn't hurt your ability to take care of your family. Click below to see which program option works best for you!

Resp. Ex. 1



## Competitive Pricing

On average, a Solidarity Membership is **6% more affordable** than other
healthcare sharing ministries, and over **60% more affordable** than a
traditional health insurance policy.



# Truly Comprehensive

Your health matters, and it deserves the best care possible. Solidarity HealthShare provides comprehensive sharing for a wide range of medical services, ensuring that you and your loved ones are not only protected from unexpected medical expenses, but living as healthy as you can. From preventive care to major medical events, we have your back every step of the way.



## Wellness Visits

One wellness visit per Member per year is shared 100% even before your meet your Annual Unshared Amount (AUA) out of pocket. We believe that you should be proactive about their health, rather than just getting treated once you're sick.



## Integrative & Alternative Treatments

We share into any alternative treatments that are medically necessary,
evidence-based, and prescribed by a physician. This can include things like
acupuncture, massage therapy, and chiropractic care.

Resp. Ex. 1



## Unlimited Mental Health Counseling

Solidarity is the first healthsharing ministry to fully share mental health treatment for its Members. We believe your mental, physical, and spiritual health are all crucial and all connected to one another.



## Life-Affirming Fertility Treatments

We share into any ethical fertility treatments, including Natural Procreative Technology treatments that treat the core issues causing the infertility or other gynecological issues.



## Long-Term Generic Prescription Sharing

Our program includes sharing for generic prescriptions, including chronic conditions and pre-existing conditions, as well as short-term medications. You have a small co-share, and the rest is shared by the Membership.



## Comprehensive Maternity Care

Maternity care the way that works best for you. We include birthing centers, home births, midwifery, lactation consultations, progesterone supplementation, and much more to provide exactly the care that you need individually.



## Hospice and Home Healthcare

Life-affirming care doesn't end with birth, but rather extends all the way through a natural death that respects human dignity. That is why we share into hospice and home health care.



## Ambulance Services

We share emergency air or land ambulance transportation to the nearest medical facility, so you can always be confident your family will be taken care of.



# Ethical Approach

At Solidarity, we believe in the power of community and compassion. Our program is built on the Catholic principles of solidarity (that's where we got the name!) and subsidiarity. Our Members come together to share in each other's medical expenses, without sacrificing their conscience along the way.



Resp. Ex. 1

## Pro-Life Care from Conception to Natural Death

Your money will never fund abortion with Solidarity like it does with traditional insurance. Beyond that though, we go out of our way to share into life-affirming medical treatments, such as Restorative Fertility Care, NFP Instruction, and Comprehensive End of Life Care.



## Faithful to the Teachings of the Catholic Church

We never share any medical expenses that violate the teachings of the Catholic Church. This includes "treatments" such as contraception, abortifacients, IVF, surrogacy, and transgender surgeries/therapies. Our Members don't have to choose their conscience or quality healthcare, they get to have both!



## Fair & Just Medical Pricing

We consider medical overpricing an ethical issue. That is why we fight for fair and just pricing for our Members with our Reference Based Pricing model. This fresh approach results in ~60% savings off billed charges historically, far greater than traditional insurance can achieve.

### Why Solidarity?

Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 456 of 547

# What Does the Membership Include?

Here's just some of the perks of Membership that you receive when you join our community of faithful Americans sharing each others' needs in common.



## Manage Your Membership Online



## $1 Million Sharing per Incident, per Year

Resp. Ex. 1



## 100% Sharing Once AUA is Met



## Care Navigation Helps find Great Providers



## 24/7/365 Telehealth Included in Program



## Join a Caring, Praying Community

2/13/25, 9:58 PM
Why Choose Solidarity? - Home Page

# Our Impact

 **Solidarity Member Stories: Christina Jacobeen**

**SolidarityHealthShare**

03:16

**"Solidarity is our miracle. I wanted an overnight miracle, like you're healed instantly... but Solidarity has been our miracle"**

- Christina Jacobeen, Member

Resp. Ex. 1



**Member Stories: Lisa Rezner**

SolidarityHealthShare

03:59

**"I was thinking, 'Is everything gonna be ok?' Our doctor called Solidarity and it was very seamless. Everything was shared just as they presented it, and it was just a huge relief... We just felt very supported in that. "**

- Lisa Rezner, Member



**Member Stories: Lorraine Ranalli**

**SolidarityHealthShare**

03:55

**"We have to be responsible for our healthcare, for ourselves, and, again, not overtly, but just because of what Solidarity is and how it's comprised, we're encouraged to do that. And it's a win-win for everybody, and it'll be a win-win, I think, for our nation's healthcare."**

- Lorraine Ranalli, Member



# Have Questions?

Your Member Development Team is ready to help you make an informed decision. They know everything about the program and will help you see how the SolidarityHealthShare and how it's different from what you might be used to before you apply.

Schedule your free consultation today to get all your questions answered.

BOOK A CALL

# Solidarity by the Numbers

At Solidarity HealthShare, we are dedicated to our mission to revolutionize healthcare, and our commitment to our members has yielded astounding results. The statistics below show the remarkable impact of our **ethical**, **affordable**, and **comprehensive** healthcare program:

## 55,000+

Members served since the program started in 2016

## $85 / $512

Starting Monthly Contributions for Singles or Families

## $79 Million

Resp. Ex. 1



Saved and shared by our Members in 2022

"Solidarity HealthShare is an amazing, life-affirming option that my family has chosen to help us pay for our healthcare needs. They are passionate supporters of life, and I'm ecstatic that they share into medical treatments such as NaPro Technology and Natural Family Planning programs. My family and I could not be happier members of Solidarity."

**Abby Johnson**
**CEO, Founder**
**And Then There Were None**

# Ready to Get Your Membership Started?

Click the button below to get your Membership started online today!

**ENROLL NOW**

## Program

How Sharing Works
Why Solidarity
Check Prices
Enroll Now

## Resources

FAQs
Sharing Guidelines
News & Blog
Member Login
Member Care Portal Setup

## About

Our Story
Press
Contact Us

   

© 2025 Solidarity HealthShare℠ is a healthcare sharing ministry of Melita Christian Fellowship Hospital Aid Plan. Solidarity is not insurance, nor is it offered through any insurance program.

Legal Notices    Privacy Policy

# EX 1.33

CrowdHealth Isn't Health Insurance... and Why That's a Good Thing! | CrowdHealth

CrowdHealth

How It Works    Reviews    Pricing    More ⌄    Member Login    **Sign up**

‹ Return to Blog

April 8, 2022

# CrowdHealth Isn't Health Insurance... and Why That's a Good Thing!

By

When we set out to create a new and different way for Americans to pay for healthcare, we had you and your best interest at the top of our minds.

Those minds have since been boggled by some of the crazy, dysfunctional things we've learned about health insurers along the way. Where we first thought it might be an uphill climb to help people like you imagine getting out of the health insurance system, now we realize it's actually one of the biggest upsides we can offer you, our CrowdHealth Members.

That's why there's no shame or secrecy here about the fact that we aren't health insurance, and therefore we can't make the same "guarantees" insurers do.

Curious what we could possibly mean by these as "good things"? Read on!

**Why am I better off with CrowdHealth not being insurance?**

In short, you're better off with CrowdHealth not being insurance because there are so many backward incentives and structures within health insurance that actually increase



Resp. Ex. 1

Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 467 of 547

your prices and negatively affect consumers. Here are two key ones:

**1)** Did you know that the United States government limits the amount of profit health insurance plans can receive from your premiums? That sounds great in theory, but think about it this way: if a health plan can only make profits on up to 15% of your premium, and you have a $1000 premium per month, their profits are limited to $150 per month on that price. So then, what's a major way health plans can grow their profits? **By increasing your monthly premiums!** If they boost your premium by 10% to $1100, they can now profit $165 per month. This means health plans are now incentivized to make your prices go up, not go down.

**2)** To function and stay in business, health plans rely on extensive contracts with doctors and hospital systems in your city. If health plans don't have networks, then they are unlikely to sign up big companies in your city for their plans, because no company wants a health insurance plan that has super limited options on doctors and hospitals. Therefore, these networks are extremely valuable to health plans. Once they get a hospital system under contract, they don't want to lose it from their network; to keep the network size, they must keep their providers happy, so they forfeit their ability to negotiate well with the hospital systems. This gives the hospital systems the power, so they can continue to increase their prices to insurers, which leads to an increase in health insurance customers' prices, which then increases the health plan profits (see point #1).

At CrowdHealth, 100% of our revenue is generated from reducing your costs -- either by increasing the number of people in our crowdfunding community, or from negotiating with hospitals and doctors to dramatically reduce prices for the Crowd.

It's different, and it's definitely not insurance. But like we said, we think that's a really good thing! And we hope you see the difference, too.

**How is it a good thing that you cannot guarantee that all my bills will be paid?**

Well, if we were to guarantee payment, then we would be considered health insurance. (See above why we think being health insurance is a bad thing, for us and for you.)

But here is the oddity of insurance:

Regulators give insurance companies a green light to say they guarantee payment even though, according to the Kaiser Family Foundation, 40 million claims were denied in 2019. That's 17% of in-network claims from plans that are sold through healthcare.gov!

That means if you have a health plan through healthcare.gov, you have a nearly 1-in-5 chance of your claim being denied.

Resp. Ex. 1

Health insurers get away with guaranteeing coverage, but they aren't living up to their word. They make it sound like you can trust them, but in reality, they're leaving millions of Americans with huge, unexpected bills each year!

That's the opposite of what we stand for at CrowdHealth.

We're here for you, our Members, always; and we think that's a really, really good thing for us all.

---

Contact Us    FAQs    Blog and Media    Reviews    Careers    Clinicians          

CrowdHealth is a financial technology company, not a bank. Banking services are provided by Regent Bank, Member FDIC. FDIC insurance only covers failure of insured depository institutions. Certain conditions must be satisfied for pass-through FDIC deposit insurance to apply.

© CrowdHealth, Inc. All rights reserved.    Privacy Policy    Terms and Conditions

# EX 1.34









# Christian Healthcare Ministries

# GUIDELINES

Resp. Ex. 1

# Guidelines *2023v.1* *Effective date 01/01/23*

## Table of Contents

**I.  Christian Healthcare Ministries ............ 2**

A.  The heart of the ministry.................................... 2
B.  How health cost sharing works .......................... 2
C.  Statements of Beliefs .......................................... 4

**II.  Membership ...................................... 6**

A.  Membership qualifications ................................. 6
B.  Understanding membership units....................... 7
C.  Applying for membership.................................... 8
D.  Bring-a-Friend referral program...................... 10
E.  Member commitments....................................... 11
F.  When to contact CHM ....................................... 12
G.  Membership cancellation.................................. 12

**III.  Program participation.................... 14**

A.  Definition: Illness vs. incident ......................... 14
B.  Understanding program levels .......................... 15
C.  Catastrophic medical events............................. 19
D.  Switching program levels.................................. 20

**IV.  Pre-existing conditions................... 21**

A.  Definition: Pre-existing conditions................... 21
B.  Active vs. maintained conditions...................... 21
C.  Gold Schedule ................................................... 22
D.  Prayer Page ....................................................... 23
E.  Switching levels with
    pre-existing conditions ................................... 24

**V.  Understanding eligibility ................. 25**

A.  Selecting your healthcare providers................. 25
B.  Eligible medical expenses ................................. 25
C.  Provisional sharing ........................................... 27
D.  Motorized vehicle accidents ............................. 31
E.  Ineligible medical expenses.............................. 32
F.  Planning for ineligible costs............................. 35

**VI.  Submission of medical bills.............. 35**

A.  CHM is secondary to other payment sources ..... 36
B.  Medical bill sharing process ............................. 36
C.  The medical bill's journey ................................. 38
D.  Discounts and financial assistance ................... 39
E.  Paying providers after reimbursement .............. 40
F.  Reporting discounts after reimbursement ......... 40
G.  Stewardship and integrity................................. 41

**VII.  Specialized
        membership programs................... 42**

A.  Brother's Keeper................................................ 42
B.  Maternity (Gold level only)............................... 44
C.  CHM SeniorShare™ and
    Medicare-age members ................................... 48
D.  Groups.............................................................. 49
E.  Telemedicine .................................................... 50

**VIII.  CHM support teams ...................... 50**

A.  Provider Relations............................................. 50
B.  Eligibility Review.............................................. 51

**IX.  Disclosures ..................................... 51**

A.  Integrity and accountability.............................. 51
B.  Legal notices .................................................... 54
C.  Tax information ................................................. 55

**X.  Topical Index.................................... 56**

*While the ministry notifies in advance within a reasonable timeframe prior to any changes taking place to CHM's programs and policies, we encourage all CHM members and people interested in learning more about CHM to visit **chministries.org** for the most current information.*

**Important notice:** *Those who call the CHM office detailing their circumstances and asking if medical bills qualify will be given an opinion, not a decision. Bills cannot be authorized for CHM sharing over phone or email. If a member sends bills and details of a medical incident in writing, a decision will be sent by email or return mail. For more information on submitting bills to CHM, see section VI of the Guidelines or visit **chministries.org/stepbystep.***

# I.  Christian Healthcare Ministries

## A.  The heart of the ministry

Christian Healthcare Ministries (CHM) has empowered Christians to work together to share the burden of medical expenses since 1981. The powerful outcome of this harmonious relationship is that members have shared billions of dollars for medical bills while also keeping participation costs low. This efficient and effective means of health cost sharing allows members to focus on getting and staying well, and through it all, to have complete confidence that their medical bills will be satisfied based on their selected participation level.

The ministry's concept originated 2,000 years ago with the early Church, who "held all things in common" and followed the Apostles as they prioritized meeting the needs of the poor, the oppressed, and their Christian family. Jesus told His followers that the world would know they were His disciples by the way they loved one another (John 13:35 ESV). CHM members are an extension of that testimony as they carry one another's burdens.

Healthcare expenses can be among the most devastating costs known to families. Every year, thousands of individuals face financial ruin because of a major illness or accident. It doesn't have to be this way.

This is where CHM members truly shine—as they help carry the load for their brothers and sisters in Christ. Reflecting the scriptural values outlined in Acts 2 and 4 and in Galatians 6:2, **the mission of CHM is to glorify God, show Christian love, and experience God's presence as Christians share each other's medical bills**.

## B.  How health cost sharing works

Based on New Testament principles, CHM helps Christian families, churches, and ministries join together as the Body of Christ to share healthcare costs such as medical tests, maternity, hospitalization, and surgery. The ministry serves hundreds of thousands of members in all 50 states and internationally.

CHM is a non-profit health cost sharing ministry, not insurance. Participation is an expression of Christian faith—it's voluntary and doesn't require a contract. Instead, CHM members join the ministry as part of a biblical covenant through which each party desires to help the other.



CHM—a Better Business Bureau accredited charity—has a definable, accountable, and faithful framework. An independent Board of Directors governs CHM and controls its functions. CHM is a federally certified exemption to the individual mandate under the U.S. Affordable Care Act, and as such, is an eligible option for individuals and families under the national healthcare law.

Program costs are the same regardless of age, weight, health history, or geographical region. Christians can join any time throughout the year and membership can be effective immediately, as CHM has no waiting period. After reviewing the Guidelines, CHM members can select the medical doctors or hospitals they prefer; they aren't bound by an approved healthcare provider list, and treatment decisions are made between patient and physician.

CHM combines monthly membership gift amounts from Christians across the country and around the world, enabling ministry members to share medical bills sent in by their fellow members who have received medical treatment. CHM members share 100 percent of qualifying medical bills—that is, bills that are eligible under the ministry Guidelines. CHM staff follow the Guidelines because they serve to protect each ministry member and enable the body of Christ to continue to serve one another through the sharing of medical bills.

As monthly gifts flow through the ministry to bless fellow believers, members are strongly encouraged to lift each other up in prayer. Each month's billing statement includes a prayer request from a CHM member or family. The spiritual support program, Prayers Unceasing, provides members with an opportunity to send cards of encouragement and serves as a reminder to pray for the specific needs of others (James 5:6).

The faithfulness of CHM members has enabled CHM to encourage believers and share eligible medical bills since 1981. Our ministry model sets us apart. CHM members and staff pray with you and serve you—as Christians serving Christians.

**Incident occurs and you seek medical treatment**



**Request itemized bills and discounts from your provider; submit Sharing Request Packet to CHM**



**Eligible bills are processed and CHM sends you a check to pay your provider(s)**



How can we be sure our members will honor their commitment to carry each other's burdens?

**We point to our history:**



Since 1981 CHM members have exercised their faith and shared 100 percent of eligible medical bills.



**Our bill sharing model**

CHM provides a cost-effective, accountable, and faith-based framework to help fellow believers facing a health crisis. Likewise, brothers and sisters in Christ step in to help you in your time of need. Members' pre-set monthly financial gifts to CHM are the funds used to share each other's healthcare costs.

Learn more about the medical bill sharing process and see the complete explanation in section VI ("Submission of medical bills").

## C. Statements of Beliefs

### 1. Statement of Faith

**a.** We believe the Holy Bible to be the only inspired, trustworthy and true, without error Word of God (2 Timothy 3:16-17).

**b.** We believe there is only one God who eternally exists in three persons: Father, Son, and Holy Spirit (Matthew 28:19).

**c.** We believe Jesus Christ is God, in His virgin birth, in His sinless life, in His miracles, in His death that paid for our sin through His shed blood, in His bodily resurrection, in His ascension/rising up to the right hand of the Father, and in His personal return in power and glory (John 1:1; Matthew 1:18,25; Hebrews 4:15; Hebrews 9:15-22; 1 Corinthians 15:1-8; Acts 1:9-11; Hebrews 9:27-28).

**d.** We believe that acceptance of Jesus Christ and the corresponding renewal of the Holy Spirit are the only paths to salvation for lost/sinful men and women (John 3:16; John 5:24; Titus 3:3-7).

**e.** We believe in the present ministry of the Holy Spirit, who lives within and guides Christians so they are enabled to live godly lives (John 14:15-26; John 16:5-16; Ephesians 1:13-14).

**f.** We believe in eternal life, and that through belief in Jesus Christ as the Son of God, we spend eternity with the Lord in Heaven. We believe that in rejecting Jesus Christ as Lord and Savior, we receive eternal suffering in hell (Matthew 25:31-46; 1 Thessalonians 4:13-18).

**g.** We believe in the spiritual unity of believers in our Lord Jesus Christ, that all believers are members of His body, the Church (Philippians 2:1-4).

**h.** We believe God's design for sexual intimacy is to be expressed only within the context of marriage. God instituted marriage between one man and one woman as the foundation of the family and the basic structure of human society. For this reason, we believe that marriage is exclusively the union of one man and one woman (Genesis 2:24; Matthew 19:5-6; Mark 10:6-9; Romans 1:26-27; 1 Corinthians 6:9).

**i.** We believe that God created all human beings in His image. Therefore, we believe that human life is sacred from conception to its natural end; that we must honor the physical and spiritual needs of all people; following Christ's example, we believe that every person should be treated with love, dignity, and respect (Psalm 139:13; Isaiah 49:1; Jeremiah 1:5; Matthew 22:37-39; Romans 12:20-21; Galatians 6:10).

### 2. Doctrinal Disputes

If a dispute arises with regard to the doctrine and teachings of the Holy Bible, the Board of Directors is the organization's final interpreter of said doctrine and teachings, but any such interpretation shall not differ in any respect from this Constitution.

### 3. Statement of Gender and Sexuality

We believe that God wonderfully and immutably creates each person as male or female. These two distinct, complementary genders together reflect the image and nature of God (Gen. 1:26-27). We believe that rejection of one's biological sex is a rejection of the image of God within that person.

We believe that any form of sexual immorality (including adultery, fornication, homosexual behavior, bisexual conduct, bestiality, incest, and use of pornography) is sinful and offensive to God (Matt. 15:18-20; 1 Cor. 6:9-10).

We believe that in order to preserve the function and integrity of Christian Healthcare Ministries as a healthcare sharing ministry and to provide a biblical role model to the staff and membership of Christian Healthcare Ministries, it's imperative that all persons employed by Christian Healthcare Ministries in any capacity, or those who are members of Christian Healthcare Ministries, or who serve as volunteers, agree to and abide by this Statement on Gender and Sexuality (Matt. 5:16; Phil. 2:14-16; 1 Thess. 5:22).

We believe that God offers redemption and restoration to all who confess and forsake their sin, seeking His mercy and forgiveness through Jesus Christ (Acts 3:19-21; Rom. 10:9-10; 1 Cor. 6:9-11).

We believe that every person must be afforded compassion, love, kindness, respect, and dignity (Mark 12:28-31; Luke 6:31). Hateful and harassing behavior or attitudes directed toward any individual are to be repudiated and are not in accord with Scripture nor the doctrines of Christian Healthcare Ministries, Inc.





*Those who call the CHM office detailing their circumstances and asking if medical bills qualify will be given an opinion, not a decision. Medical bills cannot be authorized for CHM sharing over the phone or by email inquiry.*

Resp. Ex. 1

*If a member sends bills and details of a medical incident in writing, a decision will be sent by email or return mail. For more information on submitting bills to CHM, see section VI of the Guidelines or visit* chministries.org/stepbystep.



Manges family
*Pennsylvania*

## II.  Membership

### A.  Membership qualifications

Christians are free to join the ministry regardless of age, weight, geographic location, or health history. The qualification requirements for membership in CHM—a body of believers who have agreed to share the costs of one another's healthcare expenses—are simple.

#### 1.  Personal testimony

To be a CHM member and to have medical bills shared with other members, participants must

a.  live a Christian lifestyle consistent with CHM's Statements of Beliefs,

b.  attend worship regularly as health permits (Hebrews 10:25), *-and-*

c.  actively follow the teachings of the New Testament in its entirety. *

\* *CHM members must abstain from the following activity: use of any tobacco. nicotine, smoking device, or substitutionary smoking device (including but not limited to cigarettes, cigars, pipes, herbal cigarettes, e-cigarettes, vape pens, etc.); illegal use of drugs; and sexual immorality (as defined in the Scriptures and expressed in CHM's Statements of Beliefs). Additionally, members must follow biblical principles with respect to the use of alcohol.*

#### 2.  Contact information

Participants must have either a U.S. mailing address or an active email address and consistent, reliable, secure internet service to receive documents with confidential information. CHM cannot send funds outside of the U.S. See Guidelines II.A.3 and V.B.2 for additional information.

#### 3.  Members serving outside the U.S.

Missionaries and members serving abroad are welcome to participate in the ministry. However, please note the following requirements:

a.  CHM cannot send any correspondence outside the U.S. If you don't have a U.S. mailing address, please designate a relative, friend, or financial and medical power of attorney to receive CHM funds on your behalf.

b.  Members must translate medical bills into English and convert foreign currency to U.S. dollars.

c.  Refer to Guideline V.B.2 for additional information about medical bills incurred outside of the U.S.

Resp. Ex. 1

#### 4.  Adopted children

Upon the adoption or the assumption of legal custody of a child by a CHM member, that child can be included in the CHM membership.

The following criteria will apply to the sharing of medical bills for adopted children:

a.  If other funding sources are responsible, willing, or available to pay the adopted child's medical bills, all such sources must be exhausted before medical bills for that child are eligible for sharing.

b.  Medical bills for the birth of an adopted child are not eligible for sharing.

c.  For information about adopted children with birth defects or congenital conditions diagnosed *after* the adoption, please review Guideline V.C.9.b.

d.  *Adopting children with disabilities:* When members are considering the adoption of one or more children with pre-existing illnesses or disabilities, CHM strongly advises the prospective parents to make sure they fully understand the CHM Guidelines regarding the sharing of pre-existing conditions *prior to* adopting. Refer to Section IV for detailed information on pre-existing conditions.

#### 5.  Members age 65 and older

Please see Guideline VII.C for specific information regarding how CHM's SeniorShare™ cost reduction can be applied to Medicare-age members (individuals 65 and older). Sharing limitations will apply for members aged 65 and older who do not participate in Medicare parts A and B.

### B.  Understanding membership units

CHM uses a unit system; a unit is defined as a participating individual(s) within a membership.

#### 1.  Individual membership

A membership may consist of one individual.

#### 2.  Family membership

An individual, their spouse, and any dependent children can participate on the same membership (Guideline I.C.1.h).

a.  A family membership has a minimum of two units and a maximum of three units.

b.  All dependent children on a membership are

## Examples of units

A unit is defined as a participating individual(s) within a membership. Below are examples of how units work. Each unit may participate at a different program level.

**1 UNIT**

**One individual**

**2 UNITS**

**Husband and wife**


**OR**
**Adult plus dependent child(ren)**

**OR**
**Two or more children without a parent on the membership**

**3 UNITS**
**Husband, wife, and dependent child(ren)**

combined as a single unit as long as an adult is actively participating on the membership.

**c.** Without an adult on the membership, two or more children must participate as two units.

**d.** Individual units within the same membership may participate at different program levels. Refer to Guideline III.B for detailed information about CHM program levels.

**3. Adult children**

**a.** Adult children may remain on their parent's membership if they meet the following criteria:

**1)** They must be Christians living by biblical principles and embrace the CHM Statements of Beliefs.

**2)** They must be unmarried.

**3)** They must be considered a dependent which is defined below as a person who is:

**i.** Under age 19 at the end of the year -or-

**ii.** Under age 26 and a full-time student for at least five months of the year -or-

**iii.** Disabled

**4)** *Parents are required to submit a signed CHM Dependent Form that must be renewed annually.* Forms will be issued prior to a child's 19th birthday and prior to subsequent birthdays thereafter.

**b.** To avoid a membership gap, children who are no longer legal dependents and wish to transition to their own membership should take the following steps:

**1)** Notify CHM of intent to begin an individual membership within 30 days of becoming ineligible to remain on their parent's membership. Contact Member Services by phone at 800-791-6225 ext. 5993 or email at **info@chministries.org**.

**2)** Complete and submit a CHM membership application and the included Checklist of Understanding.

**c.** Immediate transition to an individual membership provides continuous participation without a gap, which is important in the case of pre-existing conditions. Refer to Guideline VI for detailed information about pre-existing conditions.

## C.  Applying for membership

When considering CHM membership, it's important to understand the ministry and how it operates. Prospective members should read the Guidelines thoroughly and understand CHM's Statements of Beliefs (Guideline I.C) before joining.

**1. When to join**

Membership can begin any time throughout the year.

**2. How to join**

Complete and submit the Member Application—including the Checklist of Understanding, featured on the previous page—in one of the following ways:

**a. Online**: **join.chministries.org**

**b. Mail**: 127 Hazelwood Ave., Barberton, OH 44203

**c. Fax**: 330-798-6100

**3. After the selected membership start date**

Members will receive the following communications:

**a. Welcome Packet**—arrives within several weeks of submitting the application and will include the following items:

**1)** Membership cards—an individual card for each membership participant listed on the application.

**2)** Instructions for Member Portal registration (**portal.chministries.org**)

**3)** CHM Guidelines booklet

**4)** Tips for making the most of CHM membership

**5)** Resources to use when interacting with healthcare providers

**b. Member Gift Form**—CHM's monthly billing statement with a letter from the ministry leadership detailing important ministry highlights. Details included:

**1)** Program gift amounts and account balance (Financial gifts are due by the 10th of each month; gift amounts received after the 10th of the month will not be reflected on the next statement.)

**2)** A member prayer request through the Prayers Unceasing program.

**3)** Member Portal access code for the membership.

**Maryland exception:** To remain in compliance with state laws, CHM membership for Maryland residents is member-to-member. As such, Maryland members cannot make payments through the Member Portal. Please see **chministries.org/chm-membership-for-maryland-members** or contact our Member Services department at 800-791-6225 for more information about Maryland membership.



**What is the Checklist of Understanding?** Many U.S. states legally require completion of this document in order for CHM to share members' medical bills. It confirms that members fully understand that CHM is a group of Christians who voluntarily assist each other with medical costs in accordance with the CHM Guidelines. It verifies that CHM members know that CHM is a health cost sharing ministry, not insurance, and carries out the command of Galatians 6:2 by helping Christians to meet one another's medical costs.



**Prayers Unceasing: A unique way to spiritually uplift your brothers and sisters in Christ** Through this program, you can encourage CHM members by lifting them up in prayer and sending them cards, letters, or emails of encouragement. Members receive a name and contact information each month in their Monthly Gift Form of someone who has requested prayer. It's an opportunity to put your faith into action.

## Three reasons why Bring-a-Friend helps everybody:



**HEART:** Something that sets CHM apart is the love that members have for each other, as evidenced by the encouraging cards, letters, and emails sent across the country by members to others who are going through difficult times.



**HANDS:** As Christians, we are called to be the hands of Jesus! One way to do that is by supporting your brothers and sisters in Christ through their medical difficulties.



**FEET:** "…beautiful are the feet of those who preach the good news" (Rom. 10:15). CHM enables Christian individuals, families, ministries, and missionaries to not worry about their healthcare. Instead, they focus on the life God has called them to live.

---

**c.** *Heartfelt* **Magazine**—CHM's monthly publication in which members can find ministry updates, testimonials, health information, CHM's Prayer Page listings, and more. An online version is available anytime at **chministries.org/magazine**.

Members may choose to receive *Heartfelt* Magazine via email by visiting **info.chministries.org/heartfelt**. To sign up for DirectGift and eBilling, members must contact CHM at 800-791-6225.

**4. Using the Member Portal**

The CHM Member Portal is a vital tool for members as they securely manage their membership, make payments, update personal information, and submit medical incidents for sharing.

**a.** Members can activate their portal accounts after the membership start date.

**b.** Registration requires
   **1)** an assigned portal access code* found on the Monthly Gift Form, *-and-*
   **2)** the six-digit CHM member number located on both the CHM membership card (included with the Welcome Packet) and on the Monthly Gift Form.

**c.** Step-by-step directions for portal registration are included in the Welcome Packet or found online at **portal.chministries.org**.

**d.** Members may contact Member Services at 800-791-6225 ext. 5993 for further assistance.

*\* Members submitting an online application will receive a confirmation email with a seven-digit confirmation number. This is **not** the portal access code and will not work for portal registration.*

## D.  Bring-a-Friend referral program

Bring-a-Friend is a referral program in which members are encouraged to invite Christian friends, neighbors, and extended family to join CHM. Referring others to CHM strengthens the ministry, rewards existing members, and blesses new members with all the advantages of CHM membership.

**1.** After a referral pays for three months of CHM membership, the referring member will automatically receive a credit amount corresponding to the new member's selected level.

**2.** Members can earn up to 16 credits per year.

**3.** Credits can be applied toward the monthly gift amount.

---

Alternatively, when an eligible incident is submitted, credit balance available on a membership can be used to offset annual Personal Responsibility.

**4.** Every member has a unique referral link available through CHM's Member Portal; using this link is the best way to receive proper credit for referrals.

**5.** Through the Bring-a-Friend dashboard, members can view credits, share their referral link, track referral activity, and access helpful digital resources.

**6. Important note**: Bring-a-Friend credits are not intended to be applied to or received by spouses or by adult children transitioning from a parent's membership to their own.

*\* Certain state-mandated limitations may apply. Please visit "How it works" on the Bring-a-Friend page at* **chministries.org/program-costs/bring-a-friend-referral-program** *for information.*

## E.  Member commitments

CHM is dedicated to serving members and fostering a covenant relationship. Members rely on the ministry to be faithful and responsible, and CHM counts on members to fulfill their membership commitments. Reading and agreeing to the following expectations will help you and your fellow members to effectively bear one another's healthcare burdens.

**1.** Pray for CHM members and the ministry.

**2.** Read and understand the Guidelines.

**3.** Stay current on monthly financial gifts.

**4.** Read *all* CHM communications pieces for ministry information and updates. Such items include billing statements, Member Gift letters, *Heartfelt* Magazine/eMag, emails, portal notifications, and special mailings. Visit **chministries.org** for additional information.

**5.** Complete and return all requested forms and update required forms as necessary.

**6.** Report healthcare provider discounts or financial assistance as provision is secured.

**7.** Pay appropriate providers within 30 days after receiving CHM reimbursement checks.

**8.** Respect the privacy of fellow members. Prayer requests should not be shared outside the ministry and soliciting of any kind is not permitted.

**9.** Contact CHM with membership and eligibility questions as they arise.

**10.** Avoid any fraudulent activities. If a person engages in one or more of the following actions, that person may be deemed to have committed fraud against this ministry:

   **a.** The forgery or unauthorized material alteration of any document used in applying for membership or in the submission of a medical bill for sharing.

   **b.** The material misrepresentation to us, or the making of false statements to us, concerning any person's medical condition at the time of application for membership.

   **c.** The material misrepresentation to us, or the making of false statements to us, concerning the circumstances of an incident, or the deliberate submission of a false need for sharing.

   **d.** The offering of anything of material value to one or more ministry employees in exchange for special consideration in the processing of an application for membership, the submission of medical bills for sharing, or the return of funds due back to the ministry.

   **e.** The forgery, alteration, or improper negotiation of one or more of the ministry's checks, or the conversion of ministry funds intended for a medical provider to a person's personal use.

**f.** The improper use of bank account information, routing numbers, or similar information connected with another member for a person's own financial gain. While this is a remote and unlikely possibility for most CHM members, the ministry cannot permit individuals who might attempt this kind of identity theft to remain as members.

**g.** If CHM deems a person to have engaged in fraud against this ministry, that person's membership may be immediately canceled without notice to that person at CHM's discretion.

## F. When to contact CHM

CHM exists to assist Christians as they share each other's medical expenses; effective communication will help ministry staff as they diligently work to serve you.

Select membership changes can be completed on the Member Portal (**portal.chministries.org**). Member Services is also available to assist members by phone at 800-791-6225 ext. 5993 during the business hours of 9 a.m. to 5 p.m. EST, or by email (**info@chministries.org**).

Please contact CHM with any of the following membership updates:

**1.** Contact information—address, phone number, or email

**2.** Personal information—marital status, name changes, or date of birth

**3.** Addition or removal of members—due to marriage, birth, adoption, death, or changes regarding dependents

**4.** Anticipated or current maternity events—contact the Maternity Support Team to learn how to qualify for a reduction in Maternity Personal Responsibility

**5.** Addition of individuals who are authorized to discuss or make changes to the membership

**6.** Payment information—addition of DirectGift or eBilling; updates of credit card number, bank account information, or payment withdrawal dates

**7.** Program level changes

**8.** Transitioning of adult children to individual memberships

**9.** Discounts received after medical bill submission or reimbursement

**10.** Membership cancellation

## G. Membership cancellation

CHM understands that life circumstances can change, and members may need to cancel their membership for various reasons. If this need arises, please note the following details:

**1.** Eligible medical costs cannot be shared unless the membership is continuous and current with all financial gifts through the entire sharing process.

**2.** Upon cancellation, medical bills previously incurred but not yet submitted or shared will not be eligible for reimbursement.

**3.** Members intending to discontinue their membership should allow 30 days for the change to take effect.

**4.** A refund cannot be issued for the month of cancellation or any previous months.

**5.** If a membership is three or more months delinquent, CHM considers that delinquency as the member's choice to no longer participate in this ministry. Members will receive verification of their cancellation; the membership will be canceled as of the last day of the last month in which their full gift amount was submitted.



**30 DAYS**

Notice before changes take effect

**6.** If a membership is delinquently dropped or terminated by CHM for any reason, medical bills will not be eligible for sharing.

**7.** Members seeking to rejoin CHM after cancellation will receive a new start date, and any active medical conditions as of that start date will be considered pre-existing and therefore ineligible for sharing. See Section IV for detailed information about pre-existing conditions.

**8.** Memberships for those who join CHM and never pay any financial gifts will be automatically canceled after three months and the stipulations included in this section will apply.

**9.** Members who intend to end their membership or who are unable to continue sending gifts due to financial hardship should contact Member Services at 800-791-6225 ext. 5993 to inform CHM.

To read CHM's privacy and security policies, please visit **chministries.org/policies**.



Burton family
*Arizona*



*Those who call the CHM office detailing their circumstances and asking if medical bills qualify will be given an opinion, not a decision. Medical bills cannot be authorized for CHM sharing over the phone or by email inquiry.*

Resp. Ex. 1

*If a member sends bills and details of a medical incident in writing, a decision will be sent by email or return mail. For more information on submitting bills to CHM, see section VI of the Guidelines or visit* **chministries.org/stepbystep**.



Lim family | *Missionaries in Singapore*

| Gallbladder Pain (Illness) | | | | |
|---|---|---|---|---|
| **Stomach pain** (Incident #1) | MORE THAN | **Gallstones** (Incident #2) | MORE THAN | **Gallbladder removal** (Incident #3) |
| ER visit | **90 DAYS** | Office visit (including blood work and X-ray)* | **90 DAYS** | Gallbladder surgery |
| Prescriptions * | | ER visit (including anesthesia, labs, and radiology) | | Follow-up visit * |
| | BETWEEN ELIGIBLE EXPENSES | | BETWEEN ELIGIBLE EXPENSES | |

The member must meet a separate Qualifying Amount for each incident according to level of participation.

* These services are not eligible for Silver and Bronze members.

## III. Program participation

### A. Definition: Illness vs. incident

Two words members hear often when interacting with CHM are *illness* and *incident*. Knowing the difference between these key terms is essential as you submit your eligible bills when medical events arise.

**1. Illness**

An illness is a disease, injury, or medical condition that has been identified and can be treated once or multiple times.

**a.** The maximum sharing limit per illness is $125,000.
**b.** Sharing limits can be extended up to $1 million or more per illness by participation in the Brother's Keeper program (Guidelines III.C and VII.A).

**2. Incident**

An incident is tied to a specific time period; you can have more than one incident for any given illness (see example provided). An incident includes signs, symptoms, testing, diagnosis, or treatment for a particular condition and its complications. An incident continues until one of the following statements applies:

**a.** The member's medical condition is cured according to official medical records.
**b.** Treatment is at a routine maintenance level.
**c.** You experience 90 days without any kind of testing or treatment for that particular condition, and your medical provider states that no further testing or treatment is needed.

If a member experiences a 90-day gap between testing or treatment that is eligible *per the member's selected program level,* any future bills will be considered a separate incident. Guideline III.B.3 explains how an incident qualifies for sharing.

Resp. Ex. 1

### B. Understanding program levels

CHM offers three levels of participation: Gold, Silver, and Bronze. It's best to review and understand what each level offers before joining the ministry. Membership at **Gold level with Brother's Keeper** provision offers the highest level of health cost support and provides numerous advantages for those who incur medical expenses. Refer to Guidelines III.C and VII.A for details regarding Brother's Keeper participation.



**1. Bronze and Silver level sharing provision includes:**

**a.** Inpatient and outpatient hospital services
**b.** Surgery performed at medical facilities such as, but not limited to, hospitals and ambulatory surgical centers



**2. Gold level sharing provision includes:**

**a.** Inpatient and outpatient hospital services
**b.** Urgent care
**c.** Incident-related office visits and prescriptions
**d.** Independent lab work and radiology
**e.** Physical therapy —limitations may apply (Guideline V.C.3)
**f.** Maternity—eligible for sharing on Gold level only (Guideline VII.B)
**g.** Home healthcare—up to 45 visits for medical services per eligible injury or sickness
**h.** CHM SeniorShare™ gift reduction—available to Gold members age 65 and older (Guideline VII.C.1)

**3. Qualifying Amount per Incident**

Before an incident can be submitted to CHM for sharing, it must satisfy the **Qualifying Amount per Incident** based on the member's selected participation level. Qualifying amounts are as follows:

- **Gold level**—$1,000 per incident
- **Silver level**—$2,500 per incident
- **Bronze level**—$5,000 per incident
- **SeniorShare**—$500 per incident

Members may submit incidents for sharing consideration once the full cost of eligible medical services reaches the qualifying amount for their participation level. It's important to note that only incident-related medical expenses can be combined to reach the Qualifying Amount per Incident. See Guideline III.A.2 for definition of an incident.

After 90 days pass in which no eligible expenses are incurred, the cost of additional treatment must meet a new qualifying amount before expenses can be submitted for sharing.

**4. Personal Responsibility**

Each sharing level has an assigned Personal Responsibility per unit, per year*. This amount must be satisfied before members can receive reimbursement for eligible medical expenses.

- **Gold level**—$1,000
- **Silver level**—$2,500
- **Bronze level**—$5,000
- **SeniorShare**—$0



*Start of calendar year*

**Joe breaks his arm**
**$1,500**
in total eligible medical costs
①

**Joe receives**
**$1,000**
in discounts
②

**Joe pays**
**$500**
toward his Personal Responsibility
③

**Joe's sinus infection treatment is under his qualifying amount.**
**He pays**
**$75**
out-of-pocket
④

**Joe gets a concussion**
**$2,000**
in total eligible treatment costs
⑤

**Joe receives**
**$500**
in discounts
⑥

**Joe pays his remaining**
**$500**
Personal Responsibility
⑦

**CHM shares**
**$1,000**
for Joe's eligible concussion expenses
⑧

*Calendar year end*

**CHM shares**
**100%**
of all eligible incidents since Gold Personal Responsibility is met
⑨

**$1,000**
**GOLD LEVEL**
Personal Responsibility & Qualifying Amount per Incident

Incident 1 (broken arm)  Incident 2 (sinus infection)  Incident 3 (concussion)  ALL remaining incidents

The Personal Responsibility for each unit is met through incident submissions for members participating on that unit. See Guideline III.B.4 for information on how incidents qualify for submission.

For each unit, the annual Personal Responsibility must be satisfied before medical bills may be considered for sharing. The following considerations apply to fulfillment of the Personal Responsibility:

**a.** After discounts are applied to eligible medical bills, the remaining charges are credited toward the unit's annual Personal Responsibility.

**b.** Any charges which are ineligible per the member's selected program level cannot contribute toward the fulfillment of that unit's assigned Personal Responsibility.

**c.** Personal Responsibility may be satisfied through a single incident or a combination of qualified incidents.

Personal Responsibility is a per unit amount; therefore, qualifying incidents for all children included in the unit can be combined to satisfy this annual per unit requirement.

*A separate Maternity Personal Responsibility of $1,500 is required for each eligible pregnancy. See Guideline VII.B.2 for additional information.

**5. Increase sharing support through Brother's Keeper**

The maximum lifetime sharing limit per illness is $125,000 for all program levels. Electing to participate in CHM's Brother's Keeper program increases this limit and safeguards members against catastrophic illnesses. Refer to Guideline Section VII.A for details and advantages of Brother's Keeper participation.

**6. Program level comparison**

While the ministry is committed to notifying members within a reasonable timeframe prior to necessary changes taking place, members can visit **chministries.org** for current ministry information and program updates.





Those who call the CHM office detailing their circumstances and asking if medical bills qualify will be given an opinion, not a decision. Medical bills cannot be authorized for CHM sharing over the phone or by email inquiry.

Resp. Ex. 1

If a member sends bills and details of a medical incident in writing, a decision will be sent by email or return mail. For more information on submitting bills to CHM, see section VI of the Guidelines or visit **chministries.org/stepbystep**.

| CHM program features | Gold  | Silver | Bronze |
|---|---|---|---|
| **Participation level gift amounts per unit** | Please visit chministries.org/programs-costs for current costs. | | |
| **CHM SeniorShare™ reduction** (Guideline VII.C.1) | ✓ | NA | NA |
| **Maternity** Per-pregnancy Personal Responsibility of $1,500 is applied (Guideline VII.B) | ✓ | NA | NA |
| **Qualifying Amount per Incident** | $1,000 | $2,500 | $5,000 |
| **Personal Responsibility,** per unit, per year | $1,000 | $2,500 | $5,000 |
| **Regular sharing lifetime max, per illness** | $125,000 | $125,000 | $125,000 |
| **Brother's Keeper provision, per illness** Members must add program prior to experiencing signs and symptoms (Guideline VII.A) | Unlimited sharing | Additional $100,000 per year, accruing up to $1 million | |
| **Emergency room visits** | ✓ | ✓ | ✓ |
| **Inpatient hospitalization** | ✓ | ✓ | ✓ |
| **Outpatient hospital services** | ✓ | ✓ | ✓ |
| **Surgical procedures** | ✓ | ✓ | ✓ |
| **Free access to CHM's featured telemedicine provider** (Guideline VII.E) | ✓ | ✓ | ✓ |
| **Urgent care visits** | ✓ | | |
| **Independent radiology/laboratory testing** | ✓ | | |
| **Office visits** | ✓ | | |
| **Prescription medications** non-maintenance, incident-related (Guideline V.C.1) | ✓ | | |
| **Physical therapy** up to 45 sessions per injury or sickness (Guideline V.C.3) | ✓ | | |
| **Home healthcare** up to 45 visits for medical services per eligible injury or sickness | ✓ | | |
| **Medical transportation** must meet eligibility criteria (Guideline V.C.2) | ✓ | | |
| **Life-sustaining durable medical equipment** (Guideline V.C.6) | ✓ | | |

Resp. Ex. 1

***Note:*** *Each individual unit within the same membership may participate at different program levels. For example, a two-unit membership can have one unit on Gold and one unit on Silver. All dependent children participate as a single unit as long as an adult is actively participating on the membership (Guideline II.B.2.b).*

## C. Catastrophic medical events

No one anticipates a catastrophic illness or injury. Brother's Keeper is CHM's program that enables members to meet medical bills exceeding the $125,000 maximum lifetime limit per illness. Adding Brother's Keeper at the time of joining CHM or prior to a medical event is one of the most valuable decisions members can make.

**1. Brother's Keeper basics**

Members can add Brother's Keeper to individual membership units anytime throughout the year. For illnesses exceeding $125,000 to be considered for sharing, members must have joined Brother's Keeper prior to experiencing any signs, symptoms, testing, or treatment for that illness.



**a. Gold members** participating in Brother's Keeper are eligible for *unlimited* cost support per illness for eligible medical expenses.

**b. Silver and Bronze members** receive an additional $100,000 of cost support per illness, per year. As long as members continually participate in Brother's Keeper, on each anniversary of the member's join date they'll receive an additional $100,000 of assistance, accruing up to $1 million per illness for eligible medical expenses.

***Important:*** Brother's Keeper does not include sharing provision for congenital conditions or birth defects. See Guideline V.C.9 for information regarding congenital birth defects.



**2. Brother's Keeper program cost**

Brother's Keeper participants contribute a designated gift amount (per unit) to CHM. These amounts are shared with other Brother's Keeper participants who have accrued medical bills exceeding $125,000 per illness. Please see Brother's Keeper gift amounts at **chministries.org/programs-costs**.

**3.** See Guideline Section VII.A for detailed information about how Brother's Keeper works as a complement to CHM program levels.

Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 481 of 547

## D.  Switching program levels

Members may switch levels at any time; however, it's important to review the following information before making a level change.

*Members should allow 30 days for membership change(s) to take effect. Program level switch dates will be effective as of the first of the month which follows the request. Switching levels may impact outstanding Personal Responsibility amounts.*

**30 DAYS**

Notice before changes take effect

**1.  Switching to a lower level**

When a member switches to a lower sharing level, all medical bills will be shared at that lower level regardless of when medical bills were submitted or incurred.

**2.  Switching from Bronze to Silver**

a.  All illnesses that begin with signs, symptoms, testing, or treatment on Bronze level will remain at the Bronze level for the lifetime of the membership.

b.  New illnesses with signs, symptoms, testing, or treatment beginning after the Silver level start date will be considered for sharing at the Silver level.

**3.  Switching to Gold**

a.  Once an illness begins with signs, symptoms, testing, or treatment at a lower level, it will remain at that level for the lifetime of the membership. This applies regardless of whether medical bills have been previously submitted for sharing. Medical records may be requested.

b.  New illnesses with signs, symptoms, testing, or treatment beginning after the Gold level start date will be considered for sharing at Gold level.

## IV.  Pre-existing conditions

## A.  Definition: Pre-existing conditions

CHM offers two programs for the sharing of pre-existing conditions: the Gold Schedule and the Prayer Page. In order to understand how each program works, it's important to define what qualifies as a pre-existing condition.



Have you talked to a medical professional?



Have you had signs, symptoms, treatment, or testing?



Have you taken a prescription?

**1.  Pre-existing condition:** any medical condition for which a member experiences signs, symptoms, testing, or treatment (routine and/or maintenance medications included) before joining CHM, regardless of whether the member has received a diagnosis.

**2.  A condition is no longer considered pre-existing if**

a.  you have experienced one year without signs, symptoms, or treatment; *-and-*

b.  you are not on a maintenance medication regimen for that condition; *-and-*

c.  it's documented by your official medical records.

**3.  Cancer is no longer a pre-existing condition if**

a.  your doctor has pronounced you cancer-free or cured, *-and-*

b.  you have gone five years without any signs, symptoms, treatment, or testing (other than routine follow-up appointments).

**4.  Medical bills considered for sharing on CHM's programs for pre-existing conditions must also follow all CHM Guidelines for sharing, including participation level criteria.**

## B.  Active vs. maintained conditions

CHM distinguishes between two types of pre-existing conditions: active and maintained. When a member joins CHM with a pre-existing condition, that condition must be considered maintained to qualify for sharing. To make this determination, CHM applies the following criteria:

**1.  A condition is considered active and medical bills will not be eligible for sharing if**

a.  members have experienced any signs or symptoms either before or at the time of joining CHM;  *-and/or-*

b.  the condition actively needs testing or treatment other than maintenance (routine) medications, regardless of whether or not they received a diagnosis.

Resp. Ex. 1

**2. A condition is considered maintained when**

    **a.** at least 90 days have passed without the patient undergoing testing or treatment,

    **b.** their medical provider states that no further testing or treatment is needed, *-and-*

    **c.** medical records show that the patient is cured or on a maintenance treatment regimen.

*Important: If you've experienced a medical condition prior to joining CHM, including but not limited to those on the following list, CHM may request medical records to determine whether related expenses can be shared as a maintained pre-existing condition.*

| Non-exhaustive list of pre-existing conditions that may be eligible for sharing (Medical records may be requested.) | | |
| --- | --- | --- |
| Irritable bowel syndrome (IBS) | Kidney disorders | Heart conditions (stents, pacemakers, medications, etc.) |
| Diabetes | Bunions | High blood pressure |
| Thyroid issues | Crohn's disease | Arthritis |
| Joint pain | Glaucoma | High cholesterol |
| Cataracts | Cancer | Skin Disorders |
| Asthma | Epilepsy | Congenital conditions* |
| Back or neck pain | Menorrhagia | Carpal tunnel |

*\*See Guideline V.C.9 for detailed information regarding sharing for congenital conditions.*



## C. Gold Schedule

Gold level members receive assistance with eligible medical bills for **maintained pre-existing conditions** (Guideline IV.B.2) according to the following schedule:

**1. In the first year of membership**, bills incurred for a pre-existing condition are eligible for sharing up to $15,000.

**2. In the first two years of membership**, bills incurred for a pre-existing condition are eligible for sharing up to $25,000 ($15,000 during the first year plus $10,000 during the second year).

**3. In the first three years of membership**, bills incurred for a pre-existing condition are eligible for sharing up to $50,000 ($15,000 during the first year plus $10,000 during the second year plus $25,000 during the third year).

**4. After the third year of membership**, the condition is no longer considered pre-existing and is eligible for regular sharing.

***Note:*** *Funds added annually can only be applied to medical expenses incurred after each Gold Schedule anniversary date; they cannot be applied to previously incurred bills.*

Eligible medical expenses incurred during the first three years of membership that exceed the schedule limits for Gold members will be considered for sharing on CHM's Prayer Page.

## D. Prayer Page

The Prayer Page is a Spirit-led program that enables the sharing of eligible medical bills for maintained pre-existing conditions.

Members fund the program as they voluntarily contribute donations above and beyond their monthly gift amounts to provide additional support to members with maintained pre-existing conditions.

The Prayer Page listing is updated monthly in *Heartfelt* Magazine. Members give CHM permission to include their names, addresses, condition summaries, and current donation amounts.

**1. Prayer Page participants**



    **a. Silver and Bronze members**

    The Prayer Page program enables sharing for Silver or Bronze members with eligible incidents determined to be maintained pre-existing conditions.



    **b. Gold members**

    Eligible medical bills exceeding the Gold Schedule limits described in Guideline IV.C qualify for sharing through the Prayer Page.

    **c.** For illnesses without Brother's Keeper provision, the maximum sharing limit of $125,000 will apply.

    **d.** All CHM Guidelines apply to medical expenses shared on the Prayer Page.

**2. How to contribute**

    **a. Financially**

    CHM members are encouraged to give to Prayer Page needs as they feel led. Members can give a general donation to be disbursed by CHM staff among members currently on the list. *Prayer Page donations qualify as tax-deductible charitable contributions.*

    **b. Spiritually**

    Members are invited to send cards and notes of encouragement to fellow members listed on the Prayer Page. Recipients frequently testify of the blessings of having medical expenses and spiritual needs met through the donations and prayers of CHM members. These testimonials are featured often on the CHM website (**chministries.org/testimonials**) and in *Heartfelt* Magazine.

To learn more about the Prayer Page, call 800-791-6225 or email **prayerpage@chministries.org.**



> Members from across the country prayed for Mallory's healing and sent her encouraging cards and letters. Someone even mailed her a handmade stuffed animal!

The generosity of "strangers" has left me in awe—but it just goes to show that we aren't strangers at all.

We're brothers and sisters connected through our Heavenly Father.

*– Cassie Millburn, Virginia*

Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado    pg 483 of 547

## E. Switching levels with pre-existing conditions

Switching participation levels may have an impact on the sharing of current or ongoing medical expenses for pre-existing conditions.

Please read the following about incident and illness eligibility prior to considering switching membership levels.

**1. Switching to a lower level**

When a member switches to a lower sharing level, all eligible medical bills for a maintained pre-existing condition will be considered for sharing on the Prayer Page at the lower level regardless of when medical bills were submitted or incurred.

**2. Switching from Bronze to Silver**

**a.** All pre-existing illnesses previously shared on Bronze level will continue sharing at the Bronze level for the lifetime of the membership.

**b.** New illnesses with signs, symptoms, testing, or treatment beginning after the Silver level start date will be considered for regular sharing at the Silver level.

**3. Switching to Gold**

**a.** Once an illness begins with signs, symptoms, testing, or treatment at a lower level, it will remain at that level for the lifetime of the membership, ***or*** until the member is cured and one year free of signs, symptoms, and treatment (including medications). This applies regardless of whether medical bills previously were submitted for sharing. Medical records may be requested.

**b.** New illnesses with signs, symptoms, testing, or treatment beginning after the Gold level start date will be considered for sharing at Gold level.

*Members should allow 30 days for membership change(s) to take effect. Program level switch dates will be effective as of the first of the month which follows the request. Switching levels may impact outstanding Personal Responsibility amounts.*



**30 DAYS**

Notice before changes take effect



Resp. Ex. 1

## V. Understanding eligibility

### A. Selecting your healthcare providers

CHM enables members to have the flexibility of selecting their own healthcare providers. There is no required network; however, members should select healthcare providers who offer self-pay discounts, fair prices, and reliable service.

CHM shares the costs of traditional medical treatment ordered or administered by medical doctors according to CHM Guidelines and membership level.

When interacting with healthcare providers:

**1.** Referrals are not typically required. *(Refer to Guidelines V.C.3 and V.C.7 for exceptions.)*

**2.** Present yourself as a self-pay patient. Show your membership card to acknowledge that you participate in Christian Healthcare Ministries.

**3.** Request itemized medical bills (Guideline VI.B.2.b).

**4.** Ask for discounts and apply for financial aid.

**5.** Arrange for a monthly payment plan, if necessary, until CHM completes the medical bill sharing process.

**6.** Pay providers within 30 days of receiving your reimbursement check from CHM.

### B. Eligible medical expenses

CHM has established the following eligibility Guidelines to explain which medical expenses qualify for sharing by ministry members.

**1. Eligibility requirements**

CHM members share medical expenses for healthcare procedures that are

**a.** generally accepted by the medical community; *-and-*

**b.** researched and published in reputable medical journals subject to peer review; *-and-*

**c.** widely understood and accepted as mainstream medical treatment; *-and-*

**d.** have the procedural (CPT) codes and/or description of services rendered.

**2. Medical bills incurred outside the U.S.**

**a.** CHM will share medical bills from foreign healthcare providers for members who are serving in a foreign country or traveling outside the country. ***Note:*** *Expenses incurred by members who choose to travel outside of the country for the purpose of undergoing medical testing or treatment are ineligible for sharing (Guideline V.E.43).*

**b.** Medical expenses for foreign providers will be authorized in accordance with the eligibility requirements outlined in Guideline V.B.1 and all other CHM Guidelines.

**c.** Members must translate medical bills into English and convert amounts to U.S. currency.

**d.** CHM cannot share bills for emergency transportation to the U.S. from a different country or between countries, even if the situation is life-threatening. We strongly encourage you to look into other available resources.



## Are your providers and services eligible?

CHM members share eligible expenses for traditional medical treatment according to the CHM Guidelines.

It's important to note that CHM cannot share bills pertaining to care from non-medical providers (chiropractors, psychologists, counselors, naturopaths, homeopaths, etc.) or any medical doctors practicing alternative, integrative, complementary, or functional treatment, as defined in Guideline V.E.2-3.

The following table provides a sample list of common conditions for which medical expenses are regularly shared by CHM members. Eligible expenses are shared according to CHM Guidelines and the member's selected participation level.

| | |
|---|---|
| Abdominal pain | Hemorrhoids |
| Arthritis | Hernia repair |
| Asthma | Hip and knee replacement |
| Back problems (excluding chiropractic care) | Hypertension |
| Blood problems and disorders | Infections |
| Broken bones/fractures/ dislocations/sprains (excluding crutches, walkers, etc.) | Injuries from accidents |
| Bunions | Internal hemorrhaging |
| Cancer/removal of pre-cancerous tissue | Joint pain |
| Carpal tunnel | Lung, liver, kidney, and pancreas problems |
| Cataract removal | Maternity and complications (Gold level only) |
| Concussions | Muscle problems |
| Diabetes | Neurological disease |
| Diagnostic imaging tests (MRI, CT scan, EKG, EEG, etc.) | Pneumonia/influenza |
| Diverticulitis | Podiatry |
| Endoscopy, colonoscopy, etc. | Prostate conditions |
| Female health issues | Sleep apnea |
| Gallbladder | Stroke |
| Gastrointestinal | Ulcers |
| Heart/Cardiovascular | Urology |

## C. Provisional sharing

Special considerations apply for the following list of medical expenses.

 **1. Prescription medications—oral, topical, injections, infusions (Gold members only)**

Prescription Guidelines apply regardless of the means by which the medication is administered, whether orally, topically, by injection, or by infusion. All prescriptions must be part of a qualifying incident.

**a. Eligible prescription expenses**

1) Incident-related prescriptions for treatment of a newly diagnosed illness may be shared for up to the first 90 days of treatment. Refer to Guideline III.A.2 for the definition of an incident.



**90 DAYS**

2) Prescriptions for a previously diagnosed condition can be considered for sharing according to the following criteria.
   i. There is a medically necessary change in medication.
   ii. A new medication is added to the treatment regimen.
   iii. The expense is shared until 90 days elapse without a change in medication, at which time the prescription is considered maintenance medication and therefore no longer eligible for sharing.
3) Medications with a *curative* treatment protocol and a definite end date may be eligible for sharing as part of a qualified incident. Examples include but are not limited to the following: oral chemotherapy, certain acne medications, or medications used to treat certain infections. Medical records or treatment plans may be required.
4) Immunotherapy or allergy shots are eligible during the build-up or desensitization phase, usually a period of six to nine months. Once injections transition to monthly administration, immunotherapy enters the maintenance phase, and the treatment is no longer eligible. Medical records may be necessary to make sure your treatment plan meets eligibility criteria.

**b. Ineligible prescription expenses**

1) Prescriptions for maintenance treatment regimens are not eligible for sharing.
2) Over-the-counter (OTC) medications and supplements are not eligible for sharing.

 **2. Medical transportation (Gold members only)**

**a. Eligibility criteria**

Medical transportation bills are eligible for sharing if a physician determines (as verified by medical records) that medical transport was:

1) necessary to preserve the member's life, limb, or eyesight, *-and-*
2) the transport was either from the site of the emergency to the closest medical facility, or between medical facilities because the sending facility lacked the capability of providing the appropriate level of care.

 *Those who call the CHM office detailing their circumstances and asking if medical bills qualify will be given an opinion, not a decision. Medical bills cannot be authorized for CHM sharing over the phone or by email inquiry.*

Resp. Ex. 1

*If a member sends bills and details of a medical incident in writing, a decision will be sent by email or return mail. For more information on submitting bills to CHM, see section VI of the Guidelines or visit* **chministries.org/stepbystep***.*



**b. International medical transportation**

CHM cannot share medical bills for emergency transportation whereby a member is transported to the U.S. from a different country or between countries, even if the situation is life-threatening.

**c.** Recommended providers for ineligible medical transportation are listed on our website at **chministries.org/how-it-works/recommended-providers**.

**3. Therapy (Gold members only)**

**a. Provision**

1) Up to 45 sessions of therapy are allowed per eligible injury or sickness.

2) Therapy sessions may be a combination of eligible therapy types; however, the total per injury or sickness cannot exceed 45 sessions.

3) Therapy must be ordered by a healthcare professional licensed in their state to prescribe this type of treatment ***prior to the start of therapy*** and must be performed by a licensed therapist.



Christerson family
*California*

**b. Eligible therapy**

1) Physical therapy
2) Occupational therapy
3) Aquatic therapy

**c. Ineligible therapy**

1) Therapy performed by a chiropractor or alternative treatment provider (Guidelines V.E.2 and 8)
2) Osteopathic manipulation
3) Acupuncture
4) Massage therapy
5) Vision therapy
6) Self-prescribed or Direct Access therapy (evaluation and treatment by a licensed physical therapist without first seeing your physician for a referral)
7) Any therapy performed for developmental or educational reasons

**d. Speech therapy**

1) Speech therapy to aid in speech or language development is not eligible for sharing.
2) However, speech therapy may be considered for sharing if
   i. the therapy is necessary to treat a condition resulting from an eligible illness, such as a stroke; ***-and-***
   ii. it's performed to restore normal functioning pertaining to swallowing, breathing, etc.; ***-and-***
   iii. it meets the criteria listed in Guideline V.C.3.a.
3) Medical records may be requested to determine medical necessity.

**4. Regenerative injection therapy (Gold members only)**

Treatment such as prolotherapy, stem cell injections, and platelet-rich plasma (PRP) injections must be recommended, prescribed, and administered by a medical professional who is legally licensed in their state to give these types of injections.

**a.** Any combination of the injections listed—***limited to three per joint or area, per lifetime***—may be eligible for sharing.

**b.** Multiple injections administered on the same day to the same joint count as a single injection.

**c.** Prolozone and IV stem cell infusions are considered alternative and not eligible for sharing.

**d.** Documentation showing the source of stem cells is required, as CHM cannot share injections which contain fetal or embryonic lines.

**5. Skilled nursing facilities (SNF), rehabilitation centers,\* and step-down facilities (Gold members only)**

Skilled care is healthcare given when you need skilled nursing or therapy staff to treat, manage, observe, and evaluate your care. Inpatient skilled care is administered in a SNF, rehabilitation center, or step-down facility and requires the skills of professional personnel such as registered nurses, licensed practical nurses, physical therapists, occupational therapists, speech-language pathologists, or audiologists.

**a. CHM shares medical bills from SNFs for Gold members if**

1) treatment for an eligible medical condition is rendered in a SNF because hospitalization is no longer required; ***-and-***
2) the physician has ordered the inpatient services needed for SNF care, which are furnished or supervised by the types of skilled personnel listed above; ***-and-***
3) the member requires care in a SNF for 20 days or less.

**b.** CHM assists members with short-term, major medical costs; therefore, sharing of SNF expenses after a 20-day stay must be evaluated on a case-by-case basis, according to medical records.

*\*Rehabilitation refers to medically necessary follow-up care for an illness, procedure, or injury, not rehabilitation due to the abuse of drugs or alcohol (Guideline V.E.27).*

**6. Medical appliances and equipment**

**a. Silver and Bronze provision**

Only devices inserted as part of a surgery are eligible for sharing; the expense is included in the cost of the surgery.

**b. Gold provision**

1) The cost of **life-sustaining medical equipment** prescribed by a medical doctor is eligible for sharing up to $4,000 per member (lifetime limit). Such expenses include but are not limited to sleep apnea equipment, aerosol machines, insulin pumps, and oxygen supply/generators.
2) CHM will share these expenses after all other forms of available assistance have been exhausted.
3) The cost of additional accessories or supplies acquired after the initial procurement of medical equipment is not eligible for sharing.
4) Rental or repair expenses are not eligible for sharing.

### 7. Sleep apnea appliances

Sleep apnea appliances and equipment or implantable devices may be considered for sharing with a referral from a physician. The member must undergo a sleep study and receive the physician's referral prior to obtaining the equipment or implantable device. Medical records may be requested, and all other CHM Guidelines criteria must be met.

**a. Bronze and Silver members**
Only implantable devices inserted as a surgical procedure are eligible for sharing on Bronze and Silver levels; however, the required sleep study may not be eligible for sharing.

**b. Gold members**
1) Sleep apnea appliances and equipment are eligible for sharing up to the $4,000 lifetime limit allowed for life-sustaining medical equipment (Guideline V.C.6.b).
2) Implantable devices are eligible for sharing as part of a surgical procedure.
3) Sleep apnea appliances fitted by a **dentist** must occur as the result of a physician's referral after a sleep study has taken place.
4) Home sleep studies may be considered for sharing if ordered by an M.D. or D.O.

### 8. Cataract surgery

**a.** Cataract surgeries for the right and left eye are considered the same medical incident **if both procedures occur within 90 days.**



**b.** If cataract surgery for the second eye occurs more than 90 days after the surgery for the first eye, the surgeries will be considered separate incidents and a new Qualifying Amount will apply.

**c.** When cataract surgery occurs in your first year of membership, medical records may be requested to determine if the condition is pre-existing; bills will be authorized accordingly. Refer to Guideline Section IV for detailed information on pre-existing conditions.

### 9. Congenital conditions

A congenital condition is a medical condition or physical abnormality present at birth. If identified or diagnosed within the first year of life, congenital sharing limitations will apply.

**a. Sharing up to $125,000 lifetime maximum**
Expenses for birth defects or congenital conditions (and bills from resulting conditions) may be submitted for sharing with a maximum total not to exceed $125,000* per illness, as long as the following requirements are met.

1) **Biological children**
i) The individual who incurred the bills has continuously been a CHM Gold member with no interruptions in membership since birth.
ii) Maternity expenses for the child's birth must have been eligible and shared at Gold level.
iii) The child and mother must be Gold members with a membership in good standing.
iv) The mother must remain a Gold member until $125,000 is shared.

2) **Adopted children**
i) The individual who incurred the bills has continuously been a CHM Gold member with no interruptions in membership since adoption.
ii) The child's adoptive parent must be a CHM Gold member with an account in good standing prior to the adoption.
iii) The child and adoptive parent must remain Gold members while the $125,000 provision is being shared.
iv) CHM may consult the official medical records to determine whether the condition was discovered before the adoption was finalized.

**b. Sharing up to $25,000 lifetime maximum**
The following members may submit expenses for birth defects or congenital conditions (and bills from resulting conditions) for sharing with a maximum total not to exceed $25,000* per illness.

1) Gold members who do not meet the requirements in Guideline V.C.9.a
2) Bronze and Silver members

*\* Brother's Keeper sharing provision is not available for birth defects or congenital conditions (Guideline VII.A.2.d).*

## D. Motorized vehicle accidents

If a motorized vehicle accident occurs, please note the special considerations that apply.

### 1. Safety requirements for motorized vehicles

If a CHM member is injured while operating or occupying a motorized vehicle, CHM can only share the injured member's medical bills when **all** specified safety equipment was being worn by the injured member in the way recommended by the manufacturer of the motorized vehicle at the time of the injury. This applies regardless of:

**a.** the type of motorized vehicle in use,
**b.** whether the member was the operator or passenger, *-or-*
**c.** state or county requirements.

**Exceptions:** These safety requirements do not apply: 1) When the member is operating or occupying a motorized vehicle on the member's premises or real property, whether owned or leased by the member, to service or maintain that premises or real property. 2) If the failure to use the manufactorer-recommended safety equipment did not contribute in any way to the incurred injury.

### 2. Motorized vehicle accidents and insurance

**a.** If a member is injured in an accident involving a licensed motorized vehicle, and the accident is eligible according to CHM Guidelines, the medical bills resulting from that member's injuries are eligible for sharing up to $125,000 per accident but only after all other sources of funding have been exhausted. (Participation in Brother's Keeper can increase this sharing limit—see Guideline VII.A for more information.)

**b.** If a member is a passenger in or on a motorized vehicle that they do not own, the medical coverage available from the vehicle owner's insurance policy(ies) must be exhausted before that member's medical bills are eligible for sharing.

**c.** If the member is injured by the actions of an insured motorist, the liability coverage available to the member under the wrongdoer's insurance policy(ies) must be exhausted before the member's medical expenses are eligible for sharing.

CHM does not set a minimum requirement for members regarding their auto insurance medical coverage. CHM encourages members to set the highest possible limit on the medical assistance available through their auto insurance policy in order to steward members' funds wisely and keep monthly financial gifts low.

**3. Non-member passengers**

Medical bills for non-members injured in a motorized vehicle accident are not eligible for sharing, regardless of the circumstances.

## E. Ineligible medical expenses

CHM's mission is to help members share medical bills in a way that glorifies God through an accountable, faithful framework. With biblical precepts as our guide, CHM shares 100 percent of eligible medical expenses; however, staff must do so in accordance with standards set in place for accountability to protect ministry members.

It's important for you to familiarize yourself with the following list of ineligible expenses so that you're aware of what is or isn't eligible prior to joining or undergoing medical treatment.

***Note:*** *If a condition or treatment is ineligible for sharing, any complication related to that condition or treatment is also ineligible.*

**1. Bills incurred prior to joining CHM**—see Guidelines Section IV for our pre-existing conditions policies.

**2. Alternative treatment**—CHM does not share bills for alternative (integrative, complementary, functional, etc.) treatment, including diagnostic testing supporting alternative treatment. Alternative procedures are not accepted by the medical community; have not been researched and published in mainstream, peer-reviewed medical journals; and do not meet reimbursement criteria per Centers for Medicare and Medicaid Services (CMS). This Guideline applies regardless of the type of practitioner (naturopaths, homeopaths, medical doctors, etc.).

**3. Non-medical and alternative providers**—CHM does not share bills pertaining to care from non-medical providers (chiropractors, naturopaths, homeopaths, etc.) *or any other medical doctors providing alternative, integrative, complementary, or functional treatment.*

**4. Dental expenses**—including, but not limited to, routine care, root canals, extractions, orthodontic procedures, crowns, veneers, etc.

**a. Exception:** Dental repair necessary as a result of an eligible illness or an accident that occurred after joining CHM.

  **1)** Only expenses for the initial repair are eligible provided the injury was not a result of chewing.

  **2)** Procedures such as dental braces, veneers, etc. are not included as eligible dental repair expenses.

  **3)** The incident must meet all CHM eligibility Guidelines.

**b. Exception:** Sleep apnea appliances, implantable devices, or devices fitted by a dentist must occur as the result of a physician's referral after a sleep study has taken place. Medical records may be requested. Refer to Guideline V.C.7 for information pertaining to sleep apnea.

**5. Maxillofacial expenses**—expenses from Temporomandibular Joint Disorders (TMJ/TMD) and similar dental-related conditions are not eligible for sharing. This exclusion applies regardless of variations in diagnostic terminology or coding (i.e. malocclusion, micrognathia, congenital malformations of the jaw, etc.), where treatment is being rendered, or the type of practitioner (DDS, DMD, or other) providing the treatment.

**6. Vision correction**—optometrist services, eye exams, eyeglasses, contact lenses, vision therapy, etc.

**7. Audiological expenses**—routine hearing tests, hearing aids, cochlear implants, etc.

**8. Chiropractic treatment**

**9. Out-of-pocket medical expenses**—including, but not limited to, ineligible prescriptions, over-the-counter medications, supplements.

**10. Immunizations** —including complications arising from their administration.

**11. Telephone or digital consultations with healthcare personnel**

**12. Medical transportation**—refer to Guideline V.C.2 for Gold level exceptions.

**13. Genetic testing**—Testing required to diagnose an illness or to determine treatment for a current medical condition may be eligible. In such cases, medical records may be requested to determine medical necessity.

**14. Maternity expenses for pregnancies conceived prior to Gold membership**

**15. Births from unwed mothers**

**16. Abortions**

**17. Birth control expenses**—including, but not limited to, contraceptives, vasectomies, tubal ligations, reversals (Guideline VII.B.4).

**18. Infertility testing or treatment** (Guideline VII.B.4)

**19. Pregnancies and complications resulting from in vitro fertilization and embryo implants, transfers, or adoptions** (Guideline VII.B.4)

**20. Surrogate maternity procedures and associated maternity bills** (Guideline VII.B.4)

**21. Sexual dysfunction or gender dysphoria**—medication, hormone therapy, surgery, etc.

**22. Developmental or educational therapy** (Guideline V.C.3.c.7)

**23. Psychological or psychiatric treatment, testing, or counseling**—Only emergency room bills incurred to physically stabilize a patient are eligible for sharing. This includes but is not limited to the following types of disorders: mental, sensory processing, or behavioral (ADD, ADHD, etc.). **Exception:** Inpatient hospital or emergency room medical bills incurred  to stabilize the patient's physical condition, even if incurred as the result of a psychological, psychiatric, or mental condition, are eligible for sharing. Bills incurred for treatment after the patient is moved to a psychiatric unit or behavioral facility are not eligible for sharing.

**24. Counseling sessions**—such as mental health, marriage, family, individual, group, etc.

**25. Eating disorders**—inpatient or out-patient treatment, testing, or counseling.

**26. Self-inflicted, non-accidental incidents**

**27. Drug and alcohol abuse**—including injuries and illnesses relating from such abuse.

28. **Cannabinoid product (CBD oil, medical or recreational marijuana, etc.)**—including complications related to their use, regardless of the state's legal position. The use of these items may result in sharing limitations for other conditions.

29. **Failure to utilize proper safety equipment when operating motorized vehicles**—bills incurred from motorized vehicle accidents in which members were not wearing a helmet or the proper safety equipment (Guideline V.D.1).

30. **Extreme sports and hazardous activities**—CHM cannot share medical bills incurred due to participation in professional or semi-professional extreme sports or activities; organized contests for extreme sports or activities; or hazardous activities. Such activities include but are not limited to: BASE jumping, bull riding, BMX/motocross, bungee jumping, paragliding, racecar driving, scuba diving, etc.

31. **Long-term nursing home care or custodial nursing care**—See Guideline V.C.5 for skilled nursing facilities sharing information.

32. **Membership fees**—including health or medical practice memberships, gym memberships, personal trainers, etc.

33. **Weight reduction programs or procedures**

34. **Nutritionist services**—counseling, classes, therapy, etc.

35. **Cosmetic surgery and procedures**—elective, non-health related procedures and complications arising from such procedures.

36. **Prophylactic procedures**—for example, mastectomies or hysterectomies to prevent cancer from developing in the future, when the disease is not currently present.

37. **Organ donation**—CHM cannot share the expenses for members who donate organs or complications which arise from the donation. If a CHM member is the recipient of the organ, expenses for the donor and transportation costs for the organ are not eligible for sharing.

38. **Prosthetics**

39. **Medical appliances and equipment**—including, but not limited to, orthotics, blood pressure machines, breast pumps, crutches, slings, etc. (Guideline V.C.6—some equipment qualifies, but limits apply).

40. **Medical supplies**—including, but not limited to, syringes, test strips, lancets, compression socks, shoe inserts, batteries, etc.

41. **Non-medical expenses**—such as postage, shipping, finance charges, interest charges, phone calls, administrative fees, etc.

42. **Travel expenses**—such as personal transportation, lodging, and meals.

43. **Medical tourism**—medical expenses incurred by members who choose to travel outside of the country of residence for the purpose of receiving medical testing or treatment.

44. **Relatives as providers**—reimbursement for services rendered by a healthcare professional who is also a family member.

45. **Double recovery**—Members will not be reimbursed for bills that are eligible for reimbursement through other programs such as insurance, other health cost sharing programs, financial assistance, etc. (Guideline VI.G.1).

## F. Planning for ineligible costs

CHM members will encounter necessary medical costs that are not eligible for sharing (Guideline V.E) including the annual Personal Responsibility, dental and vision care, chiropractic care, routine medications, immunizations, medical equipment costs, and more.

### 1. Recommendations

a. Set up a personal savings account with designated funds for ineligible expenses.

b. Comparison shop for providers discount programs that can offer cost savings on dental, vision, and prescriptions.

c. Read *Heartfelt* Magazine and the CHM blog to learn about helpful resources for these expenses.

### 2. Health Savings Accounts

CHM members with a funded Health Savings Account (HSA) are not required to use the funds in their HSA prior to submission of medical bills to CHM. Whether a member has a funded HSA does not affect the determination of the eligibility or the amount to be shared of any sharing request.

CHM strongly recommends that members consult with their attorney or other tax professional before paying monthly gift amounts using funds in their HSA.

# VI.  Submission of medical bills

Please review and follow the steps below before submitting bills for a medical event.

Visit our website at **chministries.org** or contact Member Services at 800-791-6225 ext. 5993 if you have any questions about medical bill submission.



Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 489 of 547

36 |    Section VI | GUIDELINES          GUIDELINES | Section VI    | 37

**Are you ready to submit medical bills? Review this check list to be sure:**


My incident meets CHM eligibility Guidelines.


My medical expenses meet my Qualifying Amount per Incident.


I'm submitting medical bills within the six-month timeframe.


I've pursued other available sources of payment (medical insurance, auto/home insurance, financial aid, third-party payers, special programs).


My medical bills are itemized.


I've completed my required forms.

Resp. Ex. 1

*Maryland members only: To comply with Maryland state law, medical bill sharing is experienced through member-to-member giving. Please visit chministries.org/chm-membership-for-maryland-members.*

## A.  CHM is secondary to other payment sources

CHM takes joy in caring for God's people and helping members to provide healthcare support for one another through the sharing of medical bills. However, CHM is a ministry and as such, when a member has insurance or when another party is liable for medical bills, CHM is secondary to other payment sources.

1.  Members should submit bills to the appropriate insurance (auto, home, school, supplemental, etc.), Medicare, Workers' Compensation, fraternal benefits, or any other resource available to pay all or part of the bills.

2.  When applicable, a receipt of payment, notice of liability, or letter of rejection from such sources should be included along with medical bill submissions.

3.  Members may also choose to submit medical bills to Medicaid before submitting them to CHM.

4.  Medical bills can be submitted to CHM while primary payment sources are pending.

## B.  Medical bill sharing process

Submitting medical bills to CHM is a collaborative effort. Members initiate the sharing processing by submitting the required forms, documentation, and itemized medical bills in a timely manner so that CHM staff can process the requests and send out funds for eligible expenses as quickly as possible.

1.  **Timeframe for submission**

Medical bills must be submitted within **six months from the date of service.**

The sooner CHM receives members' medical bills, the sooner staff can put them in the queue for medical bill processing. Additionally, when it's necessary for our Member


**Bills must be submitted within**


SIX MONTHS
from date of service

Advocate team to assist members in securing discounts,* it's more advantageous to negotiate closer to the incurred date.

*\* Securing discounts is essential to keeping monthly financial gifts low.*

2.  **Submitting medical bills**

Please use the following instructions when submitting a new incident:

a.  **Complete the Sharing Request Packet**(chministries.org/resources/forms-documents).
1)  Sharing Request Form—provides contact information and incident overview.
2)  Medical Bill Worksheet—lists itemized bills submitted along with reductions applied and payments made.
3)  Medical Release Information Form (HIPAA compliant)—CHM must have a signed copy of this form on file in order to communicate with providers and share your medical bills. _Members who are 18 years and older must sign their own form._
4)  Letter of Explanation—provides a short explanation of your medical event. The letter helps CHM staff determine how to assign each bill to an illness/incident.
5)  Please see VI.B.2.c for additional forms that may be required.

b.  **Obtain itemized medical bills relating to the illness/incident.\***

An itemized bill includes *all* of the following information:
1)  Patient name
2)  Date of service
3)  Place of service/provider name
4)  Procedural (CPT) code and/or description of services rendered
5)  Charge for each service rendered

**THE FIVE ELEMENTS OF AN ITEMIZED BILL**

❶ | PATIENT NAME

❷ | DATE(S) OF SERVICE

❸ | PROVIDER OR PLACE OF SERVICE

❹ | PROCEDURAL (CPT) CODES OR DESCRIPTION OF SERVICE

❺ | TOTAL CHARGE OF EACH SERVICE

*\* If the payment receipt does not include the five details listed above, request an itemized bill from your provider. If your provider cannot offer a printed itemized medical bill, handwritten information will be accepted only if it includes the same five itemization details and is accompanied by a dated signature of the provider or authorized medical personnel from the servicing facility.*

c.  **Complete additional forms, if applicable.**
1)  Prayer Page Form—if your incident involves a pre-existing condition.
2)  Accident Verification Form/Reimbursement Agreement Affidavit— if your incident was the result of an accident.
3)  Maternity Verification Form—this form along with the Medical Release Information Form replaces the Sharing Request Packet for pregnant members.

d.  **Submit your incident bills and forms to CHM.**
1)  Online: The Member Portal (portal.chministries.org) is the preferred method.
2)  U.S. Postal Service: 127 Hazelwood Ave., Barberton, OH 44203
3)  Fax: 330-848-4322

e. **Submit add-on bills as they are incurred.**
Additional expenses, or "add-on bills," can be submitted as part of your current incident as long as no more than 90 days have elapsed since the last eligible date of service.
  1) Add-on bills can be submitted without additional Sharing Request Forms.
  2) The new bill may be submitted by your method of choice. Please write "add-on" and your CHM member number at the top of the new bill so it may be appropriately filed.

f. **Report discounts as you receive them**
  1) If a provider issues a new bill with updated totals or discounts, please submit the new document to CHM to facilitate accurate reimbursement for the medical services rendered.
  2) If a verbal discount is extended by a provider after a medical bill has been submitted, please contact CHM at 800-791-6225 ext. 5993 or info@chministries.org to communicate the updated information.

3. **Sharing time**
a. The sharing process begins the date CHM receives medical bill(s), not when charges are incurred or the date bills are submitted. Add-on bills submitted for an on-going incident will be processed individually based on the date they're received.
b. Current information about average sharing time is available on the CHM website at **chministries.org/resources/bill-sharing-process**.
c. Extended sharing time may occur if:
  1. The Sharing Request Packet is incomplete.
  2. Medical bills are not itemized or the copy received is unreadable.
  3. CHM is waiting for a reply from the healthcare provider regarding discounts, financial aid approval, etc.
  4. CHM is waiting to receive medical records from the healthcare provider to determine incident eligibility.
d. Members who have insurance (Medicare, Medicaid, auto insurance, etc.) or Workers' Compensation should submit the Explanation of Benefits or documentation of payments received as soon as possible to avoid processing delays.

## C. The medical bill's journey

CHM has established a process to maintain the utmost financial integrity while efficiently processing medical bills.

1. **Member Records**
Staff receives bills and forms through the online Member Portal, by fax, or by mail and sorts them for processing by date of receipt.

2. **Member Bill Processing**
a. **Data Entry:** Staff reviews bills for itemization and enters them into CHM's database.
b. **Authorization:** Staff reviews and categorizes bills and authorizes them according to the CHM Guidelines.

3. **Member Advocate**
Staff audits medical bills for accuracy and, when necessary, verifies amounts with the provider to make sure the maximum discount has been obtained. Members should notify CHM of any discounts received that are not reflected on the itemized statement.

Resp. Ex. 1

4. **Member Reimbursement**
Staff performs a final review and releases funds for sharing from the audited Member Sharing Account.

## D. Discounts and financial assistance

Hospitals often are willing to extend discounts to self-pay patients and most offer financial assistance programs. The average discount varies from state to state; members may receive discounts up to 60-70 percent, depending on their location.

1. **Discounts**
Medical bill discounts are essential to enabling CHM to serve all members well. The Member Advocate department is knowledgeable about medical bill discounts and assists with discount negotiation for eligible bills exceeding $1,000. Following the Guidelines provided in this section will help CHM steward members' funds wisely:

a. Always ask for a self-pay discount first.
b. CHM recommends negotiating a self-pay discount whenever possible. *Providers routinely offer 40 percent or more in discounts for insurance policyholder's medical bills; CHM members are requesting the same consideration.*
c. If you're unable to pay your medical expenses at the time of service, please ask for a payment plan.
d. Prior to paying bills totaling $1,000 or more from an individual healthcare provider, please contact Member Advocate when the following circumstances apply:
  1) You're unable to obtain a self-pay discount.
  2) You obtain a significant discount but
    i. the provider has a deadline for payment *-and-*
    ii. you're unable to pay out-of-pocket.
e. In addition to member-negotiated discounts, CHM may negotiate discounts on a member's behalf. Most of these agreements for payment are time sensitive. If a discount is lost due to member negligence (Sharing Request Forms not returned, payment due date missed, etc.) members are responsible for any lost discounts. Your prompt attention will enable CHM to continue processing your bills in a timely manner.



"I've been incredibly pleased with my CHM membership for myself, my kids and my wife —just as I've been pleased with CHM as a physician who takes care of CHM members and works with the ministry on the provider side of it as well."

*– Jeff Erdner,*
Emergency Medical Specialist,
***Texas***

**2. Financial assistance**

Most hospitals are required to provide certain types of medical care for free or at a reduced cost. As self-pay patients, CHM members may qualify for financial assistance programs that are offered by the hospital.

Likewise, state and federal governments also allocate money toward healthcare for individuals whose incomes fall within a defined economic level. CHM requests that qualifying members use financial assistance resources when available, though it's not a requirement.

## E. Paying providers after reimbursement

It's the member's responsibility to use funds received from CHM to pay the appropriate healthcare providers or to reimburse themselves for payments already made. **It's an abuse of members' trust to use money received from CHM for any purpose other than satisfying payment to the applicable healthcare providers.**

1. Paying healthcare providers promptly is a CHM membership requirement.

2. Failure to pay your providers within 30 days of receiving your reimbursement check may result in membership termination.

3. If sharing checks are not cashed or deposited within six months, CHM will conclude that the disbursed funds are meant to be returned to the ministry and applied toward the sharing of another member's medical bills.

4. Review the Explanation of Sharing, located on the reverse side of the check stub, to determine which medical bill reimbursements are included in the received check.

5. If you have questions regarding the amount shared, please contact CHM at 800-791-6225 ext. 5993.

6. Failure to provide accurate information or failure to use shared funds to pay for submitted bills will render your entire membership ineligible for CHM sharing until all of your providers are paid the accurate amount.

7. There are certain occasions when CHM will reserve the right to pay providers directly for services rendered to members.

## F. Reporting discounts after reimbursement

Providers occasionally offer new discounts when a member contacts them to settle balances. If this happens, members are required to return the extra money back to CHM. Members should return funds to CHM in one of the following ways:

1. **Send a check** made payable to "Member Sharing Account" with "overpayment" written in the memo line to: Christian Healthcare Ministries, 127 Hazelwood Ave., Barberton, OH 44203. Please include a note explaining which provider issued the discount and the member to whom it applies.

2. **Call the CHM office** at 800-791-6225, dial "0", and ask the operator to connect you with the Gift Processing department. Members may be able to make a payment over the phone via credit or debit card or automatic bank draft.

## G. Stewardship and integrity

*The following sections are included for the protection of the funds that members have contributed for the purpose of sharing other members' medical bills. These sections apply when a member is injured due to the negligence of another person, such as motorized vehicle accidents, personal injuries sustained on someone else's property, dog bites, or any other situation that could involve liability insurance or that could result in litigation.*

**1. Double recovery prohibited**

If an accident or other circumstance results in injury to a member due to someone else's actions, injured members are encouraged to promptly submit their medical bills to CHM. However, medical expenses cannot be reimbursed or paid by both CHM and another payment source. If a member receives a settlement or payment of medical expenses from insurance or another source after CHM has already shared those expenses, CHM must be reimbursed the amount of the duplicate payment in full. In order to properly steward the ministry's funds, when the member expects to recover funds from another party, CHM may require as a condition of sharing that the member seeking payment confirms their intent to reimburse the ministry upon receipt of a double recovery.

**2. Reimbursement**

If a member recovers funds that are due to CHM because of a double recovery discussed in the preceding paragraph, the member is obligated to hold these funds in trust for CHM and transfer them to the ministry within 14 days of receipt. In that event, CHM will be deemed to hold a constructive trust, an equitable lien and other rights to these funds.

Members who expect to recover funds from another source may voluntarily choose to assign their right to those funds to CHM. If that occurs, these rights may be asserted against any other person or organization that has possession of the funds.

This right of reimbursement shall not be reduced through payment of attorney fees or costs incurred by the member or any other party without the written permission of CHM. The member holding the funds belonging to CHM shall be responsible for payment of all expenses, including attorney's fees and court costs, incurred by CHM in the enforcement of this right of reimbursement.

**3. Member legal obligations**

At the reasonable request of CHM, members shall:

a. Provide any information requested by CHM within five (5) days of the request.

b. Notify CHM promptly of how, when, and where an accident or incident resulting in the injury to the member occurred and provide all information regarding the parties involved.

c. Cooperate with CHM in the investigation of the accident or incident and protection of CHM's rights.

d. Notify CHM in writing at least 20 days before entering into any compromise or settlement that may affect the rights of CHM.

Resp. Ex. 1



# VII.  Specialized membership programs

## A.  Brother's Keeper

Brother's Keeper is a low-cost, biblically-based program enabling CHM members to meet
medical bills that exceed the $125,000 limit per illness specified in the CHM Guidelines.
Participation in this program provides a safeguard against catastrophic illness or injury.
Members have the option to add Brother's Keeper anytime but will receive the most support by
choosing to participate from the start of their membership.

### 1.  Participating in Brother's Keeper

**a.**  Brother's Keeper participants contribute *monthly* designated gift amounts per unit. These
amounts are shared with other Brother's Keeper participants who have incurred out-of-
pocket medical expenses exceeding $125,000 per illness.

**b.**  Refer to **chministries.org/programs-costs** for additional information on Brother's
Keeper participation costs.

### 2.  Brother's Keeper sharing

Adding Brother's Keeper to a membership unit increases the maximum
lifetime limit per illness.

**a.**  Members must add Brother's Keeper prior to experiencing any signs, symptoms, testing,
or treatment for illnesses exceeding $125,000 to qualify for extended sharing. Otherwise,
the standard sharing limit of $125,000 per illness applies for all participation levels.

 **b.**  **Gold members**—Brother's Keeper provides *unlimited* cost support per illness for
eligible medical expenses.

 **c.**  **Silver and Bronze members**—Brother's Keeper provides an additional $100,000
of cost support per illness, per year for eligible medical expenses. The first $100,000
is available as of the date the member adds Brother's Keeper to their membership. As
long as the member continuously participates in Brother's Keeper, on each anniversary
of their join date, they'll receive an additional $100,000 of assistance, accruing up to a
total of $1 million per illness. *Note: Funds added annually can only be applied to medical
expenses incurred after the Brother's Keeper anniversary date; they cannot be applied to
previously incurred bills.*

**d.**  Brother's Keeper does not include sharing provision for congenital conditions or birth
defects. See Guideline V.C.9 for information regarding congenital birth defects.

### 3.  Adding Brother's Keeper after joining CHM

When a member adds Brother's Keeper after having an illness shared by CHM, that illness
will not initially qualify for Brother's Keeper sharing; however, extended sharing can be
applied to new illnesses.

Previously shared illnesses may eventually qualify for Brother's Keeper sharing if they
meet the following criteria:

**a.**  The member has participated in Brother's Keeper for three full consecutive years; *-and-*

**b.**  The illness has become maintained according to the following criteria at least one time
during the first three years of Brother's Keeper participation:

    **1)**  At least 90 days have passed without the patient undergoing testing or treatment,

    **2)**  their medical provider states that no further testing or treatment is needed, *-and-*

    **3)**  medical records show that the patient is cured or on
a maintenance treatment regimen.

Once a member reaches the third-year anniversary date of Brother's Keeper participation, new
incidents within that illness will be considered for Brother's Keeper sharing.

### 4.  Brother's Keeper provision for pre-existing conditions

When a member joins CHM with a **maintained pre-existing condition\***, medical bills for
that condition exceeding $125,000 per illness can be shared through the Prayer Page based on
the following criteria, as long as all other CHM Guidelines are met:

**a.**  Brother's Keeper must be added at the time of joining CHM and participation must remain
continuous throughout the membership.

 **b.**  **Gold level members**—When eligible medical bills relating to maintained pre-existing
conditions exceed $125,000, Brother's Keeper offers unlimited cost support through
CHM's Prayer Page program. After a member has participated continuously for three
full years on the Gold level with Brother's Keeper, the condition is no longer considered
pre-existing and the member would have access to regular Brother's Keeper sharing.

 **c.**  **Silver and Bronze level members**—Through the Prayer Page program, Brother's Keeper
will offer an additional $100,000 per illness, per Brother's Keeper participation year, up to
$1 million for eligible medical bills incurred for maintained pre-existing conditions.

*\*See Guidelines Section IV for definitions and details relating to maintained pre-existing conditions.*



"Seeing our medical bills shared helped give us strength to fight against our daughter's cancer.

Ministry members sent us numerous cards and letters with meaningful words of encouragement and prayer.

Without question, our family is blessed to be part of such an amazing group of believers!"

*– Adam Abolafia,*
**California**

Resp. Ex. 1

**5. How switching levels affects Brother's Keeper**

   **a. Switching from Bronze or Silver to Gold**

When a member who participates in Brother's Keeper switches from the Bronze or Silver level to the Gold level, the following provisions apply:

    **1)** The Brother's Keeper program provides unlimited cost support for new illnesses as of the date Gold level membership begins. This only applies to medical illnesses for which no signs, symptoms, testing, or treatment have occurred prior to the switch to Gold level.

    **2)** Illnesses which have signs, symptoms, testing, or treatment prior to switching to the Gold level will be shared according to Brother's Keeper specifications for Bronze and Silver levels, as defined in Guideline VII.A.2.c.

   **b. Switching from Gold to Bronze or Silver**

When a Gold level member who participates in Brother's Keeper switches to Silver or Bronze level, the Brother's Keeper program will provide an additional $100,000 of cost support per illness, per Brother's Keeper participation year. This is accrued annually up to a maximum limit of $1 million per illness.

## B. Maternity (Gold level only) 

CHM members love to share in the blessings of new life. The ministry's Gold maternity program includes extensive provision for members wanting to grow their family.

Maternity sharing offers members with qualifying pregnancies a maximum of $125,000 per pregnancy. With the addition of Brother's Keeper prior to becoming pregnant, the per-pregnancy amount of assistance is unlimited. Guidelines III.C and VII.A provide more information about Brother's Keeper participation.

If a member joins CHM while she is pregnant, bills for that pregnancy, or any related complications thereof, cannot be shared through any of CHM's programs or through the Prayer Page.

**1. Qualifying for maternity sharing**

To qualify for maternity sharing, CHM members must meet the following criteria:

   **a.** The member must be married at the time of conception.

   **b.** The member must participate at Gold level at least 300 days prior to the expected due date.

The *entire* maternity incident is ineligible for sharing if the member does not meet the preceding qualifications. This applies to new members as well as members switching to Gold from a lower participation level.

**2. Maternity Personal Responsibility**

Reimbursement for each eligible pregnancy is subject to a Maternity Personal Responsibility* totaling $1,500. This is the amount the member is responsible to pay before their maternity costs can be considered for sharing.

This amount can be reduced to $1,000 in the following way: Members must contact the Maternity Support Team by phone within the first 16 weeks of pregnancy.

*The Personal Responsibility for maternity sharing is separate from the annual Personal Responsibility per unit required for non-maternity sharing. (Guideline III.B.3)

**3. Eligible maternity expenses**

CHM will share medical bills for:

   **a.** Obstetricians *or* legally practicing midwives—CHM shares bills from either

    **i.** one obstetrician, *-or-*

    **ii.** one midwife (including one assistant, if necessary).

   **b.** Prenatal visits.

   **c.** Ultrasounds—up to three, provided they're medically necessary. More than three will be evaluated on a case-by-case basis, and medical records may be required.

   **d.** Immunizations related to the mother's prenatal care.

   **e.** Maternity-related prescription medications.

   **f.** Labor and delivery facility charges—includes hospital facilities, birthing centers, and home births.

   **g.** Complications for mother and baby.

   **h.** Postnatal care for mother and baby up to 90 days from birth. This includes well-baby visits within 90 days of the baby's date of birth. Immunizations for baby are not included.

   **i.** Lactation consultations as needed.

   **j.** Circumcision within 90 days of birth.

   **k.** Tongue-tie within 90 days of birth.

   **Note:** *If a maternity incident is determined ineligible for sharing, then any services listed or complications related to the pregnancy and delivery are also ineligible.*





"We're forever thankful to CHM and the generous members who have taken such good care of us. We're able to give our three happy, healthy babies our love and attention without distraction from the worry of giant bills.

CHM has been the biggest blessing in our lives."

*– Cara Chatwin,*
**Utah**

Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 494 of 547

4. **Genetic testing**

   a. Must be non-invasive **and** required to determine treatment for a current medical condition.

   b. Medical records or healthcare provider notes are required for verification.

   c. An amniocentesis may be considered for sharing when medical records confirm that the procedure is necessary to determine life-preserving medical care for baby and/or mother.

5. **Ineligible maternity expenses**

   a. Pregnancies for unwed mothers

   b. Contraceptives or birth control expenses

   c. Over-the-counter medications

   d. Doula services

   e. Breast pumps

   f. Fertility procedures or treatments

   g. Gestation or surrogate maternity procedures

   h. In vitro fertilization (IVF) and maternity expenses or complications resulting from IVF

   i. Sperm donation and pregnancy as a result of sperm donation

   j. Embryo implants, transfers, or adoptions and maternity expenses or complications resulting from such procedures

   k. Tubal ligations, vasectomies, or reversal procedures

   l. Invasive genetic testing such as amniocentesis, chorionic villus sampling, or nuchal translucency ultrasound

   m. Travel expenses for members, midwives, etc.

6. **Maternity submission process**

   a. Obtain and submit a *global fee* from your OB/GYN as soon as possible. It must include the following itemized information: provider name, description of service or CPT codes, charge amount, and payment due date.

   b. Submit a completed, signed, and dated Maternity Verification Form and Medical Release Information Form (HIPAA compliant) with your initial medical bills.

   c. Submit the flat rate or prepayment agreement or flat rate from the hospital, if provided. It must have all of the itemized information listed and specify the length of the hospital stay and whether the newborn charges are included.

   d. Request itemized bills for any additional charges not included in the original agreement(s)—such as labs or ultrasounds—or when an agreement is not available.

7. **Change of provider**

   Members who change providers prior to delivery must submit a final itemized bill from the original provider **and** an itemized bill for the new provider. If funds have already been shared, the member must return any over-shared amounts or CHM will pro-rate sharing for the new provider accordingly.

8. **Switching sharing levels**

   If the pregnant member changes from Gold to Silver or Bronze at any time before CHM shares the maternity bills, the maternity incident will no longer be eligible, and any outstanding bills cannot be shared. The membership must be current with all monthly financial gifts throughout the time maternity bills are being processed for sharing.

Resp. Ex. 1

---

> ***Note:*** *If you intend to change your sharing level, number of units, discontinue your participation, or change the status of your membership in any way, please allow 30 days for the change(s) to take effect.*



**30 DAYS**

Notice before
changes take effect

9. **Babies as CHM members**

   For babies born to mothers who are eligible for CHM's Gold maternity program, the following will apply:

   a. Medical bills for the baby incurred in the first three months after birth may be considered for sharing under the mother's membership unit. ***Exception:*** Babies with a congenital birth defect must transition immediately from their mother's membership unit to their own unit. Reference Guideline V.C.9 for sharing information about congenital birth defects.

   b. The new baby must be added to the mother's membership for continued sharing eligibility. Please contact Member Services at 800-791-6225, ext. 5993 within the first three months after delivery with the following information:

      1) baby's full name

      2) date of birth

      3) Social Security number

      4) baby's participation level (Please indicate whether the baby will participate in the Brother's Keeper program detailed in Section VII.A.)

   c. If the new baby is the first child on a membership, the unit number will increase by one and the monthly financial gift also will increase. The financial gift amount will not increase if the membership already includes a child unit.

   d. Members who wish to remove the baby from their membership must contact the CHM Member Services department.

A step-by-step maternity guide is available at **chministries.org/maternity-sharing**.



Brown family
*Minnesota*

## C. CHM SeniorShare™ and Medicare-age members

As CHM members approach retirement age, they can have great comfort in knowing that CHM participation can continue without interruption into the next phase of life.

**G** **1. CHM SeniorShare™ gift reduction**

CHM members age 65 or older who participate at Gold level are eligible for a CHM SeniorShare™ program gift reduction. This advantage begins the month of the member's 65th birthday. Please see **chministries.org/programs-costs** for more detailed information about a significant gift reduction available to qualifying members. Gold-level members under age 65 with Medicare Parts A and B or a Medicare Advantage Plan can also receive this reduction beginning the next billing cycle after they provide proof of Medicare participation.

**a. Qualifying Amount per Incident**—Total eligible medical costs before discounts and Medicare adjustments are applied must reach $500 before bills can be submitted for sharing.

**b. Personal Responsibility**—Members qualifying for SeniorShare™ do not have to meet an assigned annual Personal Responsibility before eligible incidents can be considered for sharing.

> *Important note about changing levels:*
> If you are a Silver or Bronze member and would like to change to Gold, please review Guidelines III.D and IV.E for additional information about how changing levels impacts medical bill sharing eligibility. CHM requires a 30-day advance notice.



**30 DAYS**

Notice before changes take effect

**2. CHM for Medicare-age members**

CHM members 65 and older can participate in any of the ministry's cost-sharing programs (Gold, Silver or Bronze) as a complement to Medicare Parts A and B; however, membership at the Gold level combined with Brother's Keeper is the best option for members of all ages and offers the highest level of cost support.

Members should plan ahead regarding their Medicare start date to avoid gaps in full CHM sharing eligibility.

**a.** Members eligible for Medicare—for example, those qualifying for Social Security disability—and members 65 or older *must have Medicare Part A and Part B (or a Medicare Advantage Plan) to be considered Medicare-participating members who can receive full sharing eligibility.*

**b.** Otherwise, CHM shares up to 20 percent of the total eligible medical expenses that were incurred during months in which members were 65 or older but did not participate in Medicare (regardless of the reason), and the balance becomes the member's responsibility.

**c.** Likewise, CHM shares up to 20 percent of eligible medical expenses when Medicare-participating members receive treatment from a non-participating Medicare provider.

**d.** Expenses incurred by members who choose to travel outside of the country for the purpose of undergoing testing or treatment are ineligible for sharing.

**3. Submission process for members on Medicare**

Medicare-age members should follow these important steps:

**a.** Submit the complete Medicare Summary Notice (MSN) or Explanation of Benefits (EOB) for incident-related medical expenses.

**b.** Submit itemized bills only for expenses incurred for medical services or prescriptions from non-Medicare participating providers.

**c.** Complete the Sharing Request Form, Medical Release Information Form, and Letter of Explanation.

**d.** Do not submit the Medical Bill Worksheet. Instead, please note directly on your MSN or EOB which charges belong to your submitted incidents and indicate additional discounts applied.

**4. The Medicare website (medicare.gov) can help members:**

**a.** Learn more about Medicare programs. (Medicare will not be able to answer any questions about CHM or how we interact with this government program.)

**b.** Obtain local contact information for Medicare-knowledgeable representatives.

**c.** Make changes to Medicare participation during Medicare Open Enrollment.

## D. Groups

CHM group memberships provide a budget-friendly healthcare solution for non-profit ministries and Christian organizations to offer to their employees. CHM has hundreds of participating groups—among them are church groups; non-profit organizations; and Christian schools, universities, and colleges. Group members must meet CHM membership requirements as detailed in Guideline II.A.

CHM can help organizations and ministries of varying sizes create a solution that satisfies the requirements of the Patient Protection and Affordable Care Act (the PPACA, more commonly known as Obamacare). However, a group health program must be set up properly to avoid incurring heavy fines. Therefore, all groups should seek guidance from attorneys and CPAs knowledgeable about the law's requirements. CHM can provide referrals to reliable, independent professionals.

Because of the specific requirements of the Affordable Care Act (ACA), it's usually not practical for for-profit organizations to pursue an ACA-qualified group healthcare solution with CHM.

"We joined CHM in 1984. Marie had quite a bit of heart problems and...

...they never hesitated about taking care of her. It was the same way with me.

I've had a hip replacement, one knee replacement and CHM was always good to work with. I am so thankful for all the help through the years."

–Kenneth Peterson Sr.
Kansas

Resp. Ex. 1

More information about how CHM serves groups can be found at **chministries.org/groups** or by emailing **groups@chministries.org**.

## E. Telemedicine

CHM is pleased to offer a valuable service for members that should help to keep families healthier, decrease visits to the doctor, and reduce out-of-pocket costs. Through this telemedicine partnership, CHM members can connect with doctors free of charge over the phone or through video chat. Commonly addressed general medical conditions include respiratory infections, cold and flu symptoms, allergies, skin irritations, pink eye, and much more. Telemedicine provides a practical solution for a wide range of non-emergency conditions.

This modern-day service to address general medical conditions is available to all members at no additional cost beyond their regular monthly financial gifts. Members of any age can participate and receive quality care from licensed physicians. CHM's telemedicine support offers unlimited free and convenient 24-hour access seven days a week. The program travels with members throughout the country and meets them where they are—even in the comfort of their own homes.

Visit **chministries.org** for more details about this complementary program and the free services available to CHM members.

Access to consultations for mental health, dermatology, and nutritional counseling may be available at an additional fair market price. ***Important note:*** Telemedicine is available to members through this CHM-partnering service; telephone and digital consultations outside of this service may not be eligible for sharing (Guideline V.E.11).

## VIII. CHM support teams

### A. Provider Relations

We're devoted to empowering you to find quality healthcare service. This is why members have flexibility when choosing a healthcare provider and aren't bound by a provider network. It's another reason why CHM has a Provider Relations team that specializes in building relationships with healthcare providers across the country.

We call the providers with whom we've established pre-determined discount agreements our "CHM-friendly providers." You can receive accessible, quality care at competitive cash-pay prices—simply by mentioning your CHM membership. A list of these CHM-friendly providers can be found at **chministries.org/resources/chm-friendly-providers**.

Fellow members often recommend providers who offer quality care and fair pricing. You can find a list of these recommended providers at **chministries.org/how-it-works/recommended-providers**.



Resp. Ex. 1

### B. Eligibility Review

The Eligibility Review team's mission statement is "To strive for excellence and accuracy with an open mind and heart for our members and the ministry," based on Ruth 3:11 (AMP). This mindset is reflected in every task the team undertakes.

The eligibility review process consists of two distinct parts:

1. **The Eligibility Review team**
   a. Evaluates special case scenarios and applies the Guidelines accordingly
   b. Assists CHM staff as they process medical bills
   c. Reviews Guidelines for potential revision and clarification

2. **The Eligibility Review Board (ERB)**

   The ERB consists of a group of select staff members who meet regularly to review and make determinations on complex eligibility considerations. Voting takes place to maintain a platform of fairness and consistency throughout medical bill sharing. This board is represented by CHM's leadership team, the legal department, and the CHM Medical Director, among other qualified staff members and supervisors.

The consistent, transparent process and broad representation amongst the ERB participants maintains full consideration of member and ministry interests during Guidelines development and case adjudication.

## IX. Disclosures

### A. Integrity and accountability

CHM has implemented the following measures to make sure the ministry operates with integrity and accountability.

1. **Board of Directors and internal controls**

   In accordance with good business practices and Ohio law, Christian Healthcare Ministries has an independent Board of Directors that oversees and controls its operations. In addition, the ministry has the following controls in place:

   a. A stringent board member conflict of interest policy requires full disclosure of all conflicts of interest and appropriate recusal from the discussion or vote on such topics.
   b. Management and the board regularly receive and review ministry financial reports. The board also reviews and approves the ministry's annual budget.
   c. An audit is conducted and certified annually by an outside independent public accounting firm with not-for-profit accounting and auditing experience. These audits review all aspects of ministry operations from the receipt and disbursement of money to the systems and procedures that control its core functions.
   d. Christian Healthcare Ministries employs a highly qualified and effective chief financial officer and a general counsel, both of whom are subject to professional ethics and conflict of interest disclosure requirements.

**e.** CHM has implemented and abides by the provisions of the Sarbanes-Oxley Act of 2002, which directly concerns corporate fraud prevention. As a non-profit organization, CHM is not legally required to take this action, but it does so voluntarily as an additional safeguard.

**f.** CHM staff members who receive money do not disburse money.

**g.** CHM staff members who prepare checks for payment do not sign the checks.

**h.** CHM staff members who sign the checks do not reconcile bank statements.

**i.** All disbursements—whether from escrow funds or operating funds—are reviewed by CHM leadership and the chief financial officer.

## 2. Christian Healthcare Ministries standards

### a. Mission

To glorify God, show Christian love, and experience God's presence as Christians share each other's medical bills.

### b. Organization

**1)** We will remain at all times an IRS-determined non-profit 501(c)(3) tax-exempt organization.

**2)** We will maintain written personnel policies—approved by the board—governing the work and activities of all employees.

### c. Governing body

**1)** The ministry's board will have no fewer than five (5) unrelated directors.

**2)** The majority of the ministry's directors will be independent (not employees or relatives of employees).

**3)** The ministry's board will meet as frequently as necessary, but not less than quarterly, to fully and adequately oversee the business of the ministry.

**4)** The qualifications of the ministry directors shall be published online.

**5)** The ministry's board, among other things, is responsible for:

    **i.** determining the mission and vision of the ministry;

    **ii.** establishing policies for the effective oversight of the ministry;

    **iii.** acting as the final authority determining ministry membership qualifications and interpreting the ministry's Statements of Beliefs;

    **iv.** establishing the ministry's conflict of interest policy;

    **v.** approving the annual budget of the ministry and periodically assessing the ministry's financial performance in relation to that budget;

    **vi.** receiving and reviewing the annual independent audit and the audited financial statements, and evaluating recommendations made by the independent auditors;

    **vii.** hiring the president and chief executive officer, determining that officer's compensation, and annually evaluating their performance;

    **viii.** periodically reviewing the appropriateness of the overall salary structure of the ministry; *-and-*

    **ix.** reviewing and adjusting the monthly membership amounts.

### d. Conflict of interest

**1)** The ministry will maintain a written conflict of interest policy that is approved by the board and applicable to board members and officers.

**2)** Conflict of interest statements will be provided to and signed by board members and officers both at the time of the individual's initial affiliation with the ministry and annually thereafter.

### e. Financial and legal accountability

**1)** The ministry will operate in accordance with an annual budget approved by the board.

**2)** Internal financial statements will be prepared monthly and provided to and reviewed by board members at each board meeting.

**3)** Annual financial statements will be audited by an independent certified public accounting firm.

**4)** A copy of the ministry's audited financial statements will be provided to members of the general public upon written request.

**5)** A copy of the ministry's IRS Form 990 will be provided to members of the general public upon written request.

**6)** The ministry will be in compliance with all applicable federal, state, and local laws and regulations.

**7)** The ministry will remain a corporation in good standing in the State of Ohio.

**8)** The ministry will provide employees with a confidential means of reporting suspected financial impropriety or misuses of the ministry's resources.

### f. Program

**1)** The ministry will limit its membership to individuals who profess a faith substantially similar to the ministry's Statements of Beliefs and who live by biblical principles.

**2)** Ministry membership will not be restricted, and members' sharing levels will not be adjusted by the ministry, based on a person's age or health status; all eligible medical bills—including pre-existing conditions—will be shared as available funds permit, even if through different sharing methods.

**3)** The ministry will never allow itself to be advertised in any form as part of, or in conjunction with, insurance products. In addition, it will avoid the use of terms typically associated with insurance.

**4)** No member will be dropped from membership because of their health status.

**5)** Members will retain the flexibility to choose their own healthcare providers.

**6)** The ministry will clearly state amounts that members should contribute to permit sharing of medical expenses at their desired level with (a) no transfer of risk or promise to pay between the members, and (b) no transfer of risk or promise to pay between the ministry and the members.

**7)** The ministry will not compensate any person on a commission basis for enrolling prospective members in the ministry.

**8)** The ministry will publish its Guidelines for sharing (**chministries.org/guidelines**).

**9)** The ministry will publish online its current estimate of sharing time for eligible medical expenses (**chministries.org/resources/bill-sharing-process**).

**10)** The ministry will publish an online mechanism for receiving member feedback and suggestions (**chministries.org/tell-us-what-you-think**).

**11)** The ministry will not utilize independent contractors to provide core membership services, including the sharing of medical expenses.

**12)** The ministry will provide a written disclaimer on, or accompanying, all promotional documents distributed by or on behalf of the ministry, including application and Guidelines materials, that is the same as or substantially similar to the following: *Notice: This program is not insurance and is not offered through an insurance company. Whether anyone chooses to assist you with your medical bills will be totally voluntary, as no other member will be compelled by law to contribute toward your medical bills. As such, this program should never be considered insurance. Whether you receive any payments for medical expenses and whether or not this program continues to operate, you are always personally responsible for the payment of your own medical bills.*

**13)** The ministry will provide its Privacy Policy online for all members and prospective members to review at **chministries.org/policies**.

## B. Legal notices

*The mission of Christian Healthcare Ministries is to glorify God, show Christian love, and experience God's presence as Christians share each other's medical bills.*

 Please visit the CHM website (**chministries.org/resources/legal-notices**) for up-to-date information about health cost sharing in your state of residence.

**Alaska, Alabama, Arkansas, Arizona, Florida, Georgia, Idaho, Illinois, Indiana, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Carolina, South Dakota, Texas, Virginia, Wisconsin, Wyoming:** NOTICE: Under the laws of your state, Christian Healthcare Ministries, in facilitating the sharing of medical expenses, is not an insurance company and does not use insurance agents or pay commissions to insurance agents. Whether anyone chooses to assist you with your medical bills will be totally voluntary because neither this ministry nor any other participant may be compelled by law to contribute toward your medical bills. Participation in the organization or a subscription to any of its documents should never be considered to be insurance. The ministry's guidelines, plan of operation and other documents are not an insurance policy or a promise to pay for the financial or medical needs of a participant by the ministry. It is not offered through an insurance company, it is not subject to the regulatory requirements or consumer protections of your state's insurance laws, and if you join this ministry instead of purchasing health insurance you will be considered uninsured. This program is not guaranteed under your state's Life and Health (or Disability) Insurance Guaranty Association or similar organization. Without health care insurance, there is no guarantee that you, a fellow member, or any other person who is a party to this ministry will be protected in the event of illness or emergency. Regardless of whether you receive any payment for medical expenses or whether Christian Healthcare Ministries terminates, withdraws from faith-based sharing of medical expenses, or continues to operate, you are always personally responsible for the payment of your own medical bills. If your participation in this ministry ends, state law may subject you to a waiting period before you are able to apply for health insurance coverage. You should review this ministry's guidelines carefully to be sure you understand any limitations that may affect your personal medical and financial needs. Complaints concerning Christian Healthcare Ministries may be reported to the office of your state's attorney general."

Resp. Ex. 1

**Maryland:** NOTICE: This publication is not issued by an insurance company nor is it offered through an insurance company. It does not guarantee or promise that your medical bills will be published or assigned to others for payment. No other subscriber will be compelled to contribute toward the cost of your medical bills. Therefore, this publication should never be considered a substitute for an insurance policy. This activity is not regulated by the State Insurance Administration, and your liabilities are not covered by the Life and Health Guaranty Fund. Whether or not you receive any payments for medical expenses and whether or not this entity continues to operate, you are always liable for any unpaid bills.

**Pennsylvania:** NOTICE: This publication is not an insurance company nor is it offered through an insurance company. This publication does not guarantee or promise that your medical bills will be published or assigned to others for payment. Whether anyone chooses to pay your medical bills will be totally voluntary. As such, this publication should never be considered a substitute for insurance. Whether you receive any payments for medical expenses and whether or not this publication continues to operate, you are always liable for any unpaid bills.

**All Others:** This is not an insurance policy. It is a voluntary program that is neither approved, endorsed nor regulated by your state's department of insurance and the program is not guaranteed under your state's Life and Health (or Disability) Insurance Guaranty Association or similar organization.

## C. Tax information

CHM members should note the following information regarding membership and tax filing:

1. CHM is a 501(c)3 tax-exempt organization.
2. ***Members do not have to include Form 8965 as an attachment to the Federal Form 1040.***
3. CHM monthly financial gift amounts that you must give in order to continue as a member in good standing are *not* tax-deductible.
4. Brother's Keeper gift amounts are *not* tax-deductible.
5. Giving above membership amounts—such as Prayer Page contributions—qualifies as a charitable contribution for income tax purposes. Members who made these qualifying donations will receive a notice reporting their charitable contributions.
6. For additional tax information and resources visit **chministries.org/taxes**.
7. **Missouri members only:** Missouri law provides residents with a special state income tax advantage. The line-item deduction amount will be indicated on a statement the CHM office will send to you.
8. Members who are part of a group may still receive Form 1095 from their employers as part of the law's requirement; however, these forms can simply be filed away with your tax records.

# Topical index

### A

accident .........................................................8, 37, 38, 43, 47
active .............................................................................12, 19
adopted ..........................................................................13, 37
adult children ............................................................14, 17, 18
alcohol ...........................................................................35, 39
alternative .......................................................32, 34, 35, 38
auto insurance ...............................................................38, 44

### B

billing ...........................................................................9, 15, 17
Birth control ...................................................................39, 52
Board of Directors .......................................................8, 11, 57
Bring-a-Friend ...............................................................16, 17
Brother's Keeper ..............20, 21, 23, 24, 25, 37, 48, 49, 50, 53, 54, 61

### C

cancellation .....................................................................18, 19
cancer ...........................................................27, 28, 32, 40, 50
cannabinoid ..........................................................................40
cataract ...........................................................................32, 36
chiropractic ................................................................32, 39, 41
chronic .................................................................................28
commitments ........................................................................17
congenital ..........................................13, 25, 28, 36, 39, 49, 53
contact information ...........................................12, 15, 18, 43, 55
cosmetic ...............................................................................40
counseling .......................................................................39, 40
CPT ............................................................................31, 43, 52

### D

death ..............................................................................10, 18
dental ..............................................................................39, 41
developmental ................................................................34, 39
diabetes ..........................................................................28, 32
discount .......................................9, 17, 31, 41, 43, 44, 45, 46

### E

Eligibility Review Board .......................................................57
extreme sports ......................................................................40

### F

financial assistance .......................................................17, 45, 46

### G

genetic testing ...............................................................39, 52
Gold Schedule ...............................................................28, 29
Groups ..........................................................................55, 56

### I

illness................8, 20, 23, 24, 25, 26, 30, 34, 35, 43, 48, 49, 50
immunizations ................................................................39, 41
incident..........7, 11, 17, 19, 20, 23, 24, 30, 33, 36, 38, 42, 43, 44, 47, 51, 52, 55
international ..........................................................................34
itemized bills................................................................9, 41, 43, 55
IVF .......................................................................................52

### L

legal.....................................................13, 14, 40, 57, 59, 60

### M

maintained ...........................................................27, 28, 29, 49
marijuana ..............................................................................40
Maryland .........................................................................15, 17
mastectomies ........................................................................40
maternity ..........................................8, 39, 48, 50, 51, 52, 53
medical equipment.......................................................24, 35, 41
medical transportation ...........................................................34
Medicare ........................................13, 38, 42, 44, 54, 55
Member Portal .....................................15, 16, 18, 43, 44
mental health .......................................................................39
missionaries ..........................................................................16
monthly financial gifts.............................9, 17, 38, 43, 52

### N

nutritionist ...........................................................................40

### O

organ donation ......................................................................40
out-of-pocket........................................................................45, 48

### P

participation level.......................................8, 27, 32, 51, 53
Personal Responsibility ...........................21, 22, 24, 42
physical therapy ....................................................21, 24, 34

58 |    **Section X** | GUIDELINES

**Notes**

portal access code ........................................................................................................16
Prayer Page ...........................................................................16, 28, 29, 30, 43, 49, 61
pre-existing ...........................................13, 14, 19, 27, 28, 29, 30, 36, 38, 43, 49
prescriptions ..........................................................................................21, 41, 55
prolotherapy .....................................................................................................35
prosthetics .........................................................................................................40
Provider Relations ...........................................................................................56

**Q**

Qualifying Amount.............................................................21, 22, 24, 36, 42, 54

**R**

reimbursement .....................................................................17, 18, 38, 41, 44, 46, 47

**S**

safety equipment............................................................................................37, 40
SeniorShare...........................................................................................13, 21, 24, 54
Sharing Request.............................................................................................9, 43, 44
sharing time.......................................................................................................44, 59
skilled nursing..................................................................................................35, 40
sleep apnea.............................................................................................................35
Statement of Beliefs.......................................................................................14, 58, 59
surgery..........................................................................................8, 35, 36, 39, 40
switching levels................................................................................................50

**T**

tax filing..................................................................................................................61
telemedicine...........................................................................................................56
therapy ..........................................................................................21, 24, 34, 35, 39, 40
TMJ .......................................................................................................................39
travel.....................................................................................................................55

**U**

unit ......................................................................................................13, 14, 25, 48, 53

**V**

vision .........................................................................................................39, 41, 58

**W**

weight reduction .................................................................................................40

Resp. Ex. 1

Resp. Ex. 1



## 127 Hazelwood Avenue
## Barberton, OH 44203

1-800-791-6225

Hours: Mon-Fri 9ᴀᴍ-5ᴘᴍ ᴇsᴛ









📘 fb.com/iheartchm

📷 instagram.com/iheartchm

🐦 twitter.com/iheartchm

▶️ youtube.com/CHMNews

in linkedin.com/company/iheartchm

Resp. Ex. 1  © **2023 Christian Healthcare Ministries**

# EX 1.35

Select Page ☰





Resp. Ex. 1

# FREQUENTLY ASKED QUESTIONS

## HOW DO HEALTH CARE SHARING MINISTRIES WORK? 

## HOW IS HEALTH CARE SHARING MINISTRIES DIFFERENT THAN INSURANCE? 

## HOW DO I IDENTIFY A TRUSTED HEALTH CARE SHARING MINISTRY? 

 

## DO HEALTH CARE SHARING MINISTRIES "COVER" PRE-EXISTING CONDITIONS? 

## DO HEALTH CARE SHARING MINISTRIES "COVER" PRESCRIPTION MEDICATION? 

## CAN I TRUST HEALTH CARE SHARING MINISTRIES WITH MY MEDICAL BILLS?

Since the 1980's Health Care Sharing Ministries have shared 100% of eligible medical expenses for their members. The community of each Health Care Sharing Ministry faithfully comes together to share the eligible costs as described by each Ministry's sharing guidelines. Health Care Sharing Ministries facilitate faith-based communities in deciding which health care costs they share—not the government, not corporate employers, and not insurance company executives. Each ministry is transparent about what services are shared among members, and this information is made available to the public, including prospective members before enrollment.

## WHY DO SO MANY AMERICANS CHOOSE A

Case No. 1:24-cv-01386-GPG-STV   Document 76-1   filed 06/27/25   USDC Colorado
pg 506 of 547

HEALTH CARE SHARING MINISTRY?

IS ANYONE ABLE TO JOIN? 

WHO IS IN THE ALLIANCE FOR HEALTH CARE SHARING MINISTRIES? 

To interview a representative from The Alliance of Health Care Sharing Ministries, contact Media@HamiltonStrategies.com, Beth Harrison, 610.584.1096, ext. 105, or Deborah Hamilton, ext. 102.





Resp. Ex. 1

Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 507 of 547



EX 1.36





## ABOUT    🎧 PODCAST    🎁 FREE BOOK

🖥 PROGRAMS    ⛪ CHURCHES    📖 BLOG

# Our Honest Medi-Share Review after 14 years

💌 EMAIL

written by **Bob Lotich, CEPF®** | **Saving Money**





*My Medi-Share review below was originally written in 2009 when I was investigating them but has been continually updated (now for 2024) as I've been using them for over 10 years. Hope it helps!*

If you are self-employed like me or are just looking for a Christian health insurance alternative, you may just want to consider Medi-Share.

It is the alternative to health insurance that I have been using for many years, and in the following review, I want to share the good that we have liked about Medishare as well as things

Hi there! We are Bob & Linda Lotich. Jesus followers, authors, podcasters, and undying fans of Michael Scott.

This site contains the lessons we learned on our journey from being stingy, debt-ridden fools, to being able to reach our biggest financial goal of giving $1 million by age 40, having zero debt & a paid off house by age 31, and peace with money in the process.

Now we share our best lessons with people like you, groups, and churches with our Award-winning book *Simple Money, Rich Life* and our 6-week video course *True Financial Freedom*.



🎯 ABOUT          🎧 PODCAST          🎤 FREE BOOK

One of the things that caught my attention when I was shopping for a Christian health-sharing ministry as an alternative to health insurance was this:

📓 PROGRAMS        ⛪ CHURCHES          📓 BLOG

💌 EMAIL

**They say the typical family saves $500/month after switching.**

We will get to exactly what we pay and whether or not that proved to be true for us in a bit. But first, let's start from the beginning…

## What is Medi-Share?

### Medi-Share = Insurance?

People are always asking me if it is Christian Medical Insurance.

Simply put, no Medi-Share isn't insurance, but most people wouldn't really be able to tell a difference.

While it essentially serves the same purpose as health

**GRAB OUR BOOK!**



**Table of Contents**            

■ What is Medi-Share?
■ How does Medi-Share work?
■ Our Updated Medi-Share Review
■ Is Medi-Share the Solution to Your Health Insurance Needs?
■ So, what is a Christian Health Sharing Ministry?
■ What happens when you go the doctor?
■ Medi-Share Cost
■ What Are the Qualifications for Medi-Share?
■ Does Medi-Share Cover Pregnancy and Adoptions?

**LEGAL DISCLAIMER**

The articles on this site should not be taken as financial advice. Please contact a financial advisor (or coach) for specific advice regarding your situation. Any references to interest rates, giveaways, deals, products, and websites are subject to change without notice. We try our best to keep the information current, but things are always changing

2/13/25, 10:05 PM

Our Honest Medi-Share Review after 14 years



ABOUT       PODCAST       FREE BOOK

They call it, "Christian Healthcare Sharing."

It offers essentially all of the benefits of health insurance but with lower premiums.

- What we like about it
- Medi-share vs other health-sharing ministries
- Things to be aware of
- How they handled our $20,000 medical bill 📋 **EMAIL**
- Final Thoughts on Medi-Share
- $100 Medi-Share Signup Bonus

PROGRAMS        CHURCHES        BLOG

pay the bills by using affiliate relationships with Amazon, Google, eBay and others but our opinions are NEVER for sale. Find out more here.

**According to their website:**

> "Medi-Share is not "Christian insurance." Rather, it is a health care sharing program facilitated by Christian Care Ministry (CCM) through which a community of believers voluntarily come together to share the cost of one another"s medical bills.
>
> Members choose to share with each other, governed by member-voted guidelines. Although there is no guarantee of sharing, Medi-Share members have been faithfully sharing each other"s medical bills for more than 20 years, trusting the Lord to provide in their time of need through the voluntary gifts of other believers. Since 1993, more than $1.5 billion in healthcare costs have been saved through sharing or discounting."

**RELATED POSTS**

MediShare Cost Calculator (this is how to get it cheapest)

MediShare vs Samaritan Ministries

WARNING: healthcare sharing ministry users, you need to see this…

Medishare $100 Sign Up Bonus



📍 ABOUT          🎧 PODCAST          🎉 FREE BOOK

💻 PROGRAMS          ⛪ CHURCHES          🗒 BLOG



💌 EMAIL

Each month all the members pay their "share" (a fixed amount depending on the plan you select) into an account with their name on it to America's Christian Credit Union.

The funds in all of those accounts are what pay the member's medical bills each month.

> *"Each plan essentially tallies medical claims each month, then divides by the number of members, officials say. After subtracting for overhead and administrative expenses, the rest goes to pay claims."*

The Medi-Share program is flexible with multiple choices of program levels, benefits, and of course out-of-pocket expense. You are given the option of choosing your own

Resp. Ex. 1

Our Honest Medi-Share Review after 14 years



According to their website:

> "Members open their own Sharing Account with America's Christian Credit Union. Each member household voluntarily contributes their Monthly Share into their Sharing Account.
>
> For each member with eligible medical bills to be shared, Christian Care Ministry identifies one or more other members with sufficient funds in their accounts. CCM electronically transfers funds from each sharing member's account into the account of the member with whom they are sharing. CCM processes payment from the member's account."

From my experience using them, this sounds more confusing than it actually is.

They do all this behind the scenes, so as a member, I am not involved in any of that process.

**GET EXACT MEDI-SHARE PRICING DETAILS HERE**



quick video answering a lot of common questions that we get:

## Our Medi-Share video review and what we pay each month



# Is Medi-Share the Solution to Your Health Insurance Needs?

Unless you have a good employer-sponsored health insurance plan, or you're on Medicare, you're probably concerned about your health insurance.

A major reason is the cost of premiums. They can easily be over $1,000 per month for a family, or even for a couple. And that's even if you have a high deductible.

My wife, Linda, and I feel like we found a solution, or at least one that works for us. It's this Christian health-sharing ministry called Medi-Share. We've had it for our family since 2009, and have used it ever since.



ABOUT  🎧 PODCAST  📚 FREE BOOK

📘 PROGRAMS  ⛪ CHURCHES  🔖 BLOG

📧 EMAIL

But it fills the same role, and in our experience, it does it at only a fraction of the cost. And just as important, it's a service that's consistent with our faith values. We get a lot of questions about it, and that's what I'd like to discuss in our Medi-Share review here.

## So, what is a Christian Health Sharing Ministry?

As a Christian health sharing ministry, Medi-Share is based on the faith community values and practices of the early Church. It was given within the community that each member would share one another's burdens. In that way, members of Medi-Share share one another's medical burdens.

They do that by contributing to the program through monthly contributions, called "shares". The contributions go into a pool, where it's available to pay for the medical costs of members in need. In addition to payment of a member's medical costs, the community also support each other in prayer, and sometimes with personal support.

Medi-Share is a nonprofit organization, and conducts the program along biblical principles.

2/13/25, 10:05 PM                                   Our Honest Medi-Share Review after 14 years

They actually do have a good network of participating doctors, and if you use one the process is smooth, since the doctor's offices know how it works.

However, we generally use doctors from outside the network. That can add an extra step because a lot of doctors don't know how Medi-Share works. But we prefer going to doctors that we feel comfortable with, so we'll make the extra effort.

But even out-of-network, we simply explain Medi-Share to the doctor, they do a little bit of digging, and then bill Medi-Share. Medi-Share will then negotiate a discount on the services, and we'll pay the difference out of pocket.

For us, out of pocket is common, because we use the highest deductible plan Medi-Share offers. As is the case with traditional health insurance, we do this to keep the monthly contributions as low as possible.

This isn't a major problem in our family, because we mostly go for routine checkups. There's only been one or two times where we had to go back for something a little bit more complicated. Just like traditional health insurance, the high deductible works well when you don't go to the doctor that often.

Like mentioned above, the simplest option is to stay in-network with your doctors, but if you can't, it just requires a little more effort on your part.

**Here is how they explain it:**

"Resp. Ex. 1



(PHCS) PPO network, which offers 700,000 providers nationwide! (Note: Members may select any provider of their choosing, including out-of-network providers, but in doing so may not benefit from discounting of medical bills as with an in-network provider.) Show your Medi-Share ID Card to the provider, and pay your provider fee–$35 initial charge for doctor visits, $135 for an Emergency Room visit.

The doctor's office or hospital sends your bills to Medi-Share directly. PHCS negotiates discounts, an average adjustment of 30-35% by staying in-network. Your Provider Fee of $35 or $135 is also deducted from the total bill. Medi-Share processes the bills for sharing and notifies you of any amount you must pay directly in order to meet your Annual Household Portion.

For any amounts to be shared, Medi-Share transfers sufficient funds from other members' accounts into your account. Medi-Share notifies the sharing members of the recipient of their monthly share amount. Share amounts are used to pay providers. Once the dollars are transferred, Medi-Share processes payment to the doctor or hospital from the member's share account."



 

# Medi-Share Cost

  

## How much does Medi-Share cost anyway?

This is obviously a typical question, and the answer is for almost everyone Medi-Share costs a lot less than traditional health insurance. They say that the typical family saves about $500/month compared to health insurance.

When we switched from health insurance to Medi-Share, our monthly contributions fell to only **about 50% of our previous health insurance premiums.** And that's with our family of four.

Now I said we have taken the highest annual deductible to minimize the monthly contribution. Our deductible is $10,000 per year, which means Medi-Share doesn't begin paying our costs until we cross that threshold.

But as a result, our monthly contribution is about $230. It's based on the age of the oldest member of the household, and that's the contribution we're paying with me at 37 years old.

The screenshot table below will give you a basic idea what the monthly contributions are with varying deductibles (referred to as the "annual household portion"). It's based on a family of four, in which the oldest member is 40.

Notice that there are seven deductibles, ranging from $500-$10,000.





| | | |
|---|---|---|
| $1,250 | $790.00 | $663.00 |
| $2,500 | $628.00 | $532.00 |
| $3,750 | $508.00 | $430.00 |
| $5,000 | $422.00 | $347.00 |
| $7,500 | $329.00 | $278.00 |
| $10,000 | $240.00 | $199.00 |

On the far right side of the table, you'll see a heading, *Healthy Monthly Share.*

Medi-Share will give you a contribution discount of up to 20% if you meet certain health standards. These have to do with very specific metrics for blood pressure, abdominal circumference and body mass index. So, if you're super healthy, your monthly contribution will still be lower.

**GET EXACT MEDI-SHARE PRICING DETAILS**

## What Are the Qualifications for Medi-Share?

One of the most fundamental requirements of Medi-Share is that you must adhere to a biblical lifestyle to join. For instance, they won't cover abortions. Nor will you be covered if you're injured in a drunk driving accident.

# Does Medi-Share Cover Pregnancy and Adoptions?

We get this question a lot, and it's a good one. Simply put, your pregnancy related expenses will be covered as long as you're making your monthly contributions.

## How long do you have to wait to get pregnant?

From the horse's mouth:

> "Pregnant Members with an Annual Household Portion (think annual deductible) of $1,250 or higher who have faithfully shared from the month of conception through the month of delivery are eligible for maternity sharing."

We haven't been through the pregnancy experience, but we have been through two adoptions with them. They do cover certain expenses there as well. Adoptions can be very expensive, and we got about $4,000 back on our first one four years ago. On our second adoption we only got back $1,500, but by then we had opted for the higher deductible.



ABOUT     PODCAST     FREE BOOK

PROGRAMS     CHURCHES     BLOG

EMAIL

times to get customer service would run 40 minutes to an hour. They've improved on this quite a bit since. But what we have found is that they're consistently helpful anytime we speak with them.

We also typically find that they pray with us at the end of the conversation. As Christians, we find this comforting.

## Why we opt for the high-deductible plan

This is really a personal thing. As I said earlier, we set the deductible high to keep the monthly contributions low. And since we're a pretty healthy family, it's been working well so far.

A lot of people are doing that now with traditional health insurance as well. We work around the high deductible by budgeting a certain amount each month for out-of-pocket medical expenses.

It's kind of like an informal health emergency fund, ready if we need it. You pretty much have to do that if you have a high deductible with any program. In a way, it's a bit like self-insuring, at least for the first $10,000.

But it's comforting to know that Medi-Share will pay 100% of medical costs above that annual deductible.



ABOUT          PODCAST          FREE BOOK

PROGRAMS          CHURCHES          BLOG

EMAIL

## What we like about it

- With typical insurance, you pay a monthly premium, but have no idea where the money is going. With Medi-Share you are informed of who you are sharing with each month – you can then pray and send letters of support for those members.

- For most members, there is a substantial cost savings over health insurance. Most families can save $2,000 a year.

- They help cover adoption expenses (they sent us a check for $3,000 after our adoption!)

- They have been operating for 25 years.

- The members vote and make the rules. So each year the members vote on what will and won't be covered.

- There is no limit on the amount of bills that can be shared by members.

## Medi-share vs other health-sharing ministries

When we were shopping around for a health-sharing service, there were a few keys that we were looking for that ultimately led us to Medi-Share:

### 1. They had to have been around a long time and had a long history of paying bills.

Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 523 of 547
2/13/25, 10:05 PM                    Our Honest Medi-Share Review after 14 years

  

**seedtime**
FINANCIAL EDUCATION  FOR ETERNAL IMPACT

ABOUT        PODCAST        FREE BOOK

PROGRAMS        CHURCHES        BLOG

EMAIL

## 2. I didn't want to be mailing checks to other members.

In theory, I liked the idea of members physically mailing checks to each other to cover bills, in reality I was much more interested in something that functioned like the health insurance that I was used to. With Medi-share we just give our "insurance card" to the doctor or occasionally send a bill to Medi-share and they take care of the rest.  No mailing checks to members every other day or dealing with checks not showing up when I need them.  *(If you would prefer that, check out this comparison of Medishare vs Samaritan ministries)*

## 3. It had to be simple.

Medi-share has done a surprisingly good job of keeping things simple. In the health insurance world (and sharing ministries) there are often so many complexities with plans, deductibles, copays, etc. and they have made the whole process relatively simple.

## Other factors that set Medi-share apart from other Christian health-sharing ministries:

- Only one AHP (aka deductible) per family

- No caps, no annual or lifetime limits

- No requalification for membership

- 98% customer satisfaction

- They use a Nationwide PPO Network

Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 524 of 547
2/13/25, 10:05 PM                        Our Honest Medi-Share Review after 14 years



🍗 ABOUT        🎧 PODCAST        🎉 FREE BOOK

📘 PROGRAMS        ⛪ CHURCHES        📘 BLOG

## Things to be aware of

💌 EMAIL

If you are researching them you are probably wondering what are the disadvantages of Medi-Share? Well, here are some things that I see that you should be aware of…

- You have to be accepted into the program not everyone is accepted.  And you must agree to their Statement of Faith.
- You must adhere to living a Biblical lifestyle in order to maintain your membership. Not doing so can get you expelled from the program and will likely nullify any claims you may have as well.
- "Medi-Share doesn't share in all costs. All members vote on a yearly basis what costs to share. Routine physicals and health maintenance costs are currently not eligible for sharing."
- Membership is not denied due to pre-existing conditions; however, there are guidelines in place concerning pre-ex-that limit sharing of pre-existing conditions.

## How they handled our $20,000 medical bill



🏮 ABOUT        🎧 PODCAST        🎉 FREE BOOK

📘 PROGRAMS        ⛪ CHURCHES        📋 BLOG

💌 EMAIL

Long story short, Linda had a 6-hr visit to the ER that ended up costing us over $20k in medical bills. Here's how they did:

## Final Thoughts on Medi-Share

Summing up our 14 years of experience using Medishare, Linda and I are both very comfortable with Medi-Share and gladly recommend them to friends and family.

More than anything else, it's mostly a matter of getting comfortable with something different. One of our biggest concerns when we were considering it was that we would be facing a huge medical bill and that the members would just decide not to "share" with us to cover it.

After talking to the Medi-Share representative, it sounds like that isn't much of a concern if you follow the rules. She explained that in the last 24 years every *eligible* need has been



ABOUT    PODCAST    FREE BOOK

PROGRAMS    CHURCHES    BLOG

EMAIL

For example, she told me a story of a member who was in a bad car accident requiring lots of medical work, but since the person was intoxicated when they got into the accident, the expense was not covered by Medi-Share. On one hand, I think you should give the guy a break, but at the same time, it is the strict rules and policies that make the program work.

The whole point is that by living a Biblical lifestyle you will be healthier, therefore have fewer medical expenses. From what I understand, they often use leftover funds to even help cover ineligible expenses like these as a gesture of grace.

It seems like the program is perfect for healthy Christians who are committed to the Biblical lifestyle. If you already have many health conditions or are prone to lapses into substance abuse, it may not be worth it. If you are interested in learning more just click the link below to get pricing info from them, and I would suggest calling them to ask any other questions that you have.

**GET MEDI-SHARE PRICING DETAILS**

## $100 Medi-Share Signup Bonus

As a member of Medi-Share they give us a bonus for referring new members, so if you decide to sign up and let them know that Bob Lotich referred you I am happy to share that bonus with you!

2/13/25, 10:05 PM                              Our Honest Medi-Share Review after 14 years



t card as a thank

you! Just email
me here if you
do.



PURCHA...          🗒 BLOG

I would love to
hear other Medi-Share reviews from other members so if you
have had experience with Medi-Share, please share about it in
the comments!

**Medi-Share**

Medishare is a Christian health
insurance alternative that generally
is less expensive than traditional
health insurance. This is our Medi-
share review after using it for over
10 years.



**Product SKU:** #

**Product Brand:** Medi-Share

**Product Price:** $176

**Price Valid Until:** 2025-01-01

**Product In-Stock:** InStock

**Editor's Rating:**

**4.5** ★★★★½


Resp. Ex. 1

Our Honest MediShare Review after 14 years





🔥 ABOUT        🎧 PODCAST        🎉 FREE BOOK

📘 PROGRAMS        ⛪ CHURCHES        📰 BLOG

MediShare vs Samaritan Ministries

WARNING: healthcare sharing ministry users, you need to see this…

Medishare $100 Sign Up Bonus

💌 EMAIL

---



## About Bob Lotich, CEPF®

Bob Lotich, CEPF® is a Certified Educator in Personal Finance and has over 15+ years experience writing about Biblical personal finance. He is the award-winning author of *Simple Money, Rich Life* and has been named a top 20 social influencer in personal finance. Check out his on-demand Christian financial class for couples, small groups and churches called *True Financial Freedom*.

---

Resp. Ex. 1

2/13/25, 10:05 PM                                    Our Honest Medi-Share Review after 14 years



♀ ABOUT          🎧 PODCAST          🐟 FREE BOOK



PROGRAMS          CHURCHES          ▢ BLOG

💌 EMAIL

# The best combination of personal finance and the Christian faith that I've read

**– James T. (SMRL reviewer)**

In this biblically sound and grace-filled money book, you'll discover the NEW rules of money that will transform your financial life. Say goodbye to outdated advice and hello to a simple, automated system that helps you achieve better results with less time and effort.

If you're ready to achieve true financial freedom the right way and for the right reasons, this is the guide you've been waiting for.

<div align="center">

**Get a FREE copy now**

</div>

Resp. Ex. 1



# EX 1.37

2/13/25, 10:07 PM                                   SeedTime Money: Financial Freedom for Eternal Impact



🔴 **ABOUT**        🎧 **PODCAST**        🌱 **FREE BOOK**        🔷 **PROGRAMS**



⛪ **CHURCHES**        📗 **BLOG**        📧 **EMAIL**

# We help Christians live financially free and impact eternity

Learn to simplify, automate, multiply & get full control of the money you've been entrusted with. So you can pay off debt, stop fighting about it, & get on with your God-given purpose.

**Take the first step by getting our Simple Money newsletter.**

| First Name | Best Email |

**JOIN OVER 100K WHO'VE SIGNED UP**

## SeedTime has been featured in:













2/13/25, 10:07 PM    SeedTime Money: Financial Freedom for Eternal Impact



🌷 ABOUT      🎧 PODCAST      🎉 FREE BOOK      📘 PROGRAMS



⛪ CHURCHES      📝 BLOG      💌 EMAIL

## You can't serve God *and* money, but you can serve God *with* money

As Christians, we have a different set of money rules. Yet most of us are unknowingly playing by the world's rules and wondering why it isn't working out.

We help you tap into the unfair advantage we (as Christians) have with our financial lives.

We help you quickly and easily get your money sorted out. Because you need to get on with your life and the work God has called you to without money getting in the way. **Because we believe that you cannot serve God *and* money, but you can serve God *with* money.**

If this resonates with you, we recommend grabbing our book, joining over 100k friends who get our Simple Money newsletter, and subscribing to our SeedTime Money podcast.

Resp. Ex. 1

seedtime
FINANCIAL EDUCATION FOR ETERNAL IMPACT

🌹 ABOUT        🎧 PODCAST        🎁 FREE BOOK        💻 PROGRAMS

🌲 CHURCHES        📝 BLOG        💌 EMAIL



# How we can help

## Spend *less* time thinking about money and get far better results.

We focus on teaching our set-it-and-forget-it methods of managing money because we always prioritize simplicity.  And in the 21st century, it is easier than ever to automate your way to financial success.

## Experience *true* financial freedom

True financial freedom is less about yachts and private islands and more about being free to fulfill your God-given purpose. **Money is simply a tool God provides to help us do the task He has given us.** Sure, when you can afford it, get your private island and send us an invite 😊 but the key is always in seeking Him first, never the stuff.

Resp. Ex. 1

Seedtime Money: Financial Freedom for Eternal Impact



🔴 ABOUT        🎧 PODCAST        📗 FREE BOOK        💻 PROGRAMS

⛪ CHURCHES                          📄 BLOG      💌 EMAIL

## Tear down the financial lies holding you back

Whether you make 30k a year or 3 million a year, you likely have financial beliefs that you have inherited that are holding you back from your financial potential.  We help you break them once and for all and replace them with the empowering truth that will propel you forward.

## Become truly free... because the world needs you to be

Guess what?  This isn't just about you.  When you are free to follow your purpose, the by-product is that the world is blessed. And if that wasn't enough, when you are in a better financial position, you have more to give and impact the world around you. And that is where we are going my friend.

# Our Story

Resp. Ex. 1



🍎 **ABOUT**     🎧 **PODCAST**     🎉 **FREE BOOK**     📘 **PROGRAMS**



⛪ CHURCHES



📄 BLOG     💌 EMAIL

*Bob Lotich, Certified Educator in Personal Finance, CEPF®*

*Linda Lotich, Certified Spender of All our Money*

In 2001 I (Bob) was living off a nearly maxxed out credit card with only $7 in my bank account. I then found myself broken down in the middle of the road and stranded 1,000 miles from home.

I had no one to call, no money to solve the problem, and no clue how I had gotten into the mess I was in. I had reached my financial breaking point.

About the same time I (Linda) was living at home with my parents with a full-time job, and yet I was spending 150% of my income and racking up debt at a record pace.  Debt collectors began calling, and I felt scared, alone, and clueless about what to do.

And just a few years later, we got married and combined our financial messes. Look, weren't we cute?



ABOUT    🎧 PODCAST    🎁 FREE BOOK    💻 PROGRAMS

CHURCHES    BLOG    EMAIL



## We discovered a "formula" of sorts...

Out of our financial messes, as we began seeking wisdom, God began revealing a "formula" to true financial freedom. And it was counter to everything we *thought* we understood about money.

Over the years that followed as we implemented the strategies and methods we teach, we began moving forward financially.  Finally broke the paycheck-to-paycheck cycle and actually had some money leftover at the end of the month.  We began paying off credit cards, car loans, and ended up even paying off our mortgage.

Resp. Ex. 1

2/13/25, 10:07 PM                          Seedtime Money: Financial Freedom for Eternal Impact



*So excited about our mortgage payoff that 3/4 of us can't figure out where to look.*

All in all, over $400,000 of debt paid off.  And to top it all off, we were able to reach a goal we had of giving $1 million by age 40.

**To God be the glory.**

We aren't trust-fund babies.  We are just two middle-class kids from Missouri who were complete financial messes who took the steps we teach to see a financial turnaround of epic proportions.

But this isn't about us…


## This is about you and the shortcuts.

Resp. Ex. 1

Case No. 1:24-cv-01386-GPG-STV    Document 76-1    filed 06/27/25    USDC Colorado
pg 539 of 547



🍎 ABOUT     🎧 PODCAST     🎉 FREE BOOK     💻 PROGRAMS
⛪ CHURCHES     📖 BLOG     📧 EMAIL



*And that is exactly why we are here.*

# 4 ways we can help you achieve *true* financial freedom



THE

# SIMPLE MONEY

NEWSLETTER

## 1. Join over 100,000 others and get our FREE newsletter.

You'll get our best tips to better automate, save, earn passively, and invest smarter without any guilt or shame. And a good dose of encouragement to keep you going on your journey.

**JOIN THE SEEDTIME FAMILY**

Resp. Ex. 1



🔴 **ABOUT**     🎧 **PODCAST**     📚 **FREE BOOK**     🖥️ **PROGRAMS**

⛪ **CHURCHES**     📝 **BLOG**     💌 **EMAIL**



## 2. Get our award-winning book ==for FREE==

Unlike any other financial book you've read, this is the operating manual we followed to pay off $400k of debt and give $1 million by age 40.

Join us as we share our best tactics and strategies, inspirational stories, Biblical wisdom, and some laughs. All without a hint of guilt or shame.

And for a limited time, we'd love to send you a copy for FREE if you can just help us cover shipping and handling. 👇

### GET YOUR FREE COPY

2/13/25, 10:07 PM
Seedtime Money: Financial Freedom for Eternal Impact



🔴 ABOUT     🎧 PODCAST     🎉 FREE BOOK     📘 PROGRAMS

⛪ CHURCHES     📝 BLOG     💌 EMAIL



### 3. Get the Seed Time Money podcast

Join us as we share real-life case studies, encouragement, and our best secrets and tips to unlock your earning, saving, and giving potential. Listen anywhere you listen to podcasts or on YouTube.

**LISTEN TO THE PODCAST**

2/13/25, 10:07 PM                    SeedTime Money | Financial Freedom for Eternal Impact

# seedtime
#### FINANCIAL EDUCATION FOR ETERNAL IMPACT

📍 ABOUT          🎧 PODCAST          📕 FREE BOOK          🔲 PROGRAMS

⛪ CHURCHES          📝 BLOG          💌 EMAIL



## 4. Join over 5,000 others who've taken our courses.

From our best-selling budgeting alternative, to our passive investing course, to our on-demand class for churches and small groups our courses are quick and are the fastest way to get the biggest results.

### GET RESULTS FASTER

# By the numbers:

**54,385,537**

Visitors we've served with this website since 2007.

**105,207**

Amazing Youtube subscribers

**11,635**

Students who have enrolled in one of our courses.

**42%**

of our income is given away to various charities.

Resp. Ex. 1

https://seedtime.com



ABOUT    PODCAST    FREE BOOK    PROGRAMS



## Follow us on Instagram

For daily inspiration and simple strategies to win with money, make sure to follow us. We are

Seedtime Money: Financial Freedom for Eternal Impact

 

ABOUT    PODCAST    FREE BOOK    PROGRAMS



CHURCHES    BLOG    EMAIL

FOLLOW US ON INSTAGRAM



    

    

BBB Rating: A+
As of 2/3/2025
Click for Profile

HOME    ABOUT    BELIEFS    BLOG    COURSES    SHOP    FOR CHURCHES
PRESS    AFFILIATES    LOGIN

PRIVACY POLICY | TERMS | REVIEWS | EARNINGS DISCLAIMER | CONTACT | 636-344-0438

625 BAKERS BRIDGE AVE SUITE 105-134 FRANKLIN, TN 37067

©2007-2023 · SEEDTIME (FORMERLY CHRISTIANPF)

Resp. Ex. 1

# EX 1.38

The Wayback Machine - https://web.archive.org/web/20040621111459/http://www.ohio.com:80/mld/beaconjournal/news/local/8761925.htm



| Search: | | |
|---|---|---|
| Articles-last 7 days | for | Go |

News | Sports | Business | Entertainment | Living | City Guide | Classifieds

Register or Log In.
Member Benefits

Back to Home > Beacon Journal >

Monday, Jun 21, 2004

The Beacon Journal

**Local & State**

email this     print this

The Beacon Journal

Local & State
• Medina
• Ohio
• Portage
• Stark
• Summit
• Wayne
Sports
• Baseball
• Basketball
• Colleges
• Football
• High School
Business
Arts & Living
• Health
• Food
• Enjoy
• Your Home
• Religion
• Premier
• Travel
Entertainment
• Movies
• Music
• Television
• Theater
US & World
Editorial
• Voice of the People
Columnists
Obituaries
Corrections

Weather
Akron        +76 +63
Cleveland    +77 +62
Cincinnati   +81 +66

Local Events
Yellow Pages
Discussion Boards
Maps & Directions

Posted on Wed, May. 26, 2004

## Minister, family liable in suit

Jury assigns more than $14 million in damages for misuse of charity donations

By Phil Trexler
Beacon Journal staff writer

To jurors, the Rev. Bruce Hawthorn and his family helped millions while raising millions through their charity work.

Unfortunately, their foreman said Tuesday, somewhere along the way greed took over.

In ending four days of deliberations, jurors hit Hawthorn and his family with more than $14 million in damages, siding with attorneys who argued that Hawthorn and his family misused millions of charity dollars for their personal benefit.

Whether the Barberton Rescue Mission can recover any of the damages awarded remains to be seen. Hawthorn and his family claim they are now broke, despite reporting millions in salaries in the 1990s.

Hawthorn, founder of the Barberton Rescue Mission and the Christian Brotherhood Newsletter, and his nephew, Daniel Beers, took the biggest financial hits.

Each was found liable for civil and solicitation fraud, breach of fiduciary duty, conversion and unjust enrichment.

Hawthorn was ordered to pay the mission and newsletter $2.9 million in compensatory and punitive damages. Beers was found liable for $240,000 in compensatory damages. Jurors levied an additional $3 million in punitive damages against Beers.

Beers' former company, Benevolent Health Systems, a for-profit company created by the newsletter, was assessed $6.3 million by jurors. Another for-profit company, Hawthorn and Sons, was assessed $1.6 million in damages.

Both companies are no longer in existence.

Hawthorn's sons, Tom and Ellsworth, were ordered to repay the mission $19,850 and $6,967 respectively. Ronald Beers, the father of Daniel Beers and brother-in-law to Hawthorn, was found liable for $121,800 in compensatory and punitive damages.

Jurors ruled in favor of Hawthorn's wife, Marlene, and Daniel Beers' wife, Theodora, finding the women not liable for any damages.

### Mission's history

Hawthorn, 63, founded the mission in the 1960s, offering housing and food to Akron's homeless alcoholics.

In 1981 he founded the newsletter,which served as an alternative health program. Subscribers would pay a monthly fee and their money would be pooled and used to pay medical bills of fellow members.

More than 33,000 subscribers were sending in $4 million a month by the mid-1990s.

Benevolent Health Systems (BHS) was founded at about the same time and Beers served as president. The company's purpose was to negotiate medical bills on behalf of subscribers. The newsletter was its only client and by 1997, profits of BHS had reached $2.4 million.

Hawthorn and Sons, another for-profit, was established by the family to handle postage and other services for the newsletter.

While Daniel Beers saw his income rise from $68,000 a year in the early '90s to $1.3 million in 1998, unpaid medical bills rose to $34 million. The deficit prompted investigations by federal, state and local authorities.

Although criminal charges were never brought, Hawthorn and his family were removed from the charities in 2002. The for-profit companies folded and the mission and newsletter were placed in the hands of a court-appointed receiver.

The lawsuit was filed by the mission and the Ohio attorney general in an attempt to recover donations that attorneys claim the family used to purchase dozens of pieces of property, vehicles, trips and to pay excessive salaries to Hawthorn and his family.

``We all believed that at some level when the mission started out, (Hawthorn) worked his butt off for a bunch of people who had less and he helped them every step of the way,'' said jury foreman Joey Lechtner of Twinsburg.

``Ultimately, the difficult part of our job was making judgments against people we know to be good people. It's just somewhere along the way, money came in and tainted everyone.

``And at some point, greed did unfortunately take over.''

**Reaction to verdict**

Hawthorn was not in the courtroom when Summit County Common Pleas Judge Patricia A. Cosgrove read the 63-page verdict form. He is said to be in failing health.

Thomas Connors, a Canton attorney who alone defended the family against a five-attorney team, wouldn't comment on the verdict.

``You got to be kidding me... I don't have a good reaction, obviously. I don't feel like talking,'' he said.

Daniel Beers continued to defend his actions and said the verdicts would be appealed. He said BHS served the newsletter well by reducing subscriber medical bills.

``It's unfortunate the jury felt the way they did,'' he said. ``The bottom line is these are health-care dollars, not donations by little old ladies to feed the poor.

``These are health-care dollars and we got paid on the savings. The jury just didn't see it in our favor today. It doesn't mean what we did was wrong.''

Beers also said the jury's verdict was ``not a collectible judgment.''

Assistant Ohio Attorney General Sherry Phillips said the office would allow the mission to try and collect the money itself.

R. Scott Haley, the Akron attorney appointed as receiver, said he hopes the verdict brings closure to the mission and newsletter, both of which have survived the scandal, but with steep drops in funding.

``I think this was a necessary outcome, regardless of collectibility at least to ensure accountability for those people in positions of trust,'' he said.

Phil Trexler can be reached at 330-996-3717 or ptrexler@thebeaconjournal.com

 email this    print this



News | Sports | Business | Entertainment | Living | City Guide | Classifieds
About Ohio.com | About the Real Cities Network | Terms of Use & Privacy Statement | About Knight Ridder |
Copyright

Resp. Ex. 1